UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JOSEPH WOLF, CARMEN WOLF,                          :
ON BEHALF OF THEMSELVES AND THOSE        :    Case No. 7:23-cv-00558-PMH
SIMILARLY SITUATED,                                         :
                                                                               :    **DEFENDANT DOLGEN**
                                     Plaintiffs,                      :    **NEW YORK, LLC'S**
                  v.                                                       :    **LOCAL CIVIL RULE 56.1**
                                                                               :    **STATEMENT AND PLAINTIFFS'**
DOLGEN NEW YORK, LLC D/B/A DOLGEN,     :    **RESPONSES**
                                                                               :
                                     Defendant.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Defendant Dolgen New York, LLC ("Dollar General") submits the following statement of

undisputed facts in support of its summary judgment motion and Plaintiffs Joseph and Carmen

Wolf submit the following responses.[1]

**I.    PLAINTIFFS' CLAIMS**

1.      The basis of this lawsuit concerns the purchase of five items during three

transactions, which were all made by Plaintiff Joseph Wolf ("Joseph") at Dollar General Store

#14321, located at 1334 NY-17B, White Lake, NY 12786 ("White Lake store").  (Compl. ¶¶ 5,

11, 14, 22; J. Wolf Tr. 12:13-25, 14:17-18, 16:7-11, 118:7-9, 136:8, 179:5-13).  ***Response***

Disputed. Plaintiffs' lawsuit concerns: (1) Dollar General overcharging Joseph on five items

during three transactions; (2) Dollar General overcharging Carmen Wolf ("Carmen") Wolf on one

item; and (3) Dollar General's pattern and practice of overcharging its customers at checkout

throughout its New York stores. (C. Wolf Tr. 85:21-86:13, 91:15-92:17, 93:1-16, 148:16-149:2;

Compl. ¶¶ 23-42).

---

[1] Defendants state that these undisputed facts apply to all claims for relief and defenses.

2.      Joseph bought the first item giving rise to this lawsuit, Clover Valley Lactose Free 2% Milk, on September 4, 2022 using plaintiff Carmen Wolf's ("Carmen") credit card.  (Compl. ¶ 14; Goldstein Decl. Exh. 13 (WOLF_000001; J. Wolf Tr. 70:6-8)).  ***Response*** Undisputed.

3.      Joseph bought the second item giving rise to this lawsuit, Clover Valley Lactose Free Whole Milk, on September 18, 2022 using Carmen's credit card. (Compl. ¶ 14; Goldstein Decl. Exh. 13 (WOLF_000002); J. Wolf Tr. 70:6-8). ***Response*** Undisputed.

4.      Joseph is an authorized user of Carmen's credit card.   (J. Wolf Tr. 70:6-8). ***Response*** Undisputed.

5.      The alleged price discrepancy[2] between the shelf price and the point-of-sale price for the two items in the September 4 and 18, 2022, transactions is $ 0.10 each.  (Compl. ¶ 14). ***Response*** Undisputed that Dollar General overcharged[3] the Plaintiffs a total of $0.20. (Compl. ¶ 14; Merino Decl. Exh. 1 (DG_WOLF_0001764); Goldstein Decl. Exh. 13 (WOLF_00001-02)).

6.      Joseph bought the last three items giving rise to this lawsuit, Land O'Lakes Low Fat Vanilla Yogurt, on December 11, 2022 using Carmen's credit card.  (Compl. ¶ 22).  ***Response*** Undisputed.

7.      The alleged price discrepancy between the shelf price and the point-of-sale price for the three items at issue in the December 11, 2022 transaction is $ 0.25 total.  (Compl. ¶ 22). ***Response*** Undisputed that Dollar General overcharged the Plaintiffs $0.25. (Goldstein Decl. Exh. 16 (WOLF_000007-09)).

---

[2] Dollar General defines a price discrepancy as when an item's shelf price does not match that item's point-of-sale price.

[3] The Wolfs define an overcharge as when the price charged at checkout is higher than the advertised shelf price.  Dollar General disputes that this event constitutes an overcharge.

8.      The alleged price discrepancies on the three dates in question are the only price discrepancies at Dollar General that Joseph personally experienced.  (J. Wolf Tr. 136:22-23). **Response** Disputed. Both Plaintiffs experienced the overcharges as the purchases were made on a shared account. (Compl. ¶¶ 22; C. Wolf Tr. 53:14-25, 134:21-24, 135:2-24)

9.      Plaintiffs are not seeking anything other than $0.45. (J. Wolf Tr. 157:20-21). **Response** Disputed. Plaintiffs also seek to represent a class of consumers who shopped at Dollar General stores in New York and seek to get relief for themselves and the class. C. Wolf. Tr. 150:18-151:3, 157:19-158:2. Plaintiffs seek on behalf of themselves and the class under GBL § 349: (1) a statutory damage of $50 per overcharge; and (2) injunctive and declaratory relief. (Compl. ¶¶ 64-66 and Prayer for Relief).

## II.    FACTUAL BACKGROUND

### A.  <u>Plaintiffs' Background.</u>

10.      Plaintiffs regularly shop at the White Lake store, which is a two-minute drive from their vacation home in Bethel, NY. (Compl. ¶¶ 5, 11; J. Wolf Tr. 12:13-25, 14:17-18, 16:7-11, 118:7-9, 136:8).  **Response** Undisputed.

11.      Carmen did not see the shelf prices of the items that her husband purchased.  (C. Wolf Tr. 154:11-25, 155:1-25, 156:1-25). **Response** Undisputed that she did not see the shelf prices at the time of purchase.

12.      Carmen testified that because she has a joint bank account with Joseph, which he uses to pay for the transactions made with a credit card, any price discrepancies that he was allegedly subject to are also her injury.  (C. Wolf Tr. 53:14-25, 134:21-24, 135:2-24). **Response** Undisputed that Dollar General's overcharges are also her injury.

