**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ X
JOSEPH WOLF, CARMEN WOLF,                    :    Case No. 7:23-cv-00558 (PMH)
ON BEHALF OF THEMSELVES AND THOSE            :
SIMILARLY SITUATED,                          :
                                             :
                         Plaintiffs,         :
                                             :
               v.                            :
                                             :
DOLGEN NEW YORK, LLC D/B/A DOLGEN,           :
                                             :
                         Defendant.          :
------------------------------------------------------------------ X


**DEFENDANT DOLGEN NEW YORK, LLC'S MEMORANDUM OF LAW IN SUPPORT**
**OF MOTION FOR SUMMARY JUDGMENT**

Philip A. Goldstein, Esq.                Richard Trent Taylor (*pro hac vice*)
McGuireWoods LLP                         Travis C. Gunn (*pro hac vice*)
1251 Avenue of the Americas, 20th Floor  McGuireWoods LLP
New York, New York 10020-1104            Gateway Plaza
Phone:  (212) 548-2100                   800 East Canal Street
Fax:  (212) 548-2150                     Richmond, VA 23219
*pagoldstein@mcguirewoods.com*           Phone: (804) 775-1000
                                         Fax: (804) 775-1061
                                         *rtaylor@mcguirewoods.com*
                                         *tgunn@mcguirewoods.com*

                 *Counsel for Defendant Dolgen New York, LLC*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................1

BACKGROUND .........................................................................................................2

ARGUMENT ..............................................................................................................6

    I.    Legal Standard. ..........................................................................................6

    II.    Plaintiffs Cannot Prove a Prima Facie GBL § 349 Claim Against Dollar General ......6

        A.    Dollar General's Conduct Is Not Materially Misleading.......................7

            1.    The Conduct Was Fully Disclosed to Plaintiffs................................7

            2.    The Conduct Was Not Likely to Mislead a Reasonable Consumer..............12

            3.    Plaintiffs Fail to Meet the Threshold of Materially Misleading ..................15

        B.    Plaintiffs Cannot Show Actual Injury.................................................16

        C.    Plaintiffs Cannot Prove Causation. ....................................................18

    III.    Dollar General Has A Complete Defense Pursuant To Its Regulation By NIST. ....19

    IV.    This Issue Is Controlled By *Specific* NY Laws, Not the *General* GBL. .................21

    V.    Plaintiffs' Recovery Is Barred By The Voluntary Payment Doctrine .....................23

    VI.    Plaintiffs Lack Standing To Seek Injunctive Relief. .................................................24

    VII.    Punitive Damages Are Unavailable Under GBL § 349 ............................................25

CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexandre v. Alcon Labs., Inc.*,
2024 WL 623707 (S.D.N.Y. Feb. 14, 2024) (Halpern, J.)....................................................16

*Alvarez v. Chevron Corp.*,
656 F.3d 925 (9th Cir. 2011) .............................................................................................21

*Am. Home Prods. Corp. v. Johnson & Johnson*,
672 F. Supp. 135 (S.D.N.Y. 1987)......................................................................................19

*Berni v. Barilla S.p.A.*,
964 F.3d 141 (2d Cir. 2020)...............................................................................................24

*Bildstein v. MasterCard Int'l Inc.*,
329 F. Supp.2d 410 (S.D.N.Y. 2004)...........................................................................15, 16

*Broder v. Cablevision Sys. Corp.*,
418 F.3d 187 (2d Cir. 2005)...............................................................................................22

*Bursco v. Braun*,
645 N.E.2d 724 (N.Y. 1994)...............................................................................................21

*Chufen Chen v. Dunkin' Brands, Inc.*,
954 F.3d 492 (2d Cir. 2020).........................................................................................7, 11

*Conboy v. AT&T Corp.*,
241 F.3d 242 (2d Cir. 2001)...............................................................................................22

*Creighton v. City of New York*,
2017 WL 636415 (S.D.N.Y. Feb. 14, 2017)......................................................................9, 15

*Cytyc Corp. v. Neuromedical Sys., Inc.*,
12 F. Supp.2d 296 (S.D.N.Y. 1998)....................................................................................19

*Dillon v. U-A Columbia Cablevision of Westchester, Inc.*,
790 N.E.2d 1155 (N.Y. 2003).............................................................................................23

*Dimond v. Darden Rests., Inc.*,
2014 WL 3377105 (S.D.N.Y. July 9, 2014) .......................................................................11

*Dinan v. SanDisk LLC*,
844 Fed. Appx. 978 (9th Cir. 2021)....................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dunham v. Sherwin-Williams Co.*,
  636 F. Supp. 3d 308 (N.D.N.Y. 2022) .......................................................................17

*F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
  205 F.3d 66 (2d Cir. 2000) .........................................................................................9

*Gift & Luggage Outlet, Inc. v. People*,
  756 N.Y.S.2d 717 (2003) ...........................................................................................22

*Greene v. Gerber Prods. Co.*,
  262 F. Supp. 3d 38 (E.D.N.Y. 2017) ..........................................................................17

*Grgat v. Giant Eagle, Inc.*,
  135 N.E.3d 846 (Ohio Ct. App. 2019) ................................................................12, 14

*Guzman v. Harris*,
  No. 16-CV-3499 (GBD) (RLE), 2017 WL 4386369 (S.D.N.Y. Sept. 29, 2017) ...................25

*Himmelstein v. Matthew Bender & Co.*,
  37 N.Y.3d 169 (2021) ................................................................................................12

*Horror Inc. v. Miller*,
  15 F.4th 232 (2d Cir. 2021) .........................................................................................6

*Lewis v. Hertz Corp.*,
  181 A.D.2d 493 (1st Dep't 1992) ...............................................................................11

*Lin v. Canada Goose US, Inc.*,
  640 F. Supp.3d 349 (S.D.N.Y. 2022) .........................................................................18

*Morales v. Kraft Foods Group, Inc.*,
  2016 WL 11743532 (C.D. Cal. Dec. 2, 2016) ............................................................12

*Newman v. RCN Telecom Servs., Inc.*,
  238 F.R.D. 57 (S.D.N.Y. 2006) .................................................................................23

*O'Keefe v. Walgreens Boots Alliance, Inc.*,
  172 N.E.3d 1159 (Ill. App. 2020) ..............................................................................21

*Podell v. Citicorp Diners Club, Inc.*,
  112 F.3d 98 (2d Cir. 1997) .........................................................................................18

*Pyskaty v. Wide World of Cars, LLC*,
  2018 WL 11544551 (S.D.N.Y. Apr. 9, 2018) ............................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Reinbrecht v. Walgreen Co.*,
   742 N.W.2d 243 (Neb. App. 2007).............................................................................12, 14

*Salgiobria Enters., LLC v. Cheney Bros., Inc.*,
   2022 WL 7049246 (S.D. Fla. Aug. 16, 2022)...........................................................21

*Samuel v. Time Warner Inc.,* 809 N.Y.S.2d 408 (N.Y. Sup. Ct. 2005) .........................................24

*Sanborn Libr. LLC v. ERIS Info. Inc.*,
   No. 19CV2049JHROTW, 2024 WL 1744630 (S.D.N.Y. Mar. 25, 2024) ..............................6

*Sand v. Ticketmaster–N.Y., Inc.*,
   207 A.D.2d 687 (1st Dep't 1994) .........................................................................11

*Schramm v. JP Morgan Chase Bank, N.A.*,
   2014 WL 12633527 (C.D. Cal. July 10, 2014)...........................................................12

*Segovia v. Vitamin Shoppe, Inc.*,
   2017 WL 6398747 (S.D.N.Y. Dec. 12, 2017) .........................................................16

