# EXHIBIT 3





# Transcript of Joseph Wolf

**Date:** January 8, 2024
**Case:** Wolf, et al. -v- Dolgen New York, LLC

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE SOUTHERN DISTRICT OF NEW YORK

3    ------------------------------x

4    JOSEPH WOLF, CARMEN WOLF,      :

5    ON BEHALF OF THEMSELVES AND    :

6    THOSE SIMILARLY SITUATED       :

7         Plaintiffs,         :    Case No.:

8    v.                        :    7:23-cv-00558-P

9    DOLGEN NEW YORK, LLC D/B/A     :

10   DOLGEN,                        :

11        Defendant.          :

12   ------------------------------x

13              Deposition of JOSEPH WOLF

14                 Washington, D.C.

15              Monday, January 8, 2024

16                   10:05 a.m.

17

18

19

20

21

22

23   Job No.:  520639

24   Pages:  1 - 245

25   Transcribed by:  Molly Bugher

1    Deposition of JOSEPH WOLF, held at:

2          405 E 50th Street

3          New York, NY 10022

4          Phone: (212) 594-5300

5

6

7

8

9              Pursuant to Notice, before Enrique

10   Casas, Notary Public in and for the State of New

11   York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFFS JOSEPH WOLF, et al.:
 3        HUNTER BRYSON, ESQUIRE
 4        MILBERG COLEMAN & GROSSMAN LLP
 5        405 East 50th Street
 6        New York, NY 10022
 7        Phone: (212) 594-5300
 8   AND
 9        JAVIER MERINO, ESQUIRE
10        DANN LAW
11        1520 Highway 130
12        North Brunswick, NJ 08902
13        Phone: 201-355-3440
14
15   ON BEHALF OF DEFENDANT DOLGEN:
16        TRENT TAYLOR, ESQUIRE
17        MCGUIREWOODS LLP
18        800 East Canal Street
19        Richmond, VA 23219
20        Phone: 804.775.1000
21
22   ALSO PRESENT:
23        HAROLD RODRIGUEZ - PD Videographer
24
25
```

```
1                   C O N T E N T S

2

3  EXAMINATION OF JOSEPH WOLF                    PAGE

4        By Mr. Taylor............................ 7

5        By Mr. Merino......................... 238

6               E X H I B I T S

7  NUMBER    DESCRIPTION                     PAGE

8  1         Notice............................ 23

9  2         CV................................ 23

10 3         Complaint......................... 42

11 4         Photos............................ 98

12 5         Photos........................... 111

13 6         Photos........................... 150

14 7         Reponses......................... 158

15 8         Report........................... 172

16 9         Photos........................... 177

17 10        Photos........................... 184

18 11        Photos........................... 191

19 12        Flyer............................ 192

20 13        Report........................... 193

21 14        Statement........................ 195

22 15        Photos........................... 200

23 16        Report........................... 202

24 17        Photos........................... 204

25 18        Photos........................... 205
```

1                    E X H I B I T S

2                        (Continued)

3      NUMBER      DESCRIPTION                    PAGE

4      19          Photos.......................... 207

5      20          Responses....................... 212

6      21          Audit........................... 236

7      22          Agreement....................... 236

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          VIDEOGRAPHER:  Here begins media number

3   one in the videotaped deposition of Joseph Wolf in

4   the matter of Wolf et. al. vs. Dolgen New York,

5   LLC in the United States District Court for the

6   Southern District of New York, case number 723-CV-

7   00558-PMH.  Today's date is January 8, 2024.  The

8   time on the video monitor is 10:05 a.m.  The

9   videographer today is Harold Rodriguez

10  representing Planet Depos.

11          This video deposition is taking place at

12  405 E. 50th Street, New York, New York, 10022.

13  Would counsel please voice identify themselves and

14  state whom they represent?

15          MR. MERINO:  Javier Merino of the Dann

16  Law firm, counsel for the Plaintiffs and the

17  putative class.

18          MR. BRYSON:  Hunter Bryson on behalf of

19  the Plaintiffs and the putative class.

20          MR. TAYLOR:  Trent Taylor with McGuire

21  Woods on behalf of Dolgen New York, LLC, doing

22  business as Dollar General, the Defendant.

23          VIDEOGRAPHER:  The Court Reporter today

24  is Henrique Casas representing Planet Depos.  Will

25  the witness now be sworn in, please?

1              JOSEPH WOLF,

2       a witness, having been duly sworn was

3  examined and testified as follows:

4              MR. TAYLOR:  All right.  Before we get

5  started, I just want to put on the record that a

6  protective order governs in this case the

7  deposition transcripts and the exhibits and we

8  will make the appropriate confidentiality

9  designations if necessary at the appropriate time.

10         EXAMINATION BY COUNSEL FOR DEFENDANT,

11                     DOLGEN

12  BY MR. TAYLOR:

13      Q:   So first of all, good morning, Mr. Wolf.

14      A:   Good morning.

15      Q:   Before we get started to the substance

16  of this deposition, let me ask you this first,

17  have you ever been in a deposition before?

18      A:   No.

19      Q:   So let me go over a few guidelines that

20  might make what we do here today a little bit

21  easier on all of us.  So I'm going to ask you

22  questions and we are trying to get information, so

23  if you can answer to the best of your ability that

24  would be fantastic.  The first sort of guideline

25  is we need verbal answers rather than shaking of

1   heads or nods or that kind of thing.  Is that

2   okay?

3       A:   Yes.

4       Q:   The second thing is that we should try

5   not to talk over each other because it makes it

6   very difficult for our court reporter to take down

7   two different people at the same time.  So I'm

8   going to try to make sure that you finish your

9   answer before I ask another question.  And if you

10  could do the same, then I think that will make

11  things easier for everyone.  Is that okay?

12      A:   Okay.

13      Q:   And if I ask questions today that you

14  don't understand, just let me know.  You can ask

15  me to rephrase where you can tell me that you

16  don't understand the question and then I will do

17  my best to rephrase it in a way so that it is

18  something that you can understand.  Is that okay?

19      A:   Yes.

20      Q:   And if you don't let me know that you

21  don't understand something, then I'm going to

22  assume that you do understand the question.  Is

23  that fair?

24      A:   I guess so.  I may understand it

25  differently in a way that you are asking it.  So

1   we may not have the same things in our heads even

2   though I don't like, say I don't understand it.

3   So I'm not actually sure if that's fair.  But I

4   will -- if I don't -- if I believe I don't

5   understand the question I will always let you

6   know, if that makes sense.

7       Q:   Yeah.  And if you're -- if you think

8   there might be a different interpretation or

9   somehow --

10      A:   If I think there is, yeah.

11      Q:   If you think that we are not on the same

12  page, then just let me know, okay?  Is that okay?

13      A:   Sure.

14      Q:   The fourth thing is if we need to take

15  any -- I'm sure that we will be taking breaks

16  today.  Just let me know if you would like to take

17  a break.  There may be times when I say, oh, let's

18  take a break or your counsel may say let's take a

19  break.  The only thing that I ask before we take a

20  break is that you ask -- excuse me -- you answer

21  the question that is pending before we take the

22  break.  Is that okay?

23      A:   Yes.

24      Q:   So let me ask you this.  Is there any

25  medical condition that you have that would prevent

1  you from answering my questions fully, truthfully,

2  and accurately?

3      A:   No.

4      Q:   Are you currently on any medications

5  that would affect your ability to completely and

6  truthfully answer my questions today?

7      A:   No.

8      Q:   You understand that you're testifying

9  under oath today?

10     A:   Yes.

11     Q:   And you understand that for all intents

12 and purposes you are testifying to a jury and that

13 the videotape of this proceeding may be shown to

14 the jury?

15     A:   Yes.

16     Q:   So let's start if we could -- if you

17 could tell me your full name.

18     A:   Joseph Allan Wolf.

19     Q:   And is that Allan with; A-L-L-E-N?

20     A:   A-L-L-A-N.

21     Q:   A-N; got it, okay.  And what is your

22 current address?

23     A:   My mailing address, home address is 3220

24 92nd Street, apartment 211, East Elmhurst, New

25 York 11369.

1      Q:   Do you have any other -- is that where

2  you primarily reside?

3      A:   Yes.

4      Q:   How long have you been at that address?

5      A:   That address, I think since 2018.

6      Q:   And does anyone live there with you?

7      A:   Yes.

8      Q:   And who is that?

9      A:   My wife and children.

10      Q:   And can you tell me your wife's name?

11      A:   Carmen.  Carmen Wolf, sorry.

12      Q:   How many children do you have?

13      A:   Two.

14      Q:   And how old are they?

15      A:   Seven and four.

16      Q:   Well, okay.  I have three children

17  myself, so I know how that is.  And what is your

18  date of birth?

19      A:   December 16, 1982.

20      Q:   And I'm sorry, what are your children's

21  names?

22      A:   Penelope and Arabella.

23      Q:   I believe you indicated that you're

24  currently married.  How long have you been

25  married?

1      A:   A little over 10 years.

2      Q:   And do you have any prior marriages?

3      A:   No.

4      Q:   And you did say that your children live

5  with you?

6      A:   Yes.

7      Q:   Does anyone else live with you at that

8  East Elmstead --

9           A.   Elmhurst.

10     Q:   Elmhurst address other than you, your

11  wife, and your two children?

12     A:   No.

13     Q:   And do you own any other properties?

14     A:   Yes.

15     Q:   And how many?

16     A:   One.

17     Q:   And can you tell me where that other

18  property is?

19     A:   In Bethel, New York.

20     Q:   And what's the address of that?

21     A:   30 Berkshire Trail.  It's kind of weird.

22  It doesn't actually have a ZIP Code.  It's that

23  rural.  But the closest one, Smallwood, New York

24  12778.

25  COURT REPORTER:  I'm sorry, what was

1   that?  New York?

2           THE WITNESS.  Smallwood, New York would

3   be the closest postal code.

4       Q:   And who's the owner of the property?  Is

5   that you and your wife?  Just you?

6       A:   I believe me.  Yeah, I think just me.

7       Q:   And how long have you owned that

8   property?

9       A:   Since December, mid December 2020.

10      Q:   And how far a drive is that from your

11  residence in East Elmhurst?

12      A:   About two hours.

13      Q:   And what is the route you typically take

14  in driving to that residence for that property?

15          MR. MERINO:  Objection to form.  You can

16  answer.

17          THE WITNESS:  Answer?

18          MR. MERINO:  Yes.

19      A:   To go from my apartment to there?

20      Q:   Yeah.

21      A:   I often follow what GPS kind of thinks

22  is best.  I'm trying to think what we typically

23  do.  I think typically, crossing the GW into New

24  Jersey and then taking I guess a road from New

25  Jersey up to Bethel if that makes sense.

1      Q:   And you know what that road is that goes

2   there?  Is it like a highway?

3      A:   Usually a highway, yeah.

4      Q:   Do you know which one it is by any

5   chance?

6      A:   I'm really bad with directions.

7      Q:   Yeah, me too.

8      A:   I'm -- GPS, yeah.

9      Q:   That's fine.  And what is that

10   particular property in Bethel or Smallwood, the 30

11   Berkshire Trail, is that what is called?

12      A:   Yes.

13      Q:   And what is sort of the purpose of that

14   particular property?

15           MR. MERINO:  Objection to form.  You can

16   answer.

17      A:   It's what you might call a vacation

18   home.

19      Q:   And is it near a lake or forest or

20   anything like that?

21      A:   There is a lake and there are forests,

22   woods I would call them, yeah.

23      Q:   And what lake is near there?

24      A:   The closest large lake I guess, White

25   Lake.

1    Q:   And how often do you go to the 30
2  Berkshire Trail property?

3    A:   How often?  Are you looking for like in
4  a -- I guess I don't understand the question.
5  Yearly?  Monthly?  What?  Can you rephrase that?

6    Q:   Yeah, why don't we start with yearly?
7  Like how many times a year would you go to the 30
8  Brookshire Trail property?

9    A:   Yeah.  Maybe like 30, around 30 times a
10 year.  I don't know.  30 plus.

11   Q:   And does it vary by season?  Do you go a
12 little bit more in the summer versus the winter?

13   A:   That depends on the year.

14   Q:   And when was the last time you were
15 there?

16   A:   Yesterday.

17   Q:   And when you go to that property, does
18 your family typically go with you?

19   A:   Yes.

20   Q:   So you were there this past weekend?

21   A:   Yes.

22   Q:   And was your family there with you?

23   A:   Yes.

24   Q:   And how many days were you there for?

25 A:   One day.

1        Q:     Just Sunday?

2        A:     Arrived Sunday evening -- or I'm sorry,

3     Saturday evening, left Sunday evening.

4        Q:     And is there a Dollar General store in

5     the vicinity of the 30 Berkshire Trail property?

6        A:     Yes.

7        Q:     And how far away would you say it is

8     from -- how far away is the Dollar General from

9     the 30 Berkshire Trail property?

10       A:     Hard for me to quantify miles.  Driving

11    a car, two minutes.

12       Q:     When you were there this weekend at 30

13    Berkshire Trail property, did you happen to visit

14    the Dollar General?

15       A:     So I shopped there frequently.  So

16    actually I'm not sure.  It's possible.  I don't

17    want to say definitively just because I'm such a

18    frequent shopper there.  Yeah.

19       Q:     So you don't recall whether you shopped

20    there yesterday?

21       A:     I may have ran out for something in the

22    morning.  But maybe I was confusing it with many

23    times that I've been there.  I can think of it,

24    but I can kind of think of maybe what -- yeah,

25    sorry.  Yeah, I really don't want to be confusing

1  of it.  So I'm not sure.  I could check my credit

2  card statements or something.  But yeah.

3      Q:   So I just want to make sure I'm clear

4  here.  Is it your testimony that you do not recall

5  whether you shopped at a Dollar General yesterday?

6      A:   So I often run in just quickly for

7  single items.  Right now I don't recall.  Do you

8  want to give me a minute?  Can I think?

9      Q:   Yeah, think.

10     A:   Try to think, okay.  Yeah, I don't want

11 to say something that I'm not certain of.  So I'm

12 not certain is my testimony.

13     Q:   Mr. Wolf, do you have any conditions

14 that affect your memory?

15     A:   No.

16     Q:   Are you on any medications that affect

17 your memory?

18     A:   No.

19     Q:   And it's still your testimony that you

20 do not recall whether you shopped at a Dollar

21 General just yesterday?  And that's your testimony

22 to the gentlemen and ladies of the jury via

23 videotape?

24     A:   Yeah.  Right now, not certain if I went

25 yesterday.  I did a lot yesterday.  Built a

1  snowman with my children, a lot of things

2  yesterday.  So I frequently shop at Dollar

3  General.  So I don't want to confuse different

4  instances or whatever.  So yeah, I'm not sure if I

5  went in there for a minute yesterday and picked up

6  something or not.  Honestly, I'm sorry.

7      Q:   What did you have for breakfast

8  yesterday?

9      A:   My wife made me an omelet.  An omelet,

10 yeah.

11     Q:   Did you have lunch yesterday?

12     A:   I don't think I did.

13     Q:   You mentioned you did a lot yesterday

14 and you mentioned building a snowman.  What else

15 did you do yesterday?

16     A:   Sled.  I sledded, went down a hill with

17 my children on a sled in the snow.

18     Q:   How much snow do they get up there?

19     A:   It was a good amount of snow.

20     Q:   Do you know how many inches?

21     A:   I can't -- I don't know exactly about

22 the inches, but it was a good amount of snow.

23     Q:   Enough to sled and build a snowman, I

24 guess?

25 A:   Yeah.  Yeah.

1      Q:    Do you recall anything else you did

2  yesterday?

3      A:    Yeah, we drove home in the evening back

4  to our apartment.

5      Q:    Did you stop anywhere along the way once

6  you started the drive home?

7      A:    No.

8      Q:    And what time did you leave to drive

9  home?

10      A:    Maybe 7:00 p.m.

11      Q:    All right.  I want to go back to -- let

12  me ask you this.  Do you hold any elected

13  positions?

14      A:    No.

15      Q:    All right.  Do you have any membership

16  in any clubs, churches, or organizations?

17      A:    No.

18      Q:    Are there any volunteer activities that

19  you engage in on a regular basis?

20          MR. MERINO:  Objection to form.  You can

21  answer.

22      A:    No.

23      Q:    And do you have any hobbies?

24      A:    Yes.

25  Q:    Can you tell me what some of those are?

1      A:    Reading history books.

2      Q:    If you have any good recommendations, by

3  all means let me know.  Any other hobbies?

4      A:    No.

5      Q:    Let me ask about any relatives living

6  nearby.  Do you have any relatives that live

7  nearby?

8            MR. MERINO:  Objection to form.  You can

9  answer.

10     A:    Nearby?  Sort of clarify.  Nearby where?

11     Q:    Near your work or in New Jersey.

12     A:    And what does nearby mean?

13     Q:    In the states of New York or New Jersey.

14     A:    In the entire state of New York or New

15  Jersey, yes.

16     Q:    And can you tell me who some of them

17  are?

18     A:    My wife lives with me.

19     Q:    We already talked about your wife and

20  children, but sort of other than that.

21     A:    Yeah.  A brother in New Jersey.

22     Q:    Let me ask you, what is his name?

23     A:    Daniel Wolf.

24     Q:    And what does he do for a living?

25  A:He is -- I don't know the exact title,

1   but he -- sort of almost like a guidance counselor

2   at a high school.

3       Q:    At a high school you said?

4       A:    Sorry, middle school.

5       Q:    Middle school?

6       A:    Yeah.

7       Q:    What about any other relatives who live

8   in the states of New York or New Jersey?

9       A:    Yeah, my mother and father.

10      Q:    And where do they live?

11      A:    In New Jersey.  Sorry, New York,

12  Brunswick, New Jersey.

13      Q:    And your father's name is Andrew?

14      A:    Yes.

15      Q:    And he is a lawyer; is that correct?

16      A:    Yes.

17      Q:    And what is your mother's name?

18      A:    Laura.

19      Q:    Laura, okay.  And does she have an

20  occupation?

21      A:    No.

22      Q:    Has she ever had an occupation to your

23  knowledge?

24      A:    Yes.

25  Q:    And what was that?

1      A:    Something in the mortgage industry,

2   yeah.

3      Q:    What about any other relatives who live

4   in the states of New York or New Jersey?

5      A:    I guess when you're saying relative,

6   how -- what does that mean?  Like how far are we

7   trying to branch?

8      Q:    Sure.  So I guess what I'm talking about

9   our -- you've already talk about your mother and

10  father.  Any other siblings?  Let's start with

11  that.  Any of your siblings that live in the

12  states of New York or New Jersey?

13     A:    No.

14     Q:    What about -- well, let's stop there.  I

15  can ask your wife those questions tomorrow about

16  her family.  I think what I would like to do now

17  is mark some exhibits.  So bear with me just one

18  second.

19          MR. TAYLOR:  Can I get some more water?

20          UNIDENTIFIED SPEAKER:  I'll get more

21  water.

22          MR. TAYLOR:  All right, thank you.

23     Q:    All right.  I'm handed you what's been

24  marked as Wolf 1.  Mr. Wolf, have you ever seen

25  this document before?

1              (Exhibit 1 was marked for

2      identification.)

3          A:   Yes.  Yes, yeah.

4          Q:   And what's your understanding of what

5      the document is?

6          A:   This is a notice of deposition.

7          Q:   That's fine.  You can set that aside.

8      All right.  I'm now handing you what has been

9      marked as Wolf 2.  Do you recognize that document?

10             (Exhibit 2 was marked for

11     identification.)

12         A:   Yes.

13         Q:   Okay, and what is it?

14         A:   This is my resume.

15         Q:   And did you put this together yourself?

16         A:   Yes.

17         Q:   And how up-to-date is it?  Or is it up-

18     to-date?

19         A:   Yeah, it's up-to-date.

20         Q:   I just wanted to go through a couple of

21     things here.  So it says that you work at the

22     Brooklyn Latin School.  Is that correct?

23         A:   Yes.

24         Q:   And it says that your honor is classical

25     and IB 20th-century history teacher and advisor;

1    is that correct?

2         A:   Yes.  No longer -- so the advisor there,

3    now that I'm looking at that, that kind of speaks

4    to a program we don't offer anymore, but yeah.

5         Q:   And you have worked continuously in that

6    job since September 2009?

7         A:   Yes.

8         Q:   And is that a public school?  Private

9    school?

10        A:   Public school.

11        Q:   And how far is that from your apartment

12   in East Elmhurst?

13        A:   Can you qualify what you mean by how

14   far?  Like how far mileage?

15        Q:   How far is your commute?  How far is

16   your commute?

17        A:   How many miles?

18        Q:   I mean in terms of time.

19        A:   Time, okay.  Typically 30 minutes

20   driving.

21        Q:   And do you typically drive to work?

22        A:   Yes.

23        Q:   Have you -- Mr. Wolf, have you ever

24   worked in retail before?

25   A:   No.

1      Q:    I believe you testified earlier that

2  you've never had your deposition taken.  You can

3  set that aside.  Is that correct?

4      A:    Yes.

5      Q:    Have you ever testified at any kind of

6  court hearing or trial in the past?

7      A:    No.

8      Q:    Have you ever filed a worker's

9  compensation claim?

10      A:    No.

11      Q:    Have you ever filed a Social Security

12  disability claim?

13      A:    No.

14      Q:    Have you ever been convicted of a

15  felony?

16      A:    No.

17      Q:    Have you ever filed for bankruptcy

18  petition in the last five years?

19      A:    No.

20      Q:    Have you spoken with the media at all

21  about this case?

22      A:    No.

23      Q:    Have you been contacted by the media at

24  all about this case?

25  A:    No.

1    Q:   All right.  What did you do to prepare

2  for this deposition?

3    A:   I reviewed documents and met with my

4  lawyers.

5    Q:   All right.  And when did you meet with

6  your lawyers?

7    A:   This morning, last week, and I believe

8  the week before.

9    Q:   This morning you said you met with your

10  lawyers.  Who in particular did you meet with?

11    A:   Javier and Hunter.

12    Q:   And how long did you meet with them for

13  approximately?

14    A:   This morning specifically?

15    Q:   Yeah.

16    A:   Twenty minutes.

17    Q:   What time did you get here this morning?

18    A:   9:30.

19    Q:   Was there anyone else present this

20  morning when you were meeting with Mr. Marino and

21  Mr. Bryson?

22    A:   No.

23    Q:   I believe you said that you also met

24  with your lawyers last week; is that correct?

25  A:   Yes.

1      Q:    And how long did you meet with your

2   lawyers last week approximately?

3      A:    Approximately an hour.

4      Q:    And did you meet with them in person or

5   via Zoom?

6      A:    Not via Zoom, but virtual, virtually,

7   yeah.

8      Q:    And who in particular did you meet with

9   last week for an hour?

10      A:    Hunter and Javier.

11      Q:    Anyone else present on the virtual

12   session with them other than you and those two?

13      A:    Yes.

14      Q:    And who was that?

15      A:    My wife.

16      Q:    Anyone else present other than you and

17   your wife and Mr. Marino and Mr. Bryson during

18   that virtual session?

19      A:    No.

20      Q:    And when you were meeting with them,

21   were you and Carmen on the same computer?  Or

22   excuse me, Ms. Wolf, on the same computer or

23   separate computers?

24      A:    We were on the same computer.

25   Q:  And let's go to the week before that

1  which I believe you said you also met with your

2  attorneys; is that right?

3      A:   Yes.

4      Q:   So two weeks ago.  How long did you meet

5  with your attorneys on that occasion?

6      A:   An hour as well.

7      Q:   And was that also virtual?  Or was it in

8  person?

9      A:   Virtual.

10     Q:   And who was present during that meeting?

11     A:   So me, Hunter, Javier.  I can't remember

12  if my wife was present at that one or not.

13     Q:   Was there anyone else present on that

14  occasion other than possibly your wife?

15     A:   No.

16     Q:   I believe you said you also reviewed

17  documents with your attorneys; is that correct?

18     A:   Yes.

19     Q:   And was it on all three occasions or

20  just some of them?

21     A:   I guess I don't recall specifically.

22     Q:   And how many -- do you know

23  approximately how many documents you reviewed with

24  your attorneys on those occasions?

25  A:   Just in those meetings?

1    Q:    Yeah.

2    A:    A few was all I can say.

3    Q:    And do you recall what any of them were?

4    A:    Can I just ask a question about that?

5    Q:    Sure, go ahead.

6    A:    This feels to me like it's diving into

7    what I spoke about with my lawyer.

8    Q:    Yeah.

9    A:    Am I allowed to --

10    Q:    So let me jump in and say this.  I'm

11    definitely not asking you about the conversations.

12    And that's why I sort of phrased the question why

13    did.  I'm curious about what document you looked

14    at, not about what the conversations around those

15    documents were.  And so yeah, before you get into

16    conversations with counsel, by all means you

17    should flag that and you should not just sort of

18    blurt it out.  Because some of that's going to be

19    potentially privileged.

20    A:    Yeah.

21    Q:    So right now I'm just asking about the

22    documents that you recall looking at.

23    A:    Just about documents?

24    Q:    Yeah.

25    A:    And you said documents we reviewed?  Is

1    that the question?

2         Q:    Yeah.

3         A:    And by review, what do you mean by

4    review?

5         Q:    Looked at.

6         A:    Like looked at --

7         Q:    In any form.

8         A:    So that's why I'm -- so we, I mean

9    talked about documents.  But I don't know that I

10   looked at any.  Yeah, I'm sorry.

11        Q:    Well then if there were documents that

12   were discussed, without getting into the content

13   of what those documents were --

14        A:    Yeah.

15        Q:    You could identify what those documents

16   were.

17        A:    Yeah.  I think one that was discussed

18   was a document with photos, photographs taken from

19   my phone.

20        Q:    Any other documents that you recall?

21        A:    Yeah, I mean we discussed the complaint.

22        Q:    Any other ones that you can recall?

23        A:    Specifically just from those preparation

24   sessions?

25   Q:Those three preparation sessions, this

1    morning and the other two.

2         A:    The class rights and responsibilities,

3    class representative document.

4         Q:    Is that from the retainer agreement?

5         A:    I'm not sure the language it's from,

6    yeah.

7         Q:    Any other documents you can recall?

8         A:    Not off the top of my head.

9         Q:    All right.  Mr. Wolf, let me ask you

10   this.  In your own words can you describe what

11   this lawsuit is about?

12        A:    Yes.

13        Q:    Please do.

14        A:    So Dollar General is overcharging

15   customers like myself.

16        Q:    All right.  Anything else that you would

17   add to that?  Or is that your description what the

18   suit is about?

19        A:    That's the core of it, Dollar General

20   overcharging customers like myself.  I would like

21   them to have accurate pricing and to provide

22   proper relief to people like myself who have been

23   overcharged.

24        Q:    And what do you hope to gain out of this

25   lawsuit if anything?

1          MR. MERINO:  Objection to form.  You can

2    answer.

3          A:   I really have to defer to my attorneys

4    on that.

5          Q:   Do you have any expectation of receiving

6    any compensation from this lawsuit?

7          A:   I've got to defer to my attorneys on

8    that.

9          Q:   You said that you hoped Dollar General

10   would provide proper relief to people like

11   yourself who have been overcharged, right?

12         A:   I did say that.

13         Q:   And what proper relief -- what do you

14   think proper relief would be?

15         A:   I would have to defer to my attorneys on

16   that to figure that out.

17         Q:   Do you have any opinion about what

18   proper relief would be?

19         A:   I've really got to defer to my attorneys

20   on that one.

21         Q:   Do you have an understanding of how

22   much, meaning money, you could make from this

23   lawsuit?

24          MR. MERINO:  Objection to form.  You can

25   answer.

1      A:   Yeah, I mean, this sounds like the same

2  question you've been asking.  So I've got to defer

3  to my attorneys on that.

4      Q:   Do you have any understanding of what

5  the damages sought in this lawsuit are?

6      A:   Can you clarify what you mean by

7  damages?

8      Q:   Yeah.  Do you have any understanding of

9  what this lawsuit is seeking from Dollar General?

10         MR. MERINO:  Objection to form.  You can

11 answer.

12     A:   Yes.

13     Q:   And what is that?

14     A:   Fair compensation to people who have

15 been overcharged and hopefully helping to make

16 sure that Dollar General has accurate pricing to

17 customers that shop there, Dollar General

18 specifically in New York State, yeah.

19     Q:   Anything else that you are aware of that

20 you are seeking in this lawsuit?

21     A:   No.

22     Q:   Do you want to shut down Dollar General

23 stores in New York?

24     A:   I've got to defer to my attorneys on

25 that.

1      Q:   Well, do you have an opinion on whether

2  or not you want to shut down Dollar General stores

3  in New York?

4           MR. MERINO:  Objection to form.  You can

5  answer.

6      A:   Yeah.  Again, I would have to defer to

7  my attorneys on that.

8      Q:   Let me ask you this.  Why are you

9  deferring to your attorney about whether you have

10  an opinion about whether you want to shut down

11  Dollar General stores in New York?

12      A:   Because I feel like this is something I

13  need to discuss with my attorneys.

14      Q:   And I'm not asking -- I'm just asking

15  whether you have an opinion sitting here today as

16  to whether you have a desire to shut down Dollar

17  General stores in New York.

18           MR. MERINO:  Objection, asked and

19  answered.  You can answer.

20      A:   Can you repeat the question?

21      Q:   Sure.  I'm asking whether sitting here

22  right now without any discussions with counsel,

23  whether you have an opinion about whether you, as

24  a result of this lawsuit, would like to shut down

25  Dollar General stores in New York.

1    MR. MERINO:  Objection, asked and

2  answered.  You can answer.

3    A:   Again, it -- forgive me if I'm not

4  understanding the question, but it sounds like

5  just another version of the same question you

6  already asked.  So to be able to answer that, I

7  would need to talk to my attorneys first.

8    Q:   And just -- I'm not --

9    A:   I know you are trying to splice hairs

10  here, but I don't see the difference.  So I'm not

11  being intentionally obtuse.

12    Q:   Yeah.  And all I'm trying to do is -- I

13  just -- whatever it is, it is.  I'm just trying to

14  understand it.  So is it your testimony that you

15  have no opinion sitting here right now about

16  whether Dollar General stores in New York should

17  be shut down?

18    MR. MERINO:  Objection to form.  You can

19  answer.

20    A:   It's my testimony that I need to talk to

21  my lawyers to be able to answer that question.

22    Q:   So here's what I'm trying to get at.

23  It's one thing you are saying you don't have an

24  opinion.  It's another if you're saying you have

25  an opinion but you don't want to give it.  And so

1  if your testimony is that you don't have an

2  opinion because you need to talk to your

3  attorneys, okay.  But I'm just -- so my question

4  is, do you have an opinion sitting here right now

5  about that particular issue?

6       MR. MERINO:  Objection, asked and

7  answered again.  You can answer.

8       A:   Do I have an opinion?  This is -- again,

9  this is something I need to talk to my lawyers

10  about.  Yeah.

11      Q:   I'm really going to have to insist on an

12  answer one way or another.  Do you have an opinion

13  one way or the other sitting here without talking

14  to your attorneys?

15      A:   Can I say that I don't know?  I -- yeah.

16      Q:   So it's your testimony you don't know

17  whether you have an opinion?

18      MR. MERINO:  Objection.

19      A:   Yeah.  So opinion sounds like a set

20  thing.  So I don't -- yeah, I don't.

21      Q:   Let me ask it a different way then.  Do

22  you have any thoughts of any type or variety

23  without talking to your lawyers about whether

24  Dollar General stores in New York should be shut

25  down?

1          MR. MERINO:  Objection, asked and

2     answered.  You can answer.

3          A:   I don't have any thoughts right now, no.

4          Q:   Mr. Wolf, do you want to punish Dollar

5     General as a result of this lawsuit?

6          MR. MERINO:  Objection to form.  You can

7     answer.

8          A:   Yeah, can you define punish?

9          Q:   I mean, are -- let me put it another

10    way.  Are you angry at Dollar General as a result

11    of the incidences of where you were overcharged?

12         A:   I'm not happy that they overcharged me.

13         Q:   And as a result of not being happy,

14    would you like to see Dollar General punished in

15    some form or fashion as a result of you been

16    overcharged?

17         MR. MERINO:  Objection to form.

18    Objection, asked and answered.  You can answer.

19         A:   I've got to defer to my attorneys on the

20    answer to that.

21         Q:   And once again, I guess I'm trying to

22    understand why it is that you feel like you need

23    to defer to your attorney about whether you want

24    to see Dollar General punished as opposed to how

25    they should be punished.  I'm asking whether you

1    want Dollar General punished.

2         A:    So to clarify, you're asking whether I

3    think there should be -- look, I want fair

4    compensation for all the people that Dollar

5    General overcharged and I want them have accurate

6    pricing.  It's my -- and can you -- yeah, I'm

7    having trouble with that word punish.  Can you

8    explain again what you mean by that?

9         Q:    Well, you filed a lawsuit suing Dollar

10   General.

11        A:    Yeah, course.

12        Q:    And I'm assuming -- well, there was a

13   reason for that.  You want Dollar General to

14   suffer some kind of consequences as a result of

15   the overcharging experiences that you had?

16             MR. MERINO:  Objection to form.  You can

17   answer.

18        A:    Yeah.  Yeah, I've stated what I want out

19   of the lawsuit, right?

20        Q:    So you do want Dollar General to suffer

21   some consequences as a result of the overcharging

22   experiences?

23             MR. MERINO:  Objection, mischaracterizes

24   testimony.  Objection, asked and answered.  I

25   think Mr. Wolf has made it pretty clear what he is

1    seeking through the lawsuit here.

2          MR. TAYLOR:  Well, and I understand that

3    Javier, but I don't feel like I've got an answer

4    to my question.  So I'm going to ask it again.

5          A:   So to clarify, you want me to label what

6    I've already said as, what I'm saying as a

7    consequence question is that what you want?

8          Q:   No, it's not what I want.  I'm just

9    trying to understand exactly what -- yeah, go

10   ahead.

11         A:   In my opinion, you could or could not

12   label those as consequences.  Yeah, I don't -- I

13   think these are consequences.  If Dollar General

14   fairly compensates all the people that they've

15   been overcharging, that would be a consequence,

16   cause and effect of what they've done.  But I

17   don't know if some of the language that's being

18   used here -- I don't want to be mischaracterized.

19   But yeah, anyway.  I would say if Dollar General

20   compensates all the people they've been

21   overcharging, I would say those are consequences

22   of Dollar General about his actions.

23         Q:   And let me ask you this.  I believe you

24   said earlier that you hope that -- to make Dollar

25   General have accurate pricing in New York stores;

1  is that right?

2      A:    I would like them to have accurate

3  pricing, yeah.

4      Q:    And do you have any kind of thoughts

5  about how or what Dollar General could do to

6  accomplish that?

7          MR. MERINO:  Objection to form.  You can

8  answer.

9      A:    So this sounds like it's asking me to

10 weigh in on what I want, like specific results for

11 some kind of specific -- and so in general I want

12 accurate pricing.  I would have to defer to my

13 attorneys on how they believe that could be

14 accomplished.

15     Q:    And I guess really my only question

16 there is whether you have any particular thoughts

17 about how that would be accomplished.  And if you

18 don't that's fine.  I just wanted to see if you

19 have any particular thoughts or ideas about how

20 Dollar General could accomplish that sitting here

21 right now.

22     A:    Yeah, I would have to defer to my

23 attorneys on that.

24     Q:    Well, once again, let me -- we are

25 seeking clarity here.

1      A:    Yeah.

2      Q:    So I'm going to ask you, do you

3  currently have any thoughts or ideas about that

4  particular issue without speaking to your

5  attorneys?  If the answer is no, that's fine.

6            MR. MERINO:  Objection to form.  You can

7  answer.

8      A:    Can you repeat the question again?  I'm

9  sorry.

10     Q:    Sure.  I believe you previously said you

11 hope to make Dollar General have accurate pricing

12 in New York stores.  In my question is, do you

13 have any --

14     A:    So I would like for them to have

15 accurate pricing, yeah.

16     Q:    And so my question is, do you have any

17 particular thoughts or ideas about how Dollar

18 General could accomplish that sitting here right

19 now without having to talk to your attorneys about

20 it?

21            MR. MERINO:  Objection to form.  You can

22 answer.

23     A:    Yeah, by complying with the law.

24     Q:    Anything else?

25 A:    That's it, yeah.

1      Q:   How did you -- Mr. Wolf, how did you

2  become involved in this lawsuit?

3      A:   I was overcharged by Dollar General.

4      Q:   And specifically, when did your first

5  overcharge occur?

6      A:   So the first overcharge that I'm aware

7  of was on September 4, 2022, I believe.  I don't

8  have the documents in front of me.

9      Q:   All right.  I'm handing you what has

10  been marked as Wolf 3.  Just one second.  Have you

11  seen this document before?

12          (Exhibit 3 was marked for

13  identification.)

14      A:   Yes.

15      Q:   All right.  And what is it?

16      A:   I believe this is called --

17          COURT REPORTER:  Watch the microphone.

18          THE WITNESS:  Oh, sorry.

19      A:   I believe this is called a complaint.

20      Q:   And have you seen this document before?

21      A:   Yes.

22      Q:   Did you read it or review it before it

23  was filed in court to your knowledge?

24      A:   Yes.

25  Q:   And let me turn your attention to

1  paragraph 14, which is -- I believe it's page 3.

2  And you'll see that it says in September 2022,

3  Joseph made two purchases at the White Lake Dollar

4  General store.  And then it has a chart below that

5  which has two transactions, one on September 18

6  and one on September 4.  Is that accurate?

7       A:   Yes.

8       Q:   And is it your testimony that the first

9  time that you were aware that you were overcharged

10 was on September 4?

11      A:   Yes.  Yes.

12      Q:   And that was the purchase of the 2

13 percent lactose-free milk?

14      A:   Yes.

15      Q:   And before that transaction on September

16 4, that transaction for the 2 percent lactose-free

17 milk, had you spoken or communicated with an

18 attorney about Dollar General in pricing?

19      A:   No.

20      Q:   And when was the first time that you

21 consulted with an attorney about Dollar General

22 and price discrepancies?

23      A:   On or about that day, September 4.

24      Q:   And so I understand that on or about,

25 but I guess --

1          A:    On or after, yeah.

2          Q:    So I guess my question is this, do you

3    recall specifically when you reached out to an

4    attorney about Dollar General and price

5    discrepancies, whether it was before or after this

6    transaction on September 4?

7          A:    After the transaction, yeah.

8          Q:    And you are certain of that?

9          A:    I'm sorry.  Can you repeat the question?

10   I just -- you're digging with are you certain and

11   I want to make sure I answer accurately.

12         Q:    Yeah.  So I believe you just testify

13   that the first time you reached out to an attorney

14   about Dollar General and price discrepancies, the

15   first time you contacted or communicated with an

16   attorney about Dollar General and its price

17   discrepancies was after the transaction that you

18   made at the Dollar General store on September 4,

19   2022 for 2 percent lactose-free milk; is that

20   correct?

21         A:    Yeah, the first time I spoke with anyone

22   in any sort of legal capacity as an attorney was

23   after that transaction.

24         Q:    Do you recall how close in time it was

25   to the transaction that you communicated with an

1   attorney?

2        A:   Yeah, this was over a year ago.  I

3   remember it being fairly close in time.  I can't

4   tell you the exact date.

5        Q:   Do you recall how you communicated with

6   the attorney on -- about Dollar General and its

7   price discrepancies for the first time?

8        A:   A phone call.

9        Q:   And do you recall what phone it was?

10  Was it from your cell phone or from some other

11  phone?

12       A:   Cell phone.

13       Q:   And who was the attorney that you spoke

14  with?

15       A:   Andrew Wolf.

16       Q:   Who is your father?

17       A:   Yes.

18       Q:   Let me ask you this.  Has Andrew Wolf,

19  your father, ever represented you as a lawyer any

20  other time in the past?

21       A:   So no.  I'm just trying to remember --

22  the reason of the pause, like in my teens, I don't

23  know, a speeding ticket or something, but nothing

24  that I can recall right now.

25  Q:   Then to your recollection he's never

1    represented you in an actual case before?

2        A:   No.  No.

3        Q:   And on or about September 4, related to

4    Dollar General, again, the price discrepancy

5    issues that you encountered, did you reach out to

6    Andrew Wolf first?  Or did he reach out to you

7    first?

8        A:   You're asking if after I was overcharged

9    if he reached out to me about my overcharge?

10       Q:   Yes.

11       A:   No, I reached out to him.

12       Q:   Do you recall him ever reaching out to

13   you about Dollar General and price discrepancy

14   issues prior to when you reached out to him in any

15   form or fashion --

16       A:   Yeah.

17       Q:   Whether they were specific to you or

18   not?

19       A:   Yeah, can you define reaching out?

20       Q:   Yeah, communicate, contact.

21       A:   Any communication?

22       Q:   Yeah.

23       A:   So prior to September 4 -- my wife and I

24   are frequent shoppers at Dollar General.  In sort

25   of casual conversation I mentioned to my father

1    that I was going to pick up something at Dollar

2    General.  He mentioned just to be careful there,

3    that they are known for overcharging customers.

4         Q:   And when was that conversation?

5         A:   I don't remember exactly.  I would guess

6    in the weeks before.  I don't have a specific date

7    in my memory.

8         Q:   Do you recall anything else about that

9    conversation with your father?  For instance, did

10   he mention that he was aware of legal actions or

11   that there might be legal actions about -- against

12   Dollar General for these -- for price

13   discrepancies?

14        A:   No.

15        Q:   Did he indicate that he represented

16   parties who might be filing suit?

17        A:   No.

18        Q:   And when you met with them, where did

19   you -- I mean, that particular conversation, was

20   that in person, or via phone, or similar, virtual?

21        A:   Yeah, I believe in person.

22        Q:   And do you recall where that was?

23        A:   I believe at the 30 Berkshire Trail

24   house.

25   Q:   So that's --

1          MR. MERINO:  Just when you're -- I could

2    use a break whenever you are done with your line

3    of questioning.

4          MR. TAYLOR:  Yeah, okay.  Let me just

5    ask another couple of questions.

6          Q:   So is this -- Mr. Andrew Wolf, does he

7    sometimes visit the 30 Berkshire Trail property?

8          A:   Yes.

9          Q:   And what was your reaction to --

10          A:   Oh, I'm sorry.  Just to clarify -- yeah,

11    no, sorry.  Yes, go ahead.

12          Q:   And I believe -- and so he, I believe he

13    said in casual conversation, he said just to be

14    careful about Dollar General, they've been known

15    to overcharge on some items or something like

16    that?  Is that fair?

17          A:   Yeah.

18          Q:   And what was your reaction to that?

19          A:   Thank you for letting me know.

20          Q:   And did -- as a result of that, did you

21    pay closer attention when you did shop at Dollar

22    General?

23          A:   Yeah, I mean generally speaking I trust

24    the prices.  I trust that stores are being

25    accurate in their pricing.  That made me worry a

1   little bit.  So I decided to be a little bit more

2   vigilant when I shopped in Dollar General, yeah.

3       Q:   And let me just -- and so you said that

4   in terms of timing you believe it might have been

5   a few weeks before September 4, a September 4,

6   2022 purchase at Dollar General?

7       A:   I don't remember exactly, yeah.

8       Q:   Could it have been six months before?

9       A:   I don't think it was.  No, definitely

10  not.  It was much closer than that, yeah.

11      Q:   Do you recall the time of year?  Was it

12  like in the summer?

13      A:   I mean, September 4 is still the summer.

14  So yeah, I mean some time -- when the summer

15  start?  July 21, is that -- and sometime in the

16  days or weeks before.  Yeah, sometime -- yeah, it

17  wasn't like the season before.

18          MR. TAYLOR:  All right.  Why don't we

19  take a break here?

20          MR. MERINO:  Okay.

21          COURT

22          (Off the record at 11:12 a.m., resuming

23  at 11:22 a.m.)

24  BY MR. TAYLOR:

25  Q:   All right Mr. Wolf, I wanted to go back

1  briefly to this conversation that we were talking

2  about before the break that you had with your

3  father, Andrew Wolf, in the weeks prior to the

4  September 4, 2022 transaction at Dollar General.

5       A:   Yes.

6       Q:   On that occasion, was there any

7  discussion at all, whether from you, from him, or

8  anyone else in the room about a lawsuit?

9       A:   No.

10      Q:   Was there any discussion at all, whether

11  from you or your father or anyone else in the room

12  on that occasion about going to purchase items at

13  Dollar General to determine whether there was an

14  overcharge?

15      A:   No.  So just to maybe help us out with

16  all the questions on the conversation, what I

17  stated was everything that was said.  So if you're

18  asking where there other this or that, that's what

19  was said.  So, yeah, it was like that 32nd

20  interaction or whatever.

21      Q:   Got it.  And have you ever shopped at a

22  Dollar General with your father, Andrew Wolf?

23      A:   To my recollection, no.

24      Q:   And am I correct in saying Andrew Wolf

25  is a lawyer with the Dann Law firm?

1        A:    Yes.

2        Q:    And he is a colleague of Mr. Merino?

3        A:    Yes.

4        Q:    All right.  Between that -- so you

5   mentioned the conversation you had with your

6   father, Andrew Wolf in the weeks prior to

7   September 4, 2022.  I'm now interested as to

8   whether or not there were any other communications

9   with your father about Dollar General in any form

10  or fashion whether from you or from him between

11  that conversation we just talked about and the

12  September 4, 2022 transaction you made at Dollar

13  General.

14       A:    Not that I can recall.

15       Q:    And let me ask you this.  I know it's a

16  little bit different for everyone and their

17  family.  How often do you see your father, Andrew

18  Wolf?

19       A:    Generally maybe once a month.

20       Q:    And do you typically travel to see him?

21  Or does he travel to see you?  Or it depends?

22       A:    A little of both.

23       Q:    Do you regularly communicate with him

24  via some other method whether phone calls, emails,

25  texts, instant messages?

1      A:    I guess can you define regularly?  It's
2  going to make me look like a bad son.
3      Q:    No, I'm not trying to do that.
4      A:    No, no.  But yeah, define regularly,
5  yeah.
6      Q:    Well, so I guess do you -- how often
7  would you say that you communicate with your
8  father, Andrew Wolf in any form or fashion?
9      A:    It really depends.  Sometimes I can go
10  long stretches without talking to him and
11  sometimes if there is something on my mind I will
12  reach out.  So I don't know if there is any one
13  answer to that.
14      Q:    When you do communicate with him, how do
15  you -- what are some of the ways you communicate
16  with him?
17      A:    Give him a call usually.
18      Q:    What about text messages or IMs?
19      A:    I have texted him, but more frequently
20  that I would say that's rarer than just calling
21  him and talking to him on the phone.
22      Q:    Is there sort of a regular time every
23  week where you or your family give him or your
24  mother a call?
25  A:    No.

1    Q:   What about email?  Do you email with him

2  at all?

3    A:   Generally, no.  I'm sure in my 40 years

4  there have been emails, but generally no.  I'm

5  sorry, the only thing I would add, sometimes my

6  kids and I will do like a FaceTime with grandma

7  and grandpa some evenings, yeah.

8    Q:   Got it.  So I want to go back for a

9  second to that conversation you had in the weeks

10  prior to September 4, 2022 where you say Andrew

11  Wolf told you to be careful about shopping at

12  Dollar General.  Do you recall any communications

13  with Andrew Wolf prior to that occasion where

14  either he or you discussed Dollar General in any

15  form or fashion?

16    A:   I don't recall any, no.

17    Q:   Did anyone tell you or suggest to you

18  that you should make the transaction on September

19  4, 2022 at the Dollar General store?

20         MR. MERINO:  Objection to form.  You can

21  answer.

22    A:   No.

23    Q:   Did anyone else ever suggest to you that

24  you should make purchases from Dollar General at

25  any time?

1      MR. MERINO:  Objection to form.  You can

2  answer.

3      A:   So by suggest, can you just clarify?  Is

4  it I had -- like I had no idea that I wanted to

5  make a purchase and then someone says it and now I

6  want to make the purchase?

7      Q:   Well, so let me ask --

8      A:   Yeah.  Sorry, I didn't mean to

9  interrupt.

10      Q:   Yeah, that's fine.

11      A:   Sorry, yeah.

12      Q:   Did you make any of the purchases at

13  Dollar General where you allege you have been

14  overcharged as a result of any conversation that

15  you had with counsel or their staff?

16      A:   No.

17      Q:   All right.  I want to understand the

18  timeline a little bit.  I believe you said that

19  you communicated with Andrew Wolf at some point I

20  think you said on or around September 4, which you

21  said occurred after the overcharge on September 4;

22  is that accurate?

23      A:    Yeah.

24      Q:   And I believe that you retained counsel

25  for this lawsuit on September 20; is that correct?

1       A:   I believe so, yeah.

2       Q:   Why did you reach out to your father

3  about -- or soon after the overcharge that you

4  allege that you experience on September 4, 2022?

5       A:   Yeah, generally speaking when I shop

6  icing that stores are being honest and transparent

7  with me and that their prices are accurate.  When

8  I realized that this wasn't the case with Dollar

9  General it was horrifying.  And I reached out.

10  I'm sorry, can you -- I want to make sure I'm

11  answering -- can you restate that question again?

12       Q:   Yeah.  I mean, my question is why did

13  you reach out to your father after this incident

14  on September 4?

15       A:   Yeah, because I was overcharged.

16       Q:   And did you have in your mind that you

17  wanted to file a lawsuit at that time?

18       A:   Before reaching out to him?

19       Q:   Well, I mean, was that one of the things

20  that you had in your mind you reached out to him?

21       A:   I reached out to him to get some legal

22  advice, yeah.

23       Q:   And legal advice pertaining to what?

24       A:   To the overcharges.

25  Q:   And would part of that legal advice have

1    been considering filing a lawsuit?

2        A:   Again, I just -- I reached out to him to

3    get legal advice.  You're asking me what advice

4    did he give me --

5        Q:   I'm not asking that.  Absolutely not.

6        A:   So I'm sorry.  I'm not understanding

7    your question.

8        Q:   You said that you reached out to him to

9    seek legal advice.  And I'm asking, seek legal

10   advice about what.

11           MR. MERINO:  Objection, asked and

12   answered.  You can answer.

13       A:   Yeah.  About the overcharge.  About the

14   fact that I had been overcharged by Dollar

15   General, yeah.

16       Q:   And when you reached out to him, did you

17   have in your mind that you might want to file a

18   lawsuit at that time?

19       A:   This is over a year ago.  I can't tell

20   you exactly like what was in my mind, but I wanted

21   to get some legal advice for them is all I can

22   say.

23       Q:   And when you did contact him I believe

24   you said you thought it was a phone call.

25   A:   Yes.  Yes.

1    Q:   How long did that conversation last?

2    A:   I don't recall.

3    Q:   After that conversation you had with

4 him, when was the next time that you had a

5 conversation with a lawyer or the staff of a

6 lawyer?

7    A:   Within the weeks afterward is all I can

8 say.  I know we -- the retainer agreement was like

9 the 21st.  So sometime between that period, 20th

10 or 21st.  Sometime between that period is all I

11 can say for certain a year later.

12    Q:   Prior to retaining a lawyer in this case

13 did you do any research on your own about Dollar

14 General and pricing issues?

15    A:   No.  I'm sorry.  Actually I need to go

16 back to that.  What do you mean by research?

17    Q:   I don't know.  What do you -- I mean,

18 have you done anything -- I mean, research how you

19 would typically define it.

20    A:   Okay.  You said -- yeah.

21    Q:   Did you do any looking on the Internet

22 trying to find information about --

23    A:   No.  So my -- I'm a teacher so research

24 can mean many things.  So I documented my own

25 experience.  That was my research, but I didn't

1    look on the Internet at any -- as far as I can

2    remember, any articles or anything about that.

3        Q:    Between the time of the September 4,

4    2022 transaction and the time that you retain a

5    lawyer in this case, did you speak with anyone

6    other than a lawyer about your experiences at

7    Dollar General or try to obtain more information

8    about Dollar General and pricing issues?

9        A:    I spoke with my wife.

10       Q:    Anyone other than your wife?

11       A:    No.

12       Q:    All right.  Let's look at Exhibit 3, if

13   you would.  Let's start with paragraph 5 and just

14   be careful of the microphone there.

15       A:    Yeah.

16       Q:    Before you get yelled at.

17       A:    Actually, I'm already --

18           THE WITNESS:  You said over -- under the

19   wire?

20           COURT REPORTER:  Under.  Above the wire

21   under your arm.

22           THE WITNESS:  Oh, wire under my arm,

23   okay.

24           COURT REPORTER:  Yeah.

25   Q:    I want to turn your attention to

1    paragraph 5, which is on page 2.

2         A:   Yeah.

3         Q:   And that's where it says you own a

4    vacation home in Bethel, New York.  And that's the

5    30 Berkshire Trail property?

6         A:   Bethel, New York, yes.

7         Q:   And what's the name of the subdivision

8    there?

9         A:   Subdivision like area where my house is

10   located?

11        Q:   Yes, in the subdivision.

12        A:   I'm sorry, can you define what a

13   subdivision is?  It just sounds -- I don't know.

14   I'm not --

15        Q:   Sometimes properties are located in

16   subdivisions.

17        A:   Like a planned community are you saying?

18        Q:   Yeah, or something like that.

19        A:   No.  I mean, the area is called

20   Smallwood.  They have a civic association, but I

21   don't -- yeah.

22        Q:   Is there a country club nearby?

23        A:   There is a small civic association that

24   you can join.

25   Q:   Are you a member?

1        A:    Yes.

2        Q:    What's the name of it?

3        A:    Smallwood Civic Association.

4        Q:    Sorry, say that again.

5        A:    The Smallwood Civic Association.

6        Q:    Smallwood Civic Association?

7        A:    Yeah.

8        Q:    Is there something called Mountain Lakes

9   Country Club nearby?

10       A:    Not sure.

11       Q:    Are you a member of a country club

12   there?

13       A:    No.

14       Q:    Are you a member of a country club at

15   all?

16       A:    I'm sorry, what is a country club?  It

17   sounds --

18       Q:    You either know or you don't know.  It's

19   an organization where people sometimes go for --

20   and we can look it up if you want.

21       A:    Okay.

22       Q:    Where there might be tennis or swimming

23   or golf.

24       A:    So the Civic Association, they have a

25   tennis court and they have a lodge.  I've never

1    referred to it as a country club or called it --

2    or heard it called a country club.  But that's why

3    I'm asking.  I'm not trying to be intentionally

4    obtuse.

5        Q:    Yeah.  So you said tennis court or

6    something else.

7        A:    It has a tennis court and you have the

8    right to use the lake, I guess.

9        Q:    Right to use the lake?

10       A:    Yeah.

11       Q:    Sorry, I just didn't hear what you said.

12       A:    Yeah.

13       Q:    Is there a swimming pool there as well?

14       A:    No.

15       Q:    And I'm assuming you pay some kind of

16   fee.

17       A:    Yeah.

18       Q:    All right.  So I want to move to

19   paragraph 11.  And that says that you regularly

20   shop at the Dollar General located at 1334 New

21   York, 17B, White Lake, New York; is that accurate?

22       A:    Yeah, I believe that -- I don't have the

23   address memorized, but I think that's one that we

24   go to.

25   Q:  And 17B, is that sort of the highway

1    that you drive on to get to the property there?

2        A:    Yeah.

3        Q:    And it says you regularly shop there.

4    How often do you shop there?

5        A:    I'd say probably every month on

6    weekends.  We are up there weekends.

7        Q:    Would you say it's the closest retailer

8    to the property at 30 Berkshire Trail?

9        A:    Yes, there is a gas station next to it,

10   but yeah, it's closest, what I would say like

11   retailer.

12       Q:    And would you shop at that Dollar

13   General every time you visited the 30 Berkshire

14   Trail property?

15       A:    Not every time.

16       Q:    Most times?

17       A:    I would say frequently, yeah.  I

18   can't -- I'm having a hard time right now

19   quantifying the majority of the times or not.  But

20   yeah, pretty frequently.

21       Q:    And what types of things do you

22   typically purchase there?

23       A:    Usually like immediate necessities,

24   groceries, things that my -- generally things that

25   my kids need to eat breakfast or something like

1   that.

2        Q:    Are there any other Dollar Generals that

3   you shop at?  Any other locations I should say.

4        A:    As far as I can remember, no.

5        Q:    All right.  So I want to go to paragraph

6   14, which I know we've already talked about a

7   little bit.  And it references to transactions

8   that were made in September 2022, and the first

9   one being on September 4, okay?

10       A:    Yeah, all right.

11       Q:    So the September 4 transaction,

12  that's -- I think you said previously that's the

13  first transaction where you noticed the

14  discrepancies between the shelf price and what you

15  were charged; is that accurate?

16       A:    First time I noticed an overcharge,

17  yeah.

18       Q:    And do you recall why you were

19  purchasing the 2 percent lactose-free milk on

20  September 4?

21       A:    Yes.

22       Q:    Can you tell me --

23       A:    My kids needed milk.

24       Q:    And are your kids, are any of your kids

25  lactose intolerant?

1    A:    No.

2    Q:    Was there a particular reason why you

3  were buying lactose-free milk?

4    A:    Yes.  Yes, yes.

5    Q:    And what is it?

6    A:    Actually, sorry.  I'm trying to --

7  sorry.  You're asking me to remember about like to

8  a year ago, like exactly what was in my mind when

9  I was buying the milk.  Can I just -- so you're

10 asking me to remember a year ago why I bought

11 lactose-free milk?

12   Q:    Yeah.

13   A:    As opposed to any other milk?

14   Q:    Yeah.

15   A:    So I mean, it could be a bunch of

16 reasons.  We I guess sometimes buy lactose-free

17 milk.  We've purchased it before.  It may be out

18 of habit.  Yeah, no.  I mean, that's what I chose.

19 Sorry, I'm having -- like a year ago why a certain

20 type of milk.  Well, you're asking -- yeah.

21   Q:    Yeah.  I mean, so is there any member of

22 your family, you, your wife, your two children,

23 who are lactose intolerant?

24   A:    I am lactose intolerant, yeah.

25 Q:    All right.  I thought I just asked that

1  question.  I thought you told me that you weren't.

2       A:   I'm sorry, I misunderstood then.

3       Q:   So you are lactose intolerant?

4       A:   I am lactose intolerant, yeah.

5       Q:   And you typically -- does that mean you

6  typically by lactose-free milk?

7       A:   No, we don't typically by lactose-

8  free -- actually, I'm sorry.  We buy both.  I am

9  not typically drinking milk in my household.  So

10 no, we try different types of milks, we've bought

11 all kinds of milks.  That's why I'm having

12 trouble.  Yeah, we bought -- it's not like we only

13 by that, yeah.  If that makes sense.

14      Q:   So do you recall whether you purchased

15 this 2 percent lactose-free milk for you or for

16 your children or for someone else?

17      A:   Yeah.  No, it was for my children.

18      Q:   And so let me just ask the question, do

19 you know why you bought lactose-free milk for your

20 children when they are not lactose intolerant?

21      A:   Again, it was over a year ago.  Maybe

22 out of habit.  Sometimes we've gotten it before.

23 My wife's mother is lactose intolerant.  So my

24 wife's mother's household, sometime she buys it.

25 So sometimes my wife will get that, for example in

1  our apartment in New Jersey, it's something --

2  yeah.  Sorry, can you repeat the question again?

3     Q:   Sure.  So I'm wondering why if you were

4  buying the milk for your children and you told me

5  that you are not lactose intolerant, why you

6  purchased lactose-free milk.

7     A:   Yeah.  Again, I don't -- something

8  that -- lactose-free milk is often in our

9  household.  Sometimes I buy it, sometimes I don't.

10  If I buy lactose-free milk, it's possible I would

11  be able to use it and maybe splash some in my

12  coffee or something.  It's typically the only time

13  I have milk.  If I buy non-lactose-free milk I can

14  take a Lactaid pill or something.  But yeah, I

15  suppose I could have gotten -- I don't know.

16  You're asking me to speculate on why I bought a

17  certain kind of milk a year ago.  So it's really

18  hard for me to say.

19     Q:   I'm not asking you to speculate.  I'm

20  just asking if you remember.

21     A:   I don't know that, yeah.

22     Q:   And my question is, do you recall why on

23  that particular day you were buying 2 percent

24  lactose-free milk?

25  A:   Yes.

1    Q:    I thought you just told me that it's

2   speculating.  But go ahead.

3    A:    Sorry.  I remember why I buy milk, not

4   specifically which type I picked out or whatever.

5   But I remember I was buying milk, it was to get

6   milk for my kids.

7    Q:    And do you remember specifically why you

8   made the choice to purchase 2 percent lactose-free

9   milk?

10    A:    I don't remember specifically.

11    Q:    That's what I'm trying to get at.

12    A:    Sorry.  Again, not trying to be

13   intentionally obtuse.

14    Q:    You know, whatever it is, it is.  Had

15   you -- do you recall having purchased lactose-free

16   milk from Dollar General prior to September 4,

17   2022?

18    A:    I don't recall specifically, yeah.

19    Q:    And on September 4, 2022, when -- so you

20   only bought one item that day, correct?

21    A:    On September 4?

22    Q:    Yeah.

23    A:    I can check the receipt.  I believe so.

24   But do you mind if I look at the receipt?

25   Q:  No, by all means.  Exhibit 1 will be

1   what we reference.  Exhibit -- and just to be

2   clear, Exhibit 1 to the complaint, which is

3   Exhibit 3.

4        A:   The 4th, yes.  Yes.

5        Q:   So you only bought one item on that day,

6   correct?

7        A:   Yes.

8        Q:   And this is you bought it at 9:18 p.m.

9        A:   Yes.

10       Q:   Is that consistent with your

11  recollection?

12       A:   Yes.

13       Q:   And if you recall why it is that you

14  were only purchasing one item as opposed to going

15  and buying other items?

16       A:   Yes.  So my -- thank you for helping me

17  recall some of this.  So my daughter likes to

18  drink milk before she goes to bed.  So maybe I

19  was -- again, this is a year ago.  I don't

20  remember exactly, but I would've probably picked

21  up milk to give to my daughter because if she

22  doesn't have her milk before bedtime she is not a

23  happy camper.

24       Q:   I understand.

25  A:   But again, that's me trying to remember

1  a year ago.

2      Q:   Which daughter was it?  Would that be

3  the seven-year-old or four-year-old?

4      A:   Penelope is the one who loves her milk,

5  yeah.

6      Q:   And which one is that?

7      A:   The four-year-old.

8      Q:   Four-year-old, okay, got it.  All right.

9  So on that particular day, September 4, 2022, did

10  you go to Dollar General by yourself?

11      A:   Yes.

12      Q:   So your wife Carmen was not with you at

13  Dollar General for the September 4, 2022

14  transaction?

15      A:   I don't believe so.

16      Q:   And do you recall looking at the shelf

17  price tag prior to grabbing the milk and going to

18  the cash register?

19      A:   I don't recall specifically.

20      Q:   Do you typically look at price tags,

21  shelf price tags of items when you're shopping?

22      A:   Typically I trust that stores have

23  accurate pricing, that they are honest and

24  straightforward with their customers.  So

25  typically, no.

1     Q:   You don't recall whether you did for the
2 September board 2022 transaction for 2 percent
3 lactose-free milk?
4     A:   I don't recall whether I looked at the
5 shelf price before.  Yeah, I don't recall.
6     Q:   And it says in the paragraph 14 that you
7 used Carmen's credit card; is that right?
8     A:   Yes, I'm an authorized user, yeah.
9     Q:   So I guess I wanted a little clarity on
10 sort of what credit cards you all have, and is it
11 a joint account.  Some of that kind of stuff.  Let
12 me just ask, the -- Carmen's credit card that is
13 referenced in paragraph 14, who is that through?
14     A:   I believe through Carmen.  Is that what
15 you -- sorry.
16     Q:   Who is the bank?
17     A:   Oh, the bank.  Citibank.
18     Q:   And is that MasterCard?
19     A:   I believe so.
20     Q:   If you want to reference Exhibit 1 to
21 Exhibit 3.
22     A:   Exhibit 1 to Exhibit 3.  Sorry, what --
23     Q:   It's just the first one.
24     A:   Right there?
25 Q:   Yeah, right there.

1       A:    It's a card I know ends in like 6329 or

2   whatever.

3       Q:    You've seen --

4       A:    Your question, is it a MasterCard?

5       Q:    Yeah.

6       A:    I think so, yeah.

7       Q:    Well, can you look at the third line?

8       A:    Yes, it is a MasterCard, thank you.

9       Q:    And I don't know what some of these

10  numbers mean, but right next to the MasterCard it

11  says 8142.  Is that like the last four of one of

12  your credit cards or one of Carmen's credit cards

13  to your knowledge?

14      A:    I don't think so.

15      Q:    How many credit cards do y'all own?

16      A:    Typically use this, we call it like a

17  joint account card although I'm technically an

18  authorized user, for like mostly everything.  I do

19  have, I call it like a personal card, like one

20  that's not a joint card that I typically don't

21  use.  Kind of keep it as a backup.  Carmen, it's

22  hard for me to speak for.  I don't want to speak

23  for her.

24      Q:    The personal card that you have, who was

25  that through in terms of the bank or the financial

1   company?

2      A:   Citibank, yeah.

3      Q:   Citibank.  And is that also a

4   MasterCard?

5      A:   Yes.

6      Q:   Did -- let me ask you this.  I know that

7   we received some credit card statements related to

8   Dollar General purchases.  Do you know whether or

9   not any of those documents were from this personal

10  card that you have or not?

11     A:   I don't think so.

12     Q:   Did you check the credit card statements

13  of your personal card to see if there were any

14  Dollar General transactions over the last three

15  years?

16     A:   I think so.  Although I want to double

17  check.

18     Q:   I'll just put on the record that I would

19  ask that you consult with your attorneys about

20  that.

21     A:   Yeah.

22     Q:   If there is anything, if we could get

23  those because we've asked for that.

24     A:   Yeah.

25  Q:  Going back to the card that you used on

1   September 4, 2022, tell me how this works.  Is

2   there just one card that you have that you -- one

3   physical card that you and Carmen sort of pass

4   back and forth?  Or is there multiple cards?

5          A:   I have a card and she has a card.

6          Q:   And do they have the same last four

7   digits?  The same number, the last four digits?

8          A:   Yeah.

9          Q:   And is that a joint account?

10         A:   We call it a joint account.  If I call

11  on the phone to make changes I have to get Carmen

12  on the phone.  So technically I think I'm -- they

13  call me an authorized user, but I have a card with

14  my name on it.

15         Q:   And you are considered to be an

16  authorized user of that account to your knowledge?

17         A:   That's my understanding.

18         Q:   And who -- does she pay the bills?  Do

19  you pay the bills for that particular credit card?

20         A:   Do I pay the bills?  Like where does the

21  income come from?

22         Q:   Yeah.

23         A:   We both pay the bills.

24         Q:   And let me just ask it this way because

25  I know -- do y'all have like a joint bank account?

1     A:   Yeah.

2     Q:   And is that what would be used to pay

3  Carmen's credit card that we are talking about

4  here?

5     A:   Typically, yeah.

6     Q:   I'm just wondering whether or not she

7  has like a separate account that she uses to pay

8  for -- you know, what's charged to that credit

9  card or not.

10     A:   It will come from a joint account, joint

11  bank account, yeah.

12     Q:   What about your personal card?  Is that

13  something that you pay with from the joint bank

14  account or from some other account?

15     A:   I would pay it from an individual

16  account that I have, not from the joint account.

17     Q:   And what is sort of the purpose of that

18  personal card?

19     A:   Just to have a backup credit card in

20  case I lose one or whatever.

21     Q:   Is there a particular reason for like

22  business reason or anything like that?

23     A:   No.

24     Q:   All right.  Let's go back to September
, 2022.  You went in to purchase the lactose-free

25  milk.  And did you take it to the checkout

1  register to check out?

2      A:   Yes.  I don't remember.  Yes, I know I

3  checked it out, yeah.

4      Q:   And let me ask you this.  Is there a

5  self-serve checkout register at that particular

6  Dollar General or not?

7      A:   As far as I'm aware there is one now.

8  I'm not sure if there was one at that time.  There

9  may have been.

10      Q:   And on September 4, 2022, do you recall

11  whether or not you had a Dollar General employee

12  checking you out or not?

13      A:   I don't remember.

14      Q:   When you checked out, was there a

15  monitor that would display the item and the price

16  that you recall?

17      A:   I don't remember exactly what the layout

18  was at that time, yeah.

19      Q:   You purchased the product.  At what

20  point did you realize that you had been

21  overcharged?

22      A:   Yeah.  So I guess after making the

23  purchase.  I can't remember what it was at the

24  time, but something didn't set right or feel

25  right.  I went and took a picture of the shelf

1  price.  And when I got home I compared the picture

2  that I had with the receipt and realized that I

3  had been overcharged.

4      Q:   So you went and took a picture of the

5  shelf tag at what point?  During the same visit?

6      A:   Yeah.  Yeah, after I had checked out.

7      Q:   And why did you do that?

8      A:   I guess I was worried about being

9  overcharged, but I don't remember specifically

10  what prompted it, yeah.

11      Q:   And it's your testimony that you didn't

12  actually compare the shelf price tag and the

13  receipt until you got home?

14      A:   Yes.

15      Q:   You were given a receipt after that

16  transaction, right?

17      A:   Yeah.

18      Q:   It was a physical receipt?

19      A:   Yeah.

20      Q:   It's what's depicted in Exhibit 1 to

21  Exhibit 3?

22      A:   Yeah.

23      Q:   You could have compared that receipt to

24  the shelf price tag right then, right?

25      A:   Could have, has a lot of judgment in

1  that.  Like the verb, to be able to.

2       Q:   I'm not trying to judge.  I'm simply

3  asking you, was there something preventing you

4  from comparing the receipt to the shelf price tag?

5       A:   I see.  Yeah, I was buying milk for my

6  kid who needed to go to bed.  Or whatever.  I

7  don't want to speculate.  But yes, I needed to get

8  home and get this stuff to my kid.  So that's why

9  I didn't do it there, if that's why you're asking

10  why it did not compare them in the store.  I was

11  trying to get my food and these necessities home

12  to my children who needed them.

13       Q:   But you did take the time to go snap a

14  picture?

15       A:   Walked around the corner, snapped a

16  photo, and decided I would investigate it when I

17  had time.

18       Q:   And I want to explore a little bit.  You

19  said that you just got a funny feeling and that's

20  why you took the picture.

21       A:   I don't want to speculate.  This was

22  over a year ago.  But obviously something -- for

23  some reason I thought that there was some kind

24  of -- overcharging may have been a possibility.

25  So I wanted to be vigilant, to snap a photo just

1    to be able to -- just appeal to verify if I have

2    been overcharged.

3        Q:    Was there a reason why you didn't ask

4    the employee whether that was the correct price?

5        A:    Like why it didn't go back later?

6        Q:    No, at that particular --

7        A:    So I didn't realize I had been

8    overcharged in July had compared the photo and

9    receipt, which was not at Dollar General, yeah.

10       Q:    But you just testified that you had an

11   idea that it was possible you had been

12   overcharged.

13       A:    There's always a possibility that

14   overcharging happens.  I just wanted to snap a

15   photo just to be on to verify that I was being

16   accurately charged the correct price.  I didn't

17   know I had been overcharged.

18       Q:    But you thought there might have been?

19           MR. BRYSON:  Objection to form.

20           MR. TAYLOR:  You can't make an

21   objection.  Who's objecting?

22           MR. MERINO:  Objection to form.  You can

23   answer.

24   A:    I just wanted to be vigilant, keep

25   records to make sure I hadn't been overcharged.

1    Q:   Have you ever before taking a picture of

2    a shelf label at any store prior to September 4,

3    2022, with your phone?

4    A:   Not that I can recall.

5    Q:   And so I'm trying to understand, what is

6    it that led you to, for the first time ever, to

7    take a picture of a shelf price tag on September

8    4, 2022, when you were admittedly already in a

9    hurry?

10   A:   Yeah.  Again, I generally trust that

11   stores have accurate pricing.  I already had in my

12   head to kind of be sort of vigilant in Dollar

13   General to make sure I wasn't being overcharged.

14   I don't recall the specifics of that incident, but

15   I decided there I wanted to go back and try and

16   verify -- take a picture so I can verify that I

17   was being accurately charged.  But no, I don't

18   remember all the specifics of what happened over a

19   year ago in this milk purchase.

20   Q:   Do you recall how soon after you paid

21   for the lactose-free milk on September 4, 2022

22   that you photographed at the shelf price label?

23   A:   I think right afterwards, sort of on the

24   way out the door.

25   Q:   Was there anything that prevented you

1    from asking the Dollar General employee who was

2    there, what the correct price was?  Or to -- you

3    know, about the overcharging?  The possibility of

4    overcharging?

5        A:    So again, I can't speak to this thing

6    that happened a year ago.  I don't remember all

7    the details.  But yeah, certainly I was -- wanted

8    to get home and get the stuff home to my kids.

9    There's typically one, maybe two employees at

10   Dollar General and they are usually checking out

11   other people.  But I -- yeah, again, I'm just --

12   I'm speculating as to the circumstances of a milk

13   purchase that happened a year ago.

14       Q:    But that milk purchase forms the basis

15   of the complaint.

16       A:    Yeah.  Yeah.

17       Q:    Which is why it's important and why I'm

18   asking questions about that.

19       A:    Yeah.

20       Q:    And so I believe you said that you went

21   and took the photograph of the shelf label

22   immediately after the transaction was complete; is

23   that right?

24   A:    I believe so, yeah.

25       Q:    And so my question is, do you or do you

1  not sort of recall what it was specifically that

2  popped into your head that led you to want to go

3  take that picture?

4          MR. MERINO:  Objection, asked and

5  answered.  You can answer.

6      A:   Again, I wanted to make sure that Dollar

7  General is charging the accurate price.  That's

8  all I can remember.

9      Q:   Do you recall whether there were other

10  individuals and customers in the store that

11  evening?

12     A:   I don't recall.

13     Q:   All right.  So you said that you went

14  home and compared it.  At what point did you

15  compare it?

16     A:   I don't recall exactly.  It would have

17  been in the day or days afterwards.

18     Q:   But at some point you noticed that there

19  was a price discrepancy?

20     A:   Yes.

21          THE WITNESS:  I'm sorry, after this

22  question can I -- bathroom break?  Is that okay?

23  Like two minutes or --

24  MR. TAYLOR:  Oh, yeah.  Yeah.

25          THE WITNESS:  Unless we are going to

1    have lunch right around the corner.

2              MR. TAYLOR:  I'm not sure.

3              THE WITNESS:  I've just been drinking a

4    lot of water.

5              MR. TAYLOR:  Yeah, no.  Why don't we --

6    as soon as we get an answer to this --

7              THE WITNESS:  Yeah, yeah, after this

8    one, yeah.

9              MR. TAYLOR:  And so can you read back my

10   question please?

11             COURT REPORTER:  Sure.

12             (The requested audio was played back.)

13        Q:   At some point you noticed a price

14   discrepancy.

15        A:   Yeah.

16             MR. TAYLOR:  Let's go ahead and take a

17   break.

18             THE WITNESS:  Yeah, just two minutes if

19   that's possible.

20             MR. TAYLOR:  Sure.

21             (Off the record at 12:10 p.m., resuming

22   at 12:13 p.m.)

23   BY MR. TAYLOR:

24   Q:   All right, Mr. Wolf.  We were just

25   talking about how you had -- or testimony that you

1   had realized that you had overpaid at some point

2   after the September 4, 2022 transaction, correct?

3        A:   Yes.

4        Q:   And you don't recall exactly what was

5   that you realized that there had been an

6   overcharge?

7        A:   It was a soon afterwards, but not

8   exactly, no.

9        Q:   And how much were you overcharged?  You

10  can look at paragraph 14 if that's helpful.

11       A:   Yeah.  Yeah, yeah.  Yeah, in the

12  September 4th purchase?

13       Q:   September 4th.

14       A:   Yeah, $.10.

15       Q:   And when you realize -- how did you

16  realize that you have been overcharged?  What did

17  you do?

18       A:   How did I realize I've been overcharged?

19       Q:   How did you realize it, yeah?

20       A:   Yeah, comparing the receipt to the shelf

21  price that was listed, the photograph.

22       Q:   The photograph, okay.  And do you -- is

23  it your testimony that you don't recall whether

24  you did it later that evening on September 4 or

25  whether it was September 5 or some other time?

1       A:   I don't remember right now, sorry.

2       Q:   And when you did realize that you had

3  been overcharged $.10, what was your reaction?

4            MR. MERINO:  Objection to form.  You can

5  answer.

6       A:   I wasn't happy.

7       Q:   And what did you do about it?

8            MR. MERINO:  Objection to form.  You can

9  answer.

10      A:   I contacted Andrew Wolf to seek legal

11 advice.

12      Q:   Do you recall all -- did you happen to

13 go back to that Dollar General at some point

14 thereafter?

15      A:   Ever?

16      Q:   Yeah.

17      A:   Yes.

18      Q:   Do you recall when it was?

19      A:   The most immediate time afterwards you

20 are saying?  Or any times?

21      Q:   Do you recall the next time you went?

22      A:   The very next time?  I don't remember

23 off of my head the very next time that I went.

24 Q:   And was there a -- did you -- so you are

25 now aware of this price overcharge.  The next time

1   you went to that Dollar General, did you talk to a

2   Dollar General employee about it?

3       A:   No.

4       Q:   Why not?

5       A:   So typically when I go to Dollar General

6   it's too buy necessities and groceries for my

7   family.  And that's why I'm going there.  So

8   that's what I'm doing if that makes sense.

9       Q:   And my question is why didn't you raise

10  it with a Dollar General employee.  You said you

11  weren't happy.  I think you use the word horrified

12  earlier.  So why didn't you raise it with a Dollar

13  General employee?  You are already there.

14      A:   Yeah.  You're asking me to like

15  hypothesize why I didn't, did not do something a

16  year ago?

17      Q:   I'm not asking you to hypothesize.  I'm

18  asking you why you didn't -- what was your

19  reasoning for not talking to a Dollar General

20  employee about this particular issue?

21          MR. MERINO:  Objection to form.  You can

22  answer.

23      A:   Yeah, I don't remember what was going on

24  the next time I was in the Dollar General there

25  and what time constraints or whatever I would have

1    had.  So I don't think I can answer that.

2        Q:   And what --

3        A:   I don't remember, yeah.

4        Q:   Well, so you discovered that there was

5    an alleged overcharging by Dollar General.  When

6    that occurred, did you think to yourself, oh, I'm

7    going to go have a conversation with the employees

8    at the Dollar General store to get the issue

9    addressed?  Did you ever have that thought?

10            MR. MERINO:  Objection to form.  You can

11   answer.

12       A:   So I'm just pausing trying to remember

13   my thoughts a year ago, if that's okay.  Thoughts

14   that -- you're saying like did you have thoughts

15   that then did not act on?  And this is a year ago.

16   So this is tough to remember, if that makes sense.

17       Q:   If you don't remember, you don't

18   remember.

19       A:   Yeah.  Yeah, I don't remember.  I'm

20   sorry.

21       Q:   And have you ever gone to customer

22   service at a retailer before?

23            MR. MERINO:  Objection to form.  You can

24   answer.

25       A:   So I'm trying to remember like specific

1    incidents to be able to answer that.  I don't

2    remember any specific incidents of going to

3    customer service.  Yeah, I don't remember any

4    specific incidents of going to customer service, I

5    guess would be my answer.

6        Q:   And I guess really in the core of the

7    question is this.  Why is it that you thought to

8    call a lawyer after been overcharged $.10 rather

9    than addressing it at the Dollar General store

10   where you made the purchase?

11       A:   Yeah.  I -- and so as I said before, I

12   generally trust that -- excuse me.  I generally

13   trust that stores have accurate pricing, that they

14   are not overcharging their customers.  You know,

15   in this case I felt that that trust was really

16   broken here and I decided to seek advice on this,

17   yeah.

18       Q:   Let me ask you this.  Let's go ahead and

19   move to paragraph 13 on Exhibit 3.  It says when

20   there was a price discrepancy, plaintiffs were

21   charged and paid more than the advertised price.

22   Do you ever recall being aware that you are

23   undercharged, paid less for any products at Dollar

24   General?

25            MR. MERINO:  Objection to form.  You can

1   answer.

2        A:   No.

3        Q:   Would you be upset if you were

4   undercharged?

5             MR. MERINO:  Objection to form.  You can

6   answer.

7        A:   These hypotheticals --

8        Q:   It's not a hypothetical.  It's not a

9   hypothetical.

10       A:   Would you be upset if you were

11  undercharged?

12       Q:   Can you answer it?

13       A:   I don't think so, but I haven't been in

14  that situation.  But I don't think so.

15       Q:   Would you feel like your trust had

16  been -- the trust you had in the retailer had been

17  broken if you were undercharged for a product?

18            MR. MERINO:  Objection to form.  You can

19  answer.

20       A:   Yeah, you are asking me to speculate

21  about my mental state in a hypothetical situation.

22  This is hard for me to do.  I don't know what my

23  feelings would be because I haven't experienced

24  that.

25       Q:   You know, just do the best you can with

1  the question.

2       A:   I don't know.

3       Q:   Going back for a moment with the credit

4  card that you used which you said you were using

5  Carmen's credit card.  When you use Carmen's

6  credit card and you sign the name, do you sign

7  your name or her name?

8       A:   Mine.

9            MR. MERINO:  Objection to form.  You can

10  answer.

11       A:   My name, yeah.

12       Q:   So you -- after this September 4

13  transaction, September 4, 2022 transaction, in

14  paragraph 14 it lists the next one being September

15  18, 2022; is that correct?

16       A:   Yes.

17       Q:   And you had discovered at the tents and

18  overcharge for the September 4, 2022, transaction

19  prior to the September 18, 2022, transaction,

20  correct?

21       A:   Yes.

22       Q:   So when you went into the store on

23  September 18, 2022, you were aware that there

24  could be a price discrepancy of items at the

25  Dollar General?

1        MR. MERINO:  Objection to form.  You can

2    answer.

3        A:    I was aware that there had been in the

4    past.  I didn't know what I was going to be

5    greeted with when I walked in on that day.

6        Q:    Would you say that you were more

7    careful?  Or I think you used the word vigilant

8    earlier.  Were you more vigilant upon that visit

9    at the Dollar General on September 18, 2022?

10       A:    So again, a purchase a year ago, it's

11   hard for me to compare levels of vigilance.  But I

12   was also vigilant, I guess.  I wanted to -- I

13   documented it to be able to verify later if I had

14   been overcharged.

15       Q:    I want to go back just for a second to

16   the September 4th transaction, 2022.  And you paid

17   4.25 and the shelf price was 4.15, right?

18       A:    Yes.

19       Q:    Would you still have bought the lactose-

20   free milk if the shelf price tag had been 4.25?

21       A:    Yeah, I don't want to speculate on what

22   I would or wouldn't have done a year ago.  That's

23   hard for me to do.

24   Q:    So your testimony is that $.10

25   difference might have made a difference about

1    whether you made the purchase or not?

2        A:   I don't know right now what difference

3    it would have made.  Yeah, I can't speculate as to

4    what decisions I would have me differently in an

5    alternate universe.

6        Q:   Let me direct your attention to the

7    second page of Exhibit 1 of Exhibit 3.  So you go

8    to that, it's one of the photographs I believe.

9    Yeah, that.  And you see here a receipt from the

10   September 18, 2022, transaction, correct?

11       A:   Yes.

12       Q:   And this time the transaction was for

13   Eggo buttermilk waffles and lactose-free whole

14   milk; is that correct?

15       A:   Yes.

16       Q:   And it's the same brand of lactose-free

17   milk that you purchased before, correct?

18       A:   Yes.

19       Q:   Do you recall specifically why you

20   wanted -- why you were there and why you were

21   purchasing Eggo waffles and lactose-free whole

22   milk on that occasion?

23       A:   This would have been to have necessities

24   for my family, specifically, my children are the

25   only ones who eat Eggo waffles and typically drink

1   milk.

2       Q:   And do you recall when -- and so tell me

3   what you remember about the September 18, 2022

4   transaction.

5           MR. MERINO:   Objection to form.   You can

6   answer.

7       A:   Yeah, I remember -- can I remember

8   something like details about the transaction?

9   Like in the store?

10      Q:   Yeah, anything you remember about going

11  to the store that day and --

12      A:   Yeah, I mean, the only thing I can

13  say --

14      Q:   -- so --

15      A:   -- paid for merchandise.   I paid for

16  what I bought, got a receipt, took a photo or some

17  photos to make sure I was being -- so I would be

18  able to verify if I was being accurately charged.

19  That's all I know.

20      Q:   Was anyone with you on that date?   I

21  mean, was Carmen or the children with you on

22  September 18, 2022, when you were making this

23  transaction at Dollar General?

24  A:   Not that I remember.

25      Q:   Do you recall at what point you took the

1  photographs of the shelf label?

2          MR. MERINO:  Objection to form.  You can

3  answer.

4      A:    Yeah, so I believe this time it was

5  snapping photos before.  I'm sorry, can you

6  answer -- can you restate the question?  You said

7  at what time?

8      Q:    At what point --

9      A:    Oh, what point, okay.

10      Q:    Did you take the photographs of the

11  shelf price labels of the products you purchased

12  on September 18, 2022?

13      A:    Are you asking for like a date and time?

14  What do you mean by point?

15      Q:    At what point?  Was it before or after

16  you actually purchased the items?

17      A:    I believe in this case it was before,

18  yeah.

19      Q:    And why did you do that?

20      A:    Again, to be able to verify that Dollar

21  General wasn't overcharging me.

22      Q:    Did you have some kind of idea that

23  these particular shelf price labels were

24  inaccurate?

25          MR. MERINO:  Objection to form.  You can

1    answer.

2         A:   No.

3         Q:   Am I correct in saying -- well, let me

4    ask you this.  This is the exact same brand and

5    product, although I recognize that one of them was

6    whole milk, the other was 2 percent that you

7    purchased last time.  Did you, going into that

8    store, did you remember what the price was for the

9    transaction on September 4, 2022?

10        A:   Yeah, I did not remember.

11        Q:   And so you took the -- so do you recall

12   when you went in the store on September 18, 2022,

13   whether you had -- whether you were planning to

14   buy anything other than Eggo waffles and lactose-

15   free milk?

16             MR. MERINO:  Objection to form.  You can

17   answer.

18        A:   Yeah.  I don't recall.  I typically buy

19   what I am intending to get unless there is

20   something not available.  But yeah, I don't recall

21   specifically.

22        Q:   When you have gone to Dollar General do

23   you always use a credit card?  Do you ever use

24   cash?

25        A:   I don't think I've ever used cash.

1    Q:   Yeah, me too.  I can't remember the last

2  time I used cash for anything.

3    A:   Really?

4         MR. MERINO:  I'm actually getting a

5  little hungry for lunch.  I don't know if you

6  wanted to --

7         MR. TAYLOR:  Hunter had said 12:45.

8  But --

9         MR. MERINO:  We can do 12:45.

10         MR. TAYLOR:  It doesn't really matter to

11  me, honestly.

12         MR. MERINO:  I'm ready to go now because

13  it's 12:30 and it's easier to just go to 1:00 if

14  that's okay with you.

15         MR. TAYLOR:  Yeah, that's a day.

16         MR. MERINO:  I mean, keep it round.

17  He's hungry and so if there's some --

18         MR. BRYSON.  All right.  Yeah.  I'm not

19  even hungry.

20         MR. TAYLOR:  All right.  Let's go off

21  the record, get a little glucose in our system or

22  something.

23         (Off the record at 12:33 p.m., resuming

24  at 1:22:20)

25  BY MR. TAYLOR:

1      Q:   All right Mr. Wolf, I hope you had a

2  good lunch.  I wanted to -- you may recall that we

3  were -- before our lunch break we were talking

4  about the September 18, 2022, transaction.

5      A:   Yes, what page was that on again?

6      Q:   Well, paragraph 14 of Exhibit 3 --

7      A:   Got it, yeah.

8      Q:   Talks about it.  And I guess I wanted to

9  ask you if you recall when you were grabbing the

10  items, the waffles in the lactose-free whole milk,

11  before going to the cash register did you look at

12  the shelf price label for those products?

13      A:   I don't recall.

14      Q:   But you did take pictures of them?

15      A:   Yes.

16      Q:   And I guess my question is, let me ask

17  it this way.  Do you recall sort of looking to see

18  what the price was as you were taking the picture?

19  Or were you just taking a picture just to take a

20  picture?

21      A:   I believe just snapping a photo, yeah.

22      Q:   And you -- when you went to check out,

23  do you recall whether you checked out some service

24  or with an employee?

25      A:   Don't recall, sorry.

1    Q:    And when did you realize after the

2  September 18 transaction that there had been an

3  overcharge?

4    A:    Sometime after the purchase when I

5  compared the receipt and the photo of the shelf

6  price.

7    Q:    And do you recall when that was?  Was it

8  right after?  Was it the next day?  Were you at

9  home?  Were you still in the store?  Do you recall

10  anything about where you were when you realized --

11    A:    I don't recall, unfortunately.

12    Q:    Now when you were checking out on

13  September 18, 2022, do you recall whether you look

14  at the price monitor?

15        MR. MERINO:  Objection to form.  You can

16  answer.

17    A:    I don't recall.

18    Q:    All right.

19        MR. TAYLOR:  I'm going to mark this

20  as --

21        COURT REPORTER:  Exhibit 4

22        MR. TAYLOR:  Exhibit 4.  All right.  I

23  will him that to you.

24  (Exhibit 4 was marked for

25  identification.)

1          MR. MERINO:  Yeah.

2      Q:   I'm handing you Exhibit 4, Mr. Wolf.

3  These are some photos.  And I was wondering if you

4  could flip to them just real quick, and I'm going

5  to ask you some questions about them.  Do --

6      A:   Yes.

7      Q:   Do these photos look familiar?

8      A:   I guess I need to refresh my memory a

9  little bit.  Yeah.

10      Q:   And let me represent you that these are

11  photos that were taken from the iPhone Mini if

12  that helps any.

13      A:   Yeah.

14      Q:   And I guess on a certain level -- well,

15  first of all, let me ask you this.  Do you know

16  whether you took these photos?

17      A:   If they were taken on an iPhone Many, I

18  did not take these photos.

19      Q:   And that was a question I was going to

20  ask you a little bit later, but I will go ahead

21  and ask it.  Am I correct -- well, the iPhone

22  Many, you have a report where images and text

23  messages were taken from two phones and one was an

24  iPhone Max and the other one was an iPhone Mini.

25  Are those phones that you and your wife have?

1        A:    Yes.

2        Q:    And which one is your wife's?

3        A:    My wife has the iPhone Mini.

4        Q:    And you have the iPhone Max?

5        A:    Yes.

6        Q:    So it's an iPhone 12?

7        A:    Yes.

8        Q:    Do you still have that phone?  Or were

9   you looking to upgrade or get a different one?

10        A:    I do not have the phone anymore.

11        Q:    Got it.  So do you recognize the

12   location of where these photos were taken?

13             MR. MERINO:  Object to form.  You can

14   answer.

15        A:    So it says -- I think I can make out the

16   words of Dollar General.  It looks like a Dollar

17   General.

18        Q:    And do you -- does this -- is this photo

19   consistent with how you remember the Dollar

20   General at the White Lake, New York location, how

21   it looks?

22             MR. MERINO:  Objection to form.  You can

23   answer.

24        A:    Yeah.  I'm not sure.  I don't remember

25   the layout or whatever.  Is this how Dollar

1    General looked?  Was that the verb?

2         Q:    How it looked in general at the White

3    Lake.

4         A:    At the White Lake?

5         Q:    At the White Lake.

6         A:    I don't remember how that layout was

7    when I -- we are talking about when I made the

8    September 18th purchase?  Is that what you are

9    specifically talking about?

10        Q:    Yeah.  So we will go with the September

11   4th and September 18, 2022 purchases first.  Is

12   this consistent?  Are these photos consistent with

13   your recollection of the layout of the Dollar

14   General store in White Lake, New York at the time

15   you made those transactions?

16        A:    Yeah.

17             MR. MERINO:  Object to form.  You can

18   answer.

19        A:    So yeah, I will answer that.  I don't

20   remember exactly what the layout was, September of

21   2022.  So that's hard for me to answer.

22        Q:    And so what about more recently?  Are

23   these photos consistent with how the Dollar

24   General -- your recollection of how the Dollar

25   General in White Lake, New York appears today,

1  now, the last time you visited?

2       A:   Do you know when these are -- are you

3  going to tell me when these are from?

4       Q:   Yes.  My understanding is approximately

5  September 2023.

6       A:   September 2023?  And does it still look

7  like this now?

8       Q:   Yeah.  I mean, is this consistent with

9  how you recall that store?  The one White Lake?

10      A:   What am I recalling exactly about the

11 photo?

12      Q:   You've shopped at the --

13      A:   Yeah.

14      Q:   White Lake Dollar General, correct?

15      A:   I only --

16      Q:   Is this how the register appears?

17      A:   The register?

18      Q:   The register and the display monitor?

19      A:   Is how it appears now the same as in

20 this photo?

21      Q:   Yeah, is it consistent with your

22 recollection?

23      A:   I would just -- I mean, I will say it

24 might.I don't have a specific, memorized

25 recollection of the layout there.  Yeah.

1      Q:   And in particular you will notice that

2   in these photos there is a monitor facing the

3   consumer that has -- for instance, let me point

4   you in particular to the fourth page of Exhibit 4,

5   and we will see that there is a monitor there that

6   it says HELWN-DIY paddle ball, one dollar.  Do you

7   see that?

8      A:   Yes.

9      Q:   And I'm going to represent to you that

10  that is a monitor that displays products as they

11  are scanned for a purchase.  And my question to

12  you is, do you recall having seen this monitor at

13  the point-of-sale, at the register where you

14  purchased products, at the Dollar General in White

15  Lake, New York before?

16          MR. MERINO:  Object to form.  You can

17  answer.

18      A:   Before?  Ever, not specifically

19  September?

20      Q:   Ever.

21      A:   I guess I don't have a specific

22  recollection of what the exact set up of a Dollar

23  General store looks like.

24      Q:   And I'm not asking --

25      A:   It's hard to compare this to a specific

1   recollection of mine.

2        Q:   And I'm not asking about the exact

3   recollection.  I'm asking, have you ever seen a

4   monitor like this at a Dollar General before?

5             MR. MERINO:  Object to form.  You can

6   answer.

7        A:   Have you seen a monitor like this at a

8   Dollar General store?  I -- it's -- all I will say

9   is it's possible.  I don't remember specifically

10  looking at this monitor.  But as possible, yeah.

11       Q:   So you don't remember looking at this

12  monitor?  Is that -- would that be true for all of

13  your Dollar General visits at the White Lake, New

14  York store?

15            MR. MERINO:  Object to form.  You can

16  answer.

17       A:   As I remember right now, do I remember

18  looking at a monitor like this?

19       Q:   At the Dollar General White Lake, New

20  York store at any point.

21       A:   Monitor like this: yes, I -- yeah, if

22  that makes sense.

23       Q:   When?

24       A:   Okay.

25       Q:   When?

1    A:   I'm sorry, I think I misstated my

2    response.  Can you repeat that again?  Because I

3    that's what I was saying is I don't have a

4    specific recollection of like this monitor, a

5    monitor like this, yeah.

6    Q:   Okay, because I thought you just said

7    yes.  So I'm just trying to understand.  Whatever

8    it is, it is.

9    A:   Yeah, yeah.

10    Q:   Do you recall ever having seen a monitor

11    like this, whether bigger or smaller, and monitor

12    at the point of sale, the cash register, at the

13    White Lake Dollar General store?

14         MR. MERINO:  Objection to form.  You can

15    answer.

16    A:   Yeah, a big one.  There is a self-

17    checkout one that I do remember.  Yeah.

18    Q:   Okay, and --

19    A:   It's bigger and I think maybe more clear

20    or more noticeable.

21    Q:   And when do you recall having looked at

22    that one?

23    A:   I don't have a specific date that I

24    remember seeing it.  But I do remember seeing it.

25    Q:   So it sounds like you may be have used

1    self-checkout at times that the White Lake store.

2          A:    I think so.

3          Q:    Let me just make sure your testimony

4    about this particular monitor --

5          A:    Yeah.

6          Q:    -- at the Dollar General store in White

7    Lake.  It's not your testimony that you -- that

8    there was not a monitor?  You just can't recall

9    whether there was a monitor or non-at the register

10   with the employee would checkout someone at the

11   White Lake store?

12         A:    Right.  If there was -- what it was

13   facing this way or the set up or working, I don't

14   know.  Yeah, I don't recall specifically, yeah.

15         Q:    When you have gone to the Dollar General

16   store and White Lake before, is it your practice

17   to look at that monitor when the employee is

18   checking you out, when you are making a purchase

19   there?

20               MR. MERINO:  Object to form.  You can

21   answer.

22         A:    Yeah, I don't know that I have in some

23   way, but I know that I have a general practice

24   when it comes to buying milk.  I haven't thought

25   through strategies for buying milk in the past,

1    but I have a general practice.  Hard for me to

2    answer.

3        Q:   Well, would you agree with me that this

4    particular monitor displays an item and a price

5    and that it's legible?

6            MR. MERINO:  Object to form.  You can

7    answer.

8        A:   In this photo, yes.

9        Q:   And would you agree with me that if you

10   wanted, if a customer wanted to see what items are

11   being scanned and what the price of those items

12   are, then they could do so with this monitor?

13           MR. MERINO:  Object to form.  You can

14   answer.

15       A:   Can you repeat that again?

16           MR. TAYLOR:  Can you repeat that?

17           (The requested audio was played back.)

18       A:   So if a customer wants to see what items

19   are being bought.  And what was the second part?

20           MR. TAYLOR:  Play it again?

21           Listen closely.

22           (The requested audio was played back.)

23       A:   Okay, thanks.  The audio is a little

24   muffled.  It's hard to hear.  I'm trying to

25   understand what the price of those things are.  If

1   the customer is looking at this monitor in this

2   picture, right?

3        Q:   Yeah.

4        A:   My understanding.  Yes.

5        Q:   All right.  So once you realized --

6   going back to the September 18, 2022,

7   transaction -- you can set that aside for now.  We

8   may come back to it.  The September 18, 2022,

9   transaction, you testified that at some point

10  thereafter you realized you have been overcharged,

11  correct?

12       A:   Yes.

13       Q:   And when you realized that, what, if

14  any, actions did you take?

15            MR. MERINO:  Objection to form.  You can

16  answer.

17       A:   I sought continued legal counsel.

18       Q:   So you call up your lawyer?

19       A:   I don't remember what form of

20  communication was.

21       Q:   Okay, but you contacted your lawyer?

22       A:   Yes.  Yes.

23       Q:   And the lawyer you contacted was your

24  dad?

25       A:   At this point I'm not sure, yeah.

1      Q:   Do you recall how soon after you

2   discovered that you had been overcharged on

3   September 18, 2022, that you contacted an

4   attorney?

5      A:   I'm not sure.

6      Q:   Do you recall how you contacted them?

7   You know, text message, phone call?

8      A:   Unfortunately, no.

9      Q:   Did you take any other actions after you

10   discovered you were overcharged during the

11   September 18, 2022, transaction?

12           MR. MERINO:   Objection to form.  You can

13   answer.

14      A:   Actions after I discovered I was

15   overcharged?

16      Q:   Yeah.

17      A:   I guess I'm having trouble understanding

18   the frame of the question.

19      Q:   Okay, what did you do?

20      A:   Probably ate dinner.

21      Q:   Did you do anything else?

22      A:   Put my children to bed.

23      Q:   Regarding the overcharge?

24   A:   Okay, that's what I'm asking.

25           Again, these pauses, I'm really trying

1  to remember stuff from a year ago.  I can't

2  remember anything else right now.

3      Q:   Did you talk with your wife about it?

4      A:   Yes.  Yes.

5      Q:   Do you recall what you said during that

6  conversation with your wife about the September

7  18, 2022, transaction?

8      A:   No.

9      Q:   Do you recall her -- any response that

10  she had?

11      A:   No.

12      Q:   Let's go back to September 4, 2022,

13  transaction really quick.  Did you talk to your

14  wife after you discovered that you have been

15  overcharged during that transaction?

16      A:   Yes.

17      Q:   And do you recall that conversation with

18  her?

19      A:   Not the specifics, no.

20      Q:   Do you recall anything about it?

21          MR. MERINO:  Objection to form, you can

22  answer.

23      A:   Not specifically.  I recall relaying the

24  overcharge, but I don't recall -- yeah, I don't

25  recall anything else.

1      Q:   Do you recall her reaction or whether

2    she had a reaction when he told her about the

3    overcharge, either after the September 4, 2022,

4    transaction, or the September 18, 2022,

5    transaction?

6           MR. MERINO:   Objection, asked and

7    answered to the extent of the September 18,

8    transaction, but you can answer.

9      A:   Yeah.  No.  No.

10     Q:   I want to move to Exhibit 3, which is

11   the complaint.  If we can move to the next

12   transaction which is on December 11th, and it's

13   paragraph 22 at the bottom of page 5.  Now the

14   chart here says December 11, 2023.  Am I correct

15   in saying that that's a typo in is actually

16   December 11, 2022?

17     A:   You're asking me that?  Yes.  Yes.

18     Q:   And if you want to see the attachment to

19   this -- well, so the December 11, 2023

20   transaction -- or 2022 transaction, yeah, at

21   Dollar General, am I correct in saying that at

22   this point in time you had already retained

23   lawyers for a lawsuit against Dollar General?

24     A:   Yes.

25     Q:   And can you tell me what you recall

1    about this transaction on December 11, 2023?

2                MR. MERINO:  Objection to form.  You

3    mean 2022, counsel?

4                MR. TAYLOR:  I thought I said 2022.

5    Okay, sorry.  Because I keep saying it and seeing

6    it where it says 2023.  Okay, try this again.

7        Q:   Can you tell me what you recall about

8    the December 11, 2022, transaction at the White

9    Lake Dollar General?

10       A:   I recall being overcharged by Dollar

11   General.

12       Q:   And do you recall when you went to the

13   store on that particular date?  What time of day?

14       A:   Not off the top of my head.  I can look

15   at the receipt.  That might be helpful, but --

16       Q:   Yeah.  Let me see if I can find it in

17   here.

18       A:   It's not with the other receipt.

19       Q:   What we will do --

20                MR. TAYLOR:  Let's mark these together.

21                COURT REPORTER:  Exhibit 5.

22                (Exhibit 5 was marked for

23   identification.)

24     MR. TAYLOR:  Exhibit 5.  Give that to

25   you and that to you.

1    BY MR. TAYLOR:

2         Q:    All right.  I just handed you some

3    pictures and a receipt and I wanted to ask some

4    questions about these once you've had a chance to

5    review them.

6         A:    The black-and-white photos.  These are

7    different photos, right?  Just in black-and-white?

8    Or are they the same?  There are some color and

9    black-and-white photos.

10        Q:    These are documents that were provided

11   to us.

12        A:    Okay, all right.

13        Q:    And so I guess the first question I

14   have --

15        A:    Okay, yeah.

16        Q:    Let me just ask you this.  So do you

17   recognize these documents?

18        A:    Yes.

19        Q:    And what are they?

20        A:    They are photos.

21        Q:    And did you take these photos?

22        A:    Yes.

23        Q:    So the December 11, 2022, a visit to the

24   Dollar General in White Lake, New York, did you --

25   were you there alone when you made these

1    purchases?

2          MR. MERINO:  Objection to form.  You can

3    answer.

4          A:    I believe so.

5          Q:    And you will see on the photograph of

6    the receipt that -- and maybe the best one is the

7    one that says Wolf 09 it says it was paid for with

8    a MasterCard with the last four digits 8142; do

9    you see that?

10         A:    Yeah.

11         Q:    And do you have a MasterCard with the

12    last four digits being 8142?

13         A:    Can I check?

14         Q:    Yeah.  Don't show the camera.

15         A:    Nope.  Yeah, not that I'm aware of.

16         Q:    Got it.  And so it appears that -- it

17    looks like that this receipt was for a transaction

18    at 1:43 p.m.  Do you see that at the bottom?

19         A:    Yes.

20         Q:    Is that consistent with your

21    recollection of this visit to the Dollar General

22    in White Lake on December 11, 2022?

23         A:    It's not inconsistent, so yeah.

24         Q:    And do you recall why you were

25    purchasing vanilla yogurt and half-and-half?

1          MR. MERINO:  Objection to form.  You can

2     answer.

3          A:    Partially, yeah.  For some items, but

4     not the others.

5          Q:    Tell me what you recall.

6          A:    My daughter Penelope was 4.  You can

7     tell she's a big dairy lover.  She loves her milk.

8     She loves her yogurt, vanilla yogurt.  The half-

9     and-half, I don't remember why I was purchasing

10    that.

11         Q:    And so it's your recollection that you

12    were buying the yogurt for Penelope?

13         A:    Yes.

14         Q:    Got it.  And do you recall -- and so the

15    photos of the shelf price tag here that are part

16    of Exhibit 5, you made those photographs?

17         A:    These photographs here that I'm looking

18    at?

19         Q:    Yes.

20         A:    Yes.

21         Q:    And do you recall whether you made them

22    before or after you actually made the purchase?

23         A:    I believe after.

24         Q:    And do you recall whether or not you use

25    it be self-checkout or you had an employee check

1   you out on December 11, 2022?

2        A:   I do not recall, unfortunately.

3        Q:   And do you recall whether you looked at

4   the monitor on -- at the register, which we looked

5   at in Exhibit 4, on December 11, 2022?

6            MR. MERINO:  I object to the form of the

7   question.  You can answer.

8        A:   Yeah, I don't recall specifically.  You

9   said that that photo was from 2023?

10       Q:   Yeah.

11       A:   So, yeah.

12       Q:   Well, let me ask you this.  I'm showing

13  you the monitor just so you can be on the same

14  wavelength in terms of what I'm talking about.  So

15  my question is with regard to December 11, 2022,

16  do you recall looking at any monitor at the

17  register in the White Lake store that depicted the

18  item and the price of item?

19       A:   Yeah, I don't remember specifically, no.

20       Q:   And am I correct in saying the half-and-

21  half, that was the correct price?

22       A:   You know, I'm not sure.  Is there a

23  photograph of the shelf price label?

24       Q:   While, so if you look at paragraph --

25       A:   I don't remember.

1     Q:   E2 of Exhibit 3, it only mentions low-

2  fat vanilla yogurt and not half-and-half.

3     A:  Yeah, I suppose it's possible that was

4  the correct price.

5     Q:  Okay.

6     A:  Yeah, okay.

7     Q:  So do you recall after December 11, 2022,

8  when you discovered that you had been overcharged

9  for the yogurt?

10     A:  At some point after the purchase.

11     Q:  Do you recall whether it was the same day

12  or a different day?

13     A:  Yeah, I don't recall the exact timing.

14     Q:  Do you recall having a conversation with

15  your wife after you discovered this overcharged?

16     A:  This December 11 one?  I don't recall.

17     Q:  Do you recall whether or not you

18  contacted your attorney after this December 11,

19  2022, overcharged?

20     A:  I definitely was in contact with my

21  attorney at some point after this.  I don't

22  remember if it was right after this or what.  If

23  that makes sense.

24  Q:  So when you walked into the store on

25  December 11, 2022, you were aware that there was a

1  possibility that there might be a price

2  discrepancy?  Would that be fair?

3       MR. MERINO:  Object to form.  You can

4  answer.

5       A:  I would say that again, I was just

6  determined to be vigilant.  If I discovered

7  overcharges, you know, to document them, but I had

8  no like expectation that I was going to be

9  overcharged walking in there.

10      Q:  So after this -- we already talked about

11  December 4, 2022.  Let me ask you this.  After the

12  September 18, 2022, and December 11, 2022

13  transactions, did you ever bring these overcharges

14  to the attention of a Dollar General employee at

15  the White Lake store.

16      A:  Say that again actually.  Sorry, one more

17  time.

18      Q:  All right.  The December -- sorry.  After

19  the September 18, 2022, and the December 11, 2022,

20  transactions did you ever bring the overcharges

21  that you allege you experience during those

22  transactions to the attention of a Dollar General

23  employee at the White Lake store?

24      A:  Not that I can recall.

25      Q:  And was there a particular reason why you

1  did not do that?

2      A:  So I don't have specific recollection of

3  that, but I can say having discovered these

4  overcharges after I had purchased it and left --

5  yeah, I guess I discovered them after I had

6  already left.  I will agree with that, yeah.

7      Q:  Well, I mean you are a frequent shopper

8  at the White Lake Dollar General, right?

9      A:  Yes.

10      Q:  So let me ask the question, is there a

11  particular reason why you didn't raise this issue

12  with the Dollar General employees at the White

13  Lake store the next time you visited?

14      A:  Yeah.  I'll say this.  I go there to buy

15  necessities, groceries for my children generally,

16  and, you know, other things.  That's my purpose

17  going there.  Yeah, I guess I don't have a

18  particular reason that I can name, a reason for

19  not doing something.  These questions and like a

20  negative are hard for me to answer, but yeah, I

21  don't have a particular reason in mind for not

22  doing something.  I can just -- I know what I did.

23  Yeah.

24  Q:  Did the price discrepancies that you

25  suffered or experienced at the Dollar General

1   White Lake store on September 4, September 18, and

2   December 11, 2022, not matter to you?

3           MR. MERINO:  Objection to form.  You can

4   answer.

5       A:  They do matter.

6       Q:  And so that's what I'm trying to

7   understand, is that they mattered, why did you not

8   raise them with Dollar General.

9           MR. MERINO:  Object to form.  You can

10  answer.

11      A:  Yeah, it matters, so I sought legal

12  counsel.  That's the decision I made.

13      Q:  So the decision you made was instead of

14  going back to Dollar General and asking for a

15  refund, you decided to file a lawsuit?

16      A:  It's not a binary.  You are framing it as

17  a binary and I don't appreciate your

18  characterization of that.  It wasn't I said this I

19  will do this.  That's -- I was overcharged and I

20  decided to seek legal counsel on this.  I'm not

21  even sure at the time that I even knew what could

22  happen if I spoke with anyone about it.

23          Yeah, I don't think it's a binary in the

24  way that you're trying to say it either or.  If I

25  did this I wasn't consciously doing something

1  instead of not doing something else.  I don't

2  remember at the time if that was even a thing I

3  thought I could do.  If that makes sense, yeah.

4      Q:  You could have done both, right?

5          MR. MERINO:  Object to form.  You can

6  answer.

7      A:  Yeah, I could have done a lot of things.

8  Your question was why.  And that's what I'm having

9  trouble answering, but okay.

10      Q:  Well, you just said that's not a binary.

11      A:  Yeah.

12      Q:  So I mean, was there anything preventing

13  you from going to the Dollar General in White Lake

14  and saying, hey, you overcharged me, can I get a

15  refund, or maybe you should change the price

16  label, maybe you should do something about that?

17  Was there anything preventing you from doing that?

18      A:  Yeah, I find -- you are asking me -- I

19  mean, certainly time is a -- you're asking me if

20  I -- sure, these are like extra affirmative steps

21  you are asking me to take to ensure that Dollar

22  General has accurate pricing on multitude of

23  products that they sell.  Yeah, those are like --

24  yeah, absolutely.  You know, these are things that

25  were -- that these are -- let me rephrase that.

1        I don't remember all the specifics about

2    what I was doing on all the specific dates.  But

3    yes, that would have taken time.  And I don't

4    remember whether I had it or not or how I chose to

5    spend my time or on what.  I don't remember

6    anything that was going on at this time.  But

7    yeah, there is --

8        Q:  Is it your testimony that you didn't want

9    to take the time to raise these issues with the

10   Dollar General White Lake store after they

11   occurred?

12       A:  So is not that I don't --

13       MR. MERINO:  I'll object to form.  You

14   can answer.

15       A:  Yeah.  I will say you asked me something

16   prevented me from doing it.  I think time is an

17   obstacle for sure.  I don't want to say that's why

18   I didn't do it.  I sought legal counsel and

19   that's -- that was the action I took after the

20   overcharged, yeah.

21       COURT REPORTER:  Counsel, I'm sorry to

22   interrupt.  But can I get you to move a little to

23   the right?

24       THE WITNESS:  I'm sorry.  Sorry.  Yeah.

25       COURT REPORTER:  Thank you very much,

1    Mr. Wolf.

2           THE WITNESS:  Yeah.

3        A:  I mean, I can also say I don't -- again

4    we are speculating here, but I don't -- I don't --

5    I can't say I know what would have happened if I

6    went in down the line and did as what you are

7    saying and try to talk to someone in the store and

8    ask them to adjust their pricing across all these

9    various products that have been overcharged, you

10   know?  The yeah, sorry.  I know I'm -- yeah.

11       Q:  So you don't know how much time it would

12   have taken you to get a refund or get some type of

13   resolution of these matters if you had raised them

14   with the Dollar General store at White Lake after

15   one of these transactions you had?

16       A:  I guess my --

17           MR. MERINO:  Object to form.  You can

18   answer.

19       A:  I guess my only point is it would have

20   taken time, right?  You run into these Dollar

21   General stores, again, there is one, maybe two

22   employees.  There are other people checking out.

23   You're asking me to just -- there are -- to

24   speculate.I don't remember all the exact

25   circumstances of this.  But what I -- you know,

1    you asked me why didn't I potentially wait in line

2    and then go -- so I don't remember everything that

3    was going on to be able to speculate why I didn't

4    like talk to someone.  That's why I'm having a

5    hard time with this.

6        Q:  But you felt that you had --

7        A:  I'm sure it would have taken time.

8    That's what I can say.

9        Q:  But it also took time for you to take

10   photographs of the shelf label and of the receipt

11   and to contact legal counsel, right?

12            MR. MERINO:  I will object to form.  You

13   can answer.

14       A:  Yeah, not really.  The photographs, I

15   snap either on the way in or on the way -- you

16   know, snap before on or after, just on the way

17   out.  That timing is completely in my control.

18   You know, waiting in a line to potentially talk to

19   someone to maybe or maybe not -- you know, where I

20   don't know what's going to happen, I don't know

21   how much time that would have taken.  So no, those

22   are not equivalent, me snapping a photo versus

23   other sorts of things you're mentioning.

24       Q:  After these transactions, did you give

25   any thought to other consumers who might come

1    after you and might suffer a price overcharged of

2    the same items in the White Lake store?

3         MR. MERINO:  Object to form.  You can

4    answer.

5         A:  Yeah.  I mean, I can say in general, I

6    would like Dollar General to have accurate pricing

7    and not overcharge customers at people's expense.

8    I don't remember the specifics of what mine

9    thoughts were after each of these individual

10   purchases.

11        Q:  Did it matter to you that other consumers

12   might come along behind you and be charged an

13   overcharge for the same items that you purchased

14   at the White Lake store?

15        MR. MERINO:  Objection, asked and

16   answered.  You can answer.

17        A:  Yeah.  Again, I don't know.  I don't know

18   that I was thinking about that in the way you are

19   framing it as much as I just like Dollar General

20   to have accurate pricing and not overcharge people

21   such as myself.

22        Q:  Yeah.  You had raised the issue of the

23   particular products for which you were overcharged

24   to the Dollar General store.  Would you agree that

25   you could have potentially prevented other

1    consumers from being overcharged --

2             MR. MERINO:  Object to the form.  You

3    can answer.

4        Q:  By bringing it to the attention of Dollar

5    General?

6             MR. MERINO:  Object to the form.  You

7    can answer.

8        A:  Not necessarily, no.

9        Q:  And I guess my question is, did you think

10   about those consumers at all when you made that

11   determination not to raise this issue to the

12   Dollar General White Lake store?

13            MR. MERINO:  All object to the form.  It

14   mischaracterizes testimony.  You can answer.

15            MR. TAYLOR:  He can correct me if I'm

16   wrong, yeah.

17       A:  Yeah.  So I always want Dollar General to

18   charge everyone accurate prices.  Myself, everyone

19   else has been overcharged.  Is there something

20   unclear about what I'm saying there?

21       Q:  Let me ask it this way.

22       A:  I just -- yeah.

23       Q:  So you understand that you're

24   representing a potential class of individuals,

25   right?

1     A:    Yeah.

2     Q:    What would you say to a consumer who, at

3   the White Lakes store, maybe the day after you

4   purchased the lactose free milk, maybe two days

5   after, and they said well, I was overcharged 10

6   cents for that.  And if you just simply notify

7   Dollar General then they would have potentially

8   fixed it and I wouldn't have been overcharged.

9   How is it that you can represent me in this

10  lawsuit when you refused to even bring it to

11  Dollar General's attention?  What would you say to

12  that?

13          MR. MERINO:  I'll object to the form of

14  that question.  You can answer.

15    A:    So look.  I represent -- I was

16  overcharged by Dollar General on several

17  occasions.  I represent everyone who has been

18  overcharged at a Dollar General in New York State.

19  My situation is not unique.  I don't think that

20  there is anything there that disqualifies me from

21  representing folks.  My situation is absolutely

22  not unique to myself.

23    Q:    I'm not sure that answers my question

24  exactly.  So is your testimony that you do feel

25  that you can adequately represent someone who may

1   have been overcharged on the same items you

2   purchased even though you didn't raise the issue

3   to Dollar General store lately?

4            MR. MERINO:  Object to the form.  You

5   can answer.

6      A:   Yeah.  I feel like I can adequately

7   represent anyone who has been overcharged at a

8   Dollar General in New York State.

9      Q:   And do you feel like you should have

10   done more to let Dollar General know about these

11   but in real time so that the overcharge could have

12   been fixed and not linger for a longer period of

13   time?

14            MR. MERINO:  Object to the form.  You

15   can answer.

16      A:   I think I did the best that I could.

17      Q:   And why do you say, the best that you

18   could?  What do you mean by that?

19      A:   I mean, what I did was -- yeah, you're

20   asking me to go back and second guess myself and

21   would you this and was this the right -- look.  I

22   was overcharged by Dollar General.  I care about

23   it and I made the best decisions that I could to

24   try to, you know, ensure that Dollar General has

25   accurate pricing for everyone.  Absolutely.

1     Q:    But couldn't you have ensured that they

2  had accurate pricing by bringing it to Dollar

3  General's attention?

4            MR. MERINO:   Objection to form.   You can

5  answer.

6     A:    Yeah, you're asking me to make a whole

7  bunch of, like, assumptions about, you know, my --

8  what I could have done and what my actions would

9  have led to.   I do know that Dollar General has

10  been aware, right.   Even before December 11th this

11  overcharge, there was a lawsuit filed, right,

12  about overcharges, right.   You know, my lawsuit in

13  particular, I know I'm aware of others.   Right.

14            So Dollar General's aware of overcharges

15  yet they seem to do nothing.   They seem to

16  continually overcharge.   So if filing a lawsuit is

17  not stopping Dollar General from overcharging

18  people, and you're asking me to state that, you

19  kow, me speaking to an employee somewhere in one

20  Dollar General store would have changed all of

21  Dollar General's overcharging for everyone else?

22  I don't know.   I can't answer that.

23     Q:    In hindsight, do you wish now that you

24  had raised the issue at the dollar general White

25  Plains store soon after you discovered the

1    overcharges at the three -- with regard to the

2    three transactions that comprise the basis for

3    this lawsuit?

4           MR. MERINO:  Object to form.  You can

5    answer.  And if we can get a break when you're

6    done answering the question?

7           MR. TAYLOR:  Yeah.  Sure.

8    BY MR. TAYLOR:

9      A:   Yeah.  So okay.  You're asking me, like,

10   do I wish I and.  This is assuming I had the

11   opportunity, had the time, I don't know.  This is

12   a hard question for me to answer.

13     Q:   All right.  Well do the best you can.

14     A:   I'm sorry?

15     Q:   Can you do the best you can?

16     A:   Yeah.  So you're asking me to second-

17   guess myself.

18     Q:   No.

19     A:   In asking if Dollar General had accurate

20   prices for the products that they charge people.

21   This is --

22     Q:   I'm asking in hindsight do you now wish

23   that you had raised it.  Yes, no, maybe, I don't

24   know.

25     A:   I don't know I guess I'll say.

1     Q:    Now, I think you just said something

2     about assuming I had the opportunity to raise this

3     with Dollar General.  Is it your contention that

4     you didn't have the opportunity to raise it with

5     Dollar General?

6     A:    As I said before, I don't know the

7     specifics of all the -- I don't have the specifics

8     of every time I visited.  But really, like, you

9     say to raise something with someone it requires

10    you to talk to an employee.  Frequently there are

11    1 to 2 employees at a Dollar General store.  They

12    are often doing things.  They are busy.  You have

13    to wait in line.

14           So, like, you know, there is -- I had

15    literally an opportunity, just like an

16    opportunity, you know, because to reference so

17    yeah, that's what I mean by opportunity.  Just

18    because I visit a store doesn't mean I always view

19    it as I myself having a good opportunity to do so.

20    Q:    Have you ever tried to raise any type of

21    customer service issue with a Dollar General

22    employee at the White Plains store?

23    A:    Yes.

24    Q:    Tell me about that.

25    A:    So sometime after September 4th I

1    remember being overcharged for an item.  And I

2    asked an employee about it.  I don't remember all

3    the specifics but I remember the employee

4    investigating the overcharge.  It took some time,

5    and then the employee correcting the price.

6         Q:   And you don't remember what the item

7    was?

8         A:   Unfortunately, no.

9         Q:   And had you already paid for?

10        A:   No.

11        Q:   Okay.  How did you know that there was

12   an overcharge for it?

13        A:   I don't remember specifically.  So I

14   would have asked the employee to investigate.  You

15   know, I imagine we would have had to gone and take

16   the time to look at the shelf and all that to

17   figure it out.  But somehow it was figured out.  I

18   do remember it being, and you know just -- that

19   wait time and having to go through all of that

20   just to make sure I'm being charged an accurate

21   price.  That felt tedious and burdensome to me.

22   But that's all I really remember about that.

23        Q:   Did you actually buy the item?

24        A:   After it was corrected, yes.  Yeah.

25        Q:   And do you recall how long it took for

1  this issue to be -- for the price to be changed?

2      A:    I don't recall exactly.

3      Q:    Are we talking two minutes?  Are we

4  talking 10?

5      A:    I mean at least as long to, you know, go

6  on to the shelf, come back, do whatever needs to

7  be done in the computer.  Not an insignificant

8  amount of time but I really can't quantify it.  I

9  really don't remember the specifics.

10     Q:    And you said this was before the

11  December 11th transaction, right?

12     A:    So sorry if I miscommunicated our

13  misspoke.  It was somewhere after September 4th,

14  but I don't remember at what point afterwards.

15  I'm not sure if it was before or after December,

16  but I think yeah.

17     Q:    And I guess -- here's really what my

18  question is.  Why didn't you raise it in that

19  particular visit but you didn't raise it any other

20  visits?

21     A:    Yeah.  In other visits I didn't notice

22  that I had been overcharged until I left.  And

23  compared the receipt and it was --

24     Q:    So you raised it that that one time and

25  that's the first page and it actually worked.

1   They changed it.  And so after that you were aware

2   that if you did raise the issue then Dollar

3   General would correct it and give you the correct

4   price, right?

5           MR. MERINO:  Objection to form.  You can

6   answer.

7       A:   So you're saying words, if by worked you

8   mean taking extra time to ensure that Dollar

9   General accurately charges customers, yes, it

10  worked in that case.  I was aware that in the

11  future if I realized that there was an overcharge

12  in the store that that option to take time to, you

13  know, try to settle something with an employee

14  that that could be an option.

15      Q:   Is there a particular -- do you call

16  what the difference in the price was at the time

17  you raised it?

18      A:   I'm sorry, I don't.

19      Q:   Was one of the factors why you didn't

20  raise the September 4 transaction with the White

21  Lake Dollar General store because it was only a

22  dime difference?

23          MR. MERINO:  Objection to form.

24      Q:   In other words, did the amount of the

25  price difference matter in terms of weighing

1 whether to spend the time to get it corrected?

2      A:   No.

3           MR. MERINO:  And I'll ask for a break

4 now again.

5           MR. TAYLOR:  Okay.  Yeah.  Go ahead.

6           THE WITNESS:  Okay.

7           (Off the record at 2:18 p.m., resuming

8 at 2:26 p.m.)

9 BY MR. TAYLOR:

10      Q:   All right, Mr. Wolfe.  Have you ever

11 experienced price discrepancies and any other

12 retailer?  That you can recall.

13           MR. MERINO:  Object to form.  You can

14 answer.

15      A:   Not that I recall.

16      Q:   Do you have any awareness that other

17 retailers have had issues with price discrepancies

18 at any point?

19           MR. MERINO:  Object to form.  You can

20 answer.

21      A:   No awareness.

22      Q:   Now, after the three incidents that we

23 have discussed and before the September 18 and

24 December 11, 2022 you have continued to shop at

25 Dollar General after those incidents, correct?

1      A:    Yes.

2      Q:    And why is it that you have continued to

3  go to Dollar General?

4      A:    I typically buy necessities for my

5  family, particularly my kids as we talk about

6  today Dollar General is the closest place where

7  for me to buy all those things I need, the

8  closest, you know, has, what you might call, like

9  a supermarket, you know kind of thing.  Where I

10 can get that stuff.

11     Q:    You know sometimes when plaintiffs filed

12 suit against someone they will say like I'm never

13 going to go to there again and is the reason why

14 you have continued to use, as your testimony that

15 was really for convenience?

16         MR. MERINO:  Object to form.  You can

17 answer.

18     A:    So in order when I'm getting the closest

19 other supermarket is about I would say a 15 to 20

20 minute drive.  So we're talking 40 minutes round

21 trip.  You know, a few minutes there, we're

22 talking like an hour.  Now I'm spending, if I need

23 to -- if my kid needs some milk.  So I wouldn't

24 say convenience.  I would say necessity.  And by

25 necessity were defined in that as, like, I need to

1    get some food to my kids soon.

2         Q:   So your testimony is the reason you

3    continue to shop at Dollar General is out of

4    necessity?

5         A:   Yeah.  I shop there because when you're

6    trying to get things like food and necessities to

7    your kids it is the closest place that I can go

8    to.  It's two minutes down the road.  Otherwise

9    I'm spending an hour in the car ride.  And I need

10   to, you know, I need to yeah I'll leave it at

11   that.

12        Q:   So when you shop at Dollar General after

13   these incidents that we've talked about do you

14   continue to pay close attention to the shelf price

15   and the register price?

16            MR. MERINO:  Object to form.  You can

17   answer.

18        A:   Yeah, you're saying after December 11th?

19        Q:   Yeah.

20        A:   I would say I've -- when I could, right,

21   I was vigilant about reporting any overcharges.

22   These are all the -- like the overcharges in this

23   suit are the only ones I'm aware of right now.  I

24   don't know that I always -- I'm always able to

25   maintain, you know, the same level of -- you know,

1    we shop at Dollar General frequently.  I'm not --

2    price checking, you know.  I'm not verifying

3    prices every purchase.  That would be a ridiculous

4    a burden for me to have to do.  So no, I cannot do

5    that for every purchase.

6        Q:    Okay.  Is there -- I mean, do you look

7    at the monitor at the register, after the December

8    11, 2022 transaction subsequent transactions at

9    the White Lakes store have you looked at the

10   monitor as you are checking out to see what the

11   price you're being charged is?

12            MR. MERINO:  Object to form.  You can

13   answer.

14       A:    Yeah.  I don't believe since and then I

15   have, like, verified prices after that.

16       Q:    And is there -- yeah.  So you've

17   experienced price discrepancies on at least three

18   occasions after those three occasions have you

19   changed how you shop at Dollar General at all?

20            MR. MERINO:  Object to form.  You can

21   answer.

22       A:    Yeah.  So the way I shop at Dollar

23   General is typically I go in there for just

24   groceries I need in that moment.  My kid needs

25   milk.  My kid needs yogurt.  I'm going in there

1  getting what it is and, you know, leaving and

2  getting my stuff home.  That's always my concern.

3  That's like -- that's what I do when I go to

4  Dollar General.  So they changed my practices.

5  When I could, like I said on some occasions I

6  was -- I tried to document things to see if I

7  wasn't being charged accurate prices.  But no, I

8  cannot do that indefinitely.  I think Dollar

9  General should be the one that has accurate prices

10  and doesn't require consumers to consistently, I

11  don't know, take some kind of action to ensure

12  that they are charging customers a fair price.

13     Q:   He said when I could.  What do you mean

14  by when I could?  Is there something preventing

15  you from, you know, checking to see whether or not

16  you've been overcharged?

17     A:   Again, taking photographs the shelf

18  prices.  This is time.  Then again, I am not -- I

19  shop at Dollar General frequently.  It's a huge

20  burden to have that kind of responsibility to take

21  photographs of things and compare prices every

22  single visit for years.  Right?  Our indefinitely

23  into the future.

24     Q:   I thought you told me that it was not a

25  huge burden time wise to take photographs, just to

1    go in and out and snap a photo.

2        A:   In any one instance of -- in any

3    singular instance now.  But if I'm doing this

4    forever, if you're asking me, like, my

5    responsibility as a consumer at Dollar General is

6    to correct their prices, or sorry, verifying

7    prices, like forever every time I shop there, yes,

8    that's huge.  So it's a matter of degree and how,

9    you know, things kind of add up.  Right.  Yes, I

10   can snap, you know, when I can, when I'm feeling

11   okay, I can snap some photos to be able to verify

12   to see whether I'm being charged accurately or

13   not.  But you know doing that for ever just to try

14   to make sure Dollar General is, like doing its

15   legal responsibility to charge people accurate

16   prices?  That is a burden on the consumer.  A big

17   burden, in my opinion.

18       Q:   When was the last time you took a

19   photograph of the shelf label at a Dollar General

20   that you can recall?

21       A:   I don't recall specifically.  Can I

22   check they -- all my photographs are in here, can

23   I check the --

24       Q:   No, I'm asking off the top of your head.

25       A:   Off of the top of my head --

1     Q:    We'll get to that report.

2     A:    Okay.  So you said took a photograph of

3  a shelf label with any purpose or just is your

4  purpose specifically for, like, pricing for

5  overcharges?

6     Q:    Well, for any purpose.

7     A:    So I don't recall specifically.  I do

8  take pictures of shelf labels and products other

9  than, you know, verifying, you know, trying to see

10 if I'm being charged accurate prices.  So that's

11 not the only reason I might take a picture of a

12 product on a shelf, if that makes sense.

13    Q:    All right.  I'm not sure I'm

14 understanding you.

15    A:    So being able to verify whether I'm

16 being charged accurate -- being charged and

17 accurate price at Dollar General is not the only

18 reason I might take a product of something --

19 sorry, I picture of something I see in the store.

20    Q:    What's another reason?

21    A:    I think a product looks funny.  I don't

22 know.  Whatever.  I -- if you want something, I

23 don't know.  There's all kinds of reasons why.

24 Comparison shopping.  There's a lot of reasons

25 why.

1      Q:   Do you recall the last time you took a

2  photo for any reason of a shelf label at a Dollar

3  General store?

4      A:   I don't recall what the specific last

5  photo was that I took.

6      Q:   So let's move to paragraph 25 of Exhibit

7  3.  It says, it is defendant's policy and practice

8  to charge a higher price at the register for

9  merchandise than the price advertised in the unit

10  price labels for the same merchandise on the

11  shelves in the Defendant's New York stores.  Do

12  you see that?

13      A:  Yes.

14      Q:   What information, if any, do you have

15  that it was Dollar General's policy and practice

16  to charge a higher price?

17      A:   This is my experience.

18      Q:   What do you mean, experience?

19      A:   I've been overcharged multiple times by

20  Dollar General.

21      Q:   Three times, right?

22      A:   Yet in the space of a few months.

23      Q:   Do you have any sense about whether the

24  Dollar General was doing -- it could have been a

25  mistake as opposed to a policy or practice?

1          MR. MERINO:  Objection to the -- excuse

2    me.  Object to the form.  You can answer.

3          A:   Yeah, I don't want to speculate on the

4    internal -- I can't speculate right now.

5          Q:   Okay.  Well, I mean, look, there's an

6    allegation here that Dollar General was doing this

7    on purpose, and I'm asking you whether you have

8    any information that supports that as opposed to

9    it being merely a mistake on Dollar General's

10   part.

11         A:   Yeah, I know they've been audited.  I

12   mean,

13         Q:   Let me finish so we can get that on the

14   record.

15         A:   Sorry.

16         Q:   Let me get that on the record.

17         A:   Okay.

18         Q:    As opposed to being a mistake on Dollar

19   General's part.  Go ahead.

20         MR. MERINO:  I'll object to the form.  I

21   think it mischaracterizes that you can answer.

22         MR. TAYLOR:  I mean, we can read, and I

23   think I did just read it.  And I'll read it again

24   so we are clear.  Paragraph 25 of the complaint

25   says, it is Defendant's policy and practice to

1   charge a higher price at the register for

2   merchandise than the price advertised on the unit

3   price label for the same merchandise on the

4   shelves in Defendant's New York stores.  So I

5   mean, that's the allegation.

6       Q:   And my question is, do you have any

7   information supporting that it is Dollar General's

8   policy and practice as opposed to it merely being

9   a mistake on Dollar General's part?

10      A:   Will practice -- it's their practice.

11  It happens.  Okay.  That's simple enough to

12  answer.  It happens a lot, apparently.  Policy, I

13  mean I'm aware that New York State has audited

14  Dollar General on overcharges.  And typically,

15  those audits have turned up, you know, maybe more

16  overcharges than would be acceptable.  And if

17  Dollar General is being audited on overcharges

18  this is something they know about.  So in my mind

19  if they know that they are overcharging and they

20  keep doing it, taking money from consumers, it

21  could be a policy, yeah.

22      Q:   Let me ask you this.  You work as a

23  teacher at a school, right?

24      A:   Yes.

25      Q:   Do you ever make mistakes in your job?

1              MR. MERINO:  Object to form.

2         A:    Yeah.

3         Q:    Would you agree that mistakes happen in

4    the course of people's jobs on occasion?

5              MR. MERINO:  Object to the form.  You

6    can answer.

7         A:    In different capacities and situations,

8    yeah.

9         Q:    And when you made a mistake in the past

10   in your job you appreciate it if someone brings it

11   to your attention, right?

12             MR. MERINO:  Object to form.  You can

13   answer.

14        A:    Yeah.  I feel like were equating

15   different things here.  If I make a mistake, yes,

16   I would like to know.

17        Q:    And when it's brought to your attention

18   I'm assuming that you took action to resolve the

19   mistake in some way; would that be accurate?

20             MR. MERINO:  Object to form.  You can

21   answer.

22        A:    You're asking me if every that's sorry,

23   can you repeat the question?  Is it something

24   specific you talking about, generally?

25        Q:    No, I'm asking -- you testified that you

1  sometimes make mistakes in your job, and we all

2  have.  You know when someone brings it to your

3  attention do you -- would you take steps to

4  address the state?

5          MR. MERINO:  Object to form.  You can

6  answer.

7      A:   Yeah.  Depends if I think it was a

8  mistake.  I mean you know if it was something that

9  I think -- right, people can disagree about what a

10 mistake is.  But sure.  If I agree that something

11 is a mistake I would address it.

12     Q:   Do you know how many different products

13 are sold in a Dollar General store?

14     A:   I can't tell you off the top of my head.

15     Q:   Approximately 15,000.

16         MR. MERINO:  Objection.  You're

17 testifying on the record.

18     Q:   I'll represent that it's approximately

19 15,000.  And I guess my question is this.  Given

20 that there are thousands of products in a Dollar

21 General store is that your expectation that every

22 single one of those products will have the 100

23 percent correct price 100 percent of the time?

24   MR. MERINO:  Object to form.  You can

25 answer.

1      A:    Yeah.   Just give me a second because I

2  just want to take a look at something here.

3      Q:    Let me know when you're ready.

4      A:    So I'll say this.  You know, the

5  purchases I made in September that I would not be

6  overcharged 66 percent of the time.  Right.

7  December 11 visit, a 25 percent overcharge.  This

8  is -- that is what my expectation is.  Yes, Dollar

9  General has a lot of products.  That being, a heck

10 of a lot of them must be mislabeled, have with

11 accurate pricing to be overcharging these rates.

12     Q:    What rates?

13     A:    66 percent overcharge rate for me in

14 September 2023.  That's in the complaint.  A 25

15 percent overcharge December 11.  The audience show

16 23 percent overcharge, 32 percent overcharge, 30

17 percent overcharge, 78 percent overcharge.

18     Q:    What are those from?

19     A:    I believe these are audits done by the

20 Weights and Measures Department.

21     Q:    Do you know if that was the White Lakes

22 store?

23     A:    I cannot say off the -- yeah.  I don't

24 know.  I know these were Dollar General stores in

25 New York state is all I know.

1     Q:    Would you agree that with that many

2  products in a Dollar General store that it would

3  be difficult to not make an occasional mistake in

4  terms of the price?

5          MR. MERINO:  Object to form.  You can

6  answer.

7     A:    Yeah, I don't know the answer to that.

8     Q:    Are you alleging that every product in a

9  Dollar General store has the wrong price?

10         MR. MERINO:  Object to form.  You can

11  answer.

12    A:    I'm alleging that I was overcharged for

13  the products that I -- that are listed in this

14  complaint.  This is what I --

15    Q:    That's not my question.

16    A:    That's all I'm alleging.

17    Q:    Mr. Wolf, that's not what I'm asking.

18  I'm asking, are you alleging that every product in

19  a Dollar General store has the wrong price?

20    A:    So this feels like a ridiculous

21  question.  I'm sorry to --

22    Q:    Well, then surely you want to answer.

23    A:    I haven't -- yeah.  So I haven't -- I'm

24  not able to answer that because I haven't checked

25  every single product in a Dollar General store so

1    I don't know what all of Dollar General's, you

2    know, prices are and whether they're all accurate.

3        Q:    Well, you haven't been -- every product

4    that you have purchased has not had the wrong

5    price, has it?

6        A:    As far as I'm aware, these are the only

7    overcharges that I experienced.

8        Q:    Am I correct in assuming --

9        A:    Yeah, I can't say definitively none of

10   the other ones were overcharged.  But form my

11   recollection these are the only ones that I was

12   overcharged on.

13       Q:    And so, like I say it's --

14       A:    Yeah.

15       Q:    I just want to know, are you alleging

16   that every single product in the Dollar General

17   Store is overpriced?  Yes, no, I don't know.

18       A:    Yeah.  I can't answer that.  I haven't

19   purchased every product at a Dollar General store

20   to be able to answer that.  I guess that's why I

21   feel it's slightly ridiculous.  I'm sorry to -- I

22   don't mean to --

23       Q:    Well --

24       A:    -- throw, you know.

25       Q:    Yeah, I mean, you can --

1        A:   -- words out like that.  But --

2        Q:   -- call it ridiculous.

3        A:   Yeah.

4        Q:   I mean, you know, I may have an opinion

5   that your answer is ridiculous.

6        A:   Yeah.

7        Q:   But you know, that is what it is.

8        A:   Yeah.

9        Q:   And --

10        A:   Yeah.  I haven't purchased every product

11   at a Dollar General store so I don't know the

12   answer to that.

13        Q:   But you have purchased products that did

14   have the correct price; is that accurate?  Dollar

15   General stores?

16        A:   Again, I only -- in this things are the

17   ones that I am aware that were incorrectly priced.

18   I cannot go testify that all the other ones were

19   correctly priced.  I -- the best information I

20   have, I know it's at least these discrepancies.

21   It's possible there could have been more.  But

22   this is -- this is what I noticed.

23        Q:   Is it your testimony that you don't know

24   whetherany of the products that you have

25   purchased a Dollar General store over the last

1  three years is accurate and was not a price

2  discrepancy?

3          MR. MERINO:  Object to form.  An object

4  to mischaracterizing testimony.

5          MR. TAYLOR:  I'm not trying to

6  mischaracterize testimony.  I'm just trying to get

7  an answer.

8      A:   Off the top of my head right now, I

9  cannot verify all the purchases right now that I

10  made at Dollar General.

11     Q:   Can you verify that any of the

12  purchases, or any of the products that you have

13  purchased at eight Dollar General over the last

14  three years did not have a price discrepancy?

15     A:   With my recollection of events and

16  information in front of me I cannot.  Yeah, I

17  can't verify whether all these other products were

18  correctly priced or not.  I'm just -- I can't.

19         MR. TAYLOR:  All right.  We're going to

20  market Exhibit 6.

21         (Exhibit 6 was marked for

22  identification.)

23     Q:   All right.  I'm handing you Exhibit 6.

24  Does this look familiar at all?

25     A:   Give me a second to look over it.

1              Yes.

2        Q:    Okay.  And what is this?

3        A:    These are photographs.

4        Q:    Okay.  And these are photographs that

5   you took of shelf labels in a Dollar General?

6        A:    Yes.

7        Q:    And particular to the White Lake, New

8   York store?

9        A:    Yes.

10       Q:    And you see that the second page is of

11  Eggo buttermilk waffles, correct?

12       A:    Yes.

13       Q:    And you see the shelf labels says 3.25,

14  right?

15       A:    Yes.

16       Q:    And you see on the third page of this

17  and receipt that shows you were charged 3.25 --

18       A:    Yes.

19       Q:    -- for the Eggo buttermilk waffles,

20  right?

21       A:    Yeah.

22       Q:    So you agree with me that that

23  transaction was correctly priced?

24       A:    Yes.

25       Q:    Okay.

1      A:    Yeah.

2      Q:    So let me ask --

3            (Crosstalk)

4      Q:    So is it your contention that every

5    product at a Dollar General that you have

6    purchased over the last three years was

7    incorrectly priced?

8      A:    I am not contending that every product

9    was incorrectly priced.

10     Q:    Okay.  Going to paragraph 64 in the

11   complaint, it says that you have suffered --

12   Plaintiffs and other members of the class suffered

13   and continue to suffer injuries.  Do you see that?

14     A:    Yeah.

15     Q:    All right.  What are the injuries that

16   you have suffered?

17     A:    Overcharges.

18     Q:    And in what amounts total?

19           MR. MERINO:  Object to form.  You can

20   answer.

21     A:    I guess yeah -- so I don't want to -- we

22   can, like, tell me more about the question.  So I

23   don't -- I can tell you much the overcharges were

24   in each one of these cases if that's all you're

25   asking.  In the receipts, in the evidence here.

1    It's hard for me to -- I guess to quantify what

2    the total was -- were these injuries.  Is that

3    something like a number, like quantify is that

4    something, I don't know, I would need to talk to

5    my attorneys about?  Does that make sense?

6        Q:  Well, is that --

7        A:  Or are you asking me, just, like what

8    were the overcharges on all of these receipts?

9        Q:  I'm asking you what are the -- I mean

10   this is your complaint.  What injuries are you

11   seeking here for yourself?

12       A:  Yeah, I would have to talk to my

13   attorneys for that.

14       Q:  Am I correct in saying that the amount

15   of money that you are out of pocket for the

16   transactions at issue is 45 cents?

17       A:  I would have to go through this and do

18   an --

19       Q:  Okay.

20       A:  Are the receipts accessible in an easy

21   place?  I know that our bike all around, but I

22   don't want to take --

23       Q:  I will direct you to paragraph 14 and 22

24   in the complaint.

25       A:  Yeah.  Right here.  Yeah.  But I guess I

1   don't remember how much, was it 1 -- sorry.  I

2   bought one each of these at 20.  Okay.

3          Yeah, so in these instances 45 percent

4   is the overcharge amount.  That being said in all

5   the times before this when I was not checking, you

6   know, documenting things to be able to verify that

7   Dollar General is charging accurate prices, you

8   know, I don't know how much I overpaid at Dollar

9   General, in general before, or even cents when I'm

10  not always able to document prices there to verify

11  later if I was charged accurately or not.  This is

12  the over charge, at least everything I observed.

13  I suspect I have been overpaying for many years.

14  That's just -- yeah.

15     Q:   And sorry, just to be clear because you

16  said 45 percent.

17     A:   Sorry 45 cents.

18     Q:   45 cents is what you were out of pocket

19  that you are aware of from the overcharges that

20  constitute the transactions that form the basis of

21  this lawsuit?

22     A:   Yeah, 45 cents they sell thousands of

23  whatever, times however many -- how much is Dollar

24  General making on this?  How many people buy these

25  things, you know, however many milks they sell --

1      Q:   You're saying --

2      A:   -- times what ever.  Yeah in this

3  particular case, I'm aware of these overcharges

4  here.  Certainly Dollar General is not just

5  overcharging 45 cents though.

6      Q:   I'm asking what you're seeking.

7      A:   Yeah.  No.  So what I'm seeking I'd have

8  to consult my lawyers to determine, you know, to

9  determine I guess the specific resolution to this

10     Q:   And I am asking what you were out of

11  pocket.  And you said times all the other

12  transactions.  Are you --

13     A:   So sorry.  I was referring to like the

14  amount of money that Dollar General makes by

15  overcharging, not just me, but others.  Yeah, me

16  personally, my experience, these are the

17  overcharges that I'm aware of.  It's 45 cents in

18  the news, and I suspect there have been others

19  before and since.  I'm not able to -- I'm not

20  always -- I haven't been able to document them

21  though.

22     Q:   You haven't been able to or you chose

23  not to document?

24     A:   These are all the ones that I'm aware of

25  before September 4, 2022.  Again, I generally

1   trust that stores have accurate pricing.  So given

2   that once I started looking, overcharges just

3   were, you know, coming up.  My guess is this did

4   not start September 4, 2022.  What a coincidence

5   that would have been.  My guess is I've been

6   overcharged for years.

7           And in fact, I think this complaint and

8   it goes, covers, like class members three years

9   before I filed.  So yeah.  This is what I'm aware

10  of in the months where I was -- where I was

11  documenting, you know, shelf prices and receipts

12  to be able to verify prices.  Yeah.

13      Q:  Are you seeking anything else out of

14  pocket other than that you were out of pocket

15  other than the 45 cents?

16      A:  I have --

17          MR. MERINO:  Object to form.  You can

18  answer.

19      A:  I'd have to defer to my attorneys on

20  that.

21      Q:  Okay.  Well, I'm asking you sitting here

22  today whether you can think of any other expenses

23  that you are out of pocket other than the 45

24  cents?

25      A:  Again, I'd have to -- have to defer to

1  my attorneys on that.

2      Q:   Well, and I'm asking you -- I really

3  would like you to answer that question without

4  deferring to your attorneys because I'm asking you

5  whether or not Ther'es any expenses as you're

6  sitting here right now that you're aware of that

7  you have incurred as a result of these overcharges

8  at a Dollar General other than the 45 cents that

9  we discussed?

10      A:   Can you restate that one more time?

11          MR. TAYLOR:  Can you replay that?

12          (The requested audio portion as

13  replayed.)

14      A:   And expenses would be, like, financial

15  right?  That's all we're talking about here?

16  Expenses?

17      Q:   Is there another definition of expenses?

18      A:   Possibly you expend time, you expend

19  energy certainly.  Okay.  and I'm just seeking

20  clarity here.  No, right not none other than I can

21  think of right now.

22      Q:   Okay.

23          MR. TAYLOR:  Let's mark exhibit -- this

24  would be Exhibit 7.

25          (Exhibit 7 was marked for

1  identification.)

2       Q:   I'm handing you Exhibit 7, which is

3  entitled Plaintiffs' Supplemental Combined

4  Responses to Defendant Dolgen New York, LLC's

5  First Set of Interrogatories.  Is this familiar to

6  you?

7       A:   Yes.

8       Q:   Okay.  Have you seen it before?

9       A:   Yes.

10       Q:   We're going to go through a few of these

11  responses.  Let's start with Interrogatory 4, in

12  which the answer is on page 5 and 6.  This is

13  asking about whether you have experienced,

14  observed or otherwise aware of a price discrepancy

15  anywhere other than a Dollar General store.  And I

16  wanted to specifically ask you about Family

17  Dollar.  Do you shop at Family Dollar at all?

18       A:   I don't think so.

19       Q:   Okay.  Have you ever taken any pictures

20  of a shelf label at Family Dollar that you can --

21  that you're aware of or that you recall?

22       A:   Not that I can recall.

23       Q:   Do you know whether your wife has ever

24  taken any pictures of shelf labels at Family

25  Dollar to your knowledge?

1      A:    I cannot say for certain.

2      Q:    Do you have any knowledge that she has?

3      A:    No.  That I'm aware of right now.  No,

4  not that I remember now.

5      Q:    Have you ever had any discussion with

6  your wife or anyone else about a lawsuit against

7  Family Dollar for price discrepancies?

8            MR. MERINO:  Object to form.  You can

9  answer.

10     A:    No.

11     Q:    All right.  I want to call your

12 attention to Interrogatory 7.  This begins on the

13 bottom of page 8 and it goes into page 9.  And

14 this particular interrogatory says, Identify all

15 communications that you have had with any person,

16 entity or association regarding the claims or

17 allegations of price discrepancies at any store,

18 including Dollar General, not encompassed by your

19 complaint.  And under the supplemental answer it

20 says, on or before September 4, 2022, Attorney

21 Andrew R. Wolf of the Dann Law Firm contacted

22 Joseph Wolf for the purpose of providing legal

23 advice.

24           All right.  So I want to ask you

25 about -- do you see that?

1        A:    Yeah.

2        Q:    Okay.  I want to ask you about hta

3   particular statement.  And we've talked about this

4   a little bit before, earlier today, but is this

5   sentence referring to a different conversation

6   than the one you recounted earlier where Andrew

7   Wolf, your father, mentioned to be careful

8   shopping at Dollar General?

9        A:    Is this sentence referring to that?

10       Q:    Yes.

11       A:    No.

12       Q:    Okay.  What is it referring to?  If you

13  know.

14       A:    So again, I'll tell you what happened.

15  Again, I'm not sure what that's referring to but

16  I'll just tell you what happened.  So again,

17  before September 4th my father, he warned me of --

18  he said just to, you know, be careful with

19  overcharges at Dollar General.  On or after

20  September 4th is the first time I would have

21  reached out for legal advice.  So whatever this

22  says it ways, but I'm telling you my recollection

23  of the events.

24       Q:    So the --so you don't know what this was

25  referring to in that first sentence about Andrew

1  Wolf contacting you for the purpose of providing

2  legal advice; is that your testimony?

3      A:    Right.  Yeah.  So before September 4th,

4  there were no conversations of legal advice.  It's

5  possible on September 4th we -- possible on or

6  after September 4th that that's when I reached out

7  for legal advice.  But he didn't contact me.

8      Q:    Yet that's what I'm trying to get at.

9      A:    Yeah, yeah, yeah.  He did not contact

10  me.

11      Q:    This is on our before September 4th --

12      A:    Yeah, yeah.

13      Q:    -- he contacted you?

14      A:    Yeah.  He did not.

15      Q:    Got it.  So this is incorrect?

16      A:    Seems to be so.  Unless I'm misreading

17  it or whatever.  Yeah.

18          MR. TAYLOR:  And we can talk afterwards

19  about maybe getting a supplemental.

20          MR. MERINO:  Sure.

21      Q:    So when you visited Dollar General

22  stores -- well, let me go back to on the September

23  4th, September 18th, and December 11, 2022

24  transactions.  For each of those you received a

25  receipt after the transaction; is that accurate?

1       A:    Yes.

2       Q:    Do you usually receive a receipt after a

3    transaction at the White Lake Dollar General

4    store?

5       A:    I think so, yeah.

6       Q:    And do you typically keep those

7    receipts?

8            MR. MERINO:  Object to form.  You can

9    answer.

10      A:    No.  Unless I noticed a specific reason

11   to keep it.

12      Q:    And when do you typically dispose of the

13   receipt that you receive at a Dollar General

14   store?  As you're walking out of the store, did

15   keep it for a day?  Do trash it when you get home,

16   is there a particular practice that you have with

17   regard to Dollar General receipts?

18      A:    There is no particular practice that I

19   can recall.

20      Q:    And am I correct in saying that each of

21   the receipt that you received on September 4th,

22   September 18th, and December 11, 2022 showed the

23   name and price of the products bought?

24          MR. MERINO:  Object form.  You can

25   answer.

1      A:   Yes.

2      Q:   And  do you -- let me ask you this, just

3  sort of more generally.  When you shop do you

4  typically review a receipt after the purchase?

5           MR. MERINO:  Object to form.  You can

6  answer.

7      A:   Typically, I trust most stores that they

8  have accurate pricing, so no.

9      Q:   But receipts allow customers to check

10  whether they have been correctly charged for items

11  that have purchased, right?

12           MR. MERINO:  Object to form.  You can

13  answer.

14      A:   They have part of the information to

15  verify that you were correctly charged.  They

16  don't have all of the information.

17      Q:   And what do you mean by that?

18      A:   In order to check if they overcharged

19  you, you would also need to go look at shelf

20  price, document that.  With just a receipt you

21  cannot verify that you were correctly charged.

22      Q:   But if they don't -- would you agree

23  with it that not every consumer looks at shelf

24  price tags to see what the price on the shelf is?

25           MR. MERINO:  Object to form.  You can

1  answer.

2       A:   I don't know what every consumer does.

3       Q:   Okay.  But you said you don't, right?

4       A:   I typically -- I typically -- yeah.  My

5  whole life I've trusted that stores have accurate

6  prices.  And that I'm not being overcharged.

7       Q:   Sorry, I didn't check the -- you said

8  you typically don't look at shelf price labels?

9       A:   Yeah.  I typically trust that, you know,

10  the store -- the prices are accurate.  I do not

11  typically look at shelf price labels.

12       Q:   Interrogatory 9 asks about social

13  networking, what sites, internet groups, forums,

14  organizations, online and it gives some of your

15  Facebook, some of your social media handles and I

16  just want to verify that you have never posted on

17  social media about Dollar General or this lawsuit;

18  would that be correct?

19       A:   That's correct.

20       Q:   Okay.  Have you ever been involved in a

21  class action before in any form or fashion?

22       A:   No.

23       Q:   Okay.  You know sometimes you get like a

24  notice in the mail that says, oh --

25       A:   Thank you for jiving my memory.  I've

1   gotten notice in the mail for things I don't

2   remember specifically what those were.  I think I

3   got, like, the Facebook -- like this notice about

4   like a Facebook class action or something like

5   that.  I think I got a notice about that.

6       Q:    Did you send anything in about that?

7             MR. MERINO:  Object to form.  You can

8   answer.

9       A:    Yeah.  I did submit the form that was

10  sent it to me.

11      Q:    Do you recall what your computation was,

12  if any?

13            MR. MERINO:  Object to the form.  You

14  can answer.

15      A:    Yeah.  As far as I know -- so I remember

16  filling out a form just verifying that I have,

17  like, a Facebook account.  I don't -- I don't

18  think any damages have been awarded or anything

19  like that there.  I don't think that was resolved.

20      Q:    Have you ever been sued are named as a

21  defendant in a lawsuit?

22      A:    No.

23      Q:    Have you ever visited the Dollar General

24  website?

25            MR. MERINO:  Object to form.  You can

1   answer.

2        A:    Yeah.  I don't think so.

3        Q:    Do you have, or have you ever used a

4   Dollar General mobile app on your phone or through

5   Google?

6        A:    No.

7        Q:    Have you ever given Dollar General your

8   phone number for any reason?

9        A:    I'm not sure.

10        Q:    Do you ever use, like, coupons at Dollar

11   General?

12        A:    I don't think so, no.

13        Q:    When you go to the Dollar General, I

14   know some people can type in their phone number

15   and they get, like, a discount or a coupon.  Is

16   that something that you do?

17        A:    Generally, no.

18        Q:    Do you recall ever having done that?

19        A:    I don't want to say for certain but I

20   don't remember doing that right now.

21        Q:    All right.  Can you tell me, what are

22   your phone numbers?

23        A:    732-406-5909.

24        Q:    And that's your home number?

25        A:    Cell phone number, yeah.

1          Q:    And what's your home number?  Do you
2    have a home phone?
3          A:    No.
4          Q:    Okay.  Good for you.  One of these days
5    I will get there.
6                So can we go to interrogatory 15, on
7    page 14.  The answer you will see -- so it's
8    interrogatory 15 and they got -- so that's the
9    first page and you flip it over the answer is
10   there.  I want to move to the second paragraph,
11   which says, Plaintiffs do not specifically recall
12   the checkout layout at the time of the purchase as
13   described in the complaint, but didn't realize
14   they were overcharged by Dollar General on at
15   least some occasions after their purchase.  Do you
16   see that?
17         A:    Yes.
18         Q:    Do you recall any instances where you
19   realize that there was a price discrepancy at the
20   Dollar General store prior to a purchase?
21         A:    Prior to paying, right?
22         Q:    Yeah.
23         A:    To checking out?  Just the one instance
24   I mentioned.
25         Q:    No other ones that you can think of?

1       A:    No, no.

2       Q:    Do you have -- well, let's move to

3   interrogatory 16 which below that it says,

4   describe every instance when Dollar General

5   supplies override or price match policy or other

6   discount or refund was applied to your purchase of

7   products from a Dollar General store.

8             And the first sentence of the

9   supplemental answers says, plaintiffs further

10  object to the extent this request insinuates that

11  Dollar General would honor its price override work

12  price match policy.  And my question to you is are

13  you aware of any instances where Dollar General

14  did not honor its price override or price match

15  policy or any request to bench for a refund or to

16  change the price to make sure the shelf prices

17  consistent with the point of sale price?

18      A:    So I guess I don't know that I had any

19  awareness, like, Dollar General -- what is it

20  called, I price match policy is not anything I've

21  seen.  Or price override policy, not anything I've

22  seen, or heard about, or read about.  I don't have

23  any information that they didn't honor this policy

24  that I haven't seen.

25      Q:    Have you talked with anyone other than

1  your wife who has spirits a price discrepancy at a

2  Dollar General store?

3      A:   No.

4      Q:   Have you communicated with anyone who

5  has experienced a price discrepancy at a Dollar

6  General store other than your wife?

7      A:   No.

8      Q:   And have you been aware of a price

9  discrepancy at a Dollar General store other than

10 the White Lakes Store that we have previously

11 discussed?

12     A:   In New York State?

13     Q:   Anywhere.

14     A:   I'm aware of other lawsuits filed

15 another states.

16     Q:   I'm asking about your experience.

17     A:   Okay.  So you said -- I'm sorry.  Am I

18 aware of?

19     Q:   Are you aware of any instances where you

20 have experienced a price discrepancy at a Dollar

21 General store other than the White Lakes store

22 that we have been discussing?

23     A:   Oh, I see.  No.

24    Q:   Does your wife also shop at Dollar

25 General or are you the one who typically goes

1  there?

2      A:   She goes as well.  Yeah.

3      Q:   All right.  Do you ever go together or

4  is it -- and take the kids or is it one of those

5  things where one of you has to go and the other

6  stays home with --

7      A:   One of us will stay in the car.

8      Q:   Yeah.  Got it.  Got it.  Got it.

9  Understand.

10     A:   Yeah, or -- are often one of us is just

11 the students down the road and one of us runs out.

12 It's better to leave the kids at home.  Yeah.

13     Q:   Got it.  We talked about this a little

14 bit earlier so when you go to a Dollar General

15 store do you have a list of what you plan to get,

16 whether mental or written down, or is it you're

17 going just to go because you think you might need

18 things?

19     A:   Yeah.  Usually a list of something

20 specific I need.  That morning, or that afternoon.

21     Q:   When you go to the Dollar General what

22 are the factors that you're looking at when you

23 are deciding between the various products that are

24 on the shelf that you ultimately decide to

25 purchase?

1      A:   I don't know that I have a specific set

2  of factors that I can apply to all products.

3      Q:   Okay.

4      A:   Yeah.

5      Q:   Do you -- I know you said that you live

6  here at East Elmhurst, right?  That correct?

7      A:   Yeah.

8      Q:   Where do you shop when you're at that

9  property?  For, like, groceries, you know and

10 those kinds of things.

11     A:   Yeah.  Overhear my wife does most of the

12 grocery shopping.

13     Q:   Do you know where?

14     A:   Since I just answered the question,

15 yeah, Costco maybe, yeah.

16     Q:   I didn't realize they have Costcos in

17 this area.

18     A:   Yeah.

19     Q:   I'm going to mark a different exhibit.

20 You can put that aside.

21          THE WITNESS:  Can we have a short break,

22 15 minutes just for water or something?

23          MR. TAYLOR:  Sure.

24          THE WITNESS:  Okay.

25          MR. TAYLOR:  All right.  So this is

1    Exhibit 8.  You -- and I've actually got one for

2    you.

3              (Exhibit 8 was marked for

4    identification.)

5         Q:    So this is Exhibit 8, do you recognize

6    this?

7         A:    Yes.

8         Q:    Have you seen it before?

9         A:    Yes.

10        Q:    Do you recall when you've seen it?

11        A:    Yeah.  The very -- the most recently I

12   mean, in the last week I've looked at it.

13        Q:    Okay.

14        A:    Yeah.

15        Q:    So I want to go through some things in

16   this.  Let's turn to page 2 and so this is a Site

17   Force report of pictures and messages on iPhone 12

18   Pro Max, and that's your phone, the iPhone 12 Pro

19   Max, is that correct

20        A:    Yes.

21        Q:    And if you turn to page number 2, you

22   will notice that the first instant message, which

23   is at the bottom, is from JW577 at NYU.edu; is

24   that you?

25        A:    Yes.

1      Q:   And this -- the content of the message

2    was, I'm sure only Dollar General would work with

3    him now.  And the date is October 29, 2022.  Do

4    you see that?

5      A:   Yes.  I'm sorry, I don't see that.

6    October 29 -- yeah, yeah, I see it.

7      Q:   Do you know what this message is

8    referred to?

9      A:   Yeah, I have no idea.

10      Q:   And do you know who it was sent to?

11      A:   No.

12      Q:   Do you know if it was sent to your wife,

13    would that shed any light on what the content of

14    the message is?

15      A:   No.

16      Q:   All right.  So message number 2 is from

17    732-406-5909, is that your cell phone number?

18      A:   Yes.

19      Q:   And it is to another number which is

20    titled Carmen my Princess, I'm assuming that's

21    your wife?

22      A:   So on the record can I say that that's a

23    name that I've had in my phone since we were 21

24    and she won't let me change it?

25      Q:   Yeah.

1     A:   Yes, that's my wife.

2     Q:   That's completely understandable.  But

3 just to confirm, it's not some other Carmen?

4     A:   No, no, no.

5     Q:   It's Carmen Wolf, your wife?

6     A:   Yes, she's the only princess.

7     Q:   Okay.  Got it.  And this is a message

8 dated April 19, 2023 that says where is that other

9 receipt for Dollar General; do you see that?

10     A:   Yeah, April 19, yeah.  Yeah.

11     Q:   Do you know what that is referring to?

12 Or why it was sent?

13     A:   It may have been to -- I'm not sure at

14 what point we were being asked to produce.  That's

15 April 2023, right?  Is that when that was?  Yeah,

16 so I'm not sure is that, like, what we were asked

17 to produce receipts that we had saved or if it was

18 to email a receipt to one of the lawyers.

19 Probably something around those lines.

20     Q:   Okay.  Do you have any recollection as

21 to whether it was a receipt from, like one of the

22 ones -- one of the transactions that we had

23 previously discussed here today of September 4,

24 September 18, December 11, 2022, or some other

25 transaction date?

1      A:    Do I know for sure if it was one of

2  those first three?

3      Q:    Yeah.

4      A:    I am not -- I can't say for certain.

5      Q:    And were you still -- either you or your

6  wife still taking photographs of Dollar General

7  shelf price tags or receipts after the December

8  11, 2022, transaction?

9      A:    Yes.

10     Q:    And what was the purpose of that?

11     A:    To verify that Dollar General was

12  charging accurate prices.

13     Q:    And did you have in your mind any

14  thought that you would be using those photographs

15  in the lawsuit that you had filed?

16     A:    As a class representative, if I was

17  being overcharged on something, or if we noticed

18  an overcharge on something yeah, I would use it.

19  I would say the purpose of though was to take

20  pictures for a lawsuit.  Right.  We were, again,

21  just documenting the, you know, prices and making

22  sure -- you know, wanting to make sure we're not

23  being overcharged.  If we discovered overcharges,

24  sure I would use that as -- use that information

25  as a class representative.

1      Q:    If you want to go down to the third

2   message which I think is from your wife to you.

3   It says I'll just get done thing at Dollar

4   General.  Do you know what that's referring to?

5      A:    No.  Probably it was a typo for

6   something, but I don't know.

7      Q:    Okay.

8      A:    Yeah.

9      Q:    Fourth one, from you to your wife, it

10   says, can you send me the new receipts from the

11   latest Dollar General purchase dated April 24,

12   2023; do you see that?

13      A:    Yes.

14      Q:    And do you have a recollection of what

15   that is referring to?

16      A:    No.  It's very close in time to this

17   other one.  It may have been just a request for

18   the same thing, but I'm not sure.

19      Q:    The fifth message is from you to

20   Jennifer Lucideo (phonetic).  Is Jennifer Lucideo

21   a family member of your wife's?

22      A:    Yes.

23      Q:    And what is the specific relation?

24      A:    Sister.

25      Q:    What about Daniela?

1        A:    Her cousin.

2              MR. MERINO:  I think I'm ready for a

3    brief break.

4              MR. TAYLOR:  Okay.  Yeah, that's fine.

5              THE WITNESS:  Yeah.

6              (Off the record at 3:29 p.m., resuming

7    at 3:41 p.m.)

8    BY MR. TAYLOR:

9        Q:    All right, Mr. Wolf, let's see.  I

10   wanted to ask you about --

11             MR. TAYLOR:  Let me mark another exhibit

12   real quick.  9?

13             COURT REPORTER:  9, yes.

14             (Exhibit 9 was marked for

15   identification.)

16       Q:    I'm showing you what's been marked as

17   Exhibit 9.  Do you recognize this document?

18       A:    Yes.

19       Q:    You sound unsure.

20       A:    I mean, I -- when is this email from?

21       Q:    So if you look at number 6 on page 4 of

22   Exhibit 8.

23       A:    That's Exhibit 8.  Where is that?  I'm

24   sorry.  This Exhibit 8?

25       Q:    Yes.

1      A:    Yeah.  And then page what?

2      Q:    Page 4.  So at the very top of page 4.

3      A:    4.  Okay.  And is it time stamped --

4      Q:    January 2nd.

5      A:    January 2nd.

6      Q:    2023.

7      A:    2023.  Okay.

8            MR. MERINO:  So just for the record, it

9      appears that there was an attorney client

10     privilege information that was invertedly

11     disclosed to Dollar General's counsel through our

12     document production.

13           MR. TAYLOR:  Oh.

14           MR. MERINO:  We'll object to the line of

15     questioning and ask that this document be stricken

16     from our production.

17           MR. TAYLOR:  Okay.  Well, we can go off

18     the record and talk about -- and have a discussion

19     about that so that's fine.  I won't ask questions

20     about this --

21           MR. MERINO:  Okay.

22           MR. TAYLOR:  -- right now.  So you can

23     put that away.  One thing I will ask, just

24     independent of this email.

25     Q:    Am I correct in saying that you, Joseph

1  Wolf, are the one who made the purchases on

2  September 4th, September 18th, and December 11,

3  2022?

4       A:   I believe so, yes.

5       Q:   And when you say you believe so?

6       A:   Yeah, as far as I can remember.  Yeah.

7       Q:   Well, is there any doubt in your mind

8  that you are the one who made the purchases?

9       A:   No.  You said September 4th, September

10  18th, and December 11th?

11       Q:   Yeah, the ones that are the basis for

12  this lawsuit.

13       A:   Yeah, that was me.

14       Q:   Okay.

15       A:   Yeah.

16       Q:   All right.  I want to direct your

17  attention to number -- the eighth native message

18  also on page 4 of Exhibit 8.  Do you see that?

19       A:   Yes.

20       Q:   And you see that, I believe the phone

21  number is from your wife to you; is that correct?

22       A:   Yes.

23       Q:   And the timestamp is December 11, 2022?

24       A:   Yes.

25       Q:   And the time is 12:43 p.m.?

1    A:   Yes.

2    Q:   In this -- the body of the message says

3    three Land O'Lakes vanilla yogurts, take picture

4    of prices.  Breadcrumbs, horseradish, small heavy

5    cream.  Do you see that?

6    A:   Yes.

7    Q:   Do you recall receiving this text

8    message?

9    A:   I don't recall it, no.

10   Q:   And do you recall this and being the

11   same date as of the December 11th transaction at

12   the White Lake New York Dollar General where you

13   purchased vanilla yogurt and half-and-half?

14   A:   Yeah, I don't recall specifically.

15   Q:   So let's look back at --

16   A:   But if you're asking is this date the

17   same date that I've made the purchase, yeah.

18   Q:   All right.  Let's look back at Exhibit

19   5.  Let me know when you have it.

20   A:   Which one is 5?

21   Q:   That's the receipt and the photographs

22   of the yogurt.

23   A:   Okay.  Yeah.

24   Q:   Got it?

25   A:   Yeah.

1      Q:    All right.  If you want to go to the

2    receipt in Exhibit 5, you'll note at the very

3    bottom at the time of the transaction was 1:43

4    p.m.; do you see that?

5      A:    Yes.

6      Q:    You'll agree with me that's after the

7    text message that you received from your wife?

8      A:    Yeah.

9      Q:    Do you know why she asked you to take

10   picture of the prices of the vanilla yogurt?

11     A:    So I think in general we wanted to -- in

12   our mind, especially at that point after several

13   overcharges we wanted to make sure we were being

14   accurately priced.  Or sorry.  We wanted to make

15   sure that Dollar General was accurately charging

16   the correct amount.  I don't know -- I don't think

17   specifically, you know, take pictures of prices, I

18   don't think that specifically meant to apply to

19   just the vanilla yogurt.  I think that's just a

20   general, you know, reminder to try to take

21   pictures of the prices to be able to make sure

22   were being accurately charged.

23     Q:    Had you had a conversation with your

24   wife prior to this text message about the desire

25   to take pictures of shelf price labels at Dollar

1  General stores when shopping there?

2      A:   Yes.

3      Q:   And did you come to sort of an agreement

4  about that that you would do so?  How did that

5  discussion -- was it -- did that discussion lead

6  to this text message?

7      A:   We discussed trying to make sure that we

8  were being accurately charged by Dollar General.

9  And that when we were able to we would take photos

10  to ensure we're being accurately charged.  Yeah,

11  that being said, I can't -- yeah, again, it's in

12  my wife's head about what led her to do something.

13  But we had talked about, you kow, together just

14  wanting to make sure that we're being accurately

15  charged by Dollar General.

16     Q:   I want to turn your attention next to

17  the data files on page 5, so just flip over

18  Exhibit 8 to the next page.  You'll see at the

19  very top there are a couple of photographs of

20  yogurt which are consistent with Exhibit 5.  Do

21  you see that?

22     A:   Yes.

23     Q:   And it shows that these photographs were

24  taken on December 11, 2022 at 1:29 p.m.; do you

25  see that?

1      A:   Yes.

2      Q:   And that's before the transaction --

3      MR. MERINO:  I'm sorry, what page are we

4 on in the report?

5      MR. TAYLOR:  Page 5.

6      MR. MERINO:  Okay.

7      Q:   And that's before the transaction where

8 you actually purchased this yogurt which was at

9 1:43; is that right?

10     A:   Yes.

11     Q:   And do you recall why you were taking

12 the photographs of the yogurt, you kow,

13 approximately 14 mintues before you purchased

14 them?

15     A:   Yeah.  So that I could later verify to

16 see that Dollar General was accurately -- was

17 charging accurate prices.

18     Q:   And were you paying attention at the

19 time you were taking the photographs of what the

20 actual price was, the 3 for $2.00 if you recall?

21     MR. MERINO:  Object to the form.  You

22 can answer.

23     A:   I can't recall.

24     Q:   And -- okay.

25     MR. TAYLOR:  All right.  I want to mark

1   a different exhibit now.  We can mark this as 10.

2          (Exhibit 10 was marked for

3   identification.)

4       Q:   All right.  I'm handing you Exhibit 10.

5   Do you recognize these photographs?

6       A:   I think so.  Can I check to see if these

7   are photographs that I --

8       Q:   Yeah, you can match them up on Exhibit

9   8.  On the bottom half of page 5.

10      A:   Okay.  Yeah.

11      Q:   Do you -- so these look -- do these look

12  to be consistent with the images that were pulled

13  from your phone on page 5 of Exhibit 8?

14      A:   Yes.

15      Q:   Do you recall taking these photographs

16  on October 10, 2022 at a Dollar General store?

17      A:   I don't recall specifically.

18      Q:   And do you -- have you ever bought eggs

19  at Dollar General to your recollection?

20      A:   I think so, yeah.

21      Q:   Is there any recollection as to why you

22  were taking photographs of the eggs on October 10,

23  2022?

24      A:   No recollection.  Like I said before,

25  comparison shopping.  Just something interesting.

1  Yeah, I don't remember specifically why I took

2  this photo.

3      Q:    Let's -- you mentioned comparison

4  shopping.  Do you comparison shop, Mr. Wolf?

5      A:    I think I -- so we -- because my wife

6  and I guess shop for groceries both in Bethel,

7  oftentimes at Dollar General, but also in New York

8  City.  My wife more so than me will want to know

9  how much things cost in different places to be

10 able to, I guess, just know, I guess where -- what

11 the difference is or whatever.  Yeah.

12     Q:    Well, let me ask you this.  Do you -- do

13 you Joseph Wolf, do you do any comparison shopping

14 when you go to the White Lake Dollar General?

15     A:    Like I said, I generally don't do most

16 of the shopping.  It's possible my wife might have

17 asked me, you kow, how much does something cost

18 there, let me know.  Take a photo.  So like I say,

19 there's all kinds of reason why I could take a

20 photo.  Possibly for the purposes of us together

21 comparison shopping.  I don't generally do most of

22 the shopping though.

23     Q:    I thought you --

24     A:    Including comparison shopping.

25     Q:    Yeah.  And my question is really, you

1    know, is really whether there's a distinction

2    between comparison shopping at the White Lake

3    Dollar General as opposed to when you're in the

4    city.  Because I believe you had mentioned earlier

5    Abou the fact that Dollar General store is very

6    close in White Lake but there are not a lot of

7    other stores close by.  So my question is really

8    geared toward whether or not if you do comparison

9    shopping whether it would be at the White Lake

10   store and whether you have a recollection of ever

11   having done comparison shopping at the White Lake

12   store.

13        A:   I guess what I'm having trouble with is

14   like define comparison shopping.  So you know,

15   it's possible my wife said, hey how much do eggs

16   cost there, let me know and I took a picture.  And

17   that's that.  I don't -- so I don't know if we're

18   characterizing this as do I do comparison shopping

19   at the White Lake store.

20        Q:   Well, I'm using your term, comparison

21   shopping.

22        A:   Yeah.  Yeah.  Yeah.  I said for the

23   purposes of it.  So yeah, it's possible I took a

24   picture of a price or I don't know an expiration

25   date maybe.  I don't know.  Ther'es all kind so

1   reasons why I might photograph, like I was saying

2   before, merchandise on a shelf, you know.

3       Q:   And there are --

4       A:   It's hard for me to speculate on this

5   photo.

6       Q:   Well, there are six photos of eggs here,

7   am I correct in saying that?

8       A:   And salami.  And a yogurt.

9       Q:   Do you see a shelf price for --

10      A:   No, but I see the product.  Yeah.  But

11  only yeah, the shelf price, eggs.  Yeah.

12      Q:   So would you agree with me that

13  sometimes products on the shelves can get moved

14  around and may not be where they are supposed to

15  be on the shelves and not where the shelf price

16  tag is for that particular product?

17          MR. MERINO:  Object to form.  You can

18  answer.

19      A:   So you're asking me to speculate on

20  whether a product can ever get moved from away --

21  away from the area where it's, like, shelf price

22  is located?

23      Q:   Yeah.  I thought that's what you just

24  referenced.

25      A:   Sorry, just to clarify.  Maybe I'm

1    misstating.  Did I -- yeah.  I wasn't implying

2    that this got moved somewhere.  I just know that

3    that's there.  Maybe the shelf price for this is

4    next to it.

5         Q:   Do you see a shelf price for it there?

6         A:   No.  But it's a very zoomed in photo.

7    So yeah, I would say I don't remember what I was

8    specifically taking a photograph of in this case.

9         Q:   Well --

10        A:   Eggs, salami, shelf prices.

11        Q:   There are six photos here and they're

12   all of the shelf price tag for eggs; am I

13   incorrect on that?

14        A:   There's a picture of eggs.  They all

15   have the shelf price of the eggs and they have --

16   two of them have the salami in them, with the

17   yogurt package in the background.  Yeah.

18        Q:   Would there be any reason to get a

19   picture of salami or yogurt without the shelf

20   price tag if you're comparison shopping?

21        A:   So like I said before, there is a lot of

22   reasons you would take pictures of products, not

23   just to comparison shop.  Hey, they have this

24   brand, Honey.  Is this a brand you like?  I

25   noticed this here.  There are all kinds of

1  reasons.  No, I wouldn't take a picture of

2  something without the shelf price for comparison

3  shopping, but there are all kinds of reasons I

4  could take photos.  I don't remember all the

5  circumstances of why I took photos of this -- of

6  these items here.

7      Q:   So without getting into the reasons that

8  it could have been, do you recall why you took

9  these photographs?

10          MR. MERINO:  Objection.  Asked and

11  answered.

12          MR. TAYLOR:  I don't think I have been

13  answered.

14      A:   Yeah.  I -- just to -- and these are on

15  December 10th?

16      Q:   Yeah.  No.

17      A:   These were taken on December 10th?

18      Q:   October 10th.

19      A:   Oh, sorry, October 10th.  No, I don't

20  remember exactly.  Okay.

21      Q:   Okay.  We'll move on from that.  And you

22  don't recall whether or not you actually purchased

23  these eggs and have a receipt for it, do you?

24      A:   I don't recall.  Yeah.

25      Q:   And am I correct in saying that these

1    were on October 10, 2022 which is a few weeks

2    after you retained counsel to file suit against

3    Dollar General?

4          A:    Correct, yeah.

5          Q:    And do you think that one of the reasons

6    why you might have been taking these photographs

7    would have been to use in the lawsuit against

8    Dollar General?

9          A:    Yeah, I --

10               MR. MERINO:  Objection.  Asked and

11   answered.  You can answer.

12         A:    I don't recall exactly.

13         Q:    All right.  If you go to page 6 of the

14   report, there is a picture of Lactaid on the

15   second one dated September 4, 2022; do you see

16   that?

17         A:    Mm-hmm.  The one with like the blue and

18   the red?

19         Q:    Did you -- I know these are hard to say.

20         A:    Yeah.

21         Q:    There with me just one second.  I'm not

22   going to make you pull out a magnifying.

23         A:    Yeah, yeah, I know.

24     MR. TAYLOR:  If I can have that marked

25   as Exhibit 11.  All right.  Thank you.

```
 1              (Exhibit 11 was marked for
 2    identification.)
 3         Q:   I'm handing you Exhibit 11.  Mr. Wolf,
 4    does that look familiar?
 5         A:   Yes.
 6         Q:   And what is it?
 7         A:   Photograph.
 8         Q:   And is it a photograph that you took?
 9         A:   Yes.
10         Q:   And according to Exhibit 8 it says that
11    you took this photograph on September 24, 2022, is
12    that consistent with your memory?
13         A:   It's not -- it's a long time ago and
14    it's hard to remember exactly but it's not
15    inconsistent with anything I remember.  So sure.
16    Yeah.
17         Q:   Do you recall why you took this
18    particular photo?
19         A:   Yes.
20         Q:   Okay.  Tell me why.
21         A:   I thought it was cool that that was milk
22    but you didn't have to refrigerate.
23         Q:   It is cool.
24         A:   Yeah.
25         Q:   And so this had nothing to do with any
```

1    kind of price issue, the reason why he took the

2    photograph?

3        A:    Not that I remember, no.

4        Q:    So one thing that I wanted to know.  So

5    you see there is a handwritten sign with the price

6    above it?

7        A:    Yeah.

8        Q:    Have you ever seen handwritten signs for

9    other products at Dollar General?

10            MR. MERINO:  Objection form.  You can

11    answer.

12       A:    No.

13       Q:    All right.  You can set that aside.

14            MR. TAYLOR:  Exhibit 12.

15            (Exhibit 12 was marked for

16    identification.)

17       Q:    Do you have a dog?

18       A:    No.

19       Q:    Have you ever had dog?

20       A:    No.

21       Q:    I'm handing you Exhibit 12.  And I will

22    note that on exhibit a page 6 directly below the

23    one we were just looking at is a smaller version

24    of this photograph.Do you recognize this

25    photograph?

1      A:   Yes.

2      Q:   Did you take it?

3      A:   Yes.

4      Q:   And it says that it was taken on October

5  23, 2021; is that consistent with your memory?  Do

6  you have any reason to doubt that?

7      A:   No.  I don't have any reason to doubt

8  it.

9      Q:   Do you recall why you took this

10  photograph?

11      A:   Yes.

12      Q:   Can you tell me why?

13      A:   Carmen's cousin's name Caesar.  I

14  thought it was funny.

15      Q:   I will refrain from further comment.

16  Okay so the reason why you took this photograph

17  had nothing to do with price?

18      A:   No.

19           MR. TAYLOR:  This is Exhibit 12?

20           COURT REPORTER:  The last was 12.

21           MR. TAYLOR:  Was it?  Yeah.  You're

22  right.  Okay.

23           (Exhibit 13 was marked for

24  identification.)

25      Q:   I am handing you Exhibit 12 -- excuse

1  me, Exhibit 13.  All right.  Do you recognize this

2  document?

3        A:    Not a lot to go on, but I believe so.

4        Q:    Is this a credit card statement for one

5  of the credit cards that you and your wife use?

6        A:    Her's (indiscernible).

7        Q:    And on the third page, it looks like

8  there was a transaction on April 11, 2023 at a

9  Dollar General.  Do you see that?

10       A:    Yes.

11       Q:    And is it your understanding that the

12 Mongate Valley is the same store as what we've

13 been referring to as the White Lake, New York

14 store?

15       A:    I believe so.

16       Q:    And if you go a few more pages over

17 there is also on the bottom it says Wolf 74?

18       A:    Yeah.

19       Q:    There's another reference to a December

20 11, 2022 transaction at that same store for 6.

21 him 25.  Do you see that?

22       A:    Yes.

23       Q:    And that would be the transaction that

24 we previously discussed on December 11, 2022 where

25 you have alleged that you were over charge for

1  buying yogurt?

2       A:    I think so.  Just give me a second to

3  look this over.

4       Q:    Sure.

5       A:    Yeah, that looks to be this, yeah.

6             MR. TAYLOR:  And so I'm now marking what

7  is Wolf 14.

8             (Exhibit 14 was marked for

9  identification.)

10      Q:    I'm handing you what is Wolf 14, which

11 appears to be another credit card statement.  I'm

12 going to take a look at that.  And I'm going to

13 ask you some questions about it.  And my first

14 question is, is the credit card statement for

15 Exhibit 14, is that for a different credit card

16 than the credit card statement in Exhibit 13?

17      A:    I believe it's the same.

18      Q:    Oh it was the same?

19      A:    Give me a second just to verify that.

20      Q:    Sure.

21      A:    Oh you know what, sorry.  Give me a

22 second.

23      Q:    Sure.  And one thing I will point out

24 for you for what it's worth --

25      A:    Yeah, yeah.

1       Q:    -- That on the first page of Exhibit 14

2    it says card and it says Carmen W. and then it has

3    7698.

4             And I will note that there is a

5    transaction on this Exhibit 14 on December 11,

6    2022 for 6.25 as well.

7       A:    Where do you see that?  I'm sorry.

8       Q:    Oh Wolf 84.  The number is, like, right

9    here.

10      A:    I'm sorry.  Just to clarify, I provided

11   a lot of documents and I separated it by kind of

12   what part it belonged to, into, like, different

13   folders.  So everything is, like, grouped together

14   now and that's why it's hard for me to sort it

15   through.  Okay.  So the 6.25 it's like -- where is

16   that part?

17      Q:    Do you see right here, this is where the

18   numbers are.  Wolf 84.

19      A:    Wolf 84.  Okay.

20            Okay.  Yeah.  All right, I'm there.

21      Q:    All right.  And so all I'm trying to

22   figure out is whether these two, Exhibit 13 and

23   Exhibit 14 are from the same credit card or not.

24   If you know.

25      A:    Yeah.  This is the same credit card is

1  this.  I'm just trying to figure out because it

2  looks like two sets of documents.  Here maybe?

3      Q:   Look, let me ask you this.  Did you

4  collect information --

5      A:   Yeah.

6      Q:   -- Exhibit 14?

7      A:   Yes, I did.  I did, yeah.

8      Q:   Now I believe you said that -- and maybe

9  I misheard you but you collected information from

10  multiple credit cards?

11     A:   Yes.

12     Q:   Are there any other credit card

13  statements that you searched for Dollar General

14  transactions that are not either Exhibit 13 or

15  Exhibit 14?

16     A:   Okay.  So this one, these first two

17  pages are I believe a different credit card than

18  this.  And I searched -- yeah.  This is yeah these

19  two credit cards and then I think -- I said I

20  think I need to also search that personal

21  MasterCard that we went over before.

22     Q:   Okay.

23     A:   Yeah.

24     Q:   And is the personal MasterCard is that

25  somewhere in Exhibit 14?

1      A:    I don't think so.  That's why I need to
2  search it.  I think all the rest of this is --
3  let's just go through it all.  Yeah all the rest
4  of this is -- it should be that joint account
5  ending in 6329.  Okay.  Yeah.
6      Q:    So did you search your personal credit
7  card as well?
8      A:    I don't remember.  I can do it again.  I
9  can search it.
10      Q:    Okay.
11      A:    But I didn't see anything, if not, I can
12  search it again.  Yeah.
13      Q:    We'll follow up with you about that.
14  But the first two pages you said were for a
15  different credit card.  Which credit card is that?
16  Of Exhibit 14.
17      A:    Yes so this is another credit card that
18  Carmen has.
19      Q:    Is that something that you share or for
20  just her?  What's the situation there?
21      A:    I think it might be technically like a
22  joint account card that we used to use a lot.  But
23  I think right now, Carmen just maintains that as a
24  backup card to have if she doesn't have her other
25  card.

1      Q:   Got it.  I want to turn your attention

2   real quick to -- first of all, if you're going by

3   the actual Bates number what we call it --

4      A:   Yeah.

5      Q:   Wolf 80.

6      A:   Wolf 80.  Okay.

7      Q:   And it has two transactions on the same

8   day on April 23rd, 2022.  Do you know why there

9   were two transactions on the same day?  Why you

10  would -- why either you or your wife would have

11  made two purchases at a Dollar General on the same

12  day?

13     A:   No.

14     Q:   If we turn to the next page, 81, you'll

15  see that Family Dollar is mentioned three times in

16  a row there.  Did -- do you recall whether you

17  would have been the one making purchases at Family

18  Dollar in Bronx, New York or not?

19     A:   I don't think that was me.

20     Q:   Okay.  All right.  You can set aside

21  that document for now.

22          MR. TAYLOR:  I'm marking this as Exhibit

23  15.

24          (Exhibit 15 was marked for

25  identification.)

1      Q:   I'm handing you Exhibit 15.  These are

2  photos.  And I'm wondering if you know what these

3  photographs are?

4      A:   Milk.  Photographs of milk.

5      Q:   Do you recall taking these photographs?

6      A:   Not specifically.

7      Q:   And I'll represent to you that these

8  were not found on a phone, either yours or your

9  wife's phone but they were produced in this

10  litigation.  And I'm wondering if you happen to

11  know when they were taken or any details about

12  them?

13      A:   I don't remember specifically.  Is there

14  any information you could help me with?  Is there

15  a document or?

16      Q:   No.  These were produced to us so I'm

17  just trying to figure out --

18      A:   Okay.

19      Q:   -- what it is.

20      A:   I don't remember.  I'm sorry.

21      Q:   Do you know where this would have come

22  from?  Because this would have come from either

23  you or your wife in some form or fashion and

24  presumably not from your phones.  So I'm wondering

25  if maybe you kept a file or other photographs, if

1    you recall?

2        A:    Yeah.  The only thing that -- the only

3    way my wife and I are going to take pictures is

4    with phones.  And those photographs are stored in

5    the same place as all other photographs on our

6    phone.  If that makes sense.  Does that answer

7    your question?

8        Q:    Do you ever recall purchasing whole milk

9    at Dollar General?

10       A:    There was one whole mile purchase at

11   least documented.

12       Q:    But that was lactose free.  So this is,

13   I guess --

14       A:    Oh, you're saying non lactose free whole

15   milk?

16       Q:    Yeah.

17       A:    I believe I have in the past, yeah.

18       Q:    And here, see if this jogs your memory a

19   little bit.  You'll notice that there is no price

20   on these items.  It doesn't appear to be and I'm

21   wondering if that might jar your memory as to --

22   well, let me ask it this way.  Do you ever recall

23   seeing products at Dollar General that did not

24   have a shelf price tag?

25       A:    Yes.  These say Clover Valley and I

1    think that's Dollar General brand.

2         Q:   It is.

3         A:   And they don't have a price tag so I'm

4    going to say yes then.

5         Q:   Yes, what?

6         A:   Sorry.  Yes, that I've seen items

7    without a price tag.

8         Q:   Do you recall ever having seen items at

9    a Dollar General store without a price tag other

10   than what is depicted in these photographs in

11   Exhibit 15?

12        A:   No.

13        Q:   You can put that aside.

14        A:   Okay.

15             MR. TAYLOR:  I'll mark this as Exhibit

16   16.

17             (Exhibit 16 was marked for

18   identification.)

19        Q:   All right.  I'm handing you Exhibit 16.

20   Have you seen this document before?

21        A:   Yes.

22        Q:   And this is a SyForce report for the

23   iPhone 12 mini; is that correct?

24        A:   Yes.

25        Q:   And that's your wife's phone?

1      A:   Yes.

2      Q:   Is it still currently her phone?

3      A:   No.

4      Q:   But it was until recently her phone?

5      A:   Fairly recently.  Until maybe September

6  or October.  I don't remember, yeah.

7      Q:   I wanted to refer you to on page 4 there

8  is a native message number 7 from you to Carmen

9  with a link to a New York Times article about lead

10 in baby food; do you see that?

11     A:   Yes.

12     Q:   On January 27, 2023?

13     A:   Yes.

14     Q:   Do you recall sending that text?

15     A:   I don't recall specifically sending the

16 text, no.

17     Q:   And do you recall a photograph -- or

18 wanting to get a photograph of baby food on the

19 shelves of a retailer?

20          MR. MERINO:  Object to form.  You can

21 answer.

22     A:   No.

23          MR. TAYLOR:  So that 17?

24          COURT REPORTER:  17, yes.

25          MR. TAYLOR:  Thank you.

```
 1              (Exhibit 17 was marked for
 2     identification.)
 3         Q:   I'm handing you Exhibit 17.  Okay.  So
 4     according to Exhibit 16, that photo was taken
 5     around the same time that you sent the link about
 6     lead in baby food.  Do you recall seeing this
 7     photograph?
 8         A:   No.
 9         Q:   And can I presume that you did not take
10     the photograph?
11              MR. MERINO:  Objection to form.  You can
12     answer.
13         A:   Is this baby food?
14         Q:   It looks like --
15         A:   What are we looking at here?
16         Q:   On the far right, Gerber.
17         A:   Okay.  Yeah.  I don't think I took this.
18         Q:   Do you recall having a conversation with
19     your wife about this photo or about lead in baby
20     food?
21         A:   In general I -- there were a lot of
22     articles on things that are interesting.
23     Especially like, health and safety.  So I -- yeah
24     this would be one of a number of articles that I
25     am forwarding all the time as an avid I guess,
```

1    reader of news.  But I don't remember a specific

2    conversation about this.

3         Q:   Okay.  You can set that aside.

4         A:   I'm sorry.  When -- do you know when

5    that was taken?  Did you say that?

6         Q:   Yeah, January --

7         A:   Oh, around the same time he said, right?

8         Q:   Yeah.

9         A:   Okay.

10        Q:   The 27th.  January 27, 2023.

11        A:   By the iPhone mini?

12        Q:   Yeah.

13             MR. TAYLOR:  I'm handing you what has

14   been marked as Exhibit 18.

15             (Exhibit 18 was marked for

16   identification.)

17        Q:   These appear to be photographs of tuna

18   and a receipt for a transaction at the White Lake

19   Dollar General on April 11, 2023.  Do you -- are

20   you familiar with these photographs?

21        A:   Yes.

22        Q:   Tell me what you know about them.

23        A:   That my wife took them.

24        Q:   And did she make the transaction that is

25   listed in -- that has the receipt in Exhibit 18?

1    A:    Yes.

2    Q:    And do you know why she was taking the

3    photographs of the tuna and the receipt?

4    A:    My understanding is that to make sure

5    that Dollar General was not overcharging us so

6    that she would be able to verify that the pricing

7    was accurate when she could.

8    Q:    Okay.  And you will see that in Exhibit

9    16 on page 5 that these photographs were texted to

10   you on April 24, 2023; do you see that?

11   A:    Yes.

12   Q:    And do you know for what purpose they

13   were sent to you?

14   A:    I just don't remember the specifics

15   around why she texted those to me on that date.

16   Q:    Do you recall having any conversations

17   with your wife about this particular transaction

18   or these photographs?

19   A:    Yes.

20   Q:    Tell me what you remember about that

21   conversation or conversations.

22   A:    I remember that she -- yeah, that there

23   was an overcharge.

24   Q:    Okay.

25   A:    That either -- yeah.  That was about an

1    overcharge.

2         Q:    Okay there was an overcharge and do you

3    know what occurred as a result of that overcharge?

4    Did she take any action to your knowledge?

5         A:    She spoke with me about it.

6         Q:    And do you recall what she told you

7    about it?

8         A:    That she was overcharged.

9         Q:    Did she tell you that she was planning

10   to take any action about it?

11        A:    I don't recall specifically.

12        Q:    Do you recall was she upset what was

13   her --

14        A:    I don't think she was happy about being

15   overcharged.

16        Q:    Do you recall anything specific about

17   what she said about being upset about it?

18        A:    No.

19             MR. TAYLOR:   Let's mark that and, I

20   guess, 19.

21             (Exhibit 19 was marked for

22   identification.)

23        Q:    I'm handing you Exhibit 19 which are

24   some additional photographs.  Let me reference, or

25   note that these photographs appear to match up to

1   miniature photographs on page 7 of Exhibit 16.

2        A:    Exhibit 16.  Okay.  I'm there.

3        Q:    And these particular photographs are

4   dated June 5, 2022.  Do you recall taking these

5   photographs?

6        A:    So just to clarify, everything from this

7   Stella photo all the way through Ramen is June 5,

8   2022?

9        Q:    That's what it says.

10       A:    That's what it looks like, right.

11       Q:    Yeah.

12       A:    Do I recall taking them?

13       Q:    Yeah.

14       A:    I don't recall taking them.  Probably

15  these were from Carmen's --

16       Q:    Exhibit 16.

17       A:    -- iPhone mini, right.  I don't recall

18  taking it.

19       Q:    Carmen's phone?

20       A:    Yeah.  Okay.

21       Q:    Do you know why she would be taking

22  photographs of various Dollar General shelf price

23  tags in June of 2022?

24       A:    No.  Again, I can speculate for all the

25  reasons we -- the same reasons we talked about,

1    you know for me, comparison-shopping, documenting

2    what's in Dollar General.

3        Q:    I'm just asking if you know.

4        A:    No, no, no.

5        Q:    Do you recall having a conversation with

6    her about these photographs of Dollar General

7    items that she took in June of 2022?

8        A:    No.

9        Q:    Were you aware of potential price

10   discrepancies at Dollar General stores in June of

11   2022?

12            MR. MERINO:    Object to the form.  You

13   can answer.

14       A:    No.

15       Q:    Were you or your wife, to your

16   knowledge, taking any actions in June of 2022 to

17   prepare for a lawsuit against Dollar General?

18            MR. MERINO:    Object to form.  You can

19   answer.

20       A:    No.

21       Q:    And is it your testimony that you did

22   not have any knowledge of these photographs on

23   your wife's phone prior to receiving -- or seeing

24   this report that is Exhibit 16?

25            MR. MERINO:    Object to form.  You can

1  answer.

2       A:   As far as I remember, yeah.

3       Q:   Yeah what?

4       A:   As far as I remember, yes, I did not

5  have -- if you repeat your question I can make

6  sure I'm answering it correctly but I thought it

7  was a yes to say what I'm saying.

8       Q:   So is it your testimony that you were

9  not aware of these photographs that your wife took

10 of Dollar General items in June of 2022?

11           MR. MERINO:  Object to form.  You can

12 answer.

13      A:   In June of 2022, I don't remember being

14 aware of these photographs.

15      Q:   Were you aware of these photographs in

16 Exhibit 19 at any point prior to September 4,

17 2022?

18      A:   Not that I can remember.

19      Q:   And just to be clear, so you signed a

20 retainer letter to file a lawsuit against Dollar

21 General in September 2022, and your wife was

22 taking pictures of Dollar General shelf price tags

23 in June of 2022 and you didn't have any knowledge

24 of it?

25           MR. MERINO:  Object to form.

1          A:   Yeah.   So no I didn't have any

2     knowledge, and I don't think she was taking

3     pictures of just price tags or just price tags.   I

4     don't know what she was taking pictures of.

5          Q:   What --

6          A:   But no.

7          Q:   Sorry.   What makes you say that, that

8     you don't think she was taking pictures of just

9     price tags?

10          A:   I don't know that she was taking

11     pictures of just price tags.   She has the whole

12     product pair.   It has quantity, but it looks like,

13     there are all kinds of reasons why you go to a

14     store and want to take a picture of a product to

15     remember what it is or whatever it is.   We talked

16     about comparison-shopping, being able to go home

17     and say hey have you ever had this?   Do you want

18     to try it?   All kinds of reasons why people want

19     to take photos at the store.

20          Q:   Okay.   And my question is, do you know

21     why she was taking these photographs?

22          MR. MERINO:   Objection.   Asked and

23     answered.   You can answer.

24          A:   Yeah I -- no.

25          MR. TAYLOR:   All right.   You can set

1    that aside.  This will be marked as Exhibit 20.

2            (Exhibit 20 was marked for

3    identification.)

4        Q:    I'm handing you Exhibit 20.  Does

5    this -- do you recognize this?

6        A:    Give me just a moment to --

7        Q:    Sure.  Sure, sure.

8        A:    Yes.

9        Q:    And did you review this at any point in

10   the past?

11       A:    In the past, yes.

12       Q:    All right.  I'm going to ask you some

13   questions.  Some of these questions have already

14   been answered, for some of these.  Let's move to

15   RFA 21 on page 15.

16       A:    Okay.

17       Q:    And it asked, admit that for December

18   11, 2022 Joseph Wolf was aware that he could see a

19   refund for merchandise he bought from a Dollar

20   General store, and there's some objections and

21   then at the very bottom it says denied.  And I

22   wanted to as whether that is correct in light of

23   what I believe you told me earlier about asking

24   for a price to be changed.

25       A:    Yeah.  I did asked for a price to be

1    changed.  I don't remember if it was before

2    December 11, 2022.

3         Q:   And --

4         A:   And that's not a refund either.  They're

5    two different things.

6         Q:   And I guess --

7         A:   So a refund, I guess more to answer the

8    question I don't remember having knowledge about

9    Dollar General -- like a refund policy or anything

10   like that.  Yeah.

11        Q:   Okay.  Do you have any kind of general

12   sense about whether you can ask a retailer for a

13   refund?

14             MR. MERINO:  Object to form.  You can

15   answer.

16        A:   I know that refund policies differ but

17   merchant and there tend to be great variations.

18   So I don't have any general idea of what, like,

19   could apply to all retailers.

20        Q:   Have you ever asked for a refund from a

21   retailer?

22        A:   I have returned merchandise.

23        Q:   Okay.

24        A:   Yeah.

25        Q:   And where?

1     A:   Amazon.

2     Q:   Okay.

3     A:   I've done a return, yeah.

4     Q:   Did you get a refund or did you get an

5  exchange?

6     A:   I'm gotten a refund.

7     Q:   What's that?

8     A:   A refund.

9     Q:   And do you recall -- when was the first

10  time that you recall getting a refund from Amazon?

11     A:   I don't recall.

12     Q:   But you have prior experience in asking

13  a retailer for a refund; is that true?

14          MR. MERINO:  Objection to form.  You can

15  answer.

16     A:   Yes.

17     Q:   I want to turn your attention to RFA

18  number 32 on page 20.  And it says, admit that

19  before the September 4, 2022 perches from the

20  white Lake Dollar General store identified in the

21  second amended complaint 14 --

22     A:   I'm sorry, which RFA?

23     Q:   32.  Page 20.

24     A:   Okay.

25     Q:   Admit that before the September for

1   purchase -- September 4, 2022 purchase from the

2   white Lake Dollar General store Joseph Wolf was

3   aware of any litigation against our retailer

4   overpriced discrepancies.

5           And there is an objection.  And so I

6   just want to ask you whether or not that is, in

7   fact, true.  Were you aware of any litigation

8   against a retailer overpriced discrepancies prior

9   to September 4, 2022?

10      A:   So happy to answer.

11          THE WITNESS:  I see there's an

12  objection.  I can answer?

13          MR. MERINO:  Objection to form.  You can

14  answer.

15      A:   Okay.  I was not aware of any litigation

16  before September 4th.

17          MR. MERINO:  I don't know how much you

18  have planned left but I wouldn't mind taking a

19  quick five minute break.

20          MR. TAYLOR:  Yeah, that's fine.

21          MR. MERINO:  Or if you want to --

22          MR. TAYLOR:  No, go ahead and break.

23          (Off the record at 4:45 p.m., resuming

24  at 4:50 p.m.)

25  BY MR. TAYLOR:

1      Q:   All right, Mr. Wolf so going back to

2  Exhibit 20, I want to point your attention to page

3  27, RF a number 15.  And that says, admit that

4  Joseph Wolf would have bought the Clover Valley

5  brand 2 percent lactose free milk from the white

6  Lake Dollar General store on September 4, 2022 at

7  the price listed on the shelf tag stated 4.25.

8  And I don't have an answer to that one here.  So I

9  wanted to ask you would you have bought the 2

10  percent lactose free milk from the white Lake

11  dollar store September 4, 2022 if the price listed

12  on the shelf tag had stated 4.25 as opposed to

13  4.15?

14          MR. MERINO:  Objection to form.  You can

15  answer.

16      A:   Yeah.  This is a hypothetical and it is

17  asking me to, like, remember everything that was

18  going on on September 4, 2022, over a year ago,

19  put myself in that mind set, so I don't know.

20      Q:   I want to direct your attention to page

21  40, RFA number 93.  And it reads, admit that

22  Joseph Wolf believes that it is prudent to check

23  prices on one's receipts after a transaction to

24  ensure price accuracy.  Do you agree with that

25  statement?

1          MR. MERINO:  Objection to form.  You can

2    answer.

3         A:   Generally speaking, I have, all my life

4    trusted retailers that they are being accurate and

5    honest with their pricing.  So I have generally

6    not done that throughout my life.

7         Q:   But that's not the question.  I

8    understand that you haven't done it.  But I'm

9    asking you this, whether you believe it is prudent

10   for a consumer to check prices on one's receipt

11   after a friend's action to ensure price accuracy.

12         MR. MERINO:  Objection to form.  You can

13   answer.

14        A:   Define prudent.

15        Q:   Think it's a good idea.

16        A:   Okay so I don't think that's what

17   prudent means.  But that's what you're saying.

18        Q:   Okay.  You define it then.

19        A:   Yeah.  I'd have to look it up.

20        Q:   Okay.

21        A:   You want me to look it up?

22        Q:   No.

23        A:   Okay.  If you like to rephrase it as to

24   do you think it's a good idea, is that what we are

25   doing here?

1      Q:   Well, we can do that.

2      A:   Okay.

3      Q:   Do you know what prudent means?

4      A:   I think I have an idea it has to do with

5  something like achieving the best results in a

6  most realistic way or something like that.  But

7  again, I would want to just verify the definition

8  of that.

9      Q:   Well, okay.  I'll change it for you.

10     A:   Yeah.

11     Q:   So would you agree with the statement

12  that it is a good idea for a consumer to check

13  prices on one's receipt after a transaction to

14  ensure price accuracy?

15          MR. MERINO:  Objection to form.  You can

16  answer.

17     A:   It's a good idea for all consumers to

18  always do that?

19     Q:   That's not what I said.

20          MR. TAYLOR:  Can you read back the

21  question?  Listen closely.

22          (The requested audio was played back.)

23     A:   I think it's up to each individual

24  consumer and I have a hard time making a blanket

25  statement over, you know, the policy that all

1    consumers should follow when they shop anywhere

2    just to make sure they're not being overcharged by

3    folks like Dollar General.

4         Q:    So different consumers may have

5    different practices in terms of whether they check

6    the receipt after a transaction to ensure price

7    accuracy?

8         A:    I think that's possible and likely.

9         Q:    Okay.  let's move to RF a number 95 also

10   on page 40.  And I'm going to change this one for

11   you as well.

12        A:    Okay.

13        Q:    Do you believe it is a good idea for

14   consumers to do observe the prices on items on the

15   cash register displayed on the monitor we talked

16   about earlier during checkout to ensure price

17   accuracy?

18             MR. MERINO:  Objection to form.  You can

19   answer.

20        A:    The entire premise of this question is

21   that stores like Dollar General are constantly --

22   that there is a chance that they are constantly

23   overcharging all consumers.  And that therefore

24   they need to just constantly look at every

25   transaction in order to make sure they are being

1    accurately priced.  That feels like what the

2    premise of the question is, and it feels silly or

3    ridiculous to ask every consumer to do that all

4    the time for everything.

5        Q:   Okay.  So you don't think consumers

6    should have to look at the monitor?  You don't

7    think that consumers should have to observe prices

8    of the items on the cash register displayed during

9    checkout?

10           MR. MERINO:  Objection.  Asked and

11   answered.  You can answer.

12       A:   Yeah.  It -- in order to be charged

13   accurately, I think Dollar General should be

14   charging people accurate prices no matter what.

15       Q:   Do you think consumers have the

16   responsibility to look at cash register display

17   during checkout to see what they are being charged

18   for items?

19           MR. MERINO:  Objection to form.  You can

20   answer.

21       A:   Yeah.  Are you asking, like, is there a

22   legal responsibility --

23       Q:   No.

24       A:   -- for consumers?

25       Q:   I use the word legal.

1      A:   Okay.  I'm just trying to understand, I

2  guess what the main we're talking about here.

3           So do you believe consumers should have

4  a responsibility to look at prices at the cash

5  register to ensure price accuracy?

6      Q:   Yeah.

7      A:   I really believe that's up to -- I

8  really think every person in their situation --

9  that's going to differ for every person.  People

10  have different shopping practices.  People shop

11  with all kinds of things on their mind in

12  different capacities.  I don't want to put out a

13  blanket statement that I think all consumers need

14  to follow or else they are at fault for being

15  ripped off.

16      Q:   All right.  Let me turn your attention

17  to RFA 97 on page 41.  And I'm going to change

18  this one little bit as well.

19      A:   Okay.

20      Q:   And so my question is do you believe

21  it's a good idea that once noticed for a consumer

22  to request a refund of the difference between the

23  shelf price and the checkout price if the checkout

24  prices higher?

25           MR. MERINO:   Objection to form.  You can

1   answer.

2        A:   Again, a good idea.  Again, I think this

3   is a blanket recommendation to all consumers and I

4   don't know what a good idea is for all consumers.

5   People requesting a refund takes time.  It takes

6   effort, energy.  I can't make a blanket

7   recommendation.  I think all consumers need to do

8   this X thing, or else they are at fault for being

9   overcharged by a store that is not following the

10  law.

11       Q:   I want to turn your attention to RFA 99

12  on page 42.  And this is really more of a factual

13  question.  I just want to make sure I have it

14  right.  Am I correct that prior to filing this

15  lawsuit you did not request a refund from Dollar

16  General of any of the differences between the

17  shelf price and the checkout price that were

18  identified in the second amended complaint which

19  is Exhibit 3?

20       A:   That's correct.

21       Q:   So earlier today we had a discussion

22  about you having a conversation with an employee

23  of a Dollar General store at White Lake, correct?

24       Yeah.   Yes.  A:

25       Q:   We weren't able to determine who that

1  was, correct?

2          A:    Yes.

3          Q:    Do you recall anything about the

4  employee?  Was it a man?  Was it a woman?

5          A:    No.

6          Q:    Do you recall whether it was a store

7  manager or someone else?

8          A:    No.

9          Q:    Other than that particular moment, in

10  that occasion, as we talked about, have you ever

11  had any conversations with ah current or former

12  employee of a Dollar General store at White Lake,

13  New York?

14          A:    No.

15          Q:    Other than that conversation that we

16  just talked about have you ever had any

17  conversations with any current or former employee

18  of any Dollar General store at any point?

19          A:    No.

20          Q:    All right.  You live in Queens?

21          A:    Yeah.

22          Q:    That your main residence?

23          A:    Yeah.  Yeah.

24          Q:    Are the prices for groceries and whatnot

25  would you consider those to be high in Queens?

1          MR. MERINO:  Object to the form.  You

2    can answer.

3          A:    That's hard for me to say.  Yeah, I'm

4    not sure.

5          Q:    Would the prices at the Dollar General

6    store in White Lake, New York be lower in your

7    opinion than the prices that you experienced in

8    Queens?

9          MR. MERINO:  Object to form.  You can

10   answer.

11         A:    I'm not sure.

12         Q:    When you mention Andrew Wolf, who is

13   your father and worked for the Dann Law firm.  Do

14   you have any other relatives that work for the

15   Dann Law Firm?

16         A:    No.

17         Q:    Do you have any friends that work for

18   the Dann Law firm?

19         A:    No.

20         Q:    Are you related at all to Mr. Merino?

21         MR. MERINO:  Object to form.  You can

22   answer.

23         A:    Unfortunately no.

24         MR. TAYLOR:  Well done.

25         Q:    All right.  Do you know what a class

1   action is?

2          A:   Yes.

3          Q:   All right.  What is your understanding

4   of what a class action is?

5               MR. MERINO:  Object to form, you can

6   answer.

7          A:   A lawsuit filed on behalf of a class.

8          Q:   And you have an understanding of what

9   the class definition here is?

10         A:   Yes.

11         Q:   Can you tell me what your understanding

12  is?

13         A:   Anyone who has been overcharged at a

14  Dollar General in the State of New York.

15         Q:   Do you have an understanding as to your

16  role in this lawsuit?

17         A:   Yes.

18         Q:   And hat is your understanding?

19         A:   My role is to do what's in, you know,

20  the best interest of the class.  To stay informed

21  of the proceedings.  To seek appropriate legal

22  counsel and to pursue, you know, to pursue the

23  case.

24         Q:   Do you have an understanding as to any

25  responsibilities or duties that you may have, and

1  if so what is that understanding?

2      A:   Yeah.  I thought -- sorry.  I thought I

3  just answered that.

4      Q:   Okay.  All right.  So that's your answer

5  for responsibilities and duties as well?

6      A:   Yeah.  Unless there's something specific

7  that you want to ask about there?

8      Q:   No.  Do you have an understating as to

9  who you are representing in this lawsuit, and if

10  so, what is that undercranking?

11      A:   Yeah.  I thought I answered so.  I'm

12  representing anyone who was overcharged at a

13  Dollar General in the State of New York.

14      Q:   And what qualifies you to represent that

15  class?

16      A:   I was overcharged by Dollar General in

17  the State of New York.

18      Q:   Do you believe that you are qualified to

19  represent that class?

20      A:   I do.

21      Q:   And why?

22      A:   Because I was overcharged by Dollar

23  General in the State of New York.

24      Q:   Do you know how much time you can expect

25  to spend on this case?

1      A:   How much time I've sent or expect to

2   spend moving forward?  Expect to spend, like

3   moving forward?

4      Q:   Yeah.  How much do you expect to spend

5   on the case total?

6      A:   I know how much time I've spent.  I

7   don't know how much more time the case may require

8   of me.

9      Q:   How much time have you spent thus far?

10      A:   A good 15 to 20 hours.

11      Q:   Does that include the time he has been

12   here today?

13      A:   No.

14      Q:   I'm happy to help Pat your totals.

15      A:   Thank you so much.  I appreciate it.

16      Q:   So would you agree that customers who

17   were not overcharged by Dollar General are not

18   part of the classification?

19         MR. MERINO:  Objection to form.  You can

20   answer.

21      A:   I guess I'm unclear because so many --

22   unless I was -- you know, I knew less I happened

23   to notice the overcharges by documenting, like I

24   wouldn't have noticed, right.  I'm fairly certain

25   I was overcharged prior to when I started

1    noticing.  Other folks who have not been

2    documenting their purchases and they are finding

3    where they were overcharged, I'm pretty sure that

4    other folks have been overcharged too and just not

5    know it.  So I think it's possible that people who

6    don't know they were overcharged could be part of

7    the class.

8        Q:   And do you have an understanding of

9    how -- if a customer was not documenting the

10   overcharges that he or she may not have experience

11   how anyone could ever determine whether or not

12   they did experience an overcharge?

13           MR. MERINO:  Objection to form.  You can

14   answer.

15       A:   To verify with 100 percent certain I

16   mean it's possible.  If there are known items that

17   were incorrectly priced between certain time

18   periods if folks happen to have received -- I mean

19   it technically possible for folks to, you know,

20   did you purchase X or Y items between this time

21   period?  People might remember yes, and be able to

22   document it.  But I don't know.  I guess I would

23   have to talk more with my attorneys about I don't

24   know, the exact --

25       Q:   Do you believe --

1       A:    Yeah.  But the -- yeah, about the exact

2    makeup of the class, but yeah.

3       Q:    Do you believe that customers of Dollar

4    General who were not overcharged should be

5    compensated as part of this lawsuit?

6            MR. MERINO:  Objection to form.  You can

7    answer.

8       A:    Yeah, again I would have to defer to my

9    attorneys on what compensation looks like for

10   this.

11      Q:    Do you believe that consumers who

12   utilized the price match policy or received a

13   refund if they were overcharged should be

14   compensated as part of this lawsuit?

15           MR. MERINO:  Objection to form.  You can

16   answer.

17      A:    I would have to defer to my attorneys on

18   what compensation would look like for the class.

19      Q:    Do you believe that consumers who never

20   look at the shelf price should be compensated by

21   this lawsuit?

22           MR. MERINO:  Objection to form.  You can

23   answer.

24      A:    Yeah.  I mean again, if I'm not -- feel

25   free to ask further questions but just I feel like

1   you keep asking me again until, like, what the

2   compensation could look like.  I feel like

3   that's -- again, that whole issue is something I

4   would have to discuss with my attorneys.  Like the

5   nature of the compensation.

6               MR. MERINO:  Is that your answer?

7               THE WITNESS:  Yes.

8               MR. MERINO:  Quit.

9               THE WITNESS:  Okay.  All right.

10      Q:   So you were able to figure out that you

11  had suffered a dash or experienced a overcharge at

12  Dollar General by looking at a photograph of the

13  receipt, or looking at the receipt and a

14  photograph of the shelf price tag; is that

15  correct?

16      A:    Yes.

17      Q:   And would you agree that in order to

18  determine whether someone else had suffered or

19  experienced a price discrepancy at a Dollar

20  General you would also need to look at any

21  receipts that they have an the shelf price label

22  at the time they made a purchase?

23               MR. MERINO:  Objection to form.  You can

24  answer.

25      A:    No.

1      Q:   Why do you disagree with that?

2      A:   I think that it's clearly documented

3   that there are overcharges.  For example, if

4   somebody else purchased, you know, lactate

5   whatever milk on the same day that I did, whatever

6   it is, I'm fairly certain they were overcharged.

7   Right.  I think they need their receipt.  Yeah.  I

8   think they would have been overcharged.  You're

9   saying to prove that they actually bought that

10  milk on that day or?

11     Q:  Yeah.  I mean that's what you did to

12  discover --

13     A:   Yeah.

14     Q:   --

15          MR. MERINO:  Objection to form.  You can

16  answer.

17     A:   It feels -- I have to think more about

18  it but it feels a little narrow and there's got to

19  be other ways to determine how folks are -- for

20  folks to determine that they were overcharged.  It

21  seems like it's pretty easy to figure out.  You

22  know that people are being overcharged, at least,

23  you know, definitely on some items.

24     Q:   And when you say it's pretty easy to

25  figure out?

1      A:   Because I have, you know evidence that
2  that occurred.
3      Q:   But you --
4      A:   Just an example.  If anyone else
5  purchased that same product for example they would
6  know that they were overcharged.  Right, like if I
7  asked someone if, you know, did you by milk in
8  those last two weeks or wherever, or if it was
9  like a few weeks afterwards they would know.
10      Q:   How would they know?  You couldn't --
11      A:   So I can ask, like yeah --
12      Q:   You couldn't remember whether you shop
13  that John Dollar General yesterday so how would
14  they be able to remember if they purchased some
15  weeks ago?
16      A:   Yeah.
17           MR. MERINO:  Objection to form.  You can
18  answer.
19      A:   So I remembered a lot in this.  Yes,
20  there was one thing I couldn't recall but I don't
21  think that that means that no one remembers
22  something.  So yeah, I don't know.  I don't want
23  to get -- I don't want to speculate as to how we
24  verify all of this and whatever.  I feel in
25  general there are known overcharging issues at

1 Dollar General and people know that when they shop

2 there is likely that people would have been

3 overcharged.

4  Q: I guess what I'm asking is this, and if

5 you don't know you don't know.

6  A: Okay.

7  Q: But you said it's pretty easy to figure

8 out.  So what is the basis for you saying that

9 it's pretty easy to figure out?

10   MR. MERINO:  Objection to form.  You can

11 answer.

12  A: Yeah, I guess -- I don't know.  I guess

13 so yeah I don't work and I was thinking like maybe

14 I don't know, we know there are a number of items

15 that they were overcharging for.

16   I mean, does Dollar General have the

17 capability to search for transactions and tie

18 those two credit card statements and figure out

19 who bought them?  So I mean it's possible.  I

20 don't -- I can't tell you right now.

21  Q: Do you know?

22   MR. MERINO:  Objection to form.  You can

23 answer.

24  A: Yeah.  Okay.  So I don't know.

25  Q: Okay.  All right.  All right.  In your

1   opinion is there anything that Dollar General

2   could do to end this lawsuit right now?

3           MR. MERINO:  Objection to form.  You can

4   answer.

5       A:   I would have to discuss a resolution --

6   I would have to discuss that with my -- with my

7   legal counsel.

8       Q:   Are there any safeguards that you feel

9   that Dollar General should adopt or implement to

10  prevent price discrepancies in the future, sitting

11  here right now today?

12          MR. MERINO:  Objection.  Object to the

13  form.  You can answer the question.

14      A:   Yeah, I think they should comply with

15  the law and have accurate pricing.  That's as much

16  as I can say.

17      Q:   Do you know or do you have any

18  particular thoughts on safeguards that would help

19  them do that?

20          MR. MERINO:  Objection to form.  You can

21  answer.

22      A:   I don't have any thoughts right now.

23      Q:   Okay.  And I guess at a fundamental

24  level do you recognize sort of the issue that

25  trying to keep the price accurate on 15,000 items

1    in every store in the nation 100 percent of the

2    time, do you recognize that that is a challenge

3    for retailers?

4             MR. MERINO:  Object to form.  You can

5    answer.

6        A:    Yeah.  No.  I guess I don't know what

7    challenges retailers generally have, so no.

8        Q:    All right.  Are you suing over any

9    activities of Dollar General that we have not

10   discussed here today?

11       A:    No.

12       Q:    Are you claiming any damages that we

13   have not discussed here today?

14             MR. MERINO:  Object to form.  You can

15   answer.

16       A:    I would have to ask my lawyers about

17   what really for the class will look like.

18             MR. TAYLOR:  Why don't we do this.  Why

19   don't we take a short break and I'll see if I'm

20   done.  Can we do that?

21             MR. MERINO:  We can.

22             (Off the record at 5:17 p.m., resuming

23   at 5:23 p.m.)

24       MR. TAYLOR:  All right.  So you have

25   been handed Exhibit 21.

1          (Exhibit 21 was marked for

2    identification.)

3        Q:    Do you recognize that?

4        A:    Yes.

5        Q:    And let me ask you this, did you request

6    these documents or were they provided to you?

7        A:    They were provided to me.

8        Q:    Have you made any FOIA or FOIA

9    equivalent requests of governmental agencies in

10   New York for audits?

11       A:    No.

12       Q:    I'm handing you Exhibit 22.  Do you

13   recognize Exhibit 22?

14          (Exhibit 22 was marked for

15   identification.)

16       A:    Yes.

17       Q:    Okay.  And what is it?

18       A:    Like, a class action retainer agreement.

19       Q:    Am I correct in saying that on Wolf 69

20   you, probably, electronically signed this on

21   September 20, 2022?

22       A:    Yes.

23       Q:    Do you know who Jonathan Rudnik

24   (phonetic) is?

25       A:    No.

1      Q:   All right.  You can set that aside.  Let

2   me ask you, are you aware any receipts or

3   photographs that you have of Dollar General

4   purchases or products that we haven't seen or gone

5   through here today?

6      A:   No.

7      Q:   All right.  Are you aware of any other

8   document that you or your wife may have in your

9   possession related to this lawsuit or Dollar

10  General price discrepancies that you have not,

11  either searched for, or turned over to your

12  attorneys?

13          MR. MERINO:  Objection to form.  You can

14  answer.

15      A:   No.

16          MR. TAYLOR:  All right.  With that, I

17  will say that I believe I am done with my

18  questions.  Are you all planning to ask any

19  questions?

20          MR. MERINO:  Yeah.

21          MR. TAYLOR:  There's something I want to

22  put on the record at the end but I will wait to

23  the end to do that.

24          So go ahead.  I have no further

25  questions at this time.

1                EXAMINATION BY COUNSEL FOR PLAINTIFFS,

2      JOSEPH WOLF, CARMEN WOLF, ON BEHALF OF THEMSELVES

3                  AND THOSE SIMILARLY SITUATED

4      BY MR. MERINO:

5          Q:    Mr. Wolfe, how is it that normally

6      identify the price of a product at Dollar General?

7                MR. TAYLOR:  Objection to form.  You can

8      answer.

9          A:    Like the price that I paid?

10         Q:    The -- let me rephrase.  How is it that

11     you would identify the price that is it being

12     advertised for any product at the Dollar General

13     store?

14               MR. TAYLOR:  Object to form.

15         A:    The shelf price.  Yeah.

16         Q:    Would you say that the shelf price is

17     important to you?

18               MR. TAYLOR:  Object to form.

19         A:    Yeah, it's the price being promised by

20     retailer.  Absolutely, yeah.

21         Q:    So if a retailer like Dollar General

22     charges -- ultimately charges you a price that is

23     higher than what is on the shelf label is that

24     important for you?

25               MR. TAYLOR:  Object to form.

1      A:    Absolutely.

2      Q:    And is it important for you if it's 1

3  cent?

4      A:    Doesn't matter the quantity.  I want to

5  be accurately charged at all times.  Especially

6  when we're talking about, you know, you go to

7  grocery stores often, right.  This isn't like

8  nothing I purchase is, you know, of items you may,

9  like, once in a blue moon.

10           So yeah.  Any amount is important to me

11  and the fact that we are talking about, you know,

12  items being charged for like groceries,

13  necessities, where things can absolutely, you

14  know, compound over time absolutely.  Yeah.  It

15  matters, yeah.

16      Q:    Do you feel that it is your

17  responsibility to investigate Dollar General's

18  overcharges?

19           MR. TAYLOR:  Object to the form.

20      A:    To investigate?  I feel like Dollar

21  General should have accurate pricing.  I don't

22  think anyone -- I think consumers, every

23  individual consumer should be sort of like a

24  detective and have to demand that Dollar General

25  is honest and charge a fair and accurate price,

1   the price that they are representing on the shelf,

2   yeah.

3       Q:   Do you think that for a consumer like

4   yourself it should be your responsibility to

5   verify that -- verify at the register that the

6   price on the label matches what you're being

7   charged?

8           MR. TAYLOR:  Objection to form.

9       A:   That should not be my responsibility to

10  have to do that with every single purchase.  With

11  every, you know, the amount of times that I or,

12  you know, consumers who do things like grocery

13  shopping.  That would be insane if, you know, that

14  responsibility was, you know, if that was somehow

15  just my responsibility.

16      Q:   So you might remember a line of

17  questioning before by Mr. Taylor as to potential

18  prospective hours moving forward in the case.  So

19  just with that in mind, if this case were to go

20  all the way to the trial, would you remain

21  committed to being a class representative all the

22  way through trial?

23          MR. TAYLOR:  Objection to form.

24      A:   Absolutely.

25      Q:   Mr. Wolf, have you been promised any

1   special treatment by your counsel or anyone --

2           MR. TAYLOR:  Objection.

3       Q:   -- for being a --

4           COURT REPORTER:  Are you objecting,

5   Counsel?

6           MR. TAYLOR:  No, not yet.

7       Q:   -- for being a representative of the

8   class?

9           MR. MERINO:  Objection to form.

10      A:   No, I have not been promised any special

11  treatment by anyone for being a class rep.

12      Q:   Is your objective here an individual

13  settlement in this litigation?

14          MR. TAYLOR:  Objection to form.

15      A:   It is not.

16      Q:   What's your objective here being a class

17  representative?

18      A:   Yeah, my --

19          MR. TAYLOR:  Objection to form, you can

20  answer.

21      A:   Yeah, definitely, you know, two things.

22  Number one, I would like a fair compensation for

23  folks in my class, people who were overcharged by

24  Dollar General.  And I'd like for Dollar General

25  in the future to have accurate pricing.

1        These are really the two things that I'm

2   seeking for folks in my class.  Does that make

3   sense, or you could ask a follow-up.

4        Q:   Sure.

5        A:   Yeah, okay.

6        Q:   Are you willing to commit to keeping

7   yourself generally familiar with the litigation

8   moving forward?

9             MR. TAYLOR:  Object to the form.

10       A:   Yeah.  Absolutely, yeah.

11       Q:   Are you willing to commit to continue

12  vigorously prosecuting this case moving forward?

13            MR. TAYLOR:  Objection to form.

14       A:   Definitely.

15            MR. MERINO:  Let me check my notes.  I

16  don't have any further questions.

17            MR. TAYLOR:  I also do not have any

18  further questions.

19            I will state and you should feel free to

20  object, and you probably will.  That I will leave

21  the deposition open at this point in case there

22  are any other issues related to discovery and some

23  of the things we talked about that may come up.

24     MR. MERINO:  We object to keeping the

25  deposition open.

1          MR. TAYLOR:  Okay.  We can go off the

2    record.

3          (Off the record at 5:34 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1       CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2            I, Enrique Casas, the officer before
3   whom the foregoing proceedings were taken, do
4   hereby certify that any witness(es) in the
5   foregoing proceedings were fully sworn; that the
6   proceedings were recorded by me and thereafter
7   reduced to typewriting by a qualified
8   transcriptionist; that said digital audio
9   recording of said proceedings are a true and
10  accurate record to the best of my knowledge,
11  skills, and ability; and that I am neither counsel
12  for, related to, nor employed by any of the
13  parties to this case and have no interest,
14  financial or otherwise, in its outcome.
15
16  _____
17  ENRIQUE CASAS,
18  NOTARY PUBLIC FOR THE STATE OF NEW YORK
19
20
21
22
23
24
25
```

1              CERTIFICATE OF TRANSCRIBER

2          I, Molly Bugher, do hereby certify that

3    this transcript was prepared from the digital

4    audio recording of the foregoing proceeding; that

5    said transcript is a true and accurate record of

6    the proceedings to the best of my knowledge,

7    skills, and ability; and that I am neither counsel

8    for, related to, nor employed by any of the

9    parties to the case and have no interest,

10   financial or otherwise, in its outcome.

11   _____

12

13   Molly Bugher, CDLT-161

14   January 19, 2024

15

16

17

18

19

20

21

22

23

24

25

**A**

a-l-l-a-n
10:20
a-l-l-e-n
10:19
a-n
10:21
a:he
20:25
ability
7:23, 10:5,
244:11, 245:7
able
35:6, 35:21,
66:11, 77:1,
78:1, 87:1,
90:13, 92:18,
93:20, 123:3,
136:24, 139:11,
140:15, 147:24,
148:20, 154:6,
154:10, 155:19,
155:20, 155:22,
156:12, 181:21,
182:9, 185:10,
206:6, 211:16,
222:25, 228:21,
230:10, 232:14
abou
186:5
above
58:20, 192:6
absolutely
56:5, 120:24,
126:21, 127:25,
238:20, 239:1,
239:13, 239:14,
240:24, 242:10
acceptable
143:16
accessible
153:20
accomplish
40:6, 40:20,
41:18
accomplished
40:14, 40:17

according
191:10, 204:4
account
70:11, 71:17,
73:9, 73:10,
73:16, 73:25,
74:7, 74:10,
74:11, 74:14,
74:16, 165:17,
198:4, 198:22
accuracy
216:24, 217:11,
218:14, 219:7,
219:17, 221:5
accurate
31:21, 33:16,
38:5, 39:25,
40:2, 40:12,
41:11, 41:15,
43:6, 48:25,
54:22, 55:7,
61:21, 63:15,
69:23, 79:11,
81:7, 87:13,
120:22, 124:6,
124:20, 125:18,
127:25, 128:2,
129:19, 131:20,
138:7, 138:9,
139:15, 140:10,
140:16, 140:17,
144:19, 146:11,
148:2, 149:14,
150:1, 154:7,
156:1, 161:25,
163:8, 164:5,
164:10, 175:12,
183:17, 206:7,
217:4, 220:14,
234:15, 234:25,
239:21, 239:25,
241:25, 244:10,
245:5
accurately
10:2, 44:11,
78:16, 79:17,
92:18, 133:9,
139:12, 154:11,

181:14, 181:15,
181:22, 182:8,
182:10, 182:14,
183:16, 220:1,
220:13, 239:5
achieving
218:5
across
122:8
act
86:15
action
121:19, 138:11,
144:18, 164:21,
165:4, 207:4,
207:10, 217:11,
225:1, 225:4,
236:18
actions
39:22, 47:10,
47:11, 107:14,
108:9, 108:14,
128:8, 209:16
activities
19:18, 235:9
actual
46:1, 183:20,
199:3
actually
9:3, 12:22,
16:16, 57:15,
58:17, 64:6,
65:8, 76:12,
93:16, 95:4,
110:15, 114:22,
117:16, 131:23,
132:25, 172:1,
183:8, 189:22,
231:9
add
31:17, 53:5,
139:9
additional
207:24
address
10:22, 10:23,
11:4, 11:5,
12:10, 12:20,

61:23, 145:4,
145:11
addressed
86:9
addressing
87:9
adequately
126:25, 127:6
adjust
122:8
admit
212:17, 214:18,
214:25, 216:3,
216:21
admittedly
79:8
adopt
234:9
advertised
87:21, 141:9,
143:2, 238:12
advice
55:22, 55:23,
55:25, 56:3,
56:9, 56:10,
56:21, 84:11,
87:16, 159:23,
160:21, 161:2,
161:4, 161:7
advisor
23:25, 24:2
affect
10:5, 17:14,
17:16
affirmative
120:20
after
44:1, 44:5,
44:7, 44:17,
44:23, 46:8,
54:21, 55:3,
55:13, 57:3,
75:22, 76:6,
76:15, 79:20,
80:22, 81:21,
82:7, 83:2,
87:8, 89:12,
93:15, 97:1,

97:4, 97:8,
108:1, 108:9,
108:14, 109:14,
110:3, 114:22,
114:23, 116:7,
116:10, 116:15,
116:18, 116:21,
116:22, 117:10,
117:11, 117:18,
118:4, 118:5,
121:10, 121:19,
122:14, 123:16,
123:24, 124:1,
124:9, 126:3,
126:5, 128:25,
130:25, 131:24,
132:13, 132:15,
133:1, 134:22,
134:25, 136:12,
136:18, 137:7,
137:15, 137:18,
160:19, 161:6,
161:25, 162:2,
163:4, 167:15,
175:7, 181:6,
181:12, 190:2,
216:23, 217:11,
218:13, 219:6
**afternoon**
170:20
**afterward**
57:7
**afterwards**
79:23, 81:17,
83:7, 84:19,
132:14, 161:18,
232:9
**again**
34:6, 35:3,
36:7, 36:8,
37:21, 38:8,
39:4, 40:24,
41:8, 46:4,
55:11, 56:2,
60:4, 65:21,
66:2, 66:7,
67:12, 68:19,
68:25, 79:10,

80:5, 80:11,
81:6, 90:10,
93:20, 96:5,
104:2, 106:15,
106:20, 108:25,
111:6, 117:5,
117:16, 122:3,
122:21, 124:17,
134:4, 135:13,
138:17, 138:18,
142:23, 149:16,
155:25, 156:25,
160:14, 160:15,
160:16, 175:20,
182:11, 198:8,
198:12, 208:24,
218:7, 222:2,
229:8, 229:24,
230:1, 230:3
**against**
47:11, 110:23,
135:12, 159:6,
190:2, 190:7,
209:17, 210:20,
215:3, 215:8
**agencies**
236:9
**ago**
28:4, 45:2,
56:19, 64:8,
64:10, 64:19,
65:21, 66:17,
68:19, 69:1,
77:22, 79:19,
80:6, 80:13,
85:16, 86:13,
86:15, 90:10,
90:22, 109:1,
191:13, 216:18,
232:15
**agree**
106:3, 106:9,
118:6, 124:24,
144:3, 145:10,
147:1, 151:22,
163:22, 181:6,
187:12, 216:24,
218:11, 227:16,

230:17
**agreement**
5:7, 31:4,
57:8, 182:3,
236:18
**ah**
223:11
**ahead**
29:5, 39:10,
48:11, 67:2,
82:16, 87:18,
98:20, 134:5,
142:19, 215:22,
237:24
**al**
3:2, 6:4
**allan**
10:18, 10:19
**allegation**
142:6, 143:5
**allegations**
159:17
**allege**
54:13, 55:4,
117:21
**alleged**
86:5, 194:25
**alleging**
147:8, 147:12,
147:16, 147:18,
148:15
**allow**
163:9
**allowed**
29:9
**almost**
21:1
**alone**
112:25
**along**
19:5, 124:12
**already**
20:19, 22:9,
35:6, 39:6,
58:17, 63:6,
79:8, 79:11,
85:13, 110:22,
117:10, 118:6,

131:9, 212:13
**also**
3:22, 26:23,
28:1, 28:7,
28:16, 72:3,
90:12, 122:3,
123:9, 163:19,
169:24, 179:18,
185:7, 194:17,
197:20, 219:9,
230:20, 242:17
**alternate**
91:5
**although**
71:17, 72:16,
94:5
**always**
9:5, 78:13,
94:23, 125:17,
130:18, 136:24,
138:2, 154:10,
155:20, 218:18
**amazon**
214:1, 214:10
**amended**
214:21, 222:18
**amount**
18:19, 18:22,
132:8, 133:24,
153:14, 154:4,
155:14, 181:16,
239:10, 240:11
**amounts**
152:18
**and-half**
114:9
**andrew**
21:13, 45:15,
45:18, 46:6,
48:6, 50:3,
50:22, 50:24,
51:6, 51:17,
52:8, 53:10,
53:13, 54:19,
84:10, 159:21,
160:6, 160:25,
224:12
**angry**
37:10

| | | | |
|---|---|---|---|
| **another** | 74:22, 79:25, | 27:3, 28:23, | 212:17, 212:25, |
| 8:9, 35:5, | 92:10, 94:14, | 101:4, 145:15, | 213:20, 220:10, |
| 35:24, 36:12, | 95:2, 97:10, | 145:18, 183:13 | 232:7 |
| 37:9, 48:5, | 108:21, 109:2, | **april** | **asking** |
| 140:20, 157:17, | 109:20, 109:25, | 174:8, 174:10, | 8:25, 29:11, |
| 169:15, 173:19, | 120:12, 120:17, | 174:15, 176:11, | 29:21, 33:2, |
| 177:11, 194:19, | 121:6, 126:20, | 194:8, 199:8, | 34:14, 34:21, |
| 195:11, 198:17 | 156:13, 165:6, | 205:19, 206:10 | 37:25, 38:2, |
| **answered** | 165:18, 168:20, | **arabella** | 40:9, 46:8, |
| 34:19, 35:2, | 168:21, 191:15, | 11:22 | 50:18, 56:3, |
| 36:7, 37:2, | 198:11, 207:16, | **area** | 56:5, 56:9, |
| 37:18, 38:24, | 213:9, 223:3, | 59:9, 59:19, | 61:3, 64:7, |
| 56:12, 81:5, | 234:1 | 171:17, 187:21 | 64:10, 64:20, |
| 110:7, 124:16, | **anyway** | **arm** | 66:16, 66:19, |
| 171:14, 189:11, | 39:19 | 58:21, 58:22 | 66:20, 77:3, |
| 189:13, 190:11, | **anywhere** | **around** | 77:9, 80:1, |
| 211:23, 212:14, | 19:5, 158:15, | 15:9, 29:14, | 80:18, 85:14, |
| 220:11, 226:3, | 169:13, 219:1 | 54:20, 77:15, | 85:17, 85:18, |
| 226:11 | **apartment** | 82:1, 153:21, | 88:20, 93:13, |
| **answering** | 10:24, 13:19, | 174:19, 187:14, | 102:24, 103:2, |
| 10:1, 55:11, | 19:4, 24:11, | 204:5, 205:7, | 103:3, 108:24, |
| 120:9, 129:6, | 66:1 | 206:15 | 110:17, 119:14, |
| 210:6 | **app** | **arrived** | 120:18, 120:19, |
| **answers** | 166:4 | 16:2 | 120:21, 122:23, |
| 7:25, 126:23, | **apparently** | **article** | 127:20, 128:6, |
| 168:9 | 143:12 | 203:9 | 128:18, 129:9, |
| **anymore** | **appeal** | **articles** | 129:16, 129:19, |
| 24:4, 99:10 | 78:1 | 58:2, 204:22, | 129:22, 139:4, |
| **anyone** | **appear** | 204:24 | 139:24, 142:7, |
| 11:6, 12:7, | 201:20, 205:17, | **aside** | 144:22, 144:25, |
| 26:19, 27:11, | 207:25 | 23:7, 25:3, | 147:17, 147:18, |
| 27:16, 28:13, | **appears** | 107:7, 171:20, | 152:25, 153:7, |
| 44:21, 50:8, | 100:25, 101:16, | 192:13, 199:20, | 153:9, 155:6, |
| 50:11, 53:17, | 101:19, 113:16, | 202:13, 205:3, | 155:10, 156:21, |
| 53:23, 58:5, | 178:9, 195:11 | 212:1, 237:1 | 157:2, 157:4, |
| 58:10, 92:20, | **applied** | **asked** | 158:13, 169:16, |
| 119:22, 127:7, | 168:6 | 34:18, 35:1, | 180:16, 187:19, |
| 159:6, 168:25, | **apply** | 35:6, 36:6, | 209:3, 212:23, |
| 169:4, 225:13, | 171:2, 181:18, | 37:1, 37:18, | 214:12, 216:17, |
| 226:12, 228:11, | 213:19 | 38:24, 56:11, | 217:9, 220:21, |
| 232:4, 239:22, | **appreciate** | 64:25, 72:23, | 230:1, 233:4 |
| 241:1, 241:11 | 119:17, 144:10, | 81:4, 110:6, | **asks** |
| **anything** | 227:15 | 121:15, 123:1, | 164:12 |
| 14:20, 19:1, | **appropriate** | 124:15, 131:2, | **association** |
| 31:16, 31:25, | 7:8, 7:9, | 131:14, 174:14, | 59:20, 59:23, |
| 33:19, 41:24, | 225:21 | 174:16, 181:9, | 60:3, 60:5, |
| 47:8, 57:18, | **approximately** | 185:17, 189:10, | 60:6, 60:24, |
| 58:2, 72:22, | 26:13, 27:2, | 190:10, 211:22, | 159:16 |

**assume**
8:22
**assuming**
38:12, 61:15,
129:10, 130:2,
144:18, 148:8,
173:20
**assumptions**
128:7
**ate**
108:20
**attachment**
110:18
**attention**
42:25, 48:21,
58:25, 91:6,
117:14, 117:22,
125:4, 126:11,
128:3, 136:14,
144:11, 144:17,
145:3, 159:12,
179:17, 182:16,
183:18, 199:1,
214:17, 216:2,
216:20, 221:16,
222:11
**attorney**
34:9, 37:23,
43:18, 43:21,
44:4, 44:13,
44:16, 44:22,
45:1, 45:6,
45:13, 108:4,
116:18, 116:21,
159:20, 178:9
**attorneys**
28:2, 28:5,
28:17, 28:24,
32:3, 32:7,
32:15, 32:19,
33:3, 33:24,
34:7, 34:13,
35:7, 36:3,
36:14, 37:19,
40:13, 40:23,
41:5, 41:19,
72:19, 153:5,
153:13, 156:19,

157:1, 157:4,
228:23, 229:9,
229:17, 230:4,
237:12
**audience**
146:15
**audio**
82:12, 106:17,
106:22, 106:23,
157:12, 218:22,
244:8, 245:4
**audit**
5:6
**audited**
142:11, 143:13,
143:17
**audits**
143:15, 146:19,
236:10
**authorized**
70:8, 71:18,
73:13, 73:16
**available**
94:20
**avid**
204:25
**awarded**
165:18
**aware**
33:19, 42:6,
43:9, 47:10,
75:7, 84:25,
87:22, 89:23,
90:3, 113:15,
116:25, 128:10,
128:13, 128:14,
133:1, 133:10,
136:23, 143:13,
148:6, 149:17,
154:19, 155:3,
155:17, 155:24,
156:9, 157:6,
158:14, 158:21,
159:3, 168:13,
169:8, 169:14,
169:18, 169:19,
209:9, 210:9,
210:14, 210:15,

212:18, 215:3,
215:7, 215:15,
237:2, 237:7
**awareness**
134:14, 134:21,
168:19
**away**
16:7, 16:8,
178:23, 187:20,
187:21

**B**

**baby**
203:10, 203:18,
204:6, 204:13,
204:19
**back**
19:3, 19:11,
49:25, 53:8,
57:16, 72:25,
73:4, 74:24,
78:5, 79:15,
82:9, 82:12,
84:13, 89:3,
90:15, 106:17,
106:22, 107:6,
107:8, 109:12,
119:14, 127:20,
132:6, 161:22,
180:15, 180:18,
216:1, 218:20,
218:22
**background**
188:17
**backup**
71:21, 74:19,
198:24
**bad**
14:6, 52:2
**ball**
102:6
**bank**
70:16, 70:17,
71:25, 73:25,
74:11, 74:13
**bankruptcy**
25:17
**basis**
19:19, 80:14,

129:2, 154:20,
179:11, 233:8
**bates**
199:3
**bathroom**
81:22
**bear**
22:17
**because**
8:5, 16:17,
29:18, 34:12,
36:2, 55:15,
68:21, 72:23,
73:24, 88:23,
95:12, 104:2,
104:6, 111:5,
130:16, 130:18,
133:21, 136:5,
146:1, 147:24,
154:15, 157:4,
170:17, 185:5,
186:4, 197:1,
200:22, 226:22,
227:21, 232:1
**become**
42:2
**bed**
68:18, 77:6,
108:22
**bedtime**
68:22
**been**
7:2, 7:17,
11:4, 11:24,
16:23, 22:23,
23:8, 25:14,
25:23, 31:22,
32:11, 33:2,
33:15, 37:15,
39:15, 39:20,
42:10, 48:14,
49:4, 49:8,
53:4, 54:13,
56:1, 56:14,
75:9, 75:20,
76:3, 77:24,
78:2, 78:7,
78:11, 78:17,

78:18, 78:25,
81:17, 82:3,
83:5, 83:16,
83:18, 84:3,
87:8, 88:13,
88:16, 90:3,
90:14, 90:20,
91:23, 97:2,
107:10, 108:2,
109:14, 116:8,
122:9, 125:19,
126:8, 126:17,
127:1, 127:7,
127:12, 128:10,
132:22, 138:16,
141:19, 141:24,
142:11, 148:3,
149:21, 154:13,
155:18, 155:20,
155:22, 156:5,
163:10, 164:20,
165:18, 165:20,
169:8, 169:22,
174:13, 176:17,
177:16, 189:8,
189:12, 190:6,
190:7, 194:13,
199:17, 205:14,
212:14, 225:13,
227:11, 228:1,
228:4, 231:8,
233:2, 235:25,
240:25, 241:10
**before**
2:9, 7:4, 7:15,
7:17, 8:9, 9:19,
9:21, 22:25,
24:24, 26:8,
27:25, 29:15,
42:11, 42:20,
42:22, 43:15,
44:5, 46:1,
47:6, 49:5,
49:8, 49:16,
49:17, 50:2,
55:18, 58:16,
64:17, 65:22,
68:18, 68:22,

70:5, 79:1,
86:22, 87:11,
91:17, 93:5,
93:15, 93:17,
96:3, 96:11,
102:15, 102:18,
103:4, 105:16,
114:22, 123:16,
128:10, 130:6,
132:10, 132:15,
134:23, 154:5,
154:9, 155:19,
155:25, 156:9,
158:8, 159:20,
160:4, 160:17,
161:3, 161:11,
164:21, 172:8,
183:2, 183:7,
183:13, 184:24,
187:2, 188:21,
197:21, 202:20,
213:1, 214:19,
214:25, 215:16,
240:17, 244:2
**begins**
6:2, 159:12
**behalf**
1:5, 3:2, 3:15,
6:18, 6:21,
225:7, 238:2
**behind**
124:12
**being**
35:11, 37:13,
39:17, 45:3,
48:24, 55:6,
63:9, 76:8,
78:15, 79:13,
79:17, 87:22,
89:14, 92:17,
92:18, 106:11,
106:19, 111:10,
113:12, 125:1,
131:1, 131:18,
131:20, 137:11,
138:7, 139:12,
140:10, 140:15,
140:16, 142:9,

142:18, 143:8,
143:17, 146:9,
154:4, 164:6,
174:14, 175:17,
175:23, 180:10,
181:13, 181:22,
182:8, 182:10,
182:11, 182:14,
207:14, 207:17,
210:13, 211:16,
217:4, 219:2,
219:25, 220:17,
221:14, 222:8,
231:22, 238:11,
238:19, 239:12,
240:6, 240:21,
241:3, 241:7,
241:11, 241:16
**believe**
9:4, 11:23,
13:6, 25:1,
26:7, 26:23,
28:1, 28:16,
39:23, 40:13,
41:10, 42:7,
42:16, 42:19,
43:1, 44:12,
47:21, 47:23,
48:12, 49:4,
54:18, 54:24,
55:1, 56:23,
61:22, 67:23,
69:15, 70:14,
70:19, 80:20,
80:24, 91:8,
93:4, 93:17,
96:21, 113:4,
114:23, 137:14,
146:19, 179:4,
179:5, 179:20,
186:4, 194:3,
194:15, 195:17,
197:8, 197:17,
201:17, 212:23,
217:9, 219:13,
221:3, 221:7,
221:20, 226:18,
228:25, 229:3,

229:11, 229:19,
237:17
**believes**
216:22
**belonged**
196:12
**below**
43:4, 168:3,
192:22
**bench**
168:15
**berkshire**
12:21, 14:11,
15:2, 16:5,
16:9, 16:13,
47:23, 48:7,
59:5, 62:8,
62:13
**best**
7:23, 8:17,
13:22, 88:25,
113:6, 127:16,
127:17, 127:23,
129:13, 129:15,
149:19, 218:5,
225:20, 244:10,
245:6
**bethel**
12:19, 13:25,
14:10, 59:4,
59:6, 185:6
**better**
170:12
**between**
51:4, 51:10,
57:9, 57:10,
58:3, 63:14,
170:23, 186:2,
221:22, 222:16,
228:17, 228:20
**big**
104:16, 114:7,
139:16
**bigger**
104:11, 104:19
**bike**
153:21
**bills**
73:18, 73:19,

73:20, 73:23
**binary**
119:16, 119:17,
119:23, 120:10
**birth**
11:18
**bit**
7:20, 15:12,
49:1, 51:16,
54:18, 63:7,
77:18, 98:9,
98:20, 160:4,
170:14, 201:19,
221:18
**black-and-white**
112:6, 112:7,
112:9
**blanket**
218:24, 221:13,
222:3, 222:6
**blue**
190:17, 239:9
**blurt**
29:18
**board**
70:2
**body**
180:2
**books**
20:1
**both**
51:22, 65:8,
73:23, 120:4,
185:6
**bottom**
110:13, 113:18,
159:13, 172:23,
181:3, 184:9,
194:17, 212:21
**bought**
64:10, 65:10,
65:12, 65:19,
66:16, 67:20,
68:5, 68:8,
90:19, 92:16,
106:19, 154:2,
162:23, 184:18,
212:19, 216:4,

216:9, 231:9,
233:19
**branch**
22:7
**brand**
91:16, 94:4,
188:24, 202:1,
216:5
**breadcrumbs**
180:4
**break**
9:17, 9:18,
9:19, 9:20,
9:22, 48:2,
49:19, 50:2,
81:22, 82:17,
96:3, 129:5,
134:3, 171:21,
177:3, 215:19,
215:22, 235:19
**breakfast**
18:7, 62:25
**breaks**
9:15
**brief**
177:3
**briefly**
50:1
**bring**
117:13, 117:20,
126:10
**bringing**
125:4, 128:2
**brings**
144:10, 145:2
**broken**
87:16, 88:17
**bronx**
199:18
**brooklyn**
23:22
**brookshire**
15:8
**brother**
20:21
**brought**
144:17
**brunswick**
3:12, 21:12

**bryson**
3:3, 6:18,
26:21, 27:17,
78:19, 95:18
**bugher**
1:25, 245:2,
245:13
**build**
18:23
**building**
18:14
**built**
17:25
**bunch**
64:15, 128:7
**burden**
137:4, 138:20,
138:25, 139:16,
139:17
**burdensome**
131:21
**business**
6:22, 74:22
**busy**
130:12
**buttermilk**
91:13, 151:11,
151:19
**buy**
64:16, 65:8,
66:9, 66:10,
66:13, 67:3,
85:6, 94:14,
94:18, 118:14,
131:23, 135:4,
135:7, 154:24
**buying**
64:3, 64:9,
66:4, 66:23,
67:5, 68:15,
77:5, 105:24,
105:25, 114:12,
195:1
**buys**
65:24

| C |
| --- |

**caesar**
193:13

**call**
14:17, 14:22,
45:8, 52:17,
52:24, 56:24,
71:16, 71:19,
73:10, 73:13,
87:8, 107:18,
108:7, 133:15,
135:8, 149:2,
159:11, 199:3
**called**
14:11, 42:16,
42:19, 59:19,
60:8, 61:1,
61:2, 168:20
**calling**
52:20
**calls**
51:24
**camera**
113:14
**camper**
68:23
**can't**
18:21, 28:11,
45:3, 56:19,
62:18, 75:23,
78:20, 80:5,
91:3, 95:1,
105:8, 109:1,
122:5, 128:22,
132:8, 142:4,
145:14, 148:9,
148:18, 150:17,
150:18, 175:4,
182:11, 183:23,
222:6, 233:20
**canal**
3:18
**cannot**
137:4, 138:8,
146:23, 149:18,
150:9, 150:16,
159:1, 163:21
**capability**
233:17
**capacities**
144:7, 221:12

capacity
44:22
car
16:11, 136:9,
170:7
card
17:2, 70:7,
70:12, 71:1,
71:17, 71:19,
71:20, 71:24,
72:7, 72:10,
72:12, 72:13,
72:25, 73:2,
73:3, 73:5,
73:13, 73:19,
74:3, 74:9,
74:12, 74:18,
74:19, 89:4,
89:5, 89:6,
94:23, 194:4,
195:11, 195:14,
195:15, 195:16,
196:2, 196:23,
196:25, 197:12,
197:17, 198:7,
198:15, 198:17,
198:22, 198:24,
198:25, 233:18
cards
70:10, 71:12,
71:15, 73:4,
194:5, 197:10,
197:19
care
127:22
careful
47:2, 48:14,
53:11, 58:14,
90:7, 160:7,
160:18
carmen
1:4, 11:11,
27:21, 69:12,
70:14, 71:21,
73:3, 73:11,
92:21, 173:20,
174:3, 174:5,
196:2, 198:18,

198:23, 203:8,
238:2
carmen's
70:7, 70:12,
71:12, 74:3,
89:5, 193:13,
208:15, 208:19
casas
2:10, 6:24,
244:2, 244:17
case
1:7, 6:6, 7:6,
25:21, 25:24,
46:1, 55:8,
57:12, 58:5,
74:20, 87:15,
93:17, 133:10,
155:3, 188:8,
225:23, 226:25,
227:5, 227:7,
240:18, 240:19,
242:12, 242:21,
244:13, 245:9
cases
152:24
cash
69:18, 94:24,
94:25, 95:2,
96:11, 104:12,
219:15, 220:8,
220:16, 221:4
casual
46:25, 48:13
cause
39:16
cdlt
245:13
cell
45:10, 45:12,
166:25, 173:17
cent
239:3
cents
126:6, 153:16,
154:9, 154:17,
154:18, 154:22,
155:5, 155:17,
156:15, 156:24,

157:8
certain
17:11, 17:12,
17:24, 44:8,
44:10, 57:11,
64:19, 66:17,
98:14, 159:1,
166:19, 175:4,
227:24, 228:15,
228:17, 231:6
certainly
80:7, 120:19,
155:4, 157:19
certificate
244:1, 245:1
certify
244:4, 245:2
challenge
235:2
challenges
235:7
chance
14:5, 112:4,
219:22
change
120:15, 168:16,
173:24, 218:9,
219:10, 221:17
changed
128:20, 132:1,
133:1, 137:19,
138:4, 212:24,
213:1
changes
73:11
characterization
119:18
characterizing
186:18
charge
125:18, 129:20,
139:15, 141:8,
141:16, 143:1,
154:12, 194:25,
239:25
charged
63:15, 74:8,
78:16, 79:17,

87:21, 92:18,
124:12, 131:20,
137:11, 138:7,
139:12, 140:10,
140:16, 151:17,
154:11, 163:10,
163:15, 163:21,
181:22, 182:8,
182:10, 182:15,
220:12, 220:17,
239:5, 239:12,
240:7
charges
133:9, 238:22
charging
81:7, 138:12,
154:7, 175:12,
181:15, 183:17,
220:14
chart
43:4, 110:14
check
17:1, 67:23,
72:12, 72:17,
75:1, 96:22,
113:13, 114:25,
139:22, 139:23,
163:9, 163:18,
164:7, 184:6,
216:22, 217:10,
218:12, 219:5,
242:15
checked
75:3, 75:14,
76:6, 96:23,
147:24
checking
75:12, 80:10,
97:12, 105:18,
122:22, 137:2,
137:10, 138:15,
154:5, 167:23
checkout
74:26, 75:5,
104:17, 105:10,
167:12, 219:16,
220:9, 220:17,
221:23, 222:17

children
11:9, 11:12,
11:16, 12:4,
12:11, 18:1,
18:17, 20:20,
64:22, 65:16,
65:17, 65:20,
66:4, 77:12,
91:24, 92:21,
108:22, 118:15
children's
11:20
choice
67:8
chose
64:18, 121:4,
155:22
churches
19:16
circumstances
80:12, 122:25,
189:5
citibank
70:17, 72:2,
72:3
city
185:8, 186:4
civic
59:20, 59:23,
60:3, 60:5,
60:6, 60:24
claim
25:9, 25:12
claiming
235:12
claims
159:16
clarify
20:10, 33:6,
38:2, 39:5,
48:10, 54:3,
187:25, 196:10,
208:6
clarity
40:25, 70:9,
157:20
class
6:17, 6:19,

31:2, 31:3,
125:24, 152:12,
156:8, 164:21,
165:4, 175:16,
175:25, 224:25,
225:4, 225:7,
225:9, 225:20,
226:15, 226:19,
228:7, 229:2,
229:18, 235:17,
236:18, 240:21,
241:8, 241:11,
241:16, 241:23,
242:2
classical
23:24
classification
227:18
clear
17:3, 38:25,
68:2, 104:19,
142:24, 154:15,
210:19
clearly
231:2
client
178:9
close
44:24, 45:3,
136:14, 176:16,
186:6, 186:7
closely
106:21, 218:21
closer
48:21, 49:10
closest
12:23, 13:3,
14:24, 62:7,
62:10, 135:6,
135:8, 135:18,
136:7
clover
201:25, 216:4
club
59:22, 60:9,
60:11, 60:14,
60:16, 61:1,
61:2

clubs
19:16
code
12:22, 13:3
coffee
66:12
coincidence
156:4
coleman
3:4
colleague
51:2
collect
197:4
collected
197:9
color
112:8
combined
158:3
come
73:21, 74:10,
107:8, 123:25,
124:12, 132:6,
182:3, 200:21,
200:22, 242:23
comes
105:24
coming
156:3
comment
193:15
commit
242:6, 242:11
committed
240:21
communicate
46:20, 51:23,
52:7, 52:14,
52:15
communicated
43:17, 44:15,
44:25, 45:5,
54:19, 169:4
communication
46:21, 107:20
communications
51:8, 53:12,

159:15
community
59:17
commute
24:15, 24:16
company
72:1
compare
76:12, 77:10,
81:15, 90:11,
102:25, 138:21
compared
76:1, 76:23,
78:8, 81:14,
97:5, 132:23
comparing
77:4, 83:20
comparison
140:24, 184:25,
185:3, 185:4,
185:13, 185:21,
185:24, 186:2,
186:8, 186:11,
186:14, 186:18,
186:20, 188:20,
188:23, 189:2
comparison-shopp-
ing
209:1, 211:16
compensated
229:5, 229:14,
229:20
compensates
39:14, 39:20
compensation
25:9, 32:6,
33:14, 38:4,
229:9, 229:18,
230:2, 230:5,
241:22
complaint
4:10, 30:21,
42:19, 68:2,
80:15, 110:11,
142:24, 146:14,
147:14, 152:11,
153:10, 153:24,
156:7, 159:19,

167:13, 214:21, 222:18

**complete**
80:22

**completely**
10:5, 123:17, 174:2

**comply**
234:14

**complying**
41:23

**compound**
239:14

**comprise**
129:2

**computation**
165:11

**computer**
27:21, 27:22, 27:24, 132:7

**computers**
27:23

**concern**
138:2

**condition**
9:25

**conditions**
17:13

**confidentiality**
7:8

**confirm**
174:3

**confuse**
18:3

**confusing**
16:22, 16:25

**consciously**
119:25

**consequence**
39:7, 39:15

**consequences**
38:14, 38:21, 39:12, 39:13, 39:21

**consider**
223:25

**considered**
73:15

**considering**
56:1

**consistent**
68:10, 99:19, 100:12, 100:23, 101:8, 101:21, 113:20, 168:17, 182:20, 184:12, 191:12, 193:5

**consistently**
138:10

**constantly**
219:21, 219:22, 219:24

**constitute**
154:20

**constraints**
85:25

**consult**
72:19, 155:8

**consulted**
43:21

**consumer**
102:3, 126:2, 139:5, 139:16, 163:23, 164:2, 217:10, 218:12, 218:24, 220:3, 221:21, 239:23, 240:3

**consumers**
123:25, 124:11, 125:1, 125:10, 138:10, 143:20, 218:17, 219:1, 219:4, 219:14, 219:23, 220:5, 220:7, 220:15, 220:24, 221:3, 221:13, 222:3, 222:4, 222:7, 229:11, 229:19, 239:22, 240:12

**contact**
46:10, 56:23, 116:20, 123:11, 161:7, 161:9

**contacted**
25:23, 44:15,

84:10, 107:21, 107:23, 108:3, 108:6, 116:18, 159:21, 161:13

**contacting**
161:1

**contending**
152:8

**content**
30:12, 173:1, 173:13

**contention**
130:3, 152:4

**continually**
128:16

**continue**
136:3, 136:14, 152:13, 242:11

**continued**
5:2, 107:17, 134:24, 135:2, 135:14

**continuously**
24:5

**control**
123:17

**convenience**
135:15, 135:24

**conversation**
46:5, 47:4, 47:9, 47:19, 48:13, 50:1, 50:16, 51:5, 51:11, 53:9, 54:14, 57:1, 57:3, 57:5, 86:7, 109:6, 109:17, 116:14, 160:5, 181:23, 204:18, 205:2, 206:21, 209:5, 222:22, 223:15

**conversations**
29:11, 29:14, 29:16, 161:4, 206:16, 206:21, 223:11, 223:17

**convicted**
25:14

**cool**
191:21, 191:23

**core**
31:19, 87:6

**corner**
77:15, 82:1

**correct**
21:15, 23:22, 24:1, 25:3, 26:24, 28:17, 44:20, 50:24, 54:25, 67:20, 68:6, 78:4, 78:16, 80:2, 83:2, 89:15, 89:20, 91:10, 91:14, 91:17, 94:3, 98:21, 101:14, 107:11, 110:14, 110:21, 115:20, 115:21, 116:4, 125:15, 133:3, 134:25, 139:6, 145:23, 148:8, 149:14, 151:11, 153:14, 162:20, 164:18, 164:19, 171:6, 172:19, 178:25, 179:21, 181:16, 187:7, 189:25, 190:4, 202:23, 212:22, 222:14, 222:20, 222:23, 223:1, 230:15, 236:19

**corrected**
131:24, 134:1

**correcting**
131:5

**correctly**
149:19, 150:18, 151:23, 163:10, 163:15, 163:21, 210:6

**cost**
185:9, 185:17, 186:16

costco
171:15
costcos
171:16
could
8:10, 10:16,
10:17, 17:1,
30:15, 32:22,
39:11, 40:5,
40:13, 40:20,
41:18, 48:1,
49:8, 64:15,
66:15, 72:22,
76:23, 76:25,
89:24, 98:4,
106:12, 119:21,
120:3, 120:4,
120:7, 124:25,
127:11, 127:16,
127:18, 127:23,
128:8, 133:14,
136:20, 138:5,
138:13, 138:14,
141:24, 143:21,
149:21, 183:15,
185:19, 189:4,
189:8, 200:14,
206:7, 212:18,
213:19, 228:6,
228:11, 230:2,
234:2, 242:3
couldn't
128:1, 232:10,
232:12, 232:20
counsel
6:13, 6:16,
7:10, 9:18,
29:16, 34:22,
54:15, 54:24,
107:17, 111:3,
119:12, 119:20,
121:18, 121:21,
123:11, 178:11,
190:2, 225:22,
234:7, 238:1,
241:1, 241:5,
244:11, 245:7
counselor
21:1

country
59:22, 60:9,
60:11, 60:14,
60:16, 61:1,
61:2
couple
23:20, 48:5,
182:19
coupon
166:15
coupons
166:10
course
38:11, 144:4
court
1:1, 6:5, 6:23,
8:6, 12:25,
25:6, 42:17,
42:23, 49:21,
58:20, 58:24,
60:25, 61:5,
61:7, 82:11,
97:21, 111:21,
121:21, 121:25,
177:13, 193:20,
203:24, 241:4,
244:1
cousin
177:1
cousin's
193:13
covers
156:8
cream
180:5
credit
17:1, 70:7,
70:10, 70:12,
71:12, 71:15,
72:7, 72:12,
73:19, 74:3,
74:8, 74:19,
89:3, 89:5,
89:6, 94:23,
194:4, 194:5,
195:11, 195:14,
195:15, 195:16,
196:23, 196:25,

197:10, 197:12,
197:17, 197:19,
198:6, 198:15,
198:17, 233:18
crossing
13:23
crosstalk
152:3
curious
29:13
current
10:22, 223:11,
223:17
currently
10:4, 11:24,
41:3, 203:2
customer
86:21, 87:3,
87:4, 106:10,
106:18, 107:1,
130:21, 228:9
customers
31:15, 31:20,
33:17, 47:3,
69:24, 81:10,
87:14, 124:7,
133:9, 138:12,
163:9, 227:16,
229:3
cv
4:9, 6:6

**D**

dad
107:24
dairy
114:7
damages
33:5, 33:7,
165:18, 235:12
daniel
20:23
daniela
176:25
dann
3:10, 6:15,
50:25, 159:21,
224:13, 224:15,

224:18
dash
230:11
data
182:17
date
6:7, 11:18,
45:4, 47:6,
92:20, 93:13,
104:23, 111:13,
173:3, 174:25,
180:11, 180:16,
180:17, 186:25,
206:15
dated
174:8, 176:11,
190:15, 208:4
dates
121:2
daughter
68:17, 68:21,
69:2, 114:6
day
15:25, 43:23,
66:23, 67:20,
68:5, 69:9,
81:17, 90:5,
92:11, 95:15,
97:8, 111:13,
116:11, 116:12,
126:3, 162:15,
199:8, 199:9,
199:12, 231:5,
231:10
days
15:24, 49:16,
81:17, 126:4,
167:4
december
11:19, 13:9,
110:12, 110:14,
110:16, 110:19,
111:1, 111:8,
112:23, 113:22,
115:1, 115:5,
115:15, 116:7,
116:16, 116:18,
116:25, 117:11,

117:12, 117:18,
117:19, 119:2,
128:10, 132:11,
132:15, 134:24,
136:18, 137:7,
146:7, 146:15,
161:23, 162:22,
174:24, 175:7,
179:2, 179:10,
179:23, 180:11,
182:24, 189:15,
189:17, 194:19,
194:24, 196:5,
212:17, 213:2
**decide**
170:24
**decided**
49:1, 77:16,
79:15, 87:16,
119:15, 119:20
**deciding**
170:23
**decision**
119:12, 119:13
**decisions**
91:4, 127:23
**defendant**
1:11, 3:15,
6:22, 7:10,
158:4, 165:21
**defendant's**
141:7, 141:11,
142:25, 143:4
**defer**
32:3, 32:7,
32:15, 32:19,
33:2, 33:24,
34:6, 37:19,
37:23, 40:12,
40:22, 156:19,
156:25, 229:8,
229:17
**deferring**
34:9, 157:4
**define**
37:8, 46:19,
52:1, 52:4,
57:19, 59:12,

186:14, 217:14,
217:18
**defined**
135:25
**definitely**
29:11, 49:9,
116:20, 231:23,
241:21, 242:14
**definition**
157:17, 218:7,
225:9
**definitively**
16:17, 148:9
**degree**
139:8
**demand**
239:24
**denied**
212:21
**department**
146:20
**depends**
15:13, 51:21,
52:9, 145:7
**depicted**
76:20, 115:17,
202:10
**depos**
6:10, 6:24
**deposition**
1:13, 2:1, 6:3,
6:11, 7:7, 7:16,
7:17, 23:6,
25:2, 26:2,
242:21, 242:25
**describe**
31:10, 168:4
**described**
167:13
**description**
4:7, 5:3, 31:17
**designations**
7:9
**desire**
34:16, 181:24
**details**
80:7, 92:8,
200:11

**detective**
239:24
**determination**
125:11
**determine**
50:13, 155:8,
155:9, 222:25,
228:11, 230:18,
231:19, 231:20
**determined**
117:6
**differ**
213:16, 221:9
**difference**
35:10, 90:25,
91:2, 133:16,
133:22, 133:25,
185:11, 221:22
**differences**
222:16
**different**
8:7, 9:8, 18:3,
36:21, 51:16,
65:10, 99:9,
112:7, 116:12,
144:7, 144:15,
145:12, 160:5,
171:19, 184:1,
185:9, 195:15,
196:12, 197:17,
198:15, 213:5,
219:4, 219:5,
221:10, 221:12
**differently**
8:25, 91:4
**difficult**
8:6, 147:3
**digging**
44:10
**digital**
244:8, 245:3
**digits**
73:7, 113:8,
113:12
**dime**
133:22
**dinner**
108:20

**direct**
91:6, 153:23,
179:16, 216:20
**directions**
14:6
**directly**
192:22
**disability**
25:12
**disagree**
145:9, 231:1
**disclosed**
178:11
**discount**
166:15, 168:6
**discover**
231:12
**discovered**
86:4, 89:17,
108:2, 108:10,
108:14, 109:14,
116:8, 116:15,
117:6, 118:3,
118:5, 128:25,
175:23
**discovery**
242:22
**discrepancies**
43:22, 44:5,
44:14, 44:17,
45:7, 47:13,
63:14, 118:24,
134:11, 134:17,
137:17, 149:20,
159:7, 159:17,
209:10, 215:4,
215:8, 234:10,
237:10
**discrepancy**
46:4, 46:13,
81:19, 82:14,
87:20, 89:24,
117:2, 150:2,
150:14, 158:14,
167:19, 169:1,
169:5, 169:9,
169:20, 230:19
**discuss**
34:13, 230:4,

discussed
30:12, 30:17,
30:21, 53:14,
134:23, 157:9,
169:11, 174:23,
182:7, 194:24,
235:10, 235:13
discussing
169:22
discussion
50:7, 50:10,
159:5, 178:18,
182:5, 222:21
discussions
34:22
display
75:15, 101:18,
220:16
displayed
219:15, 220:8
displays
102:10, 106:4
dispose
162:12
disqualifies
126:20
distinction
186:1
district
1:1, 1:2, 6:5,
6:6
diving
29:6
document
22:25, 23:5,
23:9, 29:13,
30:18, 31:3,
42:11, 42:20,
117:7, 138:6,
154:10, 155:20,
155:23, 163:20,
177:17, 178:12,
178:15, 194:2,
199:21, 200:15,
202:20, 228:22,
237:8
documented
57:24, 90:13,

201:11, 231:2
documenting
154:6, 156:11,
175:21, 209:1,
227:23, 228:2,
228:9
documents
26:3, 28:17,
28:23, 29:15,
29:22, 29:23,
29:25, 30:9,
30:11, 30:13,
30:15, 30:20,
31:7, 42:8,
72:9, 112:10,
112:17, 196:11,
197:2, 236:6
dog
192:17, 192:19
doing
6:21, 85:8,
118:19, 118:22,
119:25, 120:1,
120:17, 121:2,
121:16, 130:12,
139:3, 139:13,
139:14, 141:24,
142:6, 143:20,
166:20, 217:25
dolgen
1:9, 1:10,
3:15, 6:4, 6:21,
7:11, 158:4
done
39:16, 48:2,
57:18, 90:22,
120:4, 120:7,
127:10, 128:8,
129:6, 132:7,
146:19, 166:18,
176:3, 186:11,
214:3, 217:6,
217:8, 224:24,
235:20, 237:17
door
79:24
double
72:16

doubt
179:7, 193:6,
193:7
down
8:6, 18:16,
33:22, 34:2,
34:10, 34:16,
34:24, 35:17,
36:25, 122:6,
136:8, 170:11,
170:16, 176:1
drink
68:18, 91:25
drinking
65:9, 82:3
drive
13:10, 19:6,
19:8, 24:21,
62:1, 135:20
driving
13:14, 16:10,
24:20
drove
19:3
duly
7:2
during
27:17, 28:10,
76:5, 108:10,
109:5, 109:15,
117:21, 219:16,
220:8, 220:17
duties
225:25, 226:5

**E**

e2
116:1
each
8:5, 124:9,
152:24, 154:2,
161:24, 162:20,
218:23
earlier
25:1, 39:24,
85:12, 90:8,
160:4, 160:6,
170:14, 186:4,

212:23, 219:16,
222:21
easier
7:21, 8:11,
95:13
east
3:5, 3:18,
10:24, 12:8,
13:11, 24:12,
171:6
easy
153:20, 231:21,
231:24, 233:7,
233:9
eat
62:25, 91:25
edu
172:23
effect
39:16
effort
222:6
eggo
91:13, 91:21,
91:25, 94:14,
151:11, 151:19
eggs
184:18, 184:22,
186:15, 187:6,
187:11, 188:10,
188:12, 188:14,
188:15, 189:23
eight
150:13
eighth
179:17
either
53:14, 60:18,
110:3, 119:24,
123:15, 175:5,
197:14, 199:10,
200:8, 200:22,
206:25, 213:4,
237:11
elected
19:12
electronically
236:20

**elmhurst**
10:24, 12:9,
12:10, 13:11,
24:12, 171:6
**elmstead**
12:8
**else**
12:7, 18:14,
19:1, 26:19,
27:11, 27:16,
28:13, 31:16,
33:19, 41:24,
47:8, 50:8,
50:11, 53:23,
61:6, 65:16,
108:21, 109:2,
109:25, 120:1,
125:19, 128:21,
156:13, 159:6,
221:14, 222:8,
223:7, 230:18,
231:4, 232:4
**email**
53:1, 174:18,
177:20, 178:24
**emails**
51:24, 53:4
**employed**
244:12, 245:8
**employee**
75:11, 78:4,
80:1, 85:2,
85:10, 85:13,
85:20, 96:24,
105:10, 105:17,
114:25, 117:14,
117:23, 128:19,
130:10, 130:22,
131:2, 131:3,
131:5, 131:14,
133:13, 222:22,
223:4, 223:12,
223:17
**employees**
80:9, 86:7,
118:12, 122:22,
130:11
**encompassed**
159:18

**encountered**
46:5
**end**
234:2, 237:22,
237:23
**ending**
198:5
**ends**
71:1
**energy**
157:19, 222:6
**engage**
19:19
**enough**
18:23, 143:11
**enrique**
2:9, 244:2,
244:17
**ensure**
120:21, 127:24,
133:8, 138:11,
182:10, 216:24,
217:11, 218:14,
219:6, 219:16,
221:5
**ensured**
128:1
**entire**
20:14, 219:20
**entitled**
158:3
**entity**
159:16
**equating**
144:14
**equivalent**
123:22, 236:9
**especially**
181:12, 204:23,
239:5
**esquire**
3:3, 3:9, 3:16
**et**
3:2, 6:4
**even**
9:1, 95:19,
119:21, 120:2,
126:10, 127:2,

128:10, 154:9
**evening**
16:2, 16:3,
19:3, 81:11,
83:24
**evenings**
53:7
**events**
150:15, 160:23
**ever**
7:17, 21:22,
22:24, 24:23,
25:5, 25:8,
25:11, 25:14,
25:17, 45:19,
46:12, 50:21,
53:23, 79:1,
79:6, 84:15,
86:9, 86:21,
87:22, 94:23,
94:25, 102:18,
102:20, 103:3,
104:10, 117:13,
117:20, 130:20,
134:10, 139:13,
143:25, 155:2,
158:19, 158:23,
159:5, 164:20,
165:20, 165:23,
166:3, 166:7,
166:10, 166:18,
170:3, 184:18,
186:10, 187:20,
192:8, 192:19,
201:8, 201:22,
202:8, 211:17,
213:20, 223:10,
223:16, 228:11
**every**
52:22, 62:5,
62:13, 62:15,
130:8, 137:3,
137:5, 138:21,
139:7, 144:22,
145:21, 147:8,
147:18, 147:25,
148:3, 148:16,
148:19, 149:10,

152:4, 152:8,
163:23, 164:2,
168:4, 219:24,
220:3, 221:8,
221:9, 235:1,
239:22, 240:10,
240:11
**everyone**
8:11, 51:16,
125:18, 126:17,
127:25, 128:21
**everything**
50:17, 71:18,
123:2, 154:12,
196:13, 208:6,
216:17, 220:4
**evidence**
152:25, 232:1
**exact**
20:25, 45:4,
94:4, 102:22,
103:2, 116:13,
122:24, 228:24,
229:1
**exactly**
18:21, 39:9,
47:5, 49:7,
56:20, 64:8,
68:20, 75:17,
81:16, 83:4,
83:8, 100:20,
101:10, 126:24,
132:2, 189:20,
190:12, 191:14
**examination**
4:3, 7:10,
238:1
**examined**
7:3
**example**
65:25, 231:3,
232:4, 232:5
**exchange**
214:5
**excuse**
9:20, 27:22,
87:12, 142:1,
193:25

| | | | |
|---|---|---|---|
| **exhibits** | **facing** | 51:10, 52:8, | 190:1, 194:16, |
| 7:7, 22:17 | 102:2, 105:13 | 53:15, 164:21, | 232:9 |
| **expect** | **fact** | 200:23 | **fifth** |
| 226:24, 227:1, | 56:14, 156:7, | **fat** | 176:19 |
| 227:2, 227:4 | 186:5, 215:7, | 116:2 | **figure** |
| **expectation** | 239:11 | **father** | 32:16, 131:17, |
| 32:5, 117:8, | **factors** | 21:9, 22:10, | 196:22, 197:1, |
| 145:21, 146:8 | 133:19, 170:22, | 45:16, 45:19, | 200:17, 230:10, |
| **expend** | 171:2 | 46:25, 47:9, | 231:21, 231:25, |
| 157:18 | **factual** | 50:3, 50:11, | 233:7, 233:9, |
| **expense** | 222:12 | 50:22, 51:6, | 233:18 |
| 124:7 | **fair** | 51:9, 51:17, | **figured** |
| **expenses** | 8:23, 9:3, | 52:8, 55:2, | 131:17 |
| 156:22, 157:5, | 33:14, 38:3, | 55:13, 160:7, | **file** |
| 157:14, 157:16, | 48:16, 117:2, | 160:17, 224:13 | 55:17, 56:17, |
| 157:17 | 138:12, 239:25, | **father's** | 119:15, 190:2, |
| **experience** | 241:22 | 21:13 | 200:25, 210:20 |
| 55:4, 57:25, | **fairly** | **fault** | **filed** |
| 117:21, 141:17, | 39:14, 45:3, | 221:14, 222:8 | 25:8, 25:11, |
| 141:18, 155:16, | 203:5, 227:24, | **fee** | 25:17, 38:9, |
| 169:16, 214:12, | 231:6 | 61:16 | 42:23, 128:11, |
| 228:10, 228:12 | **familiar** | **feel** | 135:11, 156:9, |
| **experienced** | 98:7, 150:24, | 34:12, 37:22, | 169:14, 175:15, |
| 88:23, 118:25, | 158:5, 191:4, | 39:3, 75:24, | 225:7 |
| 134:11, 137:17, | 205:20, 242:7 | 88:15, 126:24, | **files** |
| 148:7, 158:13, | **family** | 127:6, 127:9, | 182:17 |
| 169:5, 169:20, | 15:18, 15:22, | 144:14, 148:21, | **filing** |
| 224:7, 230:11, | 22:16, 51:17, | 229:24, 229:25, | 47:16, 56:1, |
| 230:19 | 52:23, 64:22, | 230:2, 232:24, | 128:16, 222:14 |
| **experiences** | 85:7, 91:24, | 234:8, 239:16, | **filling** |
| 38:15, 38:22, | 135:5, 158:16, | 239:20, 242:19 | 165:16 |
| 58:6 | 158:17, 158:20, | **feeling** | **financial** |
| **expiration** | 158:24, 159:7, | 77:19, 139:10 | 71:25, 157:14, |
| 186:24 | 176:21, 199:15, | **feelings** | 244:14, 245:10 |
| **explain** | 199:17 | 88:23 | **find** |
| 38:8 | **fantastic** | **feels** | 57:22, 111:16, |
| **explore** | 7:24 | 29:6, 147:20, | 120:18 |
| 77:18 | **far** | 220:1, 220:2, | **finding** |
| **extent** | 13:10, 16:7, | 231:17, 231:18 | 228:2 |
| 110:7, 168:10 | 16:8, 22:6, | **felony** | **fine** |
| **extra** | 24:11, 24:14, | 25:15 | 14:9, 23:7, |
| 120:20, 133:8 | 24:15, 58:1, | **felt** | 40:18, 41:5, |
| | 63:4, 75:7, | 87:15, 123:6, | 54:10, 177:4, |
| **F** | 148:6, 165:15, | 131:21 | 178:19, 215:20 |
| **facebook** | 179:6, 204:16, | **few** | **finish** |
| 164:15, 165:3, | 210:2, 210:4, | 7:19, 29:2, | 8:8, 142:13 |
| 165:4, 165:17 | 227:9 | 49:5, 135:21, | **firm** |
| **facetime** | **fashion** | 141:22, 158:10, | 6:16, 50:25, |
| 53:6 | 37:15, 46:15, | | |

159:21, 224:13,
224:15, 224:18
**first**
7:13, 7:16,
7:24, 35:7,
42:4, 42:6,
43:8, 43:20,
44:13, 44:15,
44:21, 45:7,
46:6, 46:7,
63:8, 63:13,
63:16, 70:23,
79:6, 98:15,
100:11, 112:13,
132:25, 158:5,
160:20, 160:25,
167:9, 168:8,
172:22, 175:2,
195:13, 196:1,
197:16, 198:14,
199:2, 214:9
**five**
25:18, 215:19
**fixed**
126:8, 127:12
**flag**
29:17
**flip**
98:4, 167:9,
182:17
**flyer**
4:19
**foia**
236:8
**folders**
196:13
**folks**
126:21, 219:3,
228:1, 228:4,
228:18, 228:19,
231:19, 231:20,
241:23, 242:2
**follow**
13:21, 198:13,
219:1, 221:14
**follow-up**
242:3
**following**
222:9

**follows**
7:3
**food**
77:11, 136:1,
136:6, 203:10,
203:18, 204:6,
204:13, 204:20
**force**
172:17
**foregoing**
244:3, 244:5,
245:4
**forest**
14:19
**forests**
14:21
**forever**
139:4, 139:7
**forgive**
35:3
**former**
223:11, 223:17
**forms**
80:14
**forth**
73:4
**forums**
164:13
**forward**
227:2, 227:3,
240:18, 242:8,
242:12
**forwarding**
204:25
**found**
200:8
**four**
11:15, 71:11,
73:6, 73:7,
113:8, 113:12
**four-year-old**
69:3, 69:7,
69:8
**fourth**
9:14, 102:4,
176:9
**frame**
108:18

**framing**
119:16, 124:19
**free**
65:8, 90:20,
94:15, 126:4,
201:12, 201:14,
216:5, 216:10,
229:25, 242:19
**frequent**
16:18, 46:24,
118:7
**frequently**
16:15, 18:2,
52:19, 62:17,
62:20, 130:10,
137:1, 138:19
**friend's**
217:11
**friends**
224:17
**front**
42:8, 150:16
**full**
10:17
**fully**
10:1, 244:5
**fundamental**
234:23
**funny**
77:19, 140:21,
193:14
**further**
168:9, 193:15,
229:25, 237:24,
242:16, 242:18
**future**
133:11, 138:23,
234:10, 241:25

**G**

**gain**
31:24
**gas**
62:9
**geared**
186:8
**general's**
126:11, 128:3,

128:14, 128:21,
141:15, 142:9,
142:19, 143:7,
143:9, 148:1,
178:11, 239:17
**generally**
48:23, 51:19,
53:3, 53:4,
55:5, 62:24,
79:10, 87:12,
118:15, 144:24,
155:25, 163:3,
166:17, 185:15,
185:21, 217:3,
217:5, 235:7,
242:7
**generals**
63:2
**gentlemen**
17:22
**gerber**
204:16
**getting**
30:12, 95:4,
135:18, 138:1,
138:2, 161:19,
189:7, 214:10
**give**
17:8, 35:25,
52:17, 52:23,
56:4, 68:21,
111:24, 123:24,
133:3, 146:1,
150:25, 195:2,
195:19, 195:21,
212:6
**given**
76:15, 145:19,
156:1, 166:7
**gives**
164:14
**glucose**
95:21
**go**
7:19, 13:19,
15:1, 15:7,
15:11, 15:17,
15:18, 19:11,

23:20, 27:25,
29:5, 39:9,
48:11, 49:25,
52:9, 53:8,
57:15, 60:19,
61:24, 63:5,
67:2, 69:10,
74:24, 77:6,
77:13, 78:5,
79:15, 81:2,
82:16, 84:13,
85:5, 86:7,
87:18, 90:15,
91:7, 95:12,
95:13, 95:20,
98:20, 100:10,
109:12, 118:14,
123:2, 127:20,
131:19, 132:5,
134:5, 135:3,
135:13, 136:7,
137:23, 138:3,
139:1, 142:19,
149:18, 153:17,
158:10, 161:22,
163:19, 166:13,
167:6, 170:3,
170:5, 170:14,
170:17, 170:21,
172:15, 176:1,
178:17, 181:1,
185:14, 190:13,
194:3, 194:16,
198:3, 211:13,
211:16, 215:22,
237:24, 239:6,
240:19, 243:1

**goes**
14:1, 68:18,
156:8, 159:13,
169:25, 170:2

**going**
7:21, 8:8,
8:21, 29:18,
36:11, 39:4,
41:2, 47:1,
50:12, 52:2,
68:14, 69:17,

72:25, 81:25,
85:7, 85:23,
86:7, 87:2,
87:4, 89:3,
90:4, 92:10,
94:7, 96:11,
97:19, 98:4,
98:19, 101:3,
102:9, 107:6,
117:8, 118:17,
119:14, 120:13,
121:6, 123:3,
123:20, 135:13,
137:25, 150:19,
152:10, 158:10,
170:17, 171:19,
190:22, 195:12,
199:2, 201:3,
202:4, 212:12,
216:1, 216:18,
219:10, 221:9,
221:17

**golf**
60:23

**gone**
86:21, 94:22,
105:15, 131:15,
237:4

**good**
7:13, 7:14,
18:19, 18:22,
20:2, 96:2,
130:19, 167:4,
217:15, 217:24,
218:12, 218:17,
219:13, 221:21,
222:2, 222:4,
227:10

**google**
166:5

**gotten**
65:22, 66:15,
165:1, 214:6

**governmental**
236:9

**governs**
7:6

**gps**
13:21, 14:8

**grabbing**
69:17, 96:9

**grandma**
53:6

**grandpa**
53:7

**great**
213:17

**greeted**
90:5

**groceries**
62:24, 85:6,
118:15, 137:24,
171:9, 185:6,
223:24, 239:12

**grocery**
171:12, 239:7,
240:12

**grossman**
3:4

**grouped**
196:13

**groups**
164:13

**guess**
8:24, 13:24,
14:24, 15:4,
18:24, 22:5,
22:8, 28:21,
37:21, 40:15,
43:25, 44:2,
47:5, 52:1,
52:6, 61:8,
64:16, 70:9,
75:22, 76:8,
87:5, 87:6,
90:12, 96:8,
96:16, 98:8,
98:14, 102:21,
108:17, 112:13,
118:5, 118:17,
122:16, 122:19,
125:9, 127:20,
129:17, 129:25,
132:17, 145:19,
148:20, 152:21,
153:1, 153:25,
155:9, 156:3,

156:5, 168:18,
185:6, 185:10,
186:13, 201:13,
204:25, 207:20,
213:6, 213:7,
221:2, 227:21,
228:22, 233:4,
233:12, 234:23,
235:6

**guidance**
21:1

**guideline**
7:24

**guidelines**
7:19

**gw**
13:23

---
**H**
---

**habit**
64:18, 65:22

**hairs**
35:9

**half**
114:8, 115:21,
184:9

**half-and**
115:20

**half-and-half**
113:25, 116:2,
180:13

**handed**
22:23, 112:2,
235:25

**handing**
23:8, 42:9,
98:2, 150:23,
158:2, 184:4,
191:3, 192:21,
193:25, 195:10,
200:1, 202:19,
204:3, 205:13,
207:23, 212:4,
236:12

**handles**
164:15

**handwritten**
192:5, 192:8

**happen**
16:13, 84:12,
119:22, 123:20,
144:3, 200:10,
228:18
**happened**
79:18, 80:6,
80:13, 122:5,
160:14, 160:16,
227:22
**happens**
78:14, 143:11,
143:12
**happy**
37:12, 37:13,
68:23, 84:6,
85:11, 207:14,
215:10, 227:14
**hard**
16:10, 62:18,
66:18, 71:22,
88:22, 90:11,
90:23, 100:21,
102:25, 106:1,
106:24, 118:20,
123:5, 129:12,
153:1, 187:4,
190:19, 191:14,
196:14, 218:24,
224:3
**harold**
3:23, 6:9
**hat**
225:18
**head**
31:8, 79:12,
81:2, 84:23,
111:14, 139:24,
139:25, 145:14,
150:8, 182:12
**heads**
8:1, 9:1
**health**
204:23
**hear**
61:11, 106:24
**heard**
61:2, 168:22

**hearing**
25:6
**heavy**
180:4
**heck**
146:9
**held**
2:1
**help**
50:15, 200:14,
227:14, 234:18
**helpful**
83:10, 111:15
**helping**
33:15, 68:16
**helps**
98:12
**helwn-diy**
102:6
**henrique**
6:24
**her's**
194:6
**here**
6:2, 7:20,
17:4, 23:21,
26:17, 34:15,
34:21, 35:10,
35:15, 36:4,
36:13, 39:1,
39:18, 40:20,
40:25, 41:18,
49:19, 74:4,
87:16, 91:9,
110:14, 111:17,
114:15, 114:17,
122:4, 139:22,
142:6, 144:15,
146:2, 152:25,
153:11, 153:25,
155:4, 156:21,
157:6, 157:15,
157:20, 171:6,
174:23, 187:6,
188:11, 188:25,
189:6, 196:9,
196:17, 197:2,
201:18, 204:15,

216:8, 217:25,
221:2, 225:9,
227:12, 234:11,
235:10, 235:13,
237:5, 241:12,
241:16
**here's**
35:22, 132:17
**hereby**
244:4, 245:2
**hey**
120:14, 186:15,
188:23, 211:17
**high**
21:2, 21:3,
223:25
**higher**
141:8, 141:16,
143:1, 221:24,
238:23
**highway**
3:11, 14:2,
14:3, 61:25
**hill**
18:16
**hindsight**
128:23, 129:22
**history**
20:1, 23:25
**hobbies**
19:23, 20:3
**hold**
19:12
**home**
10:23, 14:18,
19:3, 19:6,
19:9, 59:4,
76:1, 76:13,
77:8, 77:11,
80:8, 81:14,
97:9, 138:2,
162:15, 166:24,
167:1, 167:2,
170:6, 170:12,
211:16
**honest**
55:6, 69:23,
217:5, 239:25

**honestly**
18:6, 95:11
**honey**
188:24
**honor**
23:24, 168:11,
168:14, 168:23
**hope**
31:24, 39:24,
41:11, 96:1
**hoped**
32:9
**hopefully**
33:15
**horrified**
85:11
**horrifying**
55:9
**horseradish**
180:4
**hour**
27:3, 27:9,
28:6, 135:22,
136:9
**hours**
13:12, 227:10,
240:18
**house**
47:24, 59:9
**household**
65:9, 65:24,
66:9
**however**
154:23, 154:25
**hta**
160:2
**huge**
138:19, 138:25,
139:8
**hungry**
95:5, 95:17,
95:19
**hunter**
3:3, 6:18,
26:11, 27:10,
28:11, 95:7
**hurry**
79:9

hypothesize
85:15, 85:17
hypothetical
88:8, 88:9,
88:21, 216:16
hypotheticals
88:7

**I**

ib
23:25
icing
55:6
idea
54:4, 78:11,
93:22, 173:9,
213:18, 217:15,
217:24, 218:4,
218:12, 218:17,
219:13, 221:21,
222:2, 222:4
ideas
40:19, 41:3,
41:17
identification
23:2, 23:11,
42:13, 97:25,
111:23, 150:22,
158:1, 172:4,
177:15, 184:3,
191:2, 192:16,
193:24, 195:9,
199:25, 202:18,
204:2, 205:16,
207:22, 212:3,
236:2, 236:15
identified
214:20, 222:18
identify
6:13, 30:15,
159:14, 238:6,
238:11
images
98:22, 184:12
imagine
131:15
immediate
62:23, 84:19

immediately
80:22
implement
234:9
implying
188:1
important
80:17, 238:17,
238:24, 239:2,
239:10
ims
52:18
inaccurate
93:24
inches
18:20, 18:22
incidences
37:11
incident
55:13, 79:14
incidents
87:1, 87:2,
87:4, 134:22,
134:25, 136:13
include
227:11
including
159:18, 185:24
income
73:21
inconsistent
113:23, 191:15
incorrect
161:15, 188:13
incorrectly
149:17, 152:7,
152:9, 228:17
incurred
157:7
indefinitely
138:8, 138:22
independent
178:24
indicate
47:15
indicated
11:23
individual
74:15, 124:9,

218:23, 239:23,
241:12
individuals
81:10, 125:24
industry
22:1
information
7:22, 57:22,
58:7, 141:14,
142:8, 143:7,
149:19, 150:16,
163:14, 163:16,
168:23, 175:24,
178:10, 197:4,
197:9, 200:14
informed
225:20
injuries
152:13, 152:15,
153:2, 153:10
insane
240:13
insignificant
132:7
insinuates
168:10
insist
36:11
instance
47:9, 102:3,
139:2, 139:3,
167:23, 168:4
instances
18:4, 154:3,
167:18, 168:13,
169:19
instant
51:25, 172:22
instead
119:13, 120:1
intending
94:19
intentionally
35:11, 61:3,
67:13
intents
10:11
interaction
50:20

interest
225:20, 244:13,
245:9
interested
51:7
interesting
184:25, 204:22
internal
142:4
internet
57:21, 58:1,
164:13
interpretation
9:8
interrogatories
158:5
interrogatory
158:11, 159:12,
159:14, 164:12,
167:6, 167:8,
168:3
interrupt
54:9, 121:22
intolerant
63:25, 64:23,
64:24, 65:3,
65:4, 65:20,
65:23, 66:5
invertedly
178:10
investigate
77:16, 131:14,
239:17, 239:20
investigating
131:4
involved
42:2, 164:20
iphone
98:11, 98:17,
98:21, 98:24,
99:3, 99:4,
99:6, 172:17,
172:18, 202:23,
205:11, 208:17
issue
36:5, 41:4,
85:20, 86:8,
118:11, 124:22,

125:11, 127:2,
128:24, 130:21,
132:1, 133:2,
153:16, 192:1,
230:3, 234:24
**issues**
46:5, 46:14,
57:14, 58:8,
121:9, 134:17,
232:25, 242:22
**item**
67:20, 68:5,
68:14, 75:15,
106:4, 115:18,
131:1, 131:6,
131:23
**items**
17:7, 48:15,
50:12, 68:15,
69:21, 89:24,
93:16, 96:10,
106:10, 106:11,
106:18, 114:3,
124:2, 124:13,
127:1, 163:10,
189:6, 201:20,
202:6, 202:8,
209:7, 210:10,
219:14, 220:8,
220:18, 228:16,
228:20, 231:23,
233:14, 234:25,
239:8, 239:12

**J**

**january**
1:15, 6:7,
178:4, 178:5,
203:12, 205:6,
205:10, 245:14
**jar**
201:21
**javier**
3:9, 6:15,
26:11, 27:10,
28:11, 39:3
**jennifer**
176:20

**jersey**
13:24, 13:25,
20:11, 20:13,
20:15, 20:21,
21:8, 21:11,
21:12, 22:4,
22:12, 66:1
**jiving**
164:25
**job**
1:23, 24:6,
143:25, 144:10,
145:1
**jobs**
144:4
**jogs**
201:18
**john**
232:13
**join**
59:24
**joint**
70:11, 71:17,
71:20, 73:9,
73:10, 73:25,
74:10, 74:13,
74:16, 198:4,
198:22
**jonathan**
236:23
**joseph**
1:4, 1:13, 2:1,
3:2, 4:3, 6:3,
7:1, 10:18,
43:3, 159:22,
178:25, 185:13,
212:18, 215:2,
216:4, 216:22,
238:2
**judge**
77:2
**judgment**
76:25
**july**
49:15, 78:8
**jump**
29:10
**june**
208:4, 208:7,

208:23, 209:7,
209:10, 209:16,
210:10, 210:13,
210:23
**jury**
10:12, 10:14,
17:22
**jw**
172:23

**K**

**keep**
71:21, 78:24,
95:16, 111:5,
143:20, 162:6,
162:11, 162:15,
230:1, 234:25
**keeping**
242:6, 242:24
**kept**
200:25
**kid**
77:6, 77:8,
135:23, 137:24,
137:25
**kids**
53:6, 62:25,
63:23, 63:24,
67:6, 80:8,
135:5, 136:1,
136:7, 170:4,
170:12
**kind**
8:1, 12:21,
13:21, 16:24,
24:3, 25:5,
38:14, 40:4,
40:11, 61:15,
66:17, 70:11,
71:21, 77:23,
79:12, 93:22,
135:9, 138:11,
138:20, 139:9,
186:25, 192:1,
196:11, 213:11
**kinds**
65:11, 140:23,
171:10, 185:19,

188:25, 189:3,
211:13, 211:18,
221:11
**knew**
119:21, 227:22
**knowledge**
21:23, 42:23,
71:13, 73:16,
158:25, 159:2,
207:4, 209:16,
209:22, 210:23,
211:2, 213:8,
244:10, 245:6
**known**
47:3, 48:14,
228:16, 232:25
**kow**
128:19, 182:13,
183:12, 185:17

**L**

**label**
39:5, 39:12,
79:2, 79:22,
80:21, 93:1,
96:12, 115:23,
120:16, 123:10,
139:19, 140:3,
141:2, 143:3,
158:20, 230:21,
238:23, 240:6
**labels**
93:11, 93:23,
140:8, 141:10,
151:5, 151:13,
158:24, 164:8,
164:11, 181:25
**lactaid**
66:14, 190:14
**lactate**
231:4
**lactose**
63:25, 64:23,
64:24, 65:3,
65:4, 65:7,
65:20, 65:23,
66:5, 90:19,
94:14, 126:4,

201:12, 201:14,
216:5, 216:10
**lactose-free**
43:13, 43:16,
44:19, 63:19,
64:3, 64:11,
64:16, 65:6,
65:15, 65:19,
66:6, 66:8,
66:10, 66:24,
67:8, 67:15,
70:3, 74:25,
79:21, 91:13,
91:16, 91:21,
96:10
**ladies**
17:22
**lake**
14:19, 14:21,
14:23, 14:24,
14:25, 43:3,
61:8, 61:9,
61:21, 99:20,
100:3, 100:4,
100:5, 100:14,
100:25, 101:9,
101:14, 102:15,
103:13, 103:19,
104:13, 105:1,
105:7, 105:11,
105:16, 111:9,
112:24, 113:22,
115:17, 117:15,
117:23, 118:8,
118:13, 119:1,
120:13, 121:10,
122:14, 124:2,
124:14, 125:12,
133:21, 151:7,
162:3, 180:12,
185:14, 186:2,
186:6, 186:9,
186:11, 186:19,
194:13, 205:18,
214:20, 215:2,
216:6, 216:10,
222:23, 223:12,
224:6

**lakes**
60:8, 126:3,
137:9, 146:21,
169:10, 169:21
**land**
180:3
**language**
31:5, 39:17
**large**
14:24
**last**
15:14, 25:18,
26:7, 26:24,
27:2, 27:9,
57:1, 71:11,
72:14, 73:6,
73:7, 94:7,
95:1, 101:1,
113:8, 113:12,
139:18, 141:1,
141:4, 149:25,
150:13, 152:6,
172:12, 193:20,
232:8
**lately**
127:3
**later**
57:11, 78:5,
83:24, 90:13,
98:20, 154:11,
183:15
**latest**
176:11
**latin**
23:22
**laura**
21:18, 21:19
**law**
3:10, 6:16,
41:23, 50:25,
159:21, 222:10,
224:13, 224:15,
224:18, 234:15
**lawsuit**
31:11, 31:25,
32:6, 32:23,
33:5, 33:9,
33:20, 34:24,

37:5, 38:9,
38:19, 39:1,
42:2, 50:8,
54:25, 55:17,
56:1, 56:18,
110:23, 119:15,
126:10, 128:11,
128:12, 128:16,
129:3, 154:21,
159:6, 164:17,
165:21, 175:15,
175:20, 179:12,
190:7, 209:17,
210:20, 222:15,
225:7, 225:16,
226:9, 229:5,
229:14, 229:21,
234:2, 237:9
**lawsuits**
169:14
**lawyer**
21:15, 29:7,
45:19, 50:25,
57:5, 57:6,
57:12, 58:5,
58:6, 87:8,
107:18, 107:21,
107:23
**lawyers**
26:4, 26:6,
26:10, 26:24,
27:2, 35:21,
36:9, 36:23,
110:23, 155:8,
174:18, 235:16
**layout**
75:17, 99:25,
100:6, 100:13,
100:20, 101:25,
167:12
**lead**
182:5, 203:9,
204:6, 204:19
**least**
132:5, 137:17,
149:20, 154:12,
167:15, 201:11,
231:22

**leave**
19:8, 136:10,
170:12, 242:20
**leaving**
138:1
**led**
79:6, 81:2,
128:9, 182:12
**left**
16:3, 118:4,
118:6, 132:22,
215:18
**legal**
44:22, 47:10,
47:11, 55:21,
55:23, 55:25,
56:3, 56:9,
56:21, 84:10,
107:17, 119:11,
119:20, 121:18,
123:11, 139:15,
159:22, 160:21,
161:2, 161:4,
161:7, 220:22,
220:25, 225:21,
234:7
**legible**
106:5
**less**
87:23, 227:22
**let's**
9:17, 9:18,
10:16, 22:10,
22:14, 27:25,
58:12, 58:13,
74:24, 82:16,
87:18, 95:20,
109:12, 111:20,
141:6, 157:23,
158:11, 168:2,
172:16, 177:9,
180:15, 180:18,
185:3, 198:3,
207:19, 212:14,
219:9
**letter**
210:20
**letting**
48:19

**level**
98:14, 136:25, 234:24
**levels**
90:11
**life**
164:5, 217:3, 217:6
**light**
173:13, 212:22
**likely**
219:8, 233:2
**likes**
68:17
**line**
48:2, 71:7, 122:6, 123:1, 123:18, 130:13, 178:14, 240:16
**lines**
174:19
**linger**
127:12
**link**
203:9, 204:5
**list**
170:15, 170:19
**listed**
83:21, 147:13, 205:25, 216:7, 216:11
**listen**
106:21, 218:21
**lists**
89:14
**literally**
130:15
**litigation**
200:10, 215:3, 215:7, 215:15, 241:13, 242:7
**little**
7:20, 12:1, 15:12, 49:1, 51:16, 51:22, 54:18, 63:7, 70:9, 77:18, 95:5, 95:21,

**live**
98:9, 98:20, 106:23, 121:22, 160:4, 170:13, 201:19, 221:18, 231:18
**live**
11:6, 12:4, 12:7, 20:6, 21:7, 21:10, 22:3, 22:11, 171:5, 223:20
**lives**
20:18
**living**
20:5, 20:24
**llc**
1:9, 6:5, 6:21
**llc's**
158:4
**llp**
3:4, 3:17
**located**
59:10, 59:15, 61:20, 187:22
**location**
99:12, 99:20
**locations**
63:3
**lodge**
60:25
**long**
11:4, 11:24, 13:7, 26:12, 27:1, 28:4, 52:10, 57:1, 131:25, 132:5, 191:13
**longer**
24:2, 127:12
**look**
38:3, 52:2, 58:1, 58:12, 60:20, 67:24, 69:20, 71:7, 83:10, 96:11, 97:13, 98:7, 101:6, 105:17, 111:14, 115:24,

126:15, 127:21, 131:16, 137:6, 142:5, 146:2, 150:24, 150:25, 163:19, 164:8, 164:11, 177:21, 180:15, 180:18, 184:11, 191:4, 195:3, 195:12, 197:3, 217:19, 217:21, 219:24, 220:6, 220:16, 221:4, 229:18, 229:20, 230:2, 230:20, 235:17
**looked**
29:13, 30:5, 30:6, 30:10, 70:4, 100:1, 100:2, 104:21, 115:3, 115:4, 137:9, 172:12
**looking**
15:3, 24:3, 29:22, 57:21, 69:16, 96:17, 99:9, 103:10, 103:11, 103:18, 107:1, 114:17, 115:16, 156:2, 170:22, 192:23, 204:15, 230:12, 230:13
**looks**
99:16, 99:21, 102:23, 113:17, 140:21, 163:23, 194:7, 195:5, 197:2, 204:14, 208:10, 211:12, 229:9
**lose**
74:20
**lot**
17:25, 18:1, 18:13, 76:25, 82:4, 120:7, 140:24, 143:12,

146:9, 146:10, 186:6, 188:21, 194:3, 196:11, 198:22, 204:21, 232:19
**lover**
114:7
**loves**
69:4, 114:7, 114:8
**low**
116:1
**lower**
224:6
**lucideo**
176:20
**lunch**
18:11, 82:1, 95:5, 96:2, 96:3

**M**

**made**
18:9, 38:25, 43:3, 44:18, 48:25, 51:12, 63:8, 67:8, 87:10, 90:25, 91:1, 91:3, 100:7, 100:15, 112:25, 114:16, 114:21, 114:22, 119:12, 119:13, 125:10, 127:23, 144:9, 146:5, 150:10, 179:1, 179:8, 180:17, 199:11, 230:22, 236:8
**magnifying**
190:22
**mail**
164:24, 165:1
**mailing**
10:23
**main**
221:2, 223:22
**maintain**
136:25

maintains
198:23
majority
62:19
make
7:8, 7:20, 8:8,
8:10, 17:3,
32:22, 33:15,
39:24, 41:11,
44:11, 52:2,
53:18, 53:24,
54:5, 54:6,
54:12, 55:10,
73:11, 78:20,
78:25, 79:13,
81:6, 92:17,
99:15, 105:3,
128:6, 131:20,
139:14, 143:25,
144:15, 145:1,
147:3, 153:5,
168:16, 175:22,
181:13, 181:14,
181:21, 182:7,
182:14, 190:22,
205:24, 206:4,
210:5, 219:2,
219:25, 222:6,
222:13, 242:2
makes
8:5, 9:6,
13:25, 65:13,
85:8, 86:16,
103:22, 116:23,
120:3, 140:12,
155:14, 201:6,
211:7
makeup
229:2
making
75:22, 92:22,
105:18, 154:24,
175:21, 199:17,
218:24
man
223:4
manager
223:7

many
11:12, 12:15,
15:7, 15:24,
16:22, 18:20,
24:17, 28:22,
28:23, 57:24,
71:15, 98:17,
98:22, 145:12,
147:1, 154:13,
154:23, 154:24,
154:25, 227:21
marino
26:20, 27:17
mark
22:17, 97:19,
111:20, 157:23,
171:19, 177:11,
183:25, 184:1,
202:15, 207:19
marked
22:24, 23:1,
23:9, 23:10,
42:10, 42:12,
97:24, 111:22,
150:21, 157:25,
172:3, 177:14,
177:16, 184:2,
190:24, 191:1,
192:15, 193:23,
195:8, 199:24,
202:17, 204:1,
205:14, 205:15,
207:21, 212:1,
212:2, 236:1,
236:14
market
150:20
marking
195:6, 199:22
marriages
12:2
married
11:24, 11:25
mastercard
70:18, 71:4,
71:8, 71:10,
72:4, 113:8,
113:11, 197:21,

197:24
match
168:5, 168:12,
168:14, 168:20,
184:8, 207:25,
229:12
matches
240:6
matter
6:4, 95:10,
119:2, 119:5,
124:11, 133:25,
139:8, 220:14,
239:4
mattered
119:7
matters
119:11, 122:13,
239:15
max
98:24, 99:4,
172:18, 172:19
maybe
15:9, 16:22,
16:24, 19:10,
50:15, 51:19,
65:21, 66:11,
68:18, 80:9,
104:19, 113:6,
120:15, 120:16,
122:21, 123:19,
126:3, 126:4,
129:23, 143:15,
161:19, 171:15,
186:25, 187:25,
188:3, 197:2,
197:8, 200:25,
203:5, 233:13
mcguire
6:20
mcguirewoods
3:17
mean
20:12, 22:6,
24:13, 24:18,
30:3, 30:8,
30:21, 33:1,
33:6, 37:9,

38:8, 47:19,
48:23, 49:13,
49:14, 54:8,
55:12, 55:19,
57:16, 57:17,
57:18, 57:24,
59:19, 64:15,
64:18, 64:21,
65:5, 71:10,
92:12, 92:21,
93:14, 95:16,
101:8, 101:23,
111:3, 118:7,
120:12, 120:19,
122:3, 124:5,
127:18, 127:19,
130:17, 130:18,
132:5, 133:8,
137:6, 138:13,
141:18, 142:5,
142:12, 142:22,
143:5, 143:13,
145:8, 148:22,
148:25, 149:4,
153:9, 163:17,
172:12, 177:20,
228:16, 228:18,
229:24, 231:11,
233:16, 233:19
meaning
32:22
means
20:3, 29:16,
67:25, 217:17,
218:3, 232:21
meant
181:18
measures
146:20
media
6:2, 25:20,
25:23, 164:15,
164:17
medical
9:25
medications
10:4, 17:16
meet
26:5, 26:10,

26:12, 27:1,
27:4, 27:8, 28:4
**meeting**
26:20, 27:20,
28:10
**meetings**
28:25
**member**
59:25, 60:11,
60:14, 64:21,
176:21
**members**
152:12, 156:8
**membership**
19:15
**memorized**
61:23, 101:24
**memory**
17:14, 17:17,
47:7, 98:8,
164:25, 191:12,
193:5, 201:18,
201:21
**mental**
88:21, 170:16
**mention**
47:10, 224:12
**mentioned**
18:13, 18:14,
46:25, 47:2,
51:5, 160:7,
167:24, 185:3,
186:4, 199:15
**mentioning**
123:23
**mentions**
116:1
**merchandise**
92:15, 141:9,
141:10, 143:2,
143:3, 187:2,
212:19, 213:22
**merchant**
213:17
**merely**
142:9, 143:8
**message**
108:7, 172:22,

173:1, 173:7,
173:14, 173:16,
174:7, 176:2,
176:19, 179:17,
180:2, 180:8,
181:7, 181:24,
182:6, 203:8
**messages**
51:25, 52:18,
98:23, 172:17
**met**
26:3, 26:9,
26:23, 28:1,
47:18
**method**
51:24
**microphone**
42:17, 58:14
**mid**
13:9
**middle**
21:4, 21:5
**might**
7:20, 9:8,
14:17, 47:11,
47:16, 49:4,
56:17, 60:22,
78:18, 90:25,
101:24, 111:15,
117:1, 123:25,
124:1, 124:12,
135:8, 140:11,
140:18, 170:17,
185:16, 187:1,
190:6, 198:21,
201:21, 228:21,
240:16
**milberg**
3:4
**mile**
201:10
**mileage**
24:14
**miles**
16:10, 24:17
**milk**
43:13, 43:17,
44:19, 63:19,

63:23, 64:3,
64:9, 64:11,
64:13, 64:17,
64:20, 65:6,
65:9, 65:15,
65:19, 66:4,
66:6, 66:8,
66:10, 66:13,
66:17, 66:24,
67:3, 67:5,
67:6, 67:9,
67:16, 68:18,
68:21, 68:22,
69:4, 69:17,
70:3, 74:26,
77:5, 79:19,
79:21, 80:12,
80:14, 90:20,
91:14, 91:17,
91:22, 92:1,
94:6, 94:15,
96:10, 105:24,
105:25, 114:7,
126:4, 135:23,
137:25, 191:21,
200:4, 201:8,
201:15, 216:5,
216:10, 231:5,
231:10, 232:7
**milks**
65:10, 65:11,
154:25
**mind**
52:11, 55:16,
55:20, 56:17,
56:20, 64:8,
67:24, 118:21,
143:18, 175:13,
179:7, 181:12,
215:18, 216:19,
221:11, 240:19
**mine**
89:8, 103:1,
124:8
**mini**
98:11, 98:24,
99:3, 202:23,
205:11, 208:17

**miniature**
208:1
**mintues**
183:13
**minute**
17:8, 18:5,
135:20, 215:19
**minutes**
16:11, 24:19,
26:16, 81:23,
82:18, 132:3,
135:20, 135:21,
136:8, 171:22
**mischaracterize**
150:6
**mischaracterized**
39:18
**mischaracterizes**
38:23, 125:14,
142:21
**mischaracterizing**
150:4
**miscommunicated**
132:12
**misheard**
197:9
**mislabeled**
146:10
**misreading**
161:16
**misspoke**
132:13
**misstated**
104:1
**misstating**
188:1
**mistake**
141:25, 142:9,
142:18, 143:9,
144:9, 144:15,
144:19, 145:8,
145:10, 145:11,
147:3
**mistakes**
143:25, 144:3,
145:1
**misunderstood**
65:2

mm-hmm
190:17
mobile
166:4
molly
1:25, 245:2,
245:13
moment
89:3, 137:24,
212:6, 223:9
monday
1:15
money
32:22, 143:20,
153:15, 155:14
mongate
194:12
monitor
6:8, 75:15,
97:14, 101:18,
102:2, 102:5,
102:10, 102:12,
103:4, 103:7,
103:10, 103:12,
103:18, 103:21,
104:4, 104:5,
104:10, 104:11,
105:4, 105:8,
105:9, 105:17,
106:4, 106:12,
107:1, 115:4,
115:13, 115:16,
137:7, 137:10,
219:15, 220:6
month
51:19, 62:5
monthly
15:5
months
49:8, 141:22,
156:10
moon
239:9
more
15:12, 22:19,
22:20, 49:1,
52:19, 58:7,
87:21, 90:6,

90:8, 100:22,
104:19, 104:20,
117:16, 127:10,
143:15, 149:21,
152:22, 157:10,
163:3, 185:8,
194:16, 213:7,
222:12, 227:7,
228:23, 231:17
morning
7:13, 7:14,
16:22, 26:7,
26:9, 26:14,
26:17, 26:20,
31:1, 170:20
mortgage
22:1
most
62:16, 84:19,
163:7, 171:11,
172:11, 185:15,
185:21, 218:6
mostly
71:18
mother
21:9, 22:9,
52:24, 65:23
mother's
21:17, 65:24
mountain
60:8
move
61:18, 87:19,
110:10, 110:11,
121:22, 141:6,
167:10, 168:2,
189:21, 212:14,
219:9
moved
187:13, 187:20,
188:2
moving
227:2, 227:3,
240:18, 242:8,
242:12
much
18:18, 32:22,
49:10, 83:9,

121:25, 122:11,
123:21, 124:19,
152:23, 154:1,
154:8, 154:23,
185:9, 185:17,
186:15, 215:17,
226:24, 227:1,
227:4, 227:6,
227:7, 227:9,
227:15, 234:15
muffled
106:24
multiple
73:4, 141:19,
197:10
multitude
120:22
must
146:10
myself
11:17, 31:15,
31:20, 31:22,
124:21, 125:18,
126:22, 127:20,
129:17, 130:19,
216:19

N

name
10:17, 11:10,
20:22, 21:13,
21:17, 59:7,
60:2, 73:14,
89:6, 89:7,
89:11, 118:18,
162:23, 173:23,
193:13
named
165:20
names
11:21
narrow
231:18
nation
235:1
native
179:17, 203:8
nature
230:5

nd
10:24, 50:19
near
14:19, 14:23,
20:11
nearby
20:6, 20:7,
20:10, 20:12,
59:22, 60:9
necessarily
125:8
necessary
7:9
necessities
62:23, 77:11,
85:6, 91:23,
118:15, 135:4,
136:6, 239:13
necessity
135:24, 135:25,
136:4
need
7:25, 9:14,
34:13, 35:7,
35:20, 36:2,
36:9, 37:22,
57:15, 62:25,
98:8, 135:7,
135:22, 135:25,
136:9, 136:10,
137:24, 153:4,
163:19, 170:17,
170:20, 197:20,
198:1, 219:24,
221:13, 222:7,
230:20, 231:7
needed
63:23, 77:6,
77:7, 77:12
needs
132:6, 135:23,
137:24, 137:25
negative
118:20
neither
244:11, 245:7
networking
164:13

**never**
25:2, 45:25,
60:25, 135:12,
164:16, 229:19
**new**
1:2, 1:9, 2:3,
2:10, 3:6, 6:4,
6:6, 6:12, 6:21,
10:24, 12:19,
12:23, 13:1,
13:2, 13:23,
13:24, 20:11,
20:13, 20:14,
20:21, 21:8,
21:11, 21:12,
22:4, 22:12,
33:18, 33:23,
34:3, 34:11,
34:17, 34:25,
35:16, 36:24,
39:25, 41:12,
59:4, 59:6,
61:20, 61:21,
66:1, 99:20,
100:14, 100:25,
102:15, 103:13,
103:19, 112:24,
126:18, 127:8,
141:11, 143:4,
143:13, 146:25,
151:7, 158:4,
169:12, 176:10,
180:12, 185:7,
194:13, 199:18,
203:9, 223:13,
224:6, 225:14,
226:13, 226:17,
226:23, 236:10,
244:18
**news**
155:18, 205:1
**next**
57:4, 62:9,
71:10, 84:21,
84:22, 84:23,
84:25, 85:24,
89:14, 97:8,
110:11, 118:13,

182:16, 182:18,
188:4, 199:14
**nj**
3:12
**nods**
8:1
**non**
201:14
**non-at**
105:9
**non-lactose-free**
66:13
**none**
148:9, 157:20
**nope**
113:15
**normally**
238:5
**north**
3:12
**notary**
2:10, 244:1,
244:18
**note**
181:2, 192:22,
196:4, 207:25
**notes**
242:15
**nothing**
45:23, 128:15,
191:25, 193:17,
239:8
**notice**
2:9, 4:8, 23:6,
102:1, 132:21,
164:24, 165:1,
165:3, 165:5,
172:22, 201:19,
227:23
**noticeable**
104:20
**noticed**
63:13, 63:16,
81:18, 82:13,
149:22, 162:10,
175:17, 188:25,
221:21, 227:24
**noticing**
228:1

**notify**
126:6
**number**
4:7, 5:3, 6:2,
6:6, 73:7,
153:3, 166:8,
166:14, 166:24,
166:25, 167:1,
172:21, 173:16,
173:17, 173:19,
177:17, 179:17,
179:21, 196:8,
199:3, 203:8,
204:24, 214:18,
216:3, 216:21,
219:9, 233:14,
241:22
**numbers**
71:10, 166:22,
196:18
**ny**
2:3, 3:6
**nyu**
172:23

─────── O ───────

**o'lakes**
180:3
**oath**
10:9
**object**
99:13, 100:17,
102:16, 103:5,
103:15, 105:20,
106:6, 106:13,
115:6, 117:3,
119:9, 120:5,
121:13, 122:17,
123:12, 124:3,
125:2, 125:6,
125:13, 126:13,
127:4, 127:14,
129:4, 134:13,
134:19, 135:16,
136:16, 137:12,
137:20, 142:2,
142:20, 144:1,
144:5, 144:12,

144:20, 145:5,
145:24, 147:5,
147:10, 150:3,
152:19, 156:17,
159:8, 162:8,
162:24, 163:5,
163:12, 163:25,
165:7, 165:13,
165:25, 168:10,
178:14, 183:21,
187:17, 203:20,
209:12, 209:18,
209:25, 210:11,
210:25, 213:14,
224:1, 224:9,
224:21, 225:5,
234:12, 235:4,
235:14, 238:14,
238:18, 238:25,
239:19, 242:9,
242:20, 242:24
**objecting**
78:21, 241:4
**objection**
13:15, 14:15,
19:20, 20:8,
32:1, 32:24,
33:10, 34:4,
34:18, 35:1,
35:18, 36:6,
36:18, 37:1,
37:6, 37:17,
37:18, 38:16,
38:23, 38:24,
40:7, 41:6,
41:21, 53:20,
54:1, 56:11,
78:19, 78:21,
78:22, 81:4,
84:4, 84:8,
85:21, 86:10,
86:23, 87:25,
88:5, 88:18,
89:9, 90:1,
92:5, 93:2,
93:25, 94:16,
97:15, 99:22,
104:14, 107:15,

108:12, 109:21,
110:6, 111:2,
113:2, 114:1,
119:3, 124:15,
128:4, 133:5,
133:23, 142:1,
145:16, 189:10,
190:10, 192:10,
204:11, 211:22,
214:14, 215:5,
215:12, 215:13,
216:14, 217:1,
217:12, 218:15,
219:18, 220:10,
220:19, 221:25,
227:19, 228:13,
229:6, 229:15,
229:22, 230:23,
231:15, 232:17,
233:10, 233:22,
234:3, 234:12,
234:20, 237:13,
238:7, 240:8,
240:23, 241:2,
241:9, 241:14,
241:19, 242:13
**objections**
212:20
**objective**
241:12, 241:16
**observe**
219:14, 220:7
**observed**
154:12, 158:14
**obstacle**
121:17
**obtain**
58:7
**obtuse**
35:11, 61:4,
67:13
**obviously**
77:22
**occasion**
28:5, 28:14,
50:6, 50:12,
53:13, 91:22,
144:4, 223:10

**occasional**
147:3
**occasions**
28:19, 28:24,
126:17, 137:18,
138:5, 167:15
**occupation**
21:20, 21:22
**occur**
42:5
**occurred**
54:21, 86:6,
121:11, 207:3,
232:2
**october**
173:3, 173:6,
184:16, 184:22,
189:18, 189:19,
190:1, 193:4,
203:6
**offer**
24:4
**officer**
244:2
**often**
13:21, 15:1,
15:3, 17:6,
51:17, 52:6,
62:4, 66:8,
130:12, 170:10,
239:7
**oftentimes**
185:7
**oh**
9:17, 42:18,
48:10, 58:22,
70:17, 81:24,
86:6, 93:9,
164:24, 169:23,
178:13, 189:19,
195:18, 195:21,
196:8, 201:14,
205:7
**old**
11:14
**omelet**
18:9
**once**
19:5, 37:21,

40:24, 51:19,
107:5, 112:4,
156:2, 221:21,
239:9
**one**
6:3, 12:16,
12:23, 14:4,
15:25, 22:17,
28:12, 30:17,
32:20, 35:23,
36:12, 36:13,
42:10, 43:5,
43:6, 52:12,
55:19, 61:23,
63:9, 67:20,
68:5, 68:14,
69:4, 69:6,
70:23, 71:11,
71:12, 71:19,
73:2, 74:20,
75:7, 75:8,
80:9, 82:8,
89:14, 91:8,
94:5, 98:23,
98:24, 99:2,
99:9, 101:9,
102:6, 104:16,
104:17, 104:22,
113:6, 113:7,
116:16, 117:16,
122:15, 122:21,
128:19, 132:24,
133:19, 138:9,
139:2, 145:22,
152:24, 154:2,
157:10, 160:6,
167:4, 167:23,
169:25, 170:4,
170:5, 170:7,
170:10, 170:11,
172:1, 174:18,
174:21, 174:22,
175:1, 176:9,
176:17, 178:23,
179:1, 179:8,
180:20, 190:5,
190:15, 190:17,
190:21, 192:4,

192:23, 194:4,
195:23, 197:16,
199:17, 201:10,
204:24, 216:8,
219:10, 221:18,
232:20, 232:21,
241:22
**one's**
216:23, 217:10,
218:13
**ones**
30:22, 91:25,
136:23, 148:10,
148:11, 149:17,
149:18, 155:24,
167:25, 174:22,
179:11
**online**
164:14
**only**
9:19, 40:15,
53:5, 65:12,
66:12, 67:20,
68:5, 68:14,
91:25, 92:12,
101:15, 116:1,
122:19, 133:21,
136:23, 140:11,
140:17, 148:6,
148:11, 149:16,
173:2, 174:6,
187:11, 201:2
**open**
242:21, 242:25
**opinion**
32:17, 34:1,
34:10, 34:15,
34:23, 35:15,
35:24, 35:25,
36:2, 36:4,
36:8, 36:12,
36:17, 36:19,
39:11, 139:17,
149:4, 224:7,
234:1
**opportunity**
129:11, 130:2,
130:4, 130:15,

130:16, 130:17,
130:19
**opposed**
37:24, 64:13,
68:14, 141:25,
142:8, 142:18,
143:8, 186:3,
216:12
**option**
133:12, 133:14
**order**
7:6, 135:18,
163:18, 219:25,
220:12, 230:17
**organization**
60:19
**organizations**
19:16, 164:14
**other**
8:5, 11:1,
12:10, 12:13,
12:17, 20:3,
20:20, 21:7,
22:3, 22:10,
27:12, 27:16,
28:14, 30:20,
30:22, 31:1,
31:7, 36:13,
45:10, 45:20,
50:18, 51:8,
51:24, 58:6,
58:10, 63:2,
63:3, 64:13,
68:15, 74:14,
80:11, 81:9,
83:25, 94:6,
94:14, 98:24,
108:9, 111:18,
118:16, 122:22,
123:23, 123:25,
124:11, 124:25,
132:19, 132:21,
133:24, 134:11,
134:16, 135:19,
140:8, 148:10,
149:18, 150:17,
152:12, 155:11,
156:14, 156:15,

156:22, 156:23,
157:8, 157:20,
158:15, 167:25,
168:5, 168:25,
169:6, 169:9,
169:14, 169:21,
170:5, 174:3,
174:8, 174:24,
176:17, 186:7,
192:9, 197:12,
198:24, 200:25,
201:5, 202:9,
223:9, 223:15,
224:14, 228:1,
228:4, 231:19,
237:7, 242:22
**others**
114:4, 128:13,
155:15, 155:18
**otherwise**
136:8, 158:14,
244:14, 245:10
**out**
16:21, 29:18,
31:24, 32:16,
38:18, 44:3,
44:13, 46:5,
46:6, 46:9,
46:11, 46:12,
46:14, 46:19,
50:15, 52:12,
55:2, 55:9,
55:13, 55:18,
55:20, 55:21,
56:2, 56:8,
56:16, 64:17,
65:22, 67:4,
75:1, 75:3,
75:12, 75:14,
76:6, 79:24,
80:10, 96:22,
96:23, 97:12,
99:15, 105:18,
115:1, 122:22,
123:17, 131:17,
136:3, 137:10,
139:1, 149:1,
153:15, 154:18,

155:10, 156:13,
156:14, 156:23,
160:21, 161:6,
162:14, 165:16,
167:23, 170:11,
190:22, 195:23,
196:22, 197:1,
200:17, 221:12,
230:10, 231:21,
231:25, 233:8,
233:9, 233:18
**outcome**
244:14, 245:10
**over**
7:19, 8:5,
12:1, 45:2,
56:19, 58:18,
65:21, 72:14,
77:22, 79:18,
149:25, 150:13,
150:25, 152:6,
154:12, 167:9,
182:17, 194:16,
194:25, 195:3,
197:21, 216:18,
218:25, 235:8,
237:11, 239:14
**overcharge**
42:5, 42:6,
46:9, 48:15,
50:14, 54:21,
55:3, 56:13,
63:16, 83:6,
84:25, 89:18,
97:3, 108:23,
109:24, 110:3,
124:7, 124:13,
124:20, 127:11,
128:11, 128:16,
131:4, 131:12,
133:11, 146:7,
146:13, 146:15,
146:16, 146:17,
154:4, 175:18,
206:23, 207:1,
207:2, 207:3,
228:12, 230:11
**overcharged**
31:23, 32:11,

33:15, 37:11,
37:12, 37:16,
38:5, 42:3,
43:9, 46:8,
54:14, 55:15,
56:14, 75:21,
76:3, 76:9,
78:2, 78:8,
78:12, 78:17,
78:25, 79:13,
83:9, 83:16,
83:18, 84:3,
87:8, 90:14,
107:10, 108:2,
108:10, 108:15,
109:15, 111:10,
116:8, 116:15,
116:19, 117:9,
119:19, 120:14,
121:20, 122:9,
124:1, 124:23,
125:1, 125:19,
126:5, 126:8,
126:16, 126:18,
127:1, 127:7,
127:22, 131:1,
132:22, 138:16,
141:19, 146:6,
147:12, 148:10,
148:12, 156:6,
163:18, 164:6,
167:14, 175:17,
175:23, 207:8,
207:15, 219:2,
222:9, 225:13,
226:12, 226:16,
226:22, 227:17,
227:25, 228:3,
228:4, 228:6,
229:4, 229:13,
231:6, 231:8,
231:20, 231:22,
232:6, 233:3,
241:23
**overcharges**
55:24, 117:7,
117:13, 117:20,
118:4, 128:12,

128:14, 129:1,
136:21, 136:22,
140:5, 143:14,
143:16, 143:17,
148:7, 152:17,
152:23, 153:8,
154:19, 155:3,
155:17, 156:2,
157:7, 160:19,
175:23, 181:13,
227:23, 228:10,
231:3, 239:18
**overcharging**
31:14, 31:20,
38:15, 38:21,
39:15, 39:21,
47:3, 77:24,
78:14, 80:3,
80:4, 86:5,
87:14, 93:21,
128:17, 128:21,
143:19, 146:11,
155:5, 155:15,
206:5, 219:23,
232:25, 233:15
**overhear**
171:11
**overpaid**
83:1, 154:8
**overpaying**
154:13
**overpriced**
148:17, 215:4,
215:8
**override**
168:5, 168:11,
168:14, 168:21
**own**
12:13, 31:10,
57:13, 57:24,
59:3, 71:15
**owned**
13:7
**owner**
13:4

**P**

**package**
188:17

**paddle**
102:6
**page**
4:3, 4:7, 5:3,
9:12, 43:1,
59:1, 91:7,
96:5, 102:4,
110:13, 132:25,
151:10, 151:16,
158:12, 159:13,
167:7, 167:9,
172:16, 172:21,
177:21, 178:1,
178:2, 179:18,
182:17, 182:18,
183:3, 183:5,
184:9, 184:13,
190:13, 192:22,
194:7, 196:1,
199:14, 203:7,
206:9, 208:1,
212:15, 214:18,
214:23, 216:2,
216:20, 219:10,
221:17, 222:12
**pages**
1:24, 194:16,
197:17, 198:14
**paid**
79:20, 87:21,
87:23, 90:16,
92:15, 113:7,
131:9, 238:9
**pair**
211:12
**paragraph**
43:1, 58:13,
59:1, 61:19,
63:5, 70:6,
70:13, 83:10,
87:19, 89:14,
96:6, 110:13,
115:24, 141:6,
142:24, 152:10,
153:23, 167:10
**part**
55:25, 106:19,
114:15, 142:10,

142:19, 143:9,
163:14, 196:12,
196:16, 227:18,
228:6, 229:5,
229:14
**partially**
114:3
**particular**
14:10, 14:14,
26:10, 27:8,
36:5, 40:16,
40:19, 41:4,
41:17, 47:19,
64:2, 66:23,
69:9, 73:19,
74:21, 75:5,
78:6, 85:20,
93:23, 102:1,
102:4, 105:4,
106:4, 111:13,
117:25, 118:11,
118:18, 118:21,
124:23, 128:13,
132:19, 133:15,
151:7, 155:3,
159:14, 160:3,
162:16, 162:18,
187:16, 191:18,
206:17, 208:3,
223:9, 234:18
**particularly**
135:5
**parties**
47:16, 244:13,
245:9
**pass**
73:3
**past**
15:20, 25:6,
45:20, 90:4,
105:25, 144:9,
201:17, 212:10,
212:11
**pat**
227:14
**pause**
45:22
**pauses**
108:25

**pausing**
86:12
**pay**
48:21, 61:15,
73:18, 73:19,
73:20, 73:23,
74:2, 74:7,
74:13, 74:15,
136:14
**paying**
167:21, 183:18
**pd**
3:23
**pending**
9:21
**penelope**
11:22, 69:4,
114:6, 114:12
**people**
8:7, 31:22,
32:10, 33:14,
38:4, 39:14,
39:20, 60:19,
80:11, 122:22,
124:20, 128:18,
129:20, 139:15,
145:9, 154:24,
166:14, 211:18,
220:14, 221:9,
221:10, 222:5,
228:5, 228:21,
231:22, 233:1,
233:2, 241:23
**people's**
124:7, 144:4
**percent**
43:13, 43:16,
44:19, 63:19,
65:15, 66:23,
67:8, 70:2,
94:6, 145:23,
146:6, 146:7,
146:13, 146:15,
146:16, 146:17,
154:3, 154:16,
216:5, 216:10,
228:15, 235:1
**perches**
214:19

**period**
57:9, 57:10,
127:12, 228:21
**periods**
228:18
**person**
27:4, 28:8,
47:20, 47:21,
159:15, 221:8,
221:9
**personal**
71:19, 71:24,
72:9, 72:13,
74:12, 74:18,
197:20, 197:24,
198:6
**personally**
155:16
**pertaining**
55:23
**petition**
25:18
**phone**
2:4, 3:7, 3:13,
3:20, 30:19,
45:8, 45:9,
45:10, 45:11,
45:12, 47:20,
51:24, 52:21,
56:24, 73:11,
73:12, 79:3,
99:8, 99:10,
108:7, 166:4,
166:8, 166:14,
166:22, 166:25,
167:2, 172:18,
173:17, 173:23,
179:20, 184:13,
200:8, 200:9,
201:6, 202:25,
203:2, 203:4,
208:19, 209:23
**phones**
98:23, 98:25,
200:24, 201:4
**phonetic**
176:20, 236:24
**photo**
77:16, 77:25,

78:8, 78:15,
92:16, 96:21,
97:5, 99:18,
101:11, 101:20,
106:8, 115:9,
123:22, 139:1,
141:2, 141:5,
185:2, 185:18,
185:20, 187:5,
188:6, 191:18,
204:4, 204:19,
208:7
**photograph**
80:21, 83:21,
83:22, 113:5,
115:23, 139:19,
140:2, 187:1,
188:8, 191:7,
191:8, 191:11,
192:2, 192:24,
192:25, 193:10,
193:16, 203:17,
203:18, 204:7,
204:10, 230:12,
230:14
**photographed**
79:22
**photographs**
30:18, 91:8,
93:1, 93:10,
114:16, 114:17,
123:10, 123:14,
138:17, 138:21,
138:25, 139:22,
151:3, 151:4,
175:6, 175:14,
180:21, 182:19,
182:23, 183:12,
183:19, 184:5,
184:7, 184:15,
184:22, 189:9,
190:6, 200:3,
200:4, 200:5,
200:25, 201:4,
201:5, 202:10,
205:17, 205:20,
206:3, 206:9,
206:18, 207:24,

207:25, 208:1,
208:3, 208:5,
208:22, 209:6,
209:22, 210:9,
210:14, 210:15,
211:21, 237:3
**photos**
4:11, 4:12,
4:13, 4:16,
4:17, 4:18,
4:22, 4:24,
4:25, 5:4,
30:18, 92:17,
93:5, 98:3,
98:7, 98:11,
98:16, 98:18,
99:12, 100:12,
100:23, 102:2,
112:6, 112:7,
112:9, 112:20,
112:21, 114:15,
139:11, 182:9,
187:6, 188:11,
189:4, 189:5,
200:2, 211:19
**phrased**
29:12
**physical**
73:3, 76:18
**pick**
47:1
**picked**
18:5, 67:4,
68:20
**picture**
75:25, 76:1,
76:4, 77:14,
77:20, 79:1,
79:7, 79:16,
81:3, 96:18,
96:19, 96:20,
107:2, 140:11,
140:19, 180:3,
181:10, 186:16,
186:24, 188:14,
188:19, 189:1,
190:14, 211:14
**pictures**
96:14, 112:3,

140:8, 158:19,
158:24, 172:17,
175:20, 181:17,
181:21, 181:25,
188:22, 201:3,
210:22, 211:3,
211:4, 211:8,
211:11
**pill**
66:14
**place**
6:11, 135:6,
136:7, 153:21,
201:5
**places**
185:9
**plains**
128:25, 130:22
**plaintiffs**
1:7, 3:2, 6:16,
6:19, 87:20,
135:11, 152:12,
158:3, 167:11,
168:9, 238:1
**plan**
170:15
**planet**
6:10, 6:24
**planned**
59:17, 215:18
**planning**
94:13, 207:9,
237:18
**play**
106:20
**played**
82:12, 106:17,
106:22, 218:22
**please**
6:13, 6:25,
31:13, 82:10
**plus**
15:10
**pmh**
6:7
**pocket**
153:15, 154:18,
155:11, 156:14,

156:23
**point**
54:19, 75:20,
76:5, 81:14,
81:18, 82:13,
83:1, 84:13,
92:25, 93:8,
93:9, 93:14,
93:15, 102:3,
103:20, 104:12,
107:9, 107:25,
110:22, 116:10,
116:21, 122:19,
132:14, 134:18,
168:17, 174:14,
181:12, 195:23,
210:16, 212:9,
216:2, 223:18,
242:21
**point-of-sale**
102:13
**policies**
213:16
**policy**
141:7, 141:15,
141:25, 142:25,
143:8, 143:12,
143:21, 168:5,
168:12, 168:15,
168:20, 168:21,
168:23, 213:9,
218:25, 229:12
**pool**
61:13
**popped**
81:2
**portion**
157:12
**positions**
19:13
**possession**
237:9
**possibility**
77:24, 78:13,
80:3, 117:1
**possible**
16:16, 66:10,
78:11, 82:19,

103:9, 103:10,
116:3, 149:21,
161:5, 185:16,
186:15, 186:23,
219:8, 228:5,
228:16, 228:19,
233:19
**possibly**
28:14, 157:18,
185:20
**postal**
13:3
**posted**
164:16
**potential**
125:24, 209:9,
240:17
**potentially**
29:19, 123:1,
123:18, 124:25,
126:7
**practice**
105:16, 105:23,
106:1, 141:7,
141:15, 141:25,
142:25, 143:8,
143:10, 162:16,
162:18
**practices**
138:4, 219:5,
221:10
**premise**
219:20, 220:2
**preparation**
30:23, 30:25
**prepare**
26:1, 209:17
**prepared**
245:3
**present**
3:22, 26:19,
27:11, 27:16,
28:10, 28:12,
28:13
**presumably**
200:24
**presume**
204:9

**pretty**
38:25, 62:20,
228:3, 231:21,
231:24, 233:7,
233:9
**prevent**
9:25, 234:10
**prevented**
79:25, 121:16,
124:25
**preventing**
77:3, 120:12,
120:17, 138:14
**previously**
41:10, 63:12,
169:10, 174:23,
194:24
**priced**
149:17, 149:19,
150:18, 151:23,
152:7, 152:9,
181:14, 220:1,
228:17
**prices**
48:24, 55:7,
125:18, 129:20,
137:3, 137:15,
138:7, 138:9,
138:18, 138:21,
139:6, 139:7,
139:16, 140:10,
148:2, 154:7,
154:10, 156:11,
156:12, 164:6,
164:10, 168:16,
175:12, 175:21,
180:4, 181:10,
181:17, 181:21,
183:17, 188:10,
216:23, 217:10,
218:13, 219:14,
220:7, 220:14,
221:4, 221:24,
223:24, 224:5,
224:7
**pricing**
31:21, 33:16,
38:6, 39:25,

40:3, 40:12,
41:11, 41:15,
43:18, 48:25,
57:14, 58:8,
69:23, 79:11,
87:13, 120:22,
122:8, 124:6,
124:20, 127:25,
128:2, 140:4,
146:11, 156:1,
163:8, 206:6,
217:5, 234:15,
239:21, 241:25
**primarily**
11:2
**princess**
173:20, 174:6
**prior**
12:2, 46:14,
46:23, 50:3,
51:6, 53:10,
53:13, 57:12,
67:16, 69:17,
79:2, 89:19,
167:20, 167:21,
181:24, 209:23,
210:16, 214:12,
215:8, 222:14,
227:25
**private**
24:8
**privilege**
178:10
**privileged**
29:19
**pro**
172:18
**probably**
62:5, 68:20,
108:20, 174:19,
176:5, 208:14,
236:20, 242:20
**proceeding**
10:13, 245:4
**proceedings**
225:21, 244:3,
244:5, 244:6,
244:9, 245:6

produce
174:14, 174:17
produced
200:9, 200:16
product
75:19, 88:17,
94:5, 140:12,
140:18, 140:21,
147:8, 147:18,
147:25, 148:3,
148:16, 148:19,
149:10, 152:5,
152:8, 187:10,
187:16, 187:20,
211:12, 211:14,
232:5, 238:6,
238:12
production
178:12, 178:16
products
87:23, 93:11,
96:12, 102:10,
102:14, 120:23,
122:9, 124:23,
129:20, 140:8,
145:12, 145:20,
145:22, 146:9,
147:2, 147:13,
149:13, 149:24,
150:12, 150:17,
162:23, 168:7,
170:23, 171:2,
187:13, 188:22,
192:9, 201:23,
237:4
program
24:4
promised
238:19, 240:25,
241:10
prompted
76:10
proper
31:22, 32:10,
32:13, 32:14,
32:18
properties
12:13, 59:15

property
12:18, 13:4,
13:8, 13:14,
14:10, 14:14,
15:2, 15:8,
15:17, 16:5,
16:9, 16:13,
48:7, 59:5,
62:1, 62:8,
62:14, 171:9
prosecuting
242:12
prospective
240:18
protective
7:6
prove
231:9
provide
31:21, 32:10
provided
112:10, 196:10,
236:6, 236:7
providing
159:22, 161:1
prudent
216:22, 217:9,
217:14, 217:17,
218:3
public
2:10, 24:8,
24:10, 244:1,
244:18
pull
190:22
pulled
184:12
punish
37:4, 37:8,
38:7
punished
37:14, 37:24,
37:25, 38:1
purchase
43:12, 49:6,
50:12, 54:5,
54:6, 62:22,
67:8, 74:25,

75:23, 79:19,
80:13, 80:14,
83:12, 87:10,
90:10, 91:1,
97:4, 100:8,
102:11, 105:18,
114:22, 116:10,
137:3, 137:5,
163:4, 167:12,
167:15, 167:20,
168:6, 170:25,
176:11, 180:17,
201:10, 215:1,
228:20, 230:22,
239:8, 240:10
purchased
64:17, 65:14,
66:6, 67:15,
75:19, 91:17,
93:11, 93:16,
94:7, 102:14,
118:4, 124:13,
126:4, 127:2,
148:4, 148:19,
149:10, 149:13,
149:25, 150:13,
152:6, 163:11,
180:13, 183:8,
183:13, 189:22,
231:4, 232:5,
232:14
purchases
43:3, 53:24,
54:12, 72:8,
100:11, 113:1,
124:10, 146:5,
150:9, 150:12,
179:1, 179:8,
199:11, 199:17,
228:2, 237:4
purchasing
63:19, 68:14,
91:21, 113:25,
114:9, 201:8
purpose
14:13, 74:17,
118:16, 140:3,
140:4, 140:6,

142:7, 159:22,
161:1, 175:10,
175:19, 206:12
purposes
10:12, 185:20,
186:23
pursuant
2:9
pursue
225:22
put
7:5, 23:15,
37:9, 72:18,
108:22, 171:20,
178:23, 202:13,
216:19, 221:12,
237:22
putative
6:17, 6:19

Q

q:those
30:25
qualified
226:18, 244:7
qualifies
226:14
qualify
24:13
quantify
16:10, 132:8,
153:1, 153:3
quantifying
62:19
quantity
211:12, 239:4
queens
223:20, 223:25,
224:8
question
8:9, 8:16,
8:22, 9:5, 9:21,
15:4, 29:4,
29:12, 30:1,
33:2, 34:20,
35:4, 35:5,
35:21, 36:3,
39:4, 39:7,

40:15, 41:8,
41:12, 41:16,
44:2, 44:9,
55:11, 55:12,
56:7, 65:1,
65:18, 66:2,
66:22, 71:4,
80:25, 81:22,
82:10, 85:9,
87:7, 89:1,
93:6, 96:16,
98:19, 102:11,
108:18, 112:13,
115:7, 115:15,
118:10, 120:8,
125:9, 126:14,
126:23, 129:6,
129:12, 132:18,
143:6, 144:23,
145:19, 147:15,
147:21, 152:22,
157:3, 168:12,
171:14, 185:25,
186:7, 195:14,
201:7, 210:5,
211:20, 213:8,
217:7, 218:21,
219:20, 220:2,
221:20, 222:13,
234:13

**questioning**
48:3, 178:15,
240:17

**questions**
7:22, 8:13,
10:1, 10:6,
22:15, 48:5,
50:16, 80:18,
98:5, 112:4,
118:19, 178:19,
195:13, 212:13,
229:25, 237:18,
237:19, 237:25,
242:16, 242:18

**quick**
98:4, 109:13,
177:12, 199:2,
215:19

**quickly**
17:6

**quit**
230:8

---

### R

**raise**
85:9, 85:12,
118:11, 119:8,
121:9, 125:11,
127:2, 130:2,
130:4, 130:9,
130:20, 132:18,
132:19, 133:2,
133:20

**raised**
122:13, 124:22,
128:24, 129:23,
132:24, 133:17

**ramen**
208:7

**ran**
16:21

**rarer**
52:20

**rate**
146:13

**rates**
146:11, 146:12

**rather**
7:25, 87:8

**rd**
199:8

**reach**
46:5, 46:6,
52:12, 55:2,
55:13

**reached**
44:3, 44:13,
46:9, 46:11,
46:14, 55:9,
55:20, 55:21,
56:2, 56:8,
56:16, 160:21,
161:6

**reaching**
46:12, 46:19,
55:18

**reaction**
48:9, 48:18,
84:3, 110:1,
110:2

**read**
42:22, 82:9,
142:22, 142:23,
168:22, 218:20

**reader**
205:1

**reading**
20:1

**reads**
216:21

**ready**
95:12, 146:3,
177:2

**real**
98:4, 127:11,
177:12, 199:2

**realistic**
218:6

**realize**
75:20, 78:7,
83:15, 83:16,
83:18, 83:19,
84:2, 97:1,
167:13, 167:19,
171:16

**realized**
55:8, 76:2,
83:1, 83:5,
97:10, 107:5,
107:10, 107:13,
133:11

**really**
14:6, 16:25,
32:3, 32:19,
36:11, 40:15,
52:9, 66:17,
87:6, 87:15,
95:3, 95:10,
108:25, 109:13,
123:14, 130:8,
131:22, 132:8,
132:9, 132:17,
135:15, 157:2,
185:25, 186:1,

186:7, 221:7,
221:8, 222:12,
235:17, 242:1

**reason**
38:13, 45:22,
64:2, 74:21,
74:22, 77:23,
78:3, 117:25,
118:11, 118:18,
118:21, 135:13,
136:2, 140:11,
140:18, 140:20,
141:2, 162:10,
166:8, 185:19,
188:18, 192:1,
193:6, 193:7,
193:16

**reasoning**
85:19

**reasons**
64:16, 140:23,
140:24, 187:1,
188:22, 189:1,
189:3, 189:7,
190:5, 208:25,
211:13, 211:18

**recalling**
101:10

**receipt**
67:23, 67:24,
76:2, 76:13,
76:15, 76:18,
76:23, 77:4,
78:9, 83:20,
91:9, 92:16,
97:5, 111:15,
111:18, 112:3,
113:6, 113:17,
123:10, 132:23,
151:17, 161:25,
162:2, 162:13,
162:21, 163:4,
163:20, 174:9,
174:18, 174:21,
180:21, 181:2,
189:23, 205:18,
205:25, 206:3,
217:10, 218:13,

219:6, 230:13,
231:7
**receipts**
152:25, 153:8,
153:20, 156:11,
162:7, 162:17,
163:9, 174:17,
175:7, 176:10,
216:23, 230:21,
237:2
**receive**
162:2, 162:13
**received**
72:7, 161:24,
162:21, 181:7,
228:18, 229:12
**receiving**
32:5, 180:7,
209:23
**recently**
100:22, 172:11,
203:4, 203:5
**recognize**
23:9, 94:5,
99:11, 112:17,
172:5, 177:17,
184:5, 192:24,
194:1, 212:5,
234:24, 235:2,
236:3, 236:13
**recollection**
45:25, 50:23,
68:11, 100:13,
100:24, 101:22,
101:25, 102:22,
103:1, 103:3,
104:4, 113:21,
114:11, 118:2,
148:11, 150:15,
160:22, 174:20,
176:14, 184:19,
184:21, 184:24,
186:10
**recommendation**
222:3, 222:7
**recommendations**
20:2
**record**
7:5, 49:22,

72:18, 82:21,
95:21, 95:23,
134:7, 142:14,
142:16, 145:17,
173:22, 177:6,
178:8, 178:18,
215:23, 235:22,
237:22, 243:2,
243:3, 244:10,
245:5
**recorded**
244:6
**recording**
244:9, 245:4
**records**
78:25
**recounted**
160:6
**red**
190:18
**reduced**
244:7
**refer**
203:7
**reference**
68:1, 70:20,
130:16, 194:19,
207:24
**referenced**
70:13, 187:24
**references**
63:7
**referred**
61:1, 173:8
**referring**
155:13, 160:5,
160:9, 160:12,
160:15, 160:25,
174:11, 176:4,
176:15, 194:13
**refrain**
193:15
**refresh**
98:8
**refrigerate**
191:22
**refund**
119:15, 120:15,

122:12, 168:6,
168:15, 212:19,
213:4, 213:7,
213:9, 213:13,
213:16, 213:20,
214:4, 214:6,
214:8, 214:10,
214:13, 221:22,
222:5, 222:15,
229:13
**refused**
126:10
**regard**
115:15, 129:1,
162:17
**regarding**
108:23, 159:16
**register**
69:18, 75:1,
75:5, 96:11,
101:16, 101:17,
101:18, 102:13,
104:12, 105:9,
115:4, 115:17,
136:15, 137:7,
141:8, 143:1,
219:15, 220:8,
220:16, 221:5,
240:5
**regular**
19:19, 52:22
**regularly**
51:23, 52:1,
52:4, 61:19,
62:3
**related**
46:3, 72:7,
224:20, 237:9,
242:22, 244:12,
245:8
**relation**
176:23
**relative**
22:5
**relatives**
20:5, 20:6,
21:7, 22:3,
224:14

**relaying**
109:23
**relief**
31:22, 32:10,
32:13, 32:14,
32:18
**remain**
240:20
**remembered**
232:19
**remembers**
232:21
**reminder**
181:20
**rep**
241:11
**repeat**
34:20, 41:8,
44:9, 66:2,
104:2, 106:15,
106:16, 144:23,
210:5
**rephrase**
8:15, 8:17,
15:5, 120:25,
217:23, 238:10
**replay**
157:11
**replayed**
157:13
**reponses**
4:14
**report**
4:15, 4:20,
4:23, 98:22,
140:1, 172:17,
183:4, 190:14,
202:22, 209:24
**reporter**
6:23, 8:6,
12:25, 42:17,
58:20, 58:24,
82:11, 97:21,
111:21, 121:21,
121:25, 177:13,
193:20, 203:24,
241:4, 244:1
**reporting**
136:21

represent
6:14, 98:10,
102:9, 126:9,
126:15, 126:17,
126:25, 127:7,
145:18, 200:7,
226:14, 226:19
representative
31:3, 175:16,
175:25, 240:21,
241:7, 241:17
represented
45:19, 46:1,
47:15
representing
6:10, 6:24,
125:24, 126:21,
226:9, 226:12,
240:1
request
168:10, 168:15,
176:17, 221:22,
222:15, 236:5
requested
82:12, 106:17,
106:22, 157:12,
218:22
requesting
222:5
requests
236:9
require
138:10, 227:7
requires
130:9
research
57:13, 57:16,
57:18, 57:23,
57:25
reside
11:2
residence
13:11, 13:14,
223:22
resolution
122:13, 155:9,
234:5
resolve
144:18

resolved
165:19
response
104:2, 109:9
responses
5:5, 158:4,
158:11
responsibilities
31:2, 225:25,
226:5
responsibility
138:20, 139:5,
139:15, 220:16,
220:22, 221:4,
239:17, 240:4,
240:9, 240:14,
240:15
rest
198:2, 198:3
restate
55:11, 93:6,
157:10
result
34:24, 37:5,
37:10, 37:13,
37:15, 38:14,
38:21, 48:20,
54:14, 157:7,
207:3
results
40:10, 218:5
resume
23:14
resuming
49:22, 82:21,
95:23, 134:7,
177:6, 215:23,
235:22
retail
24:24
retailer
62:7, 62:11,
86:22, 88:16,
134:12, 203:19,
213:12, 213:21,
214:13, 215:3,
215:8, 238:20,
238:21

retailers
134:17, 213:19,
217:4, 235:3,
235:7
retain
58:4
retained
54:24, 110:22,
190:2
retainer
31:4, 57:8,
210:20, 236:18
retaining
57:12
return
214:3
returned
213:22
review
30:3, 30:4,
42:22, 112:5,
163:4, 212:9
reviewed
26:3, 28:16,
28:23, 29:25
rf
216:3, 219:9
rfa
212:15, 214:17,
214:22, 216:21,
221:17, 222:11
richmond
3:19
ride
136:9
ridiculous
137:3, 147:20,
148:21, 149:2,
149:5, 220:3
rights
31:2
ripped
221:15
road
13:24, 14:1,
136:8, 170:11
rodriguez
3:23, 6:9

role
225:16, 225:19
room
50:8, 50:11
round
95:16, 135:20
route
13:13
row
199:16
rudnik
236:23
run
17:6, 122:20
runs
170:11
rural
12:23

---S---

safeguards
234:8, 234:18
safety
204:23
said
21:3, 26:9,
26:23, 28:1,
28:16, 29:25,
32:9, 39:6,
39:24, 41:10,
48:13, 49:3,
50:17, 50:19,
54:18, 54:20,
54:21, 56:8,
56:24, 57:20,
58:18, 61:5,
61:11, 63:12,
77:19, 80:20,
81:13, 85:10,
87:11, 89:4,
93:6, 95:7,
104:6, 109:5,
111:4, 115:9,
119:18, 120:10,
126:5, 130:1,
130:6, 132:10,
138:5, 138:13,
140:2, 154:4,

154:16, 155:11,
160:18, 164:3,
164:7, 169:17,
171:5, 179:9,
182:11, 184:24,
185:15, 186:15,
186:22, 188:21,
197:8, 197:19,
198:14, 205:7,
207:17, 218:19,
233:7, 244:8,
244:9, 245:5

**salami**
187:8, 188:10,
188:16, 188:19

**sale**
104:12, 168:17

**same**
8:7, 8:10, 9:1,
9:11, 27:21,
27:22, 27:24,
33:1, 35:5,
73:6, 73:7,
76:5, 91:16,
94:4, 101:19,
112:8, 115:13,
116:11, 124:2,
124:13, 127:1,
136:25, 141:10,
143:3, 176:18,
180:11, 180:17,
194:12, 194:20,
195:17, 195:18,
196:23, 196:25,
199:7, 199:9,
199:11, 201:5,
204:5, 205:7,
208:25, 231:5,
232:5

**saturday**
16:3

**saved**
174:17

**say**
9:2, 9:17,
9:18, 12:4,
16:7, 16:17,
17:11, 29:2,

29:10, 32:12,
36:15, 39:19,
39:21, 52:7,
52:20, 53:10,
56:22, 57:8,
57:11, 60:4,
62:5, 62:7,
62:10, 62:17,
63:3, 66:18,
90:6, 92:13,
101:23, 103:8,
117:5, 117:16,
118:3, 118:14,
119:24, 121:15,
121:17, 122:3,
122:5, 123:8,
124:5, 126:2,
126:11, 127:17,
129:25, 130:9,
135:12, 135:19,
135:24, 136:20,
146:4, 146:23,
148:9, 148:13,
159:1, 166:19,
173:22, 175:4,
175:19, 179:5,
185:18, 188:7,
190:19, 201:25,
202:4, 205:5,
210:7, 211:7,
211:17, 224:3,
231:24, 234:16,
237:17, 238:16

**saying**
22:5, 35:23,
35:24, 39:6,
50:24, 59:17,
84:20, 86:14,
94:3, 104:3,
110:15, 110:21,
111:5, 115:20,
120:14, 122:7,
125:20, 133:7,
136:18, 153:14,
155:1, 162:20,
178:25, 187:1,
187:7, 189:25,
201:14, 210:7,

217:17, 231:9,
233:8, 236:19

**says**
23:21, 23:24,
43:2, 54:5,
59:3, 61:19,
62:3, 70:6,
71:11, 87:19,
99:15, 102:6,
110:14, 111:6,
113:7, 141:7,
142:25, 151:13,
152:11, 159:14,
159:20, 160:22,
164:24, 167:11,
168:3, 168:9,
174:8, 176:3,
176:10, 180:2,
191:10, 193:4,
194:17, 196:2,
208:9, 212:21,
214:18, 216:3

**scanned**
102:11, 106:11

**school**
21:2, 21:3,
21:4, 21:5,
23:22, 24:8,
24:9, 24:10,
143:23

**search**
197:20, 198:2,
198:6, 198:9,
198:12, 233:17

**searched**
197:13, 197:18,
237:11

**season**
15:11, 49:17

**second**
8:4, 22:18,
42:10, 53:9,
90:15, 91:7,
106:19, 127:20,
129:16, 146:1,
150:25, 151:10,
167:10, 190:15,
190:21, 195:2,

195:19, 195:22,
214:21, 222:18

**security**
25:11

**see**
35:10, 37:14,
37:24, 40:18,
43:2, 51:17,
51:20, 51:21,
72:13, 77:5,
91:9, 96:17,
102:5, 102:7,
106:10, 106:18,
110:18, 111:16,
113:5, 113:9,
113:18, 137:10,
138:6, 138:15,
139:12, 140:9,
140:19, 141:12,
151:10, 151:13,
151:16, 152:13,
159:25, 163:24,
167:7, 167:16,
169:23, 173:4,
173:5, 173:6,
174:9, 176:12,
177:9, 179:18,
179:20, 180:5,
181:4, 182:18,
182:21, 182:25,
183:16, 184:6,
187:9, 187:10,
188:5, 190:15,
192:5, 194:9,
194:21, 196:7,
196:17, 198:11,
199:15, 201:18,
203:10, 206:8,
206:10, 212:18,
215:11, 220:17,
235:19

**seeing**
104:24, 111:5,
201:23, 204:6,
209:23

**seek**
56:9, 84:10,
87:16, 119:20,

225:21
**seeking**
33:9, 33:20,
39:1, 40:25,
153:11, 155:6,
155:7, 156:13,
157:19, 242:2
**seem**
128:15
**seems**
161:16, 231:21
**seen**
22:24, 42:11,
42:20, 71:3,
102:12, 103:3,
103:7, 104:10,
158:8, 168:21,
168:22, 168:24,
172:8, 172:10,
192:8, 202:6,
202:8, 202:20,
237:4
**self**
104:16
**self-checkout**
105:1, 114:25
**self-serve**
75:5
**sell**
120:23, 154:22,
154:25
**send**
165:6, 176:10
**sending**
203:14, 203:15
**sense**
9:6, 13:25,
65:13, 85:8,
86:16, 103:22,
116:23, 120:3,
140:12, 141:23,
153:5, 201:6,
213:12, 242:3
**sent**
165:10, 173:10,
173:12, 174:12,
204:5, 206:13,
227:1

**sentence**
160:5, 160:9,
160:25, 168:8
**separate**
27:23, 74:7
**separated**
196:11
**service**
86:22, 87:3,
87:4, 96:23,
130:21
**session**
27:12, 27:18
**sessions**
30:24, 30:25
**set**
23:7, 25:3,
36:19, 75:24,
102:22, 105:13,
107:7, 158:5,
171:1, 192:13,
199:20, 205:3,
211:25, 216:19,
237:1
**sets**
197:2
**settle**
133:13
**settlement**
241:13
**seven**
11:15
**seven-year-old**
69:3
**several**
126:16, 181:12
**shaking**
7:25
**share**
198:19
**shed**
173:13
**shelf**
63:14, 69:16,
69:21, 70:5,
75:25, 76:5,
76:12, 76:24,
77:4, 79:2,

79:7, 79:22,
80:21, 83:20,
90:17, 90:20,
93:1, 93:11,
93:23, 96:12,
97:5, 114:15,
115:23, 123:10,
131:16, 132:6,
136:14, 138:17,
139:19, 140:3,
140:8, 140:12,
141:2, 151:5,
151:13, 156:11,
158:20, 158:24,
163:19, 163:23,
163:24, 164:8,
164:11, 168:16,
170:24, 175:7,
181:25, 187:2,
187:9, 187:11,
187:15, 187:21,
188:3, 188:5,
188:10, 188:12,
188:15, 188:19,
189:2, 201:24,
208:22, 210:22,
216:7, 216:12,
221:23, 222:17,
229:20, 230:14,
230:21, 238:15,
238:16, 238:23,
240:1
**shelves**
141:11, 143:4,
187:13, 187:15,
203:19
**shop**
18:2, 33:17,
48:21, 55:5,
61:20, 62:3,
62:4, 62:12,
63:3, 134:24,
136:3, 136:5,
136:12, 137:1,
137:19, 137:22,
138:19, 139:7,
158:17, 163:3,
169:24, 171:8,

185:4, 185:6,
188:23, 219:1,
221:10, 232:12,
233:1
**shopped**
16:15, 16:19,
17:5, 17:20,
49:2, 50:21,
101:12
**shopper**
16:18, 118:7
**shoppers**
46:24
**shopping**
53:11, 69:21,
140:24, 160:8,
171:12, 182:1,
184:25, 185:4,
185:13, 185:16,
185:21, 185:22,
185:24, 186:2,
186:9, 186:11,
186:14, 186:18,
186:21, 188:20,
189:3, 221:10,
240:13
**short**
171:21, 235:19
**should**
8:4, 29:17,
35:16, 36:24,
37:25, 38:3,
53:18, 53:24,
63:3, 120:15,
120:16, 127:9,
138:9, 198:4,
219:1, 220:6,
220:7, 220:13,
221:3, 229:4,
229:13, 229:20,
234:9, 234:14,
239:21, 239:23,
240:4, 240:9,
242:19
**show**
113:14, 146:15
**showed**
162:22

**showing**
115:12, 177:16
**shown**
10:13
**shows**
151:17, 182:23
**shut**
33:22, 34:2,
34:10, 34:16,
34:24, 35:17,
36:24
**siblings**
22:10, 22:11
**sign**
89:6, 192:5
**signature-mig2k**
245:11
**signature-p1kal**
244:15
**signed**
210:19, 236:20
**signs**
192:8
**silly**
220:2
**similar**
47:20
**similarly**
1:6, 238:3
**simple**
143:11
**simply**
77:2, 126:6
**since**
11:5, 13:9,
24:6, 137:14,
155:19, 171:14,
173:23
**single**
17:7, 138:22,
145:22, 147:25,
148:16, 240:10
**singular**
139:3
**sister**
176:24
**site**
172:16

**sites**
164:13
**sitting**
34:15, 34:21,
35:15, 36:4,
36:13, 40:20,
41:18, 156:21,
157:6, 234:10
**situated**
1:6, 238:3
**situation**
88:14, 88:21,
126:19, 126:21,
198:20, 221:8
**situations**
144:7
**six**
49:8, 187:6,
188:11
**skills**
244:11, 245:7
**sled**
18:16, 18:17,
18:23
**sledded**
18:16
**slightly**
148:21
**small**
59:23, 180:4
**smaller**
104:11, 192:23
**smallwood**
12:23, 13:2,
14:10, 59:20,
60:3, 60:5, 60:6
**snap**
77:13, 77:25,
78:14, 123:15,
123:16, 139:1,
139:10, 139:11
**snapped**
77:15
**snapping**
93:5, 96:21,
123:22
**snow**
18:17, 18:18,

18:19, 18:22
**snowman**
18:1, 18:14,
18:23
**social**
25:11, 164:12,
164:15, 164:17
**sold**
145:13
**some**
19:25, 20:16,
22:17, 22:19,
28:20, 29:18,
37:15, 38:14,
38:21, 39:17,
40:11, 45:10,
48:15, 49:14,
51:24, 52:15,
53:7, 54:19,
55:21, 56:21,
61:15, 66:11,
68:17, 70:11,
71:9, 72:7,
74:14, 77:23,
81:18, 82:13,
83:1, 83:25,
84:13, 92:16,
93:22, 95:17,
96:23, 98:3,
98:5, 105:22,
107:9, 112:2,
112:3, 112:8,
114:3, 116:10,
116:21, 122:12,
131:4, 135:23,
136:1, 138:5,
138:11, 139:11,
144:19, 164:14,
164:15, 166:14,
167:15, 172:15,
174:3, 174:24,
195:13, 200:23,
207:24, 212:12,
212:13, 212:14,
212:20, 231:23,
232:14, 242:22
**somebody**
231:4

**somehow**
9:9, 131:17,
240:14
**someone**
54:5, 65:16,
105:10, 122:7,
123:4, 123:19,
126:25, 130:9,
135:12, 144:10,
145:2, 223:7,
230:18, 232:7
**something**
8:18, 8:21,
16:21, 17:2,
17:11, 18:6,
22:1, 34:12,
36:9, 45:23,
47:1, 48:15,
52:11, 59:18,
60:8, 61:6,
62:25, 66:1,
66:7, 66:12,
66:14, 74:13,
75:24, 77:3,
77:22, 85:15,
92:8, 94:20,
95:22, 118:19,
118:22, 119:25,
120:1, 120:16,
121:15, 125:19,
130:1, 130:9,
133:13, 138:14,
140:18, 140:19,
140:22, 143:18,
144:23, 145:8,
145:10, 146:2,
153:3, 153:4,
165:4, 166:16,
170:19, 171:22,
174:19, 175:17,
175:18, 176:6,
182:12, 184:25,
185:17, 189:2,
198:19, 218:5,
218:6, 226:6,
230:3, 232:22,
237:21
**sometime**
49:15, 49:16,

57:9, 57:10,
65:24, 97:4,
130:25
**sometimes**
48:7, 52:9,
52:11, 53:5,
59:15, 60:19,
64:16, 65:22,
65:25, 66:9,
135:11, 145:1,
164:23, 187:13
**somewhere**
128:19, 132:13,
188:2, 197:25
**son**
52:2
**soon**
55:3, 79:20,
82:6, 83:7,
108:1, 128:25,
136:1
**sorry**
11:11, 11:20,
12:25, 16:2,
16:25, 18:6,
21:4, 21:11,
30:10, 41:9,
42:18, 44:9,
48:10, 48:11,
53:5, 54:8,
54:11, 55:10,
56:6, 57:15,
59:12, 60:4,
60:16, 61:11,
64:6, 64:7,
64:19, 65:2,
65:8, 66:2,
67:3, 67:12,
70:15, 70:22,
81:21, 84:1,
86:20, 93:5,
96:25, 104:1,
111:5, 117:16,
117:18, 121:21,
121:24, 122:10,
129:14, 132:12,
133:18, 139:6,
140:19, 142:15,

144:22, 147:21,
148:21, 154:1,
154:15, 154:17,
155:13, 164:7,
169:17, 173:5,
177:24, 181:14,
183:3, 187:25,
189:19, 195:21,
196:7, 196:10,
200:20, 202:6,
205:4, 211:7,
214:22, 226:2
**sort**
7:24, 14:13,
20:10, 20:20,
21:1, 29:12,
29:17, 44:22,
46:24, 52:22,
61:25, 70:10,
73:3, 74:17,
79:12, 79:23,
81:1, 96:17,
163:3, 182:3,
196:14, 234:24,
239:23
**sorts**
123:23
**sought**
33:5, 107:17,
119:11, 121:18
**sound**
177:19
**sounds**
33:1, 35:4,
36:19, 40:9,
59:13, 60:17,
104:25
**southern**
1:2, 6:6
**space**
141:22
**speak**
58:5, 71:22,
80:5
**speaker**
22:20
**speaking**
41:4, 48:23,

55:5, 128:19,
217:3
**speaks**
24:3
**special**
241:1, 241:10
**specific**
40:10, 40:11,
46:17, 47:6,
86:25, 87:2,
87:4, 101:24,
102:21, 102:25,
104:4, 104:23,
118:2, 121:2,
141:4, 144:24,
155:9, 162:10,
170:20, 171:1,
176:23, 205:1,
207:16, 226:6
**specifically**
26:14, 28:21,
30:23, 33:18,
42:4, 44:3,
67:4, 67:7,
67:10, 67:18,
69:19, 76:9,
81:1, 91:19,
91:24, 94:21,
100:9, 102:18,
103:9, 105:14,
109:23, 115:8,
115:19, 131:13,
139:21, 140:4,
140:7, 158:16,
165:2, 167:11,
180:14, 181:17,
181:18, 184:17,
185:1, 188:8,
200:6, 200:13,
203:15, 207:11
**specifics**
79:14, 79:18,
109:19, 121:1,
124:8, 130:7,
131:3, 132:9,
206:14
**speculate**
66:16, 66:19,

77:7, 77:21,
88:20, 90:21,
91:3, 122:24,
123:3, 142:3,
142:4, 187:4,
187:19, 208:24,
232:23
**speculating**
67:2, 80:12,
122:4
**speeding**
45:23
**spend**
121:5, 134:1,
226:25, 227:2,
227:4
**spending**
135:22, 136:9
**spent**
227:6, 227:9
**spirits**
169:1
**splash**
66:11
**splice**
35:9
**spoke**
29:7, 44:21,
45:13, 58:9,
119:22, 207:5
**spoken**
25:20, 43:17
**st**
57:9, 57:10
**staff**
54:15, 57:5
**stamped**
178:3
**start**
10:16, 15:6,
22:10, 49:15,
58:13, 156:4,
158:11
**started**
7:5, 7:15,
19:6, 156:2,
227:25
**state**
2:10, 6:14,

20:14, 33:18,
88:21, 126:18,
127:8, 128:18,
143:13, 145:4,
146:25, 169:12,
225:14, 226:13,
226:17, 226:23,
242:19, 244:18
**stated**
38:18, 50:17,
216:7, 216:12
**statement**
4:21, 160:3,
194:4, 195:11,
195:14, 195:16,
216:25, 218:11,
218:25, 221:13
**statements**
17:2, 72:7,
72:12, 197:13,
233:18
**states**
1:1, 6:5,
20:13, 21:8,
22:4, 22:12,
169:15
**station**
62:9
**stay**
170:7, 225:20
**stays**
170:6
**stella**
208:7
**steps**
120:20, 145:3
**still**
17:19, 49:13,
90:19, 97:9,
99:8, 101:6,
175:5, 175:6,
203:2
**stop**
19:5, 22:14
**stopping**
128:17
**stored**
201:4

**stores**
33:23, 34:2,
34:11, 34:17,
34:25, 35:16,
36:24, 39:25,
41:12, 48:24,
55:6, 69:22,
79:11, 87:13,
122:21, 141:11,
143:4, 146:24,
149:15, 156:1,
161:22, 163:7,
164:5, 182:1,
186:7, 209:10,
219:21, 239:7
**straightforward**
69:24
**strategies**
105:25
**street**
2:2, 3:5, 3:18,
6:12, 10:24
**stretches**
52:10
**stricken**
178:15
**students**
170:11
**stuff**
70:11, 77:8,
80:8, 109:1,
135:10, 138:2
**subdivision**
59:7, 59:9,
59:11, 59:13
**subdivisions**
59:16
**submit**
165:9
**subsequent**
137:8
**substance**
7:15
**sued**
165:20
**suffer**
38:14, 38:20,
124:1, 152:13

**suffered**
118:25, 152:11,
152:12, 152:16,
230:11, 230:18
**suggest**
53:17, 53:23,
54:3
**suing**
38:9, 235:8
**suit**
31:18, 47:16,
135:12, 136:23,
190:2
**summer**
15:12, 49:12,
49:13, 49:14
**sunday**
16:1, 16:2,
16:3
**supermarket**
135:9, 135:19
**supplemental**
158:3, 159:19,
161:19, 168:9
**supplies**
168:5
**supporting**
143:7
**supports**
142:8
**suppose**
66:15, 116:3
**supposed**
187:14
**sure**
8:8, 9:3, 9:13,
9:15, 16:16,
17:1, 17:3,
18:4, 22:8,
29:5, 31:5,
33:16, 34:21,
41:10, 44:11,
53:3, 55:10,
60:10, 66:3,
75:8, 78:25,
79:13, 81:6,
82:2, 82:11,
82:20, 92:17,

99:24, 105:3,
107:25, 108:5,
115:22, 119:21,
120:20, 121:17,
123:7, 126:23,
129:7, 131:20,
132:15, 139:14,
140:13, 145:10,
160:15, 161:20,
166:9, 168:16,
171:23, 173:2,
174:13, 174:16,
175:1, 175:22,
175:24, 176:18,
181:13, 181:15,
181:21, 182:7,
182:14, 191:15,
195:4, 195:20,
195:23, 206:4,
210:6, 212:7,
219:2, 219:25,
222:13, 224:4,
224:11, 228:3,
242:4
**surely**
147:22
**suspect**
154:13, 155:18
**swimming**
60:22, 61:13
**sworn**
6:25, 7:2,
244:5
**syforce**
202:22
**system**
95:21

---
**T**
---

**tag**
69:17, 76:5,
76:12, 76:24,
77:4, 79:7,
90:20, 114:15,
187:16, 188:12,
188:20, 201:24,
202:3, 202:7,
202:9, 216:7,

216:12, 230:14

**tags**
69:20, 69:21,
163:24, 175:7,
208:23, 210:22,
211:3, 211:9,
211:11

**take**
8:6, 9:14,
9:16, 9:18,
9:19, 9:21,
13:13, 49:19,
66:14, 74:26,
77:13, 79:7,
79:16, 81:3,
82:16, 93:10,
96:14, 96:19,
98:18, 107:14,
108:9, 112:21,
120:21, 121:9,
123:9, 131:15,
133:12, 138:11,
138:20, 138:25,
140:8, 140:11,
140:18, 145:3,
146:2, 153:22,
170:4, 175:19,
180:3, 181:9,
181:17, 181:20,
181:25, 182:9,
185:18, 185:19,
188:22, 189:1,
189:4, 193:2,
195:12, 201:3,
204:9, 207:4,
207:10, 211:14,
211:19, 235:19

**taken**
25:2, 30:18,
98:11, 98:17,
98:23, 99:12,
121:3, 122:12,
122:20, 123:7,
123:21, 158:19,
158:24, 182:24,
189:17, 193:4,
200:11, 204:4,
205:5, 244:3

**takes**
222:5

**taking**
6:11, 9:15,
13:24, 79:1,
96:18, 96:19,
133:8, 138:17,
143:20, 175:6,
183:11, 183:19,
184:15, 184:22,
188:8, 190:6,
200:5, 206:2,
208:4, 208:12,
208:14, 208:18,
208:21, 209:16,
210:22, 211:2,
211:4, 211:8,
211:10, 211:21,
215:18

**talk**
8:5, 22:9,
35:7, 35:20,
36:2, 36:9,
41:19, 85:1,
109:3, 109:13,
122:7, 123:4,
123:18, 130:10,
135:5, 153:4,
153:12, 161:18,
178:18, 228:23

**talked**
20:19, 30:9,
51:11, 63:6,
117:10, 136:13,
160:3, 168:25,
170:13, 182:13,
208:25, 211:15,
219:15, 223:10,
223:16, 242:23

**talking**
22:8, 36:13,
36:23, 50:1,
52:10, 52:21,
74:3, 82:25,
85:19, 96:3,
100:7, 100:9,
115:14, 132:3,
132:4, 135:20,

135:22, 144:24,
157:15, 221:2,
239:6, 239:11

**talks**
96:8

**taylor**
3:16, 4:4,
6:20, 7:4, 7:12,
22:19, 22:22,
39:2, 48:4,
49:18, 49:24,
78:20, 81:24,
82:2, 82:5,
82:9, 82:16,
82:20, 82:23,
95:7, 95:10,
95:15, 95:20,
95:25, 97:19,
97:22, 106:16,
106:20, 111:4,
111:20, 111:24,
112:1, 125:15,
129:7, 129:8,
134:5, 134:9,
142:22, 150:5,
150:19, 157:11,
157:23, 161:18,
171:23, 171:25,
177:4, 177:8,
177:11, 178:13,
178:17, 178:22,
183:5, 183:25,
189:12, 190:24,
192:14, 193:19,
193:21, 195:6,
199:22, 202:15,
203:23, 203:25,
205:13, 207:19,
211:25, 215:20,
215:22, 215:25,
218:20, 224:24,
235:18, 235:24,
237:16, 237:21,
238:7, 238:14,
238:18, 238:25,
239:19, 240:8,
240:17, 240:23,
241:2, 241:6,

241:14, 241:19,
242:9, 242:13,
242:17, 243:1

**teacher**
23:25, 57:23,
143:23

**technically**
71:17, 73:12,
198:21, 228:19

**tedious**
131:21

**teens**
45:22

**tell**
8:15, 10:17,
11:10, 12:17,
19:25, 20:16,
45:4, 53:17,
56:19, 63:22,
73:1, 92:2,
101:3, 110:25,
111:7, 114:5,
114:7, 130:24,
145:14, 152:22,
152:23, 160:14,
160:16, 166:21,
191:20, 193:12,
205:22, 206:20,
207:9, 225:11,
233:20

**telling**
160:22

**tend**
213:17

**tennis**
60:22, 60:25,
61:5, 61:7

**tents**
89:17

**term**
186:20

**terms**
24:18, 49:4,
71:25, 115:14,
133:25, 147:4,
219:5

**testified**
7:3, 25:1,

25:5, 78:10,
107:9, 144:25
**testify**
44:12, 149:18
**testifying**
10:8, 10:12,
145:17
**testimony**
17:4, 17:12,
17:19, 17:21,
35:14, 35:20,
36:1, 36:16,
38:24, 43:8,
76:11, 82:25,
83:23, 90:24,
105:3, 105:7,
121:8, 125:14,
126:24, 135:14,
136:2, 149:23,
150:4, 150:6,
161:2, 209:21,
210:8
**text**
52:18, 98:22,
108:7, 180:7,
181:7, 181:24,
182:6, 203:14,
203:16
**texted**
52:19, 206:9,
206:15
**texts**
51:25
**th**
2:2, 3:5, 6:12,
57:9, 100:8,
110:12, 128:10,
132:11, 136:18,
161:23, 162:22,
179:2, 179:10,
180:11, 189:15,
189:17, 189:18,
189:19, 205:10
**th-century**
23:25
**thank**
22:22, 48:19,
68:16, 71:8,

121:25, 164:25,
190:25, 203:25,
227:15
**thanks**
106:23
**themselves**
1:5, 6:13,
238:2
**ther'es**
157:5, 186:25
**thereafter**
84:14, 107:10,
244:6
**therefore**
219:23
**thing**
8:1, 8:4, 9:14,
9:19, 35:23,
36:20, 53:5,
80:5, 92:12,
120:2, 135:9,
176:3, 176:18,
178:23, 192:4,
195:23, 201:2,
222:8, 232:20
**things**
8:11, 9:1,
18:1, 23:21,
55:19, 57:24,
62:21, 62:24,
106:25, 118:16,
120:7, 120:24,
123:23, 130:12,
135:7, 136:6,
138:6, 138:21,
139:9, 144:15,
149:16, 154:6,
154:25, 165:1,
170:5, 170:18,
171:10, 172:15,
185:9, 204:22,
213:5, 221:11,
239:13, 240:12,
241:21, 242:1,
242:23
**thinking**
124:18, 233:13
**thinks**
13:21

**third**
71:7, 151:16,
176:1, 194:7
**thought**
56:24, 64:25,
65:1, 67:1,
77:23, 78:18,
86:9, 87:7,
104:6, 105:24,
111:4, 120:3,
123:25, 138:24,
175:14, 185:23,
187:23, 191:21,
193:14, 210:6,
226:2, 226:11
**thoughts**
36:22, 37:3,
40:4, 40:16,
40:19, 41:3,
41:17, 86:13,
86:14, 124:9,
234:18, 234:22
**thousands**
145:20, 154:22
**three**
11:16, 28:19,
30:25, 72:14,
129:1, 129:2,
134:22, 137:17,
137:18, 141:21,
150:1, 150:14,
152:6, 156:8,
175:2, 180:3,
199:15
**through**
23:20, 39:1,
70:13, 70:14,
71:25, 105:25,
131:19, 153:17,
158:10, 166:4,
172:15, 178:11,
196:15, 198:3,
208:7, 237:5,
240:22
**throughout**
217:6
**throw**
148:24

**ticket**
45:23
**tie**
233:17
**timeline**
54:18
**times**
9:17, 15:7,
15:9, 16:23,
62:16, 62:19,
84:20, 105:1,
141:19, 141:21,
154:5, 154:23,
155:2, 155:11,
199:15, 203:9,
239:5, 240:11
**timestamp**
179:23
**timing**
49:4, 116:13,
123:17
**title**
20:25
**titled**
173:20
**to-date**
23:18
**today**
6:9, 6:23,
7:20, 8:13,
9:16, 10:6,
10:9, 34:15,
100:25, 135:6,
156:22, 160:4,
174:23, 222:21,
227:12, 234:11,
235:10, 235:13,
237:5
**today's**
6:7
**together**
23:15, 111:20,
170:3, 182:13,
185:20, 196:13
**told**
53:11, 65:1,
66:4, 67:1,
110:2, 138:24,

207:6, 212:23
**tomorrow**
22:15
**took**
75:25, 76:4,
77:20, 80:21,
92:16, 92:25,
94:11, 98:16,
121:19, 123:9,
131:4, 131:25,
139:18, 140:2,
141:1, 141:5,
144:18, 151:5,
185:1, 186:16,
186:23, 189:5,
189:8, 191:8,
191:11, 191:17,
192:1, 193:9,
193:16, 204:17,
205:23, 209:7,
210:9
**top**
31:8, 111:14,
139:24, 139:25,
145:14, 150:8,
178:2, 182:19
**total**
152:18, 153:2,
227:5
**totals**
227:14
**tough**
86:16
**toward**
186:8
**trail**
12:21, 14:11,
15:2, 15:8,
16:5, 16:9,
16:13, 47:23,
48:7, 59:5,
62:8, 62:14
**transaction**
43:15, 43:16,
44:6, 44:7,
44:17, 44:23,
44:25, 50:4,
51:12, 53:18,

58:4, 63:11,
63:13, 69:14,
70:2, 76:16,
80:22, 83:2,
89:13, 89:18,
89:19, 90:16,
91:10, 91:12,
92:4, 92:8,
92:23, 94:9,
96:4, 97:2,
107:7, 107:9,
108:11, 109:7,
109:13, 109:15,
110:4, 110:5,
110:8, 110:12,
110:20, 111:1,
111:8, 113:17,
132:11, 133:20,
137:8, 151:23,
161:25, 162:3,
174:25, 175:8,
180:11, 181:3,
183:2, 183:7,
194:8, 194:20,
194:23, 196:5,
205:18, 205:24,
206:17, 216:23,
218:13, 219:6,
219:25
**transactions**
43:5, 63:7,
72:14, 100:15,
117:13, 117:20,
117:22, 122:15,
123:24, 129:2,
137:8, 153:16,
154:20, 155:12,
161:24, 174:22,
197:14, 199:7,
199:9, 233:17
**transcribed**
1:25
**transcriber**
245:1
**transcript**
245:3, 245:5
**transcriptionist**
244:8

**transcripts**
7:7
**transparent**
55:6
**trash**
162:15
**travel**
51:20, 51:21
**treatment**
241:1, 241:11
**trent**
3:16, 6:20
**trial**
25:6, 240:20,
240:22
**tried**
130:20, 138:6
**trip**
135:21
**trouble**
38:7, 65:12,
108:17, 120:9,
186:13
**true**
103:12, 214:13,
215:7, 244:9,
245:5
**trust**
48:23, 48:24,
69:22, 79:10,
87:12, 87:13,
87:15, 88:15,
88:16, 156:1,
163:7, 164:9
**trusted**
164:5, 217:4
**truthfully**
10:1, 10:6
**try**
8:4, 8:8,
17:10, 58:7,
65:10, 79:15,
111:6, 122:7,
127:24, 133:13,
139:13, 181:20,
211:18
**trying**
7:22, 13:22,

22:7, 35:9,
35:12, 35:13,
35:22, 37:21,
39:9, 45:21,
52:3, 57:22,
61:3, 64:6,
67:11, 67:12,
68:25, 77:2,
77:11, 79:5,
86:12, 86:25,
104:7, 106:24,
108:25, 119:6,
119:24, 136:6,
140:9, 150:5,
150:6, 161:8,
182:7, 196:21,
197:1, 200:17,
221:1, 234:25
**tuna**
205:17, 206:3
**turn**
42:25, 58:25,
172:16, 172:21,
182:16, 199:1,
199:14, 214:17,
221:16, 222:11
**turned**
143:15, 237:11
**twenty**
26:16
**two**
8:7, 11:13,
12:11, 13:12,
16:11, 27:12,
28:4, 31:1,
43:3, 43:5,
64:22, 80:9,
81:23, 82:18,
98:23, 122:21,
126:4, 132:3,
136:8, 188:16,
196:22, 197:2,
197:16, 197:19,
198:14, 199:7,
199:9, 199:11,
213:5, 232:8,
233:18, 241:21,
242:1

type
36:22, 64:20,
67:4, 122:12,
130:20, 166:14
types
62:21, 65:10
typewriting
244:7
typically
13:13, 13:22,
13:23, 15:18,
24:19, 24:21,
51:20, 57:19,
62:22, 65:5,
65:6, 65:7,
65:9, 66:12,
69:20, 69:22,
69:25, 71:16,
71:20, 74:5,
80:9, 85:5,
91:25, 94:18,
135:4, 137:23,
143:14, 162:6,
162:12, 163:4,
163:7, 164:4,
164:8, 164:9,
164:11, 169:25
typo
110:15, 176:5

**U**

ultimately
170:24, 238:22
unclear
125:20, 227:21
under
10:9, 58:18,
58:20, 58:21,
58:22, 159:19
undercharged
87:23, 88:4,
88:11, 88:17
undercranking
226:10
understand
8:14, 8:16,
8:18, 8:21,
8:22, 8:24, 9:2,

9:5, 10:8,
10:11, 15:4,
35:14, 37:22,
39:2, 39:9,
43:24, 54:17,
68:24, 79:5,
104:7, 106:25,
119:7, 125:23,
170:9, 217:8,
221:1
understandable
174:2
understanding
23:4, 32:21,
33:4, 33:8,
35:4, 56:6,
73:17, 101:4,
107:4, 108:17,
140:14, 194:11,
206:4, 225:3,
225:8, 225:11,
225:15, 225:18,
225:24, 226:1,
228:8
understating
226:8
unfortunately
97:11, 108:8,
115:2, 131:8,
224:23
unidentified
22:20
unique
126:19, 126:22
unit
141:9, 143:2
united
1:1, 6:5
universe
91:5
unless
81:25, 94:19,
161:16, 162:10,
226:6, 227:22
unsure
177:19
until
76:13, 132:22,

203:4, 203:5,
230:1
up-to-date
23:17, 23:19
upgrade
99:9
upset
88:3, 88:10,
207:12, 207:17
use
48:2, 61:8,
61:9, 66:11,
71:16, 71:21,
85:11, 89:5,
94:23, 114:24,
135:14, 166:10,
175:18, 175:24,
190:7, 194:5,
198:22, 220:25
user
70:8, 71:18,
73:13, 73:16
uses
74:7
using
89:4, 175:14,
186:20
usually
14:3, 52:17,
62:23, 80:10,
162:2, 170:19
utilized
229:12

**V**

va
3:19
vacation
14:17, 59:4
valley
194:12, 201:25,
216:4
vanilla
113:25, 114:8,
116:2, 180:3,
180:13, 181:10,
181:19
variations
213:17

variety
36:22
various
122:9, 170:23,
208:22
vary
15:11
verb
77:1, 100:1
verbal
7:25
verified
137:15
verify
78:1, 78:15,
79:16, 90:13,
92:18, 93:20,
139:11, 140:15,
150:9, 150:11,
150:17, 154:6,
154:10, 156:12,
163:15, 163:21,
164:16, 175:11,
183:15, 195:19,
206:6, 218:7,
228:15, 232:24,
240:5
verifying
137:2, 139:6,
140:9, 165:16
version
35:5, 192:23
versus
15:12, 123:22
via
17:22, 27:5,
27:6, 47:20,
51:24
vicinity
16:5
video
6:8, 6:11
videographer
3:23, 6:2, 6:9,
6:23
videotape
10:13, 17:23
videotaped
6:3

view
130:18
vigilance
90:11
vigilant
49:2, 77:25,
78:24, 79:12,
90:7, 90:8,
90:12, 117:6,
136:21
vigorously
242:12
virtual
27:6, 27:11,
27:18, 28:7,
28:9, 47:20
virtually
27:6
visit
16:13, 48:7,
76:5, 90:8,
112:23, 113:21,
130:18, 132:19,
138:22, 146:7
visited
62:13, 101:1,
118:13, 130:8,
161:21, 165:23
visits
103:13, 132:20,
132:21
voice
6:13
volunteer
19:18
vs
6:4

**W**

waffles
91:13, 91:21,
91:25, 94:14,
96:10, 151:11,
151:19
wait
123:1, 130:13,
131:19, 237:22
waiting
123:18

walked
77:15, 90:5,
116:24
walking
117:9, 162:14
want
7:5, 16:17,
16:25, 17:3,
17:8, 17:10,
18:3, 19:11,
33:22, 34:2,
34:10, 35:25,
37:4, 37:23,
38:1, 38:3,
38:5, 38:13,
38:18, 38:20,
39:5, 39:7,
39:8, 39:18,
40:10, 40:11,
44:11, 53:8,
54:6, 54:17,
55:10, 56:17,
58:25, 60:20,
61:18, 63:5,
70:20, 71:22,
72:16, 77:7,
77:18, 77:21,
81:2, 90:15,
90:21, 110:10,
110:18, 121:8,
121:17, 125:17,
140:22, 142:3,
146:2, 147:22,
148:15, 152:21,
153:22, 159:11,
159:24, 160:2,
164:16, 166:19,
167:10, 172:15,
176:1, 179:16,
181:1, 182:16,
183:25, 185:8,
199:1, 211:14,
211:17, 211:18,
214:17, 215:6,
215:21, 216:2,
216:20, 217:21,
218:7, 221:12,
222:11, 222:13,

226:7, 232:22,
232:23, 237:21,
239:4
wanted
23:20, 40:18,
49:25, 54:4,
55:17, 56:20,
70:9, 77:25,
78:14, 78:24,
79:15, 80:7,
81:6, 90:12,
91:20, 95:6,
96:2, 96:8,
106:10, 112:3,
158:16, 177:10,
181:11, 181:13,
181:14, 192:4,
203:7, 212:22,
216:9
wanting
175:22, 182:14,
203:18
wants
106:18
warned
160:17
washington
1:14
watch
42:17
water
22:19, 22:21,
82:4, 171:22
wavelength
115:14
way
8:17, 8:25,
19:5, 36:12,
36:13, 36:21,
37:10, 73:24,
79:24, 96:17,
105:13, 105:23,
119:24, 123:15,
123:16, 124:18,
125:21, 137:22,
144:19, 201:3,
201:22, 208:7,
218:6, 240:20,

240:22
ways
52:15, 160:22,
231:19
we'll
140:1, 178:14,
189:21, 198:13
we're
135:20, 135:21,
150:19, 157:15,
158:10, 175:22,
182:10, 182:14,
186:17, 221:2,
239:6
we've
63:6, 64:17,
65:10, 65:22,
72:23, 136:13,
160:3, 194:12
website
165:24
week
26:7, 26:8,
26:24, 27:2,
27:9, 27:25,
52:23, 172:12
weekend
15:20, 16:12
weekends
62:6
weeks
28:4, 47:6,
49:5, 49:16,
50:3, 51:6,
53:9, 57:7,
190:1, 232:8,
232:9, 232:15
weigh
40:10
weighing
133:25
weights
146:20
weird
12:21
went
17:24, 18:5,
18:16, 74:25,

75:25, 76:4,
80:20, 81:13,
84:21, 84:23,
85:1, 89:22,
94:12, 96:22,
111:12, 122:6,
197:21

**weren't**
65:1, 85:11,
222:25

**whatever**
18:4, 35:13,
50:20, 67:4,
67:14, 71:2,
74:20, 77:6,
85:25, 99:25,
104:7, 132:6,
140:22, 154:23,
160:21, 161:17,
185:11, 211:15,
231:5, 232:24

**whatnot**
223:24

**whenever**
48:2

**wherever**
232:8

**whether**
16:19, 17:5,
17:20, 34:1,
34:9, 34:10,
34:15, 34:16,
34:21, 34:23,
35:16, 36:17,
36:23, 37:23,
37:25, 38:2,
40:16, 44:5,
46:17, 50:7,
50:10, 50:13,
51:8, 51:10,
51:24, 65:14,
70:1, 70:4,
72:8, 74:6,
75:11, 78:4,
81:9, 83:23,
83:25, 91:1,
94:13, 96:23,
97:13, 98:16,

104:11, 105:9,
110:1, 114:21,
114:24, 115:3,
116:11, 116:17,
121:4, 134:1,
138:15, 139:12,
140:15, 141:23,
142:7, 148:2,
150:17, 156:22,
157:5, 158:13,
158:23, 163:10,
170:16, 174:21,
186:1, 186:8,
186:9, 186:10,
187:20, 189:22,
196:22, 199:16,
212:22, 213:12,
215:6, 217:9,
219:5, 223:6,
228:11, 230:18,
232:12

**whetherany**
149:24

**white**
14:24, 43:3,
61:21, 99:20,
100:2, 100:4,
100:5, 100:14,
100:25, 101:9,
101:14, 102:14,
103:13, 103:19,
104:13, 105:1,
105:6, 105:11,
105:16, 111:8,
112:24, 113:22,
115:17, 117:15,
117:23, 118:8,
118:12, 119:1,
120:13, 121:10,
122:14, 124:2,
124:14, 125:12,
126:3, 128:24,
130:22, 133:20,
137:9, 146:21,
151:7, 162:3,
169:10, 169:21,
180:12, 185:14,
186:2, 186:6,

186:9, 186:11,
186:19, 194:13,
205:18, 214:20,
215:2, 216:5,
216:10, 222:23,
223:12, 224:6

**whole**
91:13, 91:21,
94:6, 96:10,
128:6, 164:5,
201:8, 201:10,
201:14, 211:11,
230:3

**wife**
11:9, 12:11,
13:5, 18:9,
20:18, 20:19,
22:15, 27:15,
27:17, 28:12,
28:14, 46:23,
58:9, 58:10,
64:22, 65:25,
69:12, 98:25,
99:3, 109:3,
109:6, 109:14,
116:15, 158:23,
159:6, 169:1,
169:6, 169:24,
171:11, 173:12,
173:21, 174:1,
174:5, 175:6,
176:2, 176:9,
179:21, 181:7,
181:24, 185:5,
185:8, 185:16,
186:15, 194:5,
199:10, 200:23,
201:3, 204:19,
205:23, 206:17,
209:15, 210:9,
210:21, 237:8

**wife's**
11:10, 65:23,
65:24, 99:2,
176:21, 182:12,
200:9, 202:25,
209:23

**willing**
242:6, 242:11

**winter**
15:12

**wire**
58:19, 58:20,
58:22

**wise**
138:25

**wish**
128:23, 129:10,
129:22

**within**
57:7

**without**
30:12, 34:22,
36:13, 36:23,
41:4, 41:19,
52:10, 157:3,
188:19, 189:2,
189:7, 202:7,
202:9

**witness**
6:25, 7:2,
13:2, 13:17,
42:18, 58:18,
58:22, 81:21,
81:25, 82:3,
82:7, 82:18,
121:24, 122:2,
134:6, 171:21,
171:24, 177:5,
215:11, 230:7,
230:9

**witness(es**
244:4

**wolf**
1:4, 1:13, 2:1,
3:2, 4:3, 6:3,
6:4, 7:1, 7:13,
10:18, 11:11,
17:13, 20:23,
22:24, 23:9,
24:23, 27:22,
31:9, 37:4,
38:25, 42:1,
42:10, 45:15,
45:18, 46:6,
48:6, 49:25,
50:3, 50:22,

50:24, 51:6,
51:18, 52:8,
53:11, 53:13,
54:19, 82:24,
84:10, 96:1,
98:2, 113:7,
122:1, 147:17,
159:21, 159:22,
160:7, 161:1,
174:5, 177:9,
179:1, 185:4,
185:13, 191:3,
194:17, 195:7,
195:10, 196:8,
196:18, 196:19,
199:5, 199:6,
212:18, 215:2,
216:1, 216:4,
216:22, 224:12,
236:19, 238:2,
240:25
**wolfe**
134:10, 238:5
**woman**
223:4
**wondering**
66:3, 74:6,
98:3, 200:2,
200:10, 200:24,
201:21
**woods**
6:21, 14:22
**word**
38:7, 85:11,
90:7, 220:25
**words**
31:10, 99:16,
133:7, 133:24,
149:1
**work**
20:11, 23:21,
24:21, 143:22,
168:11, 173:2,
224:14, 224:17,
233:13
**worked**
24:5, 24:24,
132:25, 133:7,

133:10, 224:13
**worker's**
25:8
**working**
105:13
**works**
73:1
**worried**
76:8
**worry**
48:25
**worth**
195:24
**would've**
68:20
**wouldn't**
90:22, 126:8,
135:23, 189:1,
215:18, 227:24
**written**
170:16
**wrong**
125:16, 147:9,
147:19, 148:4

---
**Y**
---
**y'all**
71:15, 73:25
**year**
15:7, 15:10,
15:13, 45:2,
49:11, 56:19,
57:11, 64:8,
64:10, 64:19,
65:21, 66:17,
68:19, 69:1,
77:22, 79:19,
80:6, 80:13,
85:16, 86:13,
86:15, 90:10,
90:22, 109:1,
216:18
**yearly**
15:5, 15:6
**years**
12:1, 25:18,
53:3, 72:15,
138:22, 150:1,

150:14, 152:6,
154:13, 156:6,
156:8
**yelled**
58:16
**yesterday**
15:16, 16:20,
17:5, 17:21,
17:25, 18:2,
18:5, 18:8,
18:11, 18:13,
18:15, 19:2,
232:13
**yogurt**
113:25, 114:8,
114:12, 116:2,
116:9, 137:25,
180:13, 180:22,
181:10, 181:19,
182:20, 183:8,
183:12, 187:8,
188:17, 188:19,
195:1
**yogurts**
180:3
**york**
1:2, 1:9, 2:3,
2:11, 3:6, 6:4,
6:6, 6:12, 6:21,
10:25, 12:19,
12:23, 13:1,
13:2, 20:13,
20:14, 21:8,
21:11, 22:4,
22:12, 33:18,
33:23, 34:3,
34:11, 34:17,
34:25, 35:16,
36:24, 39:25,
41:12, 59:4,
59:6, 61:21,
99:20, 100:14,
100:25, 102:15,
103:14, 103:20,
112:24, 126:18,
127:8, 141:11,
143:4, 143:13,
146:25, 151:8,

158:4, 169:12,
180:12, 185:7,
194:13, 199:18,
203:9, 223:13,
224:6, 225:14,
226:13, 226:17,
226:23, 236:10,
244:18
**yourself**
23:15, 32:11,
69:10, 86:6,
153:11, 240:4,
242:7

---
**Z**
---
**zip**
12:22
**zoom**
27:5, 27:6
**zoomed**
188:6

---
**$**
---
**$.10**
83:14, 84:3,
87:8, 90:24
**$2.00**
183:20

---
**.**
---
**.1000**
3:20

---
**0**
---
**00**
19:10, 95:13
**00558**
1:8, 6:7
**05**
1:16, 6:8
**08902**
3:12
**09**
113:7

---
**1**
---
**1**
95:13, 113:18,

181:3, 182:24
**10**
1:16, 4:17,
6:8, 12:1,
82:21, 126:5,
132:4, 184:1,
184:2, 184:4,
184:16, 184:22,
189:15, 189:17,
189:18, 189:19,
190:1
**100**
145:22, 145:23,
228:15, 235:1
**10022**
2:3, 3:6, 6:12
**11**
4:18, 49:22,
49:23, 61:19,
110:12, 110:14,
110:16, 110:19,
111:1, 111:8,
112:23, 113:22,
115:1, 115:5,
115:15, 116:7,
116:16, 116:18,
116:25, 117:12,
117:19, 119:2,
128:10, 132:11,
134:24, 136:18,
137:8, 146:7,
146:15, 161:23,
162:22, 174:24,
175:8, 179:2,
179:10, 179:23,
180:11, 182:24,
190:25, 191:1,
191:3, 194:8,
194:20, 194:24,
196:5, 205:19,
212:18, 213:2
**111**
4:12
**11369**
10:25
**12**
4:19, 49:22,
82:21, 82:22,

95:7, 95:9,
95:13, 95:23,
99:6, 172:17,
172:18, 179:25,
192:14, 192:15,
192:21, 193:19,
193:20, 193:25,
202:23
**12778**
12:24
**13**
4:20, 82:22,
87:19, 193:23,
194:1, 195:16,
196:22, 197:14
**130**
3:11
**1334**
61:20
**14**
4:21, 43:1,
63:6, 70:6,
70:13, 83:10,
89:14, 96:6,
153:23, 167:7,
183:13, 195:7,
195:8, 195:10,
195:15, 196:1,
196:5, 196:23,
197:6, 197:15,
197:25, 198:16,
214:21
**15**
4:22, 135:19,
167:6, 167:8,
171:22, 199:23,
199:24, 200:1,
202:11, 212:15,
216:3, 227:10
**15,000**
145:15, 145:19,
234:25
**150**
4:13
**1520**
3:11
**158**
4:14

**16**
4:23, 11:19,
168:3, 202:16,
202:17, 202:19,
204:4, 206:9,
208:1, 208:2,
208:16, 209:24
**161**
245:13
**17**
4:24, 61:21,
61:25, 203:23,
203:24, 204:1,
204:3, 235:22
**172**
4:15
**177**
4:16
**18**
4:25, 43:5,
68:8, 89:15,
89:19, 89:23,
90:9, 91:10,
92:3, 92:22,
93:12, 94:12,
96:4, 97:2,
97:13, 100:8,
100:11, 107:6,
107:8, 108:3,
108:11, 109:7,
110:4, 110:7,
117:12, 117:19,
119:1, 134:7,
134:23, 161:23,
162:22, 174:24,
179:2, 179:10,
205:14, 205:15,
205:25
**184**
4:17
**19**
5:4, 174:8,
174:10, 207:20,
207:21, 207:23,
210:16, 245:14
**191**
4:18
**192**
4:19

**193**
4:20
**195**
4:21
**1982**
11:19
**1:**
183:9
**1::**
95:24

---

**2**

**2**
134:7, 134:8
**20**
5:5, 23:25,
54:25, 57:9,
95:24, 135:19,
154:2, 212:1,
212:2, 212:4,
214:18, 214:23,
216:2, 227:10,
236:21
**200**
4:22
**2009**
24:6
**201**
3:13
**2018**
11:5
**202**
4:23
**2020**
13:9
**2021**
193:5
**2023**
101:5, 101:6,
110:14, 110:19,
111:1, 111:6,
115:9, 146:14,
174:8, 174:15,
176:12, 178:6,
178:7, 194:8,
203:12, 205:10,
205:19, 206:10
**2024**
1:15, 6:7,

245:14
**204**
4:24
**205**
4:25
**207**
5:4
**21**
5:6, 49:15,
57:9, 57:10,
173:23, 212:15,
235:25, 236:1
**211**
10:24
**212**
2:4, 3:7, 5:5
**22**
5:7, 49:23,
95:24, 110:13,
153:23, 236:12,
236:13, 236:14,
236:21
**23**
1:8, 4:8, 4:9,
146:16, 193:5,
199:8, 235:23
**23219**
3:19
**236**
5:6, 5:7
**238**
4:5
**24**
176:11, 191:11,
206:10
**245**
1:24
**25**
141:6, 142:24,
146:7, 146:14,
194:21
**26**
134:8
**27**
203:12, 205:10,
216:3
**29**
173:3, 173:6,

177:6, 182:24
**2nd**
178:4, 178:5

---
**3**

**3**
177:6, 177:7
**3.25**
151:13, 151:17
**30**
12:21, 14:10,
15:1, 15:7,
15:9, 15:10,
16:5, 16:9,
16:12, 24:19,
26:18, 47:23,
48:7, 59:5,
62:8, 62:13,
95:13, 146:16
**32**
50:19, 146:16,
214:18, 214:23
**3220**
10:23
**33**
95:23
**34**
243:3
**3440**
3:13
**355**
3:13

---
**4**

**4**
54:21, 215:23,
215:24
**4.15**
90:17, 216:13
**4.25**
90:17, 90:20,
216:7, 216:12
**40**
53:3, 135:20,
216:21, 219:10
**405**
2:2, 3:5, 6:12
**406**
166:23, 173:17

**41**
177:7, 221:17
**42**
4:10, 222:12
**43**
113:18, 179:25,
181:3, 183:9
**45**
95:7, 95:9,
153:16, 154:3,
154:16, 154:17,
154:18, 154:22,
155:5, 155:17,
156:15, 156:23,
157:8, 215:23
**4th**
68:4, 83:12,
83:13, 90:16,
100:11, 130:25,
132:13, 160:17,
160:20, 161:3,
161:5, 161:6,
161:11, 161:23,
162:21, 179:2,
179:9, 215:16

---
**5**

**5**
235:22, 235:23,
243:3
**50**
2:2, 3:5, 6:12,
215:24
**520639**
1:23
**5300**
2:4, 3:7
**577**
172:23
**5909**
166:23, 173:17
**594**
2:4, 3:7

---
**6**

**6.25**
196:6, 196:15
**6329**
71:1, 198:5

**64**
152:10
**66**
146:6, 146:13
**69**
236:19

---
**7**

**7**
19:10
**723**
6:6
**732**
166:23, 173:17
**74**
194:17
**7698**
196:3
**78**
146:17
**7:-cv--p**
1:8

---
**8**

**80**
199:5, 199:6
**800**
3:18
**804.775**
3:20
**81**
199:14
**8142**
71:11, 113:8,
113:12
**84**
196:8, 196:18,
196:19

---
**9**

**9**
26:18, 68:8
**92**
10:24
**93**
216:21
**95**
219:9

No. 520639

Re:    Deposition of **Joseph Wolf**
       Date: 1/8/2024
       Case: Wolf, et al. -v- Dolgen New York, LLC
       Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
| 55 | 6 | "icing"/", I trust" Reason: transcript error |
| 78 | 8 | "in July"/"until" Reason: transcript error |
| 121 | 6 | "anything"/"everything"   Reason: transcript error |
| 143 | 10 | "Will"/"Well"  Reason: transcript error |
| 146 | 5-6 | "I would not be overcharged 66 percent of the time."/"i was overcharged on  it |
|  |  | 66 percent of the of the items" Reason: transcript error |
| 146 | 15 | "audience"/"audits" Reason: transcript error |
| 153 | 11 | "i know that our bike all around" should be removed from transcript. |
|  |  | Reason: transcript error. |
| 155 | 18 | "in the news" should be removed from transcript. Reason: transcript error |
|  |  | It is unclear what was actually said. |
| 164 | 9-11 | "Yeah. I typically trust that, you know,the store -- the prices are accurate. |
|  |  | I do not typically look at shelf price labels."/"I do generally look at shelf price |
|  |  | labels when I'm making a purchase, because I ultimately want to know what |
|  |  | I will be paying at checkout." Reason: I interpreted the question about |
|  |  | "looking at shelf price labels" to mean "looking into shelf price lables," as in |
|  |  | doing the research at the store to compare shelf price labels with the prices |
|  |  | at checkout due to the context of the previous questions. |
| 164 | 25 | "jiving"/"jogging"  Reason: transcript error |
| 168 | 20 | "I"/"a"  Reason: transcript error |
| 170 | 11 | "the student down the road"/"stays home"  Reason: transcript error |

02 / 26 / 2024

_____          _____
(Date)                                  (Signature)

Doc ID: 836bc9f2d635460695c799ba03e61422be74476a

No. 520639

Re:    Deposition of **Joseph Wolf**
       Date: 1/8/2024
       Case: Wolf, et al. -v- Dolgen New York, LLC
       Return to: transcripts@planetdepos.com

| 171 | 11 | "Overhear"/"Over there"  Reason: transcript error |
|-----|----|--------------------------------------------------|
| 175 | 19 | "I would say"/"I wouldn't say"  Reason: transcript error |
| 176 | 20 | "Luciedo"/"Viciedo"  Reason: transcript error |
| 211 | 12 | "pair"/"there"  Reason: transcript error |
|     |    |  |
|     |    |  |
|     |    |  |
|     |    |  |
|     |    |  |
|     |    |  |
|     |    |  |
|     |    |  |
|     |    |  |
|     |    |  |
|     |    |  |
|     |    |  |
|     |    |  |
|     |    |  |

02 / 26 / 2024
_____
(Date)

_____
(Signature)

Doc ID: 836bc9f2d635460695c799ba03e61422be74476a

No. 520639

Re:   Deposition of **Joseph Wolf**
Date: 1/8/2024
Case: Wolf, et al. -v- Dolgen New York, LLC
Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

I, Joseph Wolf, do hereby acknowledge that I
have read and examined the foregoing testimony, and
the same is a true, correct and complete
transcription of the testimony given by me and any
corrections appear on the attached Errata sheet
signed by me.

02 / 26 / 2024
_____          _____
(Date)                                   (Signature)

Doc ID: 836bc9f2d635460695c799ba03e61422be74476a