# EXHIBIT 6

Page 1

1                UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF NEW YORK

2

     JOSEPH WOLF, CARMEN WOLF, ON       )
3    BEHALF OF THEMSELVES AND THOSE      )
     SIMILARLY SITUATED,                 )
4                                        )Case No.
                    Plaintiffs,          )7:23-cv-00558-PMH
5                                        )
              v.                         )
6                                        )
     DOLLAR GENERAL CORPORATION,         )
7    DOLGEN NEW YORK, LLC D/B/A          )
     DOLGEN, DOLGENCORP OF TEXAS,        )
8    INC., INDIVIDUALLY, JOINTLY,        )
     SEVERALLY, OR IN THE                )
9    ALTERNATIVE,                        )
                                         )
10                  Defendants.          )
                                         )
11   _____ )

12

13

14          Confidential Videotaped Deposition of:

15

16          CONNIE DROGE

17

18          Taken on behalf of the Plaintiffs

19

20          January 31, 2024

21

22   --------------------------------------------------------
                    ALPHA REPORTING
23                A VERITEXT COMPANY
              One Vantage Way, Suite D-115
24            Nashville, Tennessee 37228
                    (615) 244-4812
25              www.alphareporting.com

```
 1    APPEARANCES:
 2     For the Plaintiffs:    ADAM A. EDWARDS, ESQ.
                              Milberg Coleman Bryson Phillips
 3                            Grossman, LLC
                              800 South Gay Street
 4                            Suite 1100
                              Knoxville, Tennessee 37929
 5                            (865) 247-0080
                              Aedwards@milberg.com
 6
                              JAVIER MERINO, ESQ. (Zoom)
 7                            Dann Law Firm
                              1520 US Highway 130
 8                            Suite 101
                              North Brunswick, New Jersey
 9                            08902
                              (201) 355-3440
10                            Jmerino@dannlaw.com
11     For the Defendants:    R. TRENT TAYLOR, ESQ.
                              McGuireWoods, LLP
12                            800 East Canal Street
                              Richmond, Virginia 23219
13                            (804) 775-1000
                              Rtaylor@mcguirewoods.com
14
15
16
17
       Also Present:         David Drumel, Videographer
18                           Jason Bates, Esq.
19
20
21
22
23
24
25
```

Page 3

1                          I N D E X
2
                                                  Page
3
    Examination by Mr. Edwards:                    6
4
5                         E X H I B I T S
6                                                 Page
7   Exhibit No. 1   .............................   47
            Plaintiffs' Notice of Deposition
8           of Connie Droge
9   Exhibit No. 2   .............................   48
            E-mail Chain
10
    Exhibit No. 3   .............................   58
11          E-mail Chain
12  Exhibit No. 4   .............................   66
            E-mail Chain
13
    Exhibit No. 5   .............................   73
14          E-mail from Rod Russell
15  Exhibit No. 6   .............................   85
            E-mail Chain
16
    Exhibit No. 7   .............................   93
17          E-mail Chain
18  Exhibit No. 8   .............................  102
            E-mail from Mia Savaloja
19
    Exhibit No. 9   .............................  105
20          E-mail Chain
21  Exhibit No. 10  .............................  109
            Dollar General Store Operations
22          Monthly IT Activity Review
            IT Product Strategy 6/22/23
23
    Exhibit No. 11  .............................  112
24          E-mail Chain
25

Page 4

1          The videotaped deposition of CONNIE DROGE

2     was taken by counsel for the Plaintiffs, at the

3     offices of Holland & Knight, LLP, Nashville City

4     Center, 511 Union St., Suite 2700, Nashville,

5     Tennessee, on January 31, 2024 at 10:09 a.m. for

6     all purposes under the Federal Rules of Civil

7     Procedure.

8          It is agreed that Rhonda S. Nicholson,

9     being a licensed stenographic court reporter and

10    notary public for the State of Tennessee, may

11    swear the witness, and that the reading and

12    signing of the completed deposition by the witness

13    were not waived.

14

15

16                         *  *  *

17

18

19

20

21

22

23

24

25

```
1              * * * P R O C E E D I N G S * * *
2                   THE VIDEOGRAPHER:  Good morning.
3         We're going on the record at 10:09 a.m. on
4         January 31, 2024.  Please note that the
5         microphones are sensitive and may pick up
6         whispering and private conversations.  Please mute
7         your phones at this time.  Audio and video
8         recording will continue to take place unless all
9         parties agree to go off the record.
10                  This is Media Unit 1 in the
11        video-recorded deposition of Connie Droge taken by
12        counsel for the plaintiff in the matter of Wolf,
13        et al., versus Dollar General, et al., filed in
14        the United States District Court for the Southern
15        District of New York, Case Number
16        7:23-cv-00558-PMH.
17                  This deposition is being held at
18        Holland & Knight located at 511 Union Street in
19        Nashville, Tennessee.  My name is David Drumel --
20        I'm the videographer -- with Veritext.  The court
21        reporter is Rhonda Nicholson.
22                  Counsel, please state your
23        appearances for the record, which will then be
24        followed by the swearing of the witness by the
25        court reporter.
```

1                    MR. EDWARDS:  Adam Edwards for the

2         plaintiffs in the proposed class, Milberg Law.

3                    MR. TAYLOR:  Trent Taylor with

4         McGuireWoods on behalf of the witness and Dolgen

5         New York, LLC.

6                    MR. BATES:  Jason Bates.  I'm

7         in-house counsel for Dollar General.

8                    MR. MERINO:  And I'm Javier Merino,

9         co-counsel for plaintiffs and the punitive class.

10                   THE STENOGRAPHER:  All right.  Could

11        you raise your right hand?  Do you swear that the

12        testimony you're about to give shall be the truth,

13        the whole truth and nothing but the truth, so help

14        you God?

15                   THE WITNESS:  I do.

16                        CONNIE DROGE

17        was called as a witness, and after having been

18        first duly sworn, testified as follows:

19                         EXAMINATION

20        BY MR. EDWARDS:

21        Q.     Good morning, Ms. Droge.

22        A.     Good morning.

23        Q.     We just met and introduced ourselves.

24        Could you go ahead and state your full name for

25        the record, please.

1    A.      Connie Victoria Droge.

2    Q.      Okay.  Is it Ms. or Mrs. Droge?

3    A.      Ms.

4    Q.      Ms.  Okay.  Again, my name is Adam

5    Edwards.  I represent the plaintiffs in this

6    matter along with co-counsel.  You understand that

7    the oath you just took is the same as if you were

8    testifying in court today?

9    A.      Yes.

10   Q.      Okay.  Is there anything that would

11   prevent you from giving honest answers today?

12   A.      No.

13   Q.      Okay.  Have you taken a -- or have you had

14   your deposition taken before?

15   A.      Yes.

16   Q.      How many times?

17   A.      One time.

18   Q.      How long ago?

19   A.      I don't recall specifically.  It was a few

20   years ago.

21   Q.      Okay.  What type of case?

22   A.      It was an age discrimination case.

23   Q.      Do you recall what state that case was

24   pending in?

25   A.      I don't.

1        Q.      Did you give your deposition here in

2    Nashville?

3        A.      I did.

4        Q.      Okay.  Do you recall the name of the

5    plaintiff in that case, either first or last?

6        A.      I don't.

7        Q.      Okay.  Male or female?

8        A.      It was male.

9        Q.      And he was terminated?

10       A.      I don't recall the details -- it was

11   several years ago -- around the case.

12       Q.      Okay.  Do you recall if you were

13   testifying as a corporate representative for

14   Dollar General?

15       A.      Yes.

16       Q.      Okay.  And that's the only time that

17   you've ever given a deposition?

18       A.      Yes.

19       Q.      Okay.  Have you ever testified in court?

20       A.      No.

21       Q.      In any type of case?

22       A.      No.

23       Q.      I'm going to be asking you a number of

24   questions today, and inevitably I will ask a

25   confusing question from time to time.

1          What I don't want is that I ask a

2     confusing question and you attempt to answer it

3     not exactly knowing what I'm intending with my

4     question.  So if I ask a confusing question,

5     please just ask me to rephrase.  You're not going

6     to hurt my feelings.  Can we agree to that?

7     A.      Yes.

8     Q.      Okay.  The other thing that's important

9     is -- and -- and counsel sitting across from me is

10    probably going to be making objections from time

11    to time, and there will be occasions where you

12    feel like you know what I'm getting at before my

13    entire question gets out.

14          So we can help the court reporter to make

15    a clear record -- let's both make the effort to

16    allow the other to finish before we jump in

17    with -- with our -- either another question on my

18    behalf or an answer from you.  Can we agree to

19    that?

20    A.      Yes.

21    Q.      All right.  In other words, let's try not

22    to talk over each other.  Okay?

23    A.      Yes.

24          MR. TAYLOR:  And real quick, if I can

25    just put something on the record.

1              MR. EDWARDS:  Yeah.

2              MR. TAYLOR:  So this deposition and

3      the exhibits are subject to the protective order

4      that has been entered in this case, and we will

5      make the appropriate confidentiality designations

6      pursuant to that protective order, which is number

7      one.

8              Number two, I just wanted to note

9      that it is our position that the third-party

10     witness here today is entitled to some nominal

11     compensation pursuant to 28 U.S.C. 1821.  We will

12     likely be sending you some correspondence on that

13     after today's deposition, referring to that and

14     asking for that nominal compensation, but we can

15     deal with that later.  I just wanted to put that

16     on the record here today.

17              MR. EDWARDS:  Okay.

18     BY MR. EDWARDS:

19     Q.     The final thing I was going to remind you

20     of -- and I'm sure you've heard this from counsel

21     across the table.  If you need to take a break

22     today at any time, just ask, and we can take a

23     break.  I usually take at least one break per

24     hour.  But what I would ask, though, is that you

25     not ask to take a break with a pending question.

1    Is that understood?

2    A.      Yes.

3    Q.      Okay.  Are you represented by counsel at

4    this deposition?

5    A.      Yes.

6    Q.      Who?

7    A.      Trent Taylor.

8    Q.      Okay.  And when was he retained?

9    A.      Yesterday.

10   Q.      Did you sign any sort of written document?

11   A.      No.

12   Q.      Okay.  Are you paying Mr. Taylor hourly

13   for his services?

14   A.      No.

15   Q.      Okay.  Are you compensating Mr. Taylor in

16   any way for his services in representing you?

17   A.      No.

18   Q.      Okay.  So your understanding is that

19   Mr. Taylor is representing you for no charge here

20   today?

21            MR. TAYLOR:  Objection.  Form.

22   BY MR. EDWARDS:

23   Q.      Is that your understanding?

24            MR. TAYLOR:  Objection.  Form.

25   BY MR. EDWARDS:

Page 12

```
 1    Q.      So when he objects to the form, that means
 2    you go ahead and answer.
 3                 MR. TAYLOR:   Sorry.
 4    BY MR. EDWARDS:
 5    Q.      You --
 6    A.      Oh, I'm sorry.
 7    Q.      You -- you -- you go ahead and answer
 8    unless he specifically instructs you not to
 9    answer, and then --
10    A.      I am --
11    Q.      -- we'll have a conversation about that.
12    A.      I am uncertain how he's being paid.
13    Q.      Okay.  Understood.  But you're certain you
14    are not paying him anything out of your pocket?
15    A.      Yes.
16    Q.      Okay.  Did you do anything to prepare for
17    this deposition today?
18    A.      Yes.
19    Q.      What did you do?
20    A.      We chatted yesterday.
21    Q.      By "we," who do you mean?
22    A.      Myself and Trent.
23    Q.      Okay.  You chatted.  Where at?
24    A.      We met at Dollar General.
25    Q.      Okay.  Here in Nashville?
```

Page 13

```
 1      A.      Yes.
 2      Q.      Okay.  And for how long did you chat?
 3      A.      I don't -- I don't remember specifically.
 4   It was a few hours.
 5      Q.      A few hours.  Okay.  Like more than five
 6   hours?
 7      A.      I -- I can't recall specifically.
 8      Q.      Okay.
 9      A.      It was a few hours.
10      Q.      Do you think it was more than three hours?
11      A.      I think so.  Yes.
12      Q.      Okay.  And did you look at documents
13   during that meeting?
14      A.      Yes.
15      Q.      Which documents did you look at?
16      A.      Like -- I don't remember which ones.  I'm
17   happy to show you if you want to show me
18   documents, but we looked at a few documents.
19      Q.      Okay.  By "a few," do you -- give me
20   what -- an idea of what you mean when you say "a
21   few" because sometimes that means different things
22   to different people.
23      A.      It could have been somewhere around five
24   or six.  Maybe a few more.  I don't recall
25   specifically.
```

1    Q.    Understood.  Can you tell me what type of

2    documents they were?  Were they e-mails, charts?

3    A.    They were e-mails.

4    Q.    E-mails.  Okay.  E-mails to or from you?

5    A.    I think most of them were not from me.

6    Q.    Okay.  But e-mails where you saw your name

7    as a recipient?

8    A.    Yes.

9    Q.    Okay.  And what did -- what was the

10    subject matter of the e-mails, if you recall?

11    A.    Compliance.

12    Q.    Okay.  What aspect of compliance?

13            MR. TAYLOR:  Objection.  Form.  You

14    can answer.  You can answer.

15            THE WITNESS:  Sorry.  It was --

16    compliance at Dollar General meant many things.

17    So they were pretty broad e-mails around

18    compliance in general.

19    BY MR. EDWARDS:

20    Q.    Okay.  Throughout your meeting with

21    Mr. Taylor for a few hours, did you gain an

22    understanding of what this lawsuit is about?

23            MR. TAYLOR:  Objection.  Form.  You

24    can answer.

25            THE WITNESS:  No.

1    BY MR. EDWARDS:

2    Q.    Okay.

3    A.    No.

4    Q.    Right.  You --

5    A.    Yes.

6    Q.    Okay.  Well, let me -- let me ask you a

7    broader question.  Do you have any idea what this

8    lawsuit is about?

9                MR. TAYLOR:  Objection.  Form.  You

10    can answer.

11                THE WITNESS:  I don't know the

12    details.

13    BY MR. EDWARDS:

14    Q.    Understood.  And I'm not looking for

15    details.  I'm just wondering if you know -- do you

16    have any understanding of what the plaintiffs

17    allege Dollar General may have done wrong here?

18    A.    Something around pricing, but I don't -- I

19    don't know what the allegations are.

20    Q.    Okay.  So you don't know anything about

21    the lawsuit more than it involves something about

22    the pricing?

23    A.    Correct.

24    Q.    Okay.  Were you shown a copy of the

25    complaint in this case?

1    A.    No.

2    Q.    Do you know when this lawsuit was filed?

3    A.    No.

4    Q.    Do you know where this lawsuit is pending?

5    A.    No.

6    Q.    You don't know what state this lawsuit

7    concerns?

8    A.    I believe it is New York.

9    Q.    Okay.  Other than five or six e-mails, did

10    you look at any other documents?

11    A.    Not that I can recall.

12    Q.    Okay.  Did you while you were working at

13    Dollar General come to understand that Dollar

14    General was dealing with an issue involving

15    pricing accuracy?

16                MR. TAYLOR:  Objection.  Form.  You

17    can answer.

18                THE WITNESS:  I'm sorry.  I don't

19    think I understood your question.

20    BY MR. EDWARDS:

21    Q.    While you were employed at Dollar General,

22    before you left, did you come to understand that

23    Dollar was -- Dollar General was attempting to

24    deal with an issue involving pricing accuracy?

25                MR. TAYLOR:  Same objection.  You can

Page 17

1     answer.
2                     THE WITNESS:  There were -- price
3     accuracy issues bubbled up from time to time.  And
4     when they did during my time there, we addressed
5     them immediately.
6     BY MR. EDWARDS:
7     Q.    Okay.  Do you feel like Dollar General
8     addressed the pricing issues, to use your phrase,
9     immediately in this case, we'll say, within the
10    last three years?
11                    MR. TAYLOR:  Objection.  Form.  You
12    can answer.
13                    THE WITNESS:  Are you talking
14    specifically about anything in New York?  Because
15    I really don't know anything about New York.  It
16    wasn't my area of responsibility.
17    BY MR. EDWARDS:
18    Q.    Well, I'm talking about pricing issues
19    generally.  And -- and first of all --
20    A.    Yeah.
21    Q.    -- why don't we get on the same page
22    and -- and -- and decide what I -- what I mean
23    when I say pricing accuracy or pricing issues.
24    That may help us.  I'm referring to prices that
25    the consumers would be exposed to on the shelves

Page 18

 1    not matching up with the prices at the register.

 2    Are we on the same page there?

 3    A.    Yes.

 4    Q.    Okay.  And when I refer to overcharging,

 5    I'm referring to a situation where the ring-up or

 6    point-of-sale price at the register is higher than

 7    the price reflected on the shelves.  Are we on the

 8    same page there?

 9    A.    Yes.

10    Q.    Okay.  So you told me that whenever

11    pricing issues bubbled up while you were employed

12    at Dollar General, Dollar General dealt with them

13    immediately.  Is that your -- is that your

14    testimony?

15    A.    Yes.

16    Q.    Okay.  And so you're aware that Dollar

17    General over the last three years has been dealing

18    with pricing issues or overcharging.

19               MR. TAYLOR:  Object --

20    BY MR. EDWARDS:

21    Q.    Is that accurate?

22               MR. TAYLOR:  Objection.  Form.  You

23    can answer.

24               THE WITNESS:  Yeah.  I don't know the

25    specifics on the pricing issues.  There were

1    things that were brought to my attention.  And

2    when they were, we took immediate action.

3    BY MR. EDWARDS:

4    Q.    Okay.  What was the immediate action that

5    was taken over the last three years to address the

6    pricing issues?

7              MR. TAYLOR:  Objection.  Form.  You

8    can answer.

9              THE WITNESS:  Goodness.  There

10   were -- you know, I -- I don't recall all of the

11   steps, but there were a lot of things that were

12   done over the course of three years at Dollar

13   General to ensure prices were accurate.

14   BY MR. EDWARDS:

15   Q.    Okay.

16   A.    The goal was always to be a hundred

17   percent accurate.  That was the goal that we had

18   for ourselves.

19   Q.    Understood.  And we're going to talk about

20   some of those things as we go through some of the

21   documents in this case.

22              Do you know that any one of those steps

23   taken by Dollar General was, in fact, effective at

24   eliminating the overcharging to consumers?

25              MR. TAYLOR:  Objection.  Form.  You

Page 20

```
 1      can answer.
 2                  THE WITNESS:  Again, I don't -- I
 3      don't know the specifics.  So I'm not sure how
 4      you're defining "effective."
 5      BY MR. EDWARDS:
 6      Q.      I mean, was the over -- you told me that
 7      over -- or pricing issues bubbled up from time to
 8      time at Dollar General?
 9      A.      Uh-huh.
10      Q.      And then they were dealt with, correct?
11      A.      That's right.  Correct.
12      Q.      And by dealt with, I assume that you mean
13      that the pricing accuracy issues were resolved; is
14      that -- is that fair?
15      A.      Yes.
16      Q.      Okay.  Were the pricing accuracy issues of
17      Dollar General resolved by the time you left
18      Dollar General?
19                  MR. TAYLOR:  Objection.  Form.  You
20      can answer.
21                  THE WITNESS:  Yes.  In -- in the
22      situations that were brought to my attention.
23      Yes.
24      BY MR. EDWARDS:
25      Q.      Okay.  What do you mean when you say "in
```

1    the situations brought to your attention"?

2    A.      When things would -- so a store manager is

3    responsible for pricing in their stores, and the

4    district managers are responsible to make sure the

5    store managers are doing their jobs.

6           If there was a breakdown and that was

7    ever shared with me, there was steps taken to make

8    sure that that store-specific pricing concern was

9    remediated very quickly, and we had follow-up and

10   accountability around that.

11   Q.      I see.  Did you ever -- were you ever made

12   aware of a root cause or causes of the -- the

13   pricing accuracy issues that Dollar General dealt

14   with over the last three years?

15           MR. TAYLOR:  Objection.  Form.  You

16   can answer.

17           THE WITNESS:  Yeah.  I can't

18   specifically say.  I think there was lots of

19   reasons that there could have been a concern with

20   price accuracy.

21   BY MR. EDWARDS:

22   Q.      What do you mean when you say "there could

23   have been a concern"?  Was there or was there not

24   a concern with pricing accuracy?

25           MR. TAYLOR:  Objection.  Form.  You

Page 22

```
 1    can answer.
 2                THE WITNESS:  There were -- in
 3    situations that were brought to my attention,
 4    there were some situations where there was a
 5    concern.
 6    BY MR. EDWARDS:
 7    Q.    Okay.  And sitting here today, do you
 8    recall what the root cause of any of these pricing
 9    issues were?
10                MR. TAYLOR:  Objection.  Form.  You
11    can answer.
12                THE WITNESS:  Again, I don't know all
13    of the root causes.  I can tell you
14    specifically -- like one thing I remember is like
15    customers removing price tags and, you know,
16    taking stickers off with them.  And so that would
17    have caused a price accuracy error.  That's just
18    one thing that comes to mind.
19    BY MR. EDWARDS:
20    Q.    All right.  Let's talk about that.
21    Customers removed pricing labels on the shelf?
22    A.    Uh-huh.
23    Q.    Okay.  And replaced it with what?  I -- I
24    don't understand.  How does that work?
25    A.    Well, they didn't replace it necessarily
```

Page 23

```
 1    with anything.  We had like advertised signs, and
 2    they peeled off.  They were like adhesive.  So you
 3    just could take them off.  And then also our
 4    stickers, when you change labels, they'd peel off.
 5            And so many times they were peeled off,
 6    showing a price that might not be right.  And
 7    customers did it for various reasons.  Sometimes
 8    they would take it to the register with them or --
 9    I don't know why.  They would take -- sometimes
10    children would just walk the aisles and pull signs
11    down.
12    Q.    I see.  So sitting here today, the --
13    the -- you told me about a root cause that appears
14    to be the fault of the consumer, right?
15    A.    No.  Not necessarily.  That's just one
16    thing that I remember.
17    Q.    Okay.  Do you remember others?
18    A.    I don't know what the specific root cause
19    to discrepancies in pricing were.  I -- I couldn't
20    tell you the specific root cause.
21    Q.    Okay.  But that's the only one that comes
22    to mind today, that one involving the consumer?
23            MR. TAYLOR:  Objection.  Form.  You
24    can answer.
25            THE WITNESS:  Yeah.  You know, in
```

1    2022, there were more price changes due to, you

2    know, inflation, and so we were taking more

3    prices -- more adjustments.  So, you know --

4    again, Dollar General had really good measures in

5    place to ensure all the work was done and came up

6    with some measures that were really what I felt

7    like above and beyond to make sure prices were

8    accurate.

9    BY MR. EDWARDS:

10   Q.    So in 2022, you feel like Dollar General

11   took measures which you consider to be above and

12   beyond to ensure accurate pricing?

13   A.    Yes.

14   Q.    What do you mean by "above and beyond"?

15   A.    I mean, there were lots of things that we

16   did to audit prices internally to make sure that

17   execution was great.  So I was responsible for

18   execution in the stores, and there were a lot of

19   disciplines and a lot of rigor to make sure that

20   the prices were accurate.

21   Q.    But my question, though, was:  What do you

22   mean when you say "above and beyond"?

23   A.    So, for example, our district managers had

24   to conduct a compliance visit every single quarter

25   in every single store.  That was what I would call

1    an above-an-beyond tactic.  One of many.

2    Q.      You're giving me examples of actions, but

3    I'm -- I'm asking you specifically -- I -- I --

4    I'm not sure what you mean by the --

5    A.      Oh.

6    Q.      -- phrase "above and beyond" in this

7    context.

8    A.      I -- I feel like in my experience in

9    retail for 25-plus years -- I have not seen

10   measures taken that broadly to make sure prices

11   were accurate.  So for me, like I feel like the

12   effort exceeded what would be normal.

13   Q.      I see.  And were those efforts in 2022

14   successful, in -- in your mind, in terms of

15   alleviating the pricing accuracy issues that

16   Dollar General was dealing with?

17             MR. TAYLOR:  Objection.  Form.  You

18   can answer.

19             THE WITNESS:  You know, again, I'm

20   not the expert.  I think -- in my experience,

21   there were less concerns bubbling up, and so I do

22   think it -- they were effective tactics.

23   BY MR. EDWARDS:

24   Q.      Okay.  What, in your mind, is an

25   acceptable overcharging or pricing discrepancy

1       rate in a Dollar General store?

2                       MR. TAYLOR:  Objection.

3       BY MR. EDWARDS:

4       Q.      Let's -- let's say that a hundred products

5       are price checked.  Is there an acceptable rate

6       of -- where the price on the shelf is less than

7       the register price?

8                       MR. TAYLOR:  Objection.  Form.  You

9       can answer.

10                      THE WITNESS:  Yeah.  I can tell you

11      that Dollar General always strove to be a hundred

12      percent with prices, and sometimes we fell short.

13      BY MR. EDWARDS:

14      Q.      Understood.  But my question is:  Is there

15      an acceptable percentage, error percentage, in

16      terms of pricing accuracy?

17      A.      Yeah.  I -- I can't really --

18                      MR. TAYLOR:  Objection.  Form.

19                      THE WITNESS:  -- speak to that.  I

20      don't know.  I really don't know.

21      BY MR. EDWARDS:

22      Q.      All right.  I mean, in your mind --

23      what -- what was your position at Dollar General

24      when you left?

25      A.      Senior vice president of stores.

1    Q.     Okay.  So as senior vice president of

2    stores, are you telling me that anything less than

3    100 percent accuracy is unacceptable --

4                    MR. TAYLOR:  Objection.  Form.

5    BY MR. EDWARDS:

6    Q.     -- as far as pricing accuracy?

7    A.     I can say we always strove --

8                    MR. TAYLOR:  Same objection.  Go

9    ahead.

10                    THE WITNESS:  -- to be a hundred

11   percent, but sometimes we fell short.

12   BY MR. EDWARDS:

13   Q.     Okay.  And what I'm asking you is:  Is

14   there a certain percentage that is acceptable --

15   like is it -- is it acceptable if 5 percent of the

16   products are, you know, overpriced --

17                    MR. TAYLOR:  Objection.

18   BY MR. EDWARDS:

19   Q.     -- or 2 percent or 10 percent?  Is there

20   anything like that?

21   A.     You know --

22                    MR. TAYLOR:  Objection.  Form.

23                    THE WITNESS:  -- I really --

24                    MR. TAYLOR:  Wait.  Wait a second.

25   Wait.  Objection.  Form.  You can answer.

```
 1              THE WITNESS:  I don't really have an
 2     opinion on that.
 3     BY MR. EDWARDS:
 4     Q.      Okay.  So you did tell me that the stores
 5     always strive for a hundred percent accuracy, the
 6     Dollar General stores, correct?
 7     A.      Yes.
 8     Q.      Okay.  Why is that?
 9     A.      That was always the expectation we had for
10     ourselves.
11     Q.      Why?
12     A.      Because we always expected a hundred
13     percent execution.  My -- my role was around
14     execution of process.
15     Q.      Okay.
16     A.      And like all other processes, we always
17     expected a hundred percent execution.
18     Q.      You execute a goal, right?
19     A.      Yes.
20     Q.      Okay.  Why was it Dollar General's goal to
21     be at a hundred percent pricing accuracy?
22     A.      That was just the expectation.  I can't
23     tell you why.  I --
24     Q.      Okay.
25     A.      You don't have an opinion as the former
```

Page 29

```
 1        senior vice president of stores for Dollar General
 2        on why it would be important for the prices on the
 3        shelf to match up with the prices at the register?
 4                      MR. TAYLOR:  Objection.  Form.  You
 5        can answer.
 6                      THE WITNESS:  I don't have an opinion
 7        on that.  I can just tell you we always strove to
 8        be a hundred percent.
 9        BY MR. EDWARDS:
10        Q.      Do you believe it's fair to consumers if
11        they believe that they are buying a product that
12        is labeled $10 and it rings up at $12?  Is that
13        fair to your consumers --
14                      MR. TAYLOR:  Object --
15        BY MR. EDWARDS:
16        Q.      -- at Dollar General?
17                      MR. TAYLOR:  Sorry.  Objection.
18        Form.  You can answer.
19                      THE WITNESS:  I don't know that I
20        would use the word "fair," that would be a word I
21        would use.  I would say if the price -- which we
22        would always want to ring up at a hundred percent
23        accurate.
24                      From the label to the register wasn't
25        correct, there were measures for the customer to
```

1       be able to share that in the store so that we

2       could solve it for them on the spot.

3       BY MR. EDWARDS:

4       Q.      Do you shop in department stores?

5       A.      Occasionally.

6       Q.      Do you shop in grocery stores?

7       A.      Occasionally.

8       Q.      Do you still shop at Dollar General?

9       A.      I do.

10      Q.      Okay.  Whenever you're at a -- I don't

11      know.  Is Dollar General considered a grocery

12      store in your mind?

13      A.      In my mind, it's a convenience store.

14      Q.      Okay.  We'll call it convenience store

15      then.  When you're shopping at a convenience

16      store, do you make a habit to always check the

17      prices on every product on your receipt after --

18      after ring-up at the register?

19                      MR. TAYLOR:  Objection.  Form.  You

20      can answer.

21                      THE WITNESS:  I do not.

22      BY MR. EDWARDS:

23      Q.      Okay.  Does Dollar General expect that its

24      consumers will check the receipt upon purchase of

25      every product that it -- it purchases?

1              MR. TAYLOR:  Objection.  Form.  You

2      can answer.

3              THE WITNESS:  I really can't answer

4      what Dollar General would expect from all

5      customers.  I don't really know.

6      BY MR. EDWARDS:

7      Q.     All right.  I mean, do you think it would

8      be reasonable for any convenience store to expect

9      that a consumer should verify accurate pricing on

10     its receipts after purchase?

11             MR. TAYLOR:  Objection.  Form.  You

12     can answer.

13             THE WITNESS:  Can you repeat the

14     question?

15     BY MR. EDWARDS:

16     Q.     Do you think it would be fair of any

17     convenience store to expect the consumer to

18     check -- to verify the accuracy of the pricing on

19     its products after purchase?

20             MR. TAYLOR:  Objection.  Form.  You

21     can answer.

22             THE WITNESS:  I don't know if I would

23     use the word "fair," but I think customers have

24     opportunities at Dollar General, as they do in all

25     retail stores, to be able to see what -- how

1      things are scanning on the register through the

2      monitor.  And there's also the receipt.  And

3      there's also just sharing with the cashier what

4      the price -- what they believe the price was.

5                    And at Dollar General, cashiers were

6      empowered up to a hundred dollars to be able to

7      make it right for the customer on the spot.

8      BY MR. EDWARDS:

9      Q.      Right.

10     A.      So --

11     Q.      But sitting here today, do you have any

12     idea of the percentage of Dollar General customers

13     that actually look at the receipt to verify

14     pricing accuracy after purchase?

15                    MR. TAYLOR:  Objection.  Form.  You

16     can answer.

17                    THE WITNESS:  I'm not the expert on

18     that.  I couldn't answer that question.

19     BY MR. EDWARDS:

20     Q.      Right.  And -- and what I'm asking you is:

21     Do you think that a consumer should, after

22     purchase at a Dollar General, check the accuracy

23     of the pricing on the receipt?

24                    MR. TAYLOR:  Objection.  Form.  You

25     can answer.

1           THE WITNESS:  Again, I don't have an

2      opinion on if they should do that or not.

3      BY MR. EDWARDS:

4      Q.      Right.  You just told me that you don't

5      yourself, correct?

6      A.      Right.

7      Q.      Okay.  Did you talk with anyone other than

8      counsel about this deposition?

9      A.      No.

10     Q.      Okay.  And you told me you didn't review

11     the complaint?

12     A.      No.

13     Q.      Okay.  When did you first become aware of

14     this lawsuit?

15     A.      I don't recall the exact date.  It might

16     have been a couple weeks ago where they reached

17     out to me about a deposition.

18     Q.      Okay.  So until McGuireWoods reached out

19     to you about a deposition, you weren't aware that

20     Dollar General had been sued in New York?

21     A.      That's correct.

22     Q.      Okay.  Other than New York, are you aware

23     of any other -- have you ever become aware of any

24     other legal action involving Dollar General over

25     pricing accuracy?

1    A.      Not that I can recall.

2    Q.      Okay.  Not aware of any situations where

3    Dollar General has dealt with pricing accuracy

4    issues in terms of state attorney generals,

5    anything like that?

6                  MR. TAYLOR:  Objection.  Form.  You

7    can answer.

8                  THE WITNESS:  Not -- not that I can

9    recall.

10   BY MR. EDWARDS:

11   Q.      Okay.  Are you aware that Dollar General

12   stores are subject to audits from various local

13   and state agencies from time to time?

14   A.      Yes.

15   Q.      Okay.  Are you aware, for example, in 2022

16   what the failure rate was in any state for pricing

17   accuracy issues?

18   A.      I -- I can't -- I really don't remember.

19   I can't recall.

20   Q.      Okay.  I'm asking you generally.  Are --

21   are you aware that failing governmental audits

22   have become an issue in 2022?

23                  MR. TAYLOR:  Objection.  Form.  You

24   can answer.

25                  THE WITNESS:  I -- again, on

1    occasion, things would bubble up to me, and we

2    would resolve them.

3    BY MR. EDWARDS:

4    Q.    Okay.  When you say things would bubble up

5    to you and we would resolve them, I'm not sure I

6    understand what you mean.  Can you explain that,

7    please?

8    A.    Yes.

9    Q.    Okay.

10    A.    There were many layers.  So there was the

11    store manager, the district manager, the regional

12    director, the vice presidents.  And that's who

13    reported in to me.

14         In my last role, I managed over 10,000

15    stores.  And if I was made aware of any specific

16    instance in a store, my team would let me know all

17    of the measures that they took to correct any

18    pricing issues, and there was always follow-up on

19    that store from the teams that worked -- that

20    reported in to me.

21    Q.    So when you say "pricing issues would

22    bubble up and we would address it," you're talking

23    about on the individual store level?

24    A.    Yes.

25    Q.    Okay.  And I'm asking you if you were

1    aware of a more nationwide issue involving pricing

2    accuracy in 2022.

3                    MR. TAYLOR:  Objection.  Form.  You

4    can answer.

5                    THE WITNESS:  Not that I can recall.

6    BY MR. EDWARDS:

7    Q.      Okay.  And you measure -- you -- I'm

8    sorry -- you measure.  You testified that you

9    have 10 -- you had 10,000 that you managed when --

10   when you left Dollar General?

11   A.      Somewhere around that.

12   Q.      Okay.  And none of them were in New York?

13   A.      No.

14   Q.      Okay.  What states?

15   A.      I don't recall all of my states.

16   Q.      Okay.

17   A.      There was a lot of them.  I had half the

18   country.

19   Q.      Okay.  Did you have Ohio?

20   A.      No.

21   Q.      Did you have Wisconsin?

22   A.      No.

23   Q.      Tell me when you started at Dollar

24   General.  I want to walk through when you started,

25   the job titles that you held up until when you

1    left.

2    A.        It was in 2016, is when I started.

3    Q.        What was your job title?

4    A.        Division vice president for Division 10.

5    Q.        Okay.

6    A.        And then I was promoted somewhere towards

7    the end of 2019.  I can't -- maybe it was August

8    or September.  I can't remember, but it was

9    somewhere at the end of 2019.

10   Q.        Okay.  To what?

11   A.        Senior vice president.

12   Q.        Is that nationwide or --

13   A.        No.  That had half the nation.

14   Q.        Is it senior VP for half the nation or

15   some -- there's some --

16   A.        Of stores.

17   Q.        -- distinction?

18   A.        Yeah.  There's just --

19   Q.        Okay.

20   A.        Yeah.  We -- we called it north and south,

21   and I had the south.

22   Q.        Okay.  Like -- so senior VP for the south

23   region?

24   A.        Well, that's not what the title was.  It

25   was just senior vice president of stores, but

Page 38

```
 1      internally we would call it the south, which was
 2      the warmer weather states.
 3      Q.      Gotcha.  All right.  We're at 2019.  Take
 4      it from there.
 5      A.      That -- that was the role -- the last role
 6      I was in at Dollar General.
 7      Q.      Okay.
 8      A.      I left in that role.
 9      Q.      You left in that role.  And when -- what
10      month did you leave, month and year?
11      A.      It was August of 2023.
12      Q.      Okay.  And where did you go?
13      A.      I went to Burlington stores.
14      Q.      What's your -- is that still your -- where
15      you're at?
16      A.      Yes.
17      Q.      What's your job title there?
18      A.      Executive vice president of stores and
19      asset protection.
20      Q.      Was that a promotion, in your mind?
21      A.      Yes.
22      Q.      Okay.  Why did you leave Dollar General in
23      August of 2023?
24      A.      For a promotion.
25      Q.      Okay.  More money?
```

Page 39

```
 1    A.      Yes.

 2    Q.      Okay.  During 2023, do you know if Dollar

 3    General was still dealing with pricing accuracy

 4    issues?

 5                  MR. TAYLOR:  Objection.  Form.  You

 6    can answer.

 7                  THE WITNESS:  I can't recall.  I

 8    don't know any specifics.

 9    BY MR. EDWARDS:

10    Q.      Okay.  I'm not asking you for specifics.

11    I'm just wondering if you recall that there were

12    still ongoing measures to attempt to resolve

13    pricing accuracy issues.

14                  MR. TAYLOR:  Objection.  Form.  You

15    can answer.

16                  THE WITNESS:  What I do recall is the

17    institution of more things to ensure prices were

18    accurate.

19    BY MR. EDWARDS:

20    Q.      Okay.  And do you recall why those

21    additional measures were instituted in 2023?

22    A.      Because Dollar General always wanted to be

23    a hundred percent with price accuracy.

24    Q.      Okay.

25    A.      It's very important to Dollar General.
```

Page 40

1    Q.    Have you ever seen any comparisons of

2    Dollar General's pricing accuracy versus their

3    competitors?

4    A.    No.  Not that I can recall.

5    Q.    Is that something as a -- as a senior vice

6    president, is that something that you would

7    typically, in other areas, comparisons of how

8    Dollar General is doing in key areas versus the

9    competition?

10              MR. TAYLOR:  Objection.  Form.  You

11    can answer.

12              THE WITNESS:  I -- I don't recall.

13    We looked really heavily on -- in our internal

14    metrics.

15    BY MR. EDWARDS:

16    Q.    Okay.  When you left -- or let me ask --

17    strike that.

18         Let me ask it this way:  As -- in your

19    role as senior vice president from 2019 to August

20    2023, who did you report to?

21    A.    Steve Sunderland.

22    Q.    And his job title?

23    A.    Executive vice president stores, asset

24    protection.

25    Q.    Did -- I'm going to mess up pronunciation

1    of her name, although I should do better.  Did --

2    did Mia Savaloja report to you?

3    A.      Mia Savaloja.  She did not.

4    Q.      Okay.  Is there -- how many people

5    reported to you directly?

6    A.      I had the division vice presidents

7    reporting in to me and at one time two senior

8    directors.

9    Q.      How -- how many people?

10   A.      Six.

11   Q.      Okay.

12   A.      And my admin.  So seven.

13   Q.      What is your educational background?

14   A.      I went to Cal State Fullerton and got a

15   degree in biological science, and I'm currently

16   attending Northwestern Kellogg School of Business.

17   Q.      Okay.

18   A.      In my second year for the MBA program.

19   Q.      A good baseball team in Cal State

20   Fullerton.

21   A.      I know.  Yeah.  You're right.

22   Q.      So you're -- are you currently working on

23   your master's?

24   A.      Yes.

25   Q.      Okay.  Is that an online degree?

```
                                                    Page 42
 1      A.      No.  It's in person.

 2      Q.      In person.  Okay.

 3      A.      On the weekends.

 4      Q.      Okay.  Good for you.

 5      A.      Yes.

 6              MR. EDWARDS:  Probably a good time to

 7      go ahead and take a break.  I'm at a good stopping

 8      point.

 9              MR. TAYLOR:  Okay.  Let's do that.

10              THE VIDEOGRAPHER:  Okay.  We're going

11      off the record.  The time is 10:46 a.m.

12            (Recess, 10:46 to 10:57 a.m.)

13              THE VIDEOGRAPHER:  We are returning

14      to the record.  The time is 10:57 a.m.

15      BY MR. EDWARDS:

16      Q.      All right.  We're back on the record.

17              THE VIDEOGRAPHER:  Don't forget your

18      microphone.

19              MR. EDWARDS:  Oh.

20      BY MR. EDWARDS:

21      Q.      All right, Ms. Droge.  Ties into -- I

22      think we had a conversation a few minutes ago

23      about stores being incentivized to ensure accurate

24      pricing.  You -- you agree that Dollar General

25      incentivizes store managers to ensure accurate
```

1    pricing?

2                    MR. TAYLOR:  Objection.  Form.  You

3    can answer.

4                    THE WITNESS:  Yeah.  I -- I don't

5    know that I would agree with that, that Dollar

6    General incentivized stores.

7    BY MR. EDWARDS:

8    Q.      Okay.

9    A.      It was the expectation to be accurate.

10   Q.      Okay.  I could have swore I heard you

11   mention the word "accountability"; is that

12   correct?

13   A.      Correct.

14   Q.      The -- the store managers were held

15   accountable by Dollar General when they had issues

16   with pricing accuracy?

17   A.      Yes.

18   Q.      How -- how so?

19   A.      I -- you know, I don't recall all the

20   details.  There was an accountability program.  I

21   don't recall the details of it.

22   Q.      In the last three years, are you aware of

23   any district manager or regional manager that's

24   been terminated due to pricing accuracy issues at

25   Dollar General?

Page 44

```
 1              MR. TAYLOR:  Objection.  Form.  You
 2      can answer.
 3              THE WITNESS:  I can't recall all of
 4      the details.  But, again, there was an
 5      accountability matrix.  So I couldn't speak to who
 6      was separated and who wasn't.  I don't recall.
 7      BY MR. EDWARDS:
 8      Q.      And I'm not asking you for details.  I'm
 9      just asking you a kind of simple yes or no thing.
10      Are you aware of any district manager or regional
11      manager that was terminated due to pricing
12      accuracy issues over the last three years?
13              MR. TAYLOR:  Objection.  Form.  You
14      can answer.
15              THE WITNESS:  Not solely for price
16      accuracy.  No.  I'm not aware of that.
17      BY MR. EDWARDS:
18      Q.      Okay.  Do you know if anyone at Dollar
19      General was ever asked to determine the scope of
20      this issue?
21              MR. TAYLOR:  Objection.  Form.  You
22      can answer.
23              THE WITNESS:  I can't really speak to
24      that because I don't know.
25      BY MR. EDWARDS:
```

1    Q.      So in terms of how often this pricing

2    accuracy issue occurs or on how many products or

3    in how many states, you haven't seen any data like

4    that?

5    A.      I haven't --

6                  MR. TAYLOR:  Objection.  Form.  Go

7    ahead.

8                  THE WITNESS:  Not that I can recall.

9    BY MR. EDWARDS:

10   Q.      Okay.  Have you ever seen any data while

11   you were at Dollar General reflecting the number

12   of failed government audits?

13   A.      Not that I can recall.

14   Q.      Have you ever seen any data reflecting the

15   percentage of inaccurate pricing in stores as a

16   result of random sampling or price checks?

17                  MR. TAYLOR:  Objection.  Form.  You

18   can answer.

19                  THE WITNESS:  Not that I can recall.

20   BY MR. EDWARDS:

21   Q.      Okay.  In the Dollar General hierarchy,

22   was -- were the folks in compliance somewhere

23   underneath you?

24                  MR. TAYLOR:  Objection.  Form.  You

25   can answer.

1            THE WITNESS:  They didn't report in

2    my area.

3    BY MR. EDWARDS:

4    Q.      Who did they -- who did compliance report

5    to?

6    A.      Somebody in store ops.

7    Q.      Okay.

8    A.      Yeah.

9    Q.      I -- I see a number of e-mails where you

10   appear to be in the same e-mail with folks

11   addressing compliance issues.  Why is that?  Do

12   you know?

13   A.      You know, I led stores, and we were in

14   charge of the execution of compliance.

15   Q.      Okay.  So compliance would come up with

16   the rules to address things like pricing accuracy

17   and -- and you were in charge of executing those

18   plans?

19   A.      Yes.

20            MR. TAYLOR:  Objection.  Form.  You

21   can answer.

22            THE WITNESS:  Yeah.

23   BY MR. EDWARDS:

24   Q.      Okay.  Were you also in charge of the

25   accountability portion if those plans weren't

1     executed as -- as ordered?

2                    MR. TAYLOR:  Objection.  Form.  You

3     can answer.

4                    THE WITNESS:  I wasn't directly

5     responsible for the accountability portion.

6     Again, there was district managers that led the

7     stores and regional directors that led the

8     district managers and vice presidents that led the

9     regional team, but ultimately my six direct

10    reports worked through their teams on those

11    accountability measures.

12    BY MR. EDWARDS:

13    Q.     Your six direct reports?

14    A.     Yes.

15                   MR. EDWARDS:  Okay.  Let's go ahead

16    and mark -- I think we've been starting back at 1

17    with these.

18                   MR. TAYLOR:  Yeah, we have.

19                   MR. EDWARDS:  Okay.  Let's go ahead

20    and mark this the next -- or the first exhibit.

21    We'll call this Exhibit 1.

22              (Document marked Exhibit No. 1.)

23                   MR. EDWARDS:  Thank you.

24                   THE WITNESS:  Yeah.  Of course.

25    Thank you.

Page 48

1    BY MR. EDWARDS:

2    Q.      Have you seen this before?

3    A.      I have not seen this.

4    Q.      Okay.  And I -- I basically just want to

5    make that Exhibit 1 for the record, and I'll --

6    I'll represent to you that you're appearing

7    pursuant to this -- this notice here today.  Do

8    you have any reason to dispute that, we're at

9    Holland & Knight, 511 Union Street?

10   A.      No.

11   Q.      Okay.  No reason to dispute that?

12   A.      No.

13            MR. EDWARDS:  Okay.  All right.  All

14   right.  Let's see.  Make this the next exhibit.

15   We'll call this Exhibit 2.  And I'll just hand

16   these to the court reporter, and she'll pass it to

17   you.

18            (Document marked Exhibit No. 2.)

19            THE WITNESS:  Thank you.

20   BY MR. EDWARDS:

21   Q.      Give you a second to review that.  And the

22   question I'm going to ask you is:  Is this an

23   e-mail that you reviewed in preparation for your

24   deposition?

25   A.      I -- I don't believe it was.

Page 49

1      Q.      Okay.  You see the -- on -- on the

2      first -- on the first page here -- I'm looking at

3      the e-mail sent Tuesday, April 5, 2022 at 5:09.

4      Are you with me there?

5      A.      Yes.

6      Q.      Okay.  That's an e-mail from

7      storecompliance@dollargeneral.com.  Who -- who

8      sends from that e-mail address?

9      A.      You know, I -- I can't speak for certain.

10     I think multiple people did, and --

11     Q.      Okay.

12     A.      -- and I don't know who all those people

13     would be.

14     Q.      Is there a reason that the e-mail would

15     come from store compliance, kind of a generic --

16     instead of a specific person in store compliance?

17                     MR. TAYLOR:  Objection.  Form.  You

18     can answer.

19                     THE WITNESS:  That was very common,

20     for e-mails to come from the store compliance

21     mailbox.

22     BY MR. EDWARDS:

23     Q.      My question is:  Do you know why?

24     A.      No.  I don't know why.

25     Q.      Okay.  And you were copied on this e-mail,

1    correct?

2    A.      Correct.

3    Q.      All right.  It says, "Field Leaders, the

4    Tuesday Core Price Label Printing Execution report

5    in BI is now available."  Do you see that?

6    A.      Yes.

7    Q.      I read that correct?

8    A.      Yes.

9    Q.      Okay.  And, again, this is an

10    April 5, 2022 e-mail, correct?

11    A.      Yes.

12    Q.      All right.  Is this Tuesday Core Price

13    Label Printing Execution report being available in

14    Power BI something that started in early 2022?

15                    MR. TAYLOR:  Objection.  Form.  You

16    can answer.

17                    THE WITNESS:  I can't recall when it

18    started.

19    BY MR. EDWARDS:

20    Q.      Okay.  What is, if you know, Tuesday Core

21    Price Label Printing Execution report?  What is

22    that?

23    A.      It's a report that would show stores

24    printed their labels on Tuesday.

25    Q.      Okay.  Why is that important to know?

1    A.      It -- it was a means to track compliance.

2    However, one thing I can tell you from my

3    experience there is frequently this report was

4    inaccurate.

5    Q.      The Power BI report was frequently

6    inaccurate?

7    A.      The report itself would -- many times

8    report stores did not complete their print labels.

9    And when we went back and checked, I'd say that

10   the majority of the time it was incorrect and

11   stores had done the work.

12          So there was some sort of inaccuracy with

13   the report.  I don't know.  I'm not the IT person.

14   I was, again, only in charge of execution, but I

15   can tell you the report many times was inaccurate.

16   Q.      And by "many times," what -- what do you

17   mean?  Like what percentage?

18   A.      I would say the majority of times where we

19   asked our team to go follow up on a store that

20   would show it wasn't printed, they, in fact, had

21   printed and put their labels up and it was

22   accurate, that they did do the work, and the

23   report would -- would show that they didn't

24   actually report.

25   Q.      So if these reports would show the

1     accuracy of label printing, it sounds like those

2     reports were unreliable, in your opinion?

3                  MR. TAYLOR:  Objection.  Form.  You

4     can answer.

5                  THE WITNESS:  I don't know that I

6     would say that they were unreliable.  I would just

7     say there were times where it would report that

8     the stores did not complete the work when, in

9     fact, they had completed the work.

10    BY MR. EDWARDS:

11    Q.     Well, if -- if they're inaccurate the

12    majority of the time, it sounds to me like they

13    would be unreliable, correct?

14                 MR. TAYLOR:  Object -- objection.

15    Form.  You can answer.

16                 THE WITNESS:  Yeah.  I can't share

17    the percentage of time.  There was a small

18    percentage of time where one store, two stores,

19    would show that they didn't do the work.  And,

20    again, when we checked, they had done the work.

21    BY MR. EDWARDS:

22    Q.     But you told me the majority of the

23    time.  That means greater than 50 percent, right?

24    A.     The majority of the time when it would

25    show that a store hadn't completed the work.  The

1    majority of that time -- and, again, I don't know

2    the percentage -- they had actually completed the

3    work.

4    Q.    Okay.  Is it possible that they -- the

5    report was run, and then when you went to do a

6    physical check, it had been printed in -- in the

7    interim?

8    A.    No.  Because they would have had -- they

9    would have had to put the labels up.  So --

10   Q.    I see.

11   A.    -- there was -- yes.  So --

12   Q.    So are the Tuesday Core Label Printing

13   Execution reports -- I assume since you were

14   copied on -- on this, those are -- those reports

15   were something that you saw at Dollar General?

16   A.    Yes.

17          MR. TAYLOR:  Objection.  Form.  You

18   can answer.

19   BY MR. EDWARDS:

20   Q.    Okay.  Did you see them regularly?

21   A.    I can't remember the frequency, to be

22   specific.  No.

23   Q.    Well, how often were they printed?

24   A.    The -- every --

25          MR. TAYLOR:  Objection.  Form.

1    BY MR. EDWARDS:

2    Q.      The reports.

3    A.      The reports -- well, we didn't print the

4    reports.  The labels were printed on Tuesdays,

5    typically.

6    Q.      Yeah.  I -- I used a bad word there.

7    A.      Sorry.

8    Q.      How often did the -- were the reports

9    created?

10              MR. TAYLOR:  Objection.  Form.

11              THE WITNESS:  Again, I think it was a

12   weekly report out, is what I believe was the

13   frequency.

14   BY MR. EDWARDS:

15   Q.      So e-mails like this from store compliance

16   to you and this big group of people would have

17   been a weekly thing?

18   A.      I believe so, but I don't recall

19   specifically.

20   Q.      Okay.

21   A.      I -- I think when it moved into Power BI,

22   there was different visibility.

23   Q.      What -- and do you mean by "different --

24   A.      You --

25   Q.      -- visibility"?

1    A.      Before there was a Power BI report, they

2    created something on e-mail, and they would send

3    it to us.  And then they created a report where

4    somebody could go into a system and look.

5    Q.      I see.

6    A.      Yeah.

7    Q.      But you had access to these reports?

8    A.      Correct.

9    Q.      Okay.  Go ahead and flip to the -- to the

10   next page.  Do you see where this says -- it has a

11   chart with weeks on it and division details?

12   A.      Yes.

13   Q.      Okay.  And it looks like everything except

14   for Divisions 1 and 5 were redacted.  Do you see

15   that?

16   A.      Yes.

17   Q.      Okay.  What are Divisions 1 and 5?

18   A.      They were not in my area.  So I -- I don't

19   know the composition of the areas.

20   Q.      Right.  Is it -- does New York sound

21   right?

22   A.      Possibly.

23   Q.      Okay.  I'm looking at the four-week

24   average on -- on the left side, which takes an

25   average of weeks nine, eight, seven and six.  Do

Page 56

1    you see that?

2    A.      Yes.

3    Q.      And this is the report from April 5, 2022;

4    is that correct?

5                    MR. TAYLOR:  Objection.  Form.  You

6    can answer.

7                    THE WITNESS:  I don't see a date.

8    Yes.

9    BY MR. EDWARDS:

10   Q.      Okay.  According to this report, the

11   four-week average for Division 1 in terms of being

12   printed on -- labels being printed on time was 77

13   percent.  Do you see that?

14   A.      Yes.

15   Q.      Okay.  And for Division 5, it was 70

16   percent, correct?

17   A.      That's what it says here.  Yes.

18   Q.      Okay.  And those would both be

19   unacceptable in terms of the percentage of times

20   that labels were printed on time, right?

21                   MR. TAYLOR:  Objection.  Objection.

22   Form.  You can answer.

23                   THE WITNESS:  I can tell you we

24   always aim to be a hundred percent.  And in the

25   next column, you can see "Printed late, percent,"

1    which means -- that could have been minutes late,

2    but they were printed.  And so the totals that I'm

3    looking at look different than what you are

4    suggesting.

5    BY MR. EDWARDS:

6    Q.      Right.  And then not printed was

7    9 percent, correct?

8    A.      Correct.  And that's where there was

9    always variability.  On the not printed is where

10   we found errors because, in fact, stores had

11   printed and done their labels.

12   Q.      Right.  So are -- are you -- I'm -- I'm a

13   little confused here.  Are you telling me that

14   this 9 percent is not reliable?

15                MR. TAYLOR:  Objection.  Form.  You

16   can answer.

17                THE WITNESS:  I can't -- again, I'm

18   not the expert on that.  I can tell you, when we

19   looked into issues specifically in my area where

20   it showed -- showed not printed, stores had, in

21   fact, printed and put their labels up.

22   BY MR. EDWARDS:

23   Q.      Okay.  But you don't have an opinion as to

24   whether this information contained in this -- in

25   this report that we've marked as Exhibit 2 is

1    accurate?

2                    MR. TAYLOR:  Objection.  Form.  You

3    can answer.

4                    THE WITNESS:  I really can't speak to

5    that, especially considering these were not my

6    areas.  I -- I'm not familiar with --

7                    MR. EDWARDS:  Okay.  Go ahead and

8    mark Exhibit 3.

9            (Document marked Exhibit No. 3.)

10                    MR. EDWARDS:  Thanks.

11                    THE WITNESS:  Thank you.

12    BY MR. EDWARDS:

13    Q.      And I'm going to ask you the same

14    question.  Take as much time as you need to

15    read -- read these.  I'm not trying to rush you.

16    But I'm going to ask you if this is a series of

17    e-mails that you reviewed in preparation for your

18    deposition.

19    A.      I can tell you, looking at the first page,

20    I have not seen this before.

21    Q.      Okay.  You mean ever?

22    A.      Well, my name is on here.  So clearly I

23    did, but I didn't see this.  I didn't see this

24    in --

25    Q.      Okay.

1    A.        -- preparation for the deposition, and I

2    do not recall.  So I would love to be able to read

3    it because I don't recall this e-mail.

4    Q.      Sure.  Just let me know when you're --

5    A.      I'm ready.

6    Q.      Oh, okay.  All right.  This appears to be

7    a series of e-mails related to an SM-DM compliance

8    accountability plan for quarter two and quarter

9    three of 2022.  Does that seem right?

10   A.      Yes.

11   Q.      Okay.  And then there's an attachment,

12   which I don't see, but it says "5/6/22 Compliance

13   Corner.  Q2 SCV."  And -- and it appears to be a

14   PowerPoint.  Does that look right?

15   A.      Yes.

16                  MR. TAYLOR:  And --

17                  MR. EDWARDS:  Okay.

18                  MR. TAYLOR:  -- just for the record,

19   are you saying that you -- you don't have it or

20   that you have it and you just don't have it with

21   you?

22                  MR. EDWARDS:  I -- I don't know if we

23   received it.

24                  MR. TAYLOR:  Okay.  That's fine.

25   That's fine.

```
 1                    MR. EDWARDS:  Yeah.  I -- I don't --
 2         I don't believe that we did, but --
 3                    MR. TAYLOR:  I think it was produced.
 4                    MR. EDWARDS:  Okay.  We'll
 5         double-check on that.  It's probably neither here
 6         nor there for -- for this deposition at least.
 7         BY MR. EDWARDS:
 8         Q.      So who is Maribeth?
 9         A.      Mary Beth was a division vice president
10         for Division 1.  Not in my area.
11         Q.      Okay.  And you told me earlier that Steve
12         Sunderland is the executive vice president,
13         correct?
14         A.      That's correct.
15         Q.      Okay.  Do you agree that compliance is
16         a -- was considered a critical area for Dollar
17         General?
18                    MR. TAYLOR:  Objection.  Form.  You
19         can answer.
20                    THE WITNESS:  I agree.  Compliance
21         was very important to Dollar General, all aspects.
22         BY MR. EDWARDS:
23         Q.      Why?
24         A.      Because it was very -- it was something
25         that we held ourselves to.  We wanted to make sure
```

Page 61

1    that we were compliant on all things, and it was
2    very important.
3    Q.     Why specifically do you feel like pricing
4    compliance was important to Dollar General?
5    A.     I think all areas of compliance were
6    important.
7    Q.     Fair enough.  But I'm asking you:  Why do
8    you think that pricing compliance specifically was
9    important to Dollar General?
10   A.     It was really important to Dollar General
11   because we expected and held ourselves to the
12   standard to be a hundred percent accurate on
13   prices.
14   Q.     But -- I think I asked you this earlier.
15   But you're not sure why Dollar General held
16   itself --
17   A.     It's an important --
18   Q.     -- to that standard?
19   A.     -- business practice with any business.
20   Right?
21   Q.     Why is it important?
22   A.     Again -- I -- I mean, I -- I'm in -- my
23   area is in charge of like the execution of the
24   strategy, not necessarily the design of the
25   strategy or why the strategy was important.

1    Q.      You have no opinion on why it would have

2    been important for Dollar General to have accurate

3    prices that consumers see on the shelf?

4                    MR. TAYLOR:  Objection.  Form.  You

5    can answer.

6                    THE WITNESS:  I do not have an

7    opinion on that.

8    BY MR. EDWARDS:

9    Q.      Okay.  So the e-mail from Steve Sunderland

10   to Maribeth --

11   A.      Oh, I just realized -- this is not Mary

12   Beth Hawthrone.  This is Maribeth Dedmon.

13   Q.      Dedmon.

14   A.      Maribeth Dedmon --

15   Q.      Right.

16   A.      -- is not a division vice president.

17   Sorry.  Maribeth Dedmon was a director on Mia's

18   team.

19   Q.      Okay.  So is this Steve Sunderland

20   addressing Maribeth Dedmon, correct?

21   A.      That's right.

22   Q.      Okay.  And I'm looking at the e-mail from

23   5/5/22 at 7:37 a.m.  Do you see that, the top one?

24   A.      Yes.

25   Q.      Okay.  I'm going down to the bottom where

Page 63

1    it -- where he states, Steve does, "We can't be
2    tone deaf with the team and need all of your help
3    to make sure that we don't say, slash, do
4    something that unravels our listening with counter
5    action.  At the same time, we have to maintain our
6    focus on the commitments that we have to the
7    organization on critical areas like compliance."
8              Do you have an understanding of what
9    Steve was referring to when he indicated that we,
10   I assume meaning Dollar General, can't be tone
11   deaf with the team?
12                  MR. TAYLOR:  Objection.  Form.  You
13   can answer.
14                  THE WITNESS:  Yeah.  I can't speak to
15   what Steve was commenting.  I really don't know
16   what he meant by this.
17   BY MR. EDWARDS:
18   Q.      Okay.  You -- you were one of the
19   recipients of this e-mail, right?
20   A.      Yes.
21   Q.      And did you follow up, ask him what he
22   meant or --
23   A.      I don't recall having that conversation
24   with him.
25   Q.      Okay.  All right.  Let's go down to what

Page 64

1    would have been the e-mail previous to this, the

2    May 4, 2022 e-mail from Mary Beth at 4:53.  Do you

3    see that?

4    A.      Yes.

5    Q.      Okay.  This -- this would be an outline of

6    the contents of the SVM and SM accountability

7    slides for Friday's Teams Live Event; is that

8    correct?

9    A.      Yes.

10   Q.      Okay.  And then she -- she lists -- she

11   lists out the bullet points and -- and messaging

12   below the e-mail, correct?

13   A.      Yes.

14   Q.      Okay.  The -- the first bullet point is

15   "Announcement of quarter two SCV, including

16   changes to align with Steritech audits and support

17   opportunity compliance areas."  Did I read that

18   right?

19   A.      Yes.

20   Q.      What do you know about Steritech audits?

21   A.      Steritech was a third party that came in

22   and checked for freshness and rotation.

23   Q.      Okay.  You don't know that they had any --

24   any role with regard to pricing accuracy?

25   A.      Not that I can recall.

1    Q.    Okay.  Let's jump forward in the document

2    to the -- to the very last page of Exhibit 3.  And

3    I'm looking for the e-mail dated April 30, 2022 at

4    5:12 p.m. from Steve Sunderland to you and

5    Maribeth and a lot of others.  Do you see that

6    one?

7    A.    Yes.

8    Q.    Okay.  The -- the sentence, the first

9    sentence reads, "We can talk more team, but we are

10   going to slow roll the DM accountability.  We

11   would like to shoot for the start of Q3, but we

12   will see where we are at on a lot of fronts."  Did

13   I read that right?

14   A.    Yes.

15   Q.    Okay.  What does that mean, slow roll the

16   DM accountability?

17   A.    That was sent by Steve, and I -- I don't

18   know what he was referring to.

19   Q.    I mean, do you have a general

20   understanding of what the phrase "slow roll"

21   means?

22   A.    Again, this was -- I don't recall this

23   e-mail or the conversation around it.

24   Q.    Right.  And -- and that wasn't my

25   question, though.  I'm -- I'm asking you, in

1      general, do you have a general understanding of

2      what the phrase "slow roll" means?

3      A.      I would think it would mean to go slow.

4      Q.      Okay.  So instead of implementing this DM

5      accountability plan immediately, slow roll would

6      mean to slow that down?

7                    MR. TAYLOR:  Objection.  Form.  You

8      can answer.

9                    THE WITNESS:  Yeah.  I -- I don't --

10     BY MR. EDWARDS:

11     Q.      Is that an unreasonable reading?

12                   MR. TAYLOR:  Objection.  Form.

13                   THE WITNESS:  I don't know what Steve

14     was referring to by this.

15     BY MR. EDWARDS:

16     Q.      Okay.  And DM is district manager?

17     A.      Correct.  It looks like this was sent in

18     Q2.

19     Q.      Right.

20     A.      Almost -- yeah.

21     Q.      This e-mail appears to have been sent --

22     well, strike that.

23                   MR. EDWARDS:  Let's go ahead and mark

24     what we'll call Exhibit 4.

25                   (Document marked Exhibit No. 4.)

1           THE WITNESS:  Thank you.

2      BY MR. EDWARDS:

3      Q.    I'll give you an opportunity to take a

4      look.  And after you've had the opportunity to

5      take a look, let me know, please.  Are you done?

6      A.    Yes.

7      Q.    Okay.  Exhibit 4 appears to be -- well,

8      there's a couple of e-mails, but I want to ask you

9      about the one sent by Zak -- is it Brining --

10     A.    Yes.

11     Q.    Okay.  I did good -- on behalf of you, Jim

12     and Zak, I presume, correct?

13     A.    Correct.

14     Q.    Okay.  And is there a reason why Zak

15     would -- was this common, for Zak to send out

16     e-mails on behalf of you and others, Jim and Zak?

17              MR. TAYLOR:  Objection.  Form.  You

18     can answer.

19              THE WITNESS:  I don't know if I would

20     use the word "common," but it did occur.

21     BY MR. EDWARDS:

22     Q.    Okay.  I mean, why -- why would that

23     occur?

24     A.    It -- for ease, honestly, of

25     communication, that one person would take the lead

1    and communicate.

2    Q.    Okay.  Is this e-mail that all three of

3    you would have got together on before it was sent?

4                 MR. TAYLOR:  Objection.  Form.  You

5    can answer.

6                 THE WITNESS:  I -- I can't recall

7    specifically.  But most likely, yes.

8    BY MR. EDWARDS:

9    Q.    Okay.  So this is an e-mail dated

10   January 5, 2023 at 1:51.  Do you see that?

11   A.    Yes.

12   Q.    Okay.  And it indicates that you were

13   excited to share that starting in week 52

14   Compliance Tuesday will launch to support key

15   compliance activities in all stores.  Did I read

16   that right?

17   A.    Yes.

18   Q.    Okay.  So is -- is the beginning of 2023

19   when this version of Compliance Tuesday was

20   launched?

21                 MR. TAYLOR:  Objection.  Form.

22   BY MR. EDWARDS:

23   Q.    Am I reading that right?

24                 MR. TAYLOR:  Objection.  Form.  You

25   can answer.

1             THE WITNESS:  I don't recall the

2     specifics of when it was launched.  Dollar General

3     continued to take measures through the years to

4     ensure the highest level of rigor around

5     compliance.  So it looks like here that it started

6     in week 52.  But, again, I don't recall the exact

7     launch.

8     BY MR. EDWARDS:

9     Q.     It indicates in the next sentence, "To

10    support Compliance Tuesday, every Tuesday morning

11    will now require double coverage at store opening

12    or triple coverage if Tuesday is a stocking day as

13    part of a seven-day work flow."

14             How is this different than what was

15    previously required prior to the beginning of

16    2023?

17             MR. TAYLOR:  Objection.  Form.  You

18    can answer.

19             THE WITNESS:  It says right here,

20    "This will be reflected through a four-hour sales

21    associate shift at store opening."  So there was

22    an additional four hours on Compliance Tuesday.

23    BY MR. TAYLOR:

24    Q.     Okay.  I mean, why -- why was this just

25    implemented in -- at the beginning of 2023?  I

Page 70

1      mean, why wasn't this done before that?

2                    MR. TAYLOR:  Objection.  Form.  You

3      can answer.

4                    THE WITNESS:  I can't speak to

5      specifically why.  What I can tell you is through

6      the years, Dollar General continued to implement

7      more measures around pricing and all compliance

8      measures.  So not just pricing, but freshness and

9      safety and everything that fell under regulatory

10     compliance.

11     BY MR. EDWARDS:

12     Q.      Did -- was there an additional cost that

13     Dollar General would have incurred with the

14     addition of this four-hour sales associate shift

15     at store opening?

16                    MR. TAYLOR:  Objection.  Form.  You

17     can answer.

18                    THE WITNESS:  Again, I'm not the

19     expert on that.  But as I'm reading this e-mail,

20     it looks like there was a shift from T6 where

21     store managers would no longer need the hours.  So

22     basically on T6, the store managers scanned their

23     outs before the store opened.

24                    So we moved those hours to Compliance

25     Tuesday, and store managers could scan their outs

1    on their T6, which would be a different day of the

2    week for every store manager, during store

3    opening.  So when the store was already opened.

4    So I think it was a shift in hours.

5    BY MR. EDWARDS:

6    Q.    Right.  So it sounds like what you're

7    telling me is that this Compliance Tuesday

8    changed -- change that was implemented at the

9    beginning of 2023 where this four-hour sales

10   associate shift at store opening is described here

11   in this e-mail, that didn't come at an increased

12   cost to Dollar General?

13   A.    Yeah.  Again --

14             MR. TAYLOR:  Objection.  Form.  You

15   can answer.

16             THE WITNESS:  -- I'm not the expert.

17   I don't know.  I think -- I -- I don't know how

18   many hours were moved from T6 to Compliance

19   Tuesday.  I don't know if it was one, two, three

20   or four.  But there was some shift.  Again, I

21   don't know.  This is not my area.

22   BY MR. EDWARDS:

23   Q.    Well, I mean, this is your e-mail, though?

24   A.    Correct.  But this would have not come

25   from me.  I -- I don't -- I'm not the labor team.

Page 72

1      So, again, my team was in charge of execution.   So
2      I'm not really sure how the hours worked.
3      Q.      Okay.
4      A.      It's not my area of expertise.
5      Q.      The next line of your e-mail states, "This
6      change is a big win for our teams," exclamation
7      point.   Why was it a big win?
8      A.      Again, Zak's e-mail shares that it was a
9      win for the teams.   I don't know specifically why,
10     you know -- this would allow the store manager to
11     have dedicated time around all of the compliance
12     things on Tuesday.   So -- so it would -- you know,
13     it would be good for the manager.
14     Q.      Okay.   You say "Zak's e-mail."   I just
15     want to make sure.   This was sent from Zak.   But
16     at the bottom of this e-mail, it says, "Thank
17     you."   And then it lists your name first, Connie,
18     Jim and Zak.   This is your e-mail, isn't it?
19                 MR. TAYLOR:   Objection.   Form.   You
20     can answer.
21                 THE WITNESS:   Well, I don't really
22     recall, since I didn't draft the e-mail.   And this
23     happened a year and a half ago.   I don't know.   I
24     don't really recall this e-mail.
25     BY MR. EDWARDS:

1    Q.    Okay.  Is it reasonable to assume that an

2    e-mail that ends with the salutation, "Thank you,

3    Connie, Jim and Zak," the -- the people

4    responsible for the content of that e-mail are, in

5    fact, you, Connie, Jim and Zak?

6                    MR. TAYLOR:  Objection.  Form.  You

7    can answer.

8                    THE WITNESS:  It could have been.

9    But now that I'm looking at the date, like I think

10   I might have even been in school this week.  I

11   don't -- I don't remember.  I don't recall this

12   e-mail.  So I -- I don't really know.

13                   MR. EDWARDS:  Well -- let's go ahead

14   and mark what we'll call Exhibit 5.

15               (Document marked Exhibit No. 5.)

16                   MR. EDWARDS:  And when you're done

17   reviewing it, just indicate to me verbally,

18   please, done.

19                   THE WITNESS:  You've got it.  Thank

20   you.

21                   MR. EDWARDS:  Otherwise we'll just be

22   sitting here.

23                   MR. TAYLOR:  While -- while we're

24   waiting, I just wanted to ask -- do you know

25   whether there was -- this seems to indicate there

Page 74

1    was an attachment.  Do you know whether you have

2    that or not?

3                    MR. EDWARDS:  I'm not going to make

4    it part of the exhibit.  No.

5                    MR. TAYLOR:  Okay.

6                    MR. EDWARDS:  Yeah.  Do you know that

7    it was produced, the attachment?

8                    MR. TAYLOR:  I feel very confident

9    that it was.

10                   MR. EDWARDS:  Okay.  We'll -- we'll

11   check.

12                   MR. TAYLOR:  But -- but if it wasn't,

13   by all means, let me know.

14                   MR. EDWARDS:  Okay.

15                   THE WITNESS:  Done.

16   BY MR. EDWARDS:

17   Q.      All right.  Thank you.  So this e-mail --

18   the salutation indicates, "Thank you in advance

19   for your commitment.  We look forward to our time

20   together.  Connie and Jim."  Is -- are you the

21   Connie?

22   A.      Yes.

23   Q.      Okay.  And who is Jim?

24   A.      Jim would have been my counterpart on the

25   other side of the country.  Jim Sullivan.

1    Q.    Jim Sullivan.  Okay.  Jim Sullivan wasn't
2    a lawyer or is not a lawyer, is he?
3    A.    Not to my knowledge.
4    Q.    Not general counsel or anything like that?
5    A.    No.
6    Q.    Okay.  So did -- did you and Jim -- are
7    you responsible for the content of this e-mail?
8                   MR. TAYLOR:  Objection.  Form.  You
9    can answer.
10                   THE WITNESS:  Again, I don't recall
11   this e-mail.  It looks like it -- it was sent from
12   Mia, possibly.
13   BY MR. EDWARDS:
14   Q.    So are -- when I see -- you know, when I
15   see an e-mail which ends with Connie and Jim, my
16   assumption is that you had something to do with
17   the content of the e-mail or -- or should I not
18   assume that?
19                   MR. TAYLOR:  Objection.  Form.
20                   THE WITNESS:  In some cases, that
21   was -- that is correct.
22   BY MR. EDWARDS:
23   Q.    Right.  So there were cases that you're
24   aware of at Dollar General where others would send
25   e-mails indicating that the e-mail was from you

Page 76

1    when, in fact, you were not responsible for the

2    content of the e-mail?

3                    MR. TAYLOR:  Objection.  Form.  You

4    can answer.

5                    THE WITNESS:  If it was sent on

6    behalf of Jim and myself, if he was in a meeting,

7    then we would sign it from both of us.

8                    And so, again, I don't recall this.

9    I'm not -- this e-mail, I don't believe I wrote

10   this e-mail, but I -- I just don't remember.

11   BY MR. EDWARDS:

12   Q.      Okay.  Can you -- sitting here today, are

13   you able to recall examples of e-mails at Dollar

14   General being sent signed from you or others where

15   you hadn't seen the content before the e-mail was

16   sent?

17                    MR. TAYLOR:  Objection.  Form.  You

18   can answer.

19                    THE WITNESS:  I can't recall.

20   BY MR. EDWARDS:

21   Q.      I mean, would that be okay?

22                    MR. TAYLOR:  Objection.  Form.

23                    THE WITNESS:  Again, if my

24   counterpart was in a meeting and, for example, if

25   I was at school that week, then he would sign from

1    both of us.

2    BY MR. EDWARDS:

3    Q.      All right.  Even if you hadn't seen or

4    signed off on the content of the e-mail?

5    A.      He might have called me while I was at

6    school and shared, you know, about meetings and

7    things like that, so --

8    Q.      Okay.  But I'm assuming, if you're like

9    me, you at least want to have an understanding of

10   what the e-mail says before somebody puts my name

11   at the bottom of it.

12              MR. TAYLOR:  Object --

13   BY MR. EDWARDS:

14   Q.      Do you feel the same way?

15              MR. TAYLOR:  Objection.  Form.

16              THE WITNESS:  Yes.

17   BY MR. EDWARDS:

18   Q.      Okay.  And, in fact, this one says at the

19   top, "Sent on behalf of Connie Droge, Droge, and

20   Jim Sullivan"?

21   A.      Yes.

22   Q.      Correct?  Okay.

23   A.      That's right.

24   Q.      Can you go ahead and read that first full

25   paragraph into the record which starts with, "As

1    part of our meeting"?

2    A.      "As part of our meeting, we ask you to

3    review the attached compliance routines

4    commitment.  Our customers expect accurate pricing

5    at the register, safe products and a safe shopping

6    environment.  It's up to us to -- to deliver every

7    day."

8    Q.     What's the basis for the statement "our

9    customers expect accurate pricing at the

10   register"?

11                   MR. TAYLOR:  Objection.  Form.  You

12   can answer.

13                   THE WITNESS:  Can you restate your

14   question?

15   BY MR. EDWARDS:

16   Q.     Yeah.  I'm -- I'm asking if you know what

17   the basis is for the statement "our customers

18   expect accurate pricing at the register."

19                   MR. TAYLOR:  Same objection.

20                   THE WITNESS:  Yeah.  As I said prior,

21   Dollar General always aimed to be a hundred

22   percent in pricing, and that's always something

23   that we talked about.

24   BY MR. EDWARDS:

25   Q.      Yeah.  But that's not what this says.  It

1    says, "Your customers expect accurate pricing at

2    the register."  What is your basis for -- for

3    saying that "your customers expect accurate

4    pricing at the register"?

5                    MR. TAYLOR:  Objection.  Form.  You

6    can answer.

7                    THE WITNESS:  Again, I don't believe

8    that I wrote this e-mail.  So I'm not exactly sure

9    what that means.  My interpretation of it was that

10   we held ourself to a very high standard at Dollar

11   General to ensure all prices were always a hundred

12   percent.

13   BY MR. EDWARDS:

14   Q.    Do you think it's unreasonable for Dollar

15   General customers to expect accurate pricing at

16   the register?

17                   MR. TAYLOR:  Objection.  Form.  You

18   can answer.

19                   THE WITNESS:  I don't know if I would

20   use the word "unreasonable."  Again, Dollar

21   General always strove to be a hundred percent with

22   price accuracy.

23   BY MR. EDWARDS:

24   Q.    I -- I appreciate that, but I'm not asking

25   you what -- anything about what Dollar General

1    strove to accomplish or strives to accomplish.

2            I'm asking you about what consumers

3    expect.  And -- and the sentence in the e-mail,

4    which purports to come from you and Jim Sullivan,

5    states, as you read, "Our customers expect

6    accurate pricing."  Sitting here today, do you

7    know whether Dollar General customers actually

8    expect accurate pricing at the register?

9            MR. TAYLOR:  Objection.  Form.  You

10   can answer.

11           THE WITNESS:  I can't speak to what

12   Dollar General customers expect.

13   BY MR. EDWARDS:

14   Q.    Right.  So this -- this statement may be

15   false, that -- this statement that Dollar General

16   customers expect accurate pricing at the register?

17           You have no idea whether that's a true

18   statement?

19           MR. TAYLOR:  Objection.  Form.  You

20   can answer.

21           THE WITNESS:  Again, I'm not the

22   expert on what Dollar General customers think.  So

23   I couldn't answer that question.

24   BY MR. EDWARDS:

25   Q.    Right.  Do you know if this statement --

1    you -- you say you don't recall if it came from

2    you.  It could have come from Jim?

3    A.    Again, I -- I'm not sure where the --

4    where it originated from.  I can't really speak to

5    where this came from.

6    Q.    Right.  You told me that you're a shopper.

7    Do you personally expect accurate pricing at the

8    register when you shop?

9                MR. TAYLOR:  Objection.  Form.  You

10    can answer.

11                THE WITNESS:  I guess I really never

12    thought about that.

13    BY MR. EDWARDS:

14    Q.    Okay.  So you don't know?  I mean, you can

15    think about it now.  You don't know whether you

16    expect accurate pricing at the register when you

17    shop?

18                MR. TAYLOR:  Objection.  Form.

19                THE WITNESS:  I would expect the

20    price to be accurate.  And if not, I would bring

21    it up with the cashier at point of sale.

22    BY MR. EDWARDS:

23    Q.    What if you didn't notice it at the point

24    of sale?  Would that be -- would that be -- would

25    that bother you?

```
1                 MR. TAYLOR:  Objection.  Form.
2                 THE WITNESS:  I wouldn't say it would
3      bother me.  I would probably bring it up on my
4      next shopping trip to that store.  It's happened
5      to me before.
6      BY MR. EDWARDS:
7      Q.     All right.  Possible that it may bother
8      someone with a limited income more than -- than
9      yourself --
10                MR. TAYLOR:  Objection.
11     BY MR. EDWARDS:
12     Q.     -- if the prices on the shelf don't match
13     up to higher prices at the register?
14                MR. TAYLOR:  Objection.  Form.
15     BY MR. EDWARDS:
16     Q.     Is that possible?
17                MR. TAYLOR:  Objection.  Form.
18                THE WITNESS:  Again, I really can't
19     comment on what a customer would think.  I -- I
20     don't know.
21     BY MR. EDWARDS:
22     Q.     Okay.  And you can't comment at all on
23     whether customers expect accurate pricing at the
24     register in Dollar General stores?
25                MR. TAYLOR:  Objection.  Form.
```

1              THE WITNESS:  Again, I can't speak

2      for Dollar General customers.

3      BY MR. EDWARDS:

4      Q.      Okay.  Do you -- do you agree that Dollar

5      General customers have the right to expect that if

6      they see a certain price on the shelf for a

7      product, that's the product -- that's the price

8      they should pay at the register?

9              MR. TAYLOR:  Objection.  Form.  You

10     can answer.

11             THE WITNESS:  Again, I really can't

12     comment on like their right.  Like that sounds

13     like a legal thing.  Like -- that's for like the

14     legal department.  I -- I was in charge of like

15     execution.

16     BY MR. EDWARDS:

17     Q.      Right.  So would you agree that if a

18     Dollar General customer sees a jug of milk labeled

19     at $4, gets it to the register and it's $5, that

20     label on the shelf, that was inaccurate?  Would

21     you agree with that?

22             MR. TAYLOR:  Objection.  Form.

23             THE WITNESS:  Yes.  And that would

24     have been brought to the attention of the cashier,

25     and it would have been fixed immediately.

Page 84

```
 1    BY MR. EDWARDS:
 2    Q.      Well, you don't know that because you
 3    don't know if the customer knew that, noticed it,
 4    at the time they checked out, right?
 5    A.      Again, if they had noticed it, we would
 6    have fixed it on the spot.
 7    Q.      Understood.  But you don't know that every
 8    customer is going to notice every pricing
 9    discrepancy at the point of sale, do you?
10              MR. TAYLOR:  Objection.  Form.  You
11    can answer.
12              THE WITNESS:  Yeah.  As I said
13    before, I can't speak to what Dollar General --
14    BY MR. EDWARDS:
15    Q.      Okay.
16    A.      - customers would --
17    Q.      And -- and my question, though -- is it
18    fair for a consumer to expect that the prices on
19    the shelf match up with the prices at the
20    register?
21              MR. TAYLOR:  Objection.  Form.
22              THE WITNESS:  I -- I don't know if
23    I'd use the word "fair," but it was our
24    expectation of ourselves to make sure that the
25    prices did match.
```

1    BY MR. EDWARDS:

2    Q.      Right.  Let me ask the question this way:

3    I'll -- you don't like the word "fair."  I'll try

4    to rephrase it.  Do you think it's unreasonable

5    for a customer of Dollar General to expect that

6    the price on the register matches up with the

7    price on the shelf?  Do you feel that's

8    unreasonable?

9                  MR. TAYLOR:  Objection.  Form.

10    Objection.  Asked and answered.  You can answer.

11                  THE WITNESS:  Again, I don't know if

12    I'd use the word unreasonable.  I can just tell

13    you that Dollar General always aimed to be a

14    hundred percent in pricing.

15                  MR. EDWARDS:  Okay.  I'll mark this

16    as Exhibit 6, please.

17              (Document marked Exhibit No. 6.)

18                  THE WITNESS:  Thank you.

19    BY MR. EDWARDS:

20    Q.      Same drill.  Take a -- take a look at this

21    one and just give me a verbal cue when you've had

22    a chance to review it, please.  Okay?

23    A.      Got it.  Done.

24    Q.      Okay.  So I want to go to, I think, the

25    first e-mail on this exhibit, which is on the last

1    page.  It's Monday, May 22nd at 7:40 a.m.  It's

2    from Steve Sutherland.  And you're the first

3    e-mail recipient.  Do you see that?

4    A.    Yes.

5    Q.    Okay.  And the subject is, "Step Change."

6    Do you see that?

7    A.    Yes.

8    Q.    And Steve starts his e-mail stating, "I

9    need your thoughts on a few things that have

10   stalled right now."  What does it mean when things

11   stall?

12                MR. TAYLOR:  Objection.  Form.  You

13   can answer.

14                THE WITNESS:  I believe he meant

15   slowed down.

16   BY MR. EDWARDS:

17   Q.    Okay.  And this is in -- in May of 2023

18   after a number of items had been implemented to

19   address pricing issues throughout 2022 and then in

20   the beginning of 2023, correct?

21                MR. TAYLOR:  Objection.  Form.  You

22   can answer.

23                THE WITNESS:  I believe this e-mail

24   was about compliance in general and speaks to a

25   lot of things around expired product.

1    BY MR. EDWARDS:

2    Q.     Understood.  I think we're missing each

3    other.  I'm -- I'm not asking you about the

4    subject of his e-mail yet.  I'm asking you about

5    the date.  The date is May 22, 2023, correct?

6    A.     Correct.

7    Q.     And May -- and May of 2023 is subsequent

8    to or after many of -- of the price accuracy steps

9    had already taken place and implemented, the

10   things that we talked about earlier, which began

11   in 2022 and into the beginning of 2023?  That's

12   correct?

13              MR. TAYLOR:  Objection.  Form.  You

14   can answer.

15   BY MR. EDWARDS:

16   Q.     Just establishing that.

17   A.     Yes.  The pricing issues, the measures, to

18   combat and make sure we were accurate were ongoing

19   every month.

20   Q.     Okay.  What are NOVs?

21   A.     Notice of violation.

22   Q.     Okay.  Is that a failed government audit?

23   A.     Yes.  I believe so.

24   Q.     Okay.  So by May, according to this e-mail

25   from Steve Sunderland, and his third bullet point,

1    by May of 2023, the notice of violations or failed

2    governmental audits did not appear to be getting

3    better; is that correct?

4                    MR. TAYLOR:  Objection.  Form.  You

5    can answer.

6                    THE WITNESS:  That's what it says

7    here.  Yes.

8    BY MR. EDWARDS:

9    Q.      Okay.  Do you see the note under "Pricing

10   Compliance"?

11   A.      Yes.

12   Q.      It states, "All of these are areas that

13   Super Tuesday can/should impact, but I'm

14   uncomfortable that we don't appear to be moving

15   any of these right now."  What is Steve indicating

16   there?

17                    MR. TAYLOR:  Objection.  Form.  You

18   can answer.

19                    THE WITNESS:  Well, I don't really

20   know what Steve was thinking when he wrote that

21   specifically or what he was referring to, but I

22   can infer that he was speaking to the damage rate.

23   BY MR. EDWARDS:

24   Q.      The damage rate.  He's not talking about

25   pricing compliance here?

1    A.    I believe he's talking about the damage
2    rate.
3    Q.    Right.  Even though this note is under the
4    bullet point "Pricing Compliance"?
5              MR. TAYLOR:  Objection.  Form.
6    Objection.  Mischaracterizes the e-mail.  You can
7    answer.
8              THE WITNESS:  Yeah.  I believe the
9    note is speaking about the damage rate, which is
10   the number one thing right -- that he mentions and
11   is the content of the majority of this e-mail.
12   BY MR. EDWARDS:
13   Q.    Did Super Tuesday have to do with damage
14   rate or pricing compliance?
15   A.    It was regulatory compliance.  There was
16   many things that it encompassed, not just pricing.
17   Q.    Okay.  So when he said -- who -- who is
18   Amelia?
19   A.    Amelia was our vice president, and she
20   worked in the asset protection area.
21   Q.    Okay.  So you think the note only
22   references damages -- damage rate, correct?
23   A.    Again, Steve wrote the note.  So I can't
24   really speak to what he was thinking when he wrote
25   it.  But reading this, I would think that when

Page 90

1    he's talking about areas that don't appear to be

2    moving right now, is he's specifically speaking

3    about the damage rate and Steritech because those

4    two would go hand in hand.

5    Q.    Okay.  Even though the note begins with

6    "all of these areas" -- the three bullet points

7    above, one of which is pricing compliance, and his

8    note starts with "all of those areas that Super

9    Tuesday can/should impact," you believe that he's

10   not referring in this note to pricing compliance?

11                MR. TAYLOR:  Objection.  Form.  You

12   can answer.

13                THE WITNESS:  Yeah.  Again, I don't

14   know what he was specifically speaking to, but I

15   believe based on reading through this e-mail that

16   it was -- a lot of this was around damage rate and

17   Steritech failed audits.

18   BY MR. EDWARDS:

19   Q.    Well, the bullet point about pricing

20   compliance is not about Steritech failed audits,

21   correct?

22   A.    That is correct.

23   Q.    It's about failed government audits,

24   right?

25   A.    That's what it says here.  Yes.

1    Q.    Yeah.  Do you see the second line under --
2    under "Note"?  It says, "Amelia, you and your team
3    have to narrow the root cause and Connie, Jim,
4    Aaron need you to lead the charge"?
5    A.    Yes.
6    Q.    List for me -- and -- and I understand
7    you -- you may not feel like this e-mail about
8    root cause relates to pricing.  That might be your
9    opinion.
10            But putting that aside for a second, can
11    you list for me the root causes -- and I asked you
12    about this earlier, and you gave me two of them, I
13    think, a consumer issue and also the
14    implementation of lots of price changes.
15            But I'd -- I'd like for you to make me a
16    complete list of all of the root causes that
17    you're aware of behind the pricing accuracy issues
18    in these failed government audits.
19                MR. TAYLOR:  Objection.  Form.
20    Objection.  Asked and answered.  And I object to
21    your characterization and commentary in the
22    lead-up of your very long question about -- that's
23    your opinion.
24                MR. EDWARDS:  It --
25                MR. TAYLOR:  You can answer.

1          MR. EDWARDS:  It was -- it was a long

2     question.  I'll rephrase it.

3     BY MR. EDWARDS:

4     Q.     List -- give me a complete list of every

5     root cause you're aware of for the pricing

6     inaccuracy issues we've been discussing.

7          MR. TAYLOR:  Objection.  Form.

8     Objection.  Asked and answered.  You can answer.

9          THE WITNESS:  I -- I don't believe I

10    could do that.  I mean, that's not my area of

11    expertise.  So I couldn't give you a comprehensive

12    list of why price accuracy issues would occur.

13    Again, I was in charge of execution.

14    BY MR. EDWARDS:

15    Q.     And -- and I'm just asking for the root

16    causes that you are aware of.

17    A.     And I shared those.  Yes.

18    Q.     Just the two?  One is the consumer moving

19    labels and the other is lots of price changes

20    during 2022?

21    A.     Correct.

22    Q.     Those are the only two root causes for

23    this pricing inaccuracy issue that you're aware

24    of?

25          MR. TAYLOR:  Objection.  Form.

Page 93

1      Objection.  Misstates testimony.  You can answer.

2                    THE WITNESS:  Again, I'm not the

3      expert around compliance.  So I really couldn't

4      speak to this.

5      BY MR. EDWARDS:

6      Q.    Okay.  But you're not aware of -- I -- I

7      just want to make sure there's no other root

8      causes you're aware of that you're not telling me

9      about; is that correct?

10     A.    There is no other root causes that I'm

11     aware of.

12                   MR. EDWARDS:  Okay.  Go ahead and

13     mark Exhibit 7, please.

14           (Document marked Exhibit No. 7.)

15                   THE WITNESS:  Thank you.

16                   MR. EDWARDS:  And let's go ahead and

17     take a quick break.  We're back at the top of the

18     hour.  You can spend as much time as you want

19     looking at that, but let's take -- let's take

20     about five minutes.

21                   THE VIDEOGRAPHER:  Okay.  We're going

22     off the record.  The time is 11:59 a.m.

23           (Recess, 11:59 to 12:10 p.m.)

24                   THE VIDEOGRAPHER:  We are returning

25     to the record.  The time is 12:10 p.m.

Page 94

1    BY MR. EDWARDS:

2    Q.      All right.  Ms. Droge, we've had a break,

3    and you've had an opportunity to look through the

4    e-mail we've marked Exhibit 7, correct?

5    A.      Yes.

6    Q.      Okay.  The subject of these e-mails appear

7    to be Pricing -- Price Watch States Overview or

8    Pricing Watch States Overview; is that correct?

9                    MR. TAYLOR:  Bless you.

10                   MR. EDWARDS:  Bless you.

11                   THE WITNESS:  Excuse me.  Thank you.

12   And, yes, that is the correct title.

13   BY MR. EDWARDS:

14   Q.      Okay.  And then there's an attachment

15   which says, "Pricing Watch States Overview" and it

16   looks like a PowerPoint.  Do you see that?

17                   MR. TAYLOR:  Well, hold on.  Just --

18   just to be clear, the attachment is not part of

19   this.  But you're saying there's a reference to an

20   attachment?

21                   MR. EDWARDS:  Correct.  Yeah.  I

22   don't -- I don't have the attachment.  Is --

23   I'm -- I'm just asking her if -- if the PPTX

24   refers to what appears to be a PowerPoint entitled

25   "Pricing Watch States Overview."

1              THE WITNESS:  Yes.  It appears to be.

2      BY MR. EDWARDS:

3      Q.     Okay.  What is a Pricing Watch States

4      Overview?  Do you know?

5      A.        There was a pricing watch.  States --

6      states -- kind of -- it was a very dynamic list.

7      States came on and off from a focus perspective

8      depending on performance.  Again, I wasn't close

9      enough to it.  This was not my area of expertise.

10     But that's my understanding of it.

11     Q.     So the Pricing Watch States Overview would

12     be a list of states that were having issues with

13     pricing accuracy?

14              MR. TAYLOR:  Objection.  Form.  You

15     can answer.

16              THE WITNESS:  Possibly.  Something

17     might have happened with -- something could have

18     been -- a singular store, and it would have been a

19     focus for us to make sure that we were a hundred

20     percent.  But, again, I -- this wasn't something I

21     managed.  So I wasn't close enough to it.

22     BY MR. EDWARDS:

23     Q.     Okay.  So it appears that you sent an

24     e-mail to -- to Mia on January 31st at 8:32,

25     correct?

```
 1                    MR. TAYLOR:  Sorry, Adam.  One thing
 2        I just want to point out I just noticed --
 3                    MR. EDWARDS:  I know.  The -- the
 4        dates -- yeah -- thing.
 5                    MR. TAYLOR:  I'm just going to put
 6        for the record -- I know you know.  So -- and
 7        we've identified this and talked about this
 8        before.  There is a date issue with some of these
 9        e-mails in here.  The top -- the -- June 14, 2023
10        appears to be incorrect, and it's a known issue
11        that we're working on.
12                    MR. EDWARDS:  Okay.  Yeah.  I -- I
13        think we've established -- and I'll -- I'll put it
14        on the record.  This e-mail from you, Connie,
15        January 31, 2023 at 8:32 p.m., based on the
16        documents produced by Dollar General, appears to
17        have been responded to by Mia on 6/14, but I think
18        both parties agree that there is some funky issue
19        with how they're -- how they're producing the
20        documents, which is turning a lot of e-mails, the
21        last one of which, to 6/14/2023.
22        BY MR. EDWARDS:
23        Q.     It's probably not fair to Mia to -- to
24        think that she waited many months to respond to
25        your e-mail, correct?
```

1        A.       Yes.

2        Q.       Okay.  She probably would have responded

3        to that the same day or -- or shortly thereafter,

4        right?

5        A.       Yes.

6        Q.       Okay.  So we know that the subject is

7        Pricing Watch States Overview.  And it appears

8        that Mia references an after meeting, in quote.

9        "Meeting with the DVPs is needed."  What -- what

10       does that mean?

11       A.       The DVPs would be the division vice

12       presidents.

13       Q.       Okay.  So she's inviting you to this

14       meeting with the DVPs?

15       A.       I don't really recall this, but it does

16       say here, "An after meeting with the DVPs is

17       needed."

18       Q.       All right.  And then she proposes a list

19       of bullet points, which appears to be her thoughts

20       on a set of criteria which should be required and

21       sustained, to address pricing issues, correct?

22                       MR. TAYLOR:  Objection.  Form.  You

23       can answer.

24                       THE WITNESS:  That's what it says

25       here.

1    BY MR. EDWARDS:

2    Q.    Okay.  And that would include "Two HHTs

3    every store," correct?

4    A.    Yes.  It does say that here.

5    Q.    What does that mean?

6    A.    An HHT is a handheld device.

7    Q.    Okay.  Is that a device where you can

8    check prices?

9    A.    You can check prices, inventory levels.

10   There's lots of data that that handheld device was

11   used for.

12   Q.    Okay.  And so at the beginning of 2023,

13   was it the case that many stores did not have two

14   handheld devices?

15             MR. TAYLOR:  Objection.  Form.  You

16   can answer.

17             THE WITNESS:  Yeah.  I -- I don't

18   recall that.  So I couldn't really speak to the

19   amount of equipment that each store had.  I really

20   don't know.

21   BY MR. EDWARDS:

22   Q.    Okay.  But it --

23   A.    It's my understanding that every store had

24   equipment that was working.  I just don't know how

25   many devices.  And, you know, some stores might

Page 99

1    have had upwards of five or six handheld devices.

2    I -- I just couldn't give you an accurate number

3    for each store.

4    Q.    Okay.  And then she also mentions "a

5    working printer every store," correct?

6    A.    Yes.  That's what it says here.

7    Q.    If there's not a working printer in the

8    store, that -- that could cause a delay in

9    printing out new prices when price change -- price

10   changes come down and that could lead to pricing

11   accuracy issues with the register, right?

12              MR. TAYLOR:  Objection.  Objection.

13   Form.  You can answer.

14              THE WITNESS:  I think that is

15   incorrect.  The direction would be if the printer

16   did stop working in the store, that the store

17   would go to their sister store and print their

18   labels.

19   BY MR. EDWARDS:

20   Q.    Okay.

21   A.    So there was a work-around.

22   Q.    So why was Connie then recommending that

23   every store have a working printer?

24   A.    Again --

25              MR. TAYLOR:  Object -- objection.

1    Form.  You can answer.
2                    THE WITNESS:  Again, Mia wrote this
3    e-mail, and I --
4    BY MR. EDWARDS:
5    Q.    I'm sorry.  Why was Mia recommending that
6    every store have a working printer?
7    A.    I don't know that she was recommending it
8    because every store's printer would be working.
9    In the event that a store's printer was not
10   working, they would just go to the nearby store
11   and print their labels.
12   Q.    What if there wasn't a nearby store?
13   A.    I don't know that that was the case with
14   20,000 Dollar General stores.  I -- I couldn't
15   speak to that --
16   Q.    Right.
17   A.    -- honestly.  There was usually always a
18   store nearby.
19   Q.    Okay.  So you don't know why she listed
20   "working printer every store" as one of the
21   consistent set of criteria that should be
22   required/sustained to address the pricing accuracy
23   issues?
24                    MR. TAYLOR:  Objection.  Form.  You
25   can answer.

1                    THE WITNESS:  I don't know what she

2       was meaning by that.  My understanding is that all

3       stores have working printers.

4       BY MR. EDWARDS:

5       Q.      Okay.  Did you ask her?  Did you follow

6       up?  Hey, what do you mean by that?

7       A.      I did not.

8                    MR. TAYLOR:  Objection.  Form.

9       BY MR. EDWARDS:

10      Q.      Okay.  And then you'll see the -- the

11      e-mail from you to her with the subject, "Pricing

12      watch states overview has been redacted as

13      nonresponsive."  Do you see that?

14      A.      Yes.

15      Q.      And do you know what your e-mail related

16      to that led Mia to respond?

17      A.      I can't -- I don't recall.

18      Q.      Okay.  Have you seen the draft deck that

19      she refers to in the January 30th e-mail here in

20      Exhibit 7?

21      A.      Again, I don't recall this.  It's possible

22      that I had seen it, but I really just don't

23      recall.

24      Q.      What is a draft deck in this context?

25                   MR. TAYLOR:  Objection.  Form.

Page 102

```
 1                    THE WITNESS:  A draft would be like a
 2        preliminary presentation.
 3                    MR. EDWARDS:  Okay.
 4                    THE WITNESS:  There's like gnats in
 5        here.
 6                    MR. EDWARDS:  Go ahead and mark
 7        Exhibit 8.
 8              (Document marked Exhibit No. 8.)
 9                    MR. EDWARDS:  It's a short one.  So
10        it should be quick to review.
11                    THE WITNESS:  Done.
12        BY MR. EDWARDS:
13        Q.      And this is an e-mail from Mia and it
14        states 6/14/2023.  But, again, I think it's
15        probably a bad date.  But the subject is the same
16        as the prior exhibit, Exhibit 8.  It's Price Watch
17        States Overview.  And it says, "Attachment.
18        Pricingwatchstatesoverview.pptx."  Correct?
19        A.      Yes.  That's what it says here.
20        Q.      Indicating that the attachment was a
21        Pricing Watch States Overview PowerPoint?
22        A.      That's what it says here.  Yes.
23        Q.      Okay.  And that's an e-mail from Mia,
24        who's not a lawyer, correct --
25        A.      Correct.
```

1    Q.        -- to you and Jim Sullivan, neither of

2    which are -- are lawyers, are they?

3    A.        I am not a lawyer.

4    Q.        Okay.

5    A.        I don't believe Jim is either.

6    Q.        I think we established that Jim is not.

7    Okay.  And do you have any reason to believe that

8    the -- that this e-mail would have been prepared

9    by or at the request of counsel?

10              MR. TAYLOR:  I'm going to object to

11   that, and I'm going to object to form.  I'm also

12   going to object because I think this is getting

13   into privilege, and I think it's inappropriate to

14   attempt to, you know, get into this particular

15   redaction of privilege on this particular

16   document.

17              MR. EDWARDS:  Yeah.  I'm just asking

18   her if she -- if -- if the -- if she knows if the

19   content of this e-mail that was redacted was

20   prepared at the request of counsel.

21              THE WITNESS:  I don't know.

22   BY MR. EDWARDS:

23   Q.        Do you know if the Pricing Watch States

24   Overview PowerPoint was prepared at the direction

25   of counsel?

1            MR. TAYLOR:  I'm going to make the

2    same objections, but you can answer.

3            THE WITNESS:  I don't know.

4    BY MR. EDWARDS:

5    Q.    Okay.  Do you recall if at any time before

6    you left in 2023, if you saw any documents that

7    you understood to be prepared in anticipation of

8    litigation or in anticipation of being sued over

9    this pricing issue?

10            MR. TAYLOR:  I'm going to object to

11    form and I'm going to object to -- calls for a

12    legal conclusion that this witness is not

13    qualified to give an answer on.  But if you're

14    able to answer, you can answer.

15            THE WITNESS:  I don't know.

16    BY MR. EDWARDS:

17    Q.    Okay.  I'll ask the question a little

18    different.  Do you -- and I'm not asking you about

19    the content.  I'm asking you if you saw any

20    documents prepared by counsel related to this

21    pricing inaccuracy issue we've been discussing

22    before you left in 2022 or 2023?

23            MR. TAYLOR:  Same objections.

24            THE WITNESS:  I don't recall.

25            MR. EDWARDS:  Go ahead and mark

1      Exhibit 9.

2                    (Document marked Exhibit No. 9.)

3                        THE WITNESS:  Thank you.

4                        MR. TAYLOR:  And just for the record,

5      the same date issue appears to be in this one as

6      well.

7                        MR. EDWARDS:  And by "the same

8      issue," you mean that the last e-mail in the

9      string produced by Dollar General ends at

10     6/14/2023?

11                       MR. TAYLOR:  Yes.  I'm sorry.  I

12     should have been more precise.  Yes.

13                       MR. EDWARDS:  Okay.

14                       MR. TAYLOR:  Trying use shorthand to

15     be quicker, but yes.  Sorry about --

16                       MR. EDWARDS:  Understood.

17     BY MR. EDWARDS:

18     Q.      Okay.  Same thing on the verbal cue when

19     you're done, please.

20     A.      Done.

21     Q.      Okay.  Before I ask you specifically about

22     Exhibit 9, about the contents of Exhibit 9, Jim

23     Sullivan, you described him earlier in a way that

24     I can't recall.  Did you describe him -- is he

25     your counterpart?

Page 106

```
 1     A.      Yes.

 2     Q.      Okay.  So you're the vice president in

 3     charge of stores for the southern, which would

 4     have made him the vice president of stores for --

 5     the northern stores?

 6               MR. TAYLOR:  Objection.  Form.  You

 7     can answer.

 8               THE WITNESS:  The senior vice

 9     president for both of us, but yes.

10     BY MR. EDWARDS:

11     Q.      Okay.  So Jim Sullivan was -- Sullivan was

12     the senior vice president for stores covering the

13     north?

14     A.      Yes.

15     Q.      Okay.  And this e-mail, which I'm going to

16     assume was somewhere around February 14th of 2023

17     even though that -- again, that last e-mail says

18     6/14/2023.  Is that -- are we on the same page

19     there?

20     A.      Yes.

21     Q.      Okay.  And that has an attachment, "2023

22     Store Compliance Visit."  Do you see that, a PDF?

23     A.      Yes.

24     Q.      That appears to be a draft deck for

25     something called a Teams Live Event; is that
```

1    accurate?

2    A.      Yes.

3              MR. TAYLOR:  I -- I apologize.  I'm

4    not following you on the attachments.  Up at the

5    very top.  Oh, okay.  It looks like there's

6    numerous attachments, just to be clear.

7              MR. EDWARDS:  There are.  I'm -- I'm

8    asking her specifically about the 2023 store

9    compliance visit draft.

10             MR. TAYLOR:  Got it.  Okay.

11             MR. EDWARDS:  There is also -- I'll

12   make the record here.

13   BY MR. EDWARDS:

14   Q.      There is also -- appears to be an

15   attachment entitled "2023 Accountability Process

16   Flow," a PDF, correct?

17   A.      Yes.

18   Q.      A Field Leader Teams Live Event

19   PowerPoint, correct?

20   A.      Yes.

21   Q.      A 2023 Quality Store Visit Draft 2,

22   correct?

23   A.      Yes.

24   Q.      Okay.  Do you recall if you attended a

25   Teams Live Event in February of 2023?

1    A.    I don't recall.

2    Q.    Do you recall ever attending a Teams Live

3    Event?

4    A.    Yes.

5    Q.    Okay.  Was -- does that mean a -- is that

6    a call using Microsoft Teams?

7    A.    Yes.

8    Q.    Okay.  And using Microsoft Teams and a

9    number of these similar pieces of software, the --

10    the meetings can be recorded, correct?

11              MR. TAYLOR:  Objection.  Form.  You

12    can answer.

13              THE WITNESS:  I'm not sure.

14    BY MR. EDWARDS:

15    Q.    Okay.  Did you ever while you worked for

16    Dollar General have occasion where you couldn't

17    attend the live event itself but watched the event

18    or listened to the event on a recording?

19    A.    Not to my recollection.

20    Q.    Okay.  So you don't know whether any of

21    these Teams Live Events were recorded?

22    A.    I -- I really don't know.

23    Q.    You don't know one way or the other?

24    A.    Huh-uh.  That's correct.

25    Q.    Okay.  Who would know?

Page 109

```
 1     A.      I don't know because I didn't run the
 2     logistics for the meetings.
 3                     MR. EDWARDS:  Okay.  All right.
 4     We'll mark Exhibit 10.
 5               (Document marked Exhibit No. 10.)
 6     BY MR. EDWARDS:
 7     Q.      And I'll tell you that this is a longer
 8     exhibit, but I'm only going to ask you about a
 9     single page.  Okay.  So while you're -- well, I'll
10     wait.
11               While you're welcome to review the entire
12     document that we've marked Exhibit 10, I'm also
13     happy to point you to the Bates number I'm going
14     to ask you about, since this exhibit appears to
15     contain a wide variety of subject matter?
16               And, again, take as much time as you'd
17     like to review, but the -- the page that I'm going
18     to ask you about is 8550.  You'll see the Bates
19     numbers at the -- at the bottom.  It says DG
20     underscore, Wolf, underscore.  And then it has a
21     list of numbers.  The page I'm going to ask you
22     about is 8550.  It starts with "Compliance
23     Excellence."
24     A.      I'm done reading this page.
25     Q.      Okay.  Is this Dollar General's Store
```

Page 110

1      Operations Monthly IT Activity Review document

2      something that you would regularly receive and --

3      and take a look at?

4                      MR. TAYLOR:  Objection.  Form.  You

5      can answer.

6                      THE WITNESS:  No.

7      BY MR. EDWARDS:

8      Q.      Okay.  All right.  You're looking at me as

9      if to say you've never seen a document like this

10     before?

11     A.      Yes.  Yes.  I don't know what this is.

12     Q.      Okay.  Well, let me just ask you about

13     some specific things on Bates 8550 of Exhibit 10.

14             Under "Compliance Excellence," Number 2

15     states, "Daily Camera Snapshot Report," dash, "New

16     report created taking 16 camera daily snapshots in

17     all stores by 7:00 a.m."  do you have any

18     knowledge or information at all related to these

19     daily camera snapshot reports?

20     A.      Never seen this report, but I'm assuming

21     that this refers to a report that was sent to our

22     district managers from CCTV, and it was images to

23     check in on store standards and other things like

24     that.  And it was sent to them by 7:00 a.m.

25     Q.      Okay.  So there were -- there's actually

Page 111

1      cameras in every Dollar General store?

2                    MR. TAYLOR:  Objection.  Form.  You

3      can answer.

4                    THE WITNESS:  I believe so.

5      BY MR. EDWARDS:

6      Q.     Okay.  And according to this, it looks

7      like 16 camera -- it looks like there were 16

8      cameras.  Does that sound right?

9      A.     Or possibly 16 photos.  I'm not sure.

10     Again, I -- I don't --

11     Q.     Okay.

12     A.     -- really know.

13     Q.     Yeah.  It says, "New report created taking

14     16 camera daily snapshot in all stores by

15     7:00 a.m."  But you don't know whether that's 16

16     photos or 16 cameras?

17                   MR. TAYLOR:  Objection.  Form.  You

18     can answer.

19                   THE WITNESS:  Correct.  Yes.

20     BY MR. EDWARDS:

21     Q.     And do you have any idea what the purpose

22     of taking those daily snapshots was or is?

23                   MR. TAYLOR:  Objection.  Form.  You

24     can answer.

25                   THE WITNESS:  Again, I'm not a

1       hundred percent sure.  I know that district

2       managers use the look-in to understand store

3       standards, other things, make sure stores were

4       open on time.  I don't know all the reasons that

5       this was being done.

6       BY MR. EDWARDS:

7       Q.      Right.  It -- it appears from this that

8       the daily camera snapshot reports would be of

9       assistance in helping Dollar General assess

10      whether compliance was being met.

11                   MR. TAYLOR:  Objection.  Form.  You

12      can answer.

13                   THE WITNESS:  I don't know.

14                   MR. EDWARDS:  Okay.  Go ahead and

15      mark Exhibit 11.

16           (Document marked Exhibit No. 11.)

17                   THE WITNESS:  Thank you.

18      BY MR. EDWARDS:

19      Q.      Same drill.  Tell me when you're done

20      looking at it, please.

21      A.      Done.

22      Q.      All right.  It looks like this is an

23      e-mail -- I'm going to skip below the 6/29 e-mail

24      at the very top, and go down to the e-mail from

25      Mia to a number of individuals, including

1      yourself, with the subject, "Compliance, Tuesday,

2      July 4th."  Do you see that e-mail?

3      A.      Yes.

4      Q.      Okay.  The -- the final sentence of that

5      e-mail from Mia states, "Our customers count on us

6      for accurate pricing, fresh product and safe --

7      and safe store every day."  As to the statement

8      "Dollar General customers count on us for accurate

9      pricing," do you agree with Mia's statement?

10                    MR. TAYLOR:  Objection.  Form.  You

11     can answer.

12                    THE WITNESS:  I really don't have an

13     opinion on what customers are relying on Dollar

14     General for.

15     BY MR. EDWARDS:

16     Q.      Okay.  So you just don't -- don't know one

17     way or the other whether customers do, in fact,

18     count on Dollar General for accurate pricing?

19     A.      Well, I can't speak on behalf of all

20     customers.  But, sure, I believe that some

21     customers may count on Dollar General for pricing.

22     Q.      Accurate pricing?

23     A.      Accurate pricing.

24     Q.      Okay.  The e-mail that proceeds that is

25     from Jim Sullivan to Mia and to yourself.  It

1      states, "Mia, I'm worried about July 4th

2      Compliance Tuesday execution."  You told me

3      earlier that you're primary -- primarily

4      interested in execution, right?

5      A.      Yes.

6      Q.      Do you -- did you talk with Jim about

7      being concerned or worried about July 4th

8      Compliance Tuesday execution --

9                    MR. TAYLOR:  Objection.  Form.

10     BY MR. EDWARDS:

11     Q.      -- in June of 2023?

12                   MR. TAYLOR:  You can answer.

13                   THE WITNESS:  I don't recall.

14     BY MR. EDWARDS:

15     Q.      Okay.  So you have no idea why Jim

16     Sullivan, your -- your counterpart to the north,

17     would have been worried about July 4th Compliance

18     Tuesday execution?

19                   MR. TAYLOR:  Objection.  Form.  You

20     can answer.

21                   THE WITNESS:  Yeah.  I don't know

22     what Jim was inferring when he wrote this e-mail.

23     BY MR. EDWARDS:

24     Q.      Okay.  Did you ask him what he meant?

25     A.      I don't recall.

Page 115

1                    MR. EDWARDS:  Okay.  All right.  If

2       you guys will give me about ten minutes, I'm going

3       to look through my notes, and then we'll wrap

4       things up.

5                    THE VIDEOGRAPHER:  We are going off

6       the record.  The time is 12:39 p.m.

7              (Recess, 12:39 to 12:52 p.m.)

8                    THE VIDEOGRAPHER:  We are returning

9       to the record.  The time is 12:52 p.m.

10                    MR. EDWARDS:  Ms. Droge, thank you

11       very much.  I have no more questions.

12                    MR. TAYLOR:  We don't have any

13       questions.  We'll read and sign.

14                    MR. EDWARDS:  Okay.

15                    THE VIDEOGRAPHER:  All right.  That

16       concludes today's testimony.  We're off the

17       record.  The time is 12:53 p.m.

18                    (Off the record at 12:53 p.m.)

19

20

21

22

23

24

25

Page 116

1    STATE OF TENNESSEE        )

                              )  SS

2    COUNTY OF DAVIDSON        )

3             I, Rhonda S. Nicholson, a Licensed

4    Stenographic Court Reporter and Notary Public

5    within and for the State at Large, do hereby

6    certify that the foregoing was taken at the place

7    set forth in the caption thereof; that the

8    proceedings were stenographically reported by me

9    in shorthand; and that the foregoing pages

10   constitute a true and correct transcription of

11   said proceedings to the best of my ability.

12            I further certify that I am neither a

13   relative nor employee nor attorney nor counsel of

14   any of the parties to this action, and that I am

15   neither a relative nor employee of such attorney

16   or counsel, and that I am not financially

17   interested in the outcome of this action.

18            WITNESS MY SIGNATURE this 14th day of

19   Feb:      *Rhonda Nicholson*

20

21   _____

     Rhonda S. Nicholson, RPR, LCR #160

22   LCR Expires:  06/30/2024

     Georgia CSR 5619-8878-0687-3600

23   Notary Public at Large,

     State of Tennessee

24   My Commission Expires:

25   03/02/2026

1          E R R A T A

2

3      I, CONNIE DROGE, having read the foregoing

4      deposition taken January 31, 2024, do hereby

5      certify said testimony is a true and accurate

6      transcript, with the following changes, if any:

7

8      PAGE LINE          SHOULD HAVE BEEN

9      ____ ____     _____

10     ____ ____     _____

11     ____ ____     _____

12     ____ ____     _____

13     ____ ____     _____

14     ____ ____     _____

15     ____ ____     _____

16     ____ ____     _____

17     ____ ____     _____

18

19                   _____

20                   CONNIE DROGE

21

22     _____

23          Notary Public

24     My commission expires:

25     _____

Page 118

1    R. TRENT TAYLOR, ESQ.

2    Rtaylor@mcguirewoods.com

3                        February 14, 2024

4    RE:    Wolf, Joseph, Et Al. v. Dollar General Corporation, Et Al.

5         1/31/2024, Connie Droge (#6426432)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   trancsripts-fl@veritext.com.

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

**&**

**&**   4:3 5:18 48:9

**0**

**00558**   1:4 5:16
**03/02/2026**
  116:25
**06/30/2024**
  116:22
**08902**   2:9

**1**

**1**   3:7 5:10 47:16
  47:21,22 48:5
  55:14,17 56:11
  60:10
**1/31/2024**   118:5
**10**   3:21 27:19
  29:12 36:9 37:4
  109:4,5,12
  110:13
**10,000**   35:14
  36:9
**100**   27:3
**101**   2:8
**102**   3:18
**105**   3:19
**109**   3:21
**10:09**   4:5 5:3
**10:46**   42:11,12
**10:57**   42:12,14
**11**   3:23 112:15
  112:16
**1100**   2:4
**112**   3:23

**115**   1:23
**11:59**   93:22,23
**12**   29:12
**12:10**   93:23,25
**12:39**   115:6,7
**12:52**   115:7,9
**12:53**   115:17,18
**130**   2:7
**14**   96:9 118:3
**14th**   106:16
  116:18
**1520**   2:7
**16**   110:16 111:7
  111:7,9,14,15
  111:16
**160**   116:21
**1821**   10:11
**1:51**   68:10

**2**

**2**   3:9 27:19
  48:15,18 57:25
  107:21 110:14
**20,000**   100:14
**201**   2:9
**2016**   37:2
**2019**   37:7,9 38:3
  40:19
**2022**   24:1,10
  25:13 34:15,22
  36:2 49:3 50:10
  50:14 56:3 59:9
  64:2 65:3 86:19
  87:11 92:20
  104:22

**2023**   38:11,23
  39:2,21 40:20
  68:10,18 69:16
  69:25 71:9
  86:17,20 87:5,7
  87:11 88:1 96:9
  96:15 98:12
  104:6,22 106:16
  106:21 107:8,15
  107:21,25
  114:11
**2024**   1:20 4:5
  5:4 116:19
  117:4 118:3
**22**   87:5
**22nd**   86:1
**23219**   2:12
**244-4812**   1:24
**247-0080**   2:5
**25**   25:9
**26636**   116:20
**2700**   4:4
**28**   10:11

**3**

**3**   3:10 58:8,9
  65:2
**30**   65:3 118:16
**30th**   101:19
**31**   1:20 4:5 5:4
  96:15 117:4
**31st**   95:24
**355-3440**   2:9
**37228**   1:24
**37929**   2:4

**4**

**4**   3:12 64:2
  66:24,25 67:7
  83:19
**47**   3:7
**48**   3:9
**4:53**   64:2
**4th**   113:2 114:1
  114:7,17

**5**

**5**   3:13 27:15
  49:3 50:10
  55:14,17 56:3
  56:15 68:10
  73:14,15 83:19
**5/5/22**   62:23
**5/6/22**   59:12
**50**   52:23
**511**   4:4 5:18
  48:9
**52**   68:13 69:6
**5619-8878-06...**
  116:22
**58**   3:10
**5:09**   49:3
**5:12**   65:4

**6**

**6**   3:3,15 85:16
  85:17
**6/14**   96:17
**6/14/2023**   96:21
  102:14 105:10
  106:18

**6/22/23**   3:22
**6/29**   112:23
**615**   1:24
**6426432**   118:5
**66**   3:12

**7**

**7**   3:16 93:13,14
  94:4 101:20
**70**   56:15
**73**   3:13
**77**   56:12
**775-1000**   2:13
**7:00**   110:17,24
  111:15
**7:23**   1:4 5:16
**7:37**   62:23
**7:40**   86:1

**8**

**8**   3:18 102:7,8
  102:16
**800**   2:3,12
**804**   2:13
**85**   3:15
**8550**   109:18,22
  110:13
**865**   2:5
**8:32**   95:24
  96:15

**9**

**9**   3:19 57:7,14
  105:1,2,22,22
**93**   3:16

**a**

**a.m.**   4:5 5:3
  42:11,12,14
  62:23 86:1
  93:22 110:17,24
  111:15
**aaron**   91:4
**ability**   116:11
**able**   30:1 31:25
  32:6 59:2 76:13
  104:14
**above**   24:7,11
  24:14,22 25:1,6
  90:7 118:6
**acceptable**
  25:25 26:5,15
  27:14,15
**access**   55:7
**accomplish**   80:1
  80:1
**accountability**
  21:10 43:11,20
  44:5 46:25 47:5
  47:11 59:8 64:6
  65:10,16 66:5
  107:15
**accountable**
  43:15
**accuracy**   16:15
  16:24 17:3,23
  20:13,16 21:13
  21:20,24 22:17
  25:15 26:16
  27:3,6 28:5,21
  31:18 32:14,22

33:25 34:3,17
  36:2 39:3,13,23
  40:2 43:16,24
  44:12,16 45:2
  46:16 52:1
  64:24 79:22
  87:8 91:17
  92:12 95:13
  99:11 100:22
  118:9
**accurate**   18:21
  19:13,17 24:8
  24:12,20 25:11
  29:23 31:9
  39:18 42:23,25
  43:9 51:22 58:1
  61:12 62:2 78:4
  78:9,18 79:1,3
  79:15 80:6,8,16
  81:7,16,20
  82:23 87:18
  99:2 107:1
  113:6,8,18,22
  113:23 117:5
**acknowledgm...**
  118:12
**action**   19:2,4
  33:24 63:5
  116:14,17
**actions**   25:2
**activities**   68:15
**activity**   3:22
  110:1
**actually**   32:13
  51:24 53:2 80:7

110:25
**adam**   2:2 6:1
  7:4 96:1
**addition**   70:14
**additional**
  39:21 69:22
  70:12
**address**   19:5
  35:22 46:16
  49:8 86:19
  97:21 100:22
**addressed**   17:4
  17:8
**addressing**
  46:11 62:20
**adhesive**   23:2
**adjustments**
  24:3
**admin**   41:12
**advance**   74:18
**advertised**   23:1
**aedwards**   2:5
**age**   7:22
**agencies**   34:13
**ago**   7:18,20 8:11
  33:16 42:22
  72:23
**agree**   5:9 9:6,18
  42:24 43:5
  60:15,20 83:4
  83:17,21 96:18
  113:9
**agreed**   4:8
**ahead**   6:24 12:2
  12:7 27:9 42:7

**[ahead - assumption]**

45:7 47:15,19
55:9 58:7 66:23
73:13 77:24
93:12,16 102:6
104:25 112:14
**aim**  56:24
**aimed**  78:21
85:13
**aisles**  23:10
**al**  5:13,13 118:4
118:4
**align**  64:16
**allegations**
15:19
**allege**  15:17
**alleviating**
25:15
**allotted**  118:19
**allow**  9:16
72:10
**alpha**  1:22
**alternative**  1:9
**amelia**  89:18,19
91:2
**amount**  98:19
**announcement**
64:15
**answer**  9:2,18
12:2,7,9 14:14
14:14,24 15:10
16:17 17:1,12
18:23 19:8 20:1
20:20 21:16
22:1,11 23:24
25:18 26:9

27:25 29:5,18
30:20 31:2,3,12
31:21 32:16,18
32:25 34:7,24
36:4 39:6,15
40:11 43:3 44:2
44:14,22 45:18
45:25 46:21
47:3 49:18
50:16 52:4,15
53:18 56:6,22
57:16 58:3
60:19 62:5
63:13 66:8
67:18 68:5,25
69:18 70:3,17
71:15 72:20
73:7 75:9 76:4
76:18 78:12
79:6,18 80:10
80:20,23 81:10
83:10 84:11
85:10 86:13,22
87:14 88:5,18
89:7 90:12
91:25 92:8 93:1
95:15 97:23
98:16 99:13
100:1,25 104:2
104:13,14,14
106:7 108:12
110:5 111:3,18
111:24 112:12
113:11 114:12
114:20

**answered**  85:10
91:20 92:8
**answers**  7:11
**anticipation**
104:7,8
**apologize**  107:3
**appear**  46:10
88:2,14 90:1
94:6
**appearances**  2:1
5:23
**appearing**  48:6
**appears**  23:13
59:6,13 66:21
67:7 94:24 95:1
95:23 96:10,16
97:7,19 105:5
106:24 107:14
109:14 112:7
**applicable**
118:8
**appreciate**
79:24
**appropriate**
10:5
**april**  49:3 50:10
56:3 65:3
**area**  17:16 46:2
55:18 57:19
60:10,16 61:23
71:21 72:4
89:20 92:10
95:9
**areas**  40:7,8
55:19 58:6 61:5

63:7 64:17
88:12 90:1,6,8
**aside**  91:10
**asked**  44:19
51:19 61:14
85:10 91:11,20
92:8
**asking**  8:23
10:14 25:3
27:13 32:20
34:20 35:25
39:10 44:8,9
61:7 65:25
78:16 79:24
80:2 87:3,4
92:15 94:23
103:17 104:18
104:19 107:8
**aspect**  14:12
**aspects**  60:21
**assess**  112:9
**asset**  38:19
40:23 89:20
**assistance**  112:9
**associate**  69:21
70:14 71:10
**assume**  20:12
53:13 63:10
73:1 75:18
106:16
**assuming**  77:8
110:20
**assumption**
75:16

**attached** 78:3
  118:11
**attachment**
  59:11 74:1,7
  94:14,18,20,22
  102:17,20
  106:21 107:15
**attachments**
  107:4,6
**attempt** 9:2
  39:12 103:14
**attempting**
  16:23
**attend** 108:17
**attended** 107:24
**attending** 41:16
  108:2
**attention** 19:1
  20:22 21:1 22:3
  83:24
**attorney** 34:4
  116:13,15
  118:13
**audio** 5:7
**audit** 24:16
  87:22
**audits** 34:12,21
  45:12 64:16,20
  88:2 90:17,20
  90:23 91:18
**august** 37:7
  38:11,23 40:19
**available** 50:5
  50:13 118:6

**average** 55:24
  55:25 56:11
**aware** 18:16
  21:12 33:13,19
  33:22,23 34:2
  34:11,15,21
  35:15 36:1
  43:22 44:10,16
  75:24 91:17
  92:5,16,23 93:6
  93:8,11

**b**

**b** 1:7 3:5
**back** 42:16
  47:16 51:9
  93:17
**background**
  41:13
**bad** 54:6 102:15
**baseball** 41:19
**based** 90:15
  96:15
**basically** 48:4
  70:22
**basis** 78:8,17
  79:2
**bates** 2:18 6:6,6
  109:13,18
  110:13
**began** 87:10
**beginning** 68:18
  69:15,25 71:9
  86:20 87:11
  98:12

**begins** 90:5
**behalf** 1:3,18
  6:4 9:18 67:11
  67:16 76:6
  77:19 113:19
**believe** 16:8
  29:10,11 32:4
  48:25 54:12,18
  60:2 76:9 79:7
  86:14,23 87:23
  89:1,8 90:9,15
  92:9 103:5,7
  111:4 113:20
**best** 116:11
**beth** 60:9 62:12
  64:2
**better** 41:1 88:3
**beyond** 24:7,12
  24:14,22 25:1,6
**bi** 50:5,14 51:5
  54:21 55:1
**big** 54:16 72:6,7
**biological** 41:15
**bless** 94:9,10
**bother** 81:25
  82:3,7
**bottom** 62:25
  72:16 77:11
  109:19
**break** 10:21,23
  10:23,25 42:7
  93:17 94:2
**breakdown**
  21:6

**bring** 81:20
  82:3
**brining** 67:9
**broad** 14:17
**broader** 15:7
**broadly** 25:10
**brought** 19:1
  20:22 21:1 22:3
  83:24
**brunswick** 2:8
**bryson** 2:2
**bubble** 35:1,4
  35:22
**bubbled** 17:3
  18:11 20:7
**bubbling** 25:21
**bullet** 64:11,14
  87:25 89:4 90:6
  90:19 97:19
**burlington**
  38:13
**business** 41:16
  61:19,19
**buying** 29:11

**c**

**c** 5:1
**cal** 41:14,19
**call** 24:25 30:14
  38:1 47:21
  48:15 66:24
  73:14 108:6
**called** 6:17
  37:20 77:5
  106:25

**calls** 104:11
**camera** 110:15
110:16,19 111:7
111:14 112:8
**cameras** 111:1,8
111:16
**canal** 2:12
**caption** 116:7
**carmen** 1:2
**case** 1:4 5:15
7:21,22,23 8:5
8:11,21 10:4
15:25 17:9
19:21 98:13
100:13
**cases** 75:20,23
**cashier** 32:3
81:21 83:24
**cashiers** 32:5
**cause** 21:12
22:8 23:13,18
23:20 91:3,8
92:5 99:8
**caused** 22:17
**causes** 21:12
22:13 91:11,16
92:16,22 93:8
93:10
**cctv** 110:22
**center** 4:4
**certain** 12:13
27:14 49:9 83:6
**certify** 116:6,12
117:5

**chain** 3:9,11,12
3:15,17,20,24
**chance** 85:22
**change** 23:4
71:8 72:6 86:5
99:9
**changed** 71:8
**changes** 24:1
64:16 91:14
92:19 99:10
117:6 118:10
**characterization**
91:21
**charge** 11:19
46:14,17,24
51:14 61:23
72:1 83:14 91:4
92:13 106:3
**chart** 55:11
**charts** 14:2
**chat** 13:2
**chatted** 12:20
12:23
**check** 30:16,24
31:18 32:22
53:6 60:5 74:11
98:8,9 110:23
**checked** 26:5
51:9 52:20
64:22 84:4
**checks** 45:16
**children** 23:10
**city** 4:3
**civil** 4:6

**class** 6:2,9
**clear** 9:15 94:18
107:6
**clearly** 58:22
**close** 95:8,21
**coleman** 2:2
**column** 56:25
**combat** 87:18
**come** 16:13,22
46:15 49:15,20
71:11,24 80:4
81:2 99:10
**comes** 22:18
23:21
**comment** 82:19
82:22 83:12
**commentary**
91:21
**commenting**
63:15
**commission**
116:24 117:24
**commitment**
74:19 78:4
**commitments**
63:6
**common** 49:19
67:15,20
**communicate**
68:1
**communication**
67:25
**company** 1:23
**comparisons**
40:1,7

**compensating**
11:15
**compensation**
10:11,14
**competition**
40:9
**competitors**
40:3
**complaint** 15:25
33:11
**complete** 51:8
52:8 91:16 92:4
**completed** 4:12
52:9,25 53:2
118:16
**compliance**
14:11,12,16,18
24:24 45:22
46:4,11,14,15
49:15,16,20
51:1 54:15 59:7
59:12 60:15,20
61:4,5,8 63:7
64:17 68:14,15
68:19 69:5,10
69:22 70:7,10
70:24 71:7,18
72:11 78:3
86:24 88:10,25
89:4,14,15 90:7
90:10,20 93:3
106:22 107:9
109:22 110:14
112:10 113:1
114:2,8,17

compliant 61:1
composition
55:19
comprehensive
92:11
concern 21:8,19
21:23,24 22:5
concerned
114:7
concerns 16:7
25:21
concludes
115:16
conclusion
104:12
conduct 24:24
confident 74:8
confidential
1:14
confidentiality
10:5
confused 57:13
confusing 8:25
9:2,4
connie 1:16 3:8
4:1 5:11 6:16
7:1 72:17 73:3,5
74:20,21 75:15
77:19 91:3
96:14 99:22
117:3,20 118:5
consider 24:11
considered
30:11 60:16

considering
58:5
consistent
100:21
constitute
116:10
consumer 23:14
23:22 31:9,17
32:21 84:18
91:13 92:18
consumers
17:25 19:24
29:10,13 30:24
62:3 80:2
contain 109:15
contained 57:24
content 73:4
75:7,17 76:2,15
77:4 89:11
103:19 104:19
contents 64:6
105:22
context 25:7
101:24
continue 5:8
continued 69:3
70:6
convenience
30:13,14,15
31:8,17
conversation
12:11 42:22
63:23 65:23
conversations
5:6

copied 49:25
53:14
copies 118:14
copy 15:24
core 50:4,12,20
53:12
corner 59:13
corporate 8:13
corporation 1:6
118:4
correct 15:23
20:10,11 28:6
29:25 33:5,21
35:17 43:12,13
50:1,2,7,10
52:13 55:8 56:4
56:16 57:7,8
60:13,14 62:20
64:8,12 66:17
67:12,13 71:24
75:21 77:22
86:20 87:5,6,12
88:3 89:22
90:21,22 92:21
93:9 94:4,8,12
94:21 95:25
96:25 97:21
98:3 99:5
102:18,24,25
107:16,19,22
108:10,24
111:19 116:10
correspondence
10:12

cost 70:12 71:12
counsel 4:2 5:12
5:22 6:7,9 7:6
9:9 10:20 11:3
33:8 75:4 103:9
103:20,25
104:20 116:13
116:16 118:14
count 113:5,8
113:18,21
counter 63:4
counterpart
74:24 76:24
105:25 114:16
country 36:18
74:25
county 116:2
couple 33:16
67:8
course 19:12
47:24
court 1:1 4:9
5:14,20,25 7:8
8:19 9:14 48:16
116:4
coverage 69:11
69:12
covering 106:12
created 54:9
55:2,3 110:16
111:13
criteria 97:20
100:21
critical 60:16
63:7

[csr - document]

**csr** 116:22
**cue** 85:21
  105:18
**currently** 41:15
  41:22
**customer** 29:25
  32:7 82:19
  83:18 84:3,8
  85:5
**customers** 22:15
  22:21 23:7 31:5
  31:23 32:12
  78:4,9,17 79:1,3
  79:15 80:5,7,12
  80:16,22 82:23
  83:2,5 84:16
  113:5,8,13,17
  113:20,21
**cv** 1:4 5:16

**d**

**d** 1:7,2,3 3:1 5:1
**daily** 110:15,16
  110:19 111:14
  111:22 112:8
**damage** 88:22
  88:24 89:1,9,13
  89:22 90:3,16
**damages** 89:22
**dann** 2:7
**dannlaw.com**
  2:10
**dash** 110:15
**data** 45:3,10,14
  98:10

**date** 33:15 56:7
  73:9 87:5,5 96:8
  102:15 105:5
**dated** 65:3 68:9
**dates** 96:4
**david** 2:17 5:19
**davidson** 116:2
**day** 69:12,13
  71:1 78:7 97:3
  113:7 116:18
**days** 118:16
**deaf** 63:2,11
**deal** 10:15 16:24
**dealing** 16:14
  18:17 25:16
  39:3
**dealt** 18:12
  20:10,12 21:13
  34:3
**decide** 17:22
**deck** 101:18,24
  106:24
**dedicated** 72:11
**dedmon** 62:12
  62:13,14,17,20
**defendants** 1:10
  2:11
**defining** 20:4
**degree** 41:15,25
**delay** 99:8
**deliver** 78:6
**department**
  30:4 83:14
**depending** 95:8

**deponent**
  118:13
**deposing** 118:13
**deposition** 1:14
  3:7 4:1,12 5:11
  5:17 7:14 8:1,17
  10:2,13 11:4
  12:17 33:8,17
  33:19 48:24
  58:18 59:1 60:6
  117:4
**describe** 105:24
**described** 71:10
  105:23
**design** 61:24
**designations**
  10:5
**details** 8:10
  15:12,15 43:20
  43:21 44:4,8
  55:11
**determine** 44:19
**device** 98:6,7,10
**devices** 98:14,25
  99:1
**dg** 109:19
**different** 13:21
  13:22 54:22,23
  57:3 69:14 71:1
  104:18
**direct** 47:9,13
**direction** 99:15
  103:24
**directly** 41:5
  47:4

**director** 35:12
  62:17
**directors** 41:8
  47:7
**disciplines**
  24:19
**discrepancies**
  23:19
**discrepancy**
  25:25 84:9
**discrimination**
  7:22
**discussing** 92:6
  104:21
**dispute** 48:8,11
**distinction**
  37:17
**district** 1:1,1
  5:14,15 21:4
  24:23 35:11
  43:23 44:10
  47:6,8 66:16
  110:22 112:1
**division** 37:4,4
  41:6 55:11
  56:11,15 60:9
  60:10 62:16
  97:11
**divisions** 55:14
  55:17
**dm** 59:7 65:10
  65:16 66:4,16
**document** 11:10
  47:22 48:18
  58:9 65:1 66:25

**[document - edwards]**

73:15 85:17
93:14 102:8
103:16 105:2
109:5,12 110:1
110:9 112:16
**documents**
13:12,15,18,18
14:2 16:10
19:21 96:16,20
104:6,20
**doing**  21:5 40:8
**dolgen**  1:7,7 6:4
**dolgencorp**  1:7
**dollar**  1:6 3:21
5:13 6:7 8:14
12:24 14:16
15:17 16:13,13
16:21,23,23
17:7 18:12,12
18:16 19:12,23
20:8,17,18
21:13 24:4,10
25:16 26:1,11
26:23 28:6,20
29:1,16 30:8,11
30:23 31:4,24
32:5,12,22
33:20,24 34:3
34:11 36:10,23
38:6,22 39:2,22
39:25 40:2,8
42:24 43:5,15
43:25 44:18
45:11,21 53:15
60:16,21 61:4,9

61:10,15 62:2
63:10 69:2 70:6
70:13 71:12
75:24 76:13
78:21 79:10,14
79:20,25 80:7
80:12,15,22
82:24 83:2,4,18
84:13 85:5,13
96:16 100:14
105:9 108:16
109:25 111:1
112:9 113:8,13
113:18,21 118:4
**dollargeneral....**
49:7
**dollars**  32:6
**double**  60:5
69:11
**draft**  72:22
101:18,24 102:1
106:24 107:9,21
**drill**  85:20
112:19
**droge**  1:16 3:8
4:1 5:11 6:16,21
7:1,2 42:21
77:19,19 94:2
115:10 117:3,20
118:5
**drumel**  2:17
5:19
**due**  24:1 43:24
44:11

**duly**  6:18
**dvps**  97:9,11,14
97:16
**dynamic**  95:6

**e**

**e**  3:1,5,9,11,12
3:14,15,17,18
3:20,24 5:1,1
14:2,3,4,4,6,10
14:17 16:9 46:9
46:10 48:23
49:3,6,8,14,20
49:25 50:10
54:15 55:2
58:17 59:3,7
62:9,22 63:19
64:1,2,12 65:3
65:23 66:21
67:8,16 68:2,9
70:19 71:11,23
72:5,8,14,16,18
72:22,24 73:2,4
73:12 74:17
75:7,11,15,17
75:25,25 76:2,9
76:10,13,15
77:4,10 79:8
80:3 85:25 86:3
86:8,23 87:4,24
89:6,11 90:15
91:7 94:4,6
95:24 96:9,14
96:20,25 100:3
101:11,15,19
102:13,23 103:8

103:19 105:8
106:15,17
112:23,23,24
113:2,5,24
114:22 117:1
**earlier**  60:11
61:14 87:10
91:12 105:23
114:3
**early**  50:14
**ease**  67:24
**east**  2:12
**educational**
41:13
**edwards**  2:2 3:3
6:1,1,20 7:5
10:1,17,18
11:22,25 12:4
14:19 15:1,13
16:20 17:6,17
18:20 19:3,14
20:5,24 21:21
22:6,19 24:9
25:23 26:3,13
26:21 27:5,12
27:18 28:3 29:9
29:15 30:3,22
31:6,15 32:8,19
33:3 34:10 35:3
36:6 39:9,19
40:15 42:6,15
42:19,20 43:7
44:7,17,25 45:9
45:20 46:3,23
47:12,15,19,23

48:1,13,20
49:22 50:19
52:10,21 53:19
54:1,14 56:9
57:5,22 58:7,10
58:12 59:17,22
60:1,4,7,22 62:8
63:17 66:10,15
66:23 67:2,21
68:8,22 69:8
70:11 71:5,22
72:25 73:13,16
73:21 74:3,6,10
74:14,16 75:13
75:22 76:11,20
77:2,13,17
78:15,24 79:13
79:23 80:13,24
81:13,22 82:6
82:11,15,21
83:3,16 84:1,14
85:1,15,19
86:16 87:1,15
88:8,23 89:12
90:18 91:24
92:1,3,14 93:5
93:12,16 94:1
94:10,13,21
95:2,22 96:3,12
96:22 98:1,21
99:19 100:4
101:4,9 102:3,6
102:9,12 103:17
103:22 104:4,16
104:25 105:7,13

105:16,17
106:10 107:7,11
107:13 108:14
109:3,6 110:7
111:5,20 112:6
112:14,18
113:15 114:10
114:14,23 115:1
115:10,14
**effective** 19:23
20:4 25:22
**effort** 9:15
25:12
**efforts** 25:13
**eight** 55:25
**either** 8:5 9:17
103:5
**eliminating**
19:24
**employed** 16:21
18:11
**employee**
116:13,15
**empowered**
32:6
**encompassed**
89:16
**ends** 73:2 75:15
105:9
**ensure** 19:13
24:5,12 39:17
42:23,25 69:4
79:11
**entered** 10:4

**entire** 9:13
109:11
**entitled** 10:10
94:24 107:15
**environment**
78:6
**equipment**
98:19,24
**errata** 118:11
118:13,16
**error** 22:17
26:15
**errors** 57:10
**especially** 58:5
**esq** 2:2,6,11,18
118:1
**established**
96:13 103:6
**establishing**
87:16
**et** 5:13,13 118:4
118:4
**event** 64:7 100:9
106:25 107:18
107:25 108:3,17
108:17,18
**events** 108:21
**exact** 33:15 69:6
**exactly** 9:3 79:8
**examination** 3:3
6:19
**example** 24:23
34:15 76:24
**examples** 25:2
76:13

**exceeded** 25:12
**excellence**
109:23 110:14
**except** 55:13
**excited** 68:13
**exclamation**
72:6
**excuse** 94:11
**execute** 28:18
**executed** 47:1
**executing** 46:17
**execution** 24:17
24:18 28:13,14
28:17 46:14
50:4,13,21
51:14 53:13
61:23 72:1
83:15 92:13
114:2,4,8,18
**executive** 38:18
40:23 60:12
**exhibit** 3:7,9,10
3:12,13,15,16
3:18,19,21,23
47:20,21,22
48:5,14,15,18
57:25 58:8,9
65:2 66:24,25
67:7 73:14,15
74:4 85:16,17
85:25 93:13,14
94:4 101:20
102:7,8,16,16
105:1,2,22,22
109:4,5,8,12,14

110:13 112:15
112:16
**exhibits** 10:3
**expect** 30:23
  31:4,8,17 78:4,9
  78:18 79:1,3,15
  80:3,5,8,12,16
  81:7,16,19
  82:23 83:5
  84:18 85:5
**expectation**
  28:9,22 43:9
  84:24
**expected** 28:12
  28:17 61:11
**experience** 25:8
  25:20 51:3
**expert** 25:20
  32:17 57:18
  70:19 71:16
  80:22 93:3
**expertise** 72:4
  92:11 95:9
**expired** 86:25
**expires** 116:22
  116:24 117:24
**explain** 35:6
**exposed** 17:25

**f**

**fact** 19:23 51:20
  52:9 57:10,21
  73:5 76:1 77:18
  113:17
**failed** 45:12
  87:22 88:1

90:17,20,23
91:18
**failing** 34:21
**fails** 118:18
**failure** 34:16
**fair** 20:14 29:10
  29:13,20 31:16
  31:23 61:7
  84:18,23 85:3
  96:23
**false** 80:15
**familiar** 58:6
**far** 27:6
**fault** 23:14
**february** 106:16
  107:25 116:19
  118:3
**federal** 4:6
**feel** 9:12 17:7
  24:10 25:8,11
  61:3 74:8 77:14
  85:7 91:7
**feelings** 9:6
**fell** 26:12 27:11
  70:9
**felt** 24:6
**female** 8:7
**field** 50:3
  107:18
**filed** 5:13 16:2
**final** 10:19
  113:4
**financially**
  116:16

**fine** 59:24,25
**finish** 9:16
**firm** 2:7
**first** 6:18 8:5
  17:19 33:13
  47:20 49:2,2
  58:19 64:14
  65:8 72:17
  77:24 85:25
  86:2
**five** 13:5,23
  16:9 93:20 99:1
**fixed** 83:25 84:6
**fl** 118:15
**flip** 55:9
**flow** 69:13
  107:16
**focus** 63:6 95:7
  95:19
**folks** 45:22
  46:10
**follow** 21:9
  35:18 51:19
  63:21 101:5
**followed** 5:24
**following** 107:4
  117:6
**follows** 6:18
**foregoing** 116:6
  116:9 117:3
**forget** 42:17
**form** 11:21,24
  12:1 14:13,23
  15:9 16:16
  17:11 18:22

19:7,25 20:19
21:15,25 22:10
23:23 25:17
26:8,18 27:4,22
27:25 29:4,18
30:19 31:1,11
31:20 32:15,24
34:6,23 36:3
39:5,14 40:10
43:2 44:1,13,21
45:6,17,24
46:20 47:2
49:17 50:15
52:3,15 53:17
53:25 54:10
56:5,22 57:15
58:2 60:18 62:4
63:12 66:7,12
67:17 68:4,21
68:24 69:17
70:2,16 71:14
72:19 73:6 75:8
75:19 76:3,17
76:22 77:15
78:11 79:5,17
80:9,19 81:9,18
82:1,14,17,25
83:9,22 84:10
84:21 85:9
86:12,21 87:13
88:4,17 89:5
90:11 91:19
92:7,25 95:14
97:22 98:15
99:13 100:1,24

101:8,25 103:11
104:11 106:6
108:11 110:4
111:2,17,23
112:11 113:10
114:9,19
**former**  28:25
**forth**  116:7
**forward**  65:1
74:19
**found**  57:10
**four**  55:23
56:11 69:20,22
70:14 71:9,20
**frequency**  53:21
54:13
**frequently**  51:3
51:5
**fresh**  113:6
**freshness**  64:22
70:8
**friday's**  64:7
**fronts**  65:12
**full**  6:24 77:24
**fullerton**  41:14
41:20
**funky**  96:18
**further**  116:12

**g**

**g**  5:1
**gain**  14:21
**gay**  2:3
**general**  1:6 3:21
5:13 6:7 8:14
12:24 14:16,18

15:17 16:13,14
16:21,23 17:7
18:12,12,17
19:13,23 20:8
20:17,18 21:13
24:4,10 25:16
26:1,11,23 28:6
29:1,16 30:8,11
30:23 31:4,24
32:5,12,22
33:20,24 34:3
34:11 36:10,24
38:6,22 39:3,22
39:25 40:8
42:24 43:6,15
43:25 44:19
45:11,21 53:15
60:17,21 61:4,9
61:10,15 62:2
63:10 65:19
66:1,1 69:2 70:6
70:13 71:12
75:4,24 76:14
78:21 79:11,15
79:21,25 80:7
80:12,15,22
82:24 83:2,5,18
84:13 85:5,13
86:24 96:16
100:14 105:9
108:16 111:1
112:9 113:8,14
113:18,21 118:4
**general's**  28:20
40:2 109:25

**generally**  17:19
34:20
**generals**  34:4
**generic**  49:15
**georgia**  116:22
**getting**  9:12
88:2 103:12
**give**  6:12 8:1
13:19 48:21
67:3 85:21 92:4
92:11 99:2
104:13 115:2
**given**  8:17
**giving**  7:11 25:2
**gnats**  102:4
**go**  5:9 6:24 12:2
12:7 19:20 27:8
38:12 42:7 45:6
47:15,19 51:19
55:4,9 58:7
63:25 66:3,23
73:13 77:24
85:24 90:4
93:12,16 99:17
100:10 102:6
104:25 112:14
112:24
**goal**  19:16,17
28:18,20
**god**  6:14
**going**  5:3 8:23
9:5,10 10:19
19:19 40:25
42:10 48:22
58:13,16 62:25

65:10 74:3 84:8
93:21 96:5
103:10,11,12
104:1,10,11
106:15 109:8,13
109:17,21
112:23 115:2,5
**good**  5:2 6:21
6:22 24:4 41:19
42:4,6,7 67:11
72:13
**goodness**  19:9
**gotcha**  38:3
**government**
45:12 87:22
90:23 91:18
**governmental**
34:21 88:2
**great**  24:17
**greater**  52:23
**grocery**  30:6,11
**grossman**  2:3
**group**  54:16
**guess**  81:11
**guys**  115:2

**h**

**h**  3:5
**habit**  30:16
**half**  36:17 37:13
37:14 72:23
**hand**  6:11 48:15
90:4,4
**handheld**  98:6
98:10,14 99:1

**happened** 72:23
82:4 95:17
**happy** 13:17
109:13
**hawthrone**
62:12
**heard** 10:20
43:10
**heavily** 40:13
**held** 5:17 36:25
43:14 60:25
61:11,15 79:10
**help** 6:13 9:14
17:24 63:2
**helping** 112:9
**hey** 101:6
**hht** 98:6
**hhts** 98:2
**hierarchy** 45:21
**high** 79:10
**higher** 18:6
82:13
**highest** 69:4
**highway** 2:7
**hold** 94:17
**holland** 4:3 5:18
48:9
**honest** 7:11
**honestly** 67:24
100:17
**hour** 10:24
69:20 70:14
71:9 93:18
**hourly** 11:12

**hours** 13:4,5,6,9
13:10 14:21
69:22 70:21,24
71:4,18 72:2
**house** 6:7
**huh** 20:9 22:22
108:24
**hundred** 19:16
26:4,11 27:10
28:5,12,17,21
29:8,22 32:6
39:23 56:24
61:12 78:21
79:11,21 85:14
95:19 112:1
**hurt** 9:6

**i**

**idea** 13:20 15:7
32:12 80:17
111:21 114:15
**identified** 96:7
**images** 110:22
**immediate** 19:2
19:4
**immediately**
17:5,9 18:13
66:5 83:25
**impact** 88:13
90:9
**implement** 70:6
**implementation**
91:14
**implemented**
69:25 71:8
86:18 87:9

**implementing**
66:4
**important** 9:8
29:2 39:25
50:25 60:21
61:2,4,6,9,10,17
61:21,25 62:2
**inaccuracy**
51:12 92:6,23
104:21
**inaccurate**
45:15 51:4,6,15
52:11 83:20
**inappropriate**
103:13
**incentivized**
42:23 43:6
**incentivizes**
42:25
**include** 98:2
**including** 64:15
112:25
**income** 82:8
**incorrect** 51:10
96:10 99:15
**increased** 71:11
**incurred** 70:13
**indicate** 73:17
73:25
**indicated** 63:9
**indicates** 68:12
69:9 74:18
**indicating** 75:25
88:15 102:20

**individual**
35:23
**individually** 1:8
**individuals**
112:25
**inevitably** 8:24
**infer** 88:22
**inferring**
114:22
**inflation** 24:2
**information**
57:24 110:18
**instance** 35:16
**instituted** 39:21
**institution**
39:17
**instructs** 12:8
**intending** 9:3
**interested** 114:4
116:17
**interim** 53:7
**internal** 40:13
**internally** 24:16
38:1
**interpretation**
79:9
**introduced** 6:23
**inventory** 98:9
**inviting** 97:13
**involves** 15:21
**involving** 16:14
16:24 23:22
33:24 36:1
**issue** 16:14,24
34:22 36:1

44:20 45:2
91:13 92:23
96:8,10,18
104:9,21 105:5
105:8
**issues** 17:3,8,18
17:23 18:11,18
18:25 19:6 20:7
20:13,16 21:13
22:9 25:15 34:4
34:17 35:18,21
39:4,13 43:15
43:24 44:12
46:11 57:19
86:19 87:17
91:17 92:6,12
95:12 97:21
99:11 100:23
**items** 86:18

**j**

**january** 1:20
4:5 5:4 68:10
95:24 96:15
101:19 117:4
**jason** 2:18 6:6
**javier** 2:6 6:8
**jersey** 2:8
**jim** 67:11,16
72:18 73:3,5
74:20,23,24,25
75:1,1,6,15 76:6
77:20 80:4 81:2
91:3 103:1,5,6
105:22 106:11
113:25 114:6,15

114:22
**jmerino** 2:10
**job** 36:25 37:3
38:17 40:22
**jobs** 21:5
**jointly** 1:8
**joseph** 1:2 118:4
**jug** 83:18
**july** 113:2 114:1
114:7,17
**jump** 9:16 65:1
**june** 96:9
114:11

**k**

**kellogg** 41:16
**key** 40:8 68:14
**kind** 44:9 49:15
95:6
**knew** 84:3
**knight** 4:3 5:18
48:9
**know** 9:12
15:11,15,19,20
16:2,4,6 17:15
18:24 19:10,22
20:3 22:12,15
23:9,18,25 24:2
24:3 25:19
26:20,20 27:16
27:21 29:19
30:11 31:5,22
35:16 39:2,8
41:21 43:5,19
44:18,24 46:12
46:13 49:9,12

49:23,24 50:20
50:25 51:13
52:5 53:1 55:19
59:4,22 63:15
64:20,23 65:18
66:13 67:5,19
71:17,17,19,21
72:9,10,12,23
73:12,24 74:1,6
74:13 75:14
77:6 78:16
79:19 80:7,25
81:14,15 82:20
84:2,3,7,22
85:11 88:20
90:14 95:4 96:3
96:6,6 97:6
98:20,24,25
100:7,13,19
101:1,15 103:14
103:21,23 104:3
104:15 108:20
108:22,23,25
109:1 110:11
111:12,15 112:1
112:4,13 113:16
114:21
**knowing** 9:3
**knowledge** 75:3
110:18
**known** 96:10
**knows** 103:18
**knoxville** 2:4

**l**

**label** 29:24 50:4
50:13,21 52:1
53:12 83:20
**labeled** 29:12
83:18
**labels** 22:21
23:4 50:24 51:8
51:21 53:9 54:4
56:12,20 57:11
57:21 92:19
99:18 100:11
**labor** 71:25
**large** 116:5,23
**late** 56:25 57:1
**launch** 68:14
69:7
**launched** 68:20
69:2
**law** 2:7 6:2
**lawsuit** 14:22
15:8,21 16:2,4,6
33:14
**lawyer** 75:2,2
102:24 103:3
**lawyers** 103:2
**layers** 35:10
**lcr** 116:21,22
**lead** 67:25 91:4
91:22 99:10
**leader** 107:18
**leaders** 50:3
**leave** 38:10,22
**led** 46:13 47:6,7
47:8 101:16

Case 7:23-cv-00558-PMH    Document 89-7    Filed 01/15/25    Page 132 of 150

**left** 16:22 20:17
  26:24 36:10
  37:1 38:8,9
  40:16 55:24
  104:6,22
**legal** 33:24
  83:13,14 104:12
  118:23
**level** 35:23 69:4
**levels** 98:9
**licensed** 4:9
  116:3
**likely** 10:12
  68:7
**limited** 82:8
**line** 72:5 91:1
  117:8
**list** 91:6,11,16
  92:4,4,12 95:6
  95:12 97:18
  109:21
**listed** 100:19
**listened** 108:18
**listening** 63:4
**lists** 64:10,11
  72:17
**litigation** 104:8
**little** 57:13
  104:17
**live** 64:7 106:25
  107:18,25 108:2
  108:17,21
**llc** 1:7 2:3 6:5
**llp** 2:11 4:3

**local** 34:12
**located** 5:18
**logistics** 109:2
**long** 7:18 13:2
  91:22 92:1
**longer** 70:21
  109:7
**look** 13:12,15
  16:10 32:13
  55:4 57:3 59:14
  67:4,5 74:19
  85:20 94:3
  110:3 112:2
  115:3
**looked** 13:18
  40:13 57:19
**looking** 15:14
  49:2 55:23 57:3
  58:19 62:22
  65:3 73:9 93:19
  110:8 112:20
**looks** 55:13
  66:17 69:5
  70:20 75:11
  94:16 107:5
  111:6,7 112:22
**lot** 19:11 24:18
  24:19 36:17
  65:5,12 86:25
  90:16 96:20
**lots** 21:18 24:15
  91:14 92:19
  98:10
**love** 59:2

**m**

**made** 21:11
  35:15 106:4
**mail** 3:9,11,12
  3:14,15,17,18
  3:20,24 46:10
  48:23 49:3,6,8
  49:14,25 50:10
  55:2 59:3 62:9
  62:22 63:19
  64:1,2,12 65:3
  65:23 66:21
  68:2,9 70:19
  71:11,23 72:5,8
  72:14,16,18,22
  72:24 73:2,4,12
  74:17 75:7,11
  75:15,17,25
  76:2,9,10,15
  77:4,10 79:8
  80:3 85:25 86:3
  86:8,23 87:4,24
  89:6,11 90:15
  91:7 94:4 95:24
  96:14,25 100:3
  101:11,15,19
  102:13,23 103:8
  103:19 105:8
  106:15,17
  112:23,23,24
  113:2,5,24
  114:22
**mailbox** 49:21
**mails** 14:2,3,4,4
  14:6,10,17 16:9

  46:9 49:20
  54:15 58:17
  59:7 67:8,16
  75:25 76:13
  94:6 96:9,20
**maintain** 63:5
**majority** 51:10
  51:18 52:12,22
  52:24 53:1
  89:11
**make** 9:14,15
  10:5 21:4,7 24:7
  24:16,19 25:10
  30:16 32:7 48:5
  48:14 60:25
  63:3 72:15 74:3
  84:24 87:18
  91:15 93:7
  95:19 104:1
  107:12 112:3
**making** 9:10
**male** 8:7,8
**managed** 35:14
  36:9 95:21
**manager** 21:2
  35:11,11 43:23
  43:23 44:10,11
  66:16 71:2
  72:10,13
**managers** 21:4
  21:5 24:23
  42:25 43:14
  47:6,8 70:21,22
  70:25 110:22
  112:2

**maribeth**  60:8
    62:10,12,14,17
    62:20 65:5
**mark**  47:16,20
    58:8 66:23
    73:14 85:15
    93:13 102:6
    104:25 109:4
    112:15
**marked**  47:22
    48:18 57:25
    58:9 66:25
    73:15 85:17
    93:14 94:4
    102:8 105:2
    109:5,12 112:16
**mary**  60:9 62:11
    64:2
**master's**  41:23
**match**  29:3
    82:12 84:19,25
**matches**  85:6
**matching**  18:1
**matrix**  44:5
**matter**  5:12 7:6
    14:10 109:15
**mba**  41:18
**mcguirewoods**
    2:11 6:4 33:18
**mcguirewood...**
    2:13 118:2
**mean**  12:21
    13:20 17:22
    20:6,12,25
    21:22 24:14,15

24:22 25:4
    26:22 31:7 35:6
    51:17 54:23
    58:21 61:22
    65:15,19 66:3,6
    67:22 69:24
    70:1 71:23
    76:21 81:14
    86:10 92:10
    97:10 98:5
    101:6 105:8
    108:5
**meaning**  63:10
    101:2
**means**  12:1
    13:21 51:1
    52:23 57:1
    65:21 66:2
    74:13 79:9
**meant**  14:16
    63:16,22 86:14
    114:24
**measure**  36:7,8
**measures**  24:4,6
    24:11 25:10
    29:25 35:17
    39:12,21 47:11
    69:3 70:7,8
    87:17
**media**  5:10
**meeting**  13:13
    14:20 76:6,24
    78:1,2 97:8,9,14
    97:16

**meetings**  77:6
    108:10 109:2
**mention**  43:11
**mentions**  89:10
    99:4
**merino**  2:6 6:8,8
**mess**  40:25
**messaging**
    64:11
**met**  6:23 12:24
    112:10
**metrics**  40:14
**mia**  3:18 41:2,3
    75:12 95:24
    96:17,23 97:8
    100:2,5 101:16
    102:13,23
    112:25 113:5,25
    114:1
**mia's**  62:17
    113:9
**microphone**
    42:18
**microphones**
    5:5
**microsoft**  108:6
    108:8
**milberg**  2:2 6:2
**milberg.com**  2:5
**milk**  83:18
**mind**  22:18
    23:22 25:14,24
    26:22 30:12,13
    38:20

**minutes**  42:22
    57:1 93:20
    115:2
**mischaracteri...**
    89:6
**missing**  87:2
**misstates**  93:1
**monday**  86:1
**money**  38:25
**monitor**  32:2
**month**  38:10,10
    87:19
**monthly**  3:22
    110:1
**months**  96:24
**morning**  5:2
    6:21,22 69:10
**moved**  54:21
    70:24 71:18
**moving**  88:14
    90:2 92:18
**multiple**  49:10
**mute**  5:6

|               n               |

**n**  3:1 5:1
**name**  5:19 6:24
    7:4 8:4 14:6
    41:1 58:22
    72:17 77:10
**narrow**  91:3
**nashville**  1:24
    4:3,4 5:19 8:2
    12:25
**nation**  37:13,14

**nationwide** 36:1
37:12
**nearby** 100:10
100:12,18
**necessarily**
22:25 23:15
61:24
**need** 10:21
58:14 63:2
70:21 86:9 91:4
**needed** 97:9,17
**neither** 60:5
103:1 116:12,15
**never** 81:11
110:9,20
**new** 1:1,7 2:8
5:15 6:5 16:8
17:14,15 33:20
33:22 36:12
55:20 99:9
110:15 111:13
**nicholson** 4:8
5:21 116:3,21
**nine** 55:25
**nominal** 10:10
10:14
**nonresponsive**
101:13
**normal** 25:12
**north** 2:8 37:20
106:13 114:16
**northern** 106:5
**northwestern**
41:16

**notary** 4:10
116:4,23 117:23
**note** 5:4 10:8
88:9 89:3,9,21
89:23 90:5,8,10
91:2 118:10
**notes** 115:3
**notice** 3:7 48:7
81:23 84:8
87:21 88:1
**noticed** 84:3,5
96:2
**novs** 87:20
**number** 5:15
8:23 10:6,8
45:11 46:9
86:18 89:10
99:2 108:9
109:13 110:14
112:25
**numbers** 109:19
109:21
**numerous** 107:6

**o**

**o** 5:1
**oath** 7:7
**object** 18:19
29:14 52:14
77:12 91:20
99:25 103:10,11
103:12 104:10
104:11
**objection** 11:21
11:24 14:13,23
15:9 16:16,25

17:11 18:22
19:7,25 20:19
21:15,25 22:10
23:23 25:17
26:2,8,18 27:4,8
27:17,22,25
29:4,17 30:19
31:1,11,20
32:15,24 34:6
34:23 36:3 39:5
39:14 40:10
43:2 44:1,13,21
45:6,17,24
46:20 47:2
49:17 50:15
52:3,14 53:17
53:25 54:10
56:5,21,21
57:15 58:2
60:18 62:4
63:12 66:7,12
67:17 68:4,21
68:24 69:17
70:2,16 71:14
72:19 73:6 75:8
75:19 76:3,17
76:22 77:15
78:11,19 79:5
79:17 80:9,19
81:9,18 82:1,10
82:14,17,25
83:9,22 84:10
84:21 85:9,10
86:12,21 87:13
88:4,17 89:5,6

90:11 91:19,20
92:7,8,25 93:1
95:14 97:22
98:15 99:12,12
99:25 100:24
101:8,25 106:6
108:11 110:4
111:2,17,23
112:11 113:10
114:9,19
**objections** 9:10
104:2,23
**objects** 12:1
**occasion** 35:1
108:16
**occasionally**
30:5,7
**occasions** 9:11
**occur** 67:20,23
92:12
**occurs** 45:2
**offices** 4:3
**oh** 12:6 25:5
42:19 59:6
62:11 107:5
**ohio** 36:19
**okay** 7:2,4,10,13
7:21 8:4,7,12,16
8:19 9:8,22
10:17 11:3,8,12
11:15,18 12:13
12:16,23,25
13:2,5,8,12,19
14:4,6,9,12,20
15:2,6,20,24

16:9,12 17:7
18:4,10,16 19:4
19:15 20:16,25
22:7,23 23:17
23:21 25:24
27:1,13 28:4,8
28:15,20,24
30:10,14,23
33:7,10,13,18
33:22 34:2,11
34:15,20 35:4,9
35:25 36:7,12
36:14,16,19
37:5,10,19,22
38:7,12,22,25
39:2,10,20,24
40:16 41:4,11
41:17,25 42:2,4
42:9,10 43:8,10
44:18 45:10,21
46:7,15,24
47:15,19 48:4
48:11,13 49:1,6
49:11,25 50:9
50:20,25 53:4
53:20 54:20
55:9,13,17,23
56:10,15,18
57:23 58:7,21
58:25 59:6,11
59:17,24 60:4
60:11,15 62:9
62:19,22,25
63:18,25 64:5
64:10,14,23

65:1,8,15 66:4
66:16 67:7,11
67:14,22 68:2,9
68:12,18 69:24
72:3,14 73:1
74:5,10,14,23
75:1,6 76:12,21
77:8,18,22
81:14 82:22
83:4 84:15
85:15,22,24
86:5,17 87:20
87:22,24 88:9
89:17,21 90:5
93:6,12,21 94:6
94:14 95:3,23
96:12 97:2,6,13
98:2,7,12,22
99:4,20 100:19
101:5,10,18
102:3,23 103:4
103:7 104:5,17
105:13,18,21
106:2,11,15,21
107:5,10,24
108:5,8,15,20
108:25 109:3,9
109:25 110:8,12
110:25 111:6,11
112:14 113:4,16
113:24 114:15
114:24 115:1,14
**ones**  13:16
**ongoing**  39:12
87:18

**online**  41:25
**open**  112:4
**opened**  70:23
71:3
**opening**  69:11
69:21 70:15
71:3,10
**operations**  3:21
110:1
**opinion**  28:2,25
29:6 33:2 52:2
57:23 62:1,7
91:9,23 113:13
**opportunities**
31:24
**opportunity**
64:17 67:3,4
94:3
**ops**  46:6
**order**  10:3,6
**ordered**  47:1
**organization**
63:7
**originated**  81:4
**ourself**  79:10
**outcome**  116:17
**outline**  64:5
**outs**  70:23,25
**overcharging**
18:4,18 19:24
25:25
**overpriced**
27:16
**overview**  94:7,8
94:15,25 95:4

95:11 97:7
101:12 102:17
102:21 103:24

**p**

**p**  5:1
**p.m.**  65:4 93:23
93:25 96:15
115:6,7,9,17,18
**page**  3:2,6 17:21
18:2,8 49:2
55:10 58:19
65:2 86:1
106:18 109:9,17
109:21,24 117:8
**pages**  116:9
**paid**  12:12
**paragraph**
77:25
**part**  69:13 74:4
78:1,2 94:18
**particular**
103:14,15
**parties**  5:9
96:18 116:14
**party**  10:9
64:21
**pass**  48:16
**pay**  83:8
**paying**  11:12
12:14
**pdf**  106:22
107:16
**peel**  23:4
**peeled**  23:2,5

**[pending - pricing]** Page 136

**pending** 7:24
  10:25 16:4
**people** 13:22
  41:4,9 49:10,12
  54:16 73:3
**percent** 19:17
  26:12 27:3,11
  27:15,19,19
  28:5,13,17,21
  29:8,22 39:23
  52:23 56:13,16
  56:24,25 57:7
  57:14 61:12
  78:22 79:12,21
  85:14 95:20
  112:1
**percentage**
  26:15,15 27:14
  32:12 45:15
  51:17 52:17,18
  53:2 56:19
**performance**
  95:8
**person** 42:1,2
  49:16 51:13
  67:25
**personally** 81:7
**perspective** 95:7
**phillips** 2:2
**phones** 5:7
**photos** 111:9,16
**phrase** 17:8
  25:6 65:20 66:2
**physical** 53:6

**pick** 5:5
**pieces** 108:9
**place** 5:8 24:5
  87:9 116:6
**plaintiff** 5:12
  8:5
**plaintiffs** 1:4,18
  2:2 3:7 4:2 6:2
  6:9 7:5 15:16
**plan** 59:8 66:5
**plans** 46:18,25
**please** 5:4,6,22
  6:25 9:5 35:7
  67:5 73:18
  85:16,22 93:13
  105:19 112:20
**plus** 25:9
**pmh** 1:4 5:16
**pocket** 12:14
**point** 18:6 42:8
  64:14 72:7
  81:21,23 84:9
  87:25 89:4
  90:19 96:2
  109:13
**points** 64:11
  90:6 97:19
**portion** 46:25
  47:5
**position** 10:9
  26:23
**possible** 53:4
  82:7,16 101:21
**possibly** 55:22
  75:12 95:16

  111:9
**power** 50:14
  51:5 54:21 55:1
**powerpoint**
  59:14 94:16,24
  102:21 103:24
  107:19
**pptx** 94:23
**practice** 61:19
**precise** 105:12
**preliminary**
  102:2
**preparation**
  48:23 58:17
  59:1
**prepare** 12:16
**prepared** 103:8
  103:20,24 104:7
  104:20
**present** 2:17
**presentation**
  102:2
**president** 26:25
  27:1 29:1 37:4
  37:11,25 38:18
  40:6,19,23 60:9
  60:12 62:16
  89:19 106:2,4,9
  106:12
**presidents**
  35:12 41:6 47:8
  97:12
**presume** 67:12
**pretty** 14:17

**prevent** 7:11
**previous** 64:1
**previously**
  69:15
**price** 17:2 18:6
  18:7 21:20
  22:15,17 23:6
  24:1 26:5,6,7
  29:21 32:4,4
  39:23 44:15
  45:16 50:4,12
  50:21 79:22
  81:20 83:6,7
  85:6,7 87:8
  91:14 92:12,19
  94:7 99:9,9
  102:16
**prices** 17:24
  18:1 19:13 24:3
  24:7,16,20
  25:10 26:12
  29:2,3 30:17
  39:17 61:13
  62:3 79:11
  82:12,13 84:18
  84:19,25 98:8,9
  99:9
**pricing** 15:18,22
  16:15,24 17:8
  17:18,23,23
  18:11,18,25
  19:6 20:7,13,16
  21:3,8,13,24
  22:8,21 23:19
  24:12 25:15,25

26:16 27:6
28:21 31:9,18
32:14,23 33:25
34:3,16 35:18
35:21 36:1 39:3
39:13 40:2
42:24 43:1,16
43:24 44:11
45:1,15 46:16
61:3,8 64:24
70:7,8 78:4,9,18
78:22 79:1,4,15
80:6,8,16 81:7
81:16 82:23
84:8 85:14
86:19 87:17
88:9,25 89:4,14
89:16 90:7,10
90:19 91:8,17
92:5,23 94:7,8
94:15,25 95:3,5
95:11,13 97:7
97:21 99:10
100:22 101:11
102:21 103:23
104:9,21 113:6
113:9,18,21,22
113:23
**pricingwatchs...**
102:18
**primarily** 114:3
**primary** 114:3
**print** 51:8 54:3
99:17 100:11

**printed** 50:24
51:20,21 53:6
53:23 54:4
56:12,12,20,25
57:2,6,9,11,20
57:21
**printer** 99:5,7
99:15,23 100:6
100:8,9,20
**printers** 101:3
**printing** 50:4,13
50:21 52:1
53:12 99:9
**prior** 69:15
78:20 102:16
**private** 5:6
**privilege** 103:13
103:15
**probably** 9:10
42:6 60:5 82:3
96:23 97:2
102:15
**procedure** 4:7
**proceedings**
116:8,11
**proceeds** 113:24
**process** 28:14
107:15
**processes** 28:16
**produced** 60:3
74:7 96:16
105:9
**producing**
96:19

**product** 3:22
29:11 30:17,25
83:7,7 86:25
113:6
**products** 26:4
27:16 31:19
45:2 78:5
**program** 41:18
43:20
**promoted** 37:6
**promotion**
38:20,24
**pronunciation**
40:25
**proposed** 6:2
**proposes** 97:18
**protection**
38:19 40:24
89:20
**protective** 10:3
10:6
**public** 4:10
116:4,23 117:23
**pull** 23:10
**punitive** 6:9
**purchase** 30:24
31:10,19 32:14
32:22
**purchases** 30:25
**purports** 80:4
**purpose** 111:21
**purposes** 4:6
**pursuant** 10:6
10:11 48:7

**put** 9:25 10:15
51:21 53:9
57:21 96:5,13
**puts** 77:10
**putting** 91:10

### q

**q2** 59:13 66:18
**q3** 65:11
**qualified** 104:13
**quality** 107:21
**quarter** 24:24
59:8,8 64:15
**question** 8:25
9:2,4,4,13,17
10:25 15:7
16:19 24:21
26:14 31:14
32:18 48:22
49:23 58:14
65:25 78:14
80:23 84:17
85:2 91:22 92:2
104:17
**questions** 8:24
115:11,13
**quick** 9:24
93:17 102:10
**quicker** 105:15
**quickly** 21:9
**quote** 97:8

### r

**r** 2:11 5:1 117:1
117:1 118:1

raise  6:11
random  45:16
rate  26:1,5
  34:16 88:22,24
  89:2,9,14,22
  90:3,16
reached  33:16
  33:18
read  50:7 58:15
  58:15 59:2
  64:17 65:13
  68:15 77:24
  80:5 115:13
  117:3 118:9
reading  4:11
  66:11 68:23
  70:19 89:25
  90:15 109:24
reads  65:9
ready  59:5
real  9:24
realized  62:11
really  17:15
  24:4,6 26:17,20
  27:23 28:1 31:3
  31:5 34:18
  40:13 44:23
  58:4 61:10
  63:15 72:2,21
  72:24 73:12
  81:4,11 82:18
  83:11 88:19
  89:24 93:3
  97:15 98:18,19
  101:22 108:22

111:12 113:12
reason  48:8,11
  49:14 67:14
  103:7 118:11
reasonable  31:8
  73:1
reasons  21:19
  23:7 112:4
recall  7:19,23
  8:4,10,12 13:7
  13:24 14:10
  16:11 19:10
  22:8 33:15 34:1
  34:9,19 36:5,15
  39:7,11,16,20
  40:4,12 43:19
  43:21 44:3,6
  45:8,13,19
  50:17 54:18
  59:2,3 63:23
  64:25 65:22
  68:6 69:1,6
  72:22,24 73:11
  75:10 76:8,13
  76:19 81:1
  97:15 98:18
  101:17,21,23
  104:5,24 105:24
  107:24 108:1,2
  114:13,25
receipt  30:17,24
  32:2,13,23
  118:17
receipts  31:10

receive  110:2
received  59:23
recess  42:12
  93:23 115:7
recipient  14:7
  86:3
recipients  63:19
recollection
  108:19
recommending
  99:22 100:5,7
record  5:3,9,23
  6:25 9:15,25
  10:16 42:11,14
  42:16 48:5
  59:18 77:25
  93:22,25 96:6
  96:14 105:4
  107:12 115:6,9
  115:17,18
recorded  5:11
  108:10,21
recording  5:8
  108:18
redacted  55:14
  101:12 103:19
redaction
  103:15
refer  18:4
reference  94:19
referenced
  118:6
references
  89:22 97:8

referring  10:13
  17:24 18:5 63:9
  65:18 66:14
  88:21 90:10
refers  94:24
  101:19 110:21
reflected  18:7
  69:20
reflecting  45:11
  45:14
regard  64:24
region  37:23
regional  35:11
  43:23 44:10
  47:7,9
register  18:1,6
  23:8 26:7 29:3
  29:24 30:18
  32:1 78:5,10,18
  79:2,4,16 80:8
  80:16 81:8,16
  82:13,24 83:8
  83:19 84:20
  85:6 99:11
regularly  53:20
  110:2
regulatory  70:9
  89:15
related  59:7
  101:15 104:20
  110:18
relates  91:8
relative  116:13
  116:15

| | | | |
|---|---|---|---|
| **reliable** 57:14 | **reports** 47:10 | **retail** 25:9 31:25 | 75:23 77:3,23 |
| **relying** 113:13 | 47:13 51:25 | **retained** 11:8 | 80:14,25 81:6 |
| **remediated** 21:9 | 52:2 53:13,14 | **return** 118:13 | 82:7 83:5,12,17 |
| **remember** 13:3 | 54:2,3,4,8 55:7 | 118:16 | 84:4 85:2 86:10 |
| 13:16 22:14 | 110:19 112:8 | **returning** 42:13 | 88:15 89:3,10 |
| 23:16,17 34:18 | **represent** 7:5 | 93:24 115:8 | 90:2,24 94:2 |
| 37:8 53:21 | 48:6 | **review** 3:22 | 97:4,18 99:11 |
| 73:11 76:10 | **representative** | 33:10 48:21 | 100:16 109:3 |
| **remind** 10:19 | 8:13 | 78:3 85:22 | 110:8 111:8 |
| **removed** 22:21 | **represented** | 102:10 109:11 | 112:7,22 114:4 |
| **removing** 22:15 | 11:3 | 109:17 110:1 | 115:1,15 |
| **repeat** 31:13 | **representing** | 118:7 | **rigor** 24:19 69:4 |
| **rephrase** 9:5 | 11:16,19 | **reviewed** 48:23 | **ring** 18:5 29:22 |
| 85:4 92:2 | **request** 103:9 | 58:17 | 30:18 |
| **replace** 22:25 | 103:20 | **reviewing** 73:17 | **rings** 29:12 |
| **replaced** 22:23 | **require** 69:11 | **rhonda** 4:8 5:21 | **rod** 3:14 |
| **report** 40:20 | **required** 69:15 | 116:3,21 | **role** 28:13 35:14 |
| 41:2 46:1,4 50:4 | 97:20 100:22 | **richmond** 2:12 | 38:5,5,8,9 40:19 |
| 50:13,21,23 | **resolve** 35:2,5 | **right** 6:10,11 | 64:24 |
| 51:3,5,7,8,13,15 | 39:12 | 9:21 15:4 20:11 | **roll** 65:10,15,20 |
| 51:23,24 52:7 | **resolved** 20:13 | 22:20 23:6,14 | 66:2,5 |
| 53:5 54:12 55:1 | 20:17 | 26:22 28:18 | **root** 21:12 22:8 |
| 55:3 56:3,10 | **respond** 96:24 | 31:7 32:7,9,20 | 22:13 23:13,18 |
| 57:25 110:15,16 | 101:16 | 33:4,6 38:3 | 23:20 91:3,8,11 |
| 110:20,21 | **responded** | 41:21 42:16,21 | 91:16 92:5,15 |
| 111:13 | 96:17 97:2 | 48:13,14 50:3 | 92:22 93:7,10 |
| **reported** 35:13 | **responsibility** | 50:12 52:23 | **rotation** 64:22 |
| 35:20 41:5 | 17:16 | 55:20,21 56:20 | **routines** 78:3 |
| 116:8 | **responsible** | 57:6,12 59:6,9 | **rpr** 116:21 |
| **reporter** 4:9 | 21:3,4 24:17 | 59:14 61:20 | **rtaylor** 2:13 |
| 5:21,25 9:14 | 47:5 73:4 75:7 | 62:15,21 63:19 | 118:2 |
| 48:16 116:4 | 76:1 | 63:25 64:18 | **rules** 4:6 46:16 |
| **reporting** 1:22 | **restate** 78:13 | 65:13,24 66:19 | **run** 53:5 109:1 |
| 41:7 | **result** 45:16 | 68:16,23 69:19 | **rush** 58:15 |
| | | 71:6 74:17 | |

| | | | |
|---|---|---|---|
| **russell** 3:14 | 77:6 | **senior** 26:25 | **sheet** 118:11 |
| **s** | **science** 41:15 | 27:1 29:1 37:11 | **shelf** 22:21 26:6 |
| **s** 3:5 4:8 5:1 | **scope** 44:19 | 37:14,22,25 | 29:3 62:3 82:12 |
| 116:3,21 | **scv** 59:13 64:15 | 40:5,19 41:7 | 83:6,20 84:19 |
| **safe** 78:5,5 | **second** 27:24 | 106:8,12 | 85:7 |
| 113:6,7 | 41:18 48:21 | **sensitive** 5:5 | **shelves** 17:25 |
| **safety** 70:9 | 91:1,10 | **sent** 49:3 65:17 | 18:7 |
| **sale** 18:6 81:21 | **see** 21:11 23:12 | 66:17,21 67:9 | **shift** 69:21 |
| 81:24 84:9 | 25:13 31:25 | 68:3 72:15 | 70:14,20 71:4 |
| **sales** 69:20 | 46:9 48:14 49:1 | 75:11 76:5,14 | 71:10,20 |
| 70:14 71:9 | 50:5 53:10,20 | 76:16 77:19 | **shoot** 65:11 |
| **salutation** 73:2 | 55:5,10,14 56:1 | 95:23 110:21,24 | **shop** 30:4,6,8 |
| 74:18 | 56:7,13,25 | 118:14 | 81:8,17 |
| **sampling** 45:16 | 58:23,23 59:12 | **sentence** 65:8,9 | **shopper** 81:6 |
| **savaloja** 3:18 | 62:3,23 64:3 | 69:9 80:3 113:4 | **shopping** 30:15 |
| 41:2,3 | 65:5,12 68:10 | **separated** 44:6 | 78:5 82:4 |
| **saw** 14:6 53:15 | 75:14,15 83:6 | **september** 37:8 | **short** 26:12 |
| 104:6,19 | 86:3,6 88:9 91:1 | **series** 58:16 | 27:11 102:9 |
| **saying** 59:19 | 94:16 101:10,13 | 59:7 | **shorthand** |
| 79:3 94:19 | 106:22 109:18 | **services** 11:13 | 105:14 116:9 |
| **says** 50:3 55:10 | 113:2 | 11:16 | **shortly** 97:3 |
| 56:17 59:12 | **seem** 59:9 | **set** 97:20 100:21 | **show** 13:17,17 |
| 69:19 72:16 | **seems** 73:25 | 116:7 | 50:23 51:20,23 |
| 77:10,18 78:25 | **seen** 25:9 40:1 | **seven** 41:12 | 51:25 52:19,25 |
| 79:1 88:6 90:25 | 45:3,10,14 48:2 | 55:25 69:13 | **showed** 57:20 |
| 91:2 94:15 | 48:3 58:20 | **several** 8:11 | 57:20 |
| 97:24 99:6 | 76:15 77:3 | **severally** 1:8 | **showing** 23:6 |
| 102:17,19,22 | 101:18,22 110:9 | **share** 30:1 | **shown** 15:24 |
| 106:17 109:19 | 110:20 | 52:16 68:13 | **side** 55:24 74:25 |
| 111:13 | **sees** 83:18 | **shared** 21:7 | **sign** 11:10 76:7 |
| **scan** 70:25 | **send** 55:2 67:15 | 77:6 92:17 | 76:25 115:13 |
| **scanned** 70:22 | 75:24 | **shares** 72:8 | 118:12 |
| **scanning** 32:1 | **sending** 10:12 | **sharing** 32:3 | **signature** |
| **school** 41:16 | **sends** 49:8 | **she'll** 48:16 | 116:18,20 |
| 73:10 76:25 | | | |

| | | | |
|---|---|---|---|
| **signed**  76:14 | **software**  108:9 | **specifically**  7:19 | 41:14,19 116:1 |
| 77:4 118:19 | **solely**  44:15 | 12:8 13:3,7,25 | 116:5,23 |
| **signing**  4:12 | **solutions**  118:23 | 17:14 21:18 | **statement**  78:8 |
| **signs**  23:1,10 | **solve**  30:2 | 22:14 25:3 | 78:17 80:14,15 |
| **similar**  108:9 | **somebody**  46:6 | 54:19 57:19 | 80:18,25 113:7 |
| **similarly**  1:3 | 55:4 77:10 | 61:3,8 68:7 70:5 | 113:9 |
| **simple**  44:9 | **sorry**  12:3,6 | 72:9 88:21 90:2 | **states**  1:1 5:14 |
| **single**  24:24,25 | 14:15 16:18 | 90:14 105:21 | 36:14,15 38:2 |
| 109:9 | 29:17 36:8 54:7 | 107:8 | 45:3 63:1 72:5 |
| **singular**  95:18 | 62:17 96:1 | **specifics**  18:25 | 80:5 88:12 94:7 |
| **sister**  99:17 | 100:5 105:11,15 | 20:3 39:8,10 | 94:8,15,25 95:3 |
| **sitting**  9:9 22:7 | **sort**  11:10 51:12 | 69:2 | 95:5,6,7,11,12 |
| 23:12 32:11 | **sound**  55:20 | **spend**  93:18 | 97:7 101:12 |
| 73:22 76:12 | 111:8 | **spot**  30:2 32:7 | 102:14,17,21 |
| 80:6 | **sounds**  52:1,12 | 84:6 | 103:23 110:15 |
| **situated**  1:3 | 71:6 83:12 | **ss**  116:1 | 113:5 114:1 |
| **situation**  18:5 | **south**  2:3 37:20 | **st**  4:4 | **stating**  86:8 |
| **situations**  20:22 | 37:21,22 38:1 | **stall**  86:11 | **stenographer** |
| 21:1 22:3,4 34:2 | **southern**  1:1 | **stalled**  86:10 | 6:10 |
| **six**  13:24 16:9 | 5:14 106:3 | **standard**  61:12 | **stenographic** |
| 41:10 47:9,13 | **speak**  26:19 | 61:18 79:10 | 4:9 116:4 |
| 55:25 99:1 | 44:5,23 49:9 | **standards** | **stenographica...** |
| **skip**  112:23 | 58:4 63:14 70:4 | 110:23 112:3 | 116:8 |
| **slash**  63:3 | 80:11 81:4 83:1 | **start**  65:11 | **step**  86:5 |
| **slides**  64:7 | 84:13 89:24 | **started**  36:23,24 | **steps**  19:11,22 |
| **slow**  65:10,15 | 93:4 98:18 | 37:2 50:14,18 | 21:7 87:8 |
| 65:20 66:2,3,5,6 | 100:15 113:19 | 69:5 | **steritech**  64:16 |
| **slowed**  86:15 | **speaking**  88:22 | **starting**  47:16 | 64:20,21 90:3 |
| **sm**  59:7 64:6 | 89:9 90:2,14 | 68:13 | 90:17,20 |
| **small**  52:17 | **speaks**  86:24 | **starts**  77:25 | **steve**  40:21 |
| **snapshot**  110:15 | **specific**  21:8 | 86:8 90:8 | 60:11 62:9,19 |
| 110:19 111:14 | 23:18,20 35:15 | 109:22 | 63:1,9,15 65:4 |
| 112:8 | 49:16 53:22 | **state**  4:10 5:22 | 65:17 66:13 |
| **snapshots** | 110:13 | 6:24 7:23 16:6 | 86:2,8 87:25 |
| 110:16 111:22 | | 34:4,13,16 | 88:15,20 89:23 |

**stickers**  22:16
  23:4
**stocking**  69:12
**stop**  99:16
**stopping**  42:7
**store**  3:21 21:2
  21:5,8 24:25
  26:1 30:1,12,13
  30:14,16 31:8
  31:17 35:11,16
  35:19,23 42:25
  43:14 46:6
  49:15,16,20
  51:19 52:18,25
  54:15 69:11,21
  70:15,21,22,23
  70:25 71:2,2,3
  71:10 72:10
  82:4 95:18 98:3
  98:19,23 99:3,5
  99:8,16,16,17
  99:23 100:6,10
  100:12,18,20
  106:22 107:8,21
  109:25 110:23
  111:1 112:2
  113:7
**store's**  100:8,9
**storecomplian...**
  49:7
**stores**  21:3
  24:18 26:25
  27:2 28:4,6 29:1
  30:4,6 31:25
  34:12 35:15

**37**:16,25 38:13
  38:18 40:23
  42:23 43:6
  45:15 46:13
  47:7 50:23 51:8
  51:11 52:8,18
  57:10,20 68:15
  82:24 98:13,25
  100:14 101:3
  106:3,4,5,12
  110:17 111:14
  112:3
**strategy**  3:22
  61:24,25,25
**street**  2:3,12
  5:18 48:9
**strike**  40:17
  66:22
**string**  105:9
**strive**  28:5
**strives**  80:1
**strove**  26:11
  27:7 29:7 79:21
  80:1
**subject**  10:3
  14:10 34:12
  86:5 87:4 94:6
  97:6 101:11
  102:15 109:15
  113:1
**subsequent**  87:7
**successful**  25:14
**sued**  33:20
  104:8

**suggesting**  57:4
**suite**  1:23 2:4,8
  4:4
**sullivan**  74:25
  75:1,1 77:20
  80:4 103:1
  105:23 106:11
  106:11 113:25
  114:16
**sunderland**
  40:21 60:12
  62:9,19 65:4
  87:25
**super**  88:13
  89:13 90:8
**support**  64:16
  68:14 69:10
**sure**  10:20 20:3
  21:4,8 24:7,16
  24:19 25:4,10
  35:5 59:4 60:25
  61:15 63:3 72:2
  72:15 79:8 81:3
  84:24 87:18
  93:7 95:19
  108:13 111:9
  112:1,3 113:20
**sustained**  97:21
  100:22
**sutherland**  86:2
**svm**  64:6
**swear**  4:11 6:11
**swearing**  5:24
**swore**  43:10

**sworn**  6:18
**system**  55:4

**t**

**t**  3:5 117:1
**t6**  70:20,22 71:1
  71:18
**table**  10:21
**tactic**  25:1
**tactics**  25:22
**tags**  22:15
**take**  5:8 10:21
  10:22,23,25
  23:3,8,9 38:3
  42:7 58:14 67:3
  67:5,25 69:3
  85:20,20 93:17
  93:19,19 109:16
  110:3
**taken**  1:18 4:2
  5:11 7:13,14
  19:5,23 21:7
  25:10 87:9
  116:6 117:4
**takes**  55:24
**talk**  9:22 19:19
  22:20 33:7 65:9
  114:6
**talked**  78:23
  87:10 96:7
**talking**  17:13,18
  35:22 88:24
  89:1 90:1
**taylor**  2:11 6:3
  6:3 9:24 10:2
  11:7,12,15,19

11:21,24 12:3
14:13,21,23
15:9 16:16,25
17:11 18:19,22
19:7,25 20:19
21:15,25 22:10
23:23 25:17
26:2,8,18 27:4,8
27:17,22,24
29:4,14,17
30:19 31:1,11
31:20 32:15,24
34:6,23 36:3
39:5,14 40:10
42:9 43:2 44:1
44:13,21 45:6
45:17,24 46:20
47:2,18 49:17
50:15 52:3,14
53:17,25 54:10
56:5,21 57:15
58:2 59:16,18
59:24 60:3,18
62:4 63:12 66:7
66:12 67:17
68:4,21,24
69:17,23 70:2
70:16 71:14
72:19 73:6,23
74:5,8,12 75:8
75:19 76:3,17
76:22 77:12,15
78:11,19 79:5
79:17 80:9,19
81:9,18 82:1,10

82:14,17,25
83:9,22 84:10
84:21 85:9
86:12,21 87:13
88:4,17 89:5
90:11 91:19,25
92:7,25 94:9,17
95:14 96:1,5
97:22 98:15
99:12,25 100:24
101:8,25 103:10
104:1,10,23
105:4,11,14
106:6 107:3,10
108:11 110:4
111:2,17,23
112:11 113:10
114:9,12,19
115:12 118:1
**team** 35:16
41:19 47:9
51:19 62:18
63:2,11 65:9
71:25 72:1 91:2
**teams** 35:19
47:10 64:7 72:6
72:9 106:25
107:18,25 108:2
108:6,8,21
**tell** 14:1 22:13
23:20 26:10
28:4,23 29:7
36:23 51:2,15
56:23 57:18
58:19 70:5

85:12 109:7
112:19
**telling** 27:2
57:13 71:7 93:8
**ten** 115:2
**tennessee** 1:24
2:4 4:5,10 5:19
116:1,23
**terminated** 8:9
43:24 44:11
**terms** 25:14
26:16 34:4 45:1
56:11,19
**testified** 6:18
8:19 36:8
**testifying** 7:8
8:13
**testimony** 6:12
18:14 93:1
115:16 117:5
118:9,17
**texas** 1:7
**thank** 47:23,25
48:19 58:11
67:1 72:16 73:2
73:19 74:17,18
85:18 93:15
94:11 105:3
112:17 115:10
**thanks** 58:10
**thereof** 116:7
**thing** 9:8 10:19
22:14,18 23:16
44:9 51:2 54:17
83:13 89:10

96:1,4 105:18
**things** 13:21
14:16 19:1,11
19:20 21:2
24:15 32:1 35:1
35:4 39:17
46:16 61:1
72:12 77:7 86:9
86:10,25 87:10
89:16 110:13,23
112:3 115:4
**think** 13:10,11
14:5 16:19
21:18 25:20,22
31:7,16,23
32:21 42:22
47:16 49:10
54:11,21 60:3
61:5,8,14 66:3
71:4,17 73:9
79:14 80:22
81:15 82:19
85:4,24 87:2
89:21,25 91:13
96:13,17,24
99:14 102:14
103:6,12,13
**thinking** 88:20
89:24
**third** 10:9 64:21
87:25
**thought** 81:12
**thoughts** 86:9
97:19

**three** 13:10
  17:10 18:17
  19:5,12 21:14
  43:22 44:12
  59:9 68:2 71:19
  90:6
**ties** 42:21
**time** 5:7 7:17
  8:16,25,25 9:10
  9:11 10:22 17:3
  17:3,4 20:7,8,17
  34:13,13 41:7
  42:6,11,14
  51:10 52:12,17
  52:18,23,24
  53:1 56:12,20
  58:14 63:5
  72:11 74:19
  84:4 93:18,22
  93:25 104:5
  109:16 112:4
  115:6,9,17
  118:18
**timeframe**
  118:8
**times** 7:16 23:5
  51:7,15,16,18
  52:7 56:19
**title** 37:3,24
  38:17 40:22
  94:12
**titles** 36:25
**today** 7:8,11
  8:24 10:10,16
  10:22 11:20

  12:17 22:7
  23:12,22 32:11
  48:7 76:12 80:6
**today's** 10:13
  115:16
**together** 68:3
  74:20
**told** 18:10 20:6
  23:13 33:4,10
  52:22 60:11
  81:6 114:2
**tone** 63:2,10
**took** 7:7 19:2
  24:11 35:17
**top** 62:23 77:19
  93:17 96:9
  107:5 112:24
**totals** 57:2
**towards** 37:6
**track** 51:1
**trancsripts**
  118:15
**transcript** 117:6
  118:6,19
**transcription**
  116:10
**trent** 2:11 6:3
  11:7 12:22
  118:1
**trip** 82:4
**triple** 69:12
**true** 80:17
  116:10 117:5
**truth** 6:12,13,13

**try** 9:21 85:3
**trying** 58:15
  105:14
**tuesday** 49:3
  50:4,12,20,24
  53:12 68:14,19
  69:10,10,12,22
  70:25 71:7,19
  72:12 88:13
  89:13 90:9
  113:1 114:2,8
  114:18
**tuesdays** 54:4
**turning** 96:20
**two** 10:8 41:7
  52:18 59:8
  64:15 71:19
  90:4 91:12
  92:18,22 98:2
  98:13
**type** 7:21 8:21
  14:1
**typically** 40:7
  54:5

## u

**u.s.c.** 10:11
**uh** 20:9 22:22
  108:24
**ultimately** 47:9
**unacceptable**
  27:3 56:19
**uncertain** 12:12
**uncomfortable**
  88:14

**under** 4:6 70:9
  88:9 89:3 91:1,2
  110:14
**underneath**
  45:23
**underscore**
  109:20,20
**understand** 7:6
  16:13,22 22:24
  35:6 91:6 112:2
**understanding**
  11:18,23 14:22
  15:16 63:8
  65:20 66:1 77:9
  95:10 98:23
  101:2
**understood**
  11:1 12:13 14:1
  15:14 16:19
  19:19 26:14
  84:7 87:2 104:7
  105:16
**union** 4:4 5:18
  48:9
**unit** 5:10
**united** 1:1 5:14
**unravels** 63:4
**unreasonable**
  66:11 79:14,20
  85:4,8,12
**unreliable** 52:2
  52:6,13
**upwards** 99:1
**use** 17:8 29:20
  29:21 31:23

67:20 79:20
84:23 85:12
105:14 112:2
**used** 54:6 98:11
118:19
**using** 108:6,8
**usually** 10:23
100:17

**v**

**v** 1:5 118:4
**vantage** 1:23
**variability** 57:9
**variety** 109:15
**various** 23:7
34:12
**verbal** 85:21
105:18
**verbally** 73:17
**verify** 31:9,18
32:13 118:9
**veritext** 1:23
5:20 118:14,23
**veritext.com.**
118:15
**version** 68:19
**versus** 5:13 40:2
40:8
**vice** 26:25 27:1
29:1 35:12 37:4
37:11,25 38:18
40:5,19,23 41:6
47:8 60:9,12
62:16 89:19
97:11 106:2,4,8
106:12

**victoria** 7:1
**video** 5:7,11
**videographer**
2:17 5:2,20
42:10,13,17
93:21,24 115:5
115:8,15
**videotaped** 1:14
4:1
**violation** 87:21
**violations** 88:1
**virginia** 2:12
**visibility** 54:22
54:25
**visit** 24:24
106:22 107:9,21
**vp** 37:14,22

**w**

**wait** 27:24,24
27:25 109:10
**waited** 96:24
**waiting** 73:24
**waived** 4:13
**walk** 23:10
36:24
**want** 9:1 13:17
29:22 36:24
48:4 67:8 72:15
77:9 85:24 93:7
93:18 96:2
**wanted** 10:8,15
39:22 60:25
73:24
**warmer** 38:2

**watch** 94:7,8,15
94:25 95:3,5,11
97:7 101:12
102:16,21
103:23
**watched** 108:17
**way** 1:23 11:16
40:18 77:14
85:2 105:23
108:23 113:17
**we've** 47:16
57:25 92:6 94:2
94:4 96:7,13
104:21 109:12
**weather** 38:2
**week** 55:23
56:11 68:13
69:6 71:2 73:10
76:25
**weekends** 42:3
**weekly** 54:12,17
**weeks** 33:16
55:11,25
**welcome** 109:11
**went** 38:13
41:14 51:9 53:5
**whispering** 5:6
**wide** 109:15
**win** 72:6,7,9
**wisconsin** 36:21
**witness** 4:11,12
5:24 6:4,15,17
10:10 14:15,25
15:11 16:18
17:2,13 18:24

19:9 20:2,21
21:17 22:2,12
23:25 25:19
26:10,19 27:10
27:23 28:1 29:6
29:19 30:21
31:3,13,22
32:17 33:1 34:8
34:25 36:5 39:7
39:16 40:12
43:4 44:3,15,23
45:8,19 46:1,22
47:4,24 48:19
49:19 50:17
52:5,16 54:11
56:7,23 57:17
58:4,11 60:20
62:6 63:14 66:9
66:13 67:1,19
68:6 69:1,19
70:4,18 71:16
72:21 73:8,19
74:15 75:10,20
76:5,19,23
77:16 78:13,20
79:7,19 80:11
80:21 81:11,19
82:2,18 83:1,11
83:23 84:12,22
85:11,18 86:14
86:23 88:6,19
89:8 90:13 92:9
93:2,15 94:11
95:1,16 97:24
98:17 99:14

**[witness - zoom]**                                    Page 146

100:2 101:1
102:1,4,11
103:21 104:3,12
104:15,24 105:3
106:8 108:13
110:6 111:4,19
111:25 112:13
112:17 113:12
114:13,21
116:18 118:8,10
118:12,18
**wolf**   1:2,2 5:12
109:20 118:4
**wondering**
15:15 39:11
**word**   29:20,20
31:23 43:11
54:6 67:20
79:20 84:23
85:3,12
**words**   9:21
**work**   22:24 24:5
51:11,22 52:8,9
52:19,20,25
53:3 69:13
99:21
**worked**   35:19
47:10 72:2
89:20 108:15
**working**   16:12
41:22 96:11
98:24 99:5,7,16
99:23 100:6,8
100:10,20 101:3

**worried**   114:1,7
114:17
**wrap**   115:3
**written**   11:10
**wrong**   15:17
**wrote**   76:9 79:8
88:20 89:23,24
100:2 114:22
**www.alphare...**
1:25

**x**

**x**   3:1,5

**y**

**yeah**   10:1 17:20
18:24 21:17
23:25 26:10,17
37:18,20 41:21
43:4 46:8,22
47:18,24 52:16
54:6 55:6 60:1
63:14 66:9,20
71:13 74:6
78:16,20,25
84:12 89:8
90:13 91:1
94:21 96:4,12
98:17 103:17
111:13 114:21
**year**   38:10
41:18 72:23
**years**   7:20 8:11
17:10 18:17
19:5,12 21:14
25:9 43:22

44:12 69:3 70:6
**yesterday**   11:9
12:20
**york**   1:1,7 5:15
6:5 16:8 17:14
17:15 33:20,22
36:12 55:20

**z**

**zak**   67:9,12,14
67:15,16 72:15
72:18 73:3,5
**zak's**   72:8,14
**zoom**   2:6

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.