# EXHIBIT 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOSEPH WOLF, CARMEN WOLF, | ) | |
| *on behalf of themselves and those* | ) | |
| *similarly situated* | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Case No.: 7-23-cv-0058-PMH |
| | ) | |
| vs. | ) | |
| | ) | |
| DOLGEN NEW YORK, LLC D/B/A | ) | |
| DOLGEN | ) | |
| | ) | |
| Defendant. | ) | |

## <u>EXPERT REPORT OF BENJAMIN S. WILNER, Ph.D.</u>

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

## TABLE OF CONTENTS

I.   Introduction ........................................................................................................3

II.  Qualifications .....................................................................................................3

III. Case Background ................................................................................................5

IV.  The Weir Declaration .........................................................................................9

V.   The Putative Class Definition And Mr. Weir's Methodology Are Inconsistent With the Allegations In This Matter .............................................................................10

    A.   Mr. Weir's Methodology Is Not Consistent With Dollar General's Alleged Improper Conduct of Failing to Update Shelf Prices ...........................................10

    B.   Not Only Did Mr. Weir Not Analyze Alleged Damages That Could Have Been Caused by Dollar General's Alleged Improper Conduct, But Such An Analysis Would Be Highly Individualized ....................................................................................11

    C.   Mr. Weir's But-For World Is Inconsistent With My Understanding of New York Law ..........12

    D.   Mr. Weir's Actual World Is Improper Because He Did Not Analyze Mitigation Efforts ........13

VI.  Mr. Weir's Methodology Does Not Ascertain Putative Class Members Nor Does It Assess Their Alleged Damages ...........................................................................13

VII. Mr. Weir's Damages Methodology Is Fatally Flawed Because He Misinterprets Dollar General Data ...........................................................................................15

    A.   Mr. Weir's Misinterpretation of County Auditor Data ...................................15

    B.   Mr. Weir's Misinterpretation of Dollar General Sales Data ...........................17

    C.   These Errors and Limitations Would Not be Remedied if Mr. Weir were Provided with the Additional Data He Requests .........................................................26

    D.   Mr. Weir Erroneously Draws Conclusions about Class-wide Damages Because He Uses Data that Cannot be Extrapolated to the Putative Class ...........................27

VIII. Individualized Issues Prevent Damages From Being Calculated on a Classwide Basis ...........28

    A.   Individualized Analyses of Each New York Dollar General Customer Would Be Needed to Assess Alleged Damages In This Matter ...............................................28

    B.   Individualized Analyses of Each New York Dollar General Customer Would Be Needed to Ascertain Their Identity and Purchases ...............................................31

    C.   Individualized Analyses of Each New York Dollar General Store In New York Would Be Needed to Assess Alleged Damages In This Matter ...............................31

IX.  Named Plaintiffs Are Not Representative of the Putative Class ..................................32

X.   Mr. Weir Incorrectly Calculated Alleged Statutory Damages ....................................34

XI.  Conclusion .........................................................................................................35

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

# I.    Introduction

Mr. Joseph Wolf and Ms. Carmen Wolf allege that Dollar General has "policies and practices of regularly charging Plaintiffs and putative class members a higher price at the register than the price of merchandise advertised on the shelves at the time of sale at its...stores in New York."[1]  They brought this lawsuit on behalf of a putative class comprised of "all consumers who at any time on or after [May 30, 2020], paid more for merchandise than the advertised price labeled on the shelf at a Dollar General store located in New York." (the "Proposed Class" and the "Proposed Class Period")[2]

Alvarez & Marsal Disputes and Investigations, LLC ("A&M") has been retained by counsel representing the Defendant, Dolgen New York, LLC ("Dollar General"), to comment on the feasibility or infeasibility of calculating alleged damages on a class-wide basis in the aforementioned matter.  In particular, I, Benjamin S. Wilner, Ph.D., am economically and statistically commenting on the proposed damages methodology contained in the February 9, 2024 Declaration of Mr. Colin Weir, who claimed that alleged damages could be formulaically calculated on a class-wide basis.[3]

As I demonstrate throughout this Expert Report, Mr. Weir's conclusions are unreliable because his declaration contains a number of errors, including: making basic counting errors, relying on incorrect assumptions, overlooking obvious instances of flawed underlying data, ignoring contexts in the data and surrounding certain sales, and erroneously treating every customer as similarly situated.

I have generated the aforementioned conclusions by reviewing the documents listed in ***Exhibit 1***. I reserve the right to modify and/or expand my opinions as I obtain and analyze additional information.

A&M is compensated for its services on an hourly basis and is being reimbursed for out-of-pocket expenses. A&M is compensated at a rate of $850 for my time.  Other individuals from A&M also provided assistance in this matter; their hourly rates range from $350 to $850.  No one who has contributed to this engagement has any known financial interest in any party to the matter.  A&M's compensation is neither based nor contingent on the results of this analysis.

This Report is provided solely for use in the matter described in the caption at the top of this Report.  This Report is not to be used with, circulated, quoted, or otherwise referred to in whole or in part for any other purpose, or in any other document without the express written consent of A&M.

# II.    Qualifications

My qualifications are stated in my curriculum vitae, which is attached as ***Exhibit 2***.  That Exhibit details my education, credentials, testimony, publications, and relevant presentations.

---

[1] Plaintiffs' Second Amended Class Action Complaint, dated May 30, 2023 (the "Complaint"), paragraph 1.
[2] Id., paragraph 43.
[3] Declaration of Colin B. Weir, dated February 9, 2024 (the "Weir Declaration"), paragraph 7.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

I am a Managing Director at A&M. I have performed economic and statistical analyses in a wide variety of engagements, including financial analysis, contract losses, a wide range of class actions, intellectual property, and lost income matters. In one matter, I analyzed how coupon location affected buying behavior in retail stores. I also testified in a case where the New York City Department of Consumer Affairs verified the weights of certain products sold at local Whole Foods stores allegedly using NIST standards.

In addition to testifying, I also serve as a business consultant in a variety of contexts. For example, I was retained by the U.S. Department of Homeland Security to economically analyze various proposed policies. I received a special commendation from the Commissioner of U.S. Customs and Border Protection for revising a $2.5 billion annual tariff. I also assisted an automobile manufacturer in developing a portion of its warranty policy.

I hold a Bachelor of Arts degree *magna cum laude* with Distinction in Major in Mathematics and Economics from the University of Pennsylvania, as well as a General Course degree in Mathematics & Statistics from the London School of Economics. I was awarded a Ph.D. in Managerial Economics and Decision Science ("MEDS") from the Kellogg Graduate School of Management at Northwestern University. MEDS studies how consumers, employees, governments and businesses make decisions in a wide variety of economic environments as well as the economic results of those decisions.

I served as a professor of economics, finance, decision science and statistics at the University of Michigan, the University of Iowa, Northwestern University and the Helsinki School of Economics. My research has been published in peer reviewed academic journals including the *Journal of Finance*, the leading academic journal in finance. My *Journal of Finance* paper studied the effects of entities repeatedly purchasing product bundles. I was awarded research grants from multiple universities and the National Science Foundation ("NSF"). My research has been cited by over a thousand other papers.[4] I also served as a referee for multiple academic journals and textbooks.

For my NSF grant, my coauthors and I statistically analyzed data from a consumer buying behavior survey we conducted that determined the prices respondents would pay for product bundles. My undergraduate advisor, Colin Camerer, a MacArthur Genius Award Winner, studies the psychological forces and their deeper neuroscientific foundations that influence economic decisions involving individuals and markets. The former President of the University of Chicago, Hugo Sonnenschein, relied on my undergraduate thesis as the theoretical basis for one of his published research papers on negotiations.

As an undergraduate, I spent three years building economic and statistical forecasting models as a research assistant to Lawrence R. Klein, who was awarded the 1980 Nobel Prize in Economics. I also studied under 2023 Nobel Laureate labor economist Claudia Goldin.

As part of my decision science doctoral program, I studied under Roger Myerson, who won the 2007 Nobel Prize in Economics for analyzing & developing rules that cause entities to make

---

[4] https://scholar.google.com/scholar?hl=en&as_sdt=0%2C14&q=benjamin+wilner&btnG=, viewed on March 13, 2024.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

economically optimal decisions, as well as under Dale Mortensen, who applied decision theory in his study of labor markets, which led to his winning the 2010 Nobel Prize in Economics.

## III.   Case Background

Dollar General operates over 20,000 discount retail stores throughout the United States and Mexico.[5] Its stores offer a "broad selection of merchandise, including consumable items, seasonal items, home products and apparel."[6] As of March 2023, Dollar General operated approximately 575 stores in the state of New York.[7]

The retail environment in New York, as in other places, includes a wide spectrum of store types, shopping methods and product offerings. Different stores appeal to customers based on the customer's location, brand loyalties, tastes, income levels, needs and preferences and any number of other decision factors. A customer in search of clothing, for example, may choose to shop at Dollar General, Neiman Marcus, Target or any number of national or local outfitters. Grocery shoppers can purchase their food at, among other options, Dollar General, Walmart, Whole Foods, a local grocery store or a convenience store. Customers have several methods of ordering and receiving their purchases, including visiting brick and mortar stores, ordering online and having their purchases delivered or ordering curbside pickup.

Dollar General appeals to its customers' priorities of "value and convenience" for "fill-in shopping, to making periodic trips to stock up on household items, to making weekly or more frequent trips to meet most essential needs."[8] As a result, Dollar General stores do not necessarily fully compete with other retail stores that cater to other customer priorities, even those that could be in close proximity.

A typical Dollar General store has approximately 19,000 individual products on its shelves at any given time.[9] These products include "a focused assortment of everyday necessities," seasonal products and apparel.[10]

After entering most retail stores, customers peruse aisles selecting the items they desire to purchase. Many potential factors affect whether a customer selects an item such as brand name, packaging, size, shelf position (e.g., floor height, hand height, eye height), product label, knowledge of prices at other stores, coupons as well as the price displayed on the shelf.

Additional detailed information can be obtained as many purchases are made via the internet where customers pick up their purchases at a nearby brick and mortar store. With internet purchases, in-

---

[5] https://investor.dollargeneral.com/websites/dollargeneral/English/310010/us-sec-filing.html?secFilingId=003b8c70 -dfa4-4f21-bfe7-40e6d8b26f63&shortDesc=Annual%20Report&format=convpdf viewed on March 14, 2024, p. 5.
[6] Ibid.
[7] https://investor.dollargeneral.com/download/companies/dollargeneral/Annual%20Reports/DG%20Annual%20 Report%202022%20Final.pdf viewed on March 14, 2024.
[8] https://investor.dollargeneral.com/websites/dollargeneral/English/310010/us-sec-filing.html?secFilingId=003b8c70 -dfa4-4f21-bfe7-40e6d8b26f63&shortDesc=Annual%20Report&format=convpdf viewed on March 14, 2024, p. 7.
[9] DG_WOLF_0040637.
[10] https://investor.dollargeneral.com/websites/dollargeneral/English/310010/us-sec-filing.html?secFilingId=003 b8c70-dfa4-4f21-bfe7-40e6d8b26f63&shortDesc=Annual%20Report&format=convpdf viewed on March 14, 2024, pp. 6-7.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

store purchase factors such as shelf position and price displayed on the shelf are not as relevant to a customer's buying decision.

Prices for products offered at retail stores can periodically change. When this occurs, Dollar General needs to make updates in three locations: its internet website, the system that interacts with the in-store cash register and on a tag adjacent to the product on the shelf. With regards to the third pricing location, corporate headquarters notifies store managers of price changes via its START task management system.[11] The price changes that Dollar General makes to its core products generally occur on Tuesdays of each week.[12]

Store managers or members of their staff are supposed to either print out or use the shipped price tags to replace the price label affixed to the shelf for products whose prices have changed. I have seen no evidence that most Dollar General stores in New York do not regularly follow these instructions as the price audits discussed below only found alleged discrepancies in a few stores for a few products for the most part. Dollar General takes a number of actions to enhance compliance in this regard. For example, 4,828 New York Dollar General employees have completed "Pricing Accuracy" trainings since February 2023.[13] Additionally, Mia Savaloja testified that Dollar General has a Compliance Tuesday program, force-prints labels and circulates a report summarizing which stores printed labels in a timely manner.[14]

However, there have been infrequent occasions where shelf prices were not updated for certain products at certain New York Dollar General stores.[15] Dollar General does not solely rely on computers and the individual actions of employees at each of its 500+ New York stores to ensure that its customers are properly charged for the products they purchase. The prices of products purchased are prominently displayed on the cash register monitor for the customer to see and verify their accuracy.[16] If a customer notified employees that the price they saw on the shelf was less than the price displayed on the register, it is Dollar General's policy to honor the lower price.[17] Furthermore, many Dollar General stores in New York have prominent signs explaining Dollar General's pricing and refund policies.[18] Conversely, if the price on the shelf exceeded the price displayed on the register, Dollar General will still honor the lower price, which in this case was not the price on the shelf.

Mr. and Ms. Wolf claim that they routinely shop at the Dollar General retail store located in White Lake, New York, near their vacation home in Bethel, New York.[19] They allege that on three occasions in 2022, Mr. Wolf was overcharged for two items he purchased from that White Lake retail store. On two occasions in September 2022, he purportedly purchased cartons of Clover Valley 2% lactose free milk and was charged $4.25, which was $0.10 higher than the $4.15 price

---

[11] Deposition testimony of Mia Savaloja, dated December 14, 2023 ("Savaloja Deposition"), p. 38.

[12] Id., pp. 38-39. Dollar General's core products are products that reside in a planogram and get replenished. Non-core products would be seasonal items like Christmas trees (*see* Savaloja Deposition, p. 46).

[13] DG_WOLF_0040630.

[14] Savaloja Deposition, pp. 106–127.

[15] *See* Savaloja Deposition, exhibit 3 (DG_WOLF_0000001) and DG_WOLF_0002593-DG_WOLF_0002595.

[16] *See* DG_WOLF_0040629.

[17] *See* Savaloja Deposition, exhibit 3 (DG_WOLF_0000001) and DG_WOLF_0002593-DG_WOLF_0002595.

[18] DG_WOLF_0040564.

[19] Deposition testimony of Carmen Wolf, dated January 9, 2024 ("C. Wolf Deposition"), pp. 21-22.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

displayed on the shelf.[20]   In December 2022, he supposedly purchased a package of three Land O'Lakes low fat vanilla yogurts for $2.25, while the price displayed on the shelf was $2.00.[21] Assuming his purchasing allegations are true, the price differences between the shelf and the register seemingly caused Mr. Wolf to be overcharged by $0.45 in total.[22]

These alleged mispricing incidents did not appear to alter the Wolfs' willingness to purchase products at Dollar General's White Lake store as they subsequently routinely shopped at that store.[23]

Based on these alleged experiences and data discussed below, the Wolfs allege that "it is [Dollar General's] policy and practice to charge a higher price at the register for merchandise than the price advertised on the unit price labels for the same merchandise on the shelves in [its] New York stores."[24]

While I have seen no documents or other evidence to suggest that it is Dollar General's policy "to charge a higher price at the register for merchandise than the price advertised on the unit price labels for the same merchandise on the shelves in [its] New York stores," the Wolfs incorrectly attempt to show that this occurs in practice through data they obtained on local government audits of Dollar General store pricing.[25]   The State of New York and certain cities and counties have divisions that, amongst other things, investigate / audit prices that brick and mortar stores charge.[26] As part of a pricing audit, these agencies go to a store on a particular day ("the audit date") and select 25 to 100 products that the store sells.  They then compare the shelf price of those products to the price at the register and note discrepancies where the shelf price was less than the register price.

As no documentation was provided about how the audit date was chosen, how the products for each audit were selected and because I understand that the counties did not utilize correct pricing audit procedures in many instances, the audits do not meet standard statistical sampling criteria.

During these audits, the agencies found some discrepancies where the price at the register exceeded the price displayed on the shelf at some Dollar General retail stores.[27]   However, these discrepancies were relatively few and far between.  These discrepancies were found on specific days at 112 of Dollar General's 500+ New York retail stores.  *Figure 1* shows that a relatively small percentage of Dollar General retail stores in New York were found to have pricing discrepancies, based on Mr. Weir's data.

---

[20] Complaint, paragraph 14.
[21] Id., paragraph 22.
[22] C. Wolf Deposition, pp. 134-135.
[23] Deposition testimony of Joseph Wolf, dated January 8, 2024 ("J. Wolf Deposition"), pp. 118 & 135.
[24] Complaint, paragraph 25.
[25] Complaint, paragraph 25.
[26]   https://agriculture.ny.gov/weights-measures#:~:text=There%20are%2060%20county%20and,%2C%20vehicle% 20scales%2C%20and%20more viewed on March 5, 2024.
[27] Undercharges were also noted in some audit reports.  For example, *see* DG_WOLF_0004867, DG_WOLF_0006528, DG_WOLF_0029327, DG_WOLF_0030248, DG_WOLF_0030257, DG_WOLF_0033069 and DG_WOLF_0033277.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

| Figure 1<br>Percentage of Stores with Documented Discrepancies, 2020-2023[28] | | | | |
|---|---|---|---|---|
| Description | 2020 | 2021 | 2022 | 2023 (Jan.-Jun.) |
| Stores with Documented Discrepancies | 18 | 41 | 75 | 41 |
| Total Stores (Approximate) in New York | 494 | 522 | 553 | 575 |
| Percentage of Stores with Discrepancies | 4% | 8% | 14% | 7% |

These discrepancies were highly concentrated in a relatively few Dollar General stores.  In fact, six New York Dollar General retail stores accounted for over half of all the discrepancies auditors identified between 2020 and 2023.[29]

To put the data in further perspective, there may be approximately 19,000 items in any given Dollar General store at a given time.[30]  This implies that the Dollar General stores in New York possessed approximately nine to ten million items in stores on a given day. ***Figure 2*** shows that the number of discrepancies found by auditors represents a miniscule fraction of these millions of products on a given day.

| Figure 2[31]<br>Percentage of Items with Documented Discrepancies vs.<br>Total Number of Items in Dollar General New York Stores | | | | |
|---|---|---|---|---|
| Description | 2020 | 2021 | 2022 | 2023 (Jan.-Jun.) |
| Number of Documented Discrepancies | 40 | 1,150 | 1,780 | 970 |
| Number of Products in New York Stores in One Day | 9,375,132 | 9,906,516 | 10,494,834 | 10,912,350 |
| % of Products with Documented Alleged Violations in New York Stores in One Day | 0.000% | 0.012% | 0.017% | 0.009% |

As the auditing agencies recognize that pricing errors can arise for a variety of reasons, they do not expect 100% agreement between the shelf price and the price at the register for products stores

---

[28] The number of stores audited was determined using data in DG_WOLF_0040562.  The total stores in New York was found in their Annual Reports (*see* https://investor.dollargeneral.com/download/companies/dollargeneral /Annual%20Reports/AR_2019_Dollar%20General_Web%20PDF.pdf,https://investor.dollargeneral.com/download/c ompanies/dollargeneral/Annual%20Reports/Dollar_General_2020_Annual_Report.pdf, https://investor.dollargeneral .com/download/companies/dollargeneral/Annual%20Reports/Final%20pdf%202021%20annual%20report.pdf    and https://investor.dollargeneral.com/download/companies/dollargeneral/Annual%20Reports/DG%20Annual%20Repor t%202022%20Final.pdf all viewed on March 14, 2024.)

[29] DG_WOLF_0040562.  These stores were located in Barker (1895 Quaker Rd, store #19579), Middleport (4201 Carmen Rd, store #15739), North Tonawanda (3816 Mapleton Rd, store #18480), Port Henry (4375 Main St., store #18555), Schenectady (1936 Van Vranken Ave., store #21982) and Waddington (11997 State Highway 37, store #15824).

[30] DG_WOLF_0040637.

[31] DG_WOLF_0040562 & DG_WOLF_0040637. The total stores in New York was found in their Annual Reports (*see*    https://investor.dollargeneral.com/download/companies/dollargeneral/Annual%20Reports/AR_2019_Dollar% 20General_Web%20PDF.pdf,https://investor.dollargeneral.com/download/companies/dollargeneral/Annual%20Repo

***CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER***

sell. Mr. Weir himself cites to standards in New York state law which indicate that "for a retail business in New York to pass an audit, 98% of the sample selected by the auditors for review need to be accurately priced."[32] Therefore, New York state accepts that some discrepancies will exist, while the Wolfs and Mr. Weir apparently claim that none should exist.

# IV.   The Weir Declaration

The Wolfs retained Mr. Weir to calculate alleged damages in this matter. As discussed above, Mr. Weir claimed that alleged damages could be calculated on a class-wide basis and provided a formula he alleges could do so.[33]

Mr. Weir bases his damages conclusions on the aforementioned government audits and data provided by Dollar General contained in the spreadsheet DG_WOLF_0040562 in response to a supposed summary of the audit findings created by the Named Plaintiffs' counsel. Utilizing the pricing discrepancies the auditors supposedly found, Mr. Weir calculated two damages figures: alleged overpayment damages and alleged statutory damages.

To calculate alleged overpayment damages, Mr. Weir started with the products where state or county agencies found the register price exceeded the shelf price on a particular date in a particular store. He then reviewed data on all sales Dollar General made of those products in the store in question for the 30 days prior to the audit date. He claims that there were 29,043 instances where Dollar General sold such products during that 30-day window for the allegedly relevant New York stores.[34]

Mr. Weir then claimed that damages could be found by taking the difference between the Point of Sale Price and the Shelf Price for each of the 29,043 sales that he claims occurred during the aforementioned 30-day window.[35] He would then use the sum of those 29,043 differences to determine the alleged overpayment damages.

He did not definitively state what Point of Sale Prices he would use in his analysis. He alludes to data supplied by Dollar General and the dates that the relevant products had most recently changed prices prior to the appliable audits.[36] Presumably, his model will assume, for each product, that

---

rts/Dollar_General_2020_Annual_Report.pdf, https://investor.dollargeneral.com/download/companies/dollargeneral/ Annual%20Reports/Final%20pdf%202021%20annual%20report.pdf and https://investor.dollargeneral.com/ download/companies/dollargeneral/Annual%20Reports/DG%20Annual%20Report%202022%20Final.pdf all viewed on March 14, 2024.) To estimate the number of products in New York stores in one day, the approximate number of stores each year (*see* Figure 1) was multiplied by the approximate products in a store. The approximate number of products per store is the reported 18,978 "Dollar General Traditional" products, which was estimated the same for each year. For example, in 2020, there were 494 approximate stores multiplied by an estimated 18,978 products.

[32] Weir Declaration, paragraph 10, citing New York Consolidated Laws, Agriculture and Markets Law – AGM §197-b(3)(b).

[33] Weir Declaration, paragraphs 7-8.

[34] Weir Declaration, paragraph 24.

[35] Weir Declaration, paragraph 23.

[36] Weir Declaration, paragraph 24.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

the price of that product which took effect most recently prior to the respective audit date was the Point of Sale price.

Mr. Weir similarly did not definitively state how he would determine Shelf Prices. Nevertheless, from his mention that Dollar General changed prices on a certain date prior to the applicable audit date,[37] he appears to assume that the shelf price the auditor saw must have been in place since that most recent price change.[38]

Mr. Weir alleges that these alleged overpayment damages are conservative because Dollar General "has not provided sales data for the full period that Plaintiffs allege would constitute the period of overcharge."[39]

To calculate alleged statutory damages, Mr. Weir started with the 29,043 sales that occurred during the aforementioned 30-day window. He then assumed that statutes require Dollar General to pay $50 for each of these incidents.

# V.    The Putative Class Definition And Mr. Weir's Methodology Are Inconsistent With the Allegations In This Matter

There are at least four foundational issues with Mr. Weir's methodology that attempts to calculate alleged damages in this matter. These issues prevent him from "determining class-wide damages in this case."

## A. Mr. Weir's Methodology Is Not Consistent With Dollar General's Alleged Improper Conduct of Failing to Update Shelf Prices

Damages are calculated by determining the difference between (1) putative class members' economic position in the Actual World with proper mitigation and (2) putative class members' economic position in the But-For World.[40] However, as discussed below, the Named Plaintiffs' theory of alleged improper conduct and Mr. Weir's analysis do not result in different economic positions in the Actual World and But-For World. Therefore, Dollar General's alleged improper conduct, alone, does not establish alleged damages.

The Actual World is determined by analyzing what actually occurred in the real-world. The Wolfs claim that Dollar General's alleged improper actions were retail store managers or members of their staff **not** printing out or taking the shipped labels and replacing the price label affixed to the shelf when notified by Dollar General's corporate START task management system that product prices changed.[41] This could cause a mismatch between the shelf price and the register price. While the Wolfs claim that the price on the shelf labels were not updated, they allege that the

---

[37] *See* Weir Declaration, Table 1.
[38] Ibid.
[39] Id., paragraphs 12 and 15.
[40] *Reference Manual on Scientific Evidence*. The National Academies Press (Washington, D.C., 2011), pp. 432, 464-466.
[41] Complaint, paragraphs 60-66.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

register price was updated.  Therefore, in the Actual World in this matter, customers of New York Dollar General retail stores paid the updated register price for products they purchased.

The But-For World is determined by analyzing what would have occurred but-for the defendant's allegedly improper actions.  As Dollar General's alleged improper actions caused the shelf price to not be updated, the shelf price would be updated in a proper But-For World.  In other words, in a proper But-For World, New York Dollar General retail store managers or members of their staff would have **always** printed out or took the shipped labels and replaced the price label affixed to the shelf when notified by Dollar General's corporate START task management system that a product's price changed.  Therefore, in this But-For World, both the shelf price and the register price would have been updated.  Therefore, in the But-For World in this matter, customers of New York Dollar General retail stores paid the updated register price for products they purchased.[42]

Consequently, there is no difference between putative class members' economic position in the Actual World with proper mitigation and in the But-For World.  In the Actual World, Dollar General's customers paid the updated register price (no matter what the shelf price states).  In the But-For World, Dollar General's customers paid the updated register price (no matter what the shelf price states).  In other words, all Dollar General's customers would have paid identical amounts in the Actual World and the But-For World.  Because 1) damages are the difference between the putative class members' economic position in the Actual World and their position in the But-For World and 2) putative class members paid identical amounts and received identical products in both Worlds, standard damages analyses would show that putative class members, in general, were not damaged.

Additionally, Mr. Weir identified no method, other than the periodic incomplete audits, to identify instances where New York Dollar General retail store managers or members of their staff did **not** in the Actual World print out or receive updated labels and replace the price label affixed to the shelf when notified by Dollar General's corporate START task management system that a given product's price changed, the heart of any relevant damages theory in this matter.

### B. Not Only Did Mr. Weir Not Analyze Alleged Damages That Could Have Been Caused by Dollar General's Alleged Improper Conduct, But Such An Analysis Would Be Highly Individualized

Based upon the Named Plaintiffs' theory of Dollar General's alleged improper conduct, the only way in which putative class members could be damaged in this matter is if they decided to purchase a product with an allegedly erroneous shelf price in the Actual World, but they would not have made such a purchase if the allegedly proper price was displayed on the shelf as in the But-For World.  The Complaint acknowledges this necessary connection between alleged wrongful conduct and allege damages by claiming that Dollar General's alleged wrongful conduct "induced" customers to buy products.[43]

---

[42] Given that the Named Plaintiffs claim that Dollar General's alleged improper action was not updating shelf prices, it would be improper to construct a But-For World where register or Point of Sale prices were altered.

[43] Complaint, paragraph 62.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

As a result, the Named Plaintiffs' theory of alleged improper conduct would require an analysis of putative class members' purchasing behavior. As each consumer utilizes their own personal beliefs and desires when making purchasing decisions, this purchasing behavior analysis must be individualized. Adjusting the prices displayed on the shelf might have altered some Dollar General customers' purchasing behavior; some Dollar General customers would not have altered their purchasing behavior given the multitude of factors that underlie purchasing decisions. In fact, evidence discussed in Section VIII.A shows that shelf prices did not affect some Dollar General customers' purchasing decisions. Shelf price changes would not have affected purchasing behavior in such situations where shelf prices did not influence purchasing.

Consequently, the Named Plaintiffs' theory of Dollar General's alleged improper conduct implies that in order to calculate alleged damages, one must identify the individual Dollar General customers who purchased products with allegedly erroneous shelf prices, but who would not have made such a purchase if the allegedly proper price was displayed on the shelf.[44]

Mr. Weir did not perform any purchasing behavior studies or discuss how they could be performed, let alone the individualized ones necessary to assess whether shelf prices affected each putative class member's distinct buying behavior. Without such analyses, Mr. Weir is not able to claim that any putative class member was damaged by Dollar General's alleged actions.

Having analyzed many purchasing behavior studies in other markets, it is my belief that, had Mr. Weir performed such studies in this case, he likely would not find that many putative class members would have changed their purchasing behavior because at best, the price difference between the allegedly proper shelf price that was not displayed and the allegedly improper shelf price that was displayed was relatively minor. For example, the price differences for Mr. Wolf's three allegedly relevant purchases was $0.45 in total.[45] Additionally, Mr. Weir's data imply that the average overcharge for each allegedly improper purchase putative class members made was $0.27.[46]

Mr. Weir just incorrectly assumed, without any analysis, that all Dollar General customers would have changed their purchasing behavior based upon relatively minimal shelf price changes. Even if this assumption were true, which it is not, Mr. Weir's damages analysis still fails.

## C. Mr. Weir's But-For World Is Inconsistent With My Understanding of New York Law

Another possible But-For World would be if New York Dollar General retail store managers or members of their staff would have printed out or took the shipped labels and replaced the price label affixed to the shelf **at least 98% of the time** after being notified by Dollar General's

---

[44] While such customers supposedly paid more than their personal value for the product(s) they purchased, they still received some value from the product(s) they received. That value received would need to be accounted for in any proper damages calculation.
[45] C. Wolf Deposition, pp. 134-135.
[46] Mr. Weir's analysis of Dollar General data at best shows that customers were overcharged approximately $7,737 for 29,043 purchases between 2020 and June 2023. $7,737 of alleged statutory damages / 29,043 alleged violations = $0.27. I do not agree with the validity of this calculation. However, I put it in this Expert Report for illustrative reasons.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

corporate START task management system that a product's price changed.[47]  This latter But-For World is consistent with New York law. [48]  This implies that in either But-For World, shelf prices could change, but register prices would remain the same.

Even if Mr. Weir were able to complete all of the steps discussed in the prior subsections, his calculations would still be flawed because he assumed that the shelf price was always accurate in the But-For World.  However, as discussed above, New York law only requires accuracy 98% of the time.  Mr. Weir did not explain how his methodology would permit such legal accuracy deviations.

### D. Mr. Weir's Actual World Is Improper Because He Did Not Analyze Mitigation Efforts

Mr. Weir did not consider whether putative class members mitigated their alleged damages.  Section VIII.A shows that the Wolfs did not.

## VI.  Mr. Weir's Methodology Does Not Ascertain Putative Class Members Nor Does It Assess Their Alleged Damages

Even if it were not replete with the data issues that are discussed below in Section VII, Mr. Weir's methodology does not identify the allegedly relevant putative class members.

Mr. Weir's methodology does not even **attempt** to identify all such putative class members.  At best, he only identifies a small fraction of the products sold that could be associated with putative class members.  As discussed above, Mr. Weir's methodology is based on the periodic audits county auditors conducted.  As a result, other than potentially some indeterminable number of prior sales of the products auditors identified with discrepancies, Mr. Weir does not draw any conclusions (no matter how wrong) about any unaudited products sold in any New York Dollar General store on any date other than the date of the audit in question.

Therefore, Mr. Weir does not claim that any of the following are putative class members that can have their alleged damages reliably measured: 1) customers who purchased products at the 400+ New York Dollar General retail stores where auditors found no price discrepancies; 2) customers who purchased products in the aforementioned 112 New York Dollar General retail stores (where auditors found some positive price discrepancies between the price at the register and the price displayed on the shelf) other than the ones identified by auditors with alleged discrepancies; or 3) as discussed below in Section VII, many of the customers who purchased products identified by auditors with alleged discrepancies on dates prior to the audit date.

Overall, Mr. Weir only attempts to draw conclusions about a small fraction of the products sold that could be associated with putative class members as discussed above in Section III.  Section

---

[47] Also *see* NIST Handbook 130, p. 247.
[48] Weir Declaration, paragraph 10, citing New York Consolidated Laws, Agriculture and Markets Law – AGM §197-b(3)(b).

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

VIII demonstrates why it would be virtually impossible to attempt to reliably measure damages for the three groups identified in the preceding paragraph.

Mr. Weir's own analysis demonstrates that his methodology does not calculate alleged damages for all putative class members. As discussed above, the Wolfs claim that they overpaid for certain products at Dollar General's White Lake, New York retail store because of the allegations in this matter. As a result, the Wolfs "should" be in the (incorrectly defined) putative class that consists of "all consumers who at any time on or after [May 30, 2020], paid more for merchandise than the advertised price labeled on the shelf at a Dollar General store located in New York."[49]

However, the Wolfs are not included in Mr. Weir's damages methodology. As discussed above, Mr. Weir's damages methodology is restricted to only the products sold in New York Dollar General stores that were identified as having positive price discrepancies by county auditors. A review of all audit reports included in the dataset Mr. Weir relied upon show that no positive price discrepancies were found at Dollar General's White Lake, New York retail store.[50] As the Wolfs only purchased products from that retail store, they would not be included in Mr. Weir's methodology since positive price discrepancies were not found at that store.[51]

While Mr. Weir claims that he would require additional data in order to properly calculate alleged damages, he does not identify any such data that would incorporate the Wolfs' purchases. As discussed above, Mr. Weir's methodology is based on the sales of products that occurred in Dollar General retail stores on dates prior to failed audits of those products in that particular store. As there were no failed audits at Dollar General's White Lake, New York retail store, the additional data he requested (sales on dates more than 30 days before failed audits )[52] would not identify the Wolfs' purchases. Additionally, it is my understanding that fact discovery has closed in this matter, preventing Mr. Weir from obtaining additional information.

This mismatch between the putative class definition and Mr. Weir's damages methodology demonstrates that he is unable, contrary to his claim, to "determine class-wide damages in this case" for all putative class members.

Notwithstanding the fact that Mr. Weir's methodology cannot identify many of the allegedly mispriced purchases putative class members made, he has not identified any means of identifying the putative class members who purchased the allegedly mispriced products he did identify. Even if he knew that a purportedly mispriced six-pack of Pepsi bottles was sold on January 18, 2023 at the Dollar General located at 13475 Broadway, Alden, New York,[53] Mr. Weir has not presented a methodology to identify who the purchaser was, including the purchaser's name and contact information.

Having previously worked on several retail matters, I can definitively state that it is difficult, if not impossible, to identify the customers who purchased a specific product at a particular retail store. For example, cash and gift card transactions are generally unidentifiable. Detailed analyses, which

---

[49] Complaint, paragraph 43.
[50] DG_WOLF_0040562.
[51] C. Wolf Deposition, p. 108.
[52] Weir Declaration, paragraph 15.
[53] DG_WOLF_0040562.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

Mr. Weir has not identified, would be needed to even have the possibility of identifying customers who purchased through other means. Such analyses are often not successful.

Dollar General personnel concurred that it would be difficult, if not impossible, to identify the purchasers of specific products at specific stores on specific days. For example, Mr. Nick Snow of Dollar General testified that he did not believe it was possible to identify purchasers for at least 95% of the allegedly relevant purchases.[54] While he believed that it might be possible to identify individuals who have a myDG account and self-identified at the register while making their purchases, such purchases only account for approximately 5% of all transactions. However, Section VII.C below provides some reasons why individuals who self-identified at the register might not be identifiable or may not be a valid putative class member.

Consequently, Mr. Weir is unable, contrary to his claim, to "determine class-wide damages in this case" because he cannot even identify putative class members. While he might claim that his calculations are conservative, they cannot be used to calculate damages for the putative class that was "routinely" and "continually" overcharged.[55] Put simply, there is not a fit between Mr. Weir's damages methodology, the putative class definition and the claims asserted on behalf of the putative class here.

# VII. Mr. Weir's Damages Methodology Is Fatally Flawed Because He Misinterprets Dollar General Data

As discussed above, Mr. Weir's damages calculations are based on two sets of figures. First, he began with the products that county auditors identified as being overpriced in certain stores. Second, Dollar General provided him (at the Named Plaintiffs' counsel's request) with all sales of those products in the allegedly relevant store for the 30 days prior to the audit date. All of Mr. Weir's resulting calculations follow from the number of sales of these products he claims to have identified in this Dollar General dataset. Notably, Mr. Weir assumes without any analysis that all of these transactions 1) are unique, 2) should have occurred at the shelf price the county auditor identified, but instead 3) occurred at his assumed register price.

However, as discussed below, these assumptions are inaccurate. A careful review demonstrates that the county auditors' data are replete with duplicates, customers did not pay the register price for all transactions in the dataset, and that the shelf prices each auditor found were not necessarily the shelf prices displayed when the allegedly relevant transaction occurred.

## A. Mr. Weir's Misinterpretation of County Auditor Data

Mr. Weir misinterprets the county auditor data he received.

First, the county auditor data are unreliable as they contain multiple errors. For example, for a number of products, auditors identified such products as having a discrepancy between the auditor's alleged shelf price and Dollar General's register list price, but more careful evaluations

---

[54] 30(b)(6) Deposition testimony of Nick Snow, dated March 7, 2024, pp. 104-107.
[55] Complaint, paragraphs 24, 32, 41 and 45.

CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER

show that no price discrepancies existed.[56]   In particular, an auditor indicated that the shelf price of Skintimate shave gel at Dollar General's Queensbury, New York retail store on March 24, 2023 was $3.65, but the register price was $4.25.[57]   However, Dollar General data indicates that the Point of Sale price for this product at the Queensbury store on March 24, 2023 was indeed $3.65— the same amount as the shelf price,[58] demonstrating that no price discrepancy existed.

Mr. Weir also did not exclude from his claimed damages the sale of 8 packages of Old El Paso Grande Tortillas that were sold at Dollar General's North Tonawanda, New York retail store that an auditor incorrectly claimed had a shelf price – register price discrepancy.   Even though the auditor claimed that the register price of this product was $6.50 on March 10, 2023,[59] ample evidence implies that the actual register price was $3.25, even lower than the auditor's claimed shelf price of $5.50.   Dollar General sales data shows that the North Tonawanda retail store sold packages of this product on March 10, 2023, the same day as the audit date, at $3.25.[60]   Dollar General's database also shows that other Old El Paso Grande Tortilla packages were sold at Dollar General's North Tonawanda, New York store during the 30 days prior to the audit data at $3.25.[61]

Consequently, all sales of products with similar errors that were contained in Dollar General's sales database should have been eliminated.   Mr. Weir did not perform such an elimination.

It is my understanding that the auditors sometimes used hand-held terminals to determine their Point of Sale price as opposed to actually going to the register to verify whether the hand-held terminal price was correct.   However, there is evidence that the hand-held terminals that the auditors used do not always report the correct Point of Sale price.[62]   As a result, this could have led to these errors making the data unreliable.[63]

Second, Mr. Weir selectively included data in his analysis.   In particular, Mr. Weir's analysis excludes instances where the register price was lower than the shelf price (in this case customers would have been undercharged for their purchase), even though such instances were identified in the county auditor data he received.   For example, Mr. Weir received information on the results of an audit that occurred at the Port Henry, New York Dollar General retail store on February 26, 2021.[64]   While Mr. Weir's calculations included the four overcharges that were identified in the audit in his analysis, it ignored the four price undercharges that the audit also identified.   This would affect both the average amount and percentage of "the POS price paid," which Mr. Weir includes in his damages methodology.

These data errors and misinterpretations prevent Mr. Weir from being able, contrary to his claim, to "determine class-wide damages in this case."

---

[56] DG_WOLF_0004241- DG_WOLF_0004244.
[57] DG_WOLF_0004243.
[58] DG_WOLF_0040562 (worksheet DG Data, "Original Sort Order" #785).
[59] DG_WOLF_0004527.
[60] DG_WOLF_0040562 (worksheet DG Data, "Original Sort Order" #1476).
[61] Ibid.
[62] DG_WOLF_0002516; Report of Sunil Sajnani, dated March 18, 2024 ("Sajnani Report"), Secs. A and B.1.
[63] Ibid.
[64] WOLF_000038 (*see* also within Complaint Exhibit 6, p. 25).

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

## B. Mr. Weir's Misinterpretation of Dollar General Sales Data

As discussed above, Mr. Weir utilizes Dollar General sales data to attempt to draw conclusions about the number of allegedly relevant sales as well as the Shelf Price and the Point of Sale price applicable to those transactions  In so doing, he 1) claims there were "29,043 overcharges of a penny or more;"[65] 2) assumes that the Shelf Price associated with each of these purchases matched the shelf price the respective auditor reported on the audit date; and 3) assumes that the Point of Sale price each customer paid matched the most recently changed price of the product as set forth in the data provided by Dollar General's effective price list as of the date of sale.

As discussed below, Mr. Weir was incorrect on each of these three points.

- There were not 29,043 overcharges of a penny or more.
- He did not demonstrate that the Shelf Price that customers saw prior to their purchase was the shelf price the auditor reported on the audit date.
- He did not show that each customer paid the price of the product that was listed in Dollar General's data as the most recently updated price for the date of sale.

Mr. Weir has no basis for his assumptions regarding these three items.  He stated that he was instructed by counsel to make such assumptions.[66]  As a result, Mr. Weir incorrectly assumed without evidence that all products identified in Dollar General's sales database "were subject to an overcharge between the effective date (or date of price change) through the date of the audit."[67]

As he has yet to be deposed, I admit that it could be possible that Mr. Weir intends to utilize Shelf Prices and Point of Sale Prices different from the ones I describe above.  However, he did not specify what those prices would be in his Declaration.  Without such vital information, Mr. Weir did not demonstrate that his damages formula could be accurate.  As a result, Mr. Weir's report does not demonstrate that he could "determine class-wide damages in this case."

### 1. Mr. Weir Incorrectly Calculated the Number of Overcharges that Existed

Mr. Weir incorrectly claims that customers were overcharged by the difference between the Shelf Price and Point of Sale Price he determined for all 29,043 purchase transactions that were identified in the Dollar General sales database.  This is wrong for multiple reasons as detailed below, and this error caused Mr. Weir to vastly overstate the number of alleged overcharges.

First, Mr. Weir significantly overstates the number of alleged overcharges the counties' auditors found.  He incorrectly claims that auditors found "29,043 overcharges of a penny or more."[68] However, he ignored the fact that over one-third of his alleged overcharges are duplicate entries.  For example, Scrubbing Bubbles was recorded 7 times as an overcharge.[69]  This fact was clearly

---

[65] Weir Declaration, paragraph 24.
[66] Id., paragraph 14.
[67] Id., paragraph 14.
[68] Weir Declaration, paragraph 24.
[69] Worksheet DG Data in DG_WOLF_0040562 (*see* "Original Sort Order" #954, #1168, #4810, #4827, #4843, #5011 and #5032).

denoted in DG_WOLF_0040562 that contained a column entitled "Duplicate Entries," which he apparently ignored.

Second, Mr. Weir's Table 1 sorts the products in question based on the number of days between the last product price change and the audit date. That table shows that "855…products have a price effective date equal to 30 days or less,"[70] which implies that the number of days between the last product price change and the audit date was less than 30.

As discussed above, Mr. Weir's damages methodology assumes that if an audit found a price discrepancy, that discrepancy would have begun on the date of the last product price change. Consequently, his logic implies that only some of the purchases during the 30-day window associated with the aforementioned 855 products would have had a price discrepancy. There would have been no price discrepancies on purchases in the database that occurred prior to the date of the last product price change. For example, an audit found on January 24, 2023 that the price of Old Spice Gameday deodorant in the Glenville Dollar General Store had a discrepancy between its shelf price of $3.95 and its register price of $4.50. Dollar General records show that the price of this product changed on January 17, 2023, seven days prior to the audit. Despite that, Mr. Weir erroneously believed that customers were overcharged for the purchases of Old Spice Gameday deodorant in the Glenville Dollar General Store that occurred on January 8, 2023, nine days prior to the price change.[71] ***Mr. Weir did not exclude 5,317 of such sales from his calculations (18% of his alleged overcharged sales).***[72]

Third, as discussed in the next two subsections, all customers did not see and base their purchases on the Shelf Price as Mr. Weir assumed. Additionally, all customers did not pay the Point of Sale price. Without accurate Shelf Price and Point of Sale Price data, Mr. Weir cannot claim that there were overcharges associated with any of the 29,043 purchases in the Dollar General sales database.

Fourth, the 29,043 purchases were based on the findings of the county auditors. As discussed above in subsection VII.A, the county auditor data are unreliable.

Fifth, Mr. Weir considered ***67 purchases*** to be overcharges even though there was no difference between the shelf price and the Point of Sale price or the shelf price was greater on the violation date.[73]

Sixth, Mr. Weir incorrectly assumes that customers were overcharged for all 29,043 purchases that are contained in DG_WOLF_0040562. However, not all of these 29,043 sales actually had an alleged price overcharge when comparing Mr. Weir's assumed Shelf Price to the Point of Sale price from the Dollar General sales data. In fact, Mr. Weir's own analysis shows there to be a) no difference between his assumed Shelf Price and the Point of Sale Price or b) a Lower Point of Sale Price than the Shelf Price for ***5,901 purchases or approximately 20% of the sales for which he claims an overcharge exists***. Mr. Weir made this error because he likely ignored the column in

---

[70] Weir Declaration, paragraph 15.
[71] DG_WOLF_0040562 (worksheet DG Data, "Original Sort Order," #299).
[72] DG_WOLF_0040562 (worksheet DG Data, "Original Sort Order," #299) and Weir Declaration, paragraph 24.
[73] I identified these purchases by noting instances where the values in the "Shelf Retail" field and the "POS Retail" field were identical.

***CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER***

the database that stated the shelf price effective date.  Indeed, examples exist where the shelf price changed during the inspection.[74]

Seventh, Mr. Weir also ignores discounts associated with the purchases that are contained in the Dollar General database.  Not only does this database include the **gross** prices for the products, but it also reports **net** prices after discounts, which are closer to what consumers actually paid.  However, Mr. Weir only performed his calculations based on **gross** prices, not **net** prices.  When one accounts for net prices, *the Dollar General database shows that there were no overcharges associated with 10,350 (approximately one-third) of the purchases Mr. Weir claims*.[75]

### 2. Mr. Weir Made Unverified & Unfounded Assumptions About the Shelf Price and Its Relevance

There are a number of reasons why Dollar General customers might not have seen the Shelf Price Mr. Weir assumed existed.

First, Mr. Weir did not verify the shelf price reported by the applicable auditor was in fact the shelf label displayed when the customer purchases occurred during the 30-day window.  Many events could have occurred that would have caused a shelf label change.  For example, Dollar General sometimes placed new shelf labels over prior labels.[76]  It is possible that the accurate shelf label fell off sometime between the purchase date displayed in Dollar General's database and the audit date or, as former Dollar General employee Connie Droge recounted in her testimony, that a customer peeled off the shelf label.[77]  In this scenario, all customers who purchased the product in question prior to the accurate shelf label falling off would have seen a different shelf label than customers who purchased subsequent to the price label falling off.

Additionally, Dollar General personnel might have accidentally placed a shelf label relating to a different product over the label of the product in question.  For example, a shelf label for a Kit Kat chocolate bar might have been placed over the accurate shelf label for a Snickers chocolate bar.  In this scenario, all customers who purchased the product in question prior to the accurate shelf label being replaced would have seen a different shelf label than customers who purchased subsequent to the price tag being replaced.  Mr. Weir made no effort to isolate such individualized issues.

In addition, price discrepancies could arise when customers would move products from one shelf to another.  In fact, a number of audit reports specifically identified such product movements.[78]  It is also possible that other auditors did not make a similar identification, which cause them to incorrectly count a moved product as a price overcharge.

Second, some of the transactions listed in DG_WOLF_0040562 may have been made over the internet through dollargeneral.com or third-party shopping services like DoorDash.[79]  If a customer made their purchases over the internet and the products were picked up at a given store, it is my

---

[74] DG_WOLF_0040562.
[75] DG_WOLF_0040562 and DG_WOLF_0040636.
[76] Deposition testimony of Michelle Molthu, dated January 26, 2024 ("Molthu Deposition"), p. 48.
[77] Deposition testimony of Connie Droge, dated January 31, 2024 ("Droge Deposition"), pp. 22-23.
[78] DG_WOLF_0004254, DG_WOLF_0004582, DG_WOLF_0004290, and DG_WOLF_0005046.
[79] DoorDash, for example, is available for certain Dollar General locations in New York; *see* Dollar General (1858 State Route 9, Lake George, New York), which is delivered by DoorDash.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

understanding Dollar General would assign the purchase to that store in its sales database. Mr. Weir made no attempt to identify such transactions. The shelf price displayed is irrelevant to such internet transactions as the customer did not base their purchases on the price displayed on the store shelf.

Third, some of the transactions listed in DG_WOLF_0040562 are instances where the auditor indicated that there was no shelf label at all.[80] A reasonable customer would not make the assumption that the product was free as the data might suggest. Mr. Weir made no attempt to identify such transactions.

Fourth, Mr. Weir based his alleged damages on information he received from Dollar General about when shelf labels were printed. He claims that the shelf label did not display the allegedly relevant price prior to that print date. This is an incorrect assumption, as shelf labels are regularly updated through other means. Dollar General corporate headquarters regularly sends pre-printed shelf strips through the mail to stores. It is not uncommon for shelf labels to be printed at a different store if the printer at a given store is offline.[81] Additionally, it is my understanding that stores sometimes update prices manually using Sharpies,[82] or just cover incorrect prices.[83] Mr. Weir failed to consider such labeling methods.

Fifth, Connie Droge, Dollar General's Senior Vice President of Stores until August 2023,[84] testified that Dollar General's data relating to pricing and label printing dates frequently does not match what actually occurred in the stores.[85] For example, if the data suggested that a store had not printed a new label for a pricing update, Ms. Droge testified that her team would follow up with the store and frequently found that the label was in fact printed and accurately displayed at that store.[86] Mr. Weir did not incorporate such data discrepancies into his calculations.

### 3. Mr. Weir Made Unverified & Unfounded Assumptions About the Price Customers Paid for the Products In Question

There are a number of reasons why the prices Dollar General customers paid for the products in question were not the Point of Sale prices that Mr. Weir assumed (i.e. those listed in Dollar General's data as the most recent prices to take effect prior to the respective audit).

First, the Point of Sale prices upon which Mr. Weir relied are unreliable. Mr. Weir purports to demonstrate in his Table 1 that "many of the products displayed shelf prices that were less than the register price for longer than 30 days—many for multiple months or even years."[87] The calculations underlying his data, however, are based on an improper application of the underlying data and are not replicable or reliable. While the database contains the best available data that Dollar General possesses, the effective date for the register price may not be reliable due to the product descriptions handwritten by auditors. Since a handwritten description may be unclear or

---

[80] DG_WOLF_0005346.
[81] Molthu Deposition, p. 166.
[82] Id., p. 48.
[83] Id., pp. 48, 60, 94, 129 and 142-143.
[84] Droge Deposition, pp. 37-38.
[85] Id., pp. 50-52.
[86] Ibid.
[87] Weir Declaration, paragraph 15.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

more information is required for the product, Dollar General did not attempt to hide these issues from Mr. Weir and the Named Plaintiffs as it specifically flagged the issues with these products in the database it provided to Mr. Weir.  In particular, Dollar General noted in the data when the price lookup for the product had low, medium or high confidence in matching the Dollar General sales data to the auditor data, or had no match at all.[88]

For example, on February 23, 2021, an auditor found a price discrepancy for "Chocolate Milk" at a Dollar General retail store located at 6 McIlwee Rd. in Heuvelton, New York.[89]  The auditor claimed that the shelf price was $3.00, and the register price was $3.50.[90]  However, Dollar General had low confidence in what chocolate milk product the auditor identified as well as its price and effective date.  Dollar General's best assumption was that it was for a 10 oz canister of Nesquik Chocolate Powder Mix, which was priced at $3.00 per unit with a price effective date of July 7, 2019.[91]  While this was Dollar General's best assumption from the auditor's product description, this resulted in a price effective date that would be almost two years prior to the audit date, and Mr. Weir's methodology would assume that Dollar General overcharged its customers for almost two years as well.  However, even though Mr. Weir would characterize this product as an overcharged product for almost two years, there was no actual price discrepancy according to the sales data because the alleged shelf price matched the register price of $3.00 after all.

In spite of Dollar General flagging this Chocolate Milk product (and other low confidence products), Mr. Weir ignored Dollar General's warnings and the actual register price per the sales data, and simply included the eight sales of this product (and other low confidence products) in his alleged price overpayment (and statutory damages) calculations.

There are a number of other examples of incorrect "register" prices in DG_WOLF_0040562:

- In an audit of a Dollar General store on September 15, 2022, the auditor claimed that a Nutty Buddy 6 pack had a shelf price of $2.15 and a "charged" price of $2.55.[92]  However, when Dollar General pulled the price data for this item, it found that it had been priced at $2.50 since August of 2000.[93]
- In the same audit of a Dollar General store on September 15, 2022, the auditor also claimed that a shredded cheese item had a shelf price of $2.50 and a "charged" price of $3.25.[94]  However, when Dollar General pulled the price data for this item, it found that it had been priced at $2 since October 2000.[95]
- In an audit of a Dollar General store in Barker, New York, on February 24, 2022, the auditor claimed that a 12 pack of Coca-Cola had a shelf price of $6.25 and a "charged" price of

---

[88] *See* the column "Confidence Level" in DG_WOLF_0040562, worksheet DG Data.
[89] DG_WOLF_0005046.
[90] Ibid.
[91] DG_WOLF_0040562 (worksheet DG Data, "Original Sort Order" #2811).
[92] DG_WOLF_0004814.
[93] DG_WOLF_0040562 (worksheet DG Data, "Original Sort Order" #2180).
[94] DG_WOLF_0004816.
[95] DG_WOLF_0040562 (worksheet DG Data, "Original Sort Order" #2189).

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

$6.75.[96]  However, when Dollar General pulled the price data for this item, it found that it had been priced at $3 since November of 2002.[97]

- In an audit of a Dollar General store in Barker, New York, on March 25, 2021, the auditor claimed that Little Debbie Oatmeal Creme Pies had a shelf price of $1.95 and a "charged" price of $2.15.[98]  However, when Dollar General pulled the price data for this item, it found that it had been priced at $1 since January 2003.[99]

- In an audit of a Dollar General store in Schenectady, New York, on May 2, 2022, the auditor claimed that cream of mushroom soup had a shelf price of $0.65 and a "charged" price of $0.80.[100]  However, when Dollar General pulled the price data for this item, it found that it had been priced at $0.50 since April 2003.[101]

- In an audit of a Dollar General store in Scotia, New York, on November 9, 2021, the auditor claimed that bagged asparagus had a shelf price of $2.50 and a "charged" price of $2.70.[102] However, when Dollar General pulled the price data for this item, it found that it had been priced at $2.50 since September 2003.[103]

- In an audit of a Dollar General store in Barker, New York, on March 25, 2021, the auditor claimed that Comfort Bay 13 piece shower curtain set had a shelf price of $12 and a "charged" price of $12.50.[104]  However, when Dollar General pulled the price data for this item, it found that it had been priced at $0.01 since September 2006.[105]

- In an audit of a Dollar General store in Barker, New York, on November 15, 2021, the auditor claimed that Comfort Bay 13 piece shower liner and hooks set had a shelf price of $7 and a "charged" price of $8.[106]  However, when Dollar General pulled the price data for this item, it found that it had been priced at $0.01 since September 2006.[107]

- In an audit of a Dollar General store in Star Lake, New York, on November 17, 2021, the auditor claimed that Lysol Spray had a shelf price of $5 and a "charged" price of $5.75.[108] However, when Dollar General pulled the price data for this item, it found that it had been priced at $0.01 since September 2006.[109]

Additionally, I have reviewed the report of Mr. Sunil Sajnani, an expert in price verification audits who identified several examples where auditors incorrectly reported prices they "observed" in New York Dollar General retail stores.[110]  There were also a number of instances where Dollar General could not match any product to the products that were included in the summary of audit findings provided by the Named Plaintiffs' counsel to Dollar General.  For example, in an audit of

---

[96] DG_WOLF_0004628.
[97] DG_WOLF_0040562 (worksheet DG Data, "Original Sort Order" #1857).
[98] DG_WOLF_0004590.
[99] DG_WOLF_0040562 (worksheet DG Data, "Original Sort Order" #3025).
[100] DG_WOLF_0004706.
[101] DG_WOLF_0040562 (worksheet DG Data, "Original Sort Order" #2057).
[102] DG_WOLF_0006594.
[103] DG_WOLF_0040562 (worksheet DG Data, "Original Sort Order" #5050).
[104] DG_WOLF_0004591.
[105] DG_WOLF_0040562 (worksheet DG Data, "Original Sort Order" #3035).
[106] DG_WOLF_0004601.
[107] DG_WOLF_0040562 (worksheet DG Data, "Original Sort Order" #3237).
[108] DG_WOLF_0004757.
[109] DG_WOLF_0040562 (worksheet DG Data, "Original Sort Order" #4073).
[110] Sajnani Report, Sec. A.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

a Dollar General store in Port Henry, New York on November 17, 2022, the auditor noted a Swiffer Wet Jet Refill item as having an overcharge.[111]  However, Dollar General was unable to match this item to one in its database.[112]

It is unclear why there was a mismatch between the prices in Dollar General's records and the "charged" price identified by auditors.  It could have been caused by auditor error.  For example, it is my understanding that items listed above as having a price of $0.01 were likely discontinued at some point.[113]  It could have been caused by the auditors and/or Named Plaintiffs' counsel not sufficiently identifying the product audited that prevented Dollar General from finding that product in its records.  At a certain level, it does not matter **why** data are unreliable; only that they are unreliable.  For the reasons discussed above, the data Mr. Weir utilized to calculate his alleged damages are unreliable.

Furthermore, Table 2 of Mr. Weir's report presents another example, where he claims that an auditor found a number of overcharges at Dollar General's Port Henry, New York retail store on November 17, 2022.  He then asserted that an auditor audited that same store on January 18, 2023 and identified the exact same overcharges as they did two months earlier.  This conclusion is erroneous as these "two" audits are actually one audit.  It is possible that the Named Plaintiffs' counsel "double counted" this audit because the auditor sent their November 17, 2022 audit report to Dollar General on January 18, 2023.[114]

Second, Dollar General does sales promotions that would make the prices in DG_WOLF_0040562 on which Mr. Weir bases his alleged damages obsolete.  For example, Dollar General provides numerous types of discounts for its customers that lower the effective price of its products.[115]  These discounts could be based on specific products (e.g., $1 off when buy 3 jars Prego Italian Sauce, buy one get one free of Nestle Chocolate Milk, etc.), total purchases  (e.g., $5 off if you spend $25, 20% off for Veteran's Day Event, etc.) as well as seasonal product price markdowns.[116]

In fact, Dollar General data show that *thousands* of transactions that Mr. Weir claims were overcharges were not actual overcharges as the products in question were sold via promotional prices.[117]  For example, an auditor claimed that a Starbucks Carmel Frappuccino drink at Dollar General's Barker, New York retail store had a shelf price of $3.35 and a register price of $3.50 on March 3, 2023.[118]  However, the auditor ignored the fact that some of these drinks were sold via a promotional price at that time if a customer bought more than one item.  In particular, that Dollar General store had a 2 for $6 sale (effective price of $3.00 per unit), subject to certain conditions, on these drinks that began on April 26, 2022 and ended on March 31, 2023.[119]

---

[111] DG_WOLF_0005492.
[112] DG_WOLF_0040562 (worksheet DG Data, "Original Sort Order" #2703).
[113] Molthu Deposition, p. 140.
[114] Weir Declaration, table 2.
[115] DG_WOLF_0040636.
[116] DG_WOLF_0040636.
[117] DG_WOLF_0040636.
[118] DG_WOLF_0005844.
[119] DG_WOLF_0040636 and DG_WOLF_0040562 ("Original Sort Order" #4430, transaction #1340591723 among others).

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

Because only some of these Frappuccino sales were subject to this promotion (i.e., more than one item purchased), it is important to investigate all sales of this product in detail.  For example, Dollar General's database shows that during the 30 days prior to the audit date of March 3, 2023, Dollar General's Barker, New York retail store sold 40 total Frappuccino drinks; however, there were 7 different effective prices ranging from $2.45 to $3.50 for these products due to discounts as well as a price change during the 30-day window.  In particular, there were 13 Frappuccino drinks sold at the promotional price of 2 for $6 (i.e., $3.00), 9 at a net price less than $3.35 due to other promotions, 8 at a price of $3.35, and 10 at a price of $3.50.[120]  Despite the fact that 30 of the 40 these purchases had an effective price less than $3.50, Mr. Weir erroneously included all these sales in his calculations.

Third, even if the price information in DG_WOLF_0040562 were reliable, customers might not have paid those prices.  As discussed above, if a customer notified Dollar General employees that the price they saw on the shelf was less than the price displayed on the register, Dollar General would honor the lower price.[121]  In that circumstance, the customer would not have paid the price shown on the price list, which supposedly corresponded to the price at the register.

Mr. Weir did not present a methodology to identify such instances.  Without such a methodology, he cannot claim that his damages formula, which assumes that all customers paid the prices that were listed in Dollar General's data as the most recent prices to take effect prior to the applicable audit date, is accurate.

Nor did Mr. Weir provide a methodology to determine the prices actually paid in those instances.  Those prices might vary from store to store.  Indeed, Dollar General has zone pricing where product prices can differ from store to store.[122]  While Mr. Wolf paid the shelf price when he noticed a discrepancy, it is the policy of certain Dollar General retail stores in certain New York counties to provide the customer with the discrepancy plus $10 in cash.[123]  Other Dollar General retail stores would give the customer the product in question for free, provide them with the discrepancy plus $10 in cash.[124]  As a result, Mr. Weir's alleged Point of Sale price is not what consumers actually paid.

Fourth, customers may unknowingly buy products at a price less than listed shelf price.[125]  In this case, where in the Actual World the customer paid a lower price than the shelf price and the But-For world where the customer would have paid the higher shelf price, the customer would incur negative damages.

Fifth, in practice, Dollar General amends the prices it charges customers both in the store and subsequently.  If a customer identifies a price issue while in the store, Dollar General personnel are authorized to override prices that might be in the computer system.  Dollar General provided documentation showing that it overrode prices on approximately 6.6 million products it sold in its

---

[120] DG_WOLF_0040562 (worksheet DG Data, "Original Sort Order" #4430).
[121] *See* Savaloja Deposition, exhibit 3 (DG_WOLF_0000001) and DG_WOLF_0002593-DG_WOLF_0002595.
[122] Deposition testimony of Brain Haug, dated December 12, 2023 ("Haug Deposition") p. 38.
[123] DG_WOLF_0002593. (If a customer was overcharged on more than one of an identical item purchased during the same visit, Dollar General will refund the total amount of the overcharges, plus pay the customer one additional $10 payment for those identical items.)
[124] DG_WOLF_0002594.  (Only the first overcharged item is given to the customer for free.)
[125] Haug Deposition, pp. 114-115.

***CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER***

New York stores during the allegedly relevant time period.[126]  In addition to these in-store price overrides, Dollar General still corrects supposed price overcharges after a customer has left the store.  For example, one customer wrote a complaint that they bought a product that had a shelf price of $9, but the register price was $10.  Dollar General fielded this complaint and ultimately gave the individual a $5 gift card.[127]  Another customer identified an overcharge after reviewing their receipt at home, went back to the Dollar General retail store where they made the purchase and obtained a refund.[128]  Yet another customer identified an overcharge at home and received a refund the next time they visited a Dollar General store.[129]  Indeed, Dollar General provided documentation that it provided its New York store customers refunds for 8.2 million products, whose prices totaled almost $18 million during the allegedly relevant time period, which is in addition to the 6.6 million price overrides, some of which would have been related to price overcharges.

Mr. Weir did not contemplate these one-off price adjustments, which could lead to negative damages again for putative class members.  As a result, Mr. Weir's alleged Point of Sale price is not what consumers actually paid.

Sixth, many customers did not pay the amount shown on Dollar General's effective price list on the date of sale.  For example, some credit cards including Dollar General's own credit card provide their cardholders with perks such as cash back, airline miles or hotel points associated with each purchase made.  Mr. Weir does not account for such perks in his damages formula.  As a result, Mr. Weir's alleged Point of Sale price is not what consumers actually paid.

### 4. Mr. Weir Did Not Perform Standard Data Cleaning Steps Necessary to Perform Accurate Damages Calculations

Having performed data analyses for almost 40 years, including having done so under several Nobel Laureates, I can stated that it is rare when I receive data that is fully clean and can be applied in analyses without careful review.  Very frequently, data that are used in analyses were collected for a different purpose.  For example, Dollar General compiled data on all of its sales in its New York retail stores to assist with internal financial reporting and strategic decisions.  As a result, the data extract that Mr. Weir received was not compiled for the specific purpose of this litigation; Mr. Weir received repurposed data.

Consequently data cleaning is a vital part of any data analysis, especially one utilizing repurposed data.  Data cleaning occurs when one investigates each data point for potential errors and to ensure that other issues are not driving results.  For example, data can be easily mis-entered by well-meaning people who are human such as when the aforementioned auditor only entered the vague description of Chocolate Milk or the various examples of false price discrepancies.  Additionally, while the data extract Mr. Weir received and analyzed included net prices after discounts, it did not possess detailed data on the type of sales promotions applied on the sale because promotional

---

[126] DG_WOLF_0040641.
[127]   DG_WOLF_0040708-DG_WOLF_0040709.    Also,  *see*  DG_WOLF_0003291,  DG_WOLF_0003614-DG_WOLF_0003617, DG_WOLF_0003706, DG_WOLF_0003720 and DG_WOLF_0003735.
[128] DG_WOLF_0003340.
[129] DG_WOLF_0003362.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

information was not needed for the way in which Dollar General used the overall data for its internal financial reporting and strategic decisions.

These aforementioned Chocolate Milk and Frappuccino sales (as well as other examples provided throughout this Expert Report) demonstrate a large methodological flaw in Mr. Weir's report. It appears that Mr. Weir just blindly incorporated all sales data he received from Dollar General into his damages calculations and did not perform the necessary data cleaning steps.

Ignorance of such typographic errors and other issues like promotions can lead to one drawing incorrect conclusions, as Mr. Weir did. As a result, it is imperative that one identifies such typographical errors and other issues like promotions as well as account for other confounding effects. It is statistically proper to then adjust the data to ensure that one generates accurate conclusions, not conclusions that are improperly biased by data issues. As Mr. Weir did not make such adjustments, his methodology and conclusions are fatally flawed and statistically invalid.

### C. These Errors and Limitations Would Not be Remedied if Mr. Weir were Provided with the Additional Data He Requests

As discussed above, Dollar General provided Mr. Weir with data on the sales of products where county auditors found price discrepancies in the relevant stores for the 30 days prior to the audit. Mr. Weir argues that Dollar General needs to provide sales data for dates more than 30 days before the audit.[130]

However, Mr. Weir would face the same issues discussed in Subsection B above if such data were provided. Mr. Weir would still not be able to determine what the shelf price was on the date of sale. The data upon which he relies would still not allow him to ascertain the individuals who purchased particular items and would still be subject to the same errors and uncertainties as the data he currently has. Consequently, the additional data Mr. Weir desires would not allow him to "determine class-wide damages in this case."

Furthermore, any Dollar General transaction and/or print data would be subject to these same shortcomings. Simply put, there is no reliable method to determine what a specific Dollar General customer purchased on a particular day at a particular retail store and for what price. Dollar General does not track cash, credit card or debit card transactions unless the customer has specifically both signed up for a myDG account and self-identified at the point of sale when making the purchase in question.[131] Moreover, there is no reliable method to determine what Dollar General customers viewed as the shelf price for all the reasons stated elsewhere in this Expert Report. A few examples of the many scenarios that would impact shelf prices, but which would not and cannot be properly accounted for in any Dollar General data include:

- some stores print their labels at sister stores;[132]
- some stores used Sharpies to hand-write the correct price on shelves;[133]

---

[130] Weir Declaration, paragraph 15.
[131] 30(b)(6) Deposition testimony of Nick Snow, dated March 7, 2024, pp. 104-107.
[132] Droge Deposition, p. 99.
[133] Molthu Deposition, pp. 48, 94, 129.

- some stores made generic price point signs;[134]
- some stores took off the price strip and put a blank one in;[135]
- some stores covered-up the price on pre-priced items with a sticker or a ticket gun (neither of which would be reflected in any records);[136]
- some stores had customers that peeled off labels;[137]
- some stores had customers that moved products from one shelf to another.[138]

## D. Mr. Weir Erroneously Draws Conclusions about Class-wide Damages Because He Uses Data that Cannot be Extrapolated to the Putative Class

It is important to note that the county auditor data is not statistically valid. The auditors did not perform standard steps required to make extrapolations.[139] It is my understanding that county auditors should use the NIST 130 standards to determine price accuracy within a given store on a given day. However, I further understand that some county auditors did not fully apply these standards in their audits.[140]

Auditors not following the auditing procedures spelled out in the NIST 130 standards prevents one from drawing accurate conclusions about whether or not the Dollar General retail store being audited displayed correct shelf prices on the audit date. As a result, Mr. Weir cannot draw statistically valid conclusions about the degree to which products were allegedly mispriced on the audit dates at the Dollar General New York retail stores that auditors audited.

Furthermore, the NIST 130 standards only discuss how auditors should conduct an audit in a given store on a given day. It is silent on the methodology auditors should employ to select the store being audited as well as the audit date.

In order for Mr. Weir to draw any conclusions about non-audited stores as well as audited stores on non-audit dates, the selection of the stores being audited as well as the audit dates must be randomly selected. Evidence shows that store and date selection was not randomized across New York state. First, it is my understanding that each county utilized its own procedures in deciding when and where to conduct audits. There was no state-wide coordination, which would be required for proper randomization. Second, the audits Mr. Weir relied upon appear to be biased toward Dollar General retail stores that were prone to possess pricing errors. For example, the store with the most violations (1895 Quaker Rd, Barker, New York store number #19579), which accounted for 26% of all violations, was audited 21 times over the relevant period, while all other stores in the data were audited 2.55 times on average.[141] This selection bias skews the audit results and prevents Mr. Weir from drawing statistically valid conclusions about the degree to which products are allegedly mispriced at Dollar General New York retail stores.

---

[134] Id., p. 129.
[135] Id., p. 129.
[136] Id., pp. 142-143.
[137] Droge Deposition, pp. 22-23.
[138] *See* audit reports herein that reference "customer moved item."
[139] *Reference Manual on Scientific Evidence*. The National Academies Press (Washington, D.C., 2011), pp. 222-224.
[140] Sajnani Report, Sec. B.2.
[141] DG_WOLF_0040562.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

The combination of auditor sampling errors in store selection, audit date selection and in-store product selection prevents Mr. Weir from knowing about the frequency of the alleged mispricing. As a result, the Named Plaintiffs cannot validly claim that Dollar General "routinely" and "continually" misprices its products as they allege in their Complaint.[142]   Additionally, not knowing the amount of alleged overcharges prevents Mr. Weir from calculating damages supposedly suffered by the putative class.

## VIII. Individualized Issues Prevent Damages From Being Calculated on a Classwide Basis

Mr. Weir incorrectly opines that his simple mathematical equations can fully account for numerous individualized issues involved in the allegedly relevant transactions.  His calculations incorrectly assume that every Dollar General customer who experienced a purported price overcharge was damaged.  Even if, contrary to the data, these customer-specific/transaction-specific issues could be formulaically analyzed on a class-wide basis, Mr. Weir has not stated how he would identify such customers.   In addition to these customer-level issues, Mr. Weir also ignores the individualized analyses that would be required of each New York Dollar General store to determine any alleged damages.

### A. Individualized Analyses of Each New York Dollar General Customer Would Be Needed to Assess Alleged Damages In This Matter

Mr. Weir ignores many customer-specific/transaction-specific differences between putative class members and their transactions at Dollar General retail stores in New York.

First, some customers likely returned their purchases upon realizing that they had been overcharged.  Mr. Weir overstated alleged damages by not properly accounting for returns.  The Dollar General database that Mr. Weir uses to calculate the number of allegedly relevant products that were sold during the 30-day window prior to the audit date does not deduct all the corresponding products that were returned.  It only includes products that were returned within that 30-day window and would not include subsequent returns.  Additionally, the returns included in the Dollar General database could correspond to products that were originally sold prior to the 30-day window.  As noted above, Dollar General produced documentation that it provided price overrides on approximately 6.6 million products as well as refunds for 8.2 million products, whose prices totaled almost $18 million in its New York stores during the allegedly relevant time period, some of which would have been related to price overcharges.

For example, let's assume that a customer purchased a box of Crayola Crayons on December 16th, a county auditor found that the shelf price was $1.00 while the register price was $1.50 on December 23rd and the customer then returned the product on December 30th, receiving a full refund.  In this example, the customer was not overcharged as they paid nothing and did not receive the box of Crayola Crayons.  On the other hand, Mr. Weir would claim that such a customer was

---

[142] Complaint, paragraphs 24, 32, 41 and 45.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

overcharged by $0.50.  Mr. Weir did not perform the individualized analyses required to identify such returns (which may or may not be possible to do so).

Second, some customers noticed price discrepancies just prior to or after the purchase of allegedly overcharged products, and Mr. Weir's analysis does not account for this fact.  For example, customers could have checked the register price in multiple ways as monitors at the checkout station prominently display prices as products are being scanned,[143] customers who pay with a credit or debit card are shown a screen on a keypad asking them to confirm the amount of their total purchase,[144] and customers are provided detailed receipts.[145]  A customer who noticed a price discrepancy may have responded in different ways to that observation.  Some may have purchased the product in question anyway without seeking an override or refund.[146]  Others may have called it to an employee's attention during, or subsequent to, the purchasing process and received a refund.[147]

For customers who called a price discrepancy to an employee's attention during the purchase process, Dollar General employees regularly overrode prices.  In particular to the database Mr. Weir relied upon, there were approximately 100 products that had their price overridden at the register, but Mr. Weir still counted them as alleged overcharges in spite of these overrides.[148]  However, as discussed above, the county auditors' inspections only encompass a fraction of all the sales transactions over the years of the putative class period.  As a result, these inspections and sales during the 30-day window would not account for the millions of products that actually have had a price correction at the register.  ***Figure 3*** displays the count of products with price corrections by year from 2020 to 2023.  Figure 3 does not contain information on Dollar General's 8.2 million products noted above.

| Figure 3 Price Overrides by Year in New York Dollar Stores[149] | | | | | |
|---|---|---|---|---|---|
| Description | 2020 | 2021 | 2022 | 2023 | Total |
| Price Override Item Units | 1,307,759 | 1,333,157 | 2,097,608 | 1,838,771 | 6,577,295 |

At a minimum, Mr. Weir cannot claim that his alleged 29,043 overcharges were actual overcharges without analyzing these overrides.  The magnitude of price corrections shows that Dollar General is actually "routinely" and "continually" remedying the alleged price overcharges purported by the plaintiffs.

Third, Mr. Weir did not analyze the differences in the purchasing behaviors of various Dollar General customers.  As discussed above, many potential factors affect whether a customer selects an item such as brand name, packaging, size, shelf position (e.g., floor height, hand height, eye

---

[143] C. Wolf Deposition, pp. 29-30 and  J. Wolf Deposition, Exhibit 4.
[144] DG_WOLF_0040629.
[145] J. Wolf Deposition, Exhibit 6.
[146] *See* DG_WOLF_0003429, DG_WOLF_0003469 and DG_WOLF_0003586. Alternatively, the customer could have opted to void the transaction. *See* DG_WOLF_0002460- DG_WOLF_0002461, DG_WOLF_0003285, DG_WOLF_0003296, DG_WOLF_0003495 and DG_WOLF_0003613.
[147] DG_WOLF_0040708-DG_WOLF_0040709 and DG_WOLF_0003369-DG_WOLF_0003472.
[148] DG_WOLF_0040562 and DG_WOLF_0040636.  *See* "Discount Type Description" type "Price Match P.O. Markdown."
[149] DG_WOLF_0040641.

***CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER***

height), product label, knowledge of prices at other stores, coupons as well as the price displayed on the shelf. Mr. Weir did not analyze whether the shelf price influenced purchase decisions. It is questionable whether a customer who fully relied on other purchasing factors was damaged. For example, some consumers are sufficiently brand loyal that they would have purchased a product with an alleged overcharge irrespective of that product's price. Mr. Weir did not investigate the individualized purchasing behavior of each Dollar General customer in New York.

Fourth, plaintiffs have a duty to mitigate their alleged damages.[150] For example, a customer who noticed a price discrepancy, did not alert Dollar General staff, and just paid the register price did not mitigate their alleged damages. Economic theory states that such customers should not be awarded damages.[151] There are several reasons why customers might have just paid the register price even if they noticed an error. For example, as discussed above, many of the register prices that Mr. Weir identified differ from the shelf price by only a few pennies. Customers might not have been willing to mitigate their alleged damages for such a small monetary value.[152] This example is not a hypothetical. As discussed in the next Section, Ms. Wolf noticed a price discrepancy, did not alert Dollar General staff, and just paid the register price.[153] Mr. Weir incorrectly provides damages to customers who did not mitigate their alleged damages. Individualized analyses would be required to identify such mitigation or lack of mitigation.

Fifth, Mr. Weir did not investigate what Dollar General customers actually paid for the products in question. Some customers purchased products with "percentage off" coupons and/or credit cards that provide benefits based upon purchases. For example, the Dollar General spendwell Cash Back credit card gives the cardholder 1% cash back on all their purchases.[154] Identifying such rebates would require individualized analyses. Mr. Weir did not account for such rebates in his damages calculations.

Sixth, it is my understanding that Dollar General customers who signed up for a myDG account agreed to class action waivers and arbitration provisions.[155] Mr. Weir did not analyze and identify such customers. He just assumed that all Dollar General customers could be putative class members.

Seventh, some Dollar General retail store customers could have resold the products they purchased. For example, one customer could be a caterer who purchased Kraft Mac & Cheese from one Dollar General retail store. Another customer could be a party planner that purchased balloons from a Dollar General retail store. Additionally, a builder could have bought light bulbs from a Dollar General store. To the extent that these individuals charged their own customers for these products, they likely were not damaged and could have actually financially benefited from the alleged overcharge. Mr. Weir did not account for such individualized resale issues.

---

[150] *Reference Manual on Scientific Evidence.* The National Academies Press (Washington, D.C., 2011), p. 461.
[151] Id., pp. 464-466.
[152] DG_WOLF_0003429, DG_WOLF_0003469 and DG_WOLF_0003586.
[153] C. Wolf Deposition, pp. 86-91. Mr. Wolf arguably did the same as he took photos of the shelf label prior to approaching the register to purchase that item. J. Wolf Deposition, pp. 181-183.
[154] https://www.dollargeneral.com/spendwell viewed on March 12, 2024.
[155] DG_WOLF_0040714, DG_WOLF_0040729, DG_WOLF_0040742, DG_WOLF_0040755, DG_WOLF_0040768, DG_WOLF_0040777 and DG_WOLF_0040788.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

## B. Individualized Analyses of Each New York Dollar General Customer Would Be Needed to Ascertain Their Identity and Purchases

The putative class in this matter is defined as "all consumers who at any time on or after [May 30, 2020], paid more for merchandise than the advertised price labeled on the shelf at a Dollar General store located in New York."[156] Nothing in the data either Mr. Weir or I have reviewed will allow for the identification of any individual putative class member, let alone all putative class members.

Instead of proffering a methodology to identify all putative class members, Mr. Weir simply asserted a number that he claims comprises the total alleged damages owed to the entire putative class. As already discussed, this number is flawed in a number of different respects. Mr. Weir does not present any methodology about how to allocate these alleged damages. He provides no method to identify the individuals who made these purchases. Simple analyses demonstrate that it would be difficult, if not impossible, to make such an identification.

For example, a Dollar General employee testified that Dollar General is unable to identify purchasers unless the customer signed up for a myDG account and self-identified as a part of that transaction.[157] Dollar General has no records of other individuals who made purchases using cash or gift cards. While I understand that Dollar General might possess truncated credit card numbers, Apple, Google & Samsung Pay numbers as well as numbers associated with other payment methods, Mr. Weir has not stated how he would link those numbers to the owners of those accounts, let alone the person making the purchases in question. Nor does he even mention myDG account holders who self-identified during those purchases in his declaration.

For just one example of the kind of individualized inquiry necessary here, my wife and I share a credit card account. Both of us have individual credit cards that are embossed with our respective names, but possess the same number. As a result, if an allegedly relevant purchase was made with our credit card, Mr. Weir would not know whether my wife or I made the purchase assuming he possessed our full credit card number.

Mr. Weir has not provided a methodology for making this or any other identity determination.

## C. Individualized Analyses of Each New York Dollar General Store In New York Would Be Needed to Assess Alleged Damages In This Matter

As previously discussed, the audits which found purported price discrepancies occurred in relatively few Dollar General stores in New York, and the preponderance of discrepancies occurred in just a handful of audited stores. It would be implausible and inappropriate to assume that every Dollar General store in New York would have pricing discrepancies exceeding the allowable 2% limit under New York law or that pricing discrepancies would occur at similar rates, for similar reasons, or with similar effect at all stores.

While Dollar General has a generally standardized manner of informing stores of price changes and expectations for how those price changes are reflected on store shelves,[158] the actual execution

---

[156] Complaint, paragraph 43.
[157] 30(b)(6) Deposition testimony of Nick Snow, dated March 7, 2024, pp. 104-107.
[158] Savaloja Deposition, p. 38.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

of updating shelf price labels almost certainly varies from store to store depending on staff availability, customer traffic, printing equipment and the like. For example, one former Dollar General employee testified that she and her team used a variety of methods to ensure pricing accuracy including using Sharpies to write prices on shelf labels when necessary.[159] Because implementation occurs at the store level, while errors occur from time to time, they are more likely to be localized and the result of human error and not the result of systematic issues.

These store-specific procedures and circumstances must be considered to credibly and reliably assess Mr. Weir's alleged damages. For example, certain Dollar General locations in New York have in-store equipment and signage to assist customers in understanding the pricing of in-store items. For example, I understand that a number of Dollar General locations in New York have price check scanners which customers may use to confirm the price of any given item. Likewise, some stores apparently have prominent signs which explain Dollar General's pricing and refund policies.[160] As mentioned above, the Dollar General Schenectady store (store #21982), which had 3.3% of the alleged auditor violations, had this prominent refund policy sign.[161] Therefore, individualized inquiry would be necessary to determine if this store's customers were actually damaged based on their review and awareness of the sign.

However, Mr. Weir did not perform such an individualized store-by-store inquiry required to determine alleged damages.

## IX.  Named Plaintiffs Are Not Representative of the Putative Class

Mr. and Ms. Wolf incorrectly claim that they "are typical of the members of the class which [they represent] because all such claims arise out of the same policies, practices, and conduct, and the same or similar documents used by Defendant in their dealings with Plaintiffs and the putative class members."[162] However, the situation and circumstances surrounding the Wolfs' purported purchases of mispriced products are not typical, nor are they representative of all putative class members, for several reasons.

First, Joseph Wolf testified that he was told by his father, one of his attorneys in this matter, that Dollar General "is known for overcharging customers."[163] Following Mr. Wolf's purchases of lactose free milk at the White Lake Dollar General store in September 2022 for which he was purportedly overcharged by $0.10, the Wolfs retained his father as legal counsel.[164] They sought such counsel because, according to Ms. Wolf, they "didn't think it was our responsibility" to first discuss the alleged mispricing of items at the White Lake Dollar General store with an employee of the store.[165] However, it is my understanding that mitigation is the responsibility of all

---

[159] Molthu Deposition, p. 48.
[160] DG_WOLF_0040564.
[161] DG_WOLF_0040564 & DG_WOLF_0040562.
[162] Complaint, paragraph 47.
[163] J. Wolf Deposition, p. 47.
[164] C. Wolf Deposition, p. 48.
[165] Id., p. 48.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

plaintiffs.[166]  Moreover, prior to the first transaction at issue in this lawsuit, Mr. Wolf testified that he was aware through his father that Dollar General's shelf prices and register prices might not match, putting him on heightened alert for any possible price discrepancies.

As previously discussed, Dollar General has well-documented policies and procedures to address instances in which customers are charged a different price at the register than an advertised shelf price, and most typical customers who notice a price discrepancy would, reasonably, first discuss the issue with a Dollar General employee.[167]  In my experience, hiring an attorney over a $0.10 price discrepancy, having made no mitigation efforts to have the discrepancy corrected in the store or with an employee afterwards, is not typical consumer behavior.  Additionally, as discussed in the prior Section, the Wolfs did not mitigate their alleged damages.

Second, the Wolfs typically make their Dollar General purchases at the White Lake Dollar General store, which is a roughly two-minute drive from their vacation home in Bethel.[168]  They have testified that the White Lake Dollar General store is the closest retail option and that other stores such as WalMart or ShopRite are a "40-minute round trip" from their vacation home.[169]

Their situation cannot plausibly be representative of all putative class members.  As the Named Plaintiffs describe in their Complaint, Dollar General "caters mainly to low-and-middle income customers in rural and suburban areas," and "the "company's core customers earn…$20,000 below the median income."[170]  The Wolfs shop at Dollar General because it is close to their *vacation* home, which is not a typical feature of a "low-to-middle income" household.

Third, I note that since the Wolfs first experienced purchasing an item with a price discrepancy in September 2022 and subsequently retaining legal counsel because of that price discrepancy, they have continued to shop at the same Dollar General store as frequently as they had before.[171]  In my experience, continuing to shop at a store that conducts practices that customers allegedly believe are so improper that they retained legal counsel is not typical consumer behavior.  Customers generally try to avoid perceived overcharges; the Wolfs' apparent indifference to matters alleged in their Complaint cannot be representative of the behavior or attitudes of all putative class members.

Fourth, Mr. and Mrs. Wolf both testified that they could not remember whether they had investigated shelf prices in detail prior to being informed by Mr. Wolf's father that Dollar General's shelf prices and register prices might not match for the purchases at issue in this lawsuit.[172]  As discussed above in Section V.B, customers' purchasing behavior would not be altered by shelf price changes (and alleged damages would not arise) if they did not investigate shelf prices prior to making a purchase.  Mr. Weir did not dismiss the likelihood that most putative class members'

---

[166] *Reference Manual on Scientific Evidence.* The National Academies Press (Washington, D.C., 2011), p. 461.
[167] Indeed, Mr. Wolf was aware of this, having had a price discrepancy corrected in a subsequent visit to the White Lake Dollar General store by a Dollar General staff member. (J. Wolf Deposition, pp. 62-63.)
[168] C. Wolf Deposition, p. 51.
[169] Id., p. 52.
[170] Complaint, paragraph 9.
[171] C. Wolf Deposition, p. 57.
[172] J. Wolf Deposition, pp. 78-79 and C. Wolf Deposition, pp. 49-50.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

actions were similar to how Mr. and Mrs. Wolf acted prior to obtaining the information from his father.

Fifth, I understand that Mr. and Mrs. Wolf took multiple photos with their phones of the shelf labels both before and after the transactions at issue in this lawsuit. In my experience, this is not typical customer behavior and is more consistent with individuals attempting to gather evidence.

## X.    Mr. Weir Incorrectly Calculated Alleged Statutory Damages

Mr. Weir incorrectly claims that statutory damages can be simply calculated by multiplying the number of alleged violations he identified in the Dollar General data by $50, based on his understanding that "New York [General Business Law] § 349 provides for statutory damages of $50 per violation."[173]  However, both of the numbers in Mr. Weir's simple calculation are incorrect.

First, as discussed above in Section VII.B, Mr. Weir does not accurately determine the number of instances where the Shelf Price was allegedly less than the Point of Sale Price at Dollar General retail stores in New York. Because he overstated the number of such alleged instances, his statutory damages figure is overstated.

Second, even if Mr. Weir had accurately determined the number of alleged incidents, that number is not applicable to the statutory damages formula. Mr. Weir noted that New York law requires retail stores to maintain a 98% accuracy rate between their shelf and register prices.[174] Consequently, it is my understanding that any mispriced item in a store that had at least a 98% accuracy rate would not be subject to statutory damages. Despite this law, Mr. Weir assessed statutory damages on every such item.

Third, the General Business Law Section that Mr. Weir references states that the store *could* be assessed statutory damages of $50 per violation.[175]  While I provide no legal opinions, it is my understanding that there is some legal debate about whether statutory damages could be awarded at lesser amounts per violation. If permitted by law, it is possible that the Finder of Fact would assess lower statutory damages per violation, especially as the maximum statutory damages figure in this matter would be dramatically larger than the overcharge damages. In particular, Mr. Weir's analysis of Dollar General data at best shows that customers were overcharged approximately $7,737 for such purchases between 2020 and June 2023.[176]  This represents an average overcharge of $0.27 per alleged "violation," a mere fraction of the statutory damages Mr. Weir claims are at issue in this case.[177]

---

[173] Weir Declaration, paragraph 25.
[174] Also *see* NIST Handbook 130, p. 247.
[175] Weir Declaration, paragraph 25.
[176] For the reasons discussed above, I do not agree with the validity of this calculation. However, I put it in this Expert Report for illustrative reasons.
[177] $7,737 of alleged overpayment damages / 29,043 alleged violations = $0.27.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

# XI.   Conclusion

I hold all opinions stated herein to a reasonable degree of economic certainty.  As I understand discovery is ongoing, I reserve the right to supplement and/or amend my opinions upon receipt of new or additional information.


March 18, 2024                                        _____

                                                     Benjamin S. Wilner, Ph.D.

*CONFIDENTIAL – SUBJECT TO THE PROTECTIVE ORDER*

**Joseph Wolf & Carmen Wolf v. DOLGEN NEW YORK, LLC**  **Exhibit 1**
**Documents Considered**

| I. Legal Filings |
| --- |
| Plaintiffs' Second Amended Class Action Complaint & Exhibits, dated May 30, 2023 (the "Complaint"). |

| II. Depositions |
| --- |
| 30(b)(6) Deposition testimony of Nick Snow, dated March 7, 2024. |
| Deposition testimony of Brain Haug, dated December 12, 2023 ("Haug Deposition"). |
| Deposition testimony of Carmen Wolf, dated January 9, 2024 ("C. Wolf Deposition"). |
| Deposition testimony of Connie Droge, dated January 31, 2024 ("Droge Deposition"). |
| Deposition testimony of Joseph Wolf & Exhibits, dated January 8, 2024 ("J. Wolf Deposition"). |
| Deposition testimony of Mia Savaloja & Exhibits, dated December 14, 2023 ("Savaloja Deposition"). |
| Deposition testimony of Michelle Molthu, dated January 26, 2024 ("Molthu Deposition"). |

| III. Other Expert Reports |
| --- |
| Declaration of Colin B. Weir, dated February 9, 2024 (the "Weir Declaration"). |
| Expert Report Of Sunil Sajnani, dated March 18, 2024 (the "Sajnani Report"). |

| IV. Documents Received from Counsel |
| --- |
| DG_WOLF_0000001-DG_WOLF_0000005 |
| DG_WOLF_0002460-DG_WOLF_0002461 |
| DG_WOLF_0002515-DG_WOLF_0002516 |
| DG_WOLF_0002593-DG_WOLF_0002595 |
| DG_WOLF_0003269 |
| DG_WOLF_0003285-DG_WOLF_0003286 |
| DG_WOLF_0003291-DG_WOLF_0003292 |
| DG_WOLF_0003339-DG_WOLF_0003340 |
| DG_WOLF_0003362-DG_WOLF_0003363 |
| DG_WOLF_0003369-DG_WOLF_0003474 |
| DG_WOLF_0003429 |
| DG_WOLF_0003469-DG_WOLF_0003470 |
| DG_WOLF_0003495 |
| DG_WOLF_0003585-DG_WOLF_0003586 |
| DG_WOLF_0003613 |
| DG_WOLF_0003614-DG_WOLF_0003617 |
| DG_WOLF_0003706-DG_WOLF_0003715 |
| DG_WOLF_0003720-DG_WOLF_0003724 |
| DG_WOLF_0003735-DG_WOLF_0003740 |
| DG_WOLF_0003761-DG_WOLF_0003764 |
| DG_WOLF_0004241-DG_WOLF_0004244 |
| DG_WOLF_0004254-DG_WOLF_0004255 |
| DG_WOLF_0004265-DG_WOLF_0004271 |
| DG_WOLF_0004282 |
| DG_WOLF_0004288-DG_WOLF_0004291 |
| DG_WOLF_0004524-DG_WOLF_0004532 |

**Joseph Wolf & Carmen Wolf v. DOLGEN NEW YORK, LLC**                    **Exhibit 1**
**Documents Considered**

| IV. Documents Received from Counsel (cont.) |
|---|
| DG_WOLF_0004580-DG_WOLF_0004582 |
| DG_WOLF_0004587-DG_WOLF_0004596 |
| DG_WOLF_0004598-DG_WOLF_0004605 |
| DG_WOLF_0004624-DG_WOLF_0004633 |
| DG_WOLF_0004704-DG_WOLF_0004713 |
| DG_WOLF_0004756-DG_WOLF_0004757 |
| DG_WOLF_0004807-DG_WOLF_0004816 |
| DG_WOLF_0004865-DG_WOLF_0004867 |
| DG_WOLF_0005046-DG_WOLF_0005048 |
| DG_WOLF_0005341-DG_WOLF_0005348 |
| DG_WOLF_0005488-DG_WOLF_0005493 |
| DG_WOLF_0005823-DG_WOLF_0005850 |
| DG_WOLF_0006525-DG_WOLF_0006528 |
| DG_WOLF_0006588-DG_WOLF_0006595 |
| DG_WOLF_0029325-DG_WOLF_0029327 |
| DG_WOLF_0030246-DG_WOLF_0030249 |
| DG_WOLF_0030255-DG_WOLF_0030258 |
| DG_WOLF_0033067-DG_WOLF_0033071 |
| DG_WOLF_0033276-DG_WOLF_0033278 |
| DG_WOLF_0040562-DG_WOLF_0040564 |
| DG_WOLF_0040629-DG_WOLF_0040630 |
| DG_WOLF_0040636-DG_WOLF_0040637 |
| DG_WOLF_0040641 |
| DG_WOLF_0040708-DG_WOLF_0040709 |
| DG_WOLF_0040714-DG_WOLF_0040796 |
| WOLF_000038 |

**Joseph Wolf & Carmen Wolf v. DOLGEN NEW YORK, LLC**    **Exhibit 1**
**Documents Considered**

| V. Other Documents Considered |
|---|
| https://agriculture.ny.gov/weights-measures#:~:text=There%20are%2060%20county%20and,%2C%20vehicle%20scales%2C%20and%20more viewed on March 5, 2024. |
| https://investor.dollargeneral.com/download/companies/dollargeneral/Annual%20Reports/AR_2019_Dollar%20General_Web%20PDF.pdf viewed on March 14, 2024. |
| https://investor.dollargeneral.com/download/companies/dollargeneral/Annual%20Reports/DG%20Annual%20Report%202022%20Final.pdf viewed on March 14, 2024. |
| https://investor.dollargeneral.com/download/companies/dollargeneral/Annual%20Reports/Dollar_General_2020_Annual_Report.pdf viewed on March 14, 2024. |
| https://investor.dollargeneral.com/download/companies/dollargeneral/Annual%20Reports/Final%20pdf%202021%20annual%20report.pdf viewed on March 14, 2024. |
| https://investor.dollargeneral.com/websites/dollargeneral/English/310010/us-sec-filing.html?secFilingId=003b8c70-dfa4-4f21-bfe7-40e6d8b26f63&shortDesc=Annual%20Report&format=convpdf viewed on March 14, 2024. |
| https://scholar.google.com/scholar?hl=en&as_sdt=0%2C14&q=benjamin+wilner&btnG=, viewed on March 13, 2024. |
| https://www.dollargeneral.com/spendwell viewed on March 12, 2024. |
| https://www.dollargeneral.com/terms-and-conditions viewed on March 15, 2024 |
| NIST Handbook 130. |
| *Reference Manual on Scientific Evidence.* The National Academies Press (Washington, D.C., 2011). |



Alvarez & Marsal
**Disputes and Investigations, LLC**
540 West Madison Street – Suite 1800
Chicago, IL 60661
Phone: +1 312 601 4220
Fax: +1 312 332 4599

### Benjamin S. Wilner, Ph.D.
Managing Director – Disputes and Investigations
bwilner@alvarezandmarsal.com

540 West Madison St.
Suite 1800
Chicago, IL 60661
Tel: (312) 470-8450

**Education**
Kellogg Graduate School
of Management,
Northwestern University
Ph.D.
Managerial Economics
and Decision Science

University of
Pennsylvania
BA magna cum laude
with distinction in major
Economics &
Mathematics

London School of
Economics
General Course Degree
Mathematics & Statistics

Dr. Benjamin Wilner has more than twenty years of advisory, valuation, and general economic & financial services experience as a consultant, academic & testifier. He is a Ph.D. economist and statistician who regularly serves as a consultant and testifying expert witness on financial damages, economic & statistical issues.

Dr. Wilner's disputes experience encompasses many industries and a broad range of single plaintiff, class action and criminal disputes including antitrust liability & damages, business interruption, business valuations, economic analyses, intellectual property, labor, lost income, product liability, statistical data analyses, and other corporate and litigation related matters.  Dr. Wilner was a panelist at the ABA Litigation Section's 26th Annual National Institute on Class Actions discussing "The Conjoint Damages Standoff: Benefit of the Bargain or Procedural Shortcut?"

In his consulting practice, Dr. Wilner advises corporations and governments on economic and statistical issues.  For example, in addition to redesigning statistical aspects of an automobile manufacturer's warranty process, Dr. Wilner received a special commendation from the Commissioner of US Customs & Border Protection for building an economic model to restructure a $2.5 billion tariff, which has won praise by a Cabinet member, Congressional officials, and the industry.

Prior to joining Alvarez & Marsal, Dr. Wilner worked at other multinational consulting firms.  He also has been a professor in the business schools at the University of Michigan, University of Iowa, Northwestern University, and the Helsinki School of Economics.  Dr. Wilner was a three year research assistant constructing statistical models for 1980 Nobel Prize Laureate Lawrence Klein and studied under 2007 Nobel Laureate decision theorist Roger Myerson, 2010 Nobel Laureate labor economist / decision theorist Dale Mortensen and 2023 Nobel Laureate labor economist Claudia Goldin. His work has been published in leading academic journals and textbooks as well as regularly cited in the academic and popular press.  Dr. Wilner won several awards for teaching and research including a grant from the National Science Foundation.

**Testimony before a Trier of Fact**

- Employment Hearing Testimony in Scott Coren v. Ronald Pieri, Board of Fire and Police Commissioners, Highwood, Illinois, October 2019 & January 2020
- Sentencing Hearing Testimony in United States v. Mark Hazelwood, United States District Court, Eastern District of Tennessee, September 2018
- Arbitration Testimony in Topix Media Lab, LLC, v. Athlon Sports Communications, Inc., American Arbitration Association, November 2017
- Trial Testimony in Syngenta Crop Protection, LLC v. Willowood, LLC, Willowood USA, LLC, Willowood Azoxystrobin, LLC, and Willowood Limited, United States District Court, Middle District of North Carolina, September 2017
- Trial Testimony in Christine Ekalliipse Mouloki v. Marie Paule Epee and Eric Ngado Epee, United States District Court, Northern District of Illinois, Eastern Division, July 2017
- Trial Testimony in The People of the State of Illinois v. Ronald A. Pieri, State of Illinois, Circuit Court of Lake County, October 2015
- Trial Testimony in Sleepy's LLC, v. Select Comfort Wholesale Corporation, et al., United States District Court, Eastern District of New York, May – June 2012 & July 2015
- Trial Testimony in Grater, Inc., and James T. Zavacki v. Kevin T. Keating and Keating & Shure, Ltd., State of Illinois, Circuit Court of Cook County, March 2015
- Trial Testimony in Think Tank Software Development Corporation et al. v. Chester Inc., et al., State of Indiana, County of Porter, March 2014
- Trial Testimony in Sharon P. Clark, Commissioner of the Kentucky Department of Insurance, in her Capacity as Rehabilitator of AIK Comp v. TransAmerica Insurance Company and TIG Insurance Company, Commonwealth of Kentucky, Franklin Circuit Court, Division Two, October 2012
- Trial Testimony in Mario Vara v. Integra Properties, Inc., Abe Polatsek, S&M Corporation and Michael Strick, State of Illinois, Circuit Court of Cook County, July 2011
- Trial Testimony in Indeck Power Equipment Company v. Professional Power Products, et al., State of Illinois, Circuit Court of Cook County, April 2010



- Trial Testimony in Saint-Gobain Autover USA, Inc., et al. v. Xinyi Glass North America, Inc., et al., United States District Court, Northern District of Ohio, Eastern Division, November 2009
- Trial Testimony in NSM Music Group, Ltd. and NSM Music, Inc. v. Synergy Law Group and Arthur E. Mertes, State of Illinois, Circuit Court of Cook County, June 2009
- Arbitration Testimony in Global Link Logistics, Inc., GLL Holdings, Inc., and Golden Gate Logistics, Inc., v. Olympus Growth Fund III, L.P., et al., American Arbitration Association, October 2008
- Arbitration Testimony in Sarah Sanford v. Society of Actuaries & Bruce Schobel, American Arbitration Association, August 2008
- Hearing Testimony in Chinitz v. Chinitz, State of Michigan, Circuit Court for the County of Oakland, May 2008
- Arbitration Testimony in BP Products North America, Inc. v. Laidlaw Educational Services, JAMS Arbitration, October 2007

**Deposition Testimony**
- Blocksom & Company v. City of Michigan City, Indiana and the Redevelopment Commission of the City of Michigan City, Indiana, Arbitration, January 2024
- Appeal of Missouri Department of Social Services Under Contract No. W9124J-21-D-0002, Armed Servies Board of Contract Appeals, December 2023
- In re: Pepperdine University Tuition and Fees COVID-19 Refund Litigation, United States District Court, Central District of California, Western Division, April 2023
- Carson Little et al. v. Grand Canyon University, United States District Court, District of Arizona, March 2023
- Marc Schultz et al. v. Emory University, United States District Court, Northern District of Georgia, Atlanta Division, February 2023
- In re: Boston University COVID-19 Refund Litigation, United States District Court, District of Massachusetts, February 2023
- Richard Parks and Steven Parks v. Horizon Holdings LLC, Parks Manufacturing LLC a/k/a PMI Opco, LLC and PMI Holdco, LLC, State of Delaware, Court of Chancery, January 2023
- Alec Faber and Ahnaf Rahman et al. v. Cornell University, United States District Court, Northern District of New York, October 2022



- Holly Blaine Vanzant and Sherry Nevius et al. v. Hill's Pet Nutrition Inc. and PetSmart, Inc., United States District Court, Northern District of Illinois, September 2022

- Penny Ninivaggi et al. v. University of Delaware & Hannah Russo et al. v. University of Delaware, United States District Court, District of Delaware, September 2022

- Nicholas Bergeron and Nick Quattrociocchi, et al. v. Rochester Institute of Technology, United States District Court, Western District of New York, August 2022

- Jennifer Pennington and Josh Pennington v. Memorial Hospital of South Bend, Inc. d/b/a Beacon Health and Fitness, Spear Corporation and Panzica Building Corporation, State of Indiana, St. Joseph Superior Court, April 2022

- Honeywell International Inc. v. North American Refractories Company Asbestos Personal Injury Settlement Trust, United States Bankruptcy Court, Western District of Pennsylvania, March 2022

- Astria Health v. Cerner Corporation and Cerner Revenue Cycle, LLC., United States Bankruptcy Court, Eastern District of Washington, March 2022

- Paul E. Dubuque v. Dubuque Coffee Co., LLC and Charles T. Dubuque, State of Illinois, Circuit Court of Cook County, October 2021

- Winamac Southern Railway Company v. Irving Materials, Inc., State of Indiana, County of Howard, October 2021

- Brooke Smith v. The Ohio State University, Court of Claims for the State of Ohio, September 2021

- H&T Fair Hills, Ltd., et al. v. Alliance Pipeline L.P., United States District Court, District of Minnesota, April 2021

- Thomas P. Gorczynski, et al. v. Electrolux Home Products, Inc., et al., United States District Court, District of New Jersey, Camden Division, February 2020

- Thomas Allegra, et al. v. Luxottica Retail North America, United States District Court, Eastern District of New York, Brooklyn Division, December 2019

- Sdahrie Howard, et al. v. Cook County Sheriff's Office and County of Cook, United States District Court, Northern District of Illinois, Eastern Division, April 2019

- In re: Whole Foods Market Group, Inc. Overcharging Litigation, United States District Court, Southern District of New York, January 2019



- WHB International, Inc. and WHB Fundição, S/A v. Allison Transmission, Inc., Marion Superior Court, Indiana Commercial Court, December 2018
- Teresa Elward, et al. v. Electrolux Home Products, Inc., United States District Court, Northern District of Illinois, Eastern Division, August 2018
- Roger Coffelt, Jr., et al. v. The Kroger Co., The Pictsweet Company and CRF Frozen Foods LLC., et al., United States District Court, Central District of California, Riverside Division, May 2018
- Rick Lindsey v. Officer Michael Orlando et al., United States District Court, Northern District of Illinois, Eastern Division, March 2018
- Syncora Guarantee Inc. v. Alinda Capital Partners, LLC, American Roads LLC, Macquarie Securities (USA) Inc., and John S. Laxmi, Supreme Court of the State of New York, County of New York, December 2017
- Kelley Antekeier v. Laboratory Corporation of America, United States District Court, Eastern District of Virginia, Alexandria Division, November 2017
- Topix Media Lab, LLC, v. Athlon Sports Communications, Inc., American Arbitration Association, October 2017
- Christine Ekalliipse Mouloki v. Marie Paule Epee and Eric Ngado Epee, United States District Court, Northern District of Illinois, Eastern Division, July 2017
- Syngenta Crop Protection, LLC v. Willowood, LLC, Willowood USA, LLC, Willowood Azoxystrobin, LLC, and Willowood Limited, United States District Court, Middle District of North Carolina, September 2016
- In re: Hardieplank Fiber Cement Siding Litigation, United States District Court, District of Minnesota, February 2016
- In re: Atlas Roofing Corporation Chalet Shingle Products Liability Litigation, United States District Court, Northern District of Georgia, Atlanta Division, December 2015
- Churchill Downs Incorporated v. Illinois Department of Revenue, Brian Hamer, as Director of The Illinois Department of Revenue, and Dan Rutherford as Treasurer of the State of Illinois, State of Illinois, Circuit Court of Cook County, August 2014
- Victor Tracy, Power of Attorney for Anne Tracy and Victor Tracy, Individually v. Robert K. Erickson, M.D., Lake County Neurosurgery, LLC, Advocate Condell Medical Center, State of Illinois, Circuit Court of Cook County, July 2014
- Marylee Arrigo v. Link Stop, Inc., et al., United States District Court, Western District of Wisconsin, October 2013



- Andrew C. Dillon v. Transportation Solutions Group, LLC, Freight Exchange of North America, LLC, 3PLogic, LLC, Transportation Solutions Enterprises, LLC and Todd Berger, United States District Court, Northern District of Illinois, Eastern Division, September 2013
- Grater, Inc., and James T. Zavacki v. Kevin T. Keating and Keating & Shure, Ltd., State of Illinois, Circuit Court of Cook County, September 2013
- Think Tank Software Development Corporation et al. v. Chester Inc., et al., State of Indiana, County of Porter, February 2012 & October 2009
- Continental Datalabel, Inc. v. Avery Dennison Corporation, United States District Court, Northern District of Illinois, Eastern Division, December 2011
- Ross v. Ross, Circuit Court of the Nineteenth Judicial Circuit, Waukegan, Lake County, Illinois, September 2011
- In re: IKO Roofing Shingle Products Liability Litigation, United States District Court, Central District of Illinois, Urbana Division, August 2011
- Jessica Ellen Legens, et al. v. Mark Alan Ikerman and Manheim Services Corporation, d/b/a Manheim Gateway St. Louis, et al., State of Illinois, Circuit Court of Madison County, November 2010
- Ronald Seymour v. Wausau Signature Agency, et al., United States District Court, Northern District of Illinois, Eastern Division, May 2010
- Neil Simon and Clarissa Simon v. Heritage Title Company, State of Illinois, Circuit Court of Cook County, December 2009
- Mario Vara v. Integra Properties, Inc., Abe Polatsek, S&M Corporation and Michael Strick, State of Illinois, Circuit Court of Cook County, December 2009
- Saint-Gobain Autover USA, Inc., et al. v. Xinyi Glass North America, Inc., et al., United States District Court, Northern District of Ohio, Eastern Division, October 2009
- Sleepy's LLC, v. Select Comfort Wholesale Corporation, et al., United States District Court, Eastern District of New York, July 2009
- Indeck Power Equipment Company v. Professional Power Products, et al., State of Illinois, Circuit Court of Cook County, September 2008
- NSM Music Group, Ltd. and NSM Music, Inc. v. Synergy Law Group and Arthur E. Mertes, State of Illinois, Circuit Court of Cook County, May 2008
- Maria Belbis, et al. v. County of Cook, United States District Court, Northern District of Illinois, Eastern Division, January 2008



- Bucyrus International, Inc. v. Price Erecting Company and Kentucky Rebuild Corp., State of Wisconsin, Circuit Court of Milwaukee County, October 2007
- Mark A. Sindecuse, M.D. v. Dean M. Katsaros, Katsaros & Associates, and CIB Marine Bancshares, Inc., United States District Court, Eastern District of Missouri, Eastern Division, June 2007
- Quentin Bullock et al., v. Michael Sheahan and Cook County, United States District Court, Northern District of Illinois, Eastern Division, September 2006

**Publications**
- "Sampling is Harder and Cheaper than You Think" *Raising the Bar*, January 2021
- "Does (Sample) Size Matter" *For the Defense*, February 2019
- "The U.S. Federal Crop Insurance Program in 2012 and Beyond," (with Frank Schnapp) *Trébol*, July 2013
- "Profitability & Effectiveness of the Federal Crop Insurance Program," (with Laura Carolan & Frank Schnapp), *Crop Insurance Today*, 44(2), pp. 28 – 32, May 2011
- "Economic and Accounting Analyses in Post-Acquisition Disputes," (with Allen Burt and Matthew Paye) *The SRR Journal*, Spring 2010
- "Statistical Analyses Relation to Reductions In Force," *The SRR Journal*, Spring 2009
- "Antitrust Analyses in Horizontal Mergers," (with Thomas R. Jackson) *The SRR Journal*, Fall 2007
- "Options Backdating: The Latest Corporate Imbroglio," (with Idris Raja) *The SRR Journal*, Spring 2007 (reprinted on mondaq.com)
- "Multi-Unit Auctions: A Comparison of Static and Dynamic Mechanisms" (with Alejandro Manelli and Martin Sefton), *Journal of Economic Behavior and Organization*, 61(2), pp. 304 – 323, October 2006
- "The Exploitation of Relationships in Financial Distress: The Case of Trade Credit," *Journal of Finance*, February 2000
- "Everything you always wanted to know about discounting, but were afraid to ask: A Finance 101 Primer," *Credit and Financial Management Review*, Summer 1999
- "Paying Your Bills: The Effect of Corporate Quality" September 1996



- Refereed for the *American Economic Review*, *American Real Estate Society*, *Journal of Finance*, the *Journal of Business, Finance and Accounting*, and John Wiley Publishers

**Professional Memberships**
- American Bar Association (Associate Status)
- American Statistical Association

**Awards**
- National Science Foundation Grant, 1998
- Old Gold Research Fellowship, University of Iowa, Summer 1997
- Outstanding Professor, University of Iowa Panhellenic Council, Fall 1996
- Doctoral Teaching Award, Kellogg Graduate School of Management, 1994

