# EXHIBIT 9

# EXPERT REPORT OF SUNIL SAJNANI, CPA, CIA, CRCM, CRMA

## I. Introduction

The two Plaintiffs, Joseph and Carmen Wolf, filed a lawsuit against Dollar General, alleging that Dollar General Corporation (Dollar General) has "policies and practices of regularly charging Plaintiffs and putative class members at a higher price at the register than the price of merchandise advertised on the shelves at the time of sale at its Dollar General stores in New York." *See* Second Amended Class Action Complaint, ¶ 1. I am a consultant for Gerson Lehrman Group ("GLG"), and through GLG, I was retained by counsel representing Dollar General to review the relevant materials and opine on (1) the accuracy, methodology, and reliability of government audit reports of Dollar General stores in New York; (2) whether the expert for Plaintiffs, Mr. Weir, can reasonably rely on these audit reports for his opinions; (3) whether failed audits necessarily mean that customers were charged more for particular items; and (4) whether Dollar General's culture of compliance and its operations related to pricing and price discrepancies are reasonable and comparable to others in the industry.

## II. Qualifications

I am currently employed as the Chief Audit, Asset Protection & Loss Prevention Executive at EZCORP, Inc. I have held that position since approximately April 2020. Previously, I held the position of Chief Audit Executive at another publicly traded retail organization (Conns, Inc.) with a multi-state store footprint. I also served multiple retail clients during my time as an auditor at PricewaterhouseCoopers. Over the years, I have planned, executed and reported on numerous price verification audits at these organizations. My duties, among many others, have involved risk assessments, planning, scoping, audit fieldwork and reporting results both to executive management and the board of directors. My experience also includes interacting with regulators who conduct audits or inspections at our company stores. My audit plans have included price verification reviews inclusive of but not limited to: merchandising strategies, corroboration of price tags to point of sales systems, corroboration of point of sales systems to inventory records, refund audits, price adjustment and concession audits, price matching procedure reviews as well as price discrepancy remediation. In addition, through my profession, I have extensive knowledge of how participants in the retail industry engage in price verification, ensure that shelf prices match register prices, and address price discrepancy issues when they arise. I have experience making audit recommendations to executive management and the board in designing/enhancing processes that strive to ensure customers have accurate prices on the shelf. Moreover, I have knowledge of and experience with consumer behavior as it relates to price discrepancies and measures to prevent them.

I am a Certified Public Accountant, Certified Internal Auditor, Certified Regulatory Compliance Manager and hold a Certification in Risk Management Assurance. Attached as **Exhibit 1** is a true and correct copy of my current resume. Attached as **Exhibit 2** is my trial and deposition testimony experience. GLG is being compensated based upon my hours incurred and my hourly rate. Payment to GLG is not contingent upon my findings or the outcome of this matter. GLG is being compensated at a rate of $725 per hour for my time.

I have designed and utilized multiple price validation audit programs based on FTC guidelines and the NIST framework, specifically Handbook 130 and the Examination Procedure for Price Verification (EPPV).[1] Handbook 130's EPPV sets forth standards for performing price verification audits of retailers. My understanding is that New York has adopted NIST Handbook 130 and the EPPV. *See, e.g.*, 1 N.Y. C.R.R. 220.14. In my experience, most if not all state, county, and local auditors rely on the procedures in Handbook 130's EPPV when performing audits of retail stores. *See, e.g.*, DG_WOLF_0004243 & 0030123 ("All tests done in accordance with NIST Handbook 130."). Handbook 130 also discusses levels of enforcement actions. As per the Handbook, lower levels of enforcement actions include increased inspections, stop-sale or correction orders, warning letters, and other notifications of non-compliance. Higher levels of enforcement action may include issuance of citations, administrative hearings, or civil penalties. Whether lower or higher levels of enforcement actions are appropriate would be based on properly performed price verification audits that complied with Handbook 130's requirements. Some of the criteria used to determine the appropriate enforcement level include "[a] store's history of error rates, the time it takes a store to correct the errors, the difference in inaccuracy rates found between 'regular' and 'sale' priced items, the ratio of overcharges to undercharges, a record of valid consumer complaints, and the magnitude of the error(s)." *See* Handbook 130's EPPV at Section 11.2(d) at page 252. I frequently referred to Handbook 130 when designing, executing and reporting on price verification audits.

Over the years, I have assisted my organizations in establishing a robust system of internal controls as a result of these audits, some of which pertain to pricing accuracy.

## III. Facts, data, and information reviewed and relied on

The facts, data, and information available to me in forming my opinions are contained below or elsewhere in my report (including footnotes). My analyses and opinions are based upon the information available and my education and training. The information I am relying upon is information typically relied upon by experts in my field. I reserve the ability to (a) review documents, deposition transcripts, expert reports, or other information still to be produced by the parties to this dispute and (b) supplement my opinions based upon that review, if appropriate. I also reserve the ability to use demonstrative exhibits and/or other information at hearings/trial to explain and illustrate my opinions.

I have reviewed the Deposition Transcripts of Plaintiffs Joseph and Carmen Wolf, as well as individuals associated with Dollar General such as Mia Savaloja, Nicholas Snow, Brian Haug, Michelle Molthu and Connie Droge. I have also reviewed the accompanying exhibits such as audit reports from local auditors, various pricing files, email communication records, records from various New York counties as well as various policy and procedure documents inclusive of standard operating procedure manuals and safety and compliance manuals. I have had access to Dollar General's production in this litigation as provided to me by McGuire Woods, and have reviewed and relied on certain of those documents as indicated herein.

---

[1] The current version of NIST Handbook 130 (including the EPPV) can be found at https://nvlpubs.nist.gov/nistpubs/hb/2024/NIST.HB.130-2024.pdf.

## IV. Opinions

Review of these materials leads me to reach four main conclusions with regard to Plaintiffs' allegations in this case. First, many of the county audits relied upon by Plaintiffs and their expert Mr. Weir contain erroneous information. Second, the audit methodology followed by many of the county auditors was deficient. Third, failed audits do not necessarily mean that customers would end up being subject to overcharges for several reasons. Fourth, the culture of compliance at Dollar General related to pricing, price changes, and preventing price discrepancies is robust. My full opinions are below.

### A. Many of the county audits contain erroneous information.

Plaintiffs rely on county audits to support their damages calculations. *See* Second Amended Class Action Complaint, ¶¶ 35-42. Their expert, Mr. Weir, does as well. He appears to have conducted no analysis at all as to whether these audit results are actually accurate or whether they were performed in such a way that they can be relied upon.

Based on my extensive review and analysis of the county audit reports of Dollar General stores in New York, I conclude that there is significant evidence that many of the county audits were incorrect. Below are a few (non-exhaustive) examples:

- The item Old El Paso Grande Tortilla was identified as being an overcharge based on a March 10, 2023, audit of a Dollar General store in North Tonawonda, NY. The auditor found that the shelf price for this item was $5.50 and that it scanned as $6.50. *See* DG_WOLF_0004527. However, when Dollar General pulled the data for this item at that store, it showed that the price was actually $3.25. *See* DG_WOLF_40562 (DG Data tab, original sort order 1476). And all 8 of the sales of this item in that store in the 30 days preceding the audit date of March 10, 2023, were for $3.25. *Id*.

- The item True Living Single Roll Paper Towel was identified as being an overcharge based on a May 24, 2023, audit of a Dollar General store in Port Henry, NY. The auditor found that the shelf price for this item was $2.50 and that it scanned as $2.65. *See* DG_WOLF_0005903. However, when Dollar General pulled the data for this item at that store, it showed that the price was actually $1. *See* DG_WOLF_40562 (DG Data tab, original sort order 4460). And all 112 units sold in the 30 days prior to the audit on May 24, 2023, were sold for $1. *Id*.

- The item Bolthouse Farms Mocha Cappuccino was identified as being an overcharge based on an April 17, 2023, audit of a Dollar General store in Randomville, NY. The auditor found that the shelf price for this item was $2.95 and that it scanned as $3.50. *See* DG_WOLF_0005848. However, when Dollar General pulled the data for this item at that store, it showed that the price was actually $2.95. *See* DG_WOLF_0040562 (DG Data tab, original sort order 4439). And all 7 units sold in the 30 days prior to the audit on April 17, 2023, including one on the day before the audit, were sold for $2.95. *Id*.

- The item Tums Chewy Bites (32 Ct) was identified as being an overcharge based on a March 1, 2023, audit of a Dollar General store in Rochester, NY. The auditor found that the shelf price for this item was $5 and that it scanned as $5.75. *See* DG_WOLF_0004554. However, when Dollar General pulled the data for this item at that store, it showed that the price was actually $5. *See* DG_WOLF_40562 (DG Data tab, original sort order 1573, Columns W-AD). And the one sale of that item that had occurred in the 30 days prior to the March 1, 2023, audit was for $5. *Id*. (Transaction ID 1387414264).

- On November 15, 2021, an auditor inspected a Dollar General store in Barker, NY. In doing so, he noted that a Butterfinger bar in that store had a shelf price of $0.95 but had a register price of $1. *See* DG_WOLF_0004602. However, Dollar General pulled what the register price was for that item during that time frame, and it was listed as $0.95. *See* DG_WOLF_0040562. Moreover, during the 30 days preceding that audit, there were eight sales of that item, and all were for $0.95 rather than $1**.** *Id*.

- On March 24, 2023, an auditor inspected a Dollar General store in Queensbury, NY. In doing so, he noted that Skintimate shaving gel in that store had a shelf price of $3.65 but had a register price of $4.25. *See* DG_WOLF_0004243. However, Dollar General pulled what the register price was for that item during that time frame, and it was listed as $3.65. *See* DG_WOLF_0040562 (DG Data tab, original sort order 912, Columns W-AD). Moreover, during the 30 days preceding that audit, there were six sales of that item, and all were for $3.65 rather than $4.25. *Id*. (Transaction IDs 1503771987, 1511501617, 1728866098, 1736422318, 1751154827, 1829589685).

- On December 8, 2022, an auditor inspected a Dollar General store in Schroon Lake, NY. In doing so, he noted that Speed Stick deodorant in that store had a shelf price of $2 but had a register price of $2.50. *See* DG_WOLF_0004173. However, Dollar General pulled what the register price was for that item during that time frame, and it was listed as $1 (and had been at that same price for over ten months). *See* DG_WOLF_0040562 (DG Data tab, original sort order 785, Columns U-AD). Moreover, during the 30 days preceding that audit, there was one sale of that item, and it was for $1**.** *Id***.** (Transaction ID 771319062).

- On September 22, 2022, an auditor inspected a Dollar General store in Schenectady, NY. In doing so, he noted that a Degree Twin Pack of deodorant in that store had a shelf price of $6 but had a register price of $6.35. *See* DG_WOLF_0003976. However, Dollar General pulled what the register price was for that item during that time frame, and it was listed as $6 (and had been at that same price for at least two months). *See* DG_WOLF_0040562 (DG Data tab, original sort order 490, Columns U-AD). Moreover, during the 30 days preceding that audit, there were two sales of that item, and both were for $6**.** *Id***.** (Transaction IDs 136470760 & 212979590).

- On April 19, 2022, an auditor inspected a Dollar General store in Manchester, NY. In doing so, he noted that Rexall Ointment in that store had a shelf price of $3.25 but had a register price of $3.45. *See* DG_WOLF_0004136. However, Dollar General pulled what

the register price was for that item during that time frame, and it was listed as $3 (and had been at that same price for at least ten months). *See* DG_WOLF_0040562 (DG Data tab, original sort order 696, Columns U-AD). Moreover, during the 30 days preceding that audit, there was one sale of that item, and it was for $3**.** ***Id*****.** (Transaction ID 979402541).

- On July 29, 2022, an auditor inspected a Dollar General store in Waddington, NY. In doing so, he noted that Rx soft gels in that store had a shelf price of $6 but had a register price of $7.40. *See* DG_WOLF_0004263. However, Dollar General pulled what the register price was for that item during that time frame, and it was listed as $5.85. *See* DG_WOLF_0040562 (DG Data tab, original sort order 941, Columns U-AD). Moreover, during the 30 days preceding that audit, there were two sales of that item, and both were for $5.85**.** ***Id*****.** (Transaction IDs 297667704 & 213142768).

These are just a few examples of the inaccuracies in the audit data. It is unclear why so many of the audit reports were incorrect. It could be due to inspector error. A number of audits note that the inspector made an error, and in those, the auditor would state as much and not include the item that was originally flagged as an overcharge. *See, e.g.*, DG_WOLF_0030719, 0029331, 0030248, 0030261, 0030257, 0033077, 0033100, and 0005276. Based on my experience (and the many mistakes noted above), it is likely that other auditors made errors and did not admit, or even notice, such mistakes.

Or such errors could be due to customers moving products or peeling off shelf labels. There is evidence that both occurred in Dollar General stores. As to customers moving products, a number of audit reports noted this issue, *see, e.g.*, DG_WOLF_0006523, 0030772, 0031541, 0029323, 0029327, 0029634, 0005046, though many others did not. As for customers peeling off shelf labels, former Dollar General employee Connie Droge noted this in her deposition testimony. *See* 1/31/24 Dep. Tr. of Connie Droge at 22:12-18, 23:1-11.

In addition, such errors by the auditors could also be due to a technology issue. Auditors will often use a hand-held scanner (also known as a HHT) to perform audits rather than actually scan items at a register. *See, e.g.*, DG_WOLF_0030123 ("Pricing Accuracy was completed with a hand-held scanner loaned to me by the store manager."), 0030744 ("Returned Store's Scanner"), and 0004175. And Dollar General stores sometimes experienced a disconnect between the price on the HHT and at the register. In fact, it appears that Plaintiffs' counsel even asked a number of Dollar General witnesses about this phenomenon at several depositions. *See, e.g.*, Deposition of Michelle Molthu at 73:18-22, 104-105. There are also documents that have been produced that reference this known issue. *See* Exhibits 2 (DG_WOLF_0002553-2560) & 5 (DG_WOLF_0002450, 2511-2517) to 1/26/24 Dep. Tr. of Michelle Molthu.

Regardless of why many of these audits contain erroneous information, the simple fact is that they do. As such, in my opinion, it is improper for anyone to rely on these audits as an accurate source of information. In addition, it is particularly improper for Mr. Weir to place complete faith in these audit reports without conducting any review or analysis of the results and methodology.

## B. The Audit Methodology Followed By The Auditors Was Deficient

The audit methodology followed by the auditors in New York was deficient in several important ways.

### 1. Failure to meet the receipt requirement

One important deviation from EPPV procedures that is apparent in the county audit reports is the failure to meet the receipt requirement. Handbook 130 requires proper documentation of alleged pricing errors to substantiate any findings and requires an auditor to trace the price of the item selected from the shelf through handheld scanning to the point of sale (POS) system. For instance, Section 2.5 on p. 233 of the EPPV states that "if you use a hand-held scanner, verify all price discrepancies by scanning the item at a check-out register and request a printed receipt to document the price that consumers would be charged." Moreover, Section 6.2 on p. 237 states that "[i]f you use a cash register, verify the accuracy and legibility of information provided on register's receipts." Also, Section 8 on p. 249 states that "cash register receipts on verified items should be retained and attached to the inspection reports as evidence." And Section 8 on p. 249 also states that "printed advertisements and sales flyers should be retained and attached to the inspection report when errors are found in these categories."

Very few of the audit reports provided contained this information. This may be because as explained above, many auditors use a HHT device when conducting their audit. Failure to abide by the receipt requirement is a significant issue with the audit reports because, without this evidence, it cannot be verified that the auditor actually captured the register price that customers would be charged. And as explained in Section __ above, the direct result of this failure to follow the EPPV procedures was that many of the audits contain erroneous information. If the auditors had complied with the receipt requirement, issues such as the HHT issue identified above could have been avoided.

One of the few reports that did include a receipt attached to the audit report came from Monroe County. *See* DG_WOLF_0004556. This shows that county auditors understand that the receipt requirement is the correct way to conduct audits. For whatever reason, they just choose to ignore this requirement in many instances.

This failure of most county auditors to actually verify the charged prices of items at the register rather than with a HHT that may or may not be synced with the register is a serious oversight. Such verification could have easily been accomplished by using the scanner at the register, as is required by EPPV procedures. But most county auditors did not do so. This failure casts doubt on the entirety of the audit reports.

### 2. Failure to follow required sampling procedures

Second, it appears that a number of the auditors did not follow the required sampling strategies when the audits were conducted. The EPPV in Section 7.3.1 at page 239 states that "[s]amples should be taken from a wide variety of items (and merchandise groups) from locations

throughout the store or 'area'." Sampling strategies per Handbook 130 are either random or stratified. These sampling procedures are intended to determine how well a store maintains price accuracy on the whole. The relevant audit workpapers I reviewed for Dollar General stores in New York do not indicate either sampling procedure. A targeted/judgmental sampling approach, if employed, can potentially artificially inflate failure rates.

Audits are required to cover the entire store and demonstrate the sampling is proportionate to the store's coverage. It cannot be determined if this was followed from reviewing many of the audit workpapers. For example, the Erie County audit reports only list items where the auditor found errors instead of every item tested. *See, e.g.*, DG_WOLF_0003918 (Erie County, 12/16/20 audit of Amherst store #8366). Thus, a methodology covering the whole store cannot be ascertained, if any were employed. While the auditor states 200 items were selected, the location of the items tested and whether it was proportional to the store's area cannot be determined.

Moreover, it is clear that the sampling procedures used by many of the auditors did not follow the procedures established by Handbook 130's EPPV. Some even outright admitted it. *See, e.g.*, DG_WOLF_0004886 ("I scanned right side of store."). Dollar General stores on average carry approximately 19,000 unique items. *See, e.g.*, DG_WOLF_40637, 40797. The chances that auditors in different stores would randomly select the same items for inspection are very low. In some instances, the same exact item that was found to have a pricing discrepancy in one store was also soon thereafter selected by auditors in another store. For example, on March 9, 2022, an inspector with Oneida County randomly selected Devour creamy alfredo mac and cheese at a Dollar General store in Utica, NY, as one of 50 products to audit. *See* DG_WOLF_0004179. Nine days later, that same inspector randomly selected Devour creamy alfredo mac and cheese at a Dollar General store in New Hartford, NY, as one of 50 products to audit. *See* DG_WOLF_0003957.

Another example can be seen in an audit performed by a Niagara County inspector of a Dollar General store in Wilson, NY, on September 9, 2022, during which Air Wick Pure Auto Spray Refill 5.89 oz was randomly selected as one of 50 items to audit. *See* DG_WOLF_0003795. Four days later, on October 3, 2022, the same inspector visited a Dollar General store in Barker, NY, and also happened to randomly select Air Wick Pure Auto Spray Refill 5.89 oz as one of 50 items to audit. *See* DG_WOLF_0003796.

In addition, at least 45 different Artskills products were sampled from Aisles 18 and 19 at store 19579 in Barker, NY on March 25, 2021. *See, e.g.*, DG_WOLF_0004592-93. Six of those products were Artskills Watercolor Pencils, Artskill Crafting Stencils, Artskills Chalkboard Marker, Artskills Craft Pliers, Artskills Poster Board Glitter, and Artskills Poster Board Making Kit. Those same products were once again selected by an auditor on May 6, 2021 at store 15739 in Middleport, NY. *See, e.g.*, DG_WOLF_0004275. Both cities are within Niagara County approximately 200 miles apart.

Even Mr. Weir in his report acknowledges this. He notes that inspectors "randomly" selected several items in a Dollar General store in Port Henry, NY, on both November 17, 2022, and then again on January 24, 2023. *See* Table 2 in Declaration of Colin B. Weir on pages 7 & 8. Those items were: (1) DG Health Roll on Hot/Cold (see DG_WOLF_0004558 & 0005450), (2)

French's Yellow Mustard (DG_WOLF_0004561 & 0005451), and (3) Starkist Tuna (DG_WOLF_0004561 & 0005490); (5) One A Day Men's 100 Count (DG_WOLF_0005489 & 0004558). He also notes that Mr. Clean Wide Angle Broom Dustpan was "randomly" selected for inspection on both November 17, 2022, and January 1, 2023 (DG_WOLF_0004507 & 0005492). He states that this item was also inspected on January 24, 2023, but he is mistaken. For all of these items discussed earlier in this paragraph, only 100 items were selected for each audit. The fact that the same items were selected in different audits is no coincidence, and it certainly was not random.

The EPPV in Section 7.3.1.1.(c) at page 242 states that "[o]nly select one item from each brand or product (if they are the same price) from a display that has two or more items of the same products size and price displayed side by side." The EPPV in Section 7.3.1.1.(e) at page 243 similarly says that "[t]he sample should not include more than one of the same item from the same display." But it is apparent from the audit reports that some county auditors would repeatedly select the same products and/or brands in their audits at Dollar General stores.

For example, in a March 31, 2021, audit of a Dollar General store in Schenectady, NY, the auditor selected 108 items; of those, 16 were various brushes and combs, and 8 were various types of vitamins. *See* DG_WOLF_0004888-95. Also, in a February 23, 2021, audit of a Dollar General store in Barker, NY, the auditor selected 50 items; of those, Froot Loops made up 3 of those, Chex Mix made up 2, Snickers made up 2, and Dawn Platinum made up 2 (all of these included individual prices and promotions). *See* DG_WOLF_0006073. In addition, in an audit of 108 items on November 9, 2021, at a store in Scotia, NY, six of the items were bottled waters. *See* DG_WOLF_0030348.

This violates Handbook 130's EPPV procedures and, as a result, likely led to artificially inflated failure rates for Dollar General stores. The fact that the same county inspectors would violate the EPPV procedures in this way casts doubt on the accuracy and reliability of these audits.

**3. Failure of auditors to consistently exclude certain kinds of errors**

A third deviation from EPPV procedures that is apparent in the county audit reports is the apparent failure of some auditors to exclude certain kinds of errors from their audit reports. The EPPV states in Section 9.1 on p. 249 that "[a]n error found to result from any of the following cases should not be considered a violation for enforcement purposes" and goes on to list "[a]n intentional undercharge" and "[a]n error obviously caused by a price label that is missing or that has fallen off the shelf" as well as an error caused when "the item or the price label or sign has obviously been relocated by an unauthorized person." However, New York county auditors apparently included all of these kinds of errors when determining whether Dollar General had failed the audits. For instance, some auditors included undercharges in their accuracy percentages. *See, e.g.*, DG_WOLF_0004248. Others included items with no shelf tags in their accuracy percentages. *See, e.g.*, DG_WOLF_0004299. Conversely, inspectors in St. Lawrence County routinely noted when customers moved items and would not count such price discrepancies as violations. *See, e.g.*, DG_WOLF_0004582, 0004290, 0004254, 0004260, 0004286, 0004292, 0006523, 0030772, 0031541, 0029323, 0029327, 0029634, 0005046. In randomly selecting their items, only the auditors in St. Lawrence County made note of instances when it appeared a

customer had moved the applicable item. That suggests two possibilities: either (1) only customers in St. Lawrence County stores moved items, or (2) auditors in other counties recorded price discrepancies against Dollar General even when caused by customers moving items. Certainly, the latter possibility seems likelier. This is further supported by testimony from a former Dollar General employee who reported that these occurrences happened with some frequency. *See, e.g.*, 1/31/24 Deposition Tr. of Connie Droge at 22:12-18, 23:1-11 ("I can tell you specifically – like one thing I remember is like customers removing price tags and, you know, taking stickers off with them. And so that would have caused a price accuracy error.").

In addition, auditors would sometimes document their own "inspector errors" in the audits I reviewed. *See, e.g.*, DG_WOLF_0005276, 0029331, 0030248, 0030257, 0030261, 0030719, 0033077, 0033100, and 0004292. In fact, in one audit, the auditor had 3 separate "inspector errors." *See* DG_WOLF_0030261. It is good that at least these inspectors would acknowledge their errors, but it is worrisome that most other audits did not include such mea culpas. That suggests that it is certainly possible (perhaps even probable) that many of these audits included inspector errors that were not acknowledged. The examples discussed above in Section IV.A. certainly suggest so. Moreover, I noticed that Plaintiffs mistakenly included some items that were marked as "inspector errors" and "customer moved" in the spreadsheet data that was given to Dollar General. For instance, in an inspection on November 4, 2022 of a Dollar store in Norwood, NY, an inspector originally marked a Glad quart item as an overcharge, but then reversed it and said "customer moved item;" he also originally marked a White Claw as an overcharge, but then reversed and said "inspector error." *See* DG_WOLF_0004292. Yet both mistakenly appear as overcharges in the audit data that Mr. Weir relies on. *See* DG_WOLF_0040562 (DG Data tab, original sort order 1088 & 1089). The same thing happened in an inspection of a Dollar General store in Waddington, NY, on October 19, 2021. The inspector originally marked a CV Healthy Cream item as an overcharge, but then reversed it and stated "OK-Inspector Error." DG_WOLF_0006527. Yet once again, this item appears as an overcharge in the audit data on which Mr. Weir relies. *See* DG_WOLF_0040562 (DG Data tab, original sort order 1154, 4791, 4815, 4831). In fact, the audit data includes 16 sales (though some are duplicates, which is yet another significant problem with the audit data) that Mr. Weir mistakenly included in his figures as an overcharge. *Id.*

**4. Other failures**

The Plaintiff's report focuses on problems with customers being overcharged. However, a number of audit reports identified undercharging. For example, in Exhibit 5 to the 12/14/23 Depo. Tr. of Mia Savaloja, page 3, Kraft Cheese Grated Parm in 8 oz is shown as $4.35 as per the shelf price and $4.25 as per the charged price upon scanning the item ($0.10 better for the customer). Similarly, Heartland Farm Bone PB Filled 4 ct. is shown as $4.35 as per the shelf price and $4 as per the charged price upon scanning the item ($0.35 or 8% better for the customer). In Exhibit 6 to the same deposition, Whole Milk 1 Gallon is shown to be $4.25 as per the shelf price compared to $4.15 at the counter ($0.10 better for the customer). While Handbook 130 recognizes that both overcharges and undercharges can be counted for purposes of calculating compliance with the 2% threshold, undercharges should not be considered for higher levels of enforcement. Further, undercharges demonstrate there is no deliberate attempt to harm customers through pricing. Notably, many other audits of Dollar General stores in New York indicated that there

were a number of undercharges in those stores. *See, e.g.*, DG_WOLF_0006528, 0031595, 0033056, 0033069, 0033277, 0029323, 0029327, 0030248, 0030257, 0004867.

Below are a few other errors and deviations from procedure that I saw in the county audit reports for Dollar General stores in New York:

- There were a number of items that were identified as overcharges in audit reports that Dollar General was subsequently unable to match to one of its products sold in that store. In fact, in one audit that occurred on November 17, 2022, at the Dollar General store in Port Henry, NY, the following four items in the audit report were all listed as overcharges: (1) Swiffer Wet Jet Refill unstoppables; (2) Sweet Sues chicken; (3) Comfort Bay shower set 13 piece; and (4) Comfort Bay window pnl black 28X63 2 count. *See* DG_WOLF_0005490, 5492. Yet Dollar General was unable to find any match for these four products. *See* DG_WOLF_0040562 (DG data tab, original sort orders 2703, 2665, 2648, and 2644, respectively. This is a significant problem that indicates that perhaps the auditor scanned the wrong item. Regardless of the cause of the problem, the audit report did not ultimately serve its purpose: if Dollar General does not know which of its current products failed an audits, then Dollar General cannot fix any issues. It is incumbent on the auditor to accurately catalog the items that are inspected, and that did not happen in at least some of the audits of New York Dollar General stores.

- Relatedly, there were a number of items that auditors identified in their audit reports as being overcharges and having a specific charged price that ended up not matching the prices that Dollar General had on file. For instance, in an audit of a Dollar General store in Schenectady, NY, on Sept. 15, 2022, the auditor found that a shredded cheese item had a shelf price of $2.50 and had a charged price of $3.25. *See* DG_WOLF_0004816. But Dollar General's data showed that the price was only $2, and that it had been at that price for almost two years. *See* DG_WOLF_40562 (DG Data tab, original sort order 2189). It is unclear whether this is an example of a mistake by an auditor or something else. Regardless, this too casts doubt on the reliability of the audit data.

- There was sometimes a significant lag between when an audit occurred and when that audit was sent to Dollar General. *See, e.g.*, DG_WOLF_00031670 (16-day lag); DG_WOLF_0029329 (17-day lag); *see also* Exhibit 5 to 12/14/23 Depo. Tr. of Mia Savaloja (62-day lag); Ex. 6 to same deposition (41-day lag).

- At other times, failed audits of one store were mistakenly sent to the wrong store. *See, e.g.*, DG_WOLF_0030259 (inspection was for store 16163 but sent to store 15824).

- Transcription errors. For instance in one audit, the auditor should have noted the amount of the overcharge as $0.25 but mistakenly noted it as $0.15. Though this may seem a minor mistake, it demonstrates that mistakes are easy to make if auditors are not careful. *See* DG_WOLF_0033077 & 0033100.

- Auditors routinely included items on promotions as part of their audits. *See, e.g.*, DG_WOLF_0030271, 0028702, 0003786, 0003798, 0003800, 0003802, 0003806. While some auditors would sometimes note if there were expired offer tags still on display, *see* DG_WOLF_0004872 ("16 expired sale/promotional offer tags were found and removed"), most auditors never noted whether these promotions were still active or not. Dollar General's promotions have an expiration date on them that customers can view. *See, e.g.*, DG_WOLF_00040565-40628. It is likely that at least some of these promotions had expired at the time the audits were performed, and the expiration date should have been documented by the auditors. I note that Dollar General produced data showing that over 2500 transactions for items that failed audits were subject to some kind of promotion close in time to the failed audit. *See* DG_WOLF_0040636.

Moreover, there are a few other issues I want to note as to the audit reports. There are some additional reasons why one should not attempt to use these audit results for any reason other than the specific purpose the auditors were using them for. These include:

- A number of local laws governed the outcome of these audits (but not the procedures), and these laws have rules that differ. *See, e.g.*, DG_WOLF_0006331-38 (Erie County's Scanner Accuracy Law, which provides for penalties even when there was one price overcharge in a store); DG_WOLF_0006521 (mentioning Local Law No. 6); DG_WOLF_0033058 (noting that Schenectady's pricing accuracy law in local law 9-2000).

- Also, penalties were sometimes issued by auditors even when there were no wrong prices, but just prices missing. *See, e.g.*, DG_WOLF_0032970, 0033254, 0028106, 0028756, 0028841, 0033059.

- Some jurisdictions require item pricing. *See, e.g.*, DG_WOLF_0030270 ("Requires single item price."). In such jurisdictions, even if a shelf label was correct, an auditor might still find that there is a violation if not every item had a price. This could sometimes lead to situations where some items were individually priced at the correct price while others perhaps had the incorrect price. *See, e.g.*, DG_WOLF_0030122-29 ("Most").

**5. Conclusion on methodology**

These deviations show that some county auditors were inconsistent in applying the EPPV procedures, and this casts further doubt on the reliability of these audits of Dollar General stores in New York as a whole, as well as a tool for attempting to determine how many price discrepancies actually existed.

These deviations are so serious that many of the audits of Dollar General stores in New York would not pass a Quality Assurance and Improvement Program (QAIP) audit conducted by a company's Internal Audit function. The Internal Audit profession is governed by The Institute

of Internal Auditors (IIA), which is an international professional association and the profession's leader in standards, certification, education, research, and technical guidance. The IIA's International Professional Practices Framework (IPPF) requires all Chief Audit Executives (CAEs) or Head of Audit Departments to develop a QAIP that includes both internal and external assessments. The QAIP must include ongoing and periodic internal assessments, and external assessments by a qualified independent assessor or assessment team from outside the organization. The Standards, promulgated by The IIA, are the primary mechanism for ensuring an organization's internal auditors consistently and accurately provide essential services in a timely, cost-effective manner. While the county audits at issue are not necessarily required to pass a QAIP audit, the fact that very few if any of the county audits would have passed a QAIP further supports my opinion that there were serious methodological flaws in these audits.

### C. Failed Audits Do Not Necessarily Mean That Customers Were Overcharged

Just because there was a failed audit for particular items does not mean that customers would have been overcharged for those items. There are a number of opportunities for consumers to understand the prices they are being charged for items prior to leaving the Dollar General store. These include: (1) the monitor at the checkout; (2) a receipt given at the register; (3) a customer price scanner in a number of NY stores (*see* DG_WOLF_0040798 & 0004291, 4583, 4268);[2] (4) the cart calculator (i.e., price-check) function in the myDG app (*see* DG_WOLF_0003304-05); and (5) a confirmation screen of the total amount of the transaction for most credit card transactions (*see* DG_WOLF_40629). Also, as noted above, many promotional signs in Dollar General stores had expiration dates on them, allowing customers to immediately know if the relevant discount was still active. Indeed, the EPPV even acknowledges the importance of the first measure above, stating in Section 6.1 on p. 237: "The importance of consumer access to the cash register display of product information and price cannot be overstated. If consumers cannot verify prices as the items are being scanned, they must wait until the transaction is completed . . . before they receive the receipt and can confirm the prices charged for the items." My understanding is that many states including New York require point-of-sale displays. *See* 1 N.Y. C.R.R. 220.2(a).

And there are also ways for customers to get reimbursed for the difference between the shelf price and the register price if a discrepancy exists. Dollar General has a price override policy allowing just this. *See* DG_WOLF_0021416-17 (SOP 88). And a number of Dollar General stores in New York had signs publicizing this price override policy. *See* DG_WOLF_40564. Testimony from Dollar General employees indicated that these price overrides were sometimes given just on the say-so of the customer without any independent verification. *See* 12/14/23 Dep. Tr. of Mia Savaloja at 111:1-3 ("There are situations where we have overrides because the employee just wants to make the customer happy.") Almost 7 million items were subject to price overrides[3] in New York Dollar General stores during the class period. *See* DG_WOLF_40641. Moreover,

---

[2] A number of audits confirmed that there was a customer price check scanner available in Dollar General stores in New York. *See, e.g.*, DG_WOLF_0006528, 0006523, 0030772, 0031595, 0033056, 0033069, 0029323, 0029327, 0029331, 0029630, 0030248, 0030261, 0030257.

[3] Based on my understanding of Dollar General's price override system, price overrides can occur for several reasons, and there is no way to determine whether a particular price override was due to a price discrepancy or not.

customers even after leaving the store, can always return and obtain a refund for a price discrepancy they might notice later. During the class period, Dollar General has records that over 8 million items were returned for a refund, some of these likely due to price discrepancies. *See* DG_WOLF_40642.

The safeguards in effect to prevent a price discrepancy are robust and are comparable to, and even exceed, what many in the industry have in place. Former Dollar General employee Connie Droge, who now works at a different retailer, agrees. *See* 1/31/24 Dep. Tr. of Connie Droge at 24:10-13 ("Q: So in 2022, you feel like DG took measures which you consider to be above and beyond to ensure accurate pricing? A: Yes."); 25:8-12 ("I feel like in my experience in retail for 25-plus years – I have not seen measures taken that broadly to make sure prices were accurate. So for me, like I feel like the effort exceeded what would be normal."). These safeguards should work in many instances to prevent an actual price discrepancy from ultimately occurring whereby a customer ends up overpaying for a product. In my experience, customers pay close attention to price and utilize the safeguards at their disposal to prevent them from paying more than the shelf price. Moreover, in my experience, upon noticing a price discrepancy, customers will almost always ask for a price override or a refund if the price difference matters to them. There is certainly ample evidence that Dollar General customers took advantage of the price override policy. *See, e.g.*, DG_WOLF_0040641; *see also* examples or price override receipts at DG_WOLF_0003369, 3472; *see also* DG_WOLF_0003652. There are also examples of customers who later went back to the store at a later time and got their money back. *See, e.g.*, DG_WOLF_0003340 & 3362. In fact, one Dollar General employee, Mia Savaloja, stated at deposition that Dollar General employee would give overrides just "to make the customer happy." 12/14/23 Depo. Tr. of Mia Savaloja at 111:1-3. That the Plaintiffs in this case did not attempt to obtain a price override or refund despite knowing about the price discrepancies strongly suggests that they are unlike many other retail customers.

**D. Dollar General's culture of compliance and operations related to pricing are reasonable and are as good as any in the industry.**

Dollar General's efforts to establish a strong culture of compliance is evident in the record. Some of the evidence of this culture of compliance that I noticed during my review of relevant documents includes:

a. **Proactive handling of customer pricing complaints.** Numerous exhibits inclusive of email communication demonstrate proactive handling of customer complaints specific to pricing. Mia Savaloja mentioned in her deposition that: "There are situations where we have overrides because the employee just wants to make the customer happy." 12/14/23 Depo. Tr. of Mia Savaloja at 111:1-3.
b. **A policy of providing customers with refunds in the event of an overcharge.** SOP88, Dollar General's Customer Overcharges Customer Service Policy, is very clear on customer restitution in the event of an overcharge. *See* DG_WOLF_0021416-17 (SOP 88).
c. **Robust training on pricing activity.** Exhibit 2 to the 12/14/23 Depo. Tr. of Mia Savaloja demonstrates the resources allocated to training and awareness. Training

records indicate that 4,827 company associates in the New York area successfully completed the 2023 Pricing Accuracy CBL. *See* DG_WOLF_0040630.

d. **Ample evidence that Dollar General employees take customer pricing complaints very seriously.** Exhibit 11 to the 12/14/23 Depo. Tr. of Mia Savaloja demonstrates the urgency with which Dollar General employees react when a price discrepancy is identified and how seriously they take it. It is a letter from Regional Director Jessica Smith to field teams. Exhibits 12 and 13 to the same deposition show diligence and persistence in following up by the same Regional Director. Deposition testimony supports this as well, showing that employees would often take whatever steps they could to cure a price discrepancy. *See, e.g.*, 1/26/24 Depo. Tr. of Michelle Molthu at 48:5-8, 60:20-22, 94:13-17, 129:20-25. When asked whether doing these things was "standard protocol," Ms. Molthu answered "yes." *Id*. at 145:21-22. *See also* DG_WOLF_0035938, 0035940-42, 0035945, 0035946-51.

e. **Field leadership actively working to identify and solve possible pricing issues.** Several exhibits to the depositions demonstrate self-identified opportunities that were communicated across teams in various email messages. Thus, rather than waiting for a county audit report to potentially identify failures, Dollar General's field leadership was proactively attempting to identify them. *See, e.g.*, Exhibits 11 & 12 to 1/26/24 Dep. Tr. of Michelle Molthu.

f. **Financial investments to increase pricing accuracy.** Exhibit 4 to 12/14/23 Dep. Tr. of Mia Savaloja is a Safety and Compliance manual that demonstrates ongoing investment in pricing accuracy programs. For example, $15M was earmarked just in Q4 of 2022 for a variety of initiatives, some of which related to price accuracy (Force Print Label technology mentioned as an example on page 5 as well as additional hours dedicated to pricing audits). Moreover, as noted below, there are a number of newer initiatives related to price accuracy that Dollar General has instituted that required substantial investment.

g. **Ad hoc correction of pricing issues at the store level.** There is ample evidence in the record to demonstrate that stores address price mismatch issues where and when identified as evident in Exhibit 11 of 12/12/23 Dep. Tr. of Brian Haug. Michelle Molthu mentions in her deposition: "If there is an issue, the clerk would fix it for the customer." 1/26/24 Depo. Tr. of Michelle Molthu at 74.Additionally, several emails in the exhibits demonstrate a proactive culture of compliance (example: emails from Michelle Molthu to Management regarding price opportunities that were self-identified by Dollar General Corporation team members). *See, e.g.*, 1/26/24 Dep. Tr. of Molthu at 48:5-8, 60:20-22, 94:13-17, 129:20-25.

h. **The creation of tools to increase pricing accuracy.** For instance, Dollar General created a report to make clear which stores printed labels in a timely manner. *See* 12/14/23 Dep. Tr. of Mia Savaloja at 106:1-107:5. It also implemented force-printing labels for stores when price overrides were performed at the store in the previous week. *See* 12/14/23 Dep. Tr. of Mia Savaloja at 108:16-113:19. And it also sentlabels to stores on an ad hoc basis such as when sales for an item are low. *See* 12/14/23 Dep. Tr. of Mia Savaloja at 113:21-115:24..

i. **Implementation of a dedicated compliance shift to include pricing activity.** Compliance Tuesday, which I understand is a dedicated four-hour shift at the beginning of the day at Dollar General stores in New York to perform compliance actions, including pricing. *See* 12/14/23 Dep. Tr. of Mia Savaloja at 116:2-127:12.

One thing to note is that retailers have always had some difficulty achieving 100% success in always matching the shelf price and the charged price. For instance, it is estimated that Dollar General would have had over 10 million items on the shelves of its New York stores at any one time. With the sheer number of stores and items in a store, and the fact that manual labor is required to effectuate price changes, retailers have always been challenged in this regard. Keep in mind that changing the price at most retailers, including Dollar General, is a two-step process. The first step is electronically updating the point-of-sale system. The second step is the more difficult part; the labels for the items that were changed need to be manually changed on the shelves. To do so, employees must print out the new shelf labels, and then the employees must locate the item that needs a new price and place the new shelf label.

One of the reasons that most governmental auditors only require 98% accuracy rather than 100% accuracy is because of the sheer number of items in stores as well as the manual aspect of placing new shelf labels. Indeed, the EPPV states at Section 10 at page 250 that "[r]andom pricing errors are to be expected . . . ." But this issue became an even bigger challenge in recent years. The COVID Pandemic caused significant disruption to businesses, particularly retail businesses where employees were required to physically interact with customers, and where supply chain disruptions led to higher than traditional levels of price volatility. Retailers (inclusive of my employer) struggled to hire and retain talent, oftentimes asking existing staff to work longer hours and juggle multiple responsibilities that traditionally would be handled by different roles.

Pricing discrepancies can occur at any retailer. These can occur due to genuine human error, because customers move items from one shelf to another, because dates on promotional materials differ from the dates a customer makes a purchase, or due to a bundled pricing deal which affects individual item prices when bought individually instead of in a bundle. Dollar General has provided a variety of methods by which a customer can confirm prices prior to making a purchase. These include a mobile app for price checks, store employees who can confirm prices, and customer-facing displays at the check-out counter. If, regardless of these measures, a customer is overcharged inadvertently, a clear refund policy is a common practice at most retailers, including at Dollar General. In addition, when Dollar General received complaints about pricing discrepancies, its employees were very proactive in addressing them. Dollar General would reach out to the customers and on some occasions, send them a gift card. *See, e.g.*, DG_WOLF_0003291, 3614-17, 3706, 3720, 3735.

It appears that Dollar General's culture of compliance and the measures described above have been effective. My understanding is that approximately 99% of the items in New York Dollar General stores that have been audited by Steritech in the last 9 months have had shelf prices that match the charged price. *See* DG_WOLF_0040560.

Based on my review of the materials and considerations raised above, it is clear that Dollar General did not deliberately intend to mislead customers through its pricing programs. In fact, the

evidence is quite to the contrary. Despite labor and supply chain disruptions during and after the COVID pandemic, which presented retailers with significant challenges specific to pricing, Dollar General worked very hard to prevent price discrepancies. Dollar General has a strong culture of compliance with many mechanisms in place to avoid overcharges, inclusive of the training and investment necessary to help its personnel succeed in complying with pricing regulations. Clear policies exist to refund any overcharge when a customer points it out. Cash registers include screens that show a customer any item's price upon scanning the item at check-out. A mobile phone application is available to conduct a price check. And of course, a customer is not obligated to purchase a product and can refuse at any point as stated in the testimony at DG_WOLF_0002460-61. In short, there is ample evidence in the record that Dollar General took appropriate measures to ensure that its customers had multiple opportunities to see the prices they were paying and had policies in place to "make it right for the customer" in the event of any alleged overcharge.

## V. Conclusion

My analyses, observations, and opinions contained in this report are based upon information available to date. I hold the opinions disclosed in this report to a reasonable degree of certainty. I reserve the ability to review documents, deposition transcripts, or other information still to be produced by the parties to this dispute and to supplement my opinions based upon that review.

Executed on: March 18, 2024

Sunil Sajnani, CPA, CIA, CRCM, CRMA