13.    The only alleged price discrepancy that Carmen personally experienced at Dollar General occurred over three months after this lawsuit was filed. (C. Wolf. Tr. 85:12-25, 86:1-14). **Response** Undisputed that Dollar General overcharged Carmen in April 2023. Disputed that it was the only overcharge she "personally experienced" as the other overcharges were made on a shared account. (C. Wolf Tr. 53:14-25, 134:21-24, 135:2-24).

14.    Carmen continues to shop at Dollar General at about the same frequency as she did before experiencing any alleged price discrepancies.   (C. Wolf Tr. 159:18-22). **Response** Undisputed that she continues shopping there because Dollar General is two minutes or less from her house. The next nearest store is 40 minutes driving around trip. (C. Wolf Tr. 159:6-17; J. Wolf. Tr. 135:11-136:11)

15.    Carmen testified that she believes retailers like Dollar General should post shelf prices that are 100% accurate 100% of the time. (C. Wolf Tr. 163:7-13). **Response** Undisputed that both Carmen and Dollar General agree that Dollar General should post shelf prices that are 100% accurate 100% of the time (Merino Decl. Exh. 2 - DG_WOLF 0010059, 0034843).

16.    Carmen also testified that going forward it does not matter to her that other customers might be subject to the same price discrepancies that she allegedly experienced.  (C. Wolf Tr. 149:11-19). **Response** Disputed. Carmen testified exactly the opposite. When Dollar General asked Carmen "Did it matter to you that other customers might be overcharge for that same item going forward?" Carmen responded and advised "It does matter to me. That's why I'm in this lawsuit." (C. Wolf Tr. 149:11-19, Merino Decl. Exh 3 (C. Wolf E.S.)).

17.    Joseph took photos of receipts and shelf price labels with his iPhone 12 Pro Max. (J. Wolf Tr. 172:15-20). **Response** Undisputed.

18.    Carmen took photos of receipts, shelf price labels, and the electronic register

display with her iPhone 12 Mini.  (J. Wolf Tr. 202:22-203:1; C. Wolf Tr. 77:23-78:7; Ex. 5 (attached as Goldstein Decl. Exh. 53)). ***Response*** Undisputed.

    **B.**  **Buying Products from Dollar General Stores.**

19.    Dollar General is a self-service retail store where products are displayed for sale on store shelves. (Savaloja Decl., ¶ 4; Wilner Exp. Rep. p. 5 (attached as Goldstein Decl. Ex. 8)). ***Response*** Undisputed.

20.    Self-service means customers can browse, inspect, and remove items they are interested in buying from a store shelf without consulting with an employee. (Savaloja Decl., ¶ 4). ***Response*** Undisputed.

21.    A typical Dollar General store has approximately 19,000 individual products on its shelves.  (Wilner Exp. Rep. p. 5; Goldstein Decl. Exh. 35 (DG_WOLF_0040637)). ***Response*** Undisputed.

22.    A label is affixed to the store shelf in close proximity to each product.  (Wilner Exp. Rep. p. 5; 12/14/23 M. Savaloja Tr. 38; Savaloja Decl., ¶ 5). ***Response*** Undisputed.

23.    The shelf label contains information about the product including, the name and price of the product. (Goldstein Decl. Exh. 13 (WOLF_000003-05); Savaloja Decl., ¶ 5). ***Response*** Undisputed.

24.    Each Dollar General retail store is notified of price changes by corporate headquarters through Dollar General's START task management system.  (B. Wilner Expert Report p. 6). ***Response*** Undisputed.

25.    Joseph testified that he does "not typically look at shelf price labels." (J. Wolf Tr. 69:20-25, 164:10-11). ***Response*** Disputed. Joseph testified that "I do generally look at shelf price labels when making a purchase, because I ultimately want to know what I will be paying at

5

checkout." (J. Wolf Tr. 69:20-25, 164:10-11; J. Wolf. E.S.)

26.　　Dollar General customers can buy a product by taking it to a checkout register that is either self-checkout or employee-operated.  (Savaloja Decl., ¶¶ 6, 7). ***Response*** Undisputed.

27.　　At an employee-operated register, the customer takes the product(s) they want to purchase to a register operated by a Dollar General employee.  (Savaloja Decl., ¶ 9). ***Response*** Undisputed.

28.　　At a self-checkout register, customers scan and pay for items by using a self-guided electronic system, typically without help from Dollar General employees. (Savaloja Decl., ¶ 8). ***Response*** Undisputed.

29.　　At both employee-operated and self-checkout registers, when an item is scanned, its name and scan price are shown on a customer-facing electronic display. (Savaloja Decl., ¶ 10). ***Response*** Undisputed.

30.　　These electronic displays are part of the register configuration at Dollar General stores in New York.  (Goldstein Decl. Exhs. 38, 49, 50 (DG_WOLF_0040798 & 0004291, 4583, 4268)). ***Response*** Undisputed.

31.　　After all products have been scanned, the electronic register display shows the total sale price owed to complete the transaction. (Savaloja Decl., ¶ 11; C. Droge Tr. 31:23-32). ***Response*** Undisputed.

32.　　Dollar General customers who pay with a credit or debit card are shown a screen on a keypad asking them to confirm the amount of their total purchase.  (Wilner Exp. Rep. at 29; Goldstein Decl. Exh. 34 (DG_WOLF_0040629)). ***Response*** Undisputed.

33.　　At an employee-operated register, after the customer pays the total sale price, the employee hands the customer any change as well as a receipt. At self-checkout registers, change

is dispensed, if any, and a printed receipt is provided to the customer. (Savaloja Decl., ¶ 12). ***Response*** Undisputed.

34.     The receipt provides information about the transaction, including the name and price of each product, applicable taxes, total amount paid, payment details, and whether any change was provided. (Savaloja Decl., ¶ 13). ***Response*** Undisputed.

35.     Customers can determine what price they were charged for an item by looking at their receipt.  (Savaloja Decl., ¶ 13). ***Response*** Undisputed.

36.     Joseph testified that customers can view the electronic register display during checkout to see the name and price of items being purchased.  (J. Wolf Tr. 106:9-25, 107:1-4). ***Response*** Disputed. Joseph testified that as to the particular monitor he was being shown, which Dollar General's counsel having represented that it "displays products as they are scanned for a purchase", that particular monitor did display the name and price of the item being purchased. (J. Wolf Tr. 101:16-102:11).

37.     Carmen testified that Dollar General has electronic register displays to show consumers the name and price of items.  (C. Wolf Tr. 145:24-25, 146:1-22). ***Response*** Undisputed.

38.     Carmen does not recall whether she looks at the electronic register display when purchasing items at the White Lake store.  (C. Wolf Tr. 32:21-25, 33:1-13). ***Response*** Undisputed.

39.     Carmen testified that she does not believe it is her responsibility to check prices on the electronic register display or the receipt.   (C. Wolf Tr. 139:15-25, 146:23-25, 147:1-5). ***Response*** Undisputed that both Carmen and Dollar General agree that it is Dollar General's responsibility to ensure it should charge accurate prices. (C. Wolf Tr. 138:8-139:25; Merino Decl. Exh. 4 (DG_WOLF_0017370-71, DG_WOLF_11321)).

40.    Joseph testified that he usually receives a receipt after shopping at Dollar General stores. (J. Wolf Tr. 161:21-162:1). ***Response*** Undisputed.

41.    Joseph testified that he received a receipt for his purchases while shopping at Dollar General on September 4, September 18, and December 11, 2022.  (J. Wolf Tr. 162:20-163:1). ***Response*** Undisputed.

42.    Carmen testified that she typically receives a receipt after shopping at the White Lake store.  (C. Wolf Tr. 33:14-18). ***Response*** Undisputed.

43.    In their responses to Dollar General's requests for admissions, Plaintiffs admit that they received receipts on September 4, September 18, and December 11, 2022, which are the transactions giving rise to their claims. (Pltfs' First Am. RFA Resp. Nos. 6, 7, 8). ***Response*** Undisputed as to receiving receipts on these dates. Dispute that the transactions giving rise to their claims are limited to these transactions, as Dollar General also overcharged Carmen on April 11, 2023. (Goldstein Decl. Exh. 15 (WOLF_000006); *id.* Exh. 15 (WOLF_000005); *id.* Exh. 53 (OPP002-0000178, p. 7, 10)), (C. Wolf Tr. 85:21-86:13, 91:15-92:17, 93:1-16, 148:16-149:2).

44.    As reflected in these receipts, for each purchase on September 4, September 8, and December 11, 2022, Joseph gave Dollar General money (via credit card) in exchange for the products he purchased.  (Goldstein Decl. Exhs. 13, (WOLF_000001, 002, 009)). ***Response*** Undisputed.

**C.**    **Dollar General's Price Match Policy.**

45.    Dollar General's price match policy was effective in New York during the class period. (Goldstein Decl. Exh. 51 (DG_WOLF_0021416-17); Savaloja Decl., ¶ 17-18 & Exh. A). ***Response*** Undisputed that there was a policy in effect. Disputed that the policy was "effective". Dollar General customers have complained about Dollar General's refusal to honor its price match

policy. A representative sample is demonstrated here. (Merino Decl. Exh. 5 ( DG_WOLF_0003282, 0003315, 0003317, 003319, 0003337, 0003339, 0003362-63, DG_WOLF_0041335)).

46.     The price match policy states, in pertinent part:

> Dollar General strives to maintain consistency between an advertised price, a product's marked price, the shelf label price, and/or the price charged at the register (the "scanned" price). Occasionally a difference between these prices may occur, resulting in an inadvertent overcharge to the customer. Dollar General will honor the lowest price for the customer.

(Goldstein Decl. Exh. 51 (DG_WOLF_0021416-17 (SOP 88); Savaloja Decl., Exh. A). ***Response*** Undisputed as to this being Dollar General's policy. Disputed that Dollar General complied with its own policy, as noted in ¶ 45.

47.     The procedures for the price match policy state that if the shelf price is lower than the scan price, "the Store Manager or key carrier should refund the overcharge amount to the customer" and an employee should "[c]orrect the pricing and/or signage immediately." (Goldstein Decl. Exh. 51 (DG_WOLF_0021416–17 (SOP 88)); Savaloja Decl., Exh. A). ***Response*** Undisputed as to this being Dollar General's policy. Disputed that Dollar General complied with its own policy, as noted in ¶ 45.

48.     A number of New York Dollar General stores had and continue to have signs publicizing this price match policy during the class period. (Goldstein Decl. Exh. 52 (DG_WOLF_40564); Sajnani Exp. Rep. p. 12 (attached as Goldstein Decl. Ex. 9)). ***Response*** Disputed. It is unclear what DG_WOLF_40564 represents. As neither Mr. Goldstein nor Mr. Sajnani are Dollar General employees, they do not have personal knowledge to testify as to the contents of DG_WOLF_40564. Even assuming Mr. Goldstein and/or Mr. Sajnani could testify as to the contents of DG_WOLF_40564, it appears to only represent the ordering of signs. The

spreadsheet does not indicate that the signs were ever hung or that they remained hung throughout the class period. Last, Dollar General has been cited on numerous occasions for failing to post its refund policy. (Merino Decl. Exh. 6 (WOLF_107-114, 123-126, 139-142, 159-162, 195-202, 211-214, 223-230, 243-246, 255-258, 324-330, 365-370, 395-398, 498-505, 517-524, 617-620, 674-67, 740-746, 820-825, 839-841, 848-850, 1002-1005; DG_WOLF_4550-4556, 4565-4572, 4616-4623, 7214-7218), Exh. 5 (WOLF_0003509)).

49.    An employee may perform a price override for a product to comply with Dollar General's price match policy. (Savaloja Decl., ¶ 15). ***Response*** Disputed. Customers complained that Dollar General refused or was otherwise failed to perform price overrides. Attached are some examples. (Merino Decl. Exh. 5 (DG_WOLF_000337-38, 0003349, 0003403, 0003456 , 0003491, 0003607,0003650, 0040902)).

50.    Customers can obtain a refund for a price discrepancy even after leaving the store if they later notice a discrepancy. (Sajnani Exp. Rep. p. 12–13). ***Response*** Disputed. There are numerous instances wherein customers complained that Dollar General refused to refund them on overcharges. Attached are some examples. (Merino Decl. Exh. 5 (DG_WOLF_0003340, 0003363, 0003380, 0003410-11, 0041278)).

51.     During the class period, in New York Dollar General stores, "over 8 million items were returned for a refund, some of these likely [were] due to price discrepancies." (Sajnani Exp. Rep. p. 13). ***Response*** Undisputed that overcharges are "the primary reason" for a price override. (C. Droge. Tr. 26:5-24).

52.    Almost 7 million items were subject to price overrides in New York Dollar General stores during the class period.   (Goldstein Decl. Exh. 36 (DG_WOLF_40641)). ***Response*** Undisputed.

53.     At least some of these overrides were likely due to price discrepancies. (Wilner Exp. Rep. p. 28). **Response** Undisputed that overcharges are "the primary reason" for a price override. (C. Droge. Tr. 26:5-24).

54.     Dollar General employees indicated that price overrides were sometimes given just on the customer's say-so without independent verification. (12/14/23 M. Savaloja Tr. 111:1-3). ***Response*** Disputed. It was Dollar General's policy and procedure to verify any overcharge before beginning a price override on the item. (Merino Decl. Exh. 7 (DG_WOLF_0003215, 0002757)).

55.     The safeguards in effect in Dollar General stores to prevent a price discrepancy are robust and are comparable to, and even exceed, what many in the industry have in place. (Sajnani Exp. Rep. p. 13; C. Droge Tr. 24:10-13). ***Response*** Disputed. Dollar General systemically overcharged its customers. Dollar General failed several hundred pricing audits in New York during the class period. (Merino Decl. Exh.  6). Dollar General has otherwise paid millions of dollars in fines to various state agencies across the country. (Merino Decl. Exh. 8). A 3rd party company Dollar General retained to evaluate its price execution noted that in a comparison to fellow retailers, Dollar General was "lagging" as Dollar General had "[u]nreliable price execution" and "stores not having the right price at time of store opening". They also noted "[u]nreliable pricing compliance". (M. Savaloja Tr. 90:20-97:9; Merino Decl. Exh. 9 (McKinsey-Wolf-000681-92)). Mr. Sajnani gave conflicting testimony as to the reliability of the handheld scanner. (Sajnani Tr. 104:13-105-106). Mr. Sajnani was unaware of whether he reviewed all of the government audits and was unable to give a ballpark estimate as to the amount of audits he reviewed. (Sajnani Tr. 20:14-21:1; 44:20-25). He furthermore was unable to explain why he selected the ten examples he did in an attempt to attack the government audit data. (Sajnani Tr. 50:12-51:4). He was also unable to identify additional examples of inaccuracies in the audit data. (Sajnani Tr. 51:6-14).

56.    Plaintiffs were never denied a price adjustment after telling a Dollar General employee about a price discrepancy. (C. Wolf Tr. 136:6-13; J. Wolf Tr. 130:20-131:5). ***Response*** Undisputed that Dollar General corrected an overcharge one time.

57.    Joseph acknowledges that it is a good idea for consumers to request a refund when they notice a price discrepancy. (J. Wolf Tr. 221:20-24, 222:1-10)). ***Response*** Disputed. When Dollar General questioned Joseph Wolf as to whether it is a good idea for consumers to request a refund when they notice a price discrepancy, he responded "I don't know what a good idea is for all consumers. People requesting a refund takes time. It takes effort, energy. I can't make a blanket recommendation." (J. Wolf. Tr. 221:20-222:5).

58.    Joseph asked a Dollar General employee about a price discrepancy after September 4, 2022, and the employee charged Joseph the lower price. (J. Wolf Tr. 130:20-131:5). ***Response*** Undisputed that Dollar General attempted to overcharge Joseph, Joseph asked Dollar General to charge the correct price, and it was then that Dollar General charged the correct price.

59.    Joseph has prior experience in asking other retailers for a refund.  (J. Wolf Tr. 213:20-214:16). ***Response*** Disputed. There was one instance where Joseph asked for a refund after returning merchandise he purchased online.  (J. Wolf Tr. 213:20-214:16)

60.    For the alleged discrepancies undergirding the Complaint, Joseph "felt that the trust was really broken here and [] decided to seek advice" from a lawyer.  (J. Wolf Tr. 87:14-17). ***Response*** Undisputed.

61.    Dr. Benjamin S. Wilner opined that, in his experience, "hiring an attorney over a $0.10 price discrepancy, having made no mitigation efforts to have the discrepancy corrected in the store or with an employee afterwards, is not typical consumer behavior."  (B. Wilner Expert Report p. 33). ***Response*** Undisputed that this represents Dr. Wilner's opinion. Disputed as to the

accuracy of Wilner's opinion. Ms. Savaloja wrote that Dollar General's typical customer would be "mad" and "humiliated" over being charged $21.35 when the final price should be $20.00. (Merino Decl. Exh. 4 (DG_WOLF_0011319-321)). Consumers have noted in complaints to Dollar General overcharging a product by $0.20 was a "bait and switch", that overcharging is "illegal", that a consumer "will obviously be angry" over a $0.20 overcharge, and that Dollar General "could get sued for" overcharging a product by $0.76. Merino Decl. 5 (DG_WOLF_0003576, 0003577, 0041216-7).

62.    "[O]n or before Sept. 4, 2022, attorney Andrew R. Wolf of the Dann Law Firm contacted Joseph Wolf for the purpose of providing legal advice." (Pltfs' ROG Resp. No. 7 (attached as Goldstein Decl. Ex. 11)). *Response* Undisputed.

63.    Andrew R. Wolf is Joseph's father. (Pltfs' First Am. RFA Resp. No. 91). *Response* Undisputed.

64.    Joseph testified that he had an opportunity to speak with Dollar General employees about a price discrepancy and get a refund for any transactions that occurred on or after September 4, 2022. (J. Wolf Tr. 130:1-19). *Response* Disputed. Joseph did not testify that he had an opportunity to "get a refund". (J. Wolf Tr. 130:1-19)

65.    Joseph never brought the price discrepancies at issue in this lawsuit (those that he allegedly experienced on September 4, September 18, and December 11, 2022) to the attention of Dollar General employees (other than filing the lawsuit). (J. Wolf Tr. 117:18-24). *Response* Undisputed.

66.    Nor has Carmen brought any price discrepancies that she has experienced to the attention of Dollar General employees (other than filing the lawsuit). (C. Wolf Tr. 47:24-48:16, 62:7-13, 93:7-16). *Response* Undisputed.

67.    Joseph explained that the only reason he did not seek a refund for the subject price discrepancies was the amount of time it would have taken to do so.  (J. Wolf Tr. 121:8-123:5). **Response** Disputed. Other reasons were because he sought legal counsel and because he was unaware of Dollar General's refund policy. (J. Wolf Tr. 121:8-20, 212:17-213:10). Undisputed that other Dollar General consumers have chosen not to demand price overrides due to Dollar General's small staff and a line of customers. (Merino Decl. Exh. 5 (DG_WOLF_0003606)).

68.    Joseph knows that for a price discrepancy "in the future," he has the "option to take time to, you know, try to settle something with an employee." (J. Wolf Tr. 133:7-14). **Response** Undisputed.

### D.  Understanding Pricing In Retail Stores.

69.    Dollar General's expert Sunil Sajnani ("Sajnani") stated that Dollar General's safeguards (checkout monitors, receipts, customer price scanner, confirmation screen) should work in many instances to prevent a price discrepancy from occurring.  (Sajnani Exp. Rep. p. 12-13). **Response** Undisputed that this statement reflects Sajnani's opinion, but this is a disputed issue. Dollar General failed numerous internal and external audits and has been cited by several government agencies for systematically overcharging consumers. (Merino Decl. Exh. 6, Exh. 8, Exh. 13).

70.    Sajnani stated that, typically, customers pay close attention to prices and use available safeguards to avoid paying more than the posted shelf price.  (Sajnani Exp. Rep. p. 13). **Response** Undisputed that this statement reflects Sajnani's opinion, but this is a disputed issue. Sajnani was unable to comment on what a customer would expect if he or she saw a 50 percent promotion. (Sajnani Tr. 114:15-23). Sajnani has never given testimony in a consumer class action case before this one. (Sajnani Tr. 39:2-7). Furthermore, Dollar General has stated that when a

customer is overcharged, it is "our fault". (Merino Decl. Exh. 4 (DG_WOLF_0011319)). Dollar General customers have also noted that Dollar General's overcharging is inherently "misleading". (Merino Decl. Exh. 5 (DG_WOLF_0041083, 0040902-04)

71.     Sajnani stated that the fact that Plaintiffs in this case did not attempt to obtain a price override or refund despite knowing about the price discrepancies strongly suggests that they are unlike many other retail customers.  (Sajnani Exp. Rep. p. 13). ***Response*** Undisputed that this statement reflects Sajnani's opinion, but this is a disputed issue. Sajnani was unable to comment on what a customer would expect if he or she saw a 50 percent promotion. (Sajnani Tr. 114:15-23). Sajnani has never given testimony in a consumer class action case before this one. (Sajnani Tr. 39:2-7). Furthermore, Dollar General has stated that when a customer is overcharged, it is "our fault". (Merino Decl. Exh. 4 (DG_WOLF_0011319)).

72.     Government agencies conduct audits to ensure pricing accuracy in retail stores. (Sajnani Exp. Rep. pp. 2–3). ***Response*** Undisputed.

73.     "[U]ndercharges demonstrate there is no deliberate attempt to harm customers through pricing." (Sajnani Exp. Rep. p. 9). ***Response*** Disputed. Despite the presence of undercharges, Dollar General has still engaged in a pattern or practice of overcharging customers. (Merino Decl. Exh.  6, Exh. 8, Exh. 9 (McKinsey-Wolf-000681-92)).

74.     NIST, or the National Institute of Standards and Technology, is an agency of the U.S. Department of Commerce, and issues several publications or handbooks, a few of which have the force of New York law, including NIST Handbook 130, which contains in Part V Examination Procedures for Price Verification that sets forth standards for performing price verification audits for retailers.  (Sajnani Exp. Rep. at 2; Goldstein Dec. Exhs. 54-58). ***Response*** Undisputed.

75.     A failed audit in one store does not implicate other stores. (Wilner Exp. Rep. p. 8).

***Response*** Disputed. Price changes for products are regularly rolled out chain-wide. Dollar General and a 3rd party company it retained regularly identified pricing problems that would each affect multiple stores, and in many cases, affect it chainwide. Dollar General has engaged in a company-wide pattern or practice of overcharging customers. (Merino Decl. Exh. 6, Exh. 8, Exh. 9 (McKinsey-Wolf-000681-92)).

76.    "[S]ix New York Dollar General retail stores accounted for over half of all the price discrepancies audit[]s identified between 2020 and 2023."  (Wilner Exp. Rep. p. 8). ***Response*** Disputed. This statement fails to take into account various internal pricing audits showing multiple failures across a wide variety of New York stores. (Merino Decl. Exh. 13 (DG_WOLF_0001765)).

77.    There has been no allegation that the White Lake store failed a government audit related to prices. (*See generally* Compl.). ***Response*** Undisputed that the White Lake store did not fail a government audit, but this is a disputed issue. There are internal compliance audits which noted pricing problems with the White Lake Store. (Merino Decl. Exh. 13 (DG_WOLF_0020167), Merino Decl. Exh. 14 (DG_WOLF_0020168), Merino Decl. Exh. 15 (DG_WOLF_0020228)).

### E.  Plaintiffs' Experiences that Form the Basis of Their Complaint.

78.    Joseph does not recall specifics of the electronic register displays at the White Lake store.  (J. Wolf Tr. 115:12-19). ***Response*** Undisputed.

79.    Plaintiffs could not admit or deny whether a computer or electronic register display was present and operating during Joseph's September 4 and September 18 and December 11, 2022 transactions at the White Lake store.  (Pltfs' First Am. RFA Resp. Nos. 3, 4, 5). ***Response*** Undisputed.

80.    Photographs taken by Carmen's phone show a working electronic register display at the White Lake store. (C. Wolf Tr. 26:5-27:7, 28:18-30:2, 31:8-15, Goldstein Decl. Ex. 59).

***Response*** Undisputed that the photographs show a working electronic display only on the day they were taken.

81.    Joseph recalled a register display at the White Lake store that was "bigger" and "maybe more clear or more noticeable" than the one in Carmen's photos.  (J. Wolf Tr.104:10-20). ***Response*** Undisputed.

82.    The White Lake store has had working, customer-facing electronic register displays at each register since at least July 1, 2022.  (Carter Decl., ¶ 8). ***Response*** Disputed. Mr. Carter's opinion is based on a review of some unknown and undescribed "transaction-level data and a call to an onsite store associate on May 15, 2024".

### i.    September 4, 2022.

83.    Carmen stated that she "was unaware" of the price listed on the store shelf for Clover Valley Lactose Free 2% Milk before September 4, 2022, "because she did not go to the store with Joseph [ ] for the September 4, 2022, purchase." (Pltfs' First Am. RFA Resp. No. 12). ***Response*** Undisputed.

84.    Joseph does not recall whether he looked at the shelf price label for Clover Valley Lactose Free 2% Milk at the White Lake store on September 4, 2022. (J. Wolf Tr. 70:1-5). ***Response*** Disputed. Joseph only did not recall whether he looked at the shelf price *before* the transaction. (J. Wolf Tr. 70:1-5). It is Joseph's practice to look at shelf labels when making a purchase. (J. Wolf. E.S. 161:9-11).

85.    On September 4, 2022 at 9:18 pm, Joseph purchased one item at the White Lake store: Clover Valley Lactose Free 2% Milk.  (Goldstein Decl. Exhs. 13 (WOLF_000001), 40 (OPP02-0000018), and 47 (OPP02-0000252)). ***Response*** Undisputed

86.    "[R]ight afterwards," Joseph "[w]alked around the corner, snapped a photo, and decided [he] would investigate it when [he] had time."  (J. Wolf Tr. 77:13–17).  ***Response*** Undisputed.

87.    On September 4, 2022 at 9:19 pm, Joseph took a photo of the shelf price for Clover Valley Lactose Free 2% Milk.  (Goldstein Decl. Exhs. 13, 39 (47 OPP002—000252, pp. 5, 8; OPP002-0000017; WOLF_000003); J. Wolf Tr. 76:4-6, 79:20–24). ***Response*** Undisputed.

88.    Joseph photographed the shelf price of Clover Valley Lactose Free 2% Milk on September 4, 2022 because he "was worried about being overcharged." (J. Wolf Tr. 76:4-10). ***Response*** Undisputed.

89.    Joseph testified he was taking photographs of shelf prices "[t]o verify that Dollar General was charging accurate prices."  (J. Wolf Tr. 175:11–12). ***Response*** Undisputed.

90.    Joseph testified that he "already had in [his] head to kind of be sort of vigilant in Dollar General to make sure [he] wasn't being overcharged." (J. Wolf Tr. 79:5-19). ***Response*** Undisputed.

91.    Joseph testified that he did not know whether he would have still bought the Clover Valley Lactose Free 2% Milk on September 4, 2022, if the price listed on the shelf tag stated $4.25. (J. Wolf Tr. 90:15-91:5; *see also* Pltfs' First Am. RFA Resp. No. 50). ***Response*** Undisputed that Joseph could not "speculate as to what decisions" he "would have [made] differently in an alternative universe." (J. Wolf Tr. 91:2-5)

92.    Carmen refused to admit or deny whether she would have allowed Joseph to buy the Clover Valley Lactose Free 2% Milk on September 4, 2022, if the price listed on the shelf tag stated $4.25.  (Pltfs' First Amended RFA Resp. No. 88). ***Response*** Undisputed that Carmen objected to this request for admission as it called for speculation and Dollar General chose not to

challenge the objection.

93.     Joseph testified that the first time he was aware of experiencing a price discrepancy at a Dollar General store was on September 4, 2022.  (J. Wolf Tr. 43:8-11). ***Response*** Undisputed.

94.     Joseph does not recall whether he viewed the electronic register display that shows the price of items on September 4, 2022 at the White Lake store. (J. Wolf Tr. 75:14-18). ***Response*** Undisputed.

95.     After learning of the price discrepancy related to his September 4, 2022 purchase, Joseph contacted his father, attorney Andrew Wolf, on or about September 4, 2022, seeking legal advice about being overcharged by Dollar General.  (J. Wolf Tr. 43:20-23, 56:8-15). ***Response*** Undisputed.

**ii.      September 18, 2022.**

96.     Carmen stated that she "was unaware" of the price listed on the store shelf for the products at issue before the September 18, 2022, purchase "because she did not go to the store with Joseph Wolf for the September 18, 2022, purchase." (Pltfs' First Am. RFA Resp. No. 13). ***Response*** Undisputed.

97.     When Joseph went into the White Lake store on September 18, 2022, he was "vigilant" and "aware" of price discrepancies "in the past." (J. Wolf Tr. 89:22–90:5). ***Response*** Undisputed.

98.     On September 18, 2022, Joseph took photos of the shelf price for: (a) Clover Valley Lactose Free Whole Milk at 3:46 pm, and (b) Kellogg's Eggo Buttermilk Waffles at 3:47 pm. (Goldstein Decl. Exhs. 14, 41, 47 (OPP02-0000252–253, pp. 5, 6, 8), 60; J. Wolf Tr. 150:19-151:6. ***Response*** Undisputed.

99.     Joseph said that he took these photographs "to verify that Dollar General wasn't

overcharging [him]." (J. Wolf Tr. 93:4-7, 20-21). ***Response*** Undisputed.

100.    Joseph testified that he does not recall whether he looked at the shelf prices for the products he purchased on September 18, 2022, prior to the transaction.  (J. Wolf Tr. 96:8-13). ***Response*** Undisputed that this was his testimony, but this is a disputed issue. Joseph did look at the shelf prices for the products he purchased on September 18, 2022, prior to the transaction, as the photographs were taken at 3:46 pm and 3:47pm, and the transaction took place at 3:57pm. (Goldstein Decl. Exhs. 14, 41, 47 (OPP02-0000252–253, pp. 5, 6, 8), 60; J. Wolf Tr. 150:19-151:6. (Goldstein Decl. Exh. 13 (WOLF_000002); Goldstein Decl. Exhs. 41-46 (OPP002-0000021-26)).

101.    On September 18, 2022 at 3:57 pm, Joseph purchased two products at the White Lake store: Kellogg's Eggo Buttermilk Waffles and Clover Valley Lactose Free Whole Milk. (Goldstein Decl. Exh. 13 (WOLF_000002); Goldstein Decl. Exhs. 41-46 (OPP002-0000021-26)). ***Response*** Undisputed.

102.    Joseph testified that he does not recall whether he viewed the electronic register display at the time of the September 18, 2022 purchase.  (J. Wolf Tr. 97:12-17). ***Response*** Undisputed.

103.    Joseph refused to admit or deny whether he would have bought the Clover Valley Lactose Free 2% Milk on September 18, 2022 if the price listed on the shelf tag stated $4.25. (Pltfs' First Am. RFA Resp. No. 51). ***Response*** Undisputed that Joseph objected to this request for admission as it called for speculation and Dollar General chose not to challenge the objection.

104.    Carmen refused to admit or deny whether she would have allowed Joseph to buy the Clover Valley Lactose Free 2% Milk on September 18, 2022, if the price listed on the shelf tag stated $4.25.  (Pltfs' First Am. RFA Resp. No. 89). ***Response*** Undisputed that Carmen objected to this request for admission as it called for speculation and Dollar General chose not to challenge

the objection.

        **iii.**     **December 11, 2022.**

    105.    Carmen stated that she "was unaware" of the shelf tag price for Land O'Lakes Low Fat Vanilla Yogurt before the December 11, 2022, purchase "because she did not go to the store with Joseph Wolf for the December 11, 2022, purchase." (Pltfs' First Am. RFA Resp. No. 14). ***Response*** Undisputed.

    106.    For the December 11, 2022, transaction, Joseph testified that he "was just determined to be vigilant" about possible price discrepancies. (J. Wolf Tr. 117:5-9). ***Response*** Undisputed.

    107.    On December 11, 2022 at 1:43 pm, Joseph bought three Land O'Lakes Vanilla Yogurts and one Land O'Lakes Half and Half. (Goldstein Decl. Exh. 16 (WOLF_000009)). ***Response*** Undisputed.

    108.    On December 11, 2022 at 12:43 p.m. Carmen sent a text to Joseph reminding him to take pictures of the prices for Land O'Lakes yogurt, stating: "3 land o lake vanilla yogurts (take picture of prices)." (J. Wolf Tr. 181:6-22; Goldstein Decl. Exh. 47 (OPP002-0000252, p. 4)). ***Response*** Undisputed.

    109.    Carmen testified that Joseph was taking pictures to check for price discrepancies and to send to their lawyer. (C. Wolf Tr. at 49:17-50:2, 125:8-14). ***Response*** Undisputed.

    110.    On December 11, 2022 at 1:29 pm, Joseph took photos of the shelf price for Land O'Lakes Vanilla Yogurt at the White Lake store. (Goldstein Decl. Exh. 47 (OPP002-0000035-36, OPP002-0000252, p. 7), 61; J. Wolf Tr. 111:22-112:22, 114:14:-20). ***Response*** Undisputed.

    111.    Joseph does not recall whether he viewed the electronic register display at the time of the December 11, 2022 purchase. (J. Wolf Tr. 115:12-19). ***Response*** Undisputed.

112.    Joseph refused to admit or deny whether he would have bought Land O'Lakes Vanilla Yogurt on December 11, 2022 if the price listed on the shelf tag stated 3/$2.25 or listed the price for a single item as $0.75.  (Pltfs' First Am. RFA Resp. No. 52). ***Response*** Undisputed that Joseph objected to this request for admission as it called for speculation, and Dollar General chose not to challenge the objection.

113.    Carmen refused to admit or deny whether she would have allowed Joseph to buy Land O'Lakes Vanilla Yogurt on December 11, 2022 if the price listed on the shelf tag stated 3/$2.25 or listed the price for a single item as $0.75.  (Pltfs' First Am. RFA Resp. No. 90). ***Response*** Undisputed that Carmen objected to this request for admission as it called for speculation, and Dollar General chose not to challenge the objection.

114.    Dollar General's expert Dr. Benjamin S. Wilner stated that taking photographs of shelf labels before and after a transaction is, in his experience, not typical consumer behavior and is consistent with individuals attempting to gather evidence.  (Wilner Exp. Rep. p. 34). ***Response*** Undisputed that this is Dr. Wilner's statement, but this is a disputed issue, as other Dollar General customers have taken photographs and videos when overcharged with no indication of an attempt to gather evidence. (Merino Decl. Exh. 5 (DG_WOLF_0003315-16, 0003368-69, 0003372, 0003392-96, 0003587-3591)).

### F.  <u>Other Transactions at Dollar General</u>

115.    On April 11, 2023 at 1:05 p.m., Carmen bought several items at the White Lake store with the total transaction price being $37.90. (Goldstein Decl. Exh. 15 (WOLF_000006)). ***Response*** Undisputed.

116.    Carmen testified that she believed that she experienced a price discrepancy related to her purchase of Starkist Chunk Tuna. (C. Wolf 85:21-86:21). ***Response*** Undisputed that Dollar

General overcharged Carmen on her purchase of Starkist Chunk Tuna.

117.    On April 11, 2023 at 1:06 pm, Carmen took photos of the shelf price for Starkist Chunk Tuna. (Goldstein Decl. Exh. 15 (WOLF_000006); *id.* Exh. 15 (WOLF_000005); *id.* Exh. 53 (OPP002-0000178, p. 7, 10)). ***Response*** Undisputed.

118.    Carmen did not photograph the shelf prices of other items purchased on April 11, 2023. (Goldstein Decl. Exh. 15 (WOLF_000006); *id.* Exh. 53 (OPP002-0000178)). ). ***Response*** Undisputed.

119.    Plaintiffs' credit card statements show that either Carmen or Joseph conducted at least fifty transactions at the White Lake[4] store between September 4, 2022 and the end of 2023. (Goldstein Decl. Exhs. 17-33 (WOLF_000072-76, 000087-102)). ***Response*** Undisputed.

**G.    Events Leading Up to Plaintiffs Filing this Action Against Dollar General.**

120.    Carmen was taking photos of shelf prices at Dollar General as early as June 2022. (Goldstein Decl. Exh. 53 (OPP002-0000178, p. 7)). ***Response*** Undisputed that Carmen would take photos for purposes of comparison shopping – "[t]o compare whether Dollar General and another store have -- who has the better price for the same item I want." (C Wolf Tr. 50:16- 51:5).

121.    On June 4, 2022, Carmen took at least twelve photos of the shelf prices of at least five distinct products, including two kinds of Ramen, paper plates, pasta, and Stella beer. (Goldstein Decl. Exh. 63 (OPP002-0000005-16)). ***Response*** Undisputed that Carmen would take photos for purposes of comparison shopping – "[t]o compare whether Dollar General and another store have -- who has the better price for the same item I want." (C Wolf Tr. 50:16- 51:5).

122.    Andrew Wolf, Plaintiffs' attorney, "warned" Joseph before September 4, 2022 to

---

[4]  The White Lake store is sometimes referred to as being in Mongaup Valley, but these are the same store – #14321. (J. Wolf Tr. 194:11-15; C. Wolf Tr. 110:9-18; WOLF_000087-102).

be careful at Dollar General because "they are known for overcharging." (J. Wolf Tr. 46:23-47:3, 159:11-160:23; Pltfs' First Am. RFA Resp. No. 91; Wilner Exp. Rep. p. 33). ***Response*** Undisputed.

123.    After that conversation, Joseph was "worried a little bit" and "decided to be a little bit more vigilant when [he] shopped at Dollar General." (J. Wolf Tr. 48:25-49:2). ***Response*** Undisputed.

124.    At the September 4, 2022 transaction, Joseph "for some reason [] thought that there was some kind of . . . overcharging may have been a possibility." (J. Wolf Tr. 77:21-24). ***Response*** Undisputed.

125.    On September 20, 2022, Plaintiffs retained counsel.  (J. Wolf Tr. 54:24-55:1; Goldstein Decl. Exh. 62 (WOLF_000077-80)). ***Response*** Undisputed.

### H.  Events Since Plaintiffs Filed this Action Against Dollar General.

126.    Plaintiffs have continued to shop at Dollar General since the alleged price discrepancies.  (J. Wolf Tr. 134:22-135:1; C. Wolf. Tr. 159:18-22).  ***Response*** Undisputed that she continues shopping there because Dollar General is two minutes or less from her house. The next nearest store is 40 minutes driving around trip. (C. Wolf Tr. 159:6-17; J. Wolf. Tr. 135:11-136:11).

127.    Carmen testified that, even after the lawsuit was filed, Plaintiffs continued to take photographs of shelf price labels in Dollar General stores.  (C. Wolf Tr. 95:7-20). ***Response*** Undisputed.

### H.  Miscellaneous

128.    Plaintiffs never told any of their friends or family, other than their attorney Andrew Wolf, about alleged price discrepancies at Dollar General.  (Goldstein Decl. Exh. 47 (OPP02-0000252, p. 10); C. Wolf Tr. 165:24-166:11; J. Wolf Tr. 58:3-11). ***Response*** Undisputed.

129.    Dr. Benjamin Wilner stated in his expert report that there is no reliable method to determine what Dollar General customers viewed as the shelf price.  (Wilner Exp. Rep. at 26).

**Response** Undisputed this is Dr. Wilner's opinion, but this is a disputed issue. Mr. Weir stated in his expert report that it is his opinion that it is possible to determine class-wide damages in this case using Dollar General's own available business records, third-party records, and industry resources. (Weir Exp. Rep. at 3.)

Dated this 17th day of June, 2024.

<table>
<tr><td>

/s/ Javier L. Merino

Javier L. Merino
THE DANN LAW FIRM
1520 US 130, Ste. 101
North Brunswick, NJ 08902
Phone: (201) 355-3440
Fax:    (216) 373-0536
Email: jmerino@dannlaw.com

</td><td>

/s/ Philip A. Goldstein

Philip A. Goldstein
McGuireWoods LLP
1251 Avenue of the Americas, 20th Floor
New York, New York 10020-1104
Phone: (212) 548-2100
Fax:    (212) 548-2150
Email:
Pagoldstein@mcguirewoods.com

/s/ R. Trent Taylor

R. Trent Taylor (*Pro hac vice*)
Phone: (804) 775-1182
Fax:    (804) 225-5409
Travis C. Gunn (*Pro hac vice*)
Phone: (804) 775-7622
Fax:    (804) 698-2039
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Email: Rtaylor@mcguirewoods.com
Email: Tgunn@mcguirewoods.com

*Counsel for Dolgen New York, LLC*

</td></tr>
</table>