*Telesco v. Starbucks Corp.*,
   682 F. Supp. 3d 397 (S.D.N.Y. 2023).................................................................6, 12

*Tudor v. Jewel Food Stores, Inc.*,
   681 N.E.2d 6 (Ill. Ct. App. 1997) .........................................................................14

*Vaccariello v. XM Satellite Radio, Inc.*,
   295 F.R.D. 62 (S.D.N.Y. 2013) .........................................................................23

*Wise v. Combe Inc.*,
   2024 WL 1178851 (S.D.N.Y. Mar. 19, 2024) (Halpern, J.)..............................................18

*Wurtz v. Rawlings Co.*,
   2016 WL 7174674 (E.D.N.Y. Nov. 17, 2016)...........................................................23

*Wurtzburger v. Kentucky Fried Chicken*,
   2017 WL 6416296 (S.D.N.Y. Dec. 13, 2017) .........................................................19

*Zuckerman v. VMG Direct Mktg., Inc.*,
   290 A.D.2d 330 (1st Dep't 2002) .......................................................................7, 11

**Statutes**

N.Y. Agric. & Mkts. Law §§ 176, 197-b(3)(a)...........................................................21, 22

GBL § 349......................................................................................................... *passim*

iv

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

**Other Authorities**

1 N.Y.C.R.R. § 220.2(a) ............................................................................................................8

1 N.Y.C.R.R. § 220.14 ..........................................................................................................8, 20

Local Rule 56.1(d) ...................................................................................................................8

NIST Handbook 130 .............................................................................................7, 8, 19, 20, 21

NIST Handbook 44 ...................................................................................................................8

## <u>INTRODUCTION</u>

Plaintiffs Joseph and Carmen Wolf claim that they are reasonable consumers who knew nothing about discrepancies between the shelf label price and the point-of-sale price at Dollar General stores, were deceived by them, and were powerless to prevent them. The facts show otherwise. Plaintiffs bought products knowing of these purported price discrepancies and, rather than just asking for a price adjustment at the register so they would pay the shelf label price, they photographed store shelves and consulted with attorneys to concoct allegations of deceit. But because they manufactured these allegations, Plaintiffs lack evidence to prove a GBL § 349 claim.

Plaintiffs do not dispute several key facts showcasing the contrived nature of this case—and underscoring that there is no GBL claim to take to the jury. To begin, Plaintiffs do not dispute that their counsel for this case includes Joseph's father, Andrew Wolf, who was personally involved in parallel litigation with Dollar General filed before this lawsuit. Mr. Wolf warned his son about alleged price discrepancies at Dollar General ***before*** Plaintiffs' transactions such that Joseph was "vigilant," "aware of price discrepancies," and "worried about being overcharged."

Plaintiffs also do not dispute that they took photographs of the shelf labels of their purchases either ***before*** or immediately after they paid for them. Plaintiffs' explicit purpose of these photographs was to ensure they had evidence for this lawsuit.

Nor do Plaintiffs dispute that Joseph was aware of Dollar General's price match policy, which allows customers to receive a refund for any price discrepancy. Indeed. Joseph asked for and received such a refund from Dollar General on at least one occasion.

Finally, it is undisputed that Plaintiffs sued over five products in three transactions, alleging a total overcharge of $0.45. Plaintiffs do not deny that they never mentioned these overcharges to a Dollar General employee or asked for a refund; they instead simply filed a class action lawsuit.

Based on these and other undisputed facts, Dolgen New York, LLC ("Dollar General")

respectfully requests that the Court grant summary judgment as to Plaintiffs' claims for at least six reasons.

*First*, Plaintiffs lack evidence to make out a GBL § 349 claim against Dollar General. The prices at issue were not materially misleading—specifically because they were fully disclosed and there is unrebutted expert evidence that reasonable customers would not be misled given the safeguards in place. Plaintiffs also cannot show any actual injury suffered or prove causation— because they were fully aware of the price discrepancies at the time of the transactions at issue.

*Second*, Dollar General has a complete defense pursuant to its regulation by the National Institute for Standards and Technology ("NIST").

*Third*, the subject matter of this litigation is covered by controlling, *specific* New York laws, which allow for a 2% rate of price discrepancies and with which Dollar General complies, and not the *General Business Laws*.

*Fourth*, Plaintiffs' recovery is barred by the Voluntary Payment Doctrine.

*Fifth*, Plaintiffs lack standing to seek injunctive relief.

*Sixth*, punitive damages are unavailable under GBL § 349.

For all these reasons, as explained below, the Court should grant this motion.

## **BACKGROUND**

Plaintiffs allege that they were overcharged in three of Joseph's transactions at a Dollar General store, once by $0.10 (on September 4, 2022), once by $0.10 (on September 18, 2022), and once by $0.25 (on December 11, 2022)—for a total of $0.45. *See* Local Civ. R. 56.1 Statement of Facts ("SOF"), ¶¶ 2-3, 5-7; Goldstein Decl. Ex. 1 (Compl. ¶¶ 14, 22), 3 (J. Wolf Tr. 70:6-8), 13 (WOLF_000001-02). On all three occasions, Joseph took photographs of the shelf prices for the items he purchased: one was taken one minute after the purchase, and the other two were taken before purchase. SOF ¶¶ 87, 98, 110; Goldstein Decl. Exhs. 13, 14, 39, 41, 47 (OPP002-0000035-

36, OPP002-000252-253, pp. 5, 6, 7, 8; OPP002-0000017; WOLF_000003), 60; J. Wolf Tr. 76:4-6, 79:20-24, 111:22-112:22, 114:14-20, 150:19-151:6. This alleged overcharging occurred at the White Lake Dollar General store that Plaintiffs frequent due to its convenient location within two minutes of their Bethel, New York vacation home. SOF ¶ 10; Compl. ¶¶ 5, 11; J. Wolf Tr. 12:13-25, 14:17-18, 16:7-11, 118:7-9, 136:8. Notably, Andrew Wolf, Joseph's father and Plaintiffs' counsel in this case (and others), "warned Joseph before September 4, 2022 to be careful at Dollar General because they are known for overcharging." SOF ¶ 122; J. Wolf Tr. 46:23-47:3, 159:11-160:23; Goldstein Decl. Ex. 8 (Wilner Exp. Rep. p. 33), 12 (Pltfs' First Am. RFA Resp. No. 91).

Carmen alleges she suffered the same injuries as Joseph because they share a joint bank account which was the pay-off source for the credit card used in the relevant transactions. SOF ¶ 12; Goldstein Decl. Ex. 4 (C. Wolf Tr. 53:14-25, 134:21-24. 135:2-24). Carmen makes this allegation despite not having seen "the shelf prices of the items that her husband purchased." SOF ¶ 11; C. Wolf Tr. 154:11-25, 155:1-25, 156:1-25. In fact, Carmen was only ever physically in the Dollar General store when an alleged price discrepancy occurred on April 11, 2023, three months after she and her husband filed suit. SOF ¶ 13; C. Wolf Tr. 53:14-25, 134:21-24, 135:2-24. To the extent it is even relevant, on that date, Carmen took a photograph of only one product's shelf price (which happened to be a price discrepancy) despite buying eleven other products. SOF ¶¶ 117-18; Goldstein Decl. Exhs. 15 (WOLF_000005-06), 53 (OPP002-0000178, pp. 7, 10).

Dollar General stores are self-service retail stores "where products are displayed for sale on store shelves." SOF ¶ 19; Savaloja Decl. ¶ 4; Wilner Exp. Rep. at 5. A standard Dollar General store has roughly 19,000 individual items on its shelves with each store being made aware of price changes through "Dollar General's START task management system," managed by the corporate headquarters. SOF ¶¶ 21, 24; Wilner Exp. Rep. at 5, 6; Goldstein Decl. Ex. 35

(DG_WOLF_0040637). Near each product there is a label attached to the shelf with "information about the product including, the name and price of the product." SOF ¶¶ 22-23; Wilner Exp. Rep. at 5; Savaloja Decl. ¶ 5; Goldstein Decl. Exhs. 5 (M. Savaloja Tr. 38), 13 (WOLF_000003-05).

To purchase an item at a Dollar General store, a customer takes the product(s) they want to buy to an employee-operated or self-checkout register. SOF ¶ 26; Savaloja Decl., ¶¶ 6, 7. At both types of registers, "when an item is scanned, its name and scan price are shown on a customer-facing electronic display" that, when all items have been scanned, also "shows the total sale price owed to complete the transaction." SOF ¶¶ 29, 31; Savaloja Decl. ¶¶ 10, 11; Goldstein Decl. Ex. 6 (C. Droge Tr. 31:23-32). If a customer chooses to pay with a debit or credit card, the display asks the customer to "confirm the amount of their total purchase" before proceeding with payment. SOF ¶ 32; Wilner Ex. Rep. at 29; Goldstein Decl. Ex. 34 (DG_WOLF_0040629).

Regardless of the type of register used, a customer is provided a receipt following completion of the transaction, which "provides information about the transaction, including the name and price of each product, applicable taxes, total amount paid, payment details, and whether any change was provided." SOF ¶¶ 33-34; Savaloja Decl. ¶¶ 12, 13. Customers can review individual product prices on this receipt. SOF ¶ 35; Savaloja Decl. ¶ 13. These register displays are in New York Dollar General stores. SOF ¶ 30; Goldstein Decl. Exhs. 38, 49, 50 (DG_WOLF_0040798 & 0004291, 4583, 4268). Joseph testified that "as to the particular monitor he was being shown [in White Lake] . . . . that particular monitor did display the name and price of the item being purchased" and that he was provided with a receipt for the transactions on the relevant dates. SOF ¶¶ 36, 41; J. Wolf Tr. 106:9-25, 107:1-4, 162:20-163:1.

Dollar General has a price match policy which honors "the lowest price for the customer" in the event of a price discrepancy. SOF ¶¶ 45-46; Goldstein Decl. Ex. 51 (DG_WOLF_0021416-

17 (SOP 88); Savaloja Decl. ¶¶ 17-18 & Ex. A. It is undisputed that this policy was in effect during the relevant time. SOF ¶¶ 45-46; Goldstein Decl. Ex. 51 (DG_WOLF_0021416-17 (SOP 88)); Savaloja Decl. ¶¶ 17-18 & Ex. A. Plaintiffs attempt to claim the policy was not "effective," but it was effective for Joseph – he used this policy to buy an item at a lower price. SOF ¶¶ 56, 58; C. Wolf Tr. 136:6-13; J. Wolf Tr. 130:20-131:5. For his transactions underlying this suit, Joseph chose not to bring the alleged price discrepancies to a Dollar General employee's attention and benefit from the price match policy. He acknowledges that "in the future, he has the option to take time to, you know, try to settle something with an employee." SOF ¶¶ 65, 68; J. Wolf Tr. 117:18-24, 133:7-14. Further proof of Dollar General's compliance with its own policy is the fact that "[a]lmost 7 million items were subject to price overrides in New York Dollar General stores during the class period." SOF ¶¶ 52-53; Goldstein Decl. Ex. 36 (DG_WOLF_40641); Wilner Exp. Rep. at 28. Thus, a number of price discrepancies were caught prior to the completion of the transaction.

Dollar General's experts, Dr. Benjamin Wilner and Sunil Sajnani, have offered several opinions to which Plaintiffs have provided no rebuttal expert testimony. *See* SOF, ¶¶ 61, 69-71; B. Wilner Exp. Rep. p. 33; Goldstein Decl. Ex. 9 (Sajnani Exp. Rep. at 12-13). First, Dr. Wilner opined that "hiring an attorney over a $0.10 price discrepancy . . . . is not typical consumer behavior." SOF ¶ 61; B. Wilner Exp. Rep. at 33. Expert testimony also includes that the many safeguards employed by Dollar General generally "should work in many instances to prevent a price discrepancy" and that, "typically, customers pay close attention to prices and use available safeguards to avoid paying more than the posted shelf price." SOF ¶¶ 69-70; Sajnani Exp. Rep. at 12-13. Testimony also highlighted that Plaintiffs' behavior in filing a lawsuit is atypical given that they already knew about possible price discrepancies. SOF ¶ 71; Sajnani Exp. Rep. at 13. Likewise, Plaintiffs taking photographs of the products they intended to buy before or immediately after a

transaction is "not typical consumer behavior [but] is consistent with individuals attempting to gather evidence." SOF ¶ 114; Wilner Exp. Rep. at 34. Plaintiffs have no expert evidence to create a genuine dispute to these expert facts. *See* SOF ¶¶ 61, 69-71.

## ARGUMENT

### I.    Legal Standard

"Summary judgment is appropriate when the record demonstrates that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021). "When a motion for summary judgment is supported by documentary and testimonial evidence, the nonmoving party may not rest upon mere allegations or denials—rather, [they] must present sufficient probative evidence to establish a genuine issue of material fact." *Id*. Evidence from the nonmoving party must be "more than mere conclusory statements, conjecture, or speculation to successfully defeat a motion for summary judgment." *Sanborn Libr. LLC v. ERIS Info. Inc.*, No. 19CV2049JHROTW, 2024 WL 1744630 at *2 (S.D.N.Y. Mar. 25, 2024). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. Moreover, the bar for the nonmoving party is high: "the record must contain contradictory evidence such that a reasonable jury could return a verdict for the nonmoving party." *Horror*, 15 F.4th at 241.

### II.    Plaintiffs Cannot Prove a Prima Facie GBL § 349 Claim Against Dollar General.

Plaintiffs cannot prove their sole claim against Dollar General, a GBL § 349 claim. A successful claim under § 349 requires a four-prong showing: (1) that a defendant engaged in "consumer-oriented conduct that is (2) materially misleading and that (3) the plaintiff suffered an injury (4) as a result of the allegedly deceptive acts or practices." *Telesco v. Starbucks Corp.*, 682 F. Supp. 3d 397, 403 (S.D.N.Y. 2023). Specifically, Plaintiffs fail to prove that Dollar General's conduct was materially misleading, that Plaintiffs have suffered an injury, and that any injury was

"a result of" the conduct at issue.

### A. Dollar General's Conduct Is Not Materially Misleading.

#### 1. The Conduct Was Fully Disclosed to Plaintiffs.

First, Plaintiffs cannot prove that Dollar General's conduct was misleading because "there can be no [§] 349(a) claim when the allegedly deceptive practice was fully disclosed." *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 501 (2d Cir. 2020). In pricing cases, "the focus is whether the amount of the charge is disclosed." *Zuckerman v. VMG Direct Mktg., Inc.*, 290 A.D.2d 330, 330-31 (1st Dep't 2002) (dismissing claim of overcharging because "promotional materials [disclosed] the exact amount to be charged"). When the practice is fully disclosed, claims are "not actionable" under § 349 "as a matter of law." *Chufen Chen*, 954 F.3d at 501.

In line with these cases, Dollar General fully discloses its point-of-sale prices before purchase. In New York Dollar General stores, both self-checkout and employee-operated registers have electronic displays which face the purchaser. SOF ¶¶ 29-30; Savaloja Decl. ¶ 10; Goldstein Decl. Exhs. 38, 49, 50 (DG_WOLF_0040798 & 0004291, 4583, 4268). Upon scan of an item, the register display shows a product's name and scanned price before the purchase is made. *Id*. And at the conclusion of the transaction, before the purchase is made, this display also shows the final price owed for item(s) being bought. SOF ¶ 31; Savaloja Decl. ¶ 11; C. Droge Tr. 31:23-32.

Both federal and state law have declared that this register display allows customers to "verify prices as the items are being scanned," which alerts customers to any price problem before "the transaction is completed[,]" and that "[t]he importance of consumer access to [a register display] of product information and price cannot be overstated." NIST Handbook 130, Examination Procedure for Price Verification (EPPV) § 6.1 (2006).[1]    Indeed, New York law

---

[1] As explained below in more detail, NIST is an arm of the Department of Commerce, and its Handbooks are considered to be part of federal law. *See* Section III. Moreover, New York has

requires such register displays, thus recognizing that register displays convey important pricing information to customers. *See* 1 N.Y.C.R.R. § 220.2(a) (incorporating NIST Handbook 44, § 1.10, G-UR.3.3 (2023 ed.) into New York law). This display acts as a final offer of the price of the item before the consumer accepts the price by paying. It also helps to cure any incorrect information the consumer might have received from an inaccurate shelf label.

It is undisputed that these displays are part of the register configuration at Dollar General stores in New York, and that they show the name and price of an item when it is scanned. SOF ¶¶ 29, 30; Savaloja Decl. ¶ 10; Goldstein Decl. Exhs. 38, 49, 50 (DG_WOLF_0040798 & 0004291, 4583, 4268). These displays, as demonstrated by Dollar General records, were working at the White Lake Dollar General store at all relevant times.[2] SOF ¶ 82; Carter Decl. ¶ 8. Moreover, Joseph recalls seeing register displays at the White Lake store. SOF ¶ 81; J. Wolf Tr. 104:10-20. Carmen also saw them. SOF ¶ 37; C. Wolf. Tr. 145:24-25, 146:1-22. And photographs taken by Carmen's phone also show a working electronic register display at the White Lake store. SOF ¶ 80; C. Wolf Tr. 26:5-27:7, 28:18-30:2, 31:8-15; Goldstein Decl. Ex. 59. Plaintiffs have no evidence that the electronic register displays were not operating at the White Lake store during the relevant time periods. SOF ¶ 79; Pltfs' First Am. RFA Resp. Nos. 3, 4, 5.

Notably, Plaintiffs do not deny viewing the electronic register displays for the transactions at issue; instead, they do not recall whether they viewed them. SOF ¶¶ 38, 94, 102, 111; J. Wolf

---

specifically adopted certain Handbooks, including the 2006 version of the Examination Procedure for Price Verification from NIST Handbook 130. *See* 1 N.Y.C.R.R. § 220.14. The 2006 version of NIST Handbook 130 can be found at https://www.nist.gov/system/files/documents/2017/05/09/hb-130-06-final-pdf.pdf (last accessed Sept. 27, 2024).

[2] Plaintiffs' only justification for disputing this fact is "Mr. Carter's opinion is based on a review of some unknown and undescribed 'transaction-level data and a call to an onsite store associate on May 15, 2024.'" SOF ¶ 82. This is not a valid basis for dispute because Plaintiffs failed to cite to any evidence in response, thus violating Local Rule 56.1(d).

Tr. 75:14-18, 97:12-17, 115:12-19; C. Wolf Tr. 32:21-25, 33:1-13. "[F]ailure to remember and lack of knowledge are not sufficient to create a genuine dispute." *Creighton v. City of New York*, 2017 WL 636415, at *40 (S.D.N.Y. Feb. 14, 2017); *see also F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses . . . do not create genuine issues of material fact.").

In their response to Dollar General's pre-motion letter, Plaintiffs argue that a consumer should not be required to consult different places for information, specifically using as an example a small disclaimer on the back of a package when the alleged misrepresentation is prominently displayed on the front. ECF No. 68 at 3. Here, however, the prices charged were prominently displayed to consumers on the register displays during the transactions at issue. The photographs of the register display at the White Lake store make that abundantly clear.



In addition to register displays disclosing the point-of-sale prices to Plaintiffs during their transactions, Plaintiffs had actual knowledge of the supposedly deceptive prices before their

transactions were completed. Because he was warned by his father (and counsel) prior to the transactions at issue, Joseph admitted that he was "vigilant," "aware of price discrepancies," and "worried about being overcharged" when he went to make the at-issue purchases. SOF, ¶¶ 88, 97, 106, 122-24; J. Wolf Tr. 46:23-47:3, 48:25-49:2, 76:4-10, 79:5-19, 89:22-90:5, 117:5-9, 159:11-160:23. As referenced above, Plaintiffs took photos of the relevant shelf price labels either before or immediately after their transactions took place. SOF ¶¶ 85-87, 98, 101, 107, 110, 115, 117; Goldstein Decl. Exhs. 13 (WOLF_000001-02), 14, 15 (WOLF_000005-06), 16 (WOLF_000009), 39, 41-46 (OPP02-0000021-26), 47 (OPP02-0000035-36; OPP002-000252, pp. 5, 6, 7, 8; WOLF_000003), 40 (OPP02-0000017-18), 47 (OPP02-00000252), 53 (OPP02-00000178, pp. 7, 10), 60; J. Wolf Tr. 76:4-6, 77:13-17, 79:20-24; 111:22-112:22, 114:14-20, 150:19-151:6. Joseph and Carmen also admitted that he was taking photographs for the express purposes of verifying that Dollar General was not overcharging him – and to send to their lawyer. SOF, ¶¶ 89, 99, 109; J. Wolf Tr. 93:4-7, 20-21, 175:11-12; C. Wolf Tr. 49:17-50:2, 125:8-14.

Carmen even sent a text to Joseph an hour before his Dec. 11, 2022, purchase reminding him to "take picture of prices" of the Land O'Lakes vanilla yogurts that he would purchase. SOF ¶ 108; J. Wolf Tr. 181:6-22; Goldstein Decl. Ex. 47 (OPP02-0000252, p. 4). Tellingly, Carmen did not tell him to take pictures of the other three products that she had also told him to buy. *Id*. And Joseph only took photos of the shelf price of the Land O'Lakes yogurt on that day – before he bought them. SOF, ¶ 110, J. Wolf Tr. 111:22-112:22, 114:14-20; Goldstein Decl. Ex. 47 (OPP02-0000035-36, OPP002-0000252, p. 7). The only explanation for this is that both already knew the Land O'Lakes yogurt had an inaccurate shelf label. Similarly, Carmen during her April 11, 2023, purchase took photos of the shelf prices for only one item despite purchasing twelve. SOF, ¶ 118, Goldstein Decl. Ex. 15 (WOLF_000006), 53 (OPP02-0000178).

If Plaintiffs were merely taking photos of the shelf labels of products they purchased as a precaution, they would have taken photos of all items they purchased, not just some. Necessarily, the only way Plaintiffs would have known to take the photos they did was if they already knew of the point-of-sale price—meaning that the correct price had been "fully disclosed."  This is true not only for the photos Plaintiffs took before the transactions but also the ones they took immediately after. That they took these photos only one minute after the transactions shows that they knew about the price discrepancy at that point—whether from the register display or some other way.

In sum, Plaintiffs cannot prove a § 349 claim because the allegedly deceptive practice— the point-of-sale price—"was fully disclosed." *Chufen Chen*, 954 F.3d at 501; *see also e.g.*, *Dimond v. Darden Rests., Inc.*, 2014 WL 3377105, at *7-8 (S.D.N.Y. July 9, 2014) (18% gratuity on bill not misleading when disclosed on menu); *Sand v. Ticketmaster–N.Y., Inc.*, 207 A.D.2d 687, 687 (1st Dep't 1994) (defendant's fees are not misleading because "such fees are always disclosed by Ticketmaster"); *Zuckerman*, 290 A.D.2d at 330 (shipping and handling fees not misleading when their exact amount is provided in "promotional materials"); *Lewis v. Hertz Corp.*, 181 A.D.2d 493, 494 (1st Dep't 1992) (the "challenged business practices," including late return fees and gas requirements, were not misleading because "these practices are fully disclosed" before the car rental commences). The Court should enter summary judgment on this basis alone.

Though New York law compels this result, cases across jurisdictions support the soundness of this conclusion. Courts have held that disclosing an allegedly deceptive pricing issue at the point of sale dispels the alleged deception and forecloses a claim. For example, an Ohio appellate court held that a retailer was not liable for allegedly deceptive conduct under circumstances very similar to those here, stating that there is no liability when a "customer is explicitly informed" of the price "on the computer screen . . . at the checkout."  *Grgat v. Giant Eagle, Inc.*, 135 N.E.3d 846, 852

(Ohio Ct. App. 2019). And a Nebraska appellate court reached a similar conclusion, holding no liability for deceptive acts because, among other things, there was a register display showing the price charged. *Reinbrecht v. Walgreen Co.*, 742 N.W.2d 243, 249 (Neb. App. 2007).

For these reasons, Dollar General's disclosure of the point-of-sale price at the point of sale means that Plaintiffs cannot prove a § 349 claim. The Court should enter summary judgment.

### 2. The Conduct Was Not Likely to Mislead a Reasonable Consumer.

Second, Plaintiffs cannot prove that Dollar General's conduct was "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Himmelstein v. Matthew Bender & Co.*, 37 N.Y.3d 169, 178 (2021). It is undisputed that Dollar General takes many steps to ensure it does not mislead reasonable consumers, including by providing point-of-sale displays, a price match policy, and transaction receipts. "[I]t is well settled that a court may determine as a matter of law that an allegedly deceptive [practice] would not have misled a reasonable consumer." *Telesco*, 682 F. Supp at 404.

Plaintiffs have no evidence to prove how a reasonable consumer would interpret the challenged conduct, much less proving how a reasonable consumer would have been misled by Dollar General's practices. A plaintiff cannot show that a reasonable consumer would be deceived by a practice just by describing his or her own personal experience. *See, e.g.*, *Schramm v. JP Morgan Chase Bank, N.A.*, 2014 WL 12633527, at *10 (C.D. Cal. July 10, 2014); *Morales v. Kraft Foods Group, Inc.*, 2016 WL 11743532, at *9 (C.D. Cal. Dec. 2, 2016). Indeed, Plaintiffs are *unlike* other customers—and *unlike* a reasonable consumer—in several respects, including their refusal to try to obtain a price override or refund despite knowing about the price discrepancies. SOF, ¶ 71; Sajnani Exp. Rep. at 13. Plaintiffs' actions belie their allegations of having been misled. That Plaintiffs have no evidence of how a reasonable consumer would react to the alleged price discrepancies, or evidence about how a reasonable consumer would have disregarded the various

safeguards provided by Dollar General to try to avoid those discrepancies, is fatal to their attempt to prove that Dollar General's conduct is likely to mislead a reasonable consumer.

In contrast to Plaintiffs, and though not its burden to do so, Dollar General affirmatively *disproved* this element. As explained above, Dollar General's register displays prominently show the price of each individual item and the total price of a consumer's purchase—before the purchase occurs. SOF ¶¶ 29, 31; Savaloja Decl. ¶¶ 10, 11; C. Droge Tr. 31:23-32. And Dollar General's expert Mr. Sajnani, who is unrebutted, states that customers typically pay close attention to prices and use available safeguards (including the register display) to avoid paying more than the posted shelf price. SOF ¶¶ 69-70; Sajnani Exp. Rep. at 12-13. He further said that these safeguards should work in many instances to prevent a price discrepancy from occurring. SOF ¶ 69; Sajnani Exp. Rep. at 12-13.[3] Dollar General also specifically aims to not mislead consumers through its price match policy, which states: "Occasionally a difference between these prices may occur, resulting in an inadvertent overcharge to the customer. Dollar General will honor the lowest price for the customer." SOF ¶ 46; Goldstein Decl. Ex. 51 (DG_WOLF_0021416-17 (SOP 88); Savaloja Decl., Exh. A. This policy was in effect during the relevant time. SOF ¶ 45; Goldstein Decl. Ex. 51 (DG_WOLF_0021416-17); Savaloja Decl. ¶¶ 17-18 & Exh. A. Dollar General stayed true to this policy by overriding the prices of "[a]lmost 7 million items [in its] stores during the class period," some of which were "due to price discrepancies." SOF ¶¶ 52-53; Goldstein Decl. Ex. 36 (DG_WOLF_40641); Wilner Exp. Rep. at 28. Taking the register display and the price match policy together, reasonable consumers would not have been misled by a shelf price discrepancy.

---

[3] Plaintiffs concede that this statement reflects Mr. Sajnani's opinion, but claim that this is still a disputed issue even though they provide no expert testimony to rebut Mr. Sajnani. Thus, Plaintiffs failed to present a genuine dispute of fact on this point. Plaintiffs try this same tactic as to a number of other facts presented by Dollar General. *See, e.g.*, SOF ¶¶ 55, 61, 69-71, 73, 75, 76, 114, 129.

Plaintiffs themselves have benefitted from this price match policy in the past. SOF ¶¶ 56, 58; C. Wolf Tr. 136:6-13; J. Wolf Tr. 130:20-131:5. Yet they chose not to engage a Dollar General employee for a price match for the three purchases that are the subject of this litigation.  SOF ¶¶ 65, 68; J. Wolf Tr. 117:18-24, 133:7-14. Courts have held that the existence of such price match policies can defeat a consumer deception claim based on price discrepancies. *See, e.g.*, *Tudor v. Jewel Food Stores, Inc.*, 681 N.E.2d 6, 8 (Ill. Ct. App. 1997) (a "money-back guarantee if the scanned price differs from the shelf price" helped defeat a consumer deception claim based on price discrepancies because the customer was not misled under these circumstances).

In addition, immediately after a transaction, Dollar General provides its customers a receipt memorializing the price for each product purchased. SOF ¶¶ 53-57, 62; Wilner Exp. Rep. at 28; M. Savaloja Tr. 111:1-3; Sajnani Exp. Rep. at 13; C. Droge Tr. 24:10-13; C. Wolf Tr. 136:6-13; J. Wolf Tr. 130:20-131:5, 221:20-24, 222:1-10; Goldstein Decl. Ex. 11 (Pltfs' ROG Resp. No. 7). Receipts enable customers "to check whether [they] have been correctly charged" before leaving the store. *Tudor*, 681 N.E.2d at 8. Multiple courts have found that providing receipts to customers dispels any potential for deception on prices. *See, e.g.*, *Grgat*, 135 N.E.3d 852 (finding no deception when the price was "also set out in writing in the customer's receipt"); *Reinbrecht*, 742 N.W.2d at 249 (similar).

Plaintiffs themselves said that context is crucial when determining whether a reasonable consumer would be deceived by something. Opp. at 2. Dollar General agrees. The context here shows that there are multiple safeguards in place to prevent price discrepancies from occurring. In the context of a customer transaction where Dollar General implemented the aforementioned safeguards to prevent, help identify, and address inadvertent price discrepancies, it is not credible that consumers were misled by an inaccurate shelf price label. Indeed, the weight of expert

evidence submitted here (all of which is unrebutted) confirms that reasonable consumers acting reasonably under the circumstances would not have been misled by the conduct at issue here.

In sum, Plaintiffs cannot prove that Dollar General's conduct was likely to mislead a reasonable consumer. The Court should enter summary judgment.

### 3. Plaintiffs Fail to Meet the Threshold of Materially Misleading.

Third, Dollar General's conduct has not been shown to be *materially* misleading. GBL § 349 requires more than mere deception; the complained-of act must have been "misleading in a material way." *Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp.2d 410, 413 (S.D.N.Y. 2004). Materiality "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Id.* at 414. This is not a low threshold. *See id.* "The burden is on plaintiffs to show materially deceptive conduct on which they relied to their detriment." *Id.*

Plaintiffs have offered no evidence that any price discrepancy affected, materially or otherwise, their purchasing decisions at Dollar General. For instance, Plaintiffs have no evidence that they (or any other consumer) would not have purchased these items if they knew the prices were actually, cumulatively, $0.45 higher or if they had not been mispriced on the shelf. SOF ¶¶ 91, 103, 112; Pltfs' First Am. RFA Resp. Nos. 50-52; J. Wolf Tr. 90:15-91:5. Joseph even testified that he did not know whether he would have still bought one of the products if the price listed on the shelf tag had matched the price of the item when scanned at the register. SOF ¶ 91; J. Wolf Tr. 90:15-91:5. As previously noted, neither the failure to remember or lack of knowledge are enough to create a genuine dispute of fact. *See Creighton*, 2017 WL 636415, at *40. Additionally, Plaintiffs continue to shop at the White Lake Dollar General (at least fifty purchases there between September 4, 2022, and the end of 2023) and have seemingly made no adjustments to their personal practices based on these allegations. SOF ¶¶ 119, 126-27; J. Wolf Tr. 134:22-135:1; C. Wolf Tr.

159:18-22; Goldstein Decl. Exhs. 17-33 (WOLF_000072-76, 000087-102).

In short, the allegedly deceptive overcharges, amounting to $0.45, would not have changed Plaintiffs' prior purchasing decisions, and have not changed Plaintiffs' ongoing purchasing decisions. Rather than *proving* materiality, Plaintiffs have *disproven* that the allegedly deceptive conduct was material—thus foreclosing their GBL § 349 claim. *See Bildstein*, 329 F. Supp.2d at 413. The Court should enter summary judgment.

### B.  Plaintiffs Cannot Show Actual Injury.

Plaintiffs cannot prove actual injury under § 349, that is, that they "purchased a product and did not receive the full value of [the] purchase." *Alexandre v. Alcon Labs., Inc.*, 2024 WL 623707, at *4 (S.D.N.Y. Feb. 14, 2024) (Halpern, J.). "In the consumer goods context, an allegation of a defendant's deception alone does not suffice to plead injury, because a plaintiff may have received the benefit of the bargain despite the alleged misrepresentation." *Id*. Rather, plaintiffs "must plead something more than the defendant's deception; for example, that the price of the product was inflated as a result of defendant's deception or that use of the product adversely affected plaintiff's health." *Id*. When the record lacks evidence of alleged injury, such as "prices of competing products for comparison" or testimony reflecting that had the plaintiff been informed "he would have been unwilling to pay Defendant's price," the defendant "is entitled to summary judgment." *Segovia v. Vitamin Shoppe, Inc.*, 2017 WL 6398747 at *4-5 (S.D.N.Y. Dec. 12, 2017).

Plaintiffs have no proof of actual injury. They lack evidence that the cost of the relevant products was inflated—that is, that the point-of-sale price was not the products' fair market value. Nor do Plaintiffs have evidence that those products impacted their health. They similarly lack evidence of competitor pricing or evidence that Plaintiffs would have been unwilling to buy their products at the higher point-of-sale price (totaling an extra $0.45 over the shelf label price). Instead, Plaintiffs merely assert that the price of the products was mislabeled on the shelf label in

the moments preceding their purchase, and the evidence shows that they were fully aware of these price discrepancies. The actual injury requirement is especially difficult for Carmen to meet. She was not even with Joseph when he made the three transactions at issue and had no knowledge of the shelf price at the time of the transaction. SOF ¶¶ 11; C. Wolf Tr. 154:11-25, 155:1-25, 156:1-25. And the only transaction that she engaged in that involved a price discrepancy was one that is not referenced in the operative Complaint and that occurred several months after this lawsuit was filed. SOF ¶ 13; C. Wolf Tr. 85:12-25, 86:1-14; *see generally* Compl.

Plaintiffs attempt to lower the standard by stating that the act of paying more at the point of sale than for the price listed at the shelf alone suffices to create an actual injury. ECF No. 68 at 4. This misstates the law, as paying more for a product than its listed shelf price does not *itself* prove that the Plaintiffs did not receive the benefit of their bargain. Moreover, Plaintiffs cannot prove that they reviewed and used that shelf label price as a basis for their purchasing decision.

Nor do Plaintiffs' authorities support their incorrect view of the law; instead, these cases undercut their position. First, in *Dunham v. Sherwin-Williams Co.*, 636 F. Supp. 3d 308, 312, 316 (N.D.N.Y. 2022), the plaintiff demonstrated that the defendant's hidden surcharge of 4%, which remained undisclosed until after she got her receipt, both caused her to purchase a product she otherwise would not have bought and to pay more for the product than she should have. Second, in *Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38, 68 (E.D.N.Y. 2017), the plaintiff not only pled that she did not receive the value of her purchase, having believed her purchased baby formula had allergy reduction qualities when it did not, but also she pled that, had she known about this deception, she would have instead purchased a competing non-allergy reducing formula at a 41% lower price. The plaintiffs in both of these cases met their burden of demonstrating actual injury, offering more than alleged overpayment of a shelf label price, while Plaintiffs here do not.

Plaintiffs thus failed to prove actual injury, and the Court should enter summary judgment.

## C.  Plaintiffs Cannot Prove Causation.

Plaintiffs cannot prove causation under GBL § 349, which requires evidence that the plaintiff "saw the relevant misleading statements before she purchased the products" and then, as a result of those misleading statements, "decid[ed] to purchase the [p]roduct." *Wise v. Combe Inc.*, 2024 WL 1178851, at *6 (S.D.N.Y. Mar. 19, 2024) (Halpern, J.). In other words, "[p]laintiff [must have] suffered injury as a result of the allegedly deceptive act or practice." *Lin v. Canada Goose US, Inc.*, 640 F. Supp.3d 349, 360 (S.D.N.Y. 2022).

Plaintiffs offer no proof to meet this requirement. In fact, the evidence proves the opposite conclusion: that the prices of the items played no role whatsoever in Plaintiffs' decision to purchase them. Indeed, Plaintiffs never testified that they would have made a different purchasing decision had the shelf price label been different.

To that end, Carmen never saw the shelf prices for the products Mr. Wolf bought. SOF ¶ 11; C. Wolf Tr. 154:11-25, 155:1-25, 156:1-25. Joseph said that he paid no attention to the shelf price for at least two of the products and does not contend that he made any purchases *because of* the lower shelf price. SOF ¶¶ 84, 100; J. Wolf Tr. 70:1-5, 96:8-13. Joseph even testified that he does "not typically look at shelf price labels."[4] SOF ¶ 25; J. Wolf Tr. 69:20-25, 164:10-11. Ironically, Plaintiffs attempt to meet this requirement through the photos they took of the items

---

[4] Plaintiffs attempted to improperly change Joseph's testimony through an errata sheet. After testifying that he does "not typically look at shelf price labels," Joseph's errata sheet stated, "I do generally look at shelf price labels when making a purchase."  SOF ¶ 25; J. Wolf Tr. 69:20-25, 164:10-1, J. Wolf, E.S. The Second Circuit has said under such circumstances, the original answer at deposition remains as evidence and recanting such evidence does not avoid summary judgment. *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103 (2d Cir. 1997) ("We agree with the district court that Podell's effort to retrieve the situation by scratching out and recanting his original testimony does not weigh enough in the balance to create an issue of fact for a jury.").

prior to purchase—the same photos that demonstrate that this lawsuit is ginned-up. Opp. at 4. In any event, Plaintiffs did not claim that they saw the shelf price labels, digested what the prices were, and only then bought their products. And they certainly never claimed that they purchased the products at issue *because of* the shelf price labels.

Plaintiffs thus failed to prove causation to make out a prima facie GBL § 349 claim. The Court should enter summary judgment.

### III.    Dollar General Has A Complete Defense Pursuant To Its Regulation By NIST.

It is "a complete defense" to a GBL § 349 claim if "the act or practice is . . . subject to and complies with the rules and regulations of" a federal agency. GBL § 349(d). Federal courts in New York have granted dispositive motions when they have found that this "safe harbor" provision has been met. *See, e.g.*, *Wurtzburger v. Kentucky Fried Chicken*, 2017 WL 6416296 (S.D.N.Y. Dec. 13, 2017); *Cytyc Corp. v. Neuromedical Sys., Inc.*, 12 F. Supp.2d 296 (S.D.N.Y. 1998); *Am. Home Prods. Corp. v. Johnson & Johnson*, 672 F. Supp. 135 (S.D.N.Y. 1987)

Rules and regulations of a federal agency govern the alleged acts at issue. Thirty years ago, NIST, which is part of the U.S. Department of Commerce, created a working group "to respond to public concern about price accuracy in retail stores." NIST Handbook 130, EPPV, at 207. After input from "[m]ore than 500 retailers, consumer representatives, and state and local weights and measures officials," NIST adopted a procedure to audit stores to help ensure that their controls adequately protect against price discrepancies. *Id*. The examination procedures "enhance the economic well-being of consumers and retail businesses in their jurisdiction." *Id*. Most states, including New York, have adopted and follow these procedures. *See* 1 N.Y.C.R.R. § 220.14.

The NIST Handbook specifically envisions that as part of regulatory examination, some error rate for price accuracy is acceptable. It concludes that "the error rate shall not exceed 2%," or in other words, "if more than 2 errors are found in the 100-item sample, the store fails."

Handbook 130, EPPV § 5, at 217 (Table 1). That is, Handbook 130 envisions that a store with 98 percent correct pricing would pass a regulatory inspection. NIST's examination procedures establish a system that enables state and local officials to audit retailers uniformly to determine whether they are pricing merchandise accurately. *Id.*, §§ 5-8. These procedures also create a uniform enforcement system that establishes increasingly severe consequences for sequential audit failures. *Id.*, § 11.

Discrepancies on shelf tags cannot be eliminated. Government oversight pursuant to Handbook 130 recognizes that fact by allowing for some degree of variation that reflects the reality of human involvement in shelf level pricing. *See, e.g.*, *id.*, § 10.2 (permitting up to 2% of inspected items to have a discrepancy). These standards developed by professional weights and measures experts make sense and provide a realistic standard for store level employees.

Plaintiffs acknowledge that Handbook 130 governs here. In fact, they premise their claim on a violation of the price verification procedures in Handbook 130 and extensively discuss these procedures. *See* Compl., ¶¶ 26-42. Plaintiffs in their Complaint even allege that "to be compliant under NIST Handbook 130, . . . a store would need to have charged a higher price than advertised on 2 or less products out of 100 products examined per store." *Id.* ¶ 31.

However, in their response to Dollar General's pre-motion letter, Plaintiffs argue that NIST Handbook 130 is not a rule or regulation and only provides guidelines and best practices. *See* ECF No. 68 at 5. But numerous courts have recognized that NIST standards are rules and regulations and thus can be the basis for application of safe harbor provisions in various state deceptive trade practice acts. *See, e.g.*, *Dinan v. SanDisk LLC*, 844 Fed. Appx. 978 (9th Cir. 2021); *Alvarez v. Chevron Corp.*, 656 F.3d 925 (9th Cir. 2011); *Salgibria Enters., LLC v. Cheney Bros., Inc.*, 2022 WL 7049246 (S.D. Fla. Aug. 16, 2022). In fact, one court specifically found that "NIST is a

division of the U.S. Department of Commerce, which clearly qualifies as a 'regulatory body'" and that, "if the U.S. Department of Commerce, through NIST, authorizes [a practice], then the plaintiff's [consumer fraud] claim is barred by [the safe harbor provision]." *O'Keefe v. Walgreens Boots Alliance, Inc.*, 172 N.E.3d 1159, 1163 (Ill. App. 2020).

It is undisputed that there has never been a single failed governmental price audit at the White Lake store. SOF, ¶ 77; *see generally* Compl. Moreover, Plaintiffs have failed to show that the price discrepancies they experienced violated Handbook 130's EPPV. NIST Handbook 130 allows up to a 2% rate of price discrepancies in a sample selected using its procedures. Plaintiffs do not allege they used these procedures in their transactions. Nor could they: they only purchased a few items that they allege had price discrepancies. Indeed, the evidence suggests that Plaintiffs instead went looking to find price discrepancies to gather evidence for a lawsuit—far from a random sample to assess the error rate.

Accordingly, Handbook 130 governs here, and the transactions at issue complied with it. The safe harbor provision of GBL § 349(d) thus applies, and summary judgment should be granted.

## IV.    This Issue Is Controlled By *Specific* NY Laws, Not the *General* GBL.

Plaintiffs' claim also fails because it is controlled by New York State Weights and Measures Law, Article 16 of the Agriculture and Markets Law and related Sections—not the GBL. In New York, specific law will prevail over a general law on a particular issue. *See Bursco v. Braun*, 645 N.E.2d 724, 727 (N.Y. 1994). "A special statute which is in conflict with a general act covering the same subject matter controls the case and repeals the general statute insofar as the special act applies." *Id*.

New York has a *specific* law which states that after inspections regulated by the commissioner of agriculture and markets, "[p]enalties may ***only*** be imposed for . . . [o]vercharges found in a sample selected using the procedures . . . of this section when overcharges number more

than two percent of the sample." N.Y. Agric. & Mkts. Law §§ 176, 197-b(3)(a) (emphasis added). This means retail stores are not punished if pricing audits determine that there is a price variation of less than 2%. *See id*. In contrast, the GBL is a collection of *general* business laws. Not to mention, the New York State Weights and Measures Law does not create a private right of action to sue over alleged "overcharges," that is, a price discrepancy.

Courts have often dismissed lawsuits that attempt to improperly circumvent specific enforcement schemes dictated by federal or state statutes. *See, e.g.*, *Gift & Luggage Outlet, Inc. v. People*, 756 N.Y.S.2d 717 (2003); *Conboy v. AT&T Corp.*, 241 F.3d 242 (2d Cir. 2001); *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187 (2d Cir. 2005). That is exactly what Plaintiffs attempt to do here. Plaintiffs seek to impose a strict liability standard against Dollar General under which a single price discrepancy could result in civil liability (and potential statutory damages and attorneys' fees) no matter the processes the store implemented to achieve pricing accuracy, or the safeguards in place to notify consumers in the event of inevitable human error, or even if the rate of error is below 2%. This necessarily conflicts with New York's regulatory standards already in existence by demanding a level of perfection that government experts (and the law) do not require.

Plaintiffs' only response is that Dollar General has allegedly "failed hundreds of audits at its stores statewide and has been cited for engaging in rampant overcharging practices, demonstrating failed compliance with the NIST." ECF No. 68 at 5. But as applied here, Plaintiffs have no proof that the White Lake Dollar General store failed an inspection where 2% of in-store items had price discrepancies. In fact, it is "[u]ndisputed that the White Lake store did not fail a government audit."[5] SOF ¶ 77; *see generally* Compl.

---

[5] Plaintiffs claim audits are a "disputed issue" because there are "internal compliance audits which noted pricing problems with the White Lake Store." SOF ¶ 77. That point does not make a disputed

Because there are *specific* New York laws that govern price discrepancies (which Dollar General did not violate), and those laws do not create a private right of action, Plaintiffs cannot bring a GBL § 349 claim as to price discrepancies. The Court should enter summary judgment.

## V.    Plaintiffs' Recovery Is Barred By The Voluntary Payment Doctrine.

Plaintiffs' GBL § 349 claim is also disallowed under the common law doctrine of voluntary payment. This doctrine "bars recovery of payments voluntarily made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law." *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 790 N.E.2d 1155, 1156 (N.Y. 2003); *see also, e.g.*, *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 78 (S.D.N.Y. 2006) (the doctrine "bar[s] recovery by any RCN subscriber who, having experienced slower than advertised service, continued to pay for and use RCN's high speed internet service" and "bar[s] recovery by any RCN subscriber who paid his or her bill even though it contained an extra $25.00 per charge for premium high speed internet service"). This doctrine applies to "statutory claims, including claims brought under GBL § 349." *Wurtz v. Rawlings Co.*, 2016 WL 7174674, at *6 (E.D.N.Y. Nov. 17, 2016). This doctrine can also be used to decline to certify a class when members make payments despite having full knowledge of pricing concerns. *Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62, 74 (S.D.N.Y. 2013).

Contrary to Plaintiffs' assertions (ECF No. 68 at 5), it is well established that Dollar General fully disclosed the pricing on the register displays which have screens showing individual and total amounts owed. *See* Section II.A.1. It is also well established that Plaintiffs made these three consecutive purchases over four months and completed those purchases despite knowing of the possibility of price discrepancies from each prior purchase. *See id*. Even prior to any of the relevant purchases, Plaintiffs had been warned by Joseph's father and counsel here, Mr. Andrew

---

fact as to government audits and auditing standards performed pursuant to NIST standards. There is no evidence that such internal compliance audits were performed pursuant to NIST standards.

Wolf, about possible pricing issues. SOF ¶ 122; J. Wolf Tr. 46:23-47:3, 159:11-160:23; Pltfs' First

Am. RFA Resp. No. 91; Wilner Exp. Rep. at 33. Moreover, Plaintiffs each took photographs of

product shelf pricing/labeling. SOF ¶¶ 17-18, 86-87, 98, 110.

Plaintiffs claim that this doctrine does not apply because there was a lack of full disclosure,

citing *Samuel v. Time Warner Inc.*, 809 N.Y.S.2d 408, 418 (N.Y. Sup. Ct. 2005). But as explained

above in Section II.A.1, the point-of-sale price was fully disclosed by the register display. Thus,

the Plaintiffs have failed to demonstrate why the doctrine's bar would not apply here.

### VI.    Plaintiffs Lack Standing To Seek Injunctive Relief.

The Second Circuit has held that injunctive relief is inappropriate in matters such as these.

In fact, "past purchasers of a product . . . . are not likely to encounter future harm of the kind that

makes injunctive relief appropriate." *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147 (2d Cir. 2020)*.* Past

purchasers generally lack standing because, essentially, "once they become aware they have been

deceived, that will often be the last time they will buy that item." *See id*. And if they do choose to buy

the product again, "there is no reason to believe that [they] will incur a harm anew;" basically, they

will not fall prey to the same information that deceived them in the first place. *See id*. at 148.

Plaintiffs knew of the possibility of price discrepancies, and Joseph has even testified that "for

a price discrepancy[,] in the future, he has the option to take time to, you know, try to settle something

with an employee." SOF, ¶ 68; J. Wolf Tr. 133:7-14. This testimony alone demonstrates why *these*

past purchasers are unlikely to suffer repeated injuries from future product purchases. Because

Plaintiffs are unlikely to incur this same price discrepancy harm again, they lack standing needed to

seek injunctive relief. The Court should enter summary judgment on Plaintiffs' injunctive relief claim.

### VII.    Punitive Damages Are Unavailable Under GBL § 349.

"[P]unitive damages, as generally understood, are unavailable under [GBL] § 349."

*Guzman v. Harris*, No. 16-CV-3499 (GBD) (RLE), 2017 WL 4386369, at *2 (S.D.N.Y. Sept. 29,

2017). This is because "[t]raditional punitive damages are not provided for within the text of GBL." *Id*. Plaintiffs attempt to suggest that "there is tension in New York law . . . as to awarding punitive damages under section 349." ECF No. 68 at 5. The contrary is true. "The New York State Senate and Assembly also appear to agree that punitive damages are not included in the statute as they have tried unsuccessfully multiple times to include language about punitive damages." *Guzman*, 2017 WL 4386369, at *3 (citing, among others, S. 435, 239th Sess. (N.Y. 2017)). Importantly, this district specifically chose not to follow the ruling of Plaintiffs' cited *Bueno* case. *See Pyskaty v. Wide World of Cars, LLC*, 2018 WL 11544551, at *2 n.1 (S.D.N.Y. Apr. 9, 2018). Accordingly, *Guzman* is far more persuasive, and punitive damages should be disallowed here.

In any event, there is no evidence that Dollar General engaged in conduct that would be punishable by punitive damages. There is unrebutted expert evidence that the safeguards in effect in Dollar General stores to prevent a price discrepancy are robust and should work in many instances to prevent a price discrepancy from occurring. SOF ¶ 69, Sajnani Exp. Rep. at 12-13. Moreover, the fact that some of the price discrepancies in various inspections were undercharges is notable. SOF ¶ 73. There is also unrebutted expert evidence that undercharges such as these demonstrate there is no deliberate attempt to harm customers through pricing. SOF ¶ 73, Sajnani Exp. Rep. at 9. Thus, no facts support punitive damages here, and they should be stricken.

## **CONCLUSION**

Dollar General respectfully requests that the Court grant the Motion.

Dated: September 27, 2024          DOLGEN NEW YORK, LLC
      New York, NY

                                              By Counsel:

                                              *s/ Philip A. Goldstein*
                                              Philip A. Goldstein
                                              McGuireWoods LLP
                                              1251 Avenue of the Americas, 20th Floor
                                              New York, New York 10020-1104

Phone: (212) 548-2100
Fax:    (212) 548-2150
Email: pagoldstein@mcguirewoods.com

R. Trent Taylor (*Pro hac vice*)
Travis C. Gunn (*Pro hac vice*)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Phone: (804) 775-1000
Fax:    (804) 775-1061
Email: rtaylor@mcguirewoods.com
Email: tgunn@mcguirewoods.com

*Counsel for Dolgen New York, LLC*