# EXHIBIT 10

Page 1

1                    UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF NEW YORK
2
3                  CASE NO.:  7:23-cv-00558-PMH
4                                              )
     JOSEPH WOLF, CARMEN WOLF,                 )
5    ON BEHALF OF THEMSELVES AND THOSE         )
     SIMILARLY SITUATED,                       )
6                                              )
              Plaintiffs,                      )
7                                              )
     v.                                        )
8                                              )
     DOLLAR GENERAL CORPORATION,               )
9    DOLGEN NEW YORK, LLC D/B/A                 )
     DOLGEN, DOLGENCORP OF TEXAS, INC.,        )
10   INDIVIDUALLY, JOINTLY, SEVERALLY,         )
     OR IN THE ALTERNATIVE,                    )
11                                             )
              Defendants.                      )
12   _____)
13
14
15
16           VIDEOTAPED DEPOSITION OF SUNIL SAJNANI
17              TAKEN BY REMOTE VIDEOCONFERENCE
18
19        TAKEN BY:    Plaintiffs Herein
20        DATE:        Friday, April 19, 2024
21        TIME:        12:01 p.m. CST to 4:29 p.m. CST
22        PURSUANT TO:  Plaintiff's Notice of Deposition
                        of Sunil Sajnani
23
          REPORTED BY:  Laura S. Eder, RMR, FPR
24                      Notary Pubic
25                      State of Florida at Large

Page 2

1   A P P E A R A N C E S:

2   On Behalf of the Plaintiffs:

3           ADAM A. EDWARDS, ESQ.
            Milberg Coleman Bryson Phillips Grossman, PLLC

4           800 South Gay Street, Suite 1100
            Knoxville, Tennessee 37929

5           aedwards@milberg.com

6

7           JAVIER L. MERINO, ESQ.
            The Dann Law Firm, PC

8           1520 U.S Highway 130, Suite 101
            North Brunswick, New Jersey 08902

9           jmermino@dannlaw.com

10

11

12   On Behalf of the Defendants:

13           R. TRENT TAYLOR, ESQ.
             McGuire Woods

14           Gateway Plaza
             800 East Canal Street

15           Richmond, Virginia 23219
             rtaylor@mcguirewoods.com

16

17

18

19   Also Present:

20       Andrew Baker, Videographer

21

22

23

24       * * * ALL ATTENDEES APPEARED REMOTELY * * *

25

Page 3

1    Videotaped Deposition of:   SUNIL SAJNANI
2                         I N D E X                    Page
3    Examination by Mr. Edwards  . . . . . . . . . . .  5
4    Certificate of Oath of Witness. . . . . . . . . .134
5    Reporter's Deposition Certificate . . . . . . . .135
6    Read and Sign Letter. . . . . . . . . . . . . . .136
7    Errata Sheet (to be forwarded upon execution) . .137
8
9                     E X H I B I T S
10   Number        Description                        Page
11   Exhibit 1     Plaintiffs' Notice of Deposition . . . 10
12   Exhibit 2     Sajnani report with exhibits . . . . . 21
13   Exhibit 3     DG spreadsheet DG_WOLF_40562 . . . . . 53
14   Exhibit 4     Definitions for Spreadsheet
                   DG_WOLF_0040563. . . . . . . . . . . . 56
15
16   Exhibit 5     Audit Data Rexall DG_WOLF_0004136 to
                   0004137. . . . . . . . . . . . . . . . 65
17
18   Exhibit 6     DG website Rexall Bacitracin Ointment. 70
19   Exhibit 7     Tums NY Audit DG_WOLF_0004552 to
                   0004554. . . . . . . . . . . . . . . . 74
20
21   Exhibit 8     Walmart Tums Chewy 32-Count. . . . . . 86
22   Exhibit 9     DG Tums Chewy Bites. . . . . . . . . . 88
23   Exhibit 10    DG website 60-Count Tums Smoothies . . 90
24   Exhibit 11    Audit Report Old El Paso Tortilla. . .108
25   Exhibit 12    Skintimate Gel Audit . . . . . . . . .118

Page 4

1             P R O C E E D I N G S:

2             THE VIDEOGRAPHER:  Good afternoon.  We are

3      going on the record at 12:01 p.m., Friday,

4      April 19th, 2024.  This is Media Unit 1 of the

5      video-recorded deposition of Sunil Sajnani, as

6      taken by counsel for plaintiff, in the matter of

7      Joseph Wolf et al. v. Dollar General Corporation

8      et al., filed in the United States District Court

9      of the Southern District of New York, Case

10      No. 7:23-cv-00558-PMH.

11             My name is Andrew Baker, from the firm

12      Veritext Legal Solutions; I am the videographer.

13      The court reporter is Laura Eder, also from

14      Veritext Legal Solutions.

15             Will counsel now state their appearance and

16      affiliations for the record, beginning with the

17      noticing attorney.

18             MR. EDWARDS:  Adam Edwards, with the Milberg

19      firm, for the plaintiffs and the proposed class.

20             MR. MERINO:  Javier Merino, of The Dann Law

21      Firm, for the plaintiffs and the proposed class.

22             MR. TAYLOR:  Trent Taylor on behalf of

23      Dolgen New York, LLC d/b/a Dollar General

24      Corporation.

25             THE COURT REPORTER:  Sunil, would you please

Page 5

1       raise your right hand.

2   THEREUPON,

3                           SUNIL SAJNANI

4   was adduced as the witness herein, and being first duly

5   sworn on oath, was questioned and testified as follows:

6               THE WITNESS:  I do.

7               THE COURT REPORTER:  Thank you.

8               MR. EDWARDS:  All right.  Anything you want

9          to put on the record, Trent, before we get

10         started?

11              MR. TAYLOR:  I do.  You know me all too

12         well, Adam.

13              I just wanted to put on the record that the

14         deposition testimony and exhibits here today are

15         governed by the protective order in this case,

16         and we will make the appropriate confidentiality

17         designations, pursuant to that protective order,

18         at the appropriate time.

19              MR. EDWARDS:  All right.

20                          EXAMINATION

21   BY MR. EDWARDS:

22         Q.   I'll ask you to go ahead and state your full

23   name, sir.

24         A.   Sunil Sajnani.

25         Q.   All right.  Mr. Sajnani, you list -- is it

1  accurate to say you've given depositions six times in

2  the past?

3      A.   Six times?  That's -- a lot of those are

4  expert opinions; some of those are depositions.

5      Q.   All right.  Let me rephrase the question.  How

6  many times have you been deposed prior to today?

7      A.   Twice, not including internal corporate

8  matters.

9      Q.   Okay.  When you -- have you been deposed in

10 internal corporate matters?

11     A.   Yes, internally.

12     Q.   That would be testimony where you were

13 questioned and gave answers under oath?

14     A.   Correct.

15     Q.   Okay.  That's not something that I'm familiar

16 with.  Explain what you mean when you say that you've

17 given depositions in internal corporate matters.

18     A.   Yeah.  Mostly human resources-type matters

19 where you have some type of dispute, those kinds of

20 things, mainly.

21     Q.   Okay.  For what companies?

22     A.   This was mainly Santander.

23     Q.   Say that again.

24     A.   Santander.  It's a Spanish bank.

25     Q.   Okay.  Spell that, please.

1          A.    S-A-N-T-A-N-D-E-R.

2          Q.    I'm going to get back to that, but I'll just

3    continue, then, with my, kind of, introductory things.

4                I'm going to be asking you a number of

5    questions today, and I'm going to try to be as clear as

6    I can with the questions that I ask.  Inevitably, I will

7    ask a question which is not phrased well or may come off

8    as confusing.  If -- if you don't understand a question

9    that I'm asking, I'll ask you to rephrase it (sic).

10   Okay?  You're not going to hurt my feelings.

11               Can we agree to that?

12         A.    Yes.

13         Q.    All right.  If I do ask you a question,

14   though, and you give me a response without asking me to

15   rephrase it, I will assume that you understood.

16               Can we agree to that?

17         A.    Yes, we can.

18         Q.    Okay.  One thing that's important to make a

19   clear record and to help out our court reporter, who has

20   a difficult job, is that we both try to avoid talking

21   over each other.  I've been guilty of it myself.  But if

22   you will do your best to let me get out my entire

23   question before you jump in with an answer, and I will

24   try to do the same when you're answering.

25               Can we agree to work on that together today?

Page 8

1        A.    Yes, we can.

2        Q.    Okay.  What did you do to prepare for your

3   deposition today?

4        A.    I reread my expert opinion report and briefly

5   glanced at a supplemental report by Mr. Weir.

6        Q.    Did you do anything else to prepare for your

7   deposition?

8        A.    Met with Mr. Taylor for roughly three to four

9   hours yesterday and the day prior, and that's it.

10       Q.    Where did you meet with Mr. Taylor?

11       A.    Here at the same place.

12       Q.    Where are you giving your deposition today?

13       A.    We're in a remote office, similar to a WeWork

14   concept.

15       Q.    Where?

16       A.    This is in Las Colinas, Irving, Texas, at a

17   place called Foster Coworking Space.

18       Q.    So you're in -- you're currently giving your

19   deposition from Irvine, Texas?

20       A.    Irving.

21       Q.    Irving.

22       A.    Sorry.

23       Q.    Okay.  All right.  Other than the -- you told

24   me you briefly reread your report, you read a

25   supplemental report of Mr. Weir, and you met with

1  Mr. Taylor yesterday for approximately three to four

2  hours; is that all correct?

3       A.   That's correct.

4       Q.   Okay.  Did you do anything else to prepare for

5  your deposition today?

6       A.   No, I did not.

7       Q.   When you met with Mr. Taylor, was there anyone

8  else in the room?

9       A.   No, there was not.

10      Q.   Was there anyone attending that meeting by

11  telephone or Zoom?

12      A.   No.

13      Q.   Okay.  All right.  We'll go ahead and make

14  this depo notice the first exhibit.  I do this just to

15  make sure that we are both familiar with how marking

16  exhibits work.  So I'm going to go ahead and introduce

17  this one.

18           All right.  You should be able to refresh now.

19  Hmm.  That's odd.  I don't see my sticker on here.  Try

20  this -- we'll go back and try this again.  It's not

21  always a well-oiled machine.  I'll try a different way.

22           Okay.  Now, refresh and see if you've got

23  Exhibit 1.

24      A.   I don't see it.

25      Q.   All right.

Page 10

1          MR. EDWARDS:  Trent, I think we can go off

2      the record for a second and --

3          MR. TAYLOR:  Okay.

4          MR. EDWARDS:  -- maybe -- maybe help

5      Mr. Sajnani out.

6          MR. TAYLOR:  Okay.

7          THE VIDEOGRAPHER:  We are off the record at

8      12:10 p.m.

9          (Recess from 12:10 p.m. to 12:13 p.m.)

10         THE VIDEOGRAPHER:  We are back on the record

11     at 12:13 p.m.

12         (Exhibit No. 1 marked for identification.)

13   BY MR. EDWARDS:

14     Q.   All right.  And, Mr. Sajnani, we went off the

15   record.  I think we figured out our exhibit share.  And

16   I think, if I understand now, that you can see what

17   we've marked as Exhibit 1?

18     A.   I can.

19     Q.   Yes.  That is the notice of your -- your

20   deposition, which is to occur today, April 19th, at

21   12:00 p.m. Central Time, correct?

22     A.   Correct.

23     Q.   Okay.  And you're appearing today pursuant to

24   this notice, correct?

25     A.   Correct.

1      Q.    Okay.  Have you reviewed any deposition

2   transcripts in this case?

3      A.    I have reviewed several deposition

4   transcripts, and a lot of those are cited and referenced

5   in my opinion report.

6      Q.    Have you reviewed any deposition transcripts

7   that are not listed in your report?

8      A.    I don't recall.  I'll have to go through the

9   report once again.  I know I've referenced several.

10     Q.    We're getting ready -- I'm sorry.  I didn't

11  mean to interrupt.  Please finish.

12     A.    I'm just trying to recall the names.  Connie,

13  Michelle, a couple others.  Yeah, but I don't recall if

14  I have a hundred percent of them captured.

15     Q.    Okay.  As a preliminary matter, did you bring

16  your report with you today?

17     A.    I have it.

18     Q.    Do you have it in front of you?

19     A.    Yes.

20     Q.    Okay.  We're going to make an exhibit of your

21  report here in just a minute, but I will tell you I

22  encourage you to look at your own report, if that helps,

23  as opposed to the one on the screen.  It may just make

24  things quicker to get to.  Okay?

25     A.    Okay.

Page 12

1        Q.    One of the things to -- I should have reminded
2    you about earlier is it is important to give verbal
3    responses.   It looks like you may be a bit like me, a
4    guy that nods "yes" and "no."   We need to make sure we
5    give verbal responses.   And when there's a yes-or-no
6    question, it's "yes" or "no" as opposed to things like
7    "uh-huh" and "uh-uh."   If we can try to do that, it will
8    make a clear record.   Okay?
9        A.    Okay.
10       Q.    The report that you brought with you, can you
11   hold it up?
12             Okay.   You don't have any notes or anything
13   like that on that copy of the report?
14       A.    No.
15       Q.    Okay.   Does that report include Exhibits 1 and
16   2?
17       A.    They do not.
18       Q.    Okay.   Did you bring with you your CV and your
19   recent testimony list?
20       A.    I have a recent testimony list.   I don't have
21   a CV with me.
22       Q.    Okay.   When I make your report an exhibit, it
23   will have both of those included with it, so if we
24   need -- if you need to reference that -- I'm not trying
25   to create a memory test here.   If you need to reference

1  it, it will be as part of the exhibit.  Okay?

2      A.   Okay.

3      Q.   Have you read the deposition transcript of

4  Mr. Wilner?

5      A.   I believe Mr. Wilner was a expert report, if

6  I'm not mistaken.

7      Q.   He did, but his deposition was also taken last

8  week.  I'm wondering if you've had the opportunity to

9  review his deposition transcript.

10     A.   I don't recall.

11     Q.   Okay.  Do you recall if you reviewed any

12  deposition transcripts in the last week?

13     A.   I don't -- I don't recall.  I don't think so.

14     Q.   Okay.  How was contact made with you in this

15  case?

16     A.   This was part of a -- I'm a part of several

17  consulting organizations, and the consulting

18  organization reached out to me, asking if I would be

19  suitable to opine on this.

20     Q.   Okay.  So what was the particular consulting

21  group in this case?

22     A.    In this case it was GLG.  I believe the full

23  form is Gerson Lehrman Group.

24     Q.    All right.  And GLG is a company that, among

25  other things, has relationships with expert witnesses,

1    and they will match those expert witnesses with firms

2    looking for an expert with certain specialities; is that

3    fair?

4              MR. TAYLOR:  Objection; form.

5              You can answer.

6        A.    That is my understanding.

7    BY MR. EDWARDS:

8        Q.    Okay.  Is that what happened in this case: GLG

9    reached out to you and put you in touch with McGuire

10   Woods?

11       A.    That is correct.

12       Q.    Okay.  Who is the first lawyer that you talked

13   to at McGuire Woods?

14       A.    It was Mr. Taylor.

15       Q.    Okay.  Have you talked with other lawyers at

16   McGuire Woods?

17       A.    I believe Mr. Taylor's colleague once, a

18   couple -- few times.

19       Q.    Who's that?

20       A.    Mr. Frank Talbott.

21       Q.    Sorry.  I couldn't hear you.

22       A.    Mr. Frank Talbott.

23       Q.    Okay.  And Mr. Talbott's an attorney?

24       A.    I believe so.

25       Q.    Okay.  Have you ever worked with the McGuire

1  Woods firm prior to this?

2      A.   This is my first time in a testimonial

3  capacity working with Mr. Taylor.

4      Q.   Okay.  What about in another capacity working

5  with Mr. Taylor?

6      A.   A couple other matters, just within the last

7  12 months or so, nontestimonial in nature, and that's

8  all I can say about that.

9      Q.   Why -- why are you -- why do you say that's

10  all you can say about that?

11      A.   I do have some confidentiality agreements that

12  I signed with GLG.

13      Q.   Okay.

14      A.   Yeah.

15      Q.   So you've worked on two other matters with

16  Mr. Taylor within the past 12 months, correct?

17      A.   Not correct.  I will rephrase what I said.

18          It was -- it was a matter.  What I probably

19  tried to say is "a couple times."

20      Q.   Okay.  So other than the matter that we're

21  here about today, you've worked with Mr. Taylor on

22  another matter within the past 12 months?

23      A.   That is correct.

24      Q.   Other than that, have you ever worked with

25  Mr. Taylor or his firm on any other matters?

1     A.   No, I have not.

2     Q.   Okay.  And with regard to that matter that you

3 have worked with, aside from the matter we're here about

4 today, it sounds like you're telling me if I ask you

5 questions about that, you're -- you're not going to

6 answer, based on your understanding of your

7 confidentiality requirements?

8     A.   That is correct.

9         MR. TAYLOR:  And just to put on the record,

10       I will also just caution him about conversations

11       with counsel that also would implicate both

12       privileged and confidential issues.  So --

13       MR. EDWARDS:  Right.

14 BY MR. EDWARDS:

15     Q.   With regard to this other matter that you

16 worked with Mr. Taylor about within the last year, can

17 you tell me, at a very high level, what the matter

18 related to?

19        MR. TAYLOR:  And I'm going to object to that

20       based on what I've just mentioned, which is the

21       confidentiality and privilege issues related to

22       nontestimonial work for lawyers.  So, again, I'm

23       going to object to that.

24 BY MR. EDWARDS:

25     Q.   Go ahead.  Go ahead, Mr. Sajnani.

1          A.    Unfortunately, I can't say more.

2          Q.    Okay.  Did you sign a retainer agreement in

3     this case?

4          A.    No.

5          Q.    And do you submit time for the work that

6     you've done in this case for billing purposes?

7          A.    I do.

8          Q.    Okay.  And what is your hourly rate?

9          A.    My hourly rate, I believe it's -- we have

10    stated that in the expert opinion report.

11         Q.    Sure.  Feel free to consult that if you need

12    to.

13         A.    Towards the bottom of Page 1, we state that

14    GLG's being compensated at a rate of 725 per hour.

15         Q.    When you say "we state," is there someone

16    other than yourself that assisted in drafting this

17    report?

18         A.    I did myself.  "We," I was referring to GLG

19    and myself, but GLG was not involved in drafting the

20    report.  But my reference to "we" was me working on

21    behalf of GLG.

22         Q.    Okay.  So does -- do you or did GLG bill

23    McGuire Woods for your services here?

24         A.    GLG did.

25         Q.    Okay.  Do you have an estimate as to

1    approximately how many hours you have in this Dollar

2    General case up to now?

3        A.   I don't recall.  GLG reaches out periodically,

4    asks me to provide an estimate of my time and my

5    activities.  I don't have a recollection of the total.

6        Q.   Sure.  And I'm not trying to hold you to

7    anything specific.  Can you ballpark it for me?

8        A.   I don't recall.

9        Q.   All right.  You -- sitting here today, are you

10   able to tell me whether it's more like ten hours or a

11   hundred hours or a thousand hours?

12       A.   It's certainly not a hundred or a thousand.

13   It's -- it's not that high.

14       Q.   Okay.  You believe that the total work you've

15   put into this case is less than a hundred hours so far?

16       A.   Absolutely.

17       Q.   Okay.  Do you think it's less than 50 hours?

18       A.   I don't recall that.  I'd really have to go

19   back.

20       Q.   Okay.

21       A.   Yeah.

22       Q.   Do you bill the same amount no matter what

23   activity you're engaged in?

24       A.   I believe so, to my recollection.

25       Q.   Okay.  When is the last time you submitted

1  your time entries to GLG for billing?

2      A.   Last time?  I want to say sometime in the

3  month of -- month of -- month of March.  They're

4  extremely -- extremely slow.

5      Q.   Okay.  Do you put -- along with the hours that

6  you spent, do you also describe the specific task that

7  you're working on in your time entries?

8      A.   As best as I can, I try to.  It's not always

9  perfect.

10     Q.   Do you know when the most recent invoice was

11 sent to GLG by McGuire Woods?

12     A.   I don't.  I'm generally not privy to that

13 information.

14     Q.   Can you give me a ballpark estimate on

15 approximately how much time you spent reviewing the data

16 and the large spreadsheet provided by Dollar General?

17 Do you know what I'm talking about?

18          MR. TAYLOR:  Objection; form.

19          You can answer.

20     A.   I have seen the spreadsheet, a large

21 spreadsheet with multiple tabs, and I've referred to it

22 back and forth.  I don't recall specifically what the

23 total time would be.

24 BY MR. EDWARDS:

25     Q.   Okay.  Do you think it was more than ten

Page 20

```
 1   hours?
 2          MR. TAYLOR:  Objection; form.
 3          You can answer.
 4      A.   I really don't recall it to put a number to
 5   it.
 6   BY MR. EDWARDS:
 7      Q.   Did you review all of the government audit
 8   data in this case?
 9          MR. TAYLOR:  Objection; form.
10          You can answer.
11      A.   I've reviewed all of the information that's
12   been made available.
13   BY MR. EDWARDS:
14      Q.   Sure.  My question is:  Do you know if Dollar
15   General provided you with all of the government audits
16   involving New York Dollar General stores for this class
17   period?
18      A.   I don't know if I can say that.
19      Q.   Okay.  Can you give me a ballpark estimate as
20   to approximately how many New York government audits you
21   reviewed?
22          MR. TAYLOR:  Objection; form.
23      A.   I mean no, but quite a bit.  Some of the files
24   have multiple audits, so it was a very extensive PDF
25   file.  Some were standalone audits.  So I -- you know,
```

Page 21

```
 1    it's hard for me to tell.
 2    BY MR. EDWARDS:
 3         Q.   In the litigation context, have any of your
 4    opinions ever been excluded by a court?
 5         A.   No.
 6         Q.   Let's go ahead and mark your report as the
 7    next exhibit.  It will be Exhibit 2.
 8              (Exhibit No. 2 marked for identification.)
 9    BY MR. EDWARDS:
10         Q.   I think you should be able to refresh and see
11    that.
12         A.   Yes.
13         Q.   I'm looking at Paragraph 1, the introduction
14    to your report, and about halfway down, do you see the
15    sentence that starts with "I am a consultant"?
16         A.   I do.
17         Q.   Okay.  You write there, "I am a consultant for
18    the Gerson Lehrman Group, ('GLG'), and through GLG, I
19    was retained by counsel representing Dollar General to
20    review the relevant materials and opine on (1) the
21    accuracy, methodology, and reliability of government
22    audit reports of Dollar General stores in New York; (2),
23    whether the report (sic) for Plaintiffs, Mr. Weir, can
24    reasonably rely on these audit reports for his opinions;
25    (3), whether failed audits necessarily mean that
```

Page 22

```
1   customers were charged more for particular items; and
2   (4), whether Dollar General's culture of compliance and
3   its operations relating to pricing and price
4   discrepancies are reasonable and comparable to others in
5   the industry."
6           Did I read that pretty close?
7           MR. TAYLOR:  I'm going to object.  I think
8       you misread No. 2, Adam.
9           MR. EDWARDS:  I'll reread No. 2.
10  BY MR. EDWARDS:
11      Q.   Number 2 states:  "Whether the expert for
12  Plaintiffs, Mr. Weir, can reasonably rely on these audit
13  reports for his opinions."
14          Did I read that right?
15      A.   Yes.
16      Q.   Okay.  With regard to No. 4 -- let me back up.
17          Would you agree what I just read encompasses
18  your assignment in this case?
19          MR. TAYLOR:  Objection; form.
20          You can answer.
21      A.   Yes.
22  BY MR. EDWARDS:
23      Q.   Okay.  As to No. 4, "whether Dollar General's
24  culture of compliance and its operations related to
25  pricing and price discrepancies are reasonable and
```

Page 23

1    comparable to others in the industry," who are the

2    others in the industry that you're making this

3    comparison with?

4         A.    I've got 20-plus years in -- in the industry,

5    in retail.  We meet often as -- as a peer group.

6    There's quite a bit of networking that takes place.  So

7    when I make this statement, it's really a collective

8    statement representing my interactions with all these

9    organizations, as well as organizations I've been with,

10   including my current organization, Conn's, who I was

11   with previously.  I was also a public accountant with

12   Price Waterhouse Coopers; I had numerous retail clients,

13   like Target at the time.

14            So it's a lot of -- a lot of companies.

15        Q.    Can you give me an example of some of the

16   companies you're referring to when you make this

17   comparison about Dollar General's culture and its

18   operations relating to pricing?

19        A.    Yeah.  Like I mentioned, you know, a few of

20   those would be Target, Conn's, EZ CORP.  It could be

21   Best Buy.  Best Buy's part of our peer group as well.

22   Rent-A-Center.  HHGregg.  A variety of companies.

23        Q.    So for all those companies you just mentioned,

24   you're familiar with the details of their culture of

25   compliance and operations related to pricing and pricing

Page 24

1    discrepancies?

2             MR. TAYLOR:  Objection; form.

3             You can answer.

4        A.   I'd say at a high level.  I think all -- my

5    peer group, all chief audit executives, chief asset

6    protection executives, generally have an idea, you know,

7    what a robust and a sound control environment should

8    look like, what the compliance culture should look like.

9    We talk about those things, improvements, et cetera,

10   best practices.

11            I would say, yeah, 20-plus years of doing

12   this, I've -- I have a sense.

13   BY MR. EDWARDS:

14       Q.   So have you actually helped some of these

15   companies implement procedures to address situations

16   where pricing accuracy is a problem or an issue?

17            MR. TAYLOR:  Objection; form.

18       A.   My own organizations that I've been -- that

19   I've been part of, you know, pricing challenges are --

20   are very common in retail, and, you know, a lot of our

21   work is meant to highlight those opportunities; and from

22   an audit standpoint, we make recommendations on how to

23   enhance the control environment.

24   BY MR. EDWARDS:

25       Q.   Okay.  You say your own companies.  You mean

Page 25

1    Conn's, for example?

2        A.    Conn's, correct.  EZ CORP as an example.

3        Q.    Okay.

4        A.    And going back to my public accounting days as

5    a consultant for Price Waterhouse Coopers,

6    recommendations made to our clients at the time.

7        Q.    How does a company -- we'll just use the

8    Conn's example, for example.  It's an electronics store

9    that I'm familiar with.  How does a company like Conn's,

10   for example, come to learn that they're dealing with

11   issues with regard to pricing accuracy?

12            MR. TAYLOR:  Objection; form.

13            You can answer.

14       A.    Yeah, I mean, it can happen a few different

15   ways.  You could have risk and control functions within

16   the company, like ourselves: asset protection, loss

17   prevention, internal audit.  That's one way.

18            Another way is you have external firms

19   sometimes that the company hires from time to time; they

20   come in to provide assurance, and they opine on it.

21            And sometimes you have, typically, people

22   responsible for taking a temperature of, you know, kind

23   of where the customer's at, what kind of complaints are

24   coming from the field.  Sometimes it comes from that:

25   customers will write it in, send you an email, maybe

Page 26

1   have a Twitter page.

2          So it could come from a variety of different

3   angles.

4   BY MR. EDWARDS:

5      Q.   Sure.  Can you give me any concrete examples

6   of how a company like Conn's, for example, might become

7   aware of a problem with pricing discrepancy?

8      A.   Yes.  At Conn's, it wasn't uncommon when a

9   customer specifically called in to the office or sent an

10  email reporting a price discrepancy.

11     Q.   Okay.  So one specific way a store could learn

12  about pricing issues is customer complaints, correct?

13     A.   Correct.

14     Q.   What's another way?

15     A.   Another way is our store associates, in their

16  day-to-day course of work, you know, find an inaccuracy

17  and they report it.  It could be their superior; it

18  could be a district manager; could be a store manager.

19  It could come from a variety of different internal rules

20  for conducting spot checks.

21     Q.   What's another example you could give me?

22     A.   Another example would be the

23  third-line-of-defense function, which is an internal

24  audit function, like myself.  Sometimes we bring it to

25  surface when we take the product -- in our audits, we

Page 27

1   take a product physically from the shelf; we look at the

2   shelf price; we go all the way back to the POS system,

3   we ring that product up; we look at what it's ringing up

4   as.

5           You know, sometimes that's one method in how

6   these come to surface.

7       Q.    Can you give me other examples of how a

8   company might become aware of pricing discrepancies?

9       A.    I mean, there are several more.  Let me think

10  about this.

11      Q.    Is -- let me ask you this:  Is a government

12  audit one way in which a company might become aware of

13  pricing discrepancies?

14          MR. TAYLOR:  Objection; form.

15          You can answer.

16      A.    Any -- I would say any audit.

17  BY MR. EDWARDS:

18      Q.    Okay.

19      A.    Internal audit, an external audit, yeah.

20      Q.    But, specifically, government audit is one way

21  in which companies discover that they may have issues

22  with pricing inaccuracies; you'd agree with that?

23          MR. TAYLOR:  Objection; form.

24          You can answer.

25      A.    Government audits are one of those mechanisms

Page 28

1    through which pricing discrepancies come to surface,

2    yes.

3    BY MR. EDWARDS:

4        Q.    Okay.  When you were working in your capacity

5    with -- either directly for companies like Conn's or

6    EZ CORP or peripherally with companies through Price

7    Waterhouse Cooper (sic), did you ever advise or direct

8    these companies on responding to failed government

9    audits and fines that ensued?

10            MR. TAYLOR:  Objection; form.

11            You can answer.

12       A.    Yeah.  One of our responsibilities as a

13   third-line-of-defense function is to provide

14   recommendations as to how to improve the control

15   environment.  So if an audit does surface a price

16   discrepancy, we would look at it and see if there are

17   opportunities to -- to enhance what the company's doing

18   internally.

19            But from a third line of defense, it is -- it

20   is not necessarily within our scope of work to advise,

21   quote/unquote, management or the board in terms of

22   the -- you know, what to do in terms of how to react.

23   BY MR. EDWARDS:

24       Q.    Okay.  So do you have any knowledge through

25   your experience in working with either companies about

Page 29

1   situations where a company, for example, receives fines

2   from failed pricing audits and -- and challenges those

3   audits, as opposed to just paying the fines?

4           MR. TAYLOR:  Objection; form.

5       A.   Yeah.  So I'll go back to what I stated

6   earlier in terms of the industry BUPs and the networking

7   and all the communication that takes place.

8           It is not common, in my experience, that

9   companies may do that, and I can draw a parallel to, you

10  know, banking as well, which is another industry I'm

11  very well familiar with.  Oftentimes when there's a

12  regulatory observation that leads to a fine or a

13  penalty, you know, it is -- it is very common for

14  companies to -- to accept that and directionally go and

15  look for opportunities where they can make enhancements.

16  BY MR. EDWARDS:

17      Q.   Is -- is that true even when the company has

18  reason to believe that the government audit data is

19  flawed or erroneous in some way?

20          MR. TAYLOR:  Objection; form.

21      A.   Yes, it is.  Many companies decide to take

22  that route to maintain the healthy relation with

23  regulators, and it's a very individualistic strategic

24  decision that companies make.

25                      - o -

Page 30

1    BY MR. EDWARDS:

2        Q.    Okay.  What do you mean when you say "maintain

3    a healthy relationship"?

4        A.    Yeah.  It's -- you know, I can give you an

5    example.  You know, in banking, you know, I've been in

6    situations where the government audit was not favorable,

7    and it may have been something I did not agree with

8    personally, management did not agree with personally,

9    but there's always an element -- right? -- that, "Should

10   we challenge this?  It's going to involve a considerable

11   amount of resources, a considerable amount of time."

12            And you just don't know how -- how a

13   government auditor may react to that.  So I think it's

14   more, sort of, avoiding the -- the disruption, the

15   effort that's involved.  Companies would rather, you

16   know, take the general theme and focus on any type of

17   improvements that they could make.

18   BY MR. EDWARDS:

19       Q.    Okay.  Thank you.

20            Your -- you've been employed as the chief

21   audit, asset protection, and loss prevention executive

22   at EZ CORP since April of 2020; is that correct?

23       A.    Correct.

24       Q.    And for someone who's not familiar with

25   EZ CORP, do they own retail stores?

Page 31

1      A.   EZ CORP owns a little over 1,200 retail

2    stores, yes.

3      Q.   And primarily selling what?

4      A.   General merchandise, electronics, power tools,

5    books --

6      Q.   Is -- I'm sorry.  You were saying?

7      A.   Books, memorabilia, mostly secondhand.

8      Q.   Secondhand.  Okay.  So are they -- is EZ CORP

9    akin to pawn shops?

10     A.   An element of the business is, yes.

11     Q.   Okay.  So EZ CORP is not a competitor with

12   Dollar General?

13          MR. TAYLOR:  Objection; form.

14          You can answer.

15     A.   I would say yes, because if you take the --

16   it's a retail business.  The pawn element -- the lending

17   element, is for those who have the need.  It's not a --

18   it's not a requirement to do business.  You can walk in

19   and purchase any product just like you would at any

20   other retail store.

21   BY MR. EDWARDS:

22     Q.   Do EZ CORP retail stores operate in New York?

23     A.   Not anymore.

24     Q.   Okay.  Prior to this case, have you had any

25   involvement with government audits specifically related

Page 32

```
 1   to pricing in New York?
 2              MR. TAYLOR:  Objection; form.
 3              You can answer.
 4        A.   In New York?  If I go long back, that would
 5   be -- I mentioned Target earlier.  Target would fall
 6   under that, but not EZ CORP and not Conn's.
 7   BY MR. EDWARDS:
 8        Q.   Okay.  So what is your experience at -- when
 9   you were with Target relating to government pricing
10   audits in New York?
11              MR. TAYLOR:  Objection; form.
12              You can answer.
13        A.   Yeah, a few -- few different ways.  One is
14   reviewing audit reports from -- from an internal
15   consultant standpoint; so the company would hire us to
16   look at the reports and make recommendations --
17   right? -- on where improvements can be made.  That was
18   one -- one way.
19              And the other was from a readiness standpoint.
20   It's -- you know, sometimes we would go in and conduct a
21   mock audit -- right? -- and that would then surface any
22   type of opportunities that can be addressed ahead of a
23   government audit.
24              So there are different ways you can be engaged
25   as an outside consultant.
```

```
 1   BY MR. EDWARDS:
 2       Q.   So who you -- who were you working for when
 3   you -- when you did work as an outside consultant for
 4   Target in New York?
 5       A.   This is Price Waterhouse Coopers.
 6       Q.   Okay.  So it sounds like you're telling me
 7   when you were with Price Waterhouse Coopers, one of the
 8   things that you did for Target was to review government
 9   audit reports to make recommendations.
10       A.   That's correct.
11       Q.   Okay.  And this was in New York, so they were
12   New York audit -- failed audit reports relating to
13   pricing, correct?
14       A.   It was not specifically just New York.  It was
15   a set of audits from a variety of different markets.
16       Q.   Right.  But New York was included, I think I
17   understood you to say.
18       A.   If I recall, yes.  I mean, this being two
19   thousand --
20       Q.   Do you --
21       A.   I mean, it's been a while.
22       Q.   Okay.  More than ten years ago?
23       A.   For that specific audit, yes.
24       Q.   Let me ask you this:  Before you got involved
25   in this Dollar General case we're here about today, do
```

1    you have a specific recollection of seeing New York

2    government audit reports related to pricing

3    inaccuracies?

4            MR. TAYLOR:  Objection; form.

5            You can answer.

6        Q.    Yes.  I recall -- I recall that.

7    BY MR. EDWARDS:

8        Q.    And that -- and you gave me the example

9    already; that would be when you were with Price

10   Waterhouse Coopers and doing work for Target, who

11   operates in New York, correct?

12       A.    Correct.

13       Q.    Okay.  And you would rely on those government

14   audit reports to make recommendations to the company,

15   correct?

16           MR. TAYLOR:  Objection; form.

17           You can answer.

18       A.    I wouldn't necessarily say "rely."  We

19   would -- we would review the reports.  We would try to

20   understand what was done, how it was done, and, first of

21   all, determine whether, you know, the output can be

22   relied upon -- right? -- and if there was any merit to

23   it, we would make recommendations independent of --

24   BY MR. EDWARDS:

25       Q.    Do you -- do you recall, sitting here today,

Page 35

1   whether you determined that the audit reports you

2   reviewed from New York governmental entities involving

3   pricing had merit?

4            MR. TAYLOR:  Objection; form.

5            You can answer.

6        A.   I don't recall.

7   BY MR. EDWARDS:

8        Q.   So you may have relied on government audit

9   reports when you were doing work from -- for Target

10  ten-plus years ago, but you just don't recall one way or

11  the other, sitting here today; is that fair?

12           MR. TAYLOR:  Objection; form.

13       A.   Hard for me to comment on that, honestly.

14  It's -- it's been a while.

15  BY MR. EDWARDS:

16       Q.   Okay.

17           MR. EDWARDS:  Let's go off the record, just

18           taking our first brief comfort break, please.

19           THE VIDEOGRAPHER:  We are off the record at

20           12:50.  This is the end of Media Unit No. 1.

21           (Recess from 12:50 p.m. to 1:01 p.m.)

22           THE VIDEOGRAPHER:  This is the beginning of

23           Media Unit No. 2.  We are on the record at

24           1:01 p.m.

25                        - o -

Page 36

1    BY MR. EDWARDS:

2        Q.    All right.   Mr. Sajnani, is there anyone else

3    in the room with you there where you're giving your

4    deposition?

5        A.    No.

6        Q.    Okay.   Mr. Taylor's not in the room with you?

7        A.    Mr. Taylor is.   I'm sorry.   Besides him and I,

8    there's nobody else.

9        Q.    Okay.   I just want to close the loop on the

10   questioning that I was engaged in before the break, so

11   I'll try to do that.

12           In your report, you challenge the accuracy of

13   some of the government audit findings in New York Dollar

14   General stores, correct?

15           MR. TAYLOR:   Objection; form.

16       A.    Correct.

17   BY MR. EDWARDS:

18       Q.    Okay.   Prior to your involvement in this case,

19   do you know whether Dollar General ever challenged the

20   accuracy of these failed pricing audits in New York?

21           MR. TAYLOR:   Objection; form.

22           You can answer.

23       A.    I do not.

24   BY MR. EDWARDS:

25       Q.    Okay.   Looking back at your -- your CV, which

Page 37

1   you've attached as an exhibit to your report, is this

2   still accurate and up to date, to the best of your

3   knowledge?

4        A.   Give me a minute to scroll there.

5        Q.   Sure.

6        A.   It is.

7        Q.   Okay.  And I'm looking now at the six cases

8   that you listed as -- it says "Testimony/Reports in Last

9   4 Years."  Do you see that?

10       A.   I see it.

11       Q.   Is this all the litigation cases you've worked

12  on in the last four years, the six listed here?

13            MR. TAYLOR:  Objection; form.

14            You can answer.

15       A.   The -- the four years, that's -- that's an

16  error.  Some of these go back way further.  The last

17  four years specifically, it would be the first two.

18  BY MR. EDWARDS:

19       Q.   Okay.  I'm assuming No. 2 is, as the name

20  implies, an insider trading case.

21       A.   That's correct.

22       Q.   Okay.  Can you tell me, at a high level, what

23  the mandatory block leave case was about?

24       A.   At a high level, it's -- it pertains to

25  Sarbanes-Oxley compliance and mandatory rotations within

1  key accounting and finance functions within an

2  organization, within a bank specifically.

3      Q.   Who -- did you provide testimony or expert

4  report in that case?

5      A.   As stated here, it was an expert report.

6      Q.   Okay.  Did -- let me -- that's a bad question.

7  Let me rephrase it.

8           Did you provide testimony in that case?

9      A.   No.

10      Q.   Who did you provide an expert report for?

11  What side?

12      A.   This was the defendant.

13      Q.   Okay.  Have you ever been retained by

14  plaintiffs or consumers in a consumer class action case?

15           MR. TAYLOR:  Objection; form.

16           You can answer.

17      A.   Repeat that, please.  Have I ever been

18  retained for?

19  BY MR. EDWARDS:

20      Q.   Right.  Have you ever been retained by

21  consumers or attorneys representing plaintiffs in a

22  consumer class action case?

23           MR. TAYLOR:  Same objection.

24           You can answer.

25      A.   No.

```
 1   BY MR. EDWARDS:
 2        Q.    So this is -- let me ask this question:  Have
 3   you ever given testimony for either side in a consumer
 4   class action case before this one?
 5              MR. TAYLOR:  Same objection.
 6              You can answer.
 7        A.    No.
 8   BY MR. EDWARDS:
 9        Q.    There's a section of your report where you
10   list out the documents that you relied upon or -- let me
11   rephrase that.
12              In Section 3 of your report, on Page 2, you
13   discuss the documents that you've relied upon, and you
14   state that those documents are included throughout your
15   report, referenced throughout your report; is that
16   correct?
17        A.    That's correct.
18        Q.    All right.  Are there other documents that you
19   reviewed and relied upon, other than those documents
20   that you cite in your report?
21        A.    I don't recall.  There's a large volume of
22   information.  I don't recall if everything is cited.
23        Q.    Okay.  Starting on Page 10, you have bullet
24   points, and I -- let me count these up.  You list nine
25   errors or deviations from procedures that you saw in the
```

Page 40

```
 1   county audit reports, correct?
 2               MR. TAYLOR:  Objection; form.
 3               You can answer.
 4        A.   On this report, I see six deviations and
 5   errors.  The next three pertain to another matter.
 6   BY MR. EDWARDS:
 7        Q.   I see.
 8        A.   And --
 9        Q.   I appreciate that clarification.  So here in
10   this report, you point out six what you -- what you
11   believe to be deviations from procedure that you saw in
12   county audit reports for Dollar General stores in
13   New York?
14               MR. TAYLOR:  Objection; form.
15               You can answer.
16        A.   Yeah.  To clarify, these are the six I decided
17   to cite and reference.  It does not necessarily indicate
18   that these were the only errors.
19   BY MR. EDWARDS:
20        Q.   Right.  Well, if there's -- if you have
21   opinions that aren't included here in your report, I'd
22   like to know about them.
23        A.   The opinion doesn't change, and it's not a --
24   what I mean is I did not state -- I may not have stated
25   many that I felt were repetitive in nature, and so I
```

```
 1    limited it to these -- these six, but it doesn't impact
 2    the opinion.
 3    BY MR. EDWARDS:
 4        Q.   I see.  On -- starting on Page -- Page 3 of
 5    your report, you start listing a number of bullet points
 6    which you classify as examples where county audits were
 7    incorrect.  Do you see that?
 8        A.   I do.
 9        Q.   Okay.  My question is:  Did you locate the
10    information in these ten bullet points you set forth in
11    your report by yourself, or did you work with
12    individuals at Dollar General to -- to identify what
13    you've described as errors?
14             MR. TAYLOR:  Objection; form.
15             You can answer without getting into any
16         conversations with counsel.
17        A.   I want to make sure I understand the question
18    correctly.  Are you asking if I found these in my review
19    of the materials?
20    BY MR. EDWARDS:
21        Q.   Well, I'm asking if you worked with any other
22    individuals in identifying the errors that you set forth
23    in these bullet points starting on Page 3 of your
24    report.
25             MR. TAYLOR:  Same objection.  Same caution.
```

Page 42

1         You can answer.

2     A.    And, look, I've gone through a very large

3 volume, of sets of data, and a lot of these were for

4 things I've noted, things I've marked and extracted out

5 in my opinion, and I've had, you know, conversations

6 here and there with counsel throughout.

7 BY MR. EDWARDS:

8     Q.    Yeah.  My -- my question, though, is:  Did you

9 identify the problems or errors, as you've described

10 them, with the data as set forth in these bullet points

11 starting on Page 3 by yourself, exclusively or with the

12 assistance of someone at Dollar General?

13         MR. TAYLOR:  Objection; form.  Same caution.

14         You can answer.

15     A.    I haven't interacted with anybody from Dollar

16 General.

17 BY MR. EDWARDS:

18     Q.    So the answer is "no," you found these errors

19 exclusively by yourself?

20         MR. TAYLOR:  Objection; form.

21         You can answer.

22     A.    Yes.  I mean, I don't know how else -- yeah.

23 BY MR. EDWARDS:

24     Q.    Okay.  And I'll give you an example.  Number 1

25 here, Old El Paso Grande Tortilla that you set forth on

Page 43

1  Page 3, or any of the others, did someone at Dollar

2  General point you to a specific line to look at in the

3  Dollar General data spreadsheet to say, "Hey, heads up,

4  check this one," for example?

5        A.    No.

6              MR. TAYLOR:  Objection; form.

7              Go ahead.

8  BY MR. EDWARDS:

9        Q.    Okay.  So you had no help at all in

10 identifying each of these errors you set forth on --

11 starting on Page 3?

12             MR. TAYLOR:  Objection; form.

13             You can answer.

14       A.    Outside of back-and-forth, just, my

15 communication with counsel, no.

16 BY MR. EDWARDS:

17       Q.    Okay.

18       A.    I oftentimes may have clarification based on

19 my review.  I've reached out, and we'd have some

20 discussions, and that's about it.

21       Q.    So are you telling me that you did have some

22 assistance in -- through conversations with counsel in

23 identifying these errors?

24             MR. TAYLOR:  Objection; form.

25             Objection; don't into the content of those

Page 44

```
1        conversations, but you can answer that question.
2        A.    Yes.  I mean, there were conversations with
3   counsel in helping clarify my understanding, yeah.
4   BY MR. EDWARDS:
5        Q.    Okay.  And that would be Mr. Taylor?
6        A.    That's correct.
7        Q.    I think I asked you this earlier, but did
8   Mr. Taylor or someone from his office provide you with
9   the audits that you reviewed the New York audits?
10            MR. TAYLOR:  Objection; form.
11       A.    Mr. -- Mr. Taylor -- Mr. Taylor's firm
12   provided me with the material to review.
13   BY MR. EDWARDS:
14       Q.    Okay.  And I'll ask a more specific question.
15   I'm referring specifically to the audits in New York
16   related to pricing by governmental entities.
17   Mr. Taylor's firm provided you with those audits that
18   you reviewed?
19       A.    Yes.
20       Q.    Sitting here today, do you know if all of the
21   audits during the relevant class period were provided or
22   whether some were selected for your review?
23            MR. TAYLOR:  Objection; form.
24            You can answer.
25       A.    I don't know.
```

Page 45

```
 1   BY MR. EDWARDS:
 2        Q.   Okay.  You haven't asked?
 3             MR. TAYLOR:  I'm going to object to
 4        getting -- without getting into the conversations
 5        with counsel, you can answer, given that
 6        cautionary.
 7             THE WITNESS:  I'm not.
 8   BY MR. EDWARDS:
 9        Q.   Would you have liked to have seen all the
10   audit data for the relevant class period relating to
11   pricing?  I'm talking about the audit data from
12   governmental entities.
13             MR. TAYLOR:  Objection; form.  Object to
14        assumes facts not in evidence.
15             You can answer.
16        A.   Yeah, the reports I've reviewed are sufficient
17   for my -- for my conclusion.
18   BY MR. EDWARDS:
19        Q.   Okay.  Do you have any idea how many products
20   were listed as overcharges throughout this class period
21   by New York officials?
22             MR. TAYLOR:  Objection; form.
23             You can answer.
24        A.   In aggregate, no.
25                            - o -
```

Page 46

1  BY MR. EDWARDS:

2      Q.   Okay.  Do you have any idea what percentage of

3  the overcharges that New York government auditors found

4  were, in your opinion, erroneous, for some reason?

5           MR. TAYLOR:  Objection; form.

6           You can answer.

7      A.   Not as a rule.

8  BY MR. EDWARDS:

9      Q.   Okay.  So you don't know, sitting here today,

10 whether the audits from New York officials that you

11 reviewed have a 1 percent error rate, a 10 percent error

12 rate?  You can't give any opinion on that?

13          MR. TAYLOR:  Objection; form.

14          You can answer.

15     A.   The individual audit reports have notes in

16 them, but those are specific to that particular audit,

17 and they all vary from one audit to another.

18 BY MR. EDWARDS:

19     Q.   I asked a confusing question, so I'll rephrase

20 it.  I'm not talking about the pass-fail rate for the

21 products tested.

22     A.   Okay.

23     Q.   You've identified ten examples in your report

24 where you believe that cites to overcharges by

25 government officials were erroneous, correct?

1    A.    Correct.

2    Q.    How many -- I'm assuming you didn't include --

3   you did not include every example you found in your

4   report.  Is that correct?

5    A.    That's correct.

6    Q.    Okay.  How many total examples did you find

7   where there was a cited overcharge in a New York

8   government official's report in total?

9         MR. TAYLOR:  Objection; form.

10    A.    That's very difficult to say.  Now -- yeah, I

11   would -- I wouldn't be able to estimate that.

12  BY MR. EDWARDS:

13    Q.    Was it more than 50?

14    A.    I really don't know.  I really don't know.

15    Q.    Okay.  Is there a specific reason why you

16   chose to only include these ten, these ten examples of

17   bullet points starting on Page 3?

18         MR. TAYLOR:  Objection; form.

19         You can answer.

20    A.    I don't -- I don't necessarily recall my

21   logic.  As I was conducting my review, I was noting

22   things done, and, you know, once I saw a certain

23   pattern, I started putting them together.  But I don't

24   necessarily recall why this and not another one.

25                          - o -

1    BY MR. EDWARDS:

2        Q.    Okay.  But I think we're on the same page.

3    You -- your testimony today is that you did find other

4    examples of errors in the government audit data, and by

5    "errors," I mean errors by the New York officials when

6    they found an overcharge for a product, correct?

7            MR. TAYLOR:  I'm going to object as asked

8        and answered.

9            You can answer.

10       A.    I wouldn't -- I wouldn't necessarily say --

11   the errors are of all sorts.  You know, pricing-related

12   matters are just -- are just one.

13           But I state in this report -- and I've

14   referenced it in many places -- all the different types

15   of errors I identified.  So I think the answer to your

16   question -- right? -- so, yes, there's a variety of

17   errors.  I wouldn't necessarily restrict it to saying

18   it's only a certain type of an error.

19   BY MR. EDWARDS:

20       Q.    Right.  Okay.  But you chose to give ten

21   examples in your report of audit errors, correct?

22           MR. TAYLOR:  Objection; form.

23           You can answer.

24       A.    I listed -- I listed ten.  Correct.

25                         - o -

Page 49

1   BY MR. EDWARDS:

2       Q.   Okay.  And why did you choose to list just

3   those ten?

4       A.   Yeah.  As I said, this is -- you know, I don't

5   recall my rationale at the time I was going through the

6   documents and why I listed these and not others that are

7   similar in nature or different.  I don't quite -- I

8   don't recollect what that rationale was.

9       Q.   Do you have any notes or writings of any kind

10  which set forth other examples, other than these ten

11  here, of -- of errors with the audit data?

12          MR. TAYLOR:  I'm going to object as to

13          getting into privileged draft information.  He

14          can answer that specific question without getting

15          into the contents, but I just want to flag that

16          this is getting into some, you know,

17          confidential, privileged, protected information.

18          But you can answer that specific question.

19      A.   Yeah.  As I understood that, do I have notes

20  that call out additional exceptions?  I don't have

21  notes.

22  BY MR. EDWARDS:

23      Q.   Okay.  Do you believe that one of the reasons

24  why you selected these ten examples of county audit

25  errors starting on Page 3 with the bullet points is

Page 50

1    because you believe these to be the clearest examples of

2    errors with regard to Dollar General products?

3            MR. TAYLOR:  Objection; form.

4            You can answer.

5        A.   Let me put it this way:  I just -- just

6    because I did not list them here doesn't necessarily

7    indicate that they weren't clear to me.  I will just go

8    back to saying I -- I don't recall the rationale why I

9    chose these in particular.  These are pretty clear, but

10   I really don't recall the -- the approach.

11   BY MR. EDWARDS:

12       Q.   So sitting here today, it sounds like you're

13   not able to state any of the reasons why you selected

14   these ten examples, starting on Page 3 of government

15   audit errors, in your opinion, correct?

16           MR. TAYLOR:  Objection; form.

17           You can answer.

18       A.   I don't.  I mean, I will add that, you know,

19   these are -- these are errors that make me question the

20   reliability of the reports themselves, which was one of

21   the duties I was tasked with, really: to opine on the

22   reliability and the integrity of the data.

23           So, you know, it supports my conclusion.  I

24   further mention on Page 5 that these are just a few

25   examples of the inaccuracies in the audit data.  It

Page 51

```
 1   isn't clear why so many of the audit reports were
 2   incorrect.  But, you know, there were several
 3   inaccuracies, and I -- I don't know the specific reason
 4   why these ten were chosen.
 5   BY MR. EDWARDS:
 6        Q.   But sitting here today, aside from these ten,
 7   you're not able to provide additional examples of
 8   inaccuracies in the audit data, correct?
 9             MR. TAYLOR:  Objection; form.
10             You can answer.
11        A.   Other than what's already in this opinion
12   report, off the top of my head, I don't -- I don't
13   recall specific issues that involve any type of product
14   names or pricing.
15   BY MR. EDWARDS:
16        Q.   Okay.  On Page 3 of your report -- scratch
17   that.  I'll start again.
18             On Page 2 of your report, in the first
19   paragraph under Section 3, I'm looking at the sentence
20   which starts with "I reserve the ability to."  Do you
21   see that?
22        A.   Yes.
23        Q.   There, you wrote in your report:  "I reserve
24   the abilities to (a) review documents, deposition
25   transcripts, expert reports, or other information still
```

Page 52

1    to be produced by the parties to this dispute and, (b),

2    supplement my opinions based upon that review if

3    appropriate."

4            Did I read that right?

5        A.    Yes.

6        Q.    Why did you include this sentence in your

7    report?

8            MR. TAYLOR:  Objection; form.

9        A.    I'd like to know if anything subsequent was

10   available for me to review.

11   BY MR. EDWARDS:

12       Q.    But you specifically reserved the right to do

13   additional work and modify your opinions in the event

14   additional data is produced; is that right?

15       A.    I think it depends on the data.  I do -- I do

16   reserve the -- the ability to review any new information

17   that surfaces.  Based on the information I have, you

18   know, this is my opinion.

19       Q.    So let me ask you this:  If additional data

20   comes to light which you believe is relevant, you

21   reserve the right to modify your opinions in this

22   report?

23           MR. TAYLOR:  Objection; form.

24           You can answer.

25       A.    Yes.  I would like to review the data.

Page 53

1   BY MR. EDWARDS:

2        Q.   Okay.  All right.  Let's go ahead and make the

3   next exhibit here.  This one may take a minute because

4   it's very large.  It's DG_WOLF_40562, the large data

5   spreadsheet.  Okay?  And we're going to call that

6   Exhibit 3.

7             (Exhibit No. 3 marked for identification.)

8   BY MR. EDWARDS:

9        Q.   I've introduced it, but it hasn't loaded yet

10  because it's a huge document, so we'll just give it a

11  minute.

12            All right.  Are you able to see that now?

13       A.   It's loading on my end.  I can see the

14  perimeter, but the data hasn't loaded yet.

15       Q.   I figured it might take a minute.

16       A.   There it is.

17       Q.   Okay.  You're familiar with this document

18  which we've identified as Exhibit 3, the large

19  spreadsheet?

20       A.   I believe so.

21       Q.   Okay.  And are you -- are you clicked on the

22  "DG Data" tab at the bottom?

23       A.   I'm there now.

24       Q.   Okay.  On the left side, do you see "Date" on

25  the far left, top left corner?

Page 54

1      A.    Yes.

2      Q.    And then next to that it says "Original Sort

3  Order"?

4      A.    Yes.

5      Q.    Is -- I want to make sure and confirm.  On

6  your screen, the products are sorted by the original

7  sort order; in other words, the -- the first entry there

8  in Row 2 would be -- No. 1 under "Original Sort Order,"

9  it would be "Hanes Boy's Tagless Briefs"?

10     A.    Yes.

11     Q.    Okay.  Sounds like we're on the same page.

12 Whew.

13           Can you describe your understanding of how

14 this document was created?

15           MR. TAYLOR:  Objection; form.

16     A.    Yeah.  This is a -- you know, sitting here,

17 it's been a while since I looked at this.  I can't -- I

18 cannot walk you through how this was created.

19 BY MR. EDWARDS:

20     Q.    Okay.  Do you know the criteria used to match

21 the items from the government audits to the items in --

22 in this spreadsheet, the Dollar General transaction

23 data?

24           MR. TAYLOR:  Objection; form.

25           You can answer.

Page 55

1          A.   I don't recall.

2     BY MR. EDWARDS:

3          Q.   Other than counsel, have you spoken with any

4     individuals at Dollar General about the information

5     Dollar General input into the spreadsheet?

6          A.   No.

7          Q.   Did you perform an audit or thorough review of

8     the information in this spreadsheet for accuracy?

9               MR. TAYLOR:  Objection; form.

10              You can answer.

11         A.   No.

12    BY MR. EDWARDS:

13         Q.   But you did rely upon this spreadsheet, 40562,

14    to identify the price discrepancies in Section A of your

15    declaration, correct?

16              MR. TAYLOR:  Objection; form.

17              You can answer.

18         A.   This was -- yeah.  This was one of the many

19    files I relied on for my opinion.

20    BY MR. EDWARDS:

21         Q.   In fact, you relied on the information in this

22    spreadsheet specifically to identify the pricing

23    discrepancies you set forth in your report, correct?

24              MR. TAYLOR:  Objection to form.

25         A.   In some of them, yes.

Page 56

1    BY MR. EDWARDS:

2        Q.   I'd like to run through some of the key fields

3    to make sure that we share the same understanding of

4    each field and ensure that there's no confusion.  Okay?

5    To do that, we'll go ahead and mark Exhibit 4.

6             (Exhibit No. 4 marked for identification.)

7    BY MR. EDWARDS:

8        Q.   It is also a spreadsheet, so I can't put an

9    exhibit tag on it, but I have just introduced it as

10   Exhibit 4.  It's a smaller spreadsheet, so it will,

11   hopefully, populate for you quicker.

12       A.   I have it.

13       Q.   Okay.  So this is Exhibit 4, and it's DG_WOLF

14   Bates 00040563.  Okay?  The question is:  Have you

15   reviewed this document before today?

16       A.   I don't recall.  I really don't.

17       Q.   Okay.  So do you know what the original sort

18   order is as set forth in the large spreadsheet we've

19   marked as Exhibit 3?

20            MR. TAYLOR:  Objection; form.

21       A.   Can you clarify the question?

22   BY MR. EDWARDS:

23       Q.   I'll cut to the chase here.  The first column

24   label is "Original Sort Order."  Do you agree?  I'm

25   looking back at Exhibit 3, the large spreadsheet.

Page 57

1          A.    Hang on.  I have to exit out of this.  I don't

2     have them side by side.  It's loading.  One second.

3                Column A is "Date," and Column B is the sort

4     order.

5          Q.    Okay.  I'm going to identify lines -- products

6     by sort order.  Can we agree to do that, so you'll know

7     how to get to the products I'm referencing?

8          A.    Yes.

9          Q.    And each item identified by the original sort

10    order has 30 corresponding rows or entries; is that

11    correct?

12         A.    I'll have to count them, but I do see a number

13    of columns.

14         Q.    And are you aware that each row corresponds to

15    30 days before the violation or audit date, which may or

16    may not have had a customer sale?  Do you understand

17    that?

18                MR. TAYLOR:  Objection; form.

19                You can answer.

20         A.    I don't recall the details at the time I was

21    looking at this for my analysis.

22    BY MR. EDWARDS:

23         Q.    Okay.  You're aware that this Dollar General

24    spreadsheet contains sales information for products

25    identified by government audits as overcharges?

Page 58

1       A.   I believe that sounds familiar, but, again, I
2   can't say with full certainty.  I don't recall when I
3   was doing this, you know, what -- what I was referencing
4   to at the time.
5       Q.   Do you know, sitting here today, how far back
6   in time from the government audit the sales information
7   contained in this spreadsheet goes?
8       A.   I don't recall.
9       Q.   Okay.  Is it your opinion that during this
10  class period, which started on May 30th, 2020, no
11  product on the shelf at a New York Dollar General store
12  was inaccurately priced on the shelf for more than 30
13  days?
14           MR. TAYLOR:  Objection; form.
15      A.   I'm not clear on the question.
16  BY MR. EDWARDS:
17      Q.   Do you have an opinion as to whether during
18  this class period, starting in May of 2020, any product
19  on the shelf at a New York Dollar General store was
20  inaccurately priced on the shelf for more than 30 days?
21           MR. TAYLOR:  Objection; form.
22           You can answer.
23      A.   Yeah, I -- I don't know.  I don't have an
24  opinion, sitting here.
25                    - o -

Page 59

```
 1  BY MR. EDWARDS:
 2      Q.   Is it possible that a product identified as an
 3  overcharge by a government audit sat on the Dollar
 4  General shelf inaccurately priced for more than 30 days?
 5           MR. TAYLOR:  Objection; form.
 6           You can answer.
 7      A.   That's hard to tell.  I don't -- I can't tell.
 8  BY MR. EDWARDS:
 9      Q.   The question is:  Is it possible?
10           MR. TAYLOR:  Same objection.
11      A.   I don't know.
12  BY MR. EDWARDS:
13      Q.   Do you see the column labeled "Shelf Retail"?
14      A.   Yes.  Column M.
15      Q.   Okay.  Do you know what that refers to?
16      A.   I would assume what it says, but I -- again, I
17  can't say for sure without spending more time reviewing
18  this.
19      Q.   Well, it just says "Shelf Retail," right?
20      A.   Yes, it does.
21      Q.   I'm wondering if you know what that means in
22  the context of this spreadsheet.
23           MR. TAYLOR:  Objection; form.
24      A.   Definitionally, I don't, in the context of
25  this spreadsheet at this point, no.
```

Page 60

1    BY MR. EDWARDS:

2         Q.   On the same spreadsheet, go to Column N1.  It

3    states "POS Retail."  Do you see that?

4         A.   I do.

5         Q.   What does that refer to?

6         A.   Again, I would say the same.  You know, I see

7    what it says, I see what it reads, but definitionally,

8    technically speaking as it pertains to this spreadsheet,

9    I -- it's hard for me to conclude right now.

10        Q.   So you see that there, in Column N, are a

11   number of prices for many, many, many products at Dollar

12   General, under the heading "POS Retail," correct?

13        A.   Correct.

14        Q.   But do you know what those prices refer to?

15             MR. TAYLOR:  Objection; form.

16        A.   I'll say the same:  I -- you know, I don't

17   know at this point.

18   BY MR. EDWARDS:

19        Q.   Do you know how the New York inspector or

20   auditor that performed any of these government audits at

21   issue in this case would obtain the POS retail price?

22             MR. TAYLOR:  Objection; form.

23             You can answer.

24        A.   In reviewing the audit reports, again, I don't

25   recollect -- a lot of the audit reports, and I've stated

Page 61

1    that here in my opinion, it -- it does not appear from

2    reading the report and the notes and the procedures that

3    the auditor actually verified the pricing to the

4    point-of-sale terminal.  So, you know, I -- I can't

5    conclude whether -- whether or not they did.  It doesn't

6    seem like they did.

7    BY MR. EDWARDS:

8        Q.   So where did -- where does the pricing

9    information in Column N labeled "POL" -- "POS Retail"

10   come from?

11       A.   I don't -- I don't recall.  I don't know.

12       Q.   Okay.  So on the same spreadsheet we've marked

13   as Exhibit 3, under Column T1, do you see "Store

14   Retail"?

15       A.   I do.

16       Q.   Do you know what "Store Retail" refers to?

17       A.   I don't.

18       Q.   Okay.  And you see in Column W1, it states

19   "Default Retail," correct?

20       A.   Correct.

21       Q.   Do you know what "Default Retail" refers to?

22       A.   I don't recall.

23       Q.   Okay.  And under Column X1, it states "Retail

24   at Audit."  Do you see that?

25       A.   I do.

Page 62

1      Q.   Do you know what "Retail at Audit" refers to?

2      A.   I don't recall.

3      Q.   So I'm assuming you couldn't tell us the

4  relationship between "Store Retail," "Default Retail,"

5  and "Retail at Audit," as those -- as that information

6  is described and set forth in this Dollar General

7  spreadsheet we've marked as Exhibit 3, correct?

8           MR. TAYLOR:  Objection; form.

9           You can answer.

10     A.   At this point, looking at this, you know, with

11 limited time, I -- you know, I can't tell.

12 BY MR. EDWARDS:

13     Q.   But you looked at this -- you looked at this

14 spreadsheet and relied on this spreadsheet in forming

15 your opinions set forth in your report, correct?

16     A.   That's correct.

17     Q.   Okay.  Do you -- do you know why "Store

18 Retail" is not available -- would not be available for

19 some of the products listed in this spreadsheet?

20          MR. TAYLOR:  Objection; form.

21     A.   I don't know the answer.  I don't recall.

22 BY MR. EDWARDS:

23     Q.   Do you know why "Store Retail" might differ

24 from "Default Retail"?

25          MR. TAYLOR:  Objection; form.

Page 63

1       A.    I don't recall at this point.

2    BY MR. EDWARDS:

3       Q.    Did you conduct any sort of analysis of the

4    differences, if any, between the "Store Retail" and the

5    "Default Retail" prices listed in Exhibit 3, this

6    spreadsheet?

7       A.    Look, I mean, it's been a while, and, you

8    know, when I was reviewing this, there's a variety of,

9    you know, analyses or procedures -- however you want to

10   call it -- that I conducted, you know, with ample time

11   on hand.

12          You know, right now, looking at it, it's hard

13   for me to walk through it and ensure I'm understanding

14   the -- the headers.

15      Q.    Before you generated your report in this case,

16   describe for me the analysis that you conducted of the

17   differences between "Store Retail" and "Default Retail"

18   prices listed in this spreadsheet.

19          MR. TAYLOR:  Objection; form.

20          You can answer.

21      A.    Yeah.  It's -- it's been -- it's been a while.

22   I just can't recall that.

23   BY MR. EDWARDS:

24      Q.    How long has it been since you looked at this

25   spreadsheet before today, Exhibit 3?

1      A.   I -- not recently.  I don't recall.

2  BY MR. EDWARDS:

3      Q.   Okay.  Was it during the time when you were

4  preparing this report?

5      A.   I really don't recall.

6      Q.   When did you prepare your expert report in

7  this case?

8      A.   That's also a good question.  I don't recall

9  that.

10      Q.   The report is dated March 18th, 2024, correct?

11  That's when you executed it?

12      A.   That's when I signed it.  Correct.

13      Q.   Okay.  Do you know approximately how -- how

14  long you started working on this report prior to its

15  submission in March of 2024?

16          MR. TAYLOR:  Objection; form.

17      A.   I don't -- I don't recollect, no.

18  BY MR. EDWARDS:

19      Q.   Let's walk through some of your ten examples

20  that you set forth where you believe that the county

21  audit data is erroneous.  Are you with me?

22      A.   I am.

23      Q.   Give me just a second, please.

24          Okay.  Turn to Page 4 of your report for me,

25  please.

Page 65

1    A.   Yes.

2    Q.   Read me the last bullet point into the record,

3    please, that starts with "On April 19th," that entire

4    bullet point.

5    A.   "On April 19th, 2022, an auditor inspected a

6    Dollar General store in Manchester, New York.  In doing

7    so, he noted that Rexall Ointment in that store had a

8    shelf price of $3.25 but had a register price of $3.45."

9         See DG-WOLF citation.

10         "However, Dollar General pulled what the

11   register price was for that item during that time frame,

12   and it was listed as $3 (and had been at that same price

13   for at least ten months)."

14         We have another reference citation, and this

15   is in the parentheses: "DG Data tab, original sort order

16   696, Columns U-AD," closed parentheses.

17         "Moreover, during the 30 days preceding that

18   audit, there was one sale of that item, and it was for

19   $3," and the transaction ID is also mentioned as

20   979402541.

21    Q.   Okay.

22         (Exhibit No. 5 marked for identification.)

23   BY MR. EDWARDS:

24    Q.   I've marked as Exhibit 5 the price

25   verification report, or inspector audit report, as we've

Page 66

1    been referring to it.  It's Bates Nos. 0004136 and 4137.

2    Let me know when you're able to view that, please.

3         A.   It's up on the screen.

4         Q.   Okay.  Turn to the second page of Exhibit 5,

5    which is Bates 0004137.  Are you there?

6         A.   I am.

7         Q.   And there, under Line 2, you see "Rexall

8    Ointment," correct?

9         A.   Yes.

10        Q.   That's the item that the government inspector

11   in New York identified as having a pricing error,

12   correct?

13        A.   Correct.

14        Q.   And you cited this in your declaration,

15   correct?

16        A.   What are you looking at?

17        Q.   Your report.

18        A.   3.45.  Yes.

19        Q.   Okay.  And what is the -- well, first of all,

20   you're aware that you can use the plus and minus tabs at

21   the top of this page to zoom in?

22        A.   Yes.  Thank you for that.

23        Q.   Okay.  What is the SKU that the auditor noted

24   there for this product?

25             MR. TAYLOR:  Objection; form.  Objection;

Page 67

1          misstates the testimony.

2                You can answer.

3     BY MR. EDWARDS:

4          Q.   The Rexall product that you refer to in your

5     report?

6          A.   It looks like a 595303.

7          Q.   Okay.  595303.  Now, let's go back to

8     Exhibit 3, which is the large data spreadsheet that you

9     relied on, and go down to "Original Sort Order 696,"

10    please.

11         A.   Okay.  I'm there.

12         Q.   Well, you made it there faster than I did, so

13    give me just a sec.

14               Okay.  Under "696," this is the Rexall

15    Ointment at issue, correct?

16         A.   It appears so.

17         Q.   Okay.  And to confirm your testimony earlier,

18    the auditor wrote down the SKU for the Rexall product at

19    issue as 595303, correct?

20               MR. TAYLOR:  Objection; form.

21               You can answer.

22         A.   I know we just looked at it.  I don't quite --

23    I think that sounds right.

24    BY MR. EDWARDS:

25         Q.   Okay.  And go over to the "Identified Dollar

Page 68

 1   General SKU" column for the Rexall product at issue.
 2   Are you there?
 3        A.   You want me to go to the item number?  I'm
 4   sorry?
 5        Q.   The "Identified DG SKU."
 6        A.   Give me a second.  "Identified DG SKU."
 7             Yes, Column G.
 8        Q.   Okay.  That SKU number is 00596901, isn't it?
 9        A.   Yes.
10        Q.   That's different than the product that the
11   auditor identified in his report, isn't it?
12             MR. TAYLOR:  Objection; form.
13             You can answer.
14        A.   Yeah.  Hard -- hard to tell.  I'm doing this
15   live with you.  Ideally -- right? -- I'd like to have
16   everything and sort of take my time looking at it and
17   corroborate it.  It's difficult to tell now when we're
18   bouncing around different files.
19   BY MR. EDWARDS:
20        Q.   Let's go over to next to Rexall Ointment.  It
21   starts with a "245."  Do you see that?
22             MR. TAYLOR:  Can you tell me what column it
23        is, Adam?
24             MR. EDWARDS:  "D."
25             MR. TAYLOR:  "D."  Okay.

1          THE WITNESS:  245303.

2    BY MR. EDWARDS:

3          Q.   Do you see that?

4          A.   I do.

5          Q.   Does "Item" refer -- what does "Item" refer to

6    here?

7          A.   Yes.  That's what I was saying earlier.

8    It's -- you know, when I was going through this -- you

9    know, it's -- I don't recall.  I don't recall at this

10   point.  It's been a while, and it's hard for me to tell

11   you the technical definitions of what's what at this

12   point.

13         Q.   Okay.  But under "Item," the number listed is

14   245303 -- correct? -- for the Rexall Ointment that you

15   cite in your report?

16         A.   Yes.

17         Q.   And, again, the auditor noted that the SKU was

18   595303, correct?

19              MR. TAYLOR:  Objection.

20              You can answer.

21         A.   I'm referring to my report.  Give me a minute.

22   I don't see where it says that, unless I'm -- I'll have

23   to go back to the exhibit.  Give me a second here.

24              It appears like a "5" and then "95303" on your

25   UPC or SKU.

1    BY MR. EDWARDS:

2       Q.   Okay.  So that the product number that the

3    auditor identified, 595303, is different than the item

4    number that Dollar General identified, which is 245303,

5    correct?

6            MR. TAYLOR:  Objection; form.

7       A.   It's hard to tell.  For me, I -- you know, at

8    this point, like I said, trying to reconcile the two

9    and -- it's hard for me to comment on that.

10   BY MR. EDWARDS:

11      Q.   Well, you can comment on whether the numbers

12   are the same, right?

13      A.   Yeah.  I mean, the number 595303 is -- yeah.

14   I'm trying to go back to Exhibit 3.

15           Yeah, I see here on the screen that the

16   numbers are different.

17      Q.   Okay.  I'm going to mark the next exhibit.

18           (Exhibit No. 6 marked for identification.)

19   BY MR. EDWARDS:

20      Q.   Let me know when you can see Exhibit 6,

21   please.

22      A.   It's up on my screen.

23      Q.   Okay.  I'll represent to you that this is a

24   screenshot from the Dollar General website, and under

25   "Product Details," do you see where it says "Rexall

Page 71

1    Bacitracin Antibiotic Ointment"?

2        A.    I'm not able to scroll on the screen, so I

3    have to minimize.  Give me a minute.

4             Available in store, Rexall -- brand

5    description Rexall.  I see that.  And I see the unit

6    size, yeah.

7        Q.    Do you see that the product is for sale for

8    3.65?

9        A.    I see it.

10       Q.    And there's one in stock at 86 South Main

11   Street in Manchester, New York?

12       A.    Yes.

13       Q.    Okay.  And the SKU number for this product is

14   "00" but then it's "595302," correct?

15       A.    Correct.

16       Q.    Is it possible that this is the item the

17   auditor was looking at and not the item reported in

18   DG_WOLF_40562, the spreadsheet?

19            MR. TAYLOR:  Objection; form.

20            You can answer.

21       A.    Hard to tell, for me.  Like I said, I'll need

22   to do more to opine on that.  It's -- I really can't

23   say.

24   BY MR. EDWARDS:

25       Q.    The question was:  Is it possible?

 1            MR. TAYLOR:  Same objection.

 2       A.   I would still say it's difficult to comment.

 3    BY MR. EDWARDS:

 4       Q.   So you're not able to answer?

 5            MR. TAYLOR:  Same objection.

 6       A.   I -- it's hard for me to say.

 7    BY MR. EDWARDS:

 8       Q.   Where the SKU for the product is noted in one

 9    of the examples that you provide in your report for a --

10    an overpriced product in a New York inspection, what did

11    you do to confirm that the DG Data product data, matched

12    the SKU for the product identified by the auditor?

13            MR. TAYLOR:  Objection; form.

14            You can answer.

15       A.   I -- again, that's been -- it's been a while.

16    Hard for me to recall all the procedures and steps I

17    took, sitting here.

18    BY MR. EDWARDS:

19       Q.   Did you do anything to confirm that the

20    product identified in these failed New York inspections

21    matched up with the data that you relied upon in the

22    Dollar General spreadsheet?

23            MR. TAYLOR:  Objection; form.

24            You can answer.

25       A.   There's a lot I did.  I just -- you know,

1   sitting here, it's been a while.  I just -- I don't

2   recall any details.

3   BY MR. EDWARDS:

4        Q.   Okay.  Let's go back to your report.

5             MR. TAYLOR:  Hey, Adam, when you get to a

6        good stopping spot in the next five minutes or

7        so, maybe take another break.

8             MR. EDWARDS:  Okay.  Sure.  I'll get through

9        this line, and we'll take a -- take another

10       break.

11            MR. TAYLOR:  Okay.

12   BY MR. EDWARDS:

13       Q.   I'm going to direct you to Page 3 of your

14   report.

15       A.   Yes.

16       Q.   Just a sec.

17            Actually, go to Page 4 of your report, the

18   bullet point at the very top, which refers to the item

19   Tums Chewy Bites 32-count.  Do you see that?

20       A.   I do.

21       Q.   Okay.  I'm going to read the beginning of this

22   from your report.  This is your quote:  "The item Tums

23   Chewy Bites 32-count was identified as being an

24   overcharge based on a March 1st, 2023, audit of a Dollar

25   General store in Rochester, New York.  The auditor found

1    that the shelf price for this item was $5 and that it

2    scanned for 5.75.  However, when Dollar General pulled

3    the data for this item at the store, it showed that the

4    price was actually $5."

5              Do you see that?

6         A.   I do.

7         Q.   Okay.  I'm going to go ahead and mark

8    Exhibit 7.

9              (Exhibit No. 7 marked for identification.)

10             THE WITNESS:  I see it.

11   BY MR. EDWARDS:

12        Q.   Okay.  If you'll go down to the last page of

13   the document -- it's Bates 0004554 -- under Item 3,

14   you'll see "Tums."  Do you see that?

15        A.   I do.

16        Q.   Is this where you took the information from

17   that you included in your report to demonstrate what you

18   believe to be an error regarding the Tums Chewy Bites

19   32-count?

20             MR. TAYLOR:  Objection; form.

21             You can answer.

22        A.   I don't know if it was this specific report or

23   page.  I don't recall.

24   BY MR. EDWARDS:

25        Q.   Well, this was an audit -- if you go to the

Page 75

1  first page of Exhibit 7, this was an audit from 3/1/23,

2  at the Dollar General store at 529 Monroe Avenue,

3  Rochester, New York, right?

4      A.   Yes.   That's what it reads.

5      Q.   Right.  And that's exactly what you cited in

6  your report, right?

7      A.   March 1, 2023.  I cite March 1, 2023, in my

8  report, yes.

9      Q.   Right.  At a Dollar General store in

10  Rochester, New York, correct?

11      A.   Correct.

12      Q.   So this appears to be the New York audit

13  report that you would have been reviewing to draft this

14  section of your report, right?

15          MR. TAYLOR:  Objection; form.

16          You can answer.

17      A.   Again, I -- you know, I don't know.  There

18  could be multiple reports in the file folder.  I

19  don't -- I don't -- it's hard for me to tell.

20  BY MR. EDWARDS:

21      Q.   Well, it says the auditor found that the shelf

22  price for this item was $5 and that it was scanned at

23  5.75, correct?  That's what you state?

24      A.   Right.

25      Q.   And that's exactly what it says next to Line 3

Page 76

1   of Bates No. 4554, next to the Tums product, correct?

2        A.   That's what it says on my screen, yes.

3        Q.   Okay.  So it's likely this document is where

4   you pulled the information about this Tums product,

5   right?

6             MR. TAYLOR:  Objection; form.

7             You can answer.

8        A.   Yeah, again, that -- that part, it's hard for

9   me to comment, again, because I just -- I'll need more

10  time.

11  BY MR. EDWARDS:

12       Q.   Mr. Sajnani, you've seen all of the

13  information that matches up between your report and this

14  exhibit that I've got in front of you here, right?

15       A.   It does match, yes.

16       Q.   Okay.  I mean, do you think it's possible that

17  it's just a coincidence that everything matches?

18            MR. TAYLOR:  Objection; form.

19       A.   Hard to tell.  Really hard to tell.

20  BY MR. EDWARDS:

21       Q.   Okay.  So with regard to the Tums Chewy Bites

22  error that you've identified at the top of Page 4 of

23  your report, in the bullet point, where did you get the

24  information which allowed you to make the statement the

25  items -- or the item Tums Chewy Bites 32-count was

Page 77

1    identified as being an overcharge based on a March 1st,

2    2023, audit of a Dollar General store in Rochester,

3    New York?

4        A.    Yeah, look, I don't recall at the time which

5    specific document I was referring to.  It's been a

6    while, like I said, so I can't really pinpoint, you

7    know, which document that was in particular, what it

8    looked like.  It's hard for me to recall that from

9    memory.

10       Q.    Well, I'm actually showing you the March 1st,

11   2023, audit of the Dollar General store in Rochester,

12   New York, which mentions a Tums product.  Isn't it

13   likely that Exhibit 7 is where you got the information

14   that you included in your report?

15            MR. TAYLOR:  I'm going to object.  I mean,

16       he mentions multiple documents in this bullet

17       point, Adam, and you keep referencing only one

18       document, and I don't think it's a fair question.

19       So objection; form.

20            You can answer.

21       A.    Yeah, I will still say the same thing:  It's,

22   you know -- just going back in time, it's hard for me

23   to -- to recall specifics.

24   BY MR. EDWARDS:

25       Q.    So sitting here today, you're unable to tell

Page 78

1   me where you got the information that you include in the

2   first bullet point of Page 4 of your report related to

3   the Tums Chewy Bites 32-count, correct?

4           MR. TAYLOR:  Objection; form.

5       A.   I don't -- I don't recall the specifics of the

6   documents and the specific columns I refer to or -- you

7   know, I don't recall, sitting here, the specifics of

8   what I looked at.

9   BY MR. EDWARDS:

10      Q.   Let's go back to the Exhibit 3.  That is the

11  large spreadsheet.

12      A.   It's loading.

13      Q.   And go down to Sort Order 1573, please.  And

14  it will take us both a minute to get there.

15      A.   I see it.

16      Q.   I think your computer's faster than mine, so

17  bear with me.

18      A.   In some cases, it seems like.

19      Q.   My wheel's spinning, so I think we're getting

20  close.

21           Okay.  1573 identifies a Tums product.  Do you

22  see that?

23      A.   I do.

24      Q.   And then if you scroll over to the SKU

25  description, it states "Tums Chewy Bites 32-count,"

Page 79

1   correct?

2        A.   Correct.

3        Q.   And here Dollar General provides sales

4   information on this spreadsheet for Tums 32-count Chewy

5   Bites, right?

6        A.   Which column is that?

7        Q.   Well, lots of the columns have information

8   about pricing and --

9        A.   Yes.

10            MR. TAYLOR:  Well, your question, Adam, was

11       about sales.  The list --

12            MR. EDWARDS:  Okay.

13            MR. TAYLOR:  -- (inaudible) here.

14   BY MR. EDWARDS:

15       Q.   Okay.  Do you see that there's pricing data

16   related to sales of Tums Chewy Bites 32-count here in

17   the spreadsheet, correct?

18       A.   Correct.

19       Q.   And that pricing information is what you rely

20   on to identify the error in your report, or what you

21   believe to be an error, correct?

22            MR. TAYLOR:  Objection; form.

23       A.   I don't -- again, I don't recall if this was a

24   specific column or the row I looked at at the time.

25   But, yes, this spreadsheet was involved in my review.

1   BY MR. EDWARDS:

2       Q.   Okay.  Well, what you say in your report is --

3   and I'm going back to that first bullet point, at the

4   top of Page 4.  You state, "However, when Dollar General

5   pulled the data for this item at the store, it showed

6   that the price was actually $5."  Right?

7       A.   Correct.

8       Q.   Okay.  And the auditor noted that the shelf

9   price for the item was $5, correct?

10      A.   Correct.

11      Q.   And that's why you say the auditor made an

12  error, right?

13          MR. TAYLOR:  Objection; form.

14      A.   No, I don't think that's what it says here.

15  So the auditor found the shelf price to be 5, it scanned

16  at 5.75, and Dollar General's price showed 5.  So -- and

17  maybe we're saying the same thing.

18  BY MR. EDWARDS:

19      Q.   Okay.  This bullet point was included in your

20  report to demonstrate that the auditor for this Tums

21  Chewy Bite 32-count product made an error when it

22  designated this to be an overcharge, correct?

23          MR. TAYLOR:  Objection; form.

24      A.   Yeah.  Based on this bullet point, yes.

25                   - o -

Page 81

1   BY MR. EDWARDS:

2       Q.   Okay.  But for this to be an error, you're

3   relying on Dollar General's data showing that the price

4   for this Tums Chewy Bite 32-count product was actually

5   $5, right?

6           MR. TAYLOR:  Objection; form.

7       A.   It is Dollar General's data, yes.  But what

8   I'm saying is I'm not sure if I can speak to this

9   specific row or column that we're looking at at this

10  point.

11  BY MR. EDWARDS:

12      Q.   The New York inspector just noted "Tums" in

13  the exhibit that I've shared with you, though, correct?

14  He didn't say anything about 32-count Chewy Bites, did

15  he?

16      A.   In the exhibit that you shared, which was, I

17  believe No. 5 -- is that right?  Should I open it up?

18      Q.   It's Exhibit 7.

19      A.   Sorry.  Let me just go back.

20          MR. TAYLOR:  Adam, are we at a good stopping

21      point?

22      A.   Tums --

23          MR. EDWARDS:  As soon as I'm done with this

24      line, we'll take a break.  It won't be more than

25      five minutes.

Page 82

```
 1            MR. TAYLOR:  It's been 20 minutes.
 2            THE WITNESS:  Tums.
 3   BY MR. EDWARDS:
 4       Q.   Okay.  He lists Tums, not Tums 32-count Chewy
 5   Bites, right?
 6       A.   Correct.
 7       Q.   And the inspector identified 11 digits of a
 8   UPC code here in his audit report, correct?
 9       A.   Right.
10       Q.   And that UPC code is 30766739287.  Do you see
11   that?
12       A.   I do.
13       Q.   Do you have a pen with you?
14       A.   I do not.
15            MR. EDWARDS:  Trent, you might want to share
16       with him a pen.
17            MR. TAYLOR:  Okay.  For what purpose?
18            MR. EDWARDS:  Well, I'm going to ask him
19       about this UPC, and I'm just thinking it would be
20       easier if he wrote it down as opposed to going
21       back and forth between exhibits.  I'm just trying
22       to save time.
23   BY MR. EDWARDS:
24       Q.   Did you write down the UPC code 30766739287?
25       A.   I just did.  Yes.
```

1      Q.   Okay.  Did you attempt to confirm whether this

2   32-count Tums Chewy Bites product DG identified actually

3   matched up with the UPC code the New York inspector

4   noted?

5           MR. TAYLOR:  Objection; form.  Objection;

6       assumes facts not in evidence.

7           You can answer.

8      A.   Yeah, I'll say the same.  I mean, I don't

9   recall the specific procedures I -- I followed at the

10  time.

11  BY MR. EDWARDS:

12     Q.   For any of the ten examples of errors that you

13  identified in your -- in your report, did you confirm

14  that the D- -- the Dollar General product data provided

15  to you matched up with the product codes identified by

16  New York inspectors?

17          MR. TAYLOR:  Objection; form.

18     A.   I don't -- I don't recall the specific steps.

19  BY MR. EDWARDS:

20     Q.   A UPC code is a universal code, correct?

21          MR. TAYLOR:  Objection; form.

22     A.   My understanding is yes.

23  BY MR. EDWARDS:

24     Q.   Okay.  That means that the code is specific to

25  a unique product, not the store who sells it, right?

Page 84

1          MR. TAYLOR:  Objection; assumes facts not in

2      evidence.  Objection; form.

3          You can answer.

4      A.   Yeah.

5   BY MR. EDWARDS:

6      Q.   Sorry.  Did you answer?

7      A.   My understanding is yes.

8      Q.   Okay.

9          MR. EDWARDS:  We can take a five-minute

10     break now, Trent, if you'd like.

11         MR. TAYLOR:  Okay.  And I may make it --

12     let's go off the record first.

13         MR. EDWARDS:  Okay.

14         THE VIDEOGRAPHER:  This is the end of Media

15     Unit No. 3 (sic).  We are off the record at

16     2:23 p.m.

17         (Recess from 2:23 p.m. to 2:40 p.m.)

18         THE VIDEOGRAPHER:  This is the beginning of

19     Media Unit No. 3.  We are on the record at

20     2:40 p.m.

21  BY MR. EDWARDS:

22     Q.   All right.  Mr. Sajnani, we just had a break.

23  I want to remind you that you're still under oath, with

24  penalty of perjury, just as if you were testifying live

25  in court today.  Do you understand that?

1    A.    I do.

2    Q.    Okay.  Did you get a cup of coffee over the

3    break?

4    A.    I did not.

5    Q.    Okay.  Did you review any documents at all

6    over the break?

7    A.    No, I did not.

8    Q.    Okay.  Did you have any conversations with

9    Mr. Taylor pertaining to anything related to this case?

10    A.    No, I did not.

11    Q.    Okay.  Did you have any conversations with

12    anyone during the break?

13    A.    The barista outside.

14    Q.    Okay.  But the barista wouldn't give you a cup

15    of coffee, or was that just for Mr. Taylor?

16    A.    He was preparing it for Mr. Taylor.

17    Q.    Okay.  All right.  We're back from the break,

18    and we're still talking about the first bullet point on

19    Page 4 of your report, where you describe an example of

20    what you believe to be an auditor error concerning Tums

21    Chewy Bites 32-count, correct?

22    A.    Correct.

23    Q.    And you wrote down the UPC code for the

24    product identified in the New York audit for the Tums

25    product, correct?

1        A.    I wrote it, yeah, based on your instruction.

2    Yep.

3        Q.    Okay.  And what was that UPC code that the

4    New York auditor identified related to this Tums product

5    at issue?

6        A.    30766739287.

7              (Exhibit No. 8 marked for identification.)

8    BY MR. EDWARDS:

9        Q.    Okay.  I've marked the next exhibit as

10   Exhibit 8.  Let me know when you can see it, please.

11       A.    Not yet.

12       Q.    Run a refresh for me, please.

13       A.    I see it.

14       Q.    Okay.  I'll represent to you that this is a

15   screenshot taken from the Walmart website.  And please

16   use your zoom function.  If you zoom in on the picture,

17   at the top left, this appears to be a 32-count Tums

18   Chewy Bites product, correct?

19             MR. TAYLOR:  I'm going to object.

20       A.    It blurs it when you -- I'm trying to look at

21   the front sticker.

22   BY MR. EDWARDS:

23       Q.    The count is a bit tough to see, isn't it?

24       A.    Yeah.

25       Q.    Can you and I agree, though, that this appears

1    to be a Tums Chewy Bite product?

2         A.    I see "Tums," yes.

3         Q.    And below the "Tums," it says "Chewy Bites"?

4         A.    Correct.

5         Q.    Okay.  And then at the top, in the URL for

6    Walmart.com, it states, "Tums Chewy Bites Heartburn

7    Relief Chewable Antacid Tablets Berry 32 Count,"

8    correct?

9         A.    Correct.

10        Q.    And do you see the enlarged picture of the

11   back of the product where it has the scan lines?

12        A.    I do.

13        Q.    Okay.  And below that scan line is the UPC

14   number for the product, right?

15             MR. TAYLOR:  Objection; form.

16        A.    I -- there is a number in between the scan

17   lines.

18   BY MR. EDWARDS:

19        Q.    Okay.  And that number is 07667491-80,

20   correct?  Actually, "807" if you go beyond the line.

21        A.    Yes, sir.

22        Q.    Okay.  Do you have any reason to believe that

23   that's not the UPC code?

24             MR. TAYLOR:  Objection; form.

25        A.    I don't know.

Page 88

1    BY MR. EDWARDS:

2         Q.   Okay.  In all of your experience in working

3    with businesses and products, you haven't learned about

4    where to identify a UPC code on a product?

5              MR. TAYLOR:  Objection; form.

6         A.   Generally, in the vicinity it's in, yeah.

7    BY MR. EDWARDS:

8         Q.   Okay.  I'm going to mark Exhibit -- if you

9    would, write down that UPC code.  We're going to come

10   back to that.

11             MR. TAYLOR:  Which UPC code, Adam?  I'm

12        sorry.

13             MR. EDWARDS:  The one I just asked him about

14        on the Tums Chewy Bites product on Exhibit 8 from

15        Walmart.

16             THE WITNESS:  Okay.

17   BY MR. EDWARDS:

18        Q.   That's 07667491807, correct?

19        A.   There's a "3" ahead of the "0766."

20        Q.   Okay.  On the left side.  Fair enough.

21             I'm going to mark the next exhibit, which is

22   Exhibit 9.

23             (Exhibit No. 9 marked for identification.)

24   BY MR. EDWARDS:

25        Q.   Tell me when you see it.

Page 89

```
1        A.    Okay.

2        Q.    All right.  And this, I'll represent to you,

3    is a screenshot taken on 4/17/2024, from the Dollar

4    General website, specifically for a store at 529 Monroe

5    Avenue.  Do you see that at the top left?

6        A.    I do.

7        Q.    Okay.  And the product here, it looks similar

8    to the Walmart product, right?

9              MR. TAYLOR:  Objection; form.

10        A.    It seems similar.

11    BY MR. EDWARDS:

12        Q.    Okay.  And the title is "Tums Assorted Berries

13    Chewy Bites 32 Count," right?

14        A.    Yes.

15        Q.    And the price of that product as of 4/17/24 is

16    6.35.  Do you see that?

17        A.    I see the price, and I see the date, yes.

18        Q.    Okay.  And it says that there's two in stock

19    at 529 Monroe Avenue, Rochester, New York, right?

20        A.    Right.

21        Q.    And then if you scroll to the very bottom of

22    the page, you'll see a line starting with "https."  It's

23    got the Dollar General website.  It's got the name of

24    the product: Tums Assorted Berries Chewy Bites.  And

25    then it has a number there.  Do you see that?
```

Page 90

1      A.    I do.

2      Q.    Okay.  Can you read that number into the

3  record, please.

4      A.    307667491807.

5      Q.    Okay.  That's the same code as we found on

6  the -- on the Walmart Tums Chewy Bites product, right?

7      A.    Yes.

8      Q.    And these products are both different than the

9  UPC code identified by the New York auditor for the Tums

10  product that you reference.  In your report, the UPC

11  code again for that product was 30766739287, correct?

12      A.    Correct.

13      Q.    So I'm now going to mark Exhibit 10.

14          (Exhibit No. 10 marked for identification.)

15  BY MR. EDWARDS:

16      Q.    Before we look at Exhibit 10, I just want to

17  make sure we're on the same page.  The UPC code for the

18  two Tums Chewy Bite 32-count products that I've shown

19  you and that we've made exhibits in this case, it does

20  not line up with the UPC code identified for the Tums

21  product in the audit that you reference in your report,

22  correct?

23      A.    The UPC written by the auditor on the report

24  does not match what we looked at on the website.

25      Q.    Okay.  Let me try this again.  For some

Page 91

1    reason, my sticker did not make its way to Exhibit 10.

2          MR. EDWARDS:  Ms. Court Reporter, can you

3       handle that?  I think if I go out of this and try

4       to reintroduce it, it'll make two exhibits.

5          THE COURT REPORTER:  Yes.  What I'll do is

6       upload it to the portal and then put a sticker on

7       it.

8          MR. EDWARDS:  Okay.

9    BY MR. EDWARDS:

10      Q.   So what I've identified as Exhibit 10 is

11   another screenshot from the DG, or Dollar General,

12   website from 4/17/24.  Again, same store: 529 Monroe

13   Avenue, Rochester, New York.  And this one, though,

14   appears to also be a Tums product, correct?

15      A.   Yes.

16      Q.   But it's a different product than the Tums

17   Chewy 32-count, correct?

18      A.   It appears so.

19      Q.   Okay.  This is actually a 60-count Smoothies

20   product, right?

21      A.   Yes, 60-count.

22      Q.   Okay.  And if you scroll down to the bottom,

23   again, look for the UPC code at the bottom of the page

24   after the URL for the Dollar General website and the

25   product description.  Do you see that?

Page 92

1          A.    I do.

2          Q.    Okay.  And read the number, please, into the

3    record.

4          A.    307667392876.

5          Q.    Okay.  Other than the "6" at the end, which

6    differs from the "7," that lines up identically with the

7    UPC code identified by the auditor, doesn't it?

8                MR. TAYLOR:  Objection; form.

9          A.    The -- it seems like there's some digit

10   missing.  The auditor report seems to be missing a

11   digit.

12   BY MR. EDWARDS:

13         Q.    The "6" on the end, correct?

14               MR. TAYLOR:  Objection; form.

15         A.    Right.

16   BY MR. EDWARDS:

17         Q.    But other than the "6" on the end, it's

18   identical, isn't it?

19               MR. TAYLOR:  Objection; form.

20         A.    It appears so.

21   BY MR. EDWARDS:

22         Q.    Right.  And as we've just seen from the --

23   from the Walmart exhibit, when you're actually looking

24   at the product, sometimes that last digit is outside the

25   bar code, to the right, isn't it?

```
                                                    Page 93
 1            MR. TAYLOR:  Objection; form.
 2       A.   In the specific example we looked at, that was
 3  the case.
 4  BY MR. EDWARDS:
 5       Q.   Okay.  Mr. Sajnani, is it possible that the
 6  product that we've -- that we're looking at here in
 7  Exhibit 10, the Tums Smoothy 60-count product, is the
 8  actual product that the New York inspector was referring
 9  to in his audit report?
10            MR. TAYLOR:  Objection; form.
11       A.   That's -- you know, without having done it
12  myself, it's -- it's a difficult one to for me to say
13  anything on.  I think that's part of the challenge as I
14  was reviewing these reports.  The -- and I think you
15  just pointed it out, that a lot of times I would run
16  into situations where the numbers or the information
17  either was incomplete or wouldn't match, which -- which
18  made it a little bit more challenging, significantly,
19  actually, which is why I can't sit here and, you know,
20  immediately help reconcile this for you.
21            The audit report we looked at, for example,
22  indicates Tums and Tums only, and, you know, that
23  requires additional steps, additional research.
24  BY MR. EDWARDS:
25       Q.   Did you do that additional step or research,
```

Page 94

1    like I've shown you here with some Internet research, to

2    verify the accuracy of your results in your report?

3                MR. TAYLOR:  Objection; form.

4        A.    At the time I was looking at the reports --

5    the audit reports, the Dollar General files, I mean, I

6    went through a variety of different method, steps.  You

7    know, I can't walk you through particularly what they

8    were for each item I looked at.

9                But I think that the underlying challenge for

10   me was -- was sometimes the information was incomplete,

11   and I -- for me, it was difficult to understand why.  So

12   it's -- it's -- you know, without -- without things

13   matching up, we auditors, you know, we're -- we always

14   look for things to match, and when data doesn't, it kind

15   of throws us in a -- you know, in a position where it's

16   hard to conclude or make a reliable -- you know, you

17   can't -- there's a concept of reliance, so that's --

18   that becomes difficult.

19   BY MR. EDWARDS:

20       Q.    Describe for me what you did to confirm that

21   this 32-count Tums Chewy Bites product that Dollar

22   General provided pricing about in its spreadsheet and

23   which you rely upon in your report actually matched up

24   with the UPC code, the New York inspector noted.

25               MR. TAYLOR:  Objection; form.

Page 95

1      A.   Yeah, I think that's what I keep saying, is

2   it's -- for me, it's difficult, first of all, to recall

3   that; and, second, I would also state that, you know,

4   if -- you know, not -- the UPCs not matching, to me,

5   it's less about sort of the underlying reasons --

6   right? -- why these are not matching or why the

7   description is not matching.

8           I think the underlying challenge for me is the

9   fact that they're not matching, and I've stated that in

10  the report.  That's really what I walked away with --

11  right? -- and that's what -- that's why I concluded what

12  I concluded.

13  BY MR. EDWARDS:

14     Q.   Sitting here today, can you state with

15  confidence that the DG data that you relied upon

16  relating to this Tums Chewy Bites 32-count product was,

17  in fact, the product that the auditor noted as an

18  overcharge in his inspection report?

19          MR. TAYLOR:  Objection; form.

20     A.   I think that's -- that's what I'm saying, is

21  the difficulty -- the underlying difficulty involved

22  when the numbers and descriptions don't match.  It

23  becomes difficult to, you know -- to arrive at a

24  conclusion.

25                      - o -

Page 96

1    BY MR. EDWARDS:

2        Q.   Okay.  I'm going to try again because I think

3    we're missing each other.  I'm going to ask you a

4    yes-or-no question.  Sitting here today, are you able to

5    confirm that the pricing information that Dollar General

6    provided concerning the Tums Chewy Bites 32-count

7    product matches up with the product the New York

8    inspector identified as an overcharge?

9            MR. TAYLOR:  Objection; form.

10   BY MR. EDWARDS:

11       Q.   Yes or no?

12           MR. TAYLOR:  I'm going to object to the

13       instruction about "yes" or "no."

14           You can answer how you see fit.

15       A.   Yeah, I would maintain it's -- you know, for

16   me, it's -- it's just difficult to say.

17   BY MR. EDWARDS:

18       Q.   It's difficult to say "yes" or "no"?

19           MR. TAYLOR:  Objection; form.

20       A.   It's difficult for me to arrive at a

21   conclusion based on data sets that are either incomplete

22   or don't match.

23   BY MR. EDWARDS:

24       Q.   Right.  It's possible that the product that

25   the inspector actually picked up and looked at was this

Page 97

1    Tums Smoothy product I've shown you, which has, but for
2    the last number, an identical UPC code, right?
3              MR. TAYLOR:  Objection; form.
4         A.   I don't know.  It's hard to tell.  Lots of
5    SKUs out there, and it's tough to tell.
6    BY MR. EDWARDS:
7         Q.   So you can't provide me with an answer one way
8    or the other as to whether it's possible?
9              MR. TAYLOR:  Objection; asked and answered.
10        Objection; form.
11             You can answer again.
12        A.   Yeah, I just -- I'll maintain I -- I just
13   can't.
14   BY MR. EDWARDS:
15        Q.   Okay.  Let's go to the next exhibit.
16   Actually, before we do that, I wanted to follow up on
17   some testimony that you gave earlier.  I think I asked
18   you about this, and I think your answer was that you
19   didn't know, but I'll try again.
20             Do you know how far back the pricing and sales
21   information goes back in this Dollar General spreadsheet
22   from the date of the failed audit?
23             MR. TAYLOR:  Objection; form.
24        A.   Sitting here, I cannot recall.
25                       - o -

Page 98

1    BY MR. EDWARDS:

2         Q.    Okay.  I will represent to you, and you can

3    assume hypothetically, that the -- the product pricing

4    and sales data that you rely upon for your report only

5    goes back 30 days from the date of the -- the -- New

6    York inspection, or audit.  Okay?  Are you with me?

7         A.    Just repeat that one more time.  I want to

8    make sure I'm aligned.

9         Q.    Yeah.  I'm representing to you and asking you

10   to assume that the product pricing and sales data in the

11   Dollar General spreadsheet you rely upon for your report

12   only goes back to 30 days from the date of the failed

13   audit.

14            MR. TAYLOR:  Objection; form.

15        A.    Okay.

16   BY MR. EDWARDS:

17        Q.    Okay.  My question is:  Do you have any reason

18   to believe that data would be less reliable if it went

19   back more than 30 days?  Ninety days, for example?

20            MR. TAYLOR:  Objection; form.

21        A.    I can't opine on that.

22   BY MR. EDWARDS:

23        Q.    Okay.  You don't have an opinion one way or

24   the other?

25            MR. TAYLOR:  Objection; asked and answered.

Page 99

1          You can answer again.

2          Objection; form.

3          You can answer.

4     A.    I don't.

5  BY MR. EDWARDS:

6     Q.    I'll try to ask it another way just to make

7  sure we're on the same page.  Do you have any reason to

8  believe that the sales and pricing data contained in the

9  Dollar General spreadsheet you've relied upon would, in

10  fact, be less reliable if it went back 90 days instead

11  of 30?

12          MR. TAYLOR:  Objection; asked and answered.

13      Objection; form.

14          You can answer.

15     A.    I'll say the same:  I don't think it impacts

16  the -- the conclusions or my opinion.

17  BY MR. EDWARDS:

18     Q.    Okay.  Please turn to -- let's see.  I believe

19  it to be the first bullet point under Section A of your

20  report, which states, "Many of the county audits

21  contained erroneous information."  It's on Page 3 of

22  your report.

23     A.    Yes.

24     Q.    It involves Old El Paso Grande Tortillas.  Do

25  you see that?

Page 100

1      A.    Yes.

2      Q.    I'm just going to read a quote from your

3  report:  "The item Old El Paso Grande Tortilla was

4  identified as being an overcharge based on a March 10th,

5  2023, audit of a Dollar General store in North

6  Tonawanda, New York.  The auditor found that the shelf

7  price for this item was 5.50 and that it scanned as

8  6.50.  However, when Dollar General pulled the data for

9  this item at the store, it showed the price was actually

10  3.25."

11          Did I read that right?

12      A.    Correct.

13      Q.    So your example there is meant to point out, I

14  think -- and you tell me if I'm wrong -- that the

15  auditor got it wrong; although the auditor found people

16  were paying 6.50 for a product with a shelf price of

17  5.50, based on Dollar General's data, consumers were

18  actually paying 3.25, right?

19          MR. TAYLOR:  Objection; form.

20          You can answer.

21      A.    Yeah, I don't -- the auditor is not saying

22  that that's what people are paying.  The auditor is

23  using a handheld scanner, and they're scanning the

24  items, and the scanner shows that it's 6.50.  And for me

25  that's one of the other challenges, is that, you know,

1    the scanner, you know, as represented by some others who

2    have testified, it doesn't always match what's on the

3    point of sale.

4              So you -- we can't say that the consumers are

5    necessarily paying -- the auditor is saying that, you

6    know, on the shelf this was listed for 5.50, and it

7    scanned, when the auditor scanned it, for 6.50.  And

8    what I'm saying is the Dollar General data shows a price

9    that's $3.25.

10   BY MR. EDWARDS:

11        Q.   Okay.  But you're using this example, I think,

12   to point out that this particular audit contains

13   erroneous information, right?

14              MR. TAYLOR:  Objection; form.

15              You can answer.

16        A.   Correct.

17   BY MR. EDWARDS:

18        Q.   And what erroneous information does the

19   audit -- the auditor set forth in his inspection report?

20        A.   So I'll go back to what I said earlier.

21   The -- for me, when the numbers don't match -- right? --

22   we have a -- a number that's $3.25 on one end, we have a

23   number that's 6.50 on one end, and we're saying -- the

24   auditor's saying that there's a shelf tag that's 5.50.

25              For me, I'm looking at this and saying, from a

Page 102

1    methodology standpoint, can I rely on this?  From a

2    procedural standpoint, can I rely on this?  So it's -- I

3    don't know what's causing the error or where the error

4    is specifically, but, to me, when I look at a report

5    like that, you know, for me, that's -- that's erroneous.

6    That's not reliable.

7         Q.   Okay.  Can you point to anything that you

8    believe the auditor did wrong during the 3/10/23 North

9    Tonawanda, New York, store audit?

10              MR. TAYLOR:  Objection; form.

11              You can answer.

12         A.   The auditor really should have taken this item

13   from the shelf and -- and taken it to the point of sale,

14   the register, and rung it up, evidenced the receipt,

15   which is a requirement in the PPP, which are the audit

16   procedures within Handbook 130, which -- which is a

17   state law in New York -- right? -- that has been

18   followed.

19              Obtaining that receipt and retaining that

20   within the audit gives a reviewer, somebody who wants to

21   re-perform and get comfort and rely on the report, the

22   adequate confidence to be able to rely on that report,

23   especially when we know and it has been discussed at

24   length by many that -- and this is also from personal

25   experience, using -- my teams using scanners out in

Page 103

1    stores -- the numbers don't always match because the

2    system that updates the scanners sometimes may be -- it

3    could be a technological lag.  It could be a variety of

4    reasons.  It doesn't match the POS, which just makes

5    this really, really challenging.

6              But having seen a receipt attached to the

7    report, for me, would have been -- would have been the

8    right way to do it, would have been more comforting.

9    BY MR. EDWARDS:

10       Q.   Are you -- when -- when you say "take it up to

11   the register," are there not scanners at the register?

12       A.   There are scanners, but they are different

13   types of scanners than what most of the auditors were

14   using to scan.

15       Q.   How do you know that this auditor involved in

16   this old El Paso Grande Tortilla product didn't, in

17   fact, scan it at the register?

18              MR. TAYLOR:  Objection; form.

19              You can answer.

20       A.   Yeah, I'm going off of -- you know, there's

21   a -- the variety of testimony here, which I've

22   referenced throughout the report.  Multiple individuals

23   have previously discussed the fact, predominantly the

24   auditors are using the HHT scanners.

25              And also in reviewing a variety of the

1    reports, there are actually comments in those reports,

2    and many -- some of those are referenced here and cited,

3    the auditor actually states in some form that

4    something -- don't quote me on this, but something along

5    the lines that the scanner was borrowed from the store

6    individual and then returned after the audit.

7            So, you know, I've seen that in work papers as

8    well.

9    BY MR. EDWARDS:

10       Q.   So -- sorry.  I wanted to make sure you were

11   done.

12       A.   Yeah.  Go ahead.

13       Q.   You referred to a handheld scanner as a

14   particular type of scanner.  Could you repeat what you

15   called it?

16       A.   It's a HHT, is what -- is what Dollar General

17   refers to it.

18       Q.   Okay.  And the HHT scanner is something that

19   Dollar General uses to check pricing information?

20            MR. TAYLOR:  Objection; form.

21       A.   In reading prior testimony, my understanding

22   is those are the handheld scanners, yes.

23   BY MR. EDWARDS:

24       Q.   Okay.  But you believe that one shouldn't rely

25   on a handheld scanner to check prices for products on

Page 105

1    the shelf?  Is that your testimony?

2              MR. TAYLOR:  Objection; form.

3         A.    That's not what I'm saying.  You know,

4    scanners can be used for a variety of purposes.  But as

5    it pertains, again, to the reliability and the accuracy

6    and the integrity of the audit reports, you know, taking

7    it all the way to the point-of-sale system, getting a

8    receipt, and evidencing that, and including that in the

9    work papers, is the proper way of executing.

10   BY MR. EDWARDS:

11        Q.    Mr. Sajnani, is it your opinion that if an

12   individual checks the price of a product in a Dollar

13   General store on the shelf with one of the Dollar

14   General HHT scanners, that the result would not be

15   reliable?

16             MR. TAYLOR:  Objection; form.  Objection;

17        assumes facts not in evidence.

18             You can answer.

19        A.    Yeah, I'm not stating that.  The mistakes --

20   mistakes happen -- right? -- in the retail environment.

21   This is -- it's quite prevalent.  It happens -- it

22   happens quite a bit.

23             And, you know, one way to ensure that you are

24   getting the accurate price is to take it to the register

25   and get the receipt.  That's -- that's a more reliable

1    indicator, specifically in this case where you have a

2    mismatch.  When the HHT scanner is proven to always

3    match what the POS shows and what the receipts show and

4    there's appropriate amount of corroboration that's done,

5    reconciliation that's done, then a lot of times the

6    auditor may rely on the HHT scanner.

7            But in this case, after reading the

8    testimonies and understanding that this is a -- an area

9    where there have been reconciliation challenges, you

10   know, I would suggest one goes to the register and gets

11   a receipt.

12   BY MR. EDWARDS:

13       Q.   How do you know from -- for your example here

14   that we're talking about, the bullet point about the Old

15   El Paso Tortilla, how do you know that the auditor

16   didn't, in fact, scan the product at the register?

17           MR. TAYLOR:  Objection; form.

18       A.   Again, this is -- this is based on what I've

19   seen, mostly, in the documentation and read in the

20   testimonies.

21   BY MR. EDWARDS:

22       Q.   Testimony from who?  Did anyone -- did any

23   testimony that you've read in this case discuss whether

24   this auditor on 3/10/23 actually went to the register?

25       A.   Not specifically as it pertains to this

Page 107

1   particular scanning transaction.

2      Q.   Okay.  So to as to this particular scanning

3   transaction on 3/10/23, the truth is you don't really

4   know where the auditor, the New York inspector, scanned

5   with a handheld scanner versus taking it to the

6   register, do you?

7          MR. TAYLOR:  Objection; form.

8      A.   For this particular transaction, you know, I

9   don't know.  But, again, based on everything I've seen,

10  it's -- you know, it's likely.

11  BY MR. EDWARDS:

12     Q.   Do you recall which deposition testimony you

13  reviewed which spoke to what type of scanning mechanism

14  New York auditors use?

15     A.   Not off the top of my head.  I'll have to go

16  through this.  I've seen it in a few -- let's see.  I

17  think Page 5 makes one reference towards the bottom.

18  There were a few -- I remember there were a few

19  instances of that.

20          And, again, I noted down a few.  This is not a

21  comprehensive list.  To my point earlier, anything I

22  found duplicative, I -- I did not feel the need to

23  include it and expand the report unnecessarily.

24     Q.   Go ahead.  And look at what I have marked --

25  or tried to mark -- ah -- what I've marked as -- shoot.

Page 108

1          MR. EDWARDS:  All right.  Let's go off the
2     record for just a second.
3          THE VIDEOGRAPHER:  We are off the record at
4     3:17 p.m.
5          (Recess from 3:17 p.m. to 3:28 p.m.)
6          THE VIDEOGRAPHER:  We are back on the record
7     at 3:28 p.m.
8          (Exhibit No. 11 marked for identification.)
9  BY MR. EDWARDS:
10     Q.   All right.  Mr. Sajnani, I've marked the next
11  exhibit, Exhibit 11, which is an audit which took place
12  on 3/10/2023 at North Tonawanda.  I believe this is the
13  audit that you reference here in your report concerning
14  the Tortillas.
15     A.   I see it.
16     Q.   Okay.  And, again, the problem you pointed out
17  there is that the auditor found that the shelf price for
18  this item was 5.50 and that it scanned for 6.50.  That's
19  what you related in your report, correct?
20     A.   Correct.
21     Q.   "However, Dollar General pulled the data for
22  this item, and it showed that the price was actually
23  3.25."  That's what you state, correct?
24     A.   Correct.
25     Q.   So customers that bought this product, it

Page 109

1    appears, would have been undercharged in your example,

2    correct?

3              MR. TAYLOR:  Objection; form.

4         A.   It appears so.

5    BY MR. EDWARDS:

6         Q.   Okay.  And the Bates number that you cite to

7    for your information about the 5.50 and 6.50, the 5.50

8    shelf price and the 6.50 scanned price, that's at Bates

9    0004527.  So if you could scroll down to that page,

10   please.

11        A.   Okay.

12             Okay.

13        Q.   Is this, in fact, the page from the audit

14   report that contains the information you relied upon to

15   set forth this opinion that you provide in your report

16   about the Old El Paso Tortilla?

17        A.   It appears so.

18        Q.   But what this document actually says

19   concerning these tortillas is that the offered price was

20   two for 5.50 and that the actual or scanned price was

21   two for 6.50.  Do you see that?

22        A.   Yes.

23        Q.   Okay.  You didn't include that detail in your

24   report, right?

25             MR. TAYLOR:  Objection; form.

Page 110

1      A.    Yeah.   It must have been just an oversight.

2    BY MR. EDWARDS:

3      Q.    Okay.  So this pricing is for a two-count of

4    Old El Paso Restaurant-Style Tortillas, correct?

5            MR. TAYLOR:  Objection; form.

6      A.    It appears so, "two for," by that language.

7    BY MR. EDWARDS:

8      Q.    Okay.  And is it possible that the two here --

9    the "two for" indicates two for one, two for the price

10   of one?

11           MR. TAYLOR:  Objection; form.

12     A.    I don't understand.

13   BY MR. EDWARDS:

14     Q.    Well, when I look at this audit and I see "two

15   for 5.50," I conclude that you can buy two of these

16   Tortilla products for 5.50.  Do you agree that that's a

17   reasonable reading?

18     A.    It's possible.

19     Q.    Okay.

20     A.    Two for 5.50.

21     Q.    Let's go back to our large spreadsheet,

22   Exhibit 3, and go down to sort order 1476.

23     A.    Exhibit 3?

24     Q.    Yeah.  The large Dollar General spreadsheet.

25   And it's Line 1476.

1      A.   Okay.

2      Q.   These are the lines that you relied upon in

3  your report.  You cite to 40562.  That's the large data

4  spreadsheet that we've marked as Exhibit 3, and you

5  specifically reference original sort order 1476, right?

6      A.   Yes.

7      Q.   And here, under the product name it states

8  "Old El Paso Restaurant Style Tortillas, 6-Count Two

9  For."  Do you see that?

10     A.   Yes.

11     Q.   That kind of lines up with what the auditor

12 stated about two products for the price of one,

13 potentially, correct?

14          MR. TAYLOR:  Objection; form.

15     A.   Yes.

16 BY MR. EDWARDS:

17     Q.   Okay.  And if you scroll over to Columns M and

18 N, you will see a shelf retail price of 5.50 and a

19 point-of-sale retail price of 6.50, correct?

20     A.   That's what it reads.

21     Q.   Right.  And POS retail, or point-of-sale

22 retail, means the price that it rings up at the

23 register, right?

24          MR. TAYLOR:  Objection; form.

25     A.   That is what I was saying earlier.  I cannot

Page 112

1    tell here without spending the adequate time and going

2    through the process I did when I looked at this in

3    depth.

4    BY MR. EDWARDS:

5        Q.   Right.  Sitting here today, you don't recall

6    what is meant by "POS retail"?

7        A.   I don't.

8        Q.   But you can see that there's a $1 difference

9    between shelf retail and point-of-sale retail, right?

10       A.   That's right.

11       Q.   And that's consistent -- is that consistent

12   with what the auditor in New York found?

13       A.   The auditor in New York found a $1 difference

14   between the scanned price and what was on the shelf.

15       Q.   But then when we go over to the Columns W and

16   X, default retail and retail at audit, the price is

17   3.25.  Do you see that?

18       A.   I see that.

19       Q.   So according to the Dollar General data, what

20   did -- what were customers making purchases of this

21   product in the days leading up to the failed audit

22   actually paying for this product?  Do you know?

23           MR. TAYLOR:  Objection; form.

24       A.   Again, sitting here, I don't.  I can see what

25   it reads, but I -- to your question, I don't.

1    BY MR. EDWARDS:

2         Q.    All right.  If you scroll over to Line Z of

3    "Unit Retail," it says 3.25, correct?

4         A.    Which row in particular?

5         Q.    "Z."

6         A.    Column Z shows blank until I get to a certain

7    row.

8         Q.    Column Z, Row 45658.

9         A.    3.25.

10        Q.    3.25.  Okay.  And it says "Total Units: 1,"

11   right?

12        A.    One.

13        Q.    And then if you go down below that to the row

14   below that 45659, it states "Total Units: 2" and the

15   price is 6.50, correct?

16        A.    Units, two, and if I stick to Column Z, I see

17   3.25, but if I then move to total sales, it's 6.50.

18        Q.    Okay.  3.25 is 50 percent of 6.50, isn't it?

19        A.    Correct.

20        Q.    All right.  So you would agree that if there

21   was a two-for-one or 50 percent promotion running on

22   March 10th, 2023, on this tortilla product scanned at a

23   regular price of 6.50 at the register, the resulting

24   discounted price would be 3.25, right?

25             MR. TAYLOR:  Objection; form.  Objection;

Page 114

1    misstates the testimony.

2         You can answer.

3    A.    Yeah, I don't know if I'm -- are you asking me

4    to follow a hypothetical?

5    BY MR. EDWARDS:

6    Q.    Sure.  Yeah.  Would you agree that if there

7    was a 50 percent promotion running on March 10th, 2023,

8    at this store, and the Old El Paso Tortilla scanned at a

9    regular price of 6.50 at the register, the resulting

10   50 percent-discounted price would be 3.25?

11        MR. TAYLOR:  Objection; form.  Objection;

12        misstates testimony.

13   A.    If this was selling -- like, I suppose.

14   BY MR. EDWARDS:

15   Q.    Okay.  So would you agree that if there was a

16   50 percent promotion running on March 10th, 2023, and

17   the shelf price of the Old El Paso Tortillas was 5.50, a

18   customer would expect the price of the item scanned at

19   the register of a 5.50 product to have a resulting

20   50 percent-discounted price of 2.75?

21   A.    I mean, it's difficult for me to comment on

22   what the customer would expect.  I think there are a lot

23   of variables there, and --

24   Q.    I'll try to make it simpler for you.  If a

25   product has a regular price of 5.50 at the register, and

Page 115

1   it's 50 percent off, the resulting price would be 2.75,

2   right?

3          A.   Yes.

4          Q.   Okay.  Do you know whether the 3.25 -- let me

5   ask the question this way:  Sitting here today, do you

6   know whether the 3.25 unit retail price that you relied

7   upon in the Dollar General data was for one product or

8   two?

9          A.   I don't recall what I did at the time.

10         Q.   Well, I mean, you've got the spreadsheet in

11  front of you.  Feel free to look at it.  I'm not trying

12  to make this a memory test.  Look at the Dollar General

13  data that I've just pointed out to you with the column

14  and row.

15              Do you have an opinion, sitting here today, as

16  to whether the 3.25 price in Row Z is for one product or

17  two?

18              MR. TAYLOR:  Wait a second.  I'm going to

19         object to the characterization as this

20         spreadsheet being DG Data, because, as you know,

21         Adam, at least half of it came from plaintiffs'

22         counsel.  So I want to put this on the record.

23              And objection; form.

24              You can answer.

25         A.   I still would -- I mean, I see what I see in

1    front of me.  I would still, I think, go back to my

2    opinion as written in this report, which is -- which is

3    representative of what -- what I did and the procedures

4    that I went through.

5    BY MR. EDWARDS:

6         Q.   Sure.  You're stating with certainty that

7    customers that bought one bag -- I'm sorry -- two bags

8    of tortillas at this Dollar General store on this date

9    actually paid 3.25?

10              MR. TAYLOR:  Objection; form.

11   BY MR. EDWARDS:

12        Q.   Is that your testimony?

13        A.   I don't think that's what my report is saying.

14        Q.   Your report states, "When Dollar General

15   pulled the data for this item at the store, it showed

16   that the price was actually 3.25," correct?

17        A.   That's what the report states.  Correct.

18        Q.   Right.  And from the Dollar General data and

19   the audit report, we confirmed that this was a two-for

20   product, correct?

21              MR. TAYLOR:  Objection to form.

22        A.   Yeah, that -- I don't know if I can

23   necessarily conclude that sitting here.

24   BY MR. EDWARDS:

25        Q.   Well, you can conclude that that's what the

1  spreadsheet says, right?  It says "Old El Paso

2  Restaurant Style Tortillas 6-Count (Two For)," right?

3        A.   I see that on the spreadsheet, yes.

4        Q.   Okay.  And that's very similar to what the

5  audit report you relied on says, right?

6             MR. TAYLOR:  Objection; form.

7        A.   Let me go back.  It did indicate two-for.

8  BY MR. EDWARDS:

9        Q.   Okay.  Let's turn to Page 4 of your report.

10  It is bullet point three, involving an audit which took

11  place on March 24th, 2023.  Do you see that?

12        A.   I do.

13        Q.   There you state, "On March 24th, 2023, an

14  auditor inspected a Dollar General store in Queensbury,

15  New York.  In doing so, he noted that Skintimate shaving

16  gel this that store had a shelf price of 3.65 but had a

17  register price of 4.25.  See DG_WOLF_42" -- "4243.

18  However, Dollar General pulled what the register price

19  was for that item during that time frame, and it was

20  listed at 3.65."

21             Did I read that right?

22        A.   Correct.

23        Q.   So this is another example that you provide as

24  an error that an auditor made, correct?

25        A.   Correct.

Page 118

1      Q.   All right.

2           (Exhibit No. 12 marked for identification.)

3    BY MR. EDWARDS:

4      Q.   I'll go ahead and mark Exhibit 12.  And this

5    appears to be a price verification summary report or

6    audit report for Queensbury, New York, correct?

7      A.   I'm opening.  Price verification, summary

8    report.  I don't see the jurisdiction.  Give me a

9    second.

10          Queensbury, New York.

11     Q.   At the very top --

12     A.   Yeah.

13     Q.   -- it says "61 Main Street, Queensbury,

14   New York," correct?

15     A.   I saw it.  Yep.

16     Q.   Okay.  Note the date on the front of this

17   inspection report.  Do you see that?

18     A.   Under "Title," yes, 4 -- 4/20/23.  I see it.

19     Q.   On the first page, read the date when this --

20   when this audit took place, this New York inspection.

21     A.   April 24, 2023.

22     Q.   Okay.  But in your report you note that the

23   inspection took place on March 24th, 2023, correct?

24     A.   I did state that.

25     Q.   Okay.  So you got -- you got the date wrong

Page 119

1    there, correct?

2            MR. TAYLOR:  Objection; form.

3        A.    I think there's another audit report.  If not,

4    yeah, I think it's just a typo done on my part.

5    BY MR. EDWARDS:

6        Q.    Okay.  Because in your report you specifically

7    reference 0004243 as the basis for your statements in

8    your report about the Skintimate shaving gel, and then,

9    as you can see, if you go to the bottom of Exhibit 12,

10   to Page 0004243, the page number you reference, if you

11   look at Line 48, there's the reference to the Skintimate

12   shaving gel, right?

13       A.    Yes.  Line 48, is that what you're looking at?

14       Q.    Yes.  And Line 48 contains the same pricing

15   information that you note in your report involving the

16   Skintimate shaving gel, that the shelf price for the

17   product was 3.65, and that the charged price was 4.25,

18   correct?

19            MR. TAYLOR:  I'm going to object to form.

20            And, Adam, I'm going to object as well

21        because Exhibit 3, which plaintiffs' counsel put

22        in, has the violation date as March 24th, 2023.

23            MR. EDWARDS:  I'm sorry.  Was that a form

24        objection?  It sounded like you're just

25        testifying there, Trent.

1           MR. TAYLOR:  Well, I think you're
2       misrepresenting the record, and so I'm trying to
3       set the record straight.
4           MR. EDWARDS:  It's kind of the witness' job
5       to do that, but okay.
6    BY MR. EDWARDS:
7       Q.   I think the question was -- I'm just trying to
8    verify that this -- this document that you're citing to
9    in your report, ending in Bates 0004243, which
10   references the Skintimate shaving gel and the same
11   prices in your report, this is the document you were
12   relying on when you set forth your opinions here in the
13   report.
14          MR. TAYLOR:  Objection; form.
15      A.   I see the pricing.  I see what you're
16   referring to.  It appears so.
17   BY MR. EDWARDS:
18      Q.   Okay.  So to address Mr. Taylor's comments,
19   we'll go back to the Dollar General data spreadsheet,
20   which we've marked as Exhibit 3.
21          MR. TAYLOR:  And I'm going to object to the
22      characterization as "the Dollar General data
23      spreadsheet" because, as I mentioned before, some
24      of this is Dollar General data; some of it is
25      plaintiffs' counsel data.

Page 121

1   BY MR. EDWARDS:

2       Q.   Mr. Sajnani, is it your understanding that

3   Dollar General provided the pricing and sales

4   information that -- encompassed in this spreadsheet that

5   you relied upon?

6            MR. TAYLOR:  Objection; form.

7       A.   I don't remember the -- the specific

8   discussion at the time.

9   BY MR. EDWARDS:

10      Q.   So as to Exhibit 3, the spreadsheet we've been

11  talking about throughout this deposition, which is

12  marked as Bates DG_WOLF_40562, are you aware of whether

13  Dollar General provided the product information as to

14  pricing and sales for this spreadsheet?

15           MR. TAYLOR:  Objection; form.

16      A.   From -- from my recollection, I don't know

17  which specific tabs or columns or rows, but I do

18  remember -- I do recall something along the lines where

19  some of this data has been compiled.

20           This spreadsheet, if I recall correctly, has

21  exchanged some hands, and it's gone back and forth now.

22  Who provided what data, the specifics -- I remember

23  discussing it -- I just don't recall at this point.

24  BY MR. EDWARDS:

25      Q.   Okay.  Are you confused in any way when I call

Page 122

1    this "the Dollar General spreadsheet"?  Do you know that

2    I'm referring to DG_WOLF_40562, Exhibit 3?

3         A.   Yes.  If we do, yeah, "Exhibit 3," I think,

4    will be more specific.

5    BY MR. EDWARDS:

6         Q.   Okay.  I'll just call it "Exhibit 3."

7              On Exhibit 3, let's go to sort number -- start

8    with 912.

9         A.   Okay.

10        Q.   Boy.  Your computer is fast.

11        A.   I think only when we're looking at this

12   exhibit.  The rest of them are taking time to load.

13        Q.   All right.  Do you see at 912 there's multiple

14   references to Skintimate shave gel, correct?

15        A.   Yes.  Correct.

16        Q.   Do you see the date of the audit violation?  I

17   believe it's Column J?  Column J reads "Violation Date."

18        A.   I see it.

19        Q.   What is the violation date?

20        A.   March 24, 2023.

21        Q.   Okay.  So did you pull your information in

22   your report from the spreadsheet when you stated

23   March 24th, 2023, as being the date of the failed audit

24   for the Skintimate shaving gel?

25              MR. TAYLOR:  Objection; form.

Page 123

1      A.    I don't know where I pulled it from

2   specifically.

3   BY MR. EDWARDS:

4      Q.    Well, I'm reading your report, and I see "On

5   March 24th, 2023, an auditor inspected a Dollar General

6   store in Queensbury, New York.  In doing so, he noted

7   that the Skintimate shaving gel in the store had a shelf

8   price of 3.65 but had a register price of 4.25," and

9   then you cite to 0004243, the spreadsheet that we're

10   looking at, right?

11      A.    That's right.

12      Q.    So I can take that to mean that you got the

13   date from this spreadsheet, right?

14          MR. TAYLOR:  Objection; form.

15      A.    Hard to tell.  Maybe -- I don't know if it was

16   an error on my part on the date or just mixing up the

17   references.  It's hard to tell.

18   BY MR. EDWARDS:

19      Q.    Right.  But we know that the actual audit for

20   the Skintimate shaving gel product took place on

21   4/24/23, a month after the date you set forth in your

22   report, and contained in the spreadsheet 40562, correct?

23          MR. TAYLOR:  Objection; form.

24      Mischaracterizes his testimony and assumes facts

25          not in evidence.

Page 124

1          You can answer.

2      A.   Based on the PDF file we looked at, that PDF

3   file had a April date on it, yes.

4   BY MR. EDWARDS:

5      Q.   The actual date of the audit as reflected by

6   the inspector that performed the audit was 4/24/23,

7   correct?

8      A.   That's right.

9      Q.   So do we actually know what the price of this

10  item was on 4/24/23?

11          MR. TAYLOR:  Objection; form.

12  BY MR. EDWARDS:

13     Q.   That being the Skintimate shave gel that was

14  cited as an overcharge by the auditor.

15     A.   I can't tell based on what I'm looking at.

16     Q.   Okay.  That information isn't provided in the

17  spreadsheet 40562, is it, Exhibit 3?

18          MR. TAYLOR:  Objection; asked and answered.

19      Objection; form.

20          You can answer.

21     A.   Yeah, I'm not saying it's not.  It's "maybe."

22  It's just -- maybe it is.  I just can't -- I can't

23  decipher at this moment without, you know, just taking a

24  step back and examining further.

25               - o -

Page 125

1   BY MR. EDWARDS:

2       Q.    Would you agree that given -- in this specific

3   example, given that the -- the data you relied upon and

4   included in your report contained in 40562 lists an

5   audit date which is 30 days before the actual audit date

6   for this product, we can't conclude that the auditor

7   committed an error, can we?

8           MR. TAYLOR:  Objection; form.

9       A.    Yeah, that's -- you know, I think a lot --

10  there's a lot of detail, and sitting here, again, I --

11  doing this on the spot, it's hard for me to say one way

12  or another.

13          You know, I had more time and -- when I was

14  preparing this report and when I was doing this test, so

15  I'll just defer to whatever I have written in my report.

16          THE VIDEOGRAPHER:  Mr. Edwards --

17          MR. EDWARDS:  Yes.

18          THE VIDEOGRAPHER:  -- this is the

19          videographer.  We've been going for a little more

20          than an hour on this media unit.  Can we take a

21          quick break --

22          MR. EDWARDS:  Sure.

23          THE VIDEOGRAPHER:  -- to change it?

24          MR. EDWARDS:  Sure.  Five-minute break to

25          change the media.  That's good.

1          THE VIDEOGRAPHER:  This is the end of Media

2     Unit No. 3.  We are off the record at 4:03 p.m.

3          (Recess from 4:03 p.m. to 4:12 p.m.)

4          THE VIDEOGRAPHER:  This is the beginning of

5     Media Unit No. 4.  We are on the record at

6     4:12 p.m.

7  BY MR. EDWARDS:

8     Q.    All right.  Mr. Sajnani, I just want to follow

9  up a bit on the -- the questioning I had earlier related

10 to the first bullet point on Page 3 of your report

11 related to the Old El Paso Tortillas.

12    A.    Yes.

13    Q.    So if you want to go there in your report.

14    A.    Yes.

15    Q.    Just to refresh your recollection, the problem

16 you pointed out there was that the auditor found a shelf

17 price of 5.50, and, upon scanning the tortilla product,

18 it scanned for 6.50.  Do you see that?

19    A.    Yes.

20    Q.    Okay.  But the issue that you have with that

21 conclusion is based on Dollar General data contained in

22 40562 of the spreadsheet, which indicates that there

23 were -- the actual sales of those -- of the product

24 referenced were for 3.25, correct?

25          MR. TAYLOR:  Objection; form.

Page 127

1          You can answer.

2     A.    Yeah, I would say based on the -- based on

3   Exhibit 3, and the data that's in there, you know, it

4   appears -- it appears so.  But, like I said, going --

5   going back, you know, I don't know necessarily the

6   specific process I undertook.

7          But, you know, seeing as the citations and

8   references are here, my, I think, underlying -- what I'm

9   raising an exception to is, really, the data --

10  right? -- that's not matching at the end of the day.

11  BY MR. EDWARDS:

12    Q.    Understood.

13    A.    Yeah.

14    Q.    Can you go back to original sort order 1476,

15  which references the product name "Old El Paso

16  Restaurant Style Tortillas, 6-Count" and then

17  "(two-for)"?

18    A.    Do you want me to sort within Exhibit 3 to

19  1476?  Is that what you're asking me to do?

20    Q.    Yeah.  I'd like you to go down to 1476 so we

21  can -- so I can ask you a question about that.

22    A.    Okay.  One second.

23          My spreadsheet is stuck.  I left it open.  Let

24  me refresh it.

25          Okay.  I'm there.

Page 128

1    Q.   So go ahead and put your cursor on the first

2  entry for 1476.  I believe it's at Line 45653.

3    A.   Okay.

4    Q.   Are you there?  Now, scroll all the way over

5  to the right.

6    A.   Okay.

7    Q.   Okay.  And if we look a few rows down from

8  that, we will see some transaction IDs, some unit

9  retail, some total units, and some total sales that took

10 place for this product on specific dates.  Do you see

11 that?

12   A.   I see the data in those -- in those rows.

13   Q.   Okay.  All right.  So for this tortilla

14 product, there's an entry for total units.  This says

15 "1."  Do you see that?

16   A.   Yes.  I see "1" for Row 45658.

17   Q.   And then next to that is a sales price of

18 $3.25, correct?

19   A.   Yes.

20   Q.   For total sales?

21   A.   Total sales.  Yes.

22   Q.   Okay.  Right below that is another entry, but

23 this is for a total unit of two.  Do you see that?

24   A.   I do.

25   Q.   Okay.  And what is the total sales listed for

Page 129

1   that one?

2        A.   $6.50.

3        Q.   Okay.  And $6.50 is the scanned price noted in

4   the audit report by the New York inspector, isn't it?

5             MR. TAYLOR:  Objection; form.

6             You can answer.

7        A.   Yeah.  Specific to, yeah, Document No. 4257,

8   yes, the item scanned for 6.50.

9   BY MR. EDWARDS:

10       Q.   Do you intend at some point to do a thorough

11  review of all of the government audit data and compare

12  it to the DG spreadsheet to confirm accuracy?

13            MR. TAYLOR:  Objection; form.

14       A.   From here on out, I -- I don't anticipate.

15  BY MR. EDWARDS:

16       Q.   Has Dollar General shared with you any

17  information about litigation outside of New York

18  involving pricing inaccuracies or overcharges?

19            MR. TAYLOR:  Objection; form.

20            You can answer.

21       A.   Repeat that one more time.

22  BY MR. EDWARDS:

23       Q.   Yeah.  And I'll rephrase it.  Are you aware of

24  any litigation outside of New York, this case that we're

25  here about today, involving Dollar General overcharges?

1          MR. TAYLOR:  Objection; form.

2          You can answer.

3     A.    I think I said this earlier.  Regarding --

4     you're specifying -- you're saying outside of this case?

5     BY MR. EDWARDS:

6     Q.    Correct.

7     A.    Yeah, I think I mentioned earlier I -- I have

8     some confidentiality-type agreements I'm bound by, and,

9     you know, I really can't get into that.

10    Q.    Yeah.  Understood.  I'm not -- I'm not really

11    asking you to get into the details of any other matters

12    that you're working on.  I'm simply asking you if you're

13    aware of any other litigation involving Dollar General

14    other than this New York case that we're here about

15    today.

16         MR. TAYLOR:  Objection; form.

17         You can answer.

18    A.    You know, at a high level, I'll say, you know,

19    I am, but I'll -- I could probably -- you know, I can't

20    go any further than that.

21    BY MR. EDWARDS:

22    Q.    Okay.  Have you been retained by Dollar

23    General in any other matters other than this New York

24    litigation we're here about today?

25         MR. TAYLOR:  I'm going to object to that as

Page 131

1          getting into privileged confidentiality issues

2          pursuant to the federal rules.  And I don't think

3          that's an appropriate question, Adam.

4              MR. EDWARDS:  Are you instructing him not to

5          answer?

6              MR. TAYLOR:  Yes, I am.

7    BY MR. EDWARDS:

8          Q.   Okay.  Are you going to follow your attorney's

9    advice and refuse to answer the question of whether you

10   have been retained by Dollar General in any matters

11   other than -- involving pricing of Dollar General stores

12   other than the matter that we're here about today?

13             MR. TAYLOR:  Objection; form.

14             You can answer.

15        A.   Yeah, I think I'll -- I'll maintain what I've

16   said.  I think beyond what I've shared, I really can't

17   get into any other details.

18   BY MR. EDWARDS:

19        Q.   Because you believe you're bound by

20   confidentiality issues?

21             MR. TAYLOR:  Objection; form.

22        A.   I am.

23   BY MR. EDWARDS:

24        Q.   Okay.

25             MR. EDWARDS:  All right.  Guys, give me just

Page 132

1        a few minutes to check my notes, and I'll wrap it

2        up.  Okay?  I'll be back in five.

3              MR. TAYLOR:  Okay.

4              THE WITNESS:  Okay.

5              THE VIDEOGRAPHER:  Mr. Edwards, do you want

6        to go off the record?

7              MR. EDWARDS:  Yes.

8              THE VIDEOGRAPHER:  Okay.  We are off the

9        record at 4:22 p.m.

10             (Recess from 4:22 p.m. to 4:29 p.m.)

11             THE VIDEOGRAPHER:  We are back on the record

12       at 4:29 p.m.

13   BY MR. EDWARDS:

14       Q.    All right.  Mr. Sajnani, I assume that you

15   don't have any opinions in this case about the

16   appropriate methods for calculating classified damages?

17   That's kind of outside your area, right?

18             MR. TAYLOR:  Objection; form.

19             You can answer.

20       A.    It is -- it is outside my area.

21             MR. EDWARDS:  Okay.  Given that, I -- I

22       don't have any more questions.

23             MR. TAYLOR:  Okay.  We don't have any

24       questions, either.  So thank you.

25             MR. EDWARDS:  All right.

Page 133

1           THE WITNESS:  Thank you.

2           MR. EDWARDS:  Go off record.

3           THE VIDEOGRAPHER:  Yes.  Stand by.

4           This is the end of Media Unit No. 4.  We are

5      off the record at 4:29 p.m., and this concludes

6      today's testimony given by Sunil Sajnani.

7           THE COURT REPORTER:  Mr. Taylor, read or

8      waive?

9           MR. TAYLOR:  We'll read.

10          THE COURT REPORTER:  Mr. Edwards, will you

11     be ordering at this time?

12          MR. EDWARDS:  Yes.

13          THE COURT REPORTER:  And, Mr. Taylor, would

14     you like a copy?

15          MR. TAYLOR:  We will order a transcript, but

16     not the video at this point.

17          MR. EDWARDS:  Same for me.  Do not need a

18     video just yet.

19          THE VIDEOGRAPHER:  Thank you very much.

20          (The deposition concluded at 4:29 p.m.

21     Reading and signing were not waived.)

22                    * * * * *

23

24

25

Page 134

1              CERTIFICATE OF OATH OF WITNESS
2    STATE OF FLORIDA        )
3    COUNTY OF SARASOTA      )

4

5        I, LAURA S. EDER, Registered Merit Reporter, Notary
6    Public in and for the State of Florida at Large, do
7    hereby certify that the witness, SUNIL SAJNANI, remotely
8    appeared before me on April 19, 2024, and was duly sworn
9    by me.
10       WITNESS my hand and official seal this 30th day of
11   April, 2024.

12

13

14                    LAURA S. EDER, RMR
                      Notary Public
15                    State of Florida at Large
                      Commission Number:  HH 357195
16                    Commission Expires:  4/26/2027

17

18

19

20

21   Personally known:       No
22   Produced identification:  Yes
23   Identification produced:  Michigan driver's license

24

25

Page 135

1                    REPORTER'S DEPOSITION CERTIFICATE

2         I, LAURA S. EDER, Registered Merit Reporter, do

3    hereby certify that I was authorized to and did

4    stenographically report the foregoing deposition of

5    SUNIL SAJNANI, the witness herein on April 19, 2024;

6    that a review of the transcript was requested; and that

7    the foregoing transcript, pages 4 through 133, is a true

8    and complete record of my stenographic notes.

9         I FURTHER certify that I am not a relative,

10   employee, attorney, our counsel of any of the parties,

11   nor am I a relative or employee of any of the parties'

12   attorney or counsel connected with the action, nor am I

13   financially interested in the action.

14        DATED this 30th day of April, 2024.

15

16

17

                    LAURA S. EDER, RMR

18

19

20

21

22

23

24

25

Page 136

1    R. Trent Taylor, Esq.
     McGuire Woods
2    Gateway Plaza
     800 East Canal Street
3    Richmond, Virginia 23219
     rtaylor@mcguirewoods.com

4

5                                    April 30, 2024

6

7    RE:    :   JOSEPH WOLF ET AL. v. DOLLAR GENERAL
                CORPORATION ET AL.
8    DEPO OF:  SUNIL SAJNANI
     TAKEN  :  April 19, 2024

9

10        The above-referenced transcript is available for
     review.

11

          The witness should read the testimony to verify its
12   accuracy.  If there are any changes, the witness should
     note those with the reason on the attached Errata Sheet.

13

          The witness should, please, date and sign the
14   Errata Sheet and email to the deposing attorney as well
     as to Veritext at Transcripts-fl@veritext.com, and
15   copies will be emailed to all ordering parties.

16        It is suggested that the completed errata be
     returned 30 days from receipt of the testimony, as
17   considered reasonable under Federal rules*; however,
     there is no Florida statute to this regard.

18

          If the witness fails to do so, the transcript may
19   be used as if signed.

20

21                       Yours,

22                       Veritext Legal Solutions

23

     *Federal Civil Procedure Rule 30(e)/Florida Civil
24   Procedure Rule 1.310(e).

25

Page 137

1  RE:    :   JOSEPH WOLF ET AL. v. DOLLAR GENERAL
           CORPORATION ET AL.

2  DEPO OF:   SUNIL SAJNANI
   TAKEN  :   April 19, 2024

3  JOB NO.:   6645553

4  PAGE _____ LINE _____ CHANGE _____

5  _____

6  REASON _____

7  PAGE _____ LINE _____ CHANGE _____

8  _____

9  REASON _____

10 PAGE _____ LINE _____ CHANGE _____

11 _____

12 REASON _____

13 PAGE _____ LINE _____ CHANGE _____

14 _____

15 REASON _____

16 PAGE _____ LINE _____ CHANGE _____

17 _____

18 REASON _____

19

20 Under penalties of perjury, I declare that I have read
   the foregoing document and that the facts stated in are

21 true.

22

23 _____    _____

   SUNIL SAJNANI                        DATE

24

25

| **0** |
| --- |
| **00**   71:14 |
| **00040563**   56:14 |
| **0004136**   3:16 66:1 |
| **0004137**   3:16 66:5 |
| **0004243**   119:7 119:10 120:9 123:9 |
| **0004527**   109:9 |
| **0004552**   3:19 |
| **0004554**   3:19 74:13 |
| **0040563**   3:14 |
| **00558**   1:3 4:10 |
| **00596901**   68:8 |
| **0766**   88:19 |
| **07667491-80** 87:19 |
| **07667491807** 88:18 |
| **08902**   2:8 |

| **1** |
| --- |
| **1**   3:11 4:4 9:23 10:12,17 12:15 17:13 21:13,20 35:20 42:24 46:11 54:8 75:7 75:7 112:8,13 113:10 128:15 128:16 |
| **1,200**   31:1 |
| **1.310**   136:24 |

**10**   3:11,23 39:23 46:11 90:13,14 90:16 91:1,10 93:7
**101**   2:8
**108**   3:24
**10th**   100:4 113:22 114:7,16
**11**   3:24 82:7 108:8,11
**1100**   2:4
**118**   3:25
**12**   3:25 15:7,16 15:22 118:2,4 119:9
**12:00**   10:21
**12:01**   1:21 4:3
**12:10**   10:8,9
**12:13**   10:9,11
**12:50**   35:20,21
**130**   2:8 102:16
**133**   135:7
**134**   3:4
**135**   3:5
**136**   3:6
**137**   3:7
**1476**   110:22,25 111:5 127:14,19 127:20 128:2
**1520**   2:8
**1573**   78:13,21
**18th**   64:10
**19**   1:20 134:8 135:5 136:8 137:2

**19th**   4:4 10:20 65:3,5
**1:01**   35:21,24
**1st**   73:24 77:1 77:10

| **2** |
| --- |
| **2**   3:12 12:16 21:7,8,22 22:8,9 22:11 35:23 37:19 39:12 51:18 54:8 66:7 113:14 |

**2.75**   114:20 115:1
**20**   23:4 24:11 82:1
**2020**   30:22 58:10,18
**2022**   65:5
**2023**   73:24 75:7 75:7 77:2,11 100:5 113:22 114:7,16 117:11 117:13 118:21 118:23 119:22 122:20,23 123:5
**2024**   1:20 4:4 64:10,15 134:8 134:11 135:5,14 136:5,8 137:2
**21**   3:12
**23219**   2:15 136:3
**24**   118:21 122:20

**245**   68:21
**245303**   69:1,14 70:4
**24th**   117:11,13 118:23 119:22 122:23 123:5
**2:23**   84:16,17
**2:40**   84:17,20

| **3** |
| --- |
| **3**   3:13 21:25 39:12 41:4,23 42:11 43:1,11 47:17 49:25 50:14 51:16,19 53:6,7,18 56:19 56:25 61:13 62:7 63:5,25 65:12,19 67:8 70:14 73:13 74:13 75:25 78:10 84:15,19 88:19 99:21 110:22,23 111:4 119:21 120:20 121:10 122:2,3 122:6,7 124:17 126:2,10 127:3 127:18 |

**3.25**   65:8 100:18 101:22 113:3,17 113:18,24 114:10 115:4,6 115:16 116:9,16 126:24 128:18

**[3.25. - 7]**

**3.25.**  100:10 101:9 108:23 112:17 113:9,10
**3.45.**  65:8 66:18
**3.65**  71:8 117:16 119:17 123:8
**3.65.**  117:20
**3/1/23**  75:1
**3/10/2023**  108:12
**3/10/23**  102:8 106:24 107:3
**30**  57:10,15 58:12,20 59:4 65:17 98:5,12 98:19 99:11 125:5 136:5,16 136:23
**30649**  134:14 135:17
**30766739287** 82:10,24 86:6 90:11
**307667392876** 92:4
**307667491807** 90:4
**30th**  58:10 134:10 135:14
**32**  3:21 73:19,23 74:19 76:25 78:3,25 79:4,16 80:21 81:4,14 82:4 83:2 85:21 86:17 87:7

89:13 90:18 91:17 94:21 95:16 96:6
**357195**  134:16
**37929**  2:4
**3:17**  108:4,5
**3:28**  108:5,7

**4**

**4**  3:14 22:2,16 22:23 37:9 56:5 56:6,10,13 64:24 73:17 76:22 78:2 80:4 85:19 117:9 118:18 126:5 133:4 135:7
**4.25**  119:17 123:8
**4.25.**  117:17
**4/17/2024**  89:3
**4/17/24**  89:15 91:12
**4/20/23**  118:18
**4/24/23**  123:21 124:6,10
**4/26/2027** 134:16
**40562**  3:13 53:4 55:13 71:18 111:3 121:12 122:2 123:22 124:17 125:4 126:22
**4137**  66:1

**42**  117:17
**4243**  117:17
**4257**  129:7
**4554**  76:1
**45653**  128:2
**45658**  113:8 128:16
**45659**  113:14
**48**  119:11,13,14
**4:03**  126:2,3
**4:12**  126:3,6
**4:22**  132:9,10
**4:29**  1:21 132:10,12 133:5 133:20

**5**

**5**  3:3,16 50:24 65:22,24 66:4 69:24 74:1,4 75:22 80:6,9,15 80:16 81:5,17 107:17
**5.50**  100:7,17 101:6 108:18 109:7,7,20 110:15 111:18 114:17,19,25 126:17
**5.50.**  101:24 110:16,20
**5.75**  75:23 80:16
**5.75.**  74:2
**50**  18:17 47:13 113:18,21 114:7 114:10,16,20

115:1
**529**  75:2 89:4,19 91:12
**53**  3:13
**56**  3:14
**595302**  71:14
**595303**  67:6,7 67:19 69:18 70:3,13

**6**

**6**  3:18 70:18,20 92:5,13,17 111:8 117:2 127:16
**6.35.**  89:16
**6.50**  100:16 101:23 109:7,8 111:19 113:15 113:18,23 114:9 129:3
**6.50.**  100:8,24 101:7 108:18 109:21 113:17 126:18 129:2,8
**60**  3:23 91:19,21 93:7
**61**  118:13
**65**  3:16
**6645553**  137:3
**696**  65:16 67:9 67:14

**7**

**7**  3:19 74:8,9 75:1 77:13

81:18 92:6
**70** 3:18
**725** 17:14
**74** 3:19
**7:23** 1:3 4:10

**8**

**8** 3:21 86:7,10
  88:14
**800** 2:4,14 136:2
**807** 87:20
**86** 3:21 71:10
**88** 3:22

**9**

**9** 3:22 88:22,23
**90** 3:23 99:10
**912** 122:8,13
**95303** 69:24
**979402541**
  65:20

**a**

**abilities** 51:24
**ability** 51:20
  52:16
**able** 9:18 18:10
  21:10 47:11
  50:13 51:7
  53:12 66:2 71:2
  72:4 96:4
  102:22
**above** 136:10
**absolutely**
  18:16
**accept** 29:14

**accountant**
  23:11
**accounting** 25:4
  38:1
**accuracy** 21:21
  24:16 25:11
  36:12,20 55:8
  94:2 105:5
  129:12 136:12
**accurate** 6:1
  37:2 105:24
**action** 38:14,22
  39:4 135:12,13
**activities** 18:5
**activity** 18:23
**actual** 93:8
  109:20 123:19
  124:5 125:5
  126:23
**actually** 24:14
  61:3 73:17 74:4
  77:10 80:6 81:4
  83:2 87:20
  91:19 92:23
  93:19 94:23
  96:25 97:16
  100:9,18 104:1
  104:3 106:24
  108:22 109:18
  112:22 116:9,16
  124:9
**ad** 65:16
**adam** 2:3 4:18
  5:12 22:8 68:23
  73:5 77:17

79:10 81:20
  88:11 115:21
  119:20 131:3
**add** 50:18
**additional**
  49:20 51:7
  52:13,14,19
  93:23,23,25
**address** 24:15
  120:18
**addressed** 32:22
**adduced** 5:4
**adequate**
  102:22 112:1
**advice** 131:9
**advise** 28:7,20
**aedwards** 2:5
**affiliations** 4:16
**afternoon** 4:2
**aggregate** 45:24
**ago** 33:22 35:10
**agree** 7:11,16,25
  22:17 27:22
  30:7,8 56:24
  57:6 86:25
  110:16 113:20
  114:6,15 125:2
**agreement** 17:2
**agreements**
  15:11 130:8
**ah** 107:25
**ahead** 5:22 9:13
  9:16 16:25,25
  21:6 32:22 43:7
  53:2 56:5 74:7

88:19 104:12
  107:24 118:4
  128:1
**akin** 31:9
**al** 4:7,8 136:7,7
  137:1,1
**aligned** 98:8
**allowed** 76:24
**alternative** 1:10
**amount** 18:22
  30:11,11 106:4
**ample** 63:10
**analyses** 63:9
**analysis** 57:21
  63:3,16
**andrew** 2:20
  4:11
**angles** 26:3
**answer** 7:23
  14:5 16:6 19:19
  20:3,10 22:20
  24:3 25:13
  27:15,24 28:11
  31:14 32:3,12
  34:5,17 35:5
  36:22 37:14
  38:16,24 39:6
  40:3,15 41:15
  42:1,14,18,21
  43:13 44:1,24
  45:5,15,23 46:6
  46:14 47:19
  48:9,15,23
  49:14,18 50:4
  50:17 51:10

52:24 54:25
55:10,17 57:19
58:22 59:6
60:23 62:9,21
63:20 67:2,21
68:13 69:20
71:20 72:4,14
72:24 74:21
75:16 76:7
77:20 83:7 84:3
84:6 96:14 97:7
97:11,18 99:1,3
99:14 100:20
101:15 102:11
103:19 105:18
114:2 115:24
124:1,20 127:1
129:6,20 130:2
130:17 131:5,9
131:14 132:19
**answered** 48:8
97:9 98:25
99:12 124:18
**answering** 7:24
**answers** 6:13
**antacid** 87:7
**antibiotic** 71:1
**anticipate**
129:14
**anybody** 42:15
**anymore** 31:23
**appear** 61:1
**appearance**
4:15

**appeared** 2:24
134:8
**appearing**
10:23
**appears** 67:16
69:24 75:12
86:17,25 91:14
91:18 92:20
109:1,4,17
110:6 118:5
120:16 127:4,4
**appreciate** 40:9
**approach** 50:10
**appropriate**
5:16,18 52:3
106:4 131:3
132:16
**approximately**
9:1 18:1 19:15
20:20 64:13
**april** 1:20 4:4
10:20 30:22
65:3,5 118:21
124:3 134:8,11
135:5,14 136:5
136:8 137:2
**area** 106:8
132:17,20
**arrive** 95:23
96:20
**aside** 16:3 51:6
**asked** 44:7 45:2
46:19 48:7
88:13 97:9,17
98:25 99:12

124:18
**asking** 7:4,9,14
13:18 41:18,21
98:9 114:3
127:19 130:11
130:12
**asks** 18:4
**asset** 24:5 25:16
30:21
**assignment**
22:18
**assistance** 42:12
43:22
**assisted** 17:16
**associates** 26:15
**assorted** 89:12
89:24
**assume** 7:15
59:16 98:3,10
132:14
**assumes** 45:14
83:6 84:1
105:17 123:24
**assuming** 37:19
47:2 62:3
**assurance** 25:20
**attached** 37:1
103:6 136:12
**attempt** 83:1
**attendees** 2:24
**attending** 9:10
**attorney** 4:17
14:23 135:10,12
136:14

**attorney's** 131:8
**attorneys** 38:21
**audit** 3:16,19,24
3:25 20:7 21:22
21:24 22:12
24:5,22 25:17
26:24 27:12,16
27:19,19,20
28:15 29:18
30:6,21 32:14
32:21,23 33:9
33:12,12,23
34:2,14 35:1,8
36:13 40:1,12
45:10,11 46:15
46:16,17 48:4
48:21 49:11,24
50:15,25 51:1,8
55:7 57:15 58:6
59:3 60:24,25
61:24 62:1,5
64:21 65:18,25
73:24 74:25
75:1,12 77:2,11
82:8 85:24
90:21 93:9,21
94:5 97:22 98:6
98:13 100:5
101:12,19 102:9
102:15,20 104:6
105:6 108:11,13
109:13 110:14
112:16,21
116:19 117:5,10
118:6,20 119:3

122:16,23
123:19 124:5,6
125:5,5 129:4
129:11
**auditor** 30:13
60:20 61:3 65:5
66:23 67:18
68:11 69:17
70:3 71:17
72:12 73:25
75:21 80:8,11
80:15,20 85:20
86:4 90:9,23
92:7,10 95:17
100:6,15,15,21
100:22 101:5,7
101:19 102:8,12
103:15 104:3
106:6,15,24
107:4 108:17
111:11 112:12
112:13 117:14
117:24 123:5
124:14 125:6
126:16
**auditor's**
101:24
**auditors** 46:3
94:13 103:13,24
107:14
**audits** 20:15,20
20:24,25 21:25
26:25 27:25
28:9 29:2,3
31:25 32:10

33:15 36:20
41:6 44:9,9,15
44:17,21 46:10
54:21 57:25
60:20 99:20
**authorized**
135:3
**available** 20:12
52:10 62:18,18
71:4 136:10
**avenue** 75:2
89:5,19 91:13
**avoid** 7:20
**avoiding** 30:14
**aware** 26:7 27:8
27:12 57:14,23
66:20 121:12
129:23 130:13

**b**

**b** 1:9 3:9 4:23
52:1 57:3
**bacitracin** 3:18
71:1
**back** 7:2 9:20
10:10 18:19
19:22 22:16
25:4 27:2 29:5
32:4 36:25
37:16 43:14
50:8 56:25 58:5
67:7 69:23
70:14 73:4
77:22 78:10
80:3 81:19
82:21 85:17

87:11 88:10
97:20,21 98:5
98:12,19 99:10
101:20 108:6
110:21 116:1
117:7 120:19
121:21 124:24
127:5,14 132:2
132:11
**bad** 38:6
**bag** 116:7
**bags** 116:7
**baker** 2:20 4:11
**ballpark** 18:7
19:14 20:19
**bank** 6:24 38:2
**banking** 29:10
30:5
**bar** 92:25
**barista** 85:13,14
**based** 16:6,20
43:18 52:2,17
73:24 77:1
80:24 86:1
96:21 100:4,17
106:18 107:9
124:2,15 126:21
127:2,2
**basis** 119:7
**bates** 56:14 66:1
66:5 74:13 76:1
109:6,8 120:9
121:12
**bear** 78:17

**beginning** 4:16
35:22 73:21
84:18 126:4
**behalf** 1:5 2:2
2:12 4:22 17:21
**believe** 13:5,22
14:17,24 17:9
18:14,24 29:18
40:11 46:24
49:23 50:1
52:20 53:20
58:1 64:20
74:18 79:21
81:17 85:20
87:22 98:18
99:8,18 102:8
104:24 108:12
122:17 128:2
131:19
**berries** 89:12,24
**berry** 87:7
**best** 7:22 19:8
23:21,21 24:10
37:2
**beyond** 87:20
131:16
**bill** 17:22 18:22
**billing** 17:6 19:1
**bit** 12:3 20:23
23:6 86:23
93:18 105:22
126:9
**bite** 80:21 81:4
87:1 90:18

**[bites - chewy]**                                    Page 143

**bites**  3:22 73:19
  73:23 74:18
  76:21,25 78:3
  78:25 79:5,16
  81:14 82:5 83:2
  85:21 86:18
  87:3,6 88:14
  89:13,24 90:6
  94:21 95:16
  96:6
**blank**  113:6
**block**  37:23
**blurs**  86:20
**board**  28:21
**books**  31:5,7
**borrowed**  104:5
**bottom**  17:13
  53:22 89:21
  91:22,23 107:17
  119:9
**bought**  108:25
  116:7
**bouncing**  68:18
**bound**  130:8
  131:19
**boy**  122:10
**boy's**  54:9
**brand**  71:4
**break**  35:18
  36:10 73:7,10
  81:24 84:10,22
  85:3,6,12,17
  125:21,24
**brief**  35:18

**briefly**  8:4,24
**briefs**  54:9
**bring**  11:15
  12:18 26:24
**brought**  12:10
**brunswick**  2:8
**bryson**  2:3
**bullet**  39:23
  41:5,10,23
  42:10 47:17
  49:25 65:2,4
  73:18 76:23
  77:16 78:2 80:3
  80:19,24 85:18
  99:19 106:14
  117:10 126:10
**bups**  29:6
**business**  31:10
  31:16,18
**businesses**  88:3
**buy**  23:21
  110:15
**buy's**  23:21

**c**

**c**  2:1 4:1
**calculating**
  132:16
**call**  49:20 53:5
  63:10 121:25
  122:6
**called**  8:17 26:9
  104:15
**canal**  2:14 136:2
**capacity**  15:3,4
  28:4

**captured**  11:14
**carmen**  1:4
**case**  1:3 4:9
  5:15 11:2 13:15
  13:21,22 14:8
  17:3,6 18:2,15
  20:8 22:18
  31:24 33:25
  36:18 37:20,23
  38:4,8,14,22
  39:4 60:21
  63:15 64:7 85:9
  90:19 93:3
  106:1,7,23
  129:24 130:4,14
  132:15
**cases**  37:7,11
  78:18
**causing**  102:3
**caution**  16:10
  41:25 42:13
**cautionary**  45:6
**center**  23:22
**central**  10:21
**certain**  14:2
  47:22 48:18
  113:6
**certainly**  18:12
**certainty**  58:2
  116:6
**certificate**  3:4,5
  134:1 135:1
**certify**  134:7
  135:3,9

**cetera**  24:9
**challenge**  30:10
  36:12 93:13
  94:9 95:8
**challenged**
  36:19
**challenges**
  24:19 29:2
  100:25 106:9
**challenging**
  93:18 103:5
**change**  40:23
  125:23,25 137:4
  137:7,10,13,16
**changes**  136:12
**characterization**
  115:19 120:22
**charged**  22:1
  119:17
**chase**  56:23
**check**  43:4
  104:19,25 132:1
**checks**  26:20
  105:12
**chewable**  87:7
**chewy**  3:21,22
  73:19,23 74:18
  76:21,25 78:3
  78:25 79:4,16
  80:21 81:4,14
  82:4 83:2 85:21
  86:18 87:1,3,6
  88:14 89:13,24
  90:6,18 91:17
  94:21 95:16

96:6
**chief** 24:5,5
  30:20
**choose** 49:2
**chose** 47:16
  48:20 50:9
**chosen** 51:4
**citation** 65:9,14
**citations** 127:7
**cite** 39:20 40:17
  69:15 75:7
  109:6 111:3
  123:9
**cited** 11:4 39:22
  47:7 66:14 75:5
  104:2 124:14
**cites** 46:24
**citing** 120:8
**civil** 136:23,23
**clarification**
  40:9 43:18
**clarify** 40:16
  44:3 56:21
**class** 4:19,21
  20:16 38:14,22
  39:4 44:21
  45:10,20 58:10
  58:18
**classified**
  132:16
**classify** 41:6
**clear** 7:5,19
  12:8 50:7,9 51:1
  58:15

**clearest** 50:1
**clicked** 53:21
**clients** 23:12
  25:6
**close** 22:6 36:9
  78:20
**closed** 65:16
**code** 82:8,10,24
  83:3,20,20,24
  85:23 86:3
  87:23 88:4,9,11
  90:5,9,11,17,20
  91:23 92:7,25
  94:24 97:2
**codes** 83:15
**coffee** 85:2,15
**coincidence**
  76:17
**coleman** 2:3
**colinas** 8:16
**colleague** 14:17
**collective** 23:7
**column** 56:23
  57:3,3 59:13,14
  60:2,10 61:9,13
  61:18,23 68:1,7
  68:22 79:6,24
  81:9 113:6,8,16
  115:13 122:17
  122:17
**columns** 57:13
  65:16 78:6 79:7
  111:17 112:15
  121:17

**come** 7:7 25:10
  25:20 26:2,19
  27:6 28:1 61:10
  88:9
**comes** 25:24
  52:20
**comfort** 35:18
  102:21
**comforting**
  103:8
**coming** 25:24
**comment** 35:13
  70:9,11 72:2
  76:9 114:21
**comments** 104:1
  120:18
**commission**
  134:16,16
**committed**
  125:7
**common** 24:20
  29:8,13
**communication**
  29:7 43:15
**companies** 6:21
  23:14,16,22,23
  24:15,25 27:21
  28:5,6,8,25 29:9
  29:14,21,24
  30:15
**company** 13:24
  25:7,9,16,19
  26:6 27:8,12
  29:1,17 32:15
  34:14

**company's**
  28:17
**comparable**
  22:4 23:1
**compare** 129:11
**comparison**
  23:3,17
**compensated**
  17:14
**competitor**
  31:11
**compiled**
  121:19
**complaints**
  25:23 26:12
**complete** 135:8
**completed**
  136:16
**compliance** 22:2
  22:24 23:25
  24:8 37:25
**comprehensive**
  107:21
**computer**
  122:10
**computer's**
  78:16
**concept** 8:14
  94:17
**concerning**
  85:20 96:6
  108:13 109:19
**conclude** 60:9
  61:5 94:16
  110:15 116:23

**[conclude - correct]**

116:25 125:6
**concluded**
95:11,12 133:20
**concludes** 133:5
**conclusion**
45:17 50:23
95:24 96:21
126:21
**conclusions**
99:16
**concrete** 26:5
**conduct** 32:20
63:3
**conducted**
63:10,16
**conducting**
26:20 47:21
**confidence**
95:15 102:22
**confidential**
16:12 49:17
**confidentiality**
5:16 15:11 16:7
16:21 130:8
131:1,20
**confirm** 54:5
67:17 72:11,19
83:1,13 94:20
96:5 129:12
**confirmed**
116:19
**confused** 121:25
**confusing** 7:8
46:19

**confusion** 56:4
**conn's** 23:10,20
25:1,2,8,9 26:6
26:8 28:5 32:6
**connected**
135:12
**connie** 11:12
**considerable**
30:10,11
**considered**
136:17
**consistent**
112:11,11
**consult** 17:11
**consultant**
21:15,17 25:5
32:15,25 33:3
**consulting**
13:17,17,20
**consumer** 38:14
38:22 39:3
**consumers**
38:14,21 100:17
101:4
**contact** 13:14
**contained** 58:7
99:8,21 123:22
125:4 126:21
**contains** 57:24
101:12 109:14
119:14
**content** 43:25
**contents** 49:15
**context** 21:3
59:22,24

**continue** 7:3
**control** 24:7,23
25:15 28:14
**conversations**
16:10 41:16
42:5 43:22 44:1
44:2 45:4 85:8
85:11
**cooper** 28:7
**coopers** 23:12
25:5 33:5,7
34:10
**copies** 136:15
**copy** 12:13
133:14
**corner** 53:25
**corp** 23:20 25:2
28:6 30:22,25
31:1,8,11,22
32:6
**corporate** 6:7
6:10,17
**corporation** 1:8
4:7,24 136:7
137:1
**correct** 6:14 9:2
9:3 10:21,22,24
10:25 14:11
15:16,17,23
16:8 25:2 26:12
26:13 30:22,23
33:10,13 34:11
34:12,15 36:14
36:16 37:21
39:16,17 40:1

44:6 46:25 47:1
47:4,5 48:6,21
48:24 50:15
51:8 55:15,23
57:11 60:12,13
61:19,20 62:7
62:15,16 64:10
64:12 66:8,12
66:13,15 67:15
67:19 69:14,18
70:5 71:14,15
75:10,11,23
76:1 78:3 79:1,2
79:17,18,21
80:7,9,10,22
81:13 82:6,8
83:20 85:21,22
85:25 86:18
87:4,8,9,20
88:18 90:11,12
90:22 91:14,17
92:13 100:12
101:16 108:19
108:20,23,24
109:2 110:4
111:13,19 113:3
113:15,19
116:16,17,20
117:22,24,25
118:6,14,23
119:1,18 122:14
122:15 123:22
124:7 126:24
128:18 130:6

| | | d | |
|---|---|---|---|

**correctly** 41:18
121:20
**corresponding**
57:10
**corresponds**
57:14
**corroborate**
68:17
**corroboration**
106:4
**counsel** 4:6,15
16:11 21:19
41:16 42:6
43:15,22 44:3
45:5 55:3
115:22 119:21
120:25 135:10
135:12
**count** 3:21,23
39:24 57:12
73:19,23 74:19
76:25 78:3,25
79:4,16 80:21
81:4,14 82:4
83:2 85:21
86:17,23 87:7
89:13 90:18
91:17,19,21
93:7 94:21
95:16 96:6
110:3 111:8
117:2 127:16
**county** 40:1,12
41:6 49:24
64:20 99:20

134:3
**couple** 11:13
14:18 15:6,19
**course** 26:16
**court** 1:1 4:8,13
4:25 5:7 7:19
21:4 84:25 91:2
91:5 133:7,10
133:13
**coworking** 8:17
**create** 12:25
**created** 54:14
54:18
**criteria** 54:20
**cst** 1:21,21
**culture** 22:2,24
23:17,24 24:8
**cup** 85:2,14
**current** 23:10
**currently** 8:18
**cursor** 128:1
**customer** 26:9
26:12 57:16
114:18,22
**customer's**
25:23
**customers** 22:1
25:25 108:25
112:20 116:7
**cut** 56:23
**cv** 1:3 4:10
12:18,21 36:25

**d** 1:9 3:2 4:1,23
7:1 68:24,25
83:14
**damages** 132:16
**dann** 2:7 4:20
**dannlaw.com**
2:9
**data** 3:16 19:15
20:8 29:18 42:3
42:10 43:3
45:10,11 48:4
49:11 50:22,25
51:8 52:14,15
52:19,25 53:4
53:14,22 54:23
64:21 65:15
67:8 72:11,11
72:21 74:3
79:15 80:5 81:3
81:7 83:14
94:14 95:15
96:21 98:4,10
98:18 99:8
100:8,17 101:8
108:21 111:3
112:19 115:7,13
115:20 116:15
116:18 120:19
120:22,24,25
121:19,22 125:3
126:21 127:3,9
128:12 129:11
**date** 1:20 37:2
53:24 57:3,15

89:17 97:22
98:5,12 116:8
118:16,19,25
119:22 122:16
122:17,19,23
123:13,16,21
124:3,5 125:5,5
136:13 137:23
**dated** 64:10
135:14
**dates** 128:10
**day** 8:9 26:16
26:16 127:10
134:10 135:14
**days** 25:4 57:15
58:13,20 59:4
65:17 98:5,12
98:19,19 99:10
112:21 125:5
136:16
**dealing** 25:10
**decide** 29:21
**decided** 40:16
**decipher** 124:23
**decision** 29:24
**declaration**
55:15 66:14
**declare** 137:20
**default** 61:19,21
62:4,24 63:5,17
112:16
**defendant** 38:12
**defendants** 1:11
2:12

**defense** 26:23
  28:13,19
**defer** 125:15
**definitionally**
  59:24 60:7
**definitions** 3:14
  69:11
**demonstrate**
  74:17 80:20
**depends** 52:15
**depo** 9:14 136:8
  137:2
**deposed** 6:6,9
**deposing** 136:14
**deposition** 1:16
  1:22 3:1,5,11
  4:5 5:14 8:3,7
  8:12,19 9:5
  10:20 11:1,3,6
  13:3,7,9,12 36:4
  51:24 107:12
  121:11 133:20
  135:1,4
**depositions** 6:1
  6:4,17
**depth** 112:3
**describe** 19:6
  54:13 63:16
  85:19 94:20
**described** 41:13
  42:9 62:6
**description** 3:10
  71:5 78:25
  91:25 95:7

**descriptions**
  95:22
**designated**
  80:22
**designations**
  5:17
**detail** 109:23
  125:10
**details** 23:24
  57:20 70:25
  73:2 130:11
  131:17
**determine** 34:21
**determined**
  35:1
**deviations**
  39:25 40:4,11
**dg** 3:13,13,14,16
  3:18,19,22,23
  53:4,22 56:13
  65:9,15 68:5,6
  71:18 72:11
  83:2 91:11
  95:15 115:20
  117:17 121:12
  122:2 129:12
**differ** 62:23
**difference** 112:8
  112:13
**differences** 63:4
  63:17
**different** 9:21
  25:14 26:2,19
  32:13,24 33:15
  48:14 49:7

  68:10,18 70:3
  70:16 90:8
  91:16 94:6
  103:12
**differs** 92:6
**difficult** 7:20
  47:10 68:17
  72:2 93:12
  94:11,18 95:2
  95:23 96:16,18
  96:20 114:21
**difficulty** 95:21
  95:21
**digit** 92:9,11,24
**digits** 82:7
**direct** 28:7
  73:13
**directionally**
  29:14
**directly** 28:5
**discounted**
  113:24 114:10
  114:20
**discover** 27:21
**discrepancies**
  22:4,25 24:1
  27:8,13 28:1
  55:14,23
**discrepancy**
  26:7,10 28:16
**discuss** 39:13
  106:23
**discussed**
  102:23 103:23

**discussing**
  121:23
**discussion**
  121:8
**discussions**
  43:20
**dispute** 6:19
  52:1
**disruption**
  30:14
**district** 1:1,1
  4:8,9 26:18
**document** 53:10
  53:17 54:14
  56:15 74:13
  76:3 77:5,7,18
  109:18 120:8,11
  129:7 137:20
**documentation**
  106:19
**documents**
  39:10,13,14,18
  39:19 49:6
  51:24 77:16
  78:6 85:5
**doing** 24:11
  28:17 34:10
  35:9 58:3 65:6
  68:14 117:15
  123:6 125:11,14
**dolgen** 1:9,9
  4:23
**dolgencorp** 1:9
**dollar** 1:8 4:7
  4:23 18:1 19:16

20:14,16 21:19
21:22 22:2,23
23:17 31:12
33:25 36:13,19
40:12 41:12
42:12,15 43:1,3
50:2 54:22 55:4
55:5 57:23
58:11,19 59:3
60:11 62:6 65:6
65:10 67:25
70:4,24 72:22
73:24 74:2 75:2
75:9 77:2,11
79:3 80:4,16
81:3,7 83:14
89:3,23 91:11
91:24 94:5,21
96:5 97:21
98:11 99:9
100:5,8,17
101:8 104:16,19
105:12,13
108:21 110:24
112:19 115:7,12
116:8,14,18
117:14,18
120:19,22,24
121:3,13 122:1
123:5 126:21
129:16,25
130:13,22
131:10,11 136:7
137:1

**draft**   49:13
   75:13
**drafting**   17:16
   17:19
**draw**   29:9
**driver's**   134:23
**duly**   5:4 134:8
**duplicative**
   107:22
**duties**   50:21

**e**

**e**   2:1,1 3:2,9 4:1
   4:1 7:1 136:23
   136:24
**earlier**   12:2
   29:6 32:5 44:7
   67:17 69:7
   97:17 101:20
   107:21 111:25
   126:9 130:3,7
**easier**   82:20
**east**   2:14 136:2
**eder**   1:23 4:13
   134:5,14 135:2
   135:17
**edwards**   2:3 3:3
   4:18,18 5:8,19
   5:21 10:1,4,13
   14:7 16:13,14
   16:24 19:24
   20:6,13 21:2,9
   22:9,10,22
   24:13,24 26:4
   27:17 28:3,23
   29:16 30:1,18

31:21 32:7 33:1
34:7,24 35:7,15
35:17 36:1,17
36:24 37:18
38:19 39:1,8
40:6,19 41:3,20
42:7,17,23 43:8
43:16 44:4,13
45:1,8,18 46:1,8
46:18 47:12
48:1,19 49:1,22
50:11 51:5,15
52:11 53:1,8
54:19 55:2,12
55:20 56:1,7,22
57:22 58:16
59:1,8,12 60:1
60:18 61:7
62:12,22 63:2
63:23 64:2,18
65:23 67:3,24
68:19,24 69:2
70:1,10,19
71:24 72:3,7,18
73:3,8,12 74:11
74:24 75:20
76:11,20 77:24
78:9 79:12,14
80:1,18 81:1,11
81:23 82:3,15
82:18,23 83:11
83:19,23 84:5,9
84:13,21 86:8
86:22 87:18
88:1,7,13,17,24

89:11 90:15
91:2,8,9 92:12
92:16,21 93:4
93:24 94:19
95:13 96:1,10
96:17,23 97:6
97:14 98:1,16
98:22 99:5,17
101:10,17 103:9
104:9,23 105:10
106:12,21
107:11 108:1,9
109:5 110:2,7
110:13 111:16
112:4 113:1
114:5,14 116:5
116:11,24 117:8
118:3 119:5,23
120:4,6,17
121:1,9,24
122:5 123:3,18
124:4,12 125:1
125:16,17,22,24
126:7 127:11
129:9,15,22
130:5,21 131:4
131:7,18,23,25
132:5,7,13,21
132:25 133:2,10
133:12,17
**effort**   30:15
**either**   28:5,25
   39:3 93:17
   96:21 132:24

**[el - exhibit]**

| | | | |
|---|---|---|---|
| **el**  3:24 42:25 99:24 100:3 103:16 106:15 109:16 110:4 111:8 114:8,17 117:1 126:11 127:15 | **entities**  35:2 44:16 45:12 | **estimate**  17:25 18:4 19:14 20:19 47:11 | **exception**  127:9 |

**el**  3:24 42:25
  99:24 100:3
  103:16 106:15
  109:16 110:4
  111:8 114:8,17
  117:1 126:11
  127:15
**electronics**  25:8
  31:4
**element**  30:9
  31:10,16,17
**email**  25:25
  26:10 136:14
**emailed**  136:15
**employed**  30:20
**employee**
  135:10,11
**encompassed**
  121:4
**encompasses**
  22:17
**encourage**
  11:22
**engaged**  18:23
  32:24 36:10
**enhance**  24:23
  28:17
**enhancements**
  29:15
**enlarged**  87:10
**ensued**  28:9
**ensure**  56:4
  63:13 105:23
**entire**  7:22 65:3

**entities**  35:2
  44:16 45:12
**entries**  19:1,7
  57:10
**entry**  54:7 128:2
  128:14,22
**environment**
  24:7,23 28:15
  105:20
**errata**  3:7
  136:12,14,16
**erroneous**  29:19
  46:4,25 64:21
  99:21 101:13,18
  102:5
**error**  37:16
  46:11,11 48:18
  66:11 74:18
  76:22 79:20,21
  80:12,21 81:2
  85:20 102:3,3
  117:24 123:16
  125:7
**errors**  39:25
  40:5,18 41:13
  41:22 42:9,18
  43:10,23 48:4,5
  48:5,11,15,17
  48:21 49:11,25
  50:2,15,19
  83:12
**especially**
  102:23
**esq**  2:3,7,13
  136:1

**estimate**  17:25
  18:4 19:14
  20:19 47:11
**et**  4:7,8 24:9
  136:7,7 137:1,1
**event**  52:13
**evidence**  45:14
  83:6 84:2
  105:17 123:25
**evidenced**
  102:14
**evidencing**
  105:8
**exactly**  75:5,25
**examination**  3:3
  5:20
**examining**
  124:24
**example**  23:15
  25:1,2,8,8,10
  26:6,21,22 29:1
  30:5 34:8 42:24
  43:4 47:3 85:19
  93:2,21 98:19
  100:13 101:11
  106:13 109:1
  117:23 125:3
**examples**  26:5
  27:7 41:6 46:23
  47:6,16 48:4,21
  49:10,24 50:1
  50:14,25 51:7
  64:19 72:9
  83:12

**exception**  127:9
**exceptions**
  49:20
**exchanged**
  121:21
**excluded**  21:4
**exclusively**
  42:11,19
**executed**  64:11
**executing**  105:9
**execution**  3:7
**executive**  30:21
**executives**  24:5
  24:6
**exhibit**  3:11,12
  3:13,14,16,18
  3:19,21,22,23
  3:24,25 9:14,23
  10:12,15,17
  11:20 12:22
  13:1 21:7,7,8
  37:1 53:3,6,7,18
  56:5,6,9,10,13
  56:19,25 61:13
  62:7 63:5,25
  65:22,24 66:4
  67:8 69:23
  70:14,17,18,20
  74:8,9 75:1
  76:14 77:13
  78:10 81:13,16
  81:18 86:7,9,10
  88:8,14,21,22
  88:23 90:13,14
  90:16 91:1,10

    

**[exhibit - form]**

92:23 93:7
97:15 108:8,11
108:11 110:22
110:23 111:4
118:2,4 119:9
119:21 120:20
121:10 122:2,3
122:6,7,12
124:17 127:3,18
**exhibits** 3:12
5:14 9:16 12:15
82:21 90:19
91:4
**exit** 57:1
**expand** 107:23
**expect** 114:18
114:22
**experience**
28:25 29:8 32:8
88:2 102:25
**expert** 6:4 8:4
13:5,25 14:1,2
17:10 22:11
38:3,5,10 51:25
64:6
**expires** 134:16
**explain** 6:16
**extensive** 20:24
**external** 25:18
27:19
**extracted** 42:4
**extremely** 19:4
19:4
**ez** 23:20 25:2
28:6 30:22,25

31:1,8,11,22
32:6

**f**

**fact** 55:21 95:9
95:17 99:10
103:17,23
106:16 109:13
**facts** 45:14 83:6
84:1 105:17
123:24 137:20
**fail** 46:20
**failed** 21:25
28:8 29:2 33:12
36:20 72:20
97:22 98:12
112:21 122:23
**fails** 136:18
**fair** 14:3 35:11
77:18 88:20
**fall** 32:5
**familiar** 6:15
9:15 23:24 25:9
29:11 30:24
53:17 58:1
**far** 18:15 53:25
58:5 97:20
**fast** 122:10
**faster** 67:12
78:16
**favorable** 30:6
**federal** 131:2
136:17,23
**feel** 17:11
107:22 115:11

**feelings** 7:10
**felt** 40:25
**field** 25:24 56:4
**fields** 56:2
**figured** 10:15
53:15
**file** 20:25 75:18
124:2,3
**filed** 4:8
**files** 20:23 55:19
68:18 94:5
**finance** 38:1
**financially**
135:13
**find** 26:16 47:6
48:3
**findings** 36:13
**fine** 29:12
**fines** 28:9 29:1,3
**finish** 11:11
**firm** 2:7 4:11,19
4:21 15:1,25
44:11,17
**firms** 14:1 25:18
**first** 5:4 9:14
14:12 15:2
34:20 35:18
37:17 51:18
54:7 56:23
66:19 75:1 78:2
80:3 84:12
85:18 95:2
99:19 118:19
126:10 128:1

**fit** 96:14
**five** 73:6 81:25
84:9 125:24
132:2
**fl** 136:14
**flag** 49:15
**flawed** 29:19
**florida** 1:25
134:2,6,15
136:17,23
**focus** 30:16
**folder** 75:18
**follow** 97:16
114:4 126:8
131:8
**followed** 83:9
102:18
**follows** 5:5
**foregoing** 135:4
135:7 137:20
**form** 13:23 14:4
19:18 20:2,9,22
22:19 24:2,17
25:12 27:14,23
28:10 29:4,20
31:13 32:2,11
34:4,16 35:4,12
36:15,21 37:13
38:15 40:2,14
41:14 42:13,20
43:6,12,24
44:10,23 45:13
45:22 46:5,13
47:9,18 48:22
50:3,16 51:9

**[form - getting]**

52:8,23 54:15
54:24 55:9,16
55:24 56:20
57:18 58:14,21
59:5,23 60:15
60:22 62:8,20
62:25 63:19
64:16 66:25
67:20 68:12
70:6 71:19
72:13,23 74:20
75:15 76:6,18
77:19 78:4
79:22 80:13,23
81:6 83:5,17,21
84:2 87:15,24
88:5 89:9 92:8
92:14,19 93:1
93:10 94:3,25
95:19 96:9,19
97:3,10,23
98:14,20 99:2
99:13 100:19
101:14 102:10
103:18 104:3,20
105:2,16 106:17
107:7 109:3,25
110:5,11 111:14
111:24 112:23
113:25 114:11
115:23 116:10
116:21 117:6
119:2,19,23
120:14 121:6,15
122:25 123:14

123:23 124:11
124:19 125:8
126:25 129:5,13
129:19 130:1,16
131:13,21
132:18
**forming**  62:14
**forth**  19:22
  41:10,22 42:10
  42:25 43:10,14
  49:10 55:23
  56:18 62:6,15
  64:20 82:21
  101:19 109:15
  120:12 121:21
  123:21
**forwarded**  3:7
**foster**  8:17
**found**  41:18
  42:18 46:3 47:3
  48:6 73:25
  75:21 80:15
  90:5 100:6,15
  107:22 108:17
  112:12,13
  126:16
**four**  8:8 9:1
  37:12,15,17
**fpr**  1:23
**frame**  65:11
  117:19
**frank**  14:20,22
**free**  17:11
  115:11

**friday**  1:20 4:3
**front**  11:18
  76:14 86:21
  115:11 116:1
  118:16
**full**  5:22 13:22
  58:2
**function**  26:23
  26:24 28:13
  86:16
**functions**  25:15
  38:1
**further**  37:16
  50:24 124:24
  130:20 135:9

**g**

**g**  4:1 68:7
**gateway**  2:14
  136:2
**gay**  2:4
**gel**  3:25 117:16
  119:8,12,16
  120:10 122:14
  122:24 123:7,20
  124:13
**general**  1:8 4:7
  4:23 18:2 19:16
  20:15,16 21:19
  21:22 30:16
  31:4,12 33:25
  36:14,19 40:12
  41:12 42:12,16
  43:2,3 50:2
  54:22 55:4,5
  57:23 58:11,19

59:4 60:12 62:6
65:6,10 68:1
70:4,24 72:22
73:25 74:2 75:2
75:9 77:2,11
79:3 80:4 83:14
89:4,23 91:11
91:24 94:5,22
96:5 97:21
98:11 99:9
100:5,8 101:8
104:16,19
105:13,14
108:21 110:24
112:19 115:7,12
116:8,14,18
117:14,18
120:19,22,24
121:3,13 122:1
123:5 126:21
129:16,25
130:13,23
131:10,11 136:7
137:1
**general's**  22:2
  22:23 23:17
  80:16 81:3,7
  100:17
**generally**  19:12
  24:6 88:6
**generated**  63:15
**gerson**  13:23
  21:18
**getting**  11:10
  41:15 45:4,4

**[getting - heads]**                                                    Page 152

| | | | **h** |
|---|---|---|---|
| 49:13,14,16 | 67:25 68:3,20 | 125:19 127:4,5 | **h** 3:9 |
| 78:19 105:7,24 | 69:23 70:14 | 130:25 131:8 | **half** 115:21 |
| 131:1 | 73:4,17 74:7,12 | **good** 4:2 64:8 | **halfway** 21:14 |
| **give** 7:14 12:2,5 | 74:25 78:10,13 | 73:6 81:20 | **hand** 5:1 63:11 |
| 19:14 20:19 | 81:19 84:12 | 125:25 | 134:10 |
| 23:15 26:5,21 | 87:20 91:3 | **governed** 5:15 | **handbook** |
| 27:7 30:4 37:4 | 97:15 101:20 | **government** | 102:16 |
| 42:24 46:12 | 104:12 107:15 | 20:7,15,20 | **handheld** |
| 48:20 53:10 | 107:24 108:1 | 21:21 27:11,20 | 100:23 104:13 |
| 64:23 67:13 | 110:21,22 | 27:25 28:8 | 104:22,25 107:5 |
| 68:6 69:21,23 | 112:15 113:13 | 29:18 30:6,13 | **handle** 91:3 |
| 71:3 85:14 | 116:1 117:7 | 31:25 32:9,23 | **hands** 121:21 |
| 118:8 131:25 | 118:4 119:9 | 33:8 34:2,13 | **hanes** 54:9 |
| **given** 6:1,17 | 120:19 122:7 | 35:8 36:13 46:3 | **hang** 57:1 |
| 39:3 45:5 125:2 | 126:13 127:14 | 46:25 47:8 48:4 | **happen** 25:14 |
| 125:3 132:21 | 127:20 128:1 | 50:14 54:21 | 105:20 |
| 133:6 | 130:20 132:6 | 57:25 58:6 59:3 | **happened** 14:8 |
| **gives** 102:20 | 133:2 | 60:20 66:10 | **happens** 105:21 |
| **giving** 8:12,18 | **goes** 58:7 97:21 | 129:11 | 105:22 |
| 36:3 | 98:5,12 106:10 | **governmental** | **hard** 21:1 35:13 |
| **glanced** 8:5 | **going** 4:3 7:2,4 | 35:2 44:16 | 59:7 60:9 63:12 |
| **glg** 13:22,24 | 7:5,10 9:16 | 45:12 | 68:14,14 69:10 |
| 14:8 15:12 | 11:20 16:5,19 | **grande** 42:25 | 70:7,9 71:21 |
| 17:18,19,21,22 | 16:23 22:7 25:4 | 99:24 100:3 | 72:6,16 75:19 |
| 17:24 18:3 19:1 | 30:10 45:3 48:7 | 103:16 | 76:8,19,19 77:8 |
| 19:11 21:18,18 | 49:5,12 53:5 | **grossman** 2:3 | 77:22 94:16 |
| **glg's** 17:14 | 57:5 69:8 70:17 | **group** 13:21,23 | 97:4 123:15,17 |
| **go** 5:22 9:13,16 | 73:13,21 74:7 | 21:18 23:5,21 | 125:11 |
| 9:20 10:1 11:8 | 77:15,22 80:3 | 24:5 | **head** 51:12 |
| 16:25,25 18:18 | 82:18,20 86:19 | **guilty** 7:21 | 107:15 |
| 21:6 27:2 29:5 | 88:8,9,21 90:13 | **guy** 12:4 | **headers** 63:14 |
| 29:14 32:4,20 | 96:2,3,12 100:2 | **guys** 131:25 | **heading** 60:12 |
| 35:17 37:16 | 103:20 112:1 | | **heads** 43:3 |
| 43:7 50:7 53:2 | 115:18 119:19 | | |
| 56:5 60:2 67:7,9 | 119:20 120:21 | | |

**healthy**  29:22
30:3
**hear**  14:21
**heartburn**  87:6
**help**  7:19 10:4
43:9 93:20
**helped**  24:14
**helping**  44:3
**helps**  11:22
**hey**  43:3 73:5
**hh**  134:16
**hhgregg**  23:22
**hht**  103:24
104:16,18
105:14 106:2,6
**high**  16:17
18:13 24:4
37:22,24 130:18
**highlight**  24:21
**highway**  2:8
**hire**  32:15
**hires**  25:19
**hmm**  9:19
**hold**  12:11 18:6
**honestly**  35:13
**hopefully**  56:11
**hour**  17:14
125:20
**hourly**  17:8,9
**hours**  8:9 9:2
18:1,10,11,11
18:15,17 19:5
20:1
**https**  89:22

**huge**  53:10
**huh**  12:7
**human**  6:18
**hundred**  11:14
18:11,12,15
**hurt**  7:10
**hypothetical**
114:4
**hypothetically**
98:3

**i**

**idea**  24:6 45:19
46:2
**ideally**  68:15
**identical**  92:18
97:2
**identically**  92:6
**identification**
10:12 21:8 53:7
56:6 65:22
70:18 74:9 86:7
88:23 90:14
108:8 118:2
134:22,23
**identified**  46:23
48:15 53:18
57:9,25 59:2
66:11 67:25
68:5,6,11 70:3,4
72:12,20 73:23
76:22 77:1 82:7
83:2,13,15
85:24 86:4 90:9
90:20 91:10
92:7 96:8 100:4

**identifies**  78:21
**identify**  41:12
42:9 55:14,22
57:5 79:20 88:4
**identifying**
41:22 43:10,23
**ids**  128:8
**immediately**
93:20
**impact**  41:1
**impacts**  99:15
**implement**
24:15
**implicate**  16:11
**implies**  37:20
**important**  7:18
12:2
**improve**  28:14
**improvements**
24:9 30:17
32:17
**inaccuracies**
27:22 34:3
50:25 51:3,8
129:18
**inaccuracy**
26:16
**inaccurately**
58:12,20 59:4
**inaudible**  79:13
**include**  12:15
47:2,3,16 52:6
78:1 107:23
109:23

**included**  12:23
33:16 39:14
40:21 74:17
77:14 80:19
125:4
**including**  6:7
23:10 105:8
**incomplete**
93:17 94:10
96:21
**incorrect**  41:7
51:2
**independent**
34:23
**indicate**  40:17
50:7 117:7
**indicates**  93:22
110:9 126:22
**indicator**  106:1
**individual**
46:15 104:6
105:12
**individualistic**
29:23
**individually**
1:10
**individuals**
41:12,22 55:4
103:22
**industry**  22:5
23:1,2,4 29:6,10
**inevitably**  7:6
**information**
19:13 20:11
39:22 41:10

**[information - know]**

49:13,17 51:25
52:16,17 55:4,8
55:21 57:24
58:6 61:9 62:5
74:16 76:4,13
76:24 77:13
78:1 79:4,7,19
93:16 94:10
96:5 97:21
99:21 101:13,18
104:19 109:7,14
119:15 121:4,13
122:21 124:16
129:17
**input** 55:5
**insider** 37:20
**inspected** 65:5
117:14 123:5
**inspection**
72:10 95:18
98:6 101:19
118:17,20,23
**inspections**
72:20
**inspector** 60:19
65:25 66:10
81:12 82:7 83:3
93:8 94:24 96:8
96:25 107:4
124:6 129:4
**inspectors**
83:16
**instances**
107:19

**instructing**
131:4
**instruction** 86:1
96:13
**integrity** 50:22
105:6
**intend** 129:10
**interacted** 42:15
**interactions**
23:8
**interested**
135:13
**internal** 6:7,10
6:17 25:17
26:19,23 27:19
32:14
**internally** 6:11
28:18
**internet** 94:1
**interrupt** 11:11
**introduce** 9:16
**introduced** 53:9
56:9
**introduction**
21:13
**introductory**
7:3
**invoice** 19:10
**involve** 30:10
51:13
**involved** 17:19
30:15 33:24
79:25 95:21
103:15

**involvement**
31:25 36:18
**involves** 99:24
**involving** 20:16
35:2 117:10
119:15 129:18
129:25 130:13
131:11
**irvine** 8:19
**irving** 8:16,20
8:21
**issue** 24:16
60:21 67:15,19
68:1 86:5
126:20
**issues** 16:12,21
25:11 26:12
27:21 51:13
131:1,20
**it'll** 91:4
**item** 57:9 65:11
65:18 66:10
68:3 69:5,5,13
70:3 71:16,17
73:18,22 74:1,3
74:13 75:22
76:25 80:5,9
94:8 100:3,7,9
102:12 108:18
108:22 114:18
116:15 117:19
124:10 129:8
**items** 22:1 54:21
54:21 76:25
100:24

**j**

**j** 122:17,17
**javier** 2:7 4:20
**jersey** 2:8
**jmermino** 2:9
**job** 7:20 120:4
137:3
**jointly** 1:10
**joseph** 1:4 4:7
136:7 137:1
**jump** 7:23
**jurisdiction**
118:8

**k**

**keep** 77:17 95:1
**key** 38:1 56:2
**kind** 7:3 25:22
25:23 49:9
94:14 111:11
120:4 132:17
**kinds** 6:19
**know** 5:11 11:9
19:10,17 20:14
20:18,25 23:19
24:6,19,20
25:22 26:16
27:5 28:22
29:10,13 30:4,5
30:5,12,16
32:20 34:21
36:19 40:22
42:5,22 44:20
44:25 46:9
47:14,14,22
48:11 49:4,16

50:18,23 51:2,3
52:9,18 54:16
54:20 56:17
57:6 58:3,5,23
59:11,15,21
60:6,14,16,17
60:19 61:4,11
61:16,21 62:1
62:10,11,17,21
62:23 63:8,9,10
63:12 64:13
66:2 67:22 69:8
69:9 70:7,20
72:25 74:22
75:17,17 77:7
77:22 78:7
86:10 87:25
93:11,19,22
94:7,12,13,15
94:16 95:3,4,23
96:15 97:4,19
97:20 100:25
101:1,6 102:3,5
102:23 103:15
103:20 104:7
105:3,6,23
106:10,13,15
107:4,8,9,10
112:22 114:3
115:4,6,20
116:22 121:16
122:1 123:1,15
123:19 124:9,23
125:9,13 127:3
127:5,5,7 130:9

130:18,18,19
**knowledge**
  28:24 37:3
**known**  134:21
**knoxville**  2:4

**l**

**l**  2:7
**label**  56:24
**labeled**  59:13
  61:9
**lag**  103:3
**language**  110:6
**large**  1:25 19:16
  19:20 39:21
  42:2 53:4,4,18
  56:18,25 67:8
  78:11 110:21,24
  111:3 134:6,15
**las**  8:16
**laura**  1:23 4:13
  134:5,14 135:2
  135:17
**law**  2:7 4:20
  102:17
**lawyer**  14:12
**lawyers**  14:15
  16:22
**leading**  112:21
**leads**  29:12
**learn**  25:10
  26:11
**learned**  88:3
**leave**  37:23
**left**  53:24,25,25
  86:17 88:20

89:5 127:23
**legal**  4:12,14
  136:22
**lehrman**  13:23
  21:18
**lending**  31:16
**length**  102:24
**letter**  3:6
**level**  16:17 24:4
  37:22,24 130:18
**license**  134:23
**light**  52:20
**liked**  45:9
**likely**  76:3
  77:13 107:10
**limited**  41:1
  62:11
**line**  26:23 28:13
  28:19 43:2 66:7
  73:9 75:25
  81:24 87:13,20
  89:22 90:20
  110:25 113:2
  119:11,13,14
  128:2 137:4,7
  137:10,13,16
**lines**  57:5 87:11
  87:17 92:6
  104:5 111:2,11
  121:18
**list**  5:25 12:19
  12:20 39:10,24
  49:2 50:6 79:11
  107:21

**listed**  11:7 37:8
  37:12 45:20
  48:24,24 49:6
  62:19 63:5,18
  65:12 69:13
  101:6 117:20
  128:25
**listing**  41:5
**lists**  82:4 125:4
**litigation**  21:3
  37:11 129:17,24
  130:13,24
**little**  31:1 93:18
  125:19
**live**  68:15 84:24
**llc**  1:9 4:23
**load**  122:12
**loaded**  53:9,14
**loading**  53:13
  57:2 78:12
**locate**  41:9
**logic**  47:21
**long**  32:4 63:24
  64:14
**look**  11:22 24:8
  24:8 27:1,3
  28:16 29:15
  32:16 42:2 43:2
  63:7 77:4 86:20
  90:16 91:23
  94:14 102:4
  107:24 110:14
  115:11,12
  119:11 128:7

**[looked - means]**

**looked** 54:17
62:13,13 63:24
67:22 77:8 78:8
79:24 90:24
93:2,21 94:8
96:25 112:2
124:2
**looking** 14:2
21:13 36:25
37:7 51:19
56:25 57:21
62:10 63:12
66:16 68:16
71:17 81:9
92:23 93:6 94:4
101:25 119:13
122:11 123:10
124:15
**looks** 12:3 67:6
89:7
**loop** 36:9
**loss** 25:16 30:21
**lot** 6:3 11:4
23:14,14 24:20
42:3 60:25
72:25 93:15
106:5 114:22
125:9,10
**lots** 79:7 97:4

**m**

**m** 59:14 111:17
**machine** 9:21
**made** 13:14
20:12 25:6
32:17 67:12

80:11,21 90:19
93:18 117:24
**main** 71:10
118:13
**maintain** 29:22
30:2 96:15
97:12 131:15
**make** 5:16 7:18
9:13,15 11:20
11:23 12:4,8,22
23:7,16 24:22
29:15,24 30:17
32:16 33:9
34:14,23 41:17
50:19 53:2 54:5
56:3 76:24
84:11 90:17
91:1,4 94:16
98:8 99:6
104:10 114:24
115:12
**makes** 103:4
107:17
**making** 23:2
112:20
**management**
28:21 30:8
**manager** 26:18
26:18
**manchester**
65:6 71:11
**mandatory**
37:23,25
**march** 19:3
64:10,15 73:24

75:7,7 77:1,10
100:4 113:22
114:7,16 117:11
117:13 118:23
119:22 122:20
122:23 123:5
**mark** 21:6 56:5
70:17 74:7 88:8
88:21 90:13
107:25 118:4
**marked** 10:12
10:17 21:8 42:4
53:7 56:6,19
61:12 62:7
65:22,24 70:18
74:9 86:7,9
88:23 90:14
107:24,25 108:8
108:10 111:4
118:2 120:20
121:12
**markets** 33:15
**marking** 9:15
**match** 14:1
54:20 76:15
90:24 93:17
94:14 95:22
96:22 101:2,21
103:1,4 106:3
**matched** 72:11
72:21 83:3,15
94:23
**matches** 76:13
76:17 96:7

**matching** 94:13
95:4,6,7,9
127:10
**material** 44:12
**materials** 21:20
41:19
**matter** 4:6
11:15 15:18,20
15:22 16:2,3,15
16:17 18:22
40:5 131:12
**matters** 6:8,10
6:17,18 15:6,15
15:25 48:12
130:11,23
131:10
**mcguire** 2:13
14:9,13,16,25
17:23 19:11
136:1
**mcguirewood...**
2:15 136:3
**mean** 6:16
11:11 20:23
21:25 24:25
25:14 27:9 30:2
33:18,21 40:24
42:22 44:2 48:5
50:18 63:7
70:13 76:16
77:15 83:8 94:5
114:21 115:10
115:25 123:12
**means** 59:21
83:24 111:22

**[meant - nontestimonial]**

**meant** 24:21
  100:13 112:6
**mechanism**
  107:13
**mechanisms**
  27:25
**media** 4:4 35:20
  35:23 84:14,19
  125:20,25 126:1
  126:5 133:4
**meet** 8:10 23:5
**meeting** 9:10
**memorabilia**
  31:7
**memory** 12:25
  77:9 115:12
**mention** 50:24
**mentioned**
  16:20 23:19,23
  32:5 65:19
  120:23 130:7
**mentions** 77:12
  77:16
**merchandise**
  31:4
**merino** 2:7 4:20
  4:20
**merit** 34:22
  35:3 134:5
  135:2
**met** 8:8,25 9:7
**method** 27:5
  94:6
**methodology**
  21:21 102:1

**methods** 132:16
**michelle** 11:13
**michigan**
  134:23
**milberg** 2:3
  4:18
**milberg.com** 2:5
**mine** 78:16
**minimize** 71:3
**minus** 66:20
**minute** 11:21
  37:4 53:3,11,15
  69:21 71:3
  78:14 84:9
  125:24
**minutes** 73:6
  81:25 82:1
  132:1
**mischaracteri...**
  123:24
**mismatch** 106:2
**misread** 22:8
**misrepresenting**
  120:2
**missing** 92:10
  92:10 96:3
**misstates** 67:1
  114:1,12
**mistaken** 13:6
**mistakes** 105:19
  105:20
**mixing** 123:16
**mock** 32:21
**modify** 52:13,21

**moment** 124:23
**monroe** 75:2
  89:4,19 91:12
**month** 19:3,3,3
  123:21
**months** 15:7,16
  15:22 65:13
**move** 113:17
**multiple** 19:21
  20:24 75:18
  77:16 103:22
  122:13

**n**

**n** 2:1 3:2 4:1 7:1
  7:1 60:10 61:9
  111:18
**n1** 60:2
**name** 4:11 5:23
  37:19 89:23
  111:7 127:15
**names** 11:12
  51:14
**nature** 15:7
  40:25 49:7
**necessarily**
  21:25 28:20
  34:18 40:17
  47:20,24 48:10
  48:17 50:6
  101:5 116:23
  127:5
**need** 12:4,24,24
  12:25 17:11
  31:17 71:21
  76:9 107:22

  133:17
**networking**
  23:6 29:6
**new** 1:1,9 2:8
  4:9,23 20:16,20
  21:22 31:22
  32:1,4,10 33:4
  33:11,12,14,16
  34:1,11 35:2
  36:13,20 40:13
  44:9,15 45:21
  46:3,10 47:7
  48:5 52:16
  58:11,19 60:19
  65:6 66:11
  71:11 72:10,20
  73:25 75:3,10
  75:12 77:3,12
  81:12 83:3,16
  85:24 86:4
  89:19 90:9
  91:13 93:8
  94:24 96:7 98:5
  100:6 102:9,17
  107:4,14 112:12
  112:13 117:15
  118:6,10,14,20
  123:6 129:4,17
  129:24 130:14
  130:23
**nine** 39:24
**ninety** 98:19
**nods** 12:4
**nontestimonial**
  15:7 16:22

**north** 2:8 100:5
102:8 108:12
**nos** 66:1
**notary** 1:24
134:5,15
**note** 118:16,22
119:15 136:12
**noted** 42:4 65:7
66:23 69:17
72:8 80:8 81:12
83:4 94:24
95:17 107:20
117:15 123:6
129:3
**notes** 12:12
46:15 49:9,19
49:21 61:2
132:1 135:8
**notice** 1:22 3:11
9:14 10:19,24
**noticing** 4:17
**noting** 47:21
**number** 3:10
7:4 20:4 22:11
41:5 42:24
57:12 60:11
68:3,8 69:13
70:2,4,13 71:13
87:14,16,19
89:25 90:2 92:2
97:2 101:22,23
109:6 119:10
122:7 134:16
**numbers** 70:11
70:16 93:16

95:22 101:21
103:1
**numerous** 23:12
**ny** 3:19

**o**

**o** 4:1 29:25
35:25 45:25
47:25 48:25
58:25 80:25
95:25 97:25
124:25
**oath** 3:4 5:5
6:13 84:23
134:1
**object** 16:19,23
22:7 45:3,13
48:7 49:12
77:15 86:19
96:12 115:19
119:19,20
120:21 130:25
**objection** 14:4
19:18 20:2,9,22
22:19 24:2,17
25:12 27:14,23
28:10 29:4,20
31:13 32:2,11
34:4,16 35:4,12
36:15,21 37:13
38:15,23 39:5
40:2,14 41:14
41:25 42:13,20
43:6,12,24,25
44:10,23 45:13
45:22 46:5,13

47:9,18 48:22
50:3,16 51:9
52:8,23 54:15
54:24 55:9,16
55:24 56:20
57:18 58:14,21
59:5,10,23
60:15,22 62:8
62:20,25 63:19
64:16 66:25,25
67:20 68:12
69:19 70:6
71:19 72:1,5,13
72:23 74:20
75:15 76:6,18
77:19 78:4
79:22 80:13,23
81:6 83:5,5,17
83:21 84:1,2
87:15,24 88:5
89:9 92:8,14,19
93:1,10 94:3,25
95:19 96:9,19
97:3,9,10,23
98:14,20,25
99:2,12,13
100:19 101:14
102:10 103:18
104:20 105:2,16
105:16 106:17
107:7 109:3,25
110:5,11 111:14
111:24 112:23
113:25,25
114:11,11

115:23 116:10
116:21 117:6
119:2,24 120:14
121:6,15 122:25
123:14,23
124:11,18,19
125:8 126:25
129:5,13,19
130:1,16 131:13
131:21 132:18
**observation**
29:12
**obtain** 60:21
**obtaining**
102:19
**occur** 10:20
**odd** 9:19
**offered** 109:19
**office** 8:13 26:9
44:8
**official** 134:10
**official's** 47:8
**officials** 45:21
46:10,25 48:5
**oftentimes**
29:11 43:18
**oiled** 9:21
**ointment** 3:18
65:7 66:8 67:15
68:20 69:14
71:1
**okay** 6:9,15,21
6:25 7:10,18 8:2
8:23 9:4,13,22
10:3,6,23 11:1

**[okay - overcharge]**                                                           Page 159

| | | | |
|---|---|---|---|
| 11:15,20,24,25 | 68:8,25 69:13 | 132:3,4,8,21,23 | 120:12 132:15 |
| 12:8,9,12,15,18 | 70:2,17,23 | **old** 3:24 42:25 | **opportunities** |
| 12:22 13:1,2,11 | 71:13 73:4,8,11 | 99:24 100:3 | 24:21 28:17 |
| 13:14,20 14:8 | 73:21 74:7,12 | 103:16 106:14 | 29:15 32:22 |
| 14:12,15,23,25 | 76:3,16,21 | 109:16 110:4 | **opportunity** |
| 15:4,13,20 16:2 | 78:21 79:12,15 | 111:8 114:8,17 | 13:8 |
| 17:2,8,22,25 | 80:2,8,19 81:2 | 117:1 126:11 | **opposed** 11:23 |
| 18:14,17,20,25 | 82:4,17 83:1,24 | 127:15 | 12:6 29:3 82:20 |
| 19:5,25 20:19 | 84:8,11,13 85:2 | **once** 11:9 14:17 | **order** 5:15,17 |
| 21:17 22:16,23 | 85:5,8,11,14,17 | 47:22 | 54:3,7,8 56:18 |
| 24:25 25:3 | 86:3,9,14 87:5 | **open** 81:17 | 56:24 57:4,6,10 |
| 26:11 27:18 | 87:13,19,22 | 127:23 | 65:15 67:9 |
| 28:4,24 30:2,19 | 88:2,8,16,20 | **opening** 118:7 | 78:13 110:22 |
| 31:8,11,24 32:8 | 89:1,7,12,18 | **operate** 31:22 | 111:5 127:14 |
| 33:6,11,22 | 90:2,5,25 91:8 | **operates** 34:11 | 133:15 |
| 34:13 35:16 | 91:19,22 92:2,5 | **operations** 22:3 | **ordering** 133:11 |
| 36:6,9,18,25 | 93:5 96:2 97:15 | 22:24 23:18,25 | 136:15 |
| 37:7,19,22 38:6 | 98:2,6,15,17,23 | **opine** 13:19 | **organization** |
| 38:13 39:23 | 99:18 101:11 | 21:20 25:20 | 13:18 23:10 |
| 41:9 42:24 43:9 | 102:7 104:18,24 | 50:21 71:22 | 38:2 |
| 43:17 44:5,14 | 107:2 108:16 | 98:21 | **organizations** |
| 45:2,19 46:2,9 | 109:6,11,12,23 | **opinion** 8:4 11:5 | 13:17 23:9,9 |
| 46:22 47:6,15 | 110:3,8,19 | 17:10 40:23 | 24:18 |
| 48:2,20 49:2,23 | 111:1,17 113:10 | 41:2 42:5 46:4 | **original** 54:2,6 |
| 51:16 53:2,5,17 | 113:18 114:15 | 46:12 50:15 | 54:8 56:17,24 |
| 53:21,24 54:11 | 115:4 117:4,9 | 51:11 52:18 | 57:9 65:15 67:9 |
| 54:20 56:4,13 | 118:16,22,25 | 55:19 58:9,17 | 111:5 127:14 |
| 56:14,17 57:5 | 119:6 120:5,18 | 58:24 61:1 | **output** 34:21 |
| 57:23 58:9 | 121:25 122:6,9 | 98:23 99:16 | **outside** 32:25 |
| 59:15 61:12,18 | 122:21 124:16 | 105:11 109:15 | 33:3 43:14 |
| 61:23 62:17 | 126:20 127:22 | 115:15 116:2 | 85:13 92:24 |
| 64:3,13,24 | 127:25 128:3,6 | **opinions** 6:4 | 129:17,24 130:4 |
| 65:21 66:4,19 | 128:7,13,22,25 | 21:4,24 22:13 | 132:17,20 |
| 66:23 67:7,11 | 129:3 130:22 | 40:21 52:2,13 | **overcharge** 47:7 |
| 67:14,17,25 | 131:8,24 132:2 | 52:21 62:15 | 48:6 59:3 73:24 |

77:1 80:22
95:18 96:8
100:4 124:14
**overcharges**
45:20 46:3,24
57:25 129:18,25
**overpriced**
72:10
**oversight** 110:1
**own** 11:22
24:18,25 30:25
**owns** 31:1
**oxley** 37:25

**p**

**p** 2:1,1 4:1
**p.m.** 1:21,21 4:3
10:8,9,9,11,21
35:21,21,24
84:16,17,17,20
108:4,5,5,7
126:2,3,3,6
132:9,10,10,12
133:5,20
**page** 3:2,10
17:13 26:1
39:12,23 41:4,4
41:23 42:11
43:1,11 47:17
48:2 49:25
50:14,24 51:16
51:18 54:11
64:24 66:4,21
73:13,17 74:12
74:23 75:1
76:22 78:2 80:4

85:19 89:22
90:17 91:23
99:7,21 107:17
109:9,13 117:9
118:19 119:10
119:10 126:10
137:4,7,10,13
137:16
**pages** 135:7
**paid** 116:9
**papers** 104:7
105:9
**paragraph**
21:13 51:19
**parallel** 29:9
**parentheses**
65:15,16
**part** 13:1,16,16
23:21 24:19
76:8 93:13
119:4 123:16
**particular**
13:20 22:1
46:16 50:9 77:7
101:12 104:14
107:1,2,8 113:4
**particularly**
94:7
**parties** 52:1
135:10,11
136:15
**paso** 3:24 42:25
99:24 100:3
103:16 106:15
109:16 110:4

111:8 114:8,17
117:1 126:11
127:15
**pass** 46:20
**past** 6:2 15:16
15:22
**pattern** 47:23
**pawn** 31:9,16
**paying** 29:3
100:16,18,22
101:5 112:22
**pc** 2:7
**pdf** 20:24 124:2
124:2
**peer** 23:5,21
24:5
**pen** 82:13,16
**penalties** 137:20
**penalty** 29:13
84:24
**people** 25:21
100:15,22
**percent** 11:14
46:11,11 113:18
113:21 114:7,10
114:16,20 115:1
**percentage** 46:2
**perfect** 19:9
**perform** 55:7
102:21
**performed**
60:20 124:6
**perimeter** 53:14
**period** 20:17
44:21 45:10,20

58:10,18
**periodically**
18:3
**peripherally**
28:6
**perjury** 84:24
137:20
**personal** 102:24
**personally** 30:8
30:8 134:21
**pertain** 40:5
**pertaining** 85:9
**pertains** 37:24
60:8 105:5
106:25
**phillips** 2:3
**phrased** 7:7
**physically** 27:1
**picked** 96:25
**picture** 86:16
87:10
**pinpoint** 77:6
**place** 8:11,17
23:6 29:7
108:11 117:11
118:20,23
123:20 128:10
**places** 48:14
**plaintiff** 4:6
**plaintiff's** 1:22
**plaintiffs** 1:6,19
2:2 3:11 4:19,21
21:23 22:12
38:14,21 115:21
119:21 120:25

**plaza**  2:14 136:2
**please**  4:25 6:25
  11:11 35:18
  38:17 64:23,25
  65:3 66:2 67:10
  70:21 78:13
  86:10,12,15
  90:3 92:2 99:18
  109:10 136:13
**pllc**  2:3
**plus**  23:4 24:11
  35:10 66:20
**pmh**  1:3 4:10
**point**  40:10 43:2
  59:25 60:17
  61:4 62:10 63:1
  65:2,4 69:10,12
  70:8 73:18
  76:23 77:17
  78:2 80:3,19,24
  81:10,21 85:18
  99:19 100:13
  101:3,12 102:7
  102:13 105:7
  106:14 107:21
  111:19,21 112:9
  117:10 121:23
  126:10 129:10
  133:16
**pointed**  93:15
  108:16 115:13
  126:16
**points**  39:24
  41:5,10,23
  42:10 47:17

49:25
**pol**  61:9
**populate**  56:11
**portal**  91:6
**pos**  27:2 60:3,12
  60:21 61:9
  103:4 106:3
  111:21 112:6
**position**  94:15
**possible**  59:2,9
  71:16,25 76:16
  93:5 96:24 97:8
  110:8,18
**potentially**
  111:13
**power**  31:4
**ppp**  102:15
**practices**  24:10
**preceding**  65:17
**predominantly**
  103:23
**preliminary**
  11:15
**prepare**  8:2,6
  9:4 64:6
**preparing**  64:4
  85:16 125:14
**present**  2:19
**pretty**  22:6 50:9
**prevalent**
  105:21
**prevention**
  25:17 30:21
**previously**
  23:11 103:23

**price**  22:3,25
  23:12 25:5
  26:10 27:2 28:6
  28:15 33:5,7
  34:9 55:14
  60:21 65:8,8,11
  65:12,24 74:1,4
  75:22 80:6,9,15
  80:16 81:3
  89:15,17 100:7
  100:9,16 101:8
  105:12,24
  108:17,22 109:8
  109:8,19,20
  110:9 111:12,18
  111:19,22
  112:14,16
  113:15,23,24
  114:9,10,17,18
  114:20,25 115:1
  115:6,16 116:16
  117:16,17,18
  118:5,7 119:16
  119:17 123:8,8
  124:9 126:17
  128:17 129:3
**priced**  58:12,20
  59:4
**prices**  60:11,14
  63:5,18 104:25
  120:11
**pricing**  22:3,25
  23:18,25,25
  24:16,19 25:11
  26:7,12 27:8,13

27:22 28:1 29:2
  32:1,9 33:13
  34:2 35:3 36:20
  44:16 45:11
  48:11 51:14
  55:22 61:3,8
  66:11 79:8,15
  79:19 94:22
  96:5 97:20 98:3
  98:10 99:8
  104:19 110:3
  119:14 120:15
  121:3,14 129:18
  131:11
**primarily**  31:3
**prior**  6:6 8:9
  15:1 31:24
  36:18 64:14
  104:21
**privilege**  16:21
**privileged**  16:12
  49:13,17 131:1
**privy**  19:12
**probably**  15:18
  130:19
**problem**  24:16
  26:7 108:16
  126:15
**problems**  42:9
**procedural**
  102:2
**procedure**
  40:11 136:23,24
**procedures**
  24:15 39:25

**[procedures - read]**                                    Page 162

61:2 63:9 72:16
83:9 102:16
116:3
**process** 112:2
127:6
**produced** 52:1
52:14 134:22,23
**product** 26:25
27:1,3 31:19
48:6 51:13
58:11,18 59:2
66:24 67:4,18
68:1,10 70:2,25
71:7,13 72:8,10
72:11,12,20
76:1,4 77:12
78:21 80:21
81:4 83:2,14,15
83:25 85:24,25
86:4,18 87:1,11
87:14 88:4,14
89:7,8,15,24
90:6,10,11,21
91:14,16,20,25
92:24 93:6,7,8
94:21 95:16,17
96:7,7,24 97:1
98:3,10 100:16
103:16 105:12
106:16 108:25
111:7 112:21,22
113:22 114:19
114:25 115:7,16
116:20 119:17
121:13 123:20

125:6 126:17,23
127:15 128:10
128:14
**products** 45:19
46:21 50:2 54:6
57:5,7,24 60:11
62:19 88:3 90:8
90:18 104:25
110:16 111:12
**promotion**
113:21 114:7,16
**proper** 105:9
**proposed** 4:19
4:21
**protected** 49:17
**protection** 24:6
25:16 30:21
**protective** 5:15
5:17
**proven** 106:2
**provide** 18:4
25:20 28:13
38:3,8,10 44:8
51:7 72:9 97:7
109:15 117:23
**provided** 19:16
20:15 44:12,17
44:21 83:14
94:22 96:6
121:3,13,22
124:16
**provides** 79:3
**pubic** 1:24
**public** 23:11
25:4 134:6,15

**pull** 122:21
**pulled** 65:10
74:2 76:4 80:5
100:8 108:21
116:15 117:18
123:1
**purchase** 31:19
**purchases**
112:20
**purpose** 82:17
**purposes** 17:6
105:4
**pursuant** 1:22
5:17 10:23
131:2
**put** 5:9,13 14:9
16:9 18:15 19:5
20:4 50:5 56:8
91:6 115:22
119:21 128:1
**putting** 47:23

**q**

**queensbury**
117:14 118:6,10
118:13 123:6
**question** 6:5 7:7
7:8,13,23 12:6
20:14 38:6 39:2
41:9,17 42:8
44:1,14 46:19
48:16 49:14,18
50:19 56:14,21
58:15 59:9 64:8
71:25 77:18
79:10 96:4

98:17 112:25
115:5 120:7
127:21 131:3,9
**questioned** 5:5
6:13
**questioning**
36:10 126:9
**questions** 7:5,6
16:5 132:22,24
**quick** 125:21
**quicker** 11:24
56:11
**quite** 20:23 23:6
49:7 67:22
105:21,22
**quote** 28:21
73:22 100:2
104:4

**r**

**r** 2:1,13 4:1 7:1
136:1
**raise** 5:1
**raising** 127:9
**rate** 17:8,9,14
46:11,12,20
**rather** 30:15
**rationale** 49:5,8
50:8
**reached** 13:18
14:9 43:19
**reaches** 18:3
**react** 28:22
30:13
**read** 3:6 8:24
13:3 22:6,14,17

**[read - register]**

52:4 65:2 73:21
90:2 92:2 100:2
100:11 106:19
106:23 117:21
118:19 133:7,9
136:11 137:20
**readiness** 32:19
**reading** 61:2
104:21 106:7
110:17 123:4
133:21
**reads** 60:7 75:4
111:20 112:25
122:17
**ready** 11:10
**really** 18:18
20:4 23:7 47:14
47:14 50:10,21
56:16 64:5
71:22 76:19
77:6 95:10
102:12 103:5,5
107:3 127:9
130:9,10 131:16
**reason** 29:18
46:4 47:15 51:3
87:22 91:1
98:17 99:7
136:12 137:6,9
137:12,15,18
**reasonable** 22:4
22:25 110:17
136:17
**reasonably**
21:24 22:12

**reasons** 49:23
50:13 95:5
103:4
**recall** 11:8,12
11:13 13:10,11
13:13 18:3,8,18
19:22 20:4
33:18 34:6,6,25
35:6,10 39:21
39:22 47:20,24
49:5 50:8,10
51:13 55:1
56:16 57:20
58:2,8 61:11,22
62:2,21 63:1,22
64:1,5,8 69:9,9
72:16 73:2
74:23 77:4,8,23
78:5,7 79:23
83:9,18 95:2
97:24 107:12
112:5 115:9
121:18,20,23
**receipt** 102:14
102:19 103:6
105:8,25 106:11
136:16
**receipts** 106:3
**receives** 29:1
**recent** 12:19,20
19:10
**recently** 64:1
**recess** 10:9
35:21 84:17
108:5 126:3

132:10
**recollect** 49:8
60:25 64:17
**recollection**
18:5,24 34:1
121:16 126:15
**recommendati...**
24:22 25:6
28:14 32:16
33:9 34:14,23
**reconcile** 70:8
93:20
**reconciliation**
106:5,9
**record** 4:3,16
5:9,13 7:19 10:2
10:7,10,15 12:8
16:9 35:17,19
35:23 65:2
84:12,15,19
90:3 92:3 108:2
108:3,6 115:22
120:2,3 126:2,5
132:6,9,11
133:2,5 135:8
**recorded** 4:5
**refer** 60:5,14
67:4 69:5,5 78:6
**reference** 12:24
12:25 17:20
40:17 65:14
90:10,21 107:17
108:13 111:5
119:7,10,11

**referenced** 11:4
11:9 39:15
48:14 103:22
104:2 126:24
136:10
**references**
120:10 122:14
123:17 127:8,15
**referencing**
57:7 58:3 77:17
**referred** 19:21
104:13
**referring** 17:18
23:16 44:15
66:1 69:21 77:5
93:8 120:16
122:2
**refers** 59:15
61:16,21 62:1
73:18 104:17
**reflected** 124:5
**refresh** 9:18,22
21:10 86:12
126:15 127:24
**refuse** 131:9
**regard** 16:2,15
22:16 25:11
50:2 76:21
136:17
**regarding** 74:18
130:3
**register** 65:8,11
102:14 103:11
103:11,17
105:24 106:10

106:16,24 107:6
111:23 113:23
114:9,19,25
117:17,18 123:8
**registered** 134:5
135:2
**regular** 113:23
114:9,25
**regulators**
29:23
**regulatory**
29:12
**reintroduce**
91:4
**related** 16:18,21
22:24 23:25
31:25 34:2
44:16 48:11
78:2 79:16 85:9
86:4 108:19
126:9,11
**relating** 22:3
23:18 32:9
33:12 45:10
95:16
**relation** 29:22
**relationship**
30:3 62:4
**relationships**
13:25
**relative** 135:9
135:11
**relevant** 21:20
44:21 45:10
52:20

**reliability** 21:21
50:20,22 105:5
**reliable** 94:16
98:18 99:10
102:6 105:15,25
**reliance** 94:17
**relied** 34:22
35:8 39:10,13
39:19 55:19,21
62:14 67:9
72:21 95:15
99:9 109:14
111:2 115:6
117:5 121:5
125:3
**relief** 87:7
**rely** 21:24 22:12
34:13,18 55:13
79:19 94:23
98:4,11 102:1,2
102:21,22
104:24 106:6
**relying** 81:3
120:12
**remember**
107:18 121:7,18
121:22
**remind** 84:23
**reminded** 12:1
**remote** 1:17
8:13
**remotely** 2:24
134:7
**rent** 23:22

**repeat** 38:17
98:7 104:14
129:21
**repetitive** 40:25
**rephrase** 6:5 7:9
7:15 15:17 38:7
39:11 46:19
129:23
**report** 3:12,24
8:4,5,24,25 11:5
11:7,9,16,21,22
12:10,13,15,22
13:5 17:10,17
17:20 21:6,14
21:23 26:17
36:12 37:1 38:4
38:5,10 39:9,12
39:15,15,20
40:4,10,21 41:5
41:11,24 46:23
47:4,8 48:13,21
51:12,16,18,23
52:7,22 55:23
61:2 62:15
63:15 64:4,6,10
64:14,24 65:25
65:25 66:17
67:5 68:11
69:15,21 72:9
73:4,14,17,22
74:17,22 75:6,8
75:13,14 76:13
76:23 77:14
78:2 79:20 80:2
80:20 82:8

83:13 85:19
90:10,21,23
92:10 93:9,21
94:2,23 95:10
95:18 98:4,11
99:20,22 100:3
101:19 102:4,21
102:22 103:7,22
107:23 108:13
108:19 109:14
109:15,24 111:3
116:2,13,14,17
116:19 117:5,9
118:5,6,8,17,22
119:3,6,8,15
120:9,11,13
122:22 123:4,22
125:4,14,15
126:10,13 129:4
135:4
**reported** 1:23
71:17
**reporter** 4:13
4:25 5:7 7:19
91:2,5 133:7,10
133:13 134:5
135:2
**reporter's** 3:5
135:1
**reporting** 26:10
**reports** 21:22
21:24 22:13
32:14,16 33:9
33:12 34:2,14
34:19 35:1,9

37:8 40:1,12
45:16 46:15
50:20 51:1,25
60:24,25 75:18
93:14 94:4,5
104:1,1 105:6
**represent** 70:23
86:14 89:2 98:2
**representative**
116:3
**represented**
101:1
**representing**
21:19 23:8
38:21 98:9
**requested** 135:6
**requirement**
31:18 102:15
**requirements**
16:7
**requires** 93:23
**reread** 8:4,24
22:9
**research** 93:23
93:25 94:1
**reserve** 51:20
51:23 52:16,21
**reserved** 52:12
**resources** 6:18
30:11
**responding** 28:8
**response** 7:14
**responses** 12:3
12:5

**responsibilities**
28:12
**responsible**
25:22
**rest** 122:12
**restaurant**
110:4 111:8
117:2 127:16
**restrict** 48:17
**result** 105:14
**resulting** 113:23
114:9,19 115:1
**results** 94:2
**retail** 23:5,12
24:20 30:25
31:1,16,20,22
59:13,19 60:3
60:12,21 61:9
61:14,16,19,21
61:23 62:1,4,4,5
62:18,23,24
63:4,5,17,17
105:20 111:18
111:19,21,22
112:6,9,9,16,16
113:3 115:6
128:9
**retained** 21:19
38:13,18,20
130:22 131:10
**retainer** 17:2
**retaining**
102:19
**returned** 104:6
136:16

**review** 13:9
20:7 21:20 33:8
34:19 41:18
43:19 44:12,22
47:21 51:24
52:2,10,16,25
55:7 79:25 85:5
129:11 135:6
136:10
**reviewed** 11:1,3
11:6 13:11
20:11,21 35:2
39:19 44:9,18
45:16 46:11
56:15 107:13
**reviewer** 102:20
**reviewing** 19:15
32:14 59:17
60:24 63:8
75:13 93:14
103:25
**rexall** 3:16,18
65:7 66:7 67:4
67:14,18 68:1
68:20 69:14
70:25 71:4,5
**richmond** 2:15
136:3
**right** 5:1,8,19
5:25 6:5 7:13
8:23 9:13,18,25
10:14 13:24
16:13 18:9
22:14 30:9
32:17,21 33:16

34:22 36:2
38:20 39:18
40:20 48:16,20
52:4,12,14,21
53:2,12 59:19
60:9 63:12
67:23 68:15
70:12 75:3,5,6,9
75:14,24 76:5
76:14 79:5 80:6
80:12 81:5,17
82:5,9 83:25
84:22 85:17
87:14 89:2,8,13
89:19,20 90:6
91:20 92:15,22
92:25 95:6,11
96:24 97:2
100:11,18
101:13,21
102:17 103:8
105:20 108:1,10
109:24 111:5,21
111:23 112:5,9
112:10 113:2,11
113:20,24 115:2
116:18 117:1,2
117:5,21 118:1
119:12 122:13
123:10,11,13,19
124:8 126:8
127:10 128:5,13
128:22 131:25
132:14,17,25

**[ring - see]**

**ring**  27:3
**ringing**  27:3
**rings**  111:22
**risk**  25:15
**rmr**  1:23 134:14
  135:17
**robust**  24:7
**rochester**  73:25
  75:3,10 77:2,11
  89:19 91:13
**room**  9:8 36:3,6
**rotations**  37:25
**roughly**  8:8
**route**  29:22
**row**  54:8 57:14
  79:24 81:9
  113:4,7,8,13
  115:14,16
  128:16
**rows**  57:10
  121:17 128:7,12
**rtaylor**  2:15
  136:3
**rule**  46:7 136:23
  136:24
**rules**  26:19
  131:2 136:17
**run**  56:2 86:12
  93:15
**rung**  102:14
**running**  113:21
  114:7,16

**s**

**s**  1:23 2:1 3:9
  4:1 7:1 134:5,14
  135:2,17
**sajnani**  1:16,22
  3:1,12 4:5 5:3
  5:24,25 10:5,14
  16:25 36:2
  76:12 84:22
  93:5 105:11
  108:10 121:2
  126:8 132:14
  133:6 134:7
  135:5 136:8
  137:2,23
**sale**  57:16 61:4
  65:18 71:7
  101:3 102:13
  105:7 111:19,21
  112:9
**sales**  57:24 58:6
  79:3,11,16
  97:20 98:4,10
  99:8 113:17
  121:3,14 126:23
  128:9,17,20,21
  128:25
**santander**  6:22
  6:24
**sarasota**  134:3
**sarbanes**  37:25
**sat**  59:3
**save**  82:22
**saw**  39:25 40:11
  47:22 118:15

**saying**  31:6
  48:17 50:8 69:7
  80:17 81:8 95:1
  95:20 100:21
  101:5,8,23,24
  101:25 105:3
  111:25 116:13
  124:21 130:4
**says**  37:8 54:2
  59:16,19 60:7
  69:22 70:25
  75:21,25 76:2
  80:14 87:3
  89:18 109:18
  113:3,10 117:1
  117:1,5 118:13
  128:14
**scan**  87:11,13
  87:16 103:14,17
  106:16
**scanned**  74:2
  75:22 80:15
  100:7 101:7,7
  107:4 108:18
  109:8,20 112:14
  113:22 114:8,18
  126:18 129:3,8
**scanner**  100:23
  100:24 101:1
  104:5,13,14,18
  104:25 106:2,6
  107:5
**scanners**  102:25
  103:2,11,12,13
  103:24 104:22

  105:4,14
**scanning**  100:23
  107:1,2,13
  126:17
**scope**  28:20
**scratch**  51:16
**screen**  11:23
  54:6 66:3 70:15
  70:22 71:2 76:2
**screenshot**
  70:24 86:15
  89:3 91:11
**scroll**  37:4 71:2
  78:24 89:21
  91:22 109:9
  111:17 113:2
  128:4
**seal**  134:10
**sec**  67:13 73:16
**second**  10:2
  57:2 64:23 66:4
  68:6 69:23 95:3
  108:2 115:18
  118:9 127:22
**secondhand**
  31:7,8
**section**  39:9,12
  51:19 55:14
  75:14 99:19
**see**  9:19,22,24
  10:16 21:10,14
  28:16 37:9,10
  40:4,7 41:4,7
  51:21 53:12,13
  53:24 57:12

**[see - sku]**

59:13 60:3,6,7
60:10 61:13,18
61:24 65:9 66:7
68:21 69:3,22
70:15,20,25
71:5,5,7,9 73:19
74:5,10,14,14
78:15,22 79:15
82:10 86:10,13
86:23 87:2,10
88:25 89:5,16
89:17,17,22,25
91:25 96:14
99:18,25 107:16
108:15 109:21
110:14 111:9,18
112:8,17,18,24
113:16 115:25
115:25 117:3,11
117:17 118:8,17
118:18 119:9
120:15,15
122:13,16,18
123:4 126:18
128:8,10,12,15
128:16,23
**seeing** 34:1
127:7
**seem** 61:6
**seems** 78:18
89:10 92:9,10
**seen** 19:20 45:9
76:12 92:22
103:6 104:7
106:19 107:9,16

**selected** 44:22
49:24 50:13
**selling** 31:3
114:13
**sells** 83:25
**send** 25:25
**sense** 24:12
**sent** 19:11 26:9
**sentence** 21:15
51:19 52:6
**services** 17:23
**set** 33:15 41:10
41:22 42:10,25
43:10 49:10
55:23 56:18
62:6,15 64:20
101:19 109:15
120:3,12 123:21
**sets** 42:3 96:21
**several** 11:3,9
13:16 27:9 51:2
**severally** 1:10
**share** 10:15
56:3 82:15
**shared** 81:13,16
129:16 131:16
**shave** 122:14
124:13
**shaving** 117:15
119:8,12,16
120:10 122:24
123:7,20
**sheet** 3:7 136:12
136:14

**shelf** 27:1,2
58:11,12,19,20
59:4,13,19 65:8
74:1 75:21 80:8
80:15 100:6,16
101:6,24 102:13
105:1,13 108:17
109:8 111:18
112:9,14 114:17
117:16 119:16
123:7 126:16
**shoot** 107:25
**shops** 31:9
**show** 106:3
**showed** 74:3
80:5,16 100:9
108:22 116:15
**showing** 77:10
81:3
**shown** 90:18
94:1 97:1
**shows** 100:24
101:8 106:3
113:6
**sic** 7:9 21:23
28:7 84:15
**side** 38:11 39:3
53:24 57:2,2
88:20
**sign** 3:6 17:2
136:13
**signature**
134:14 135:17
**signed** 15:12
64:12 136:19

**significantly**
93:18
**signing** 133:21
**similar** 8:13
49:7 89:7,10
117:4
**similarly** 1:5
**simpler** 114:24
**simply** 130:12
**sir** 5:23 87:21
**sit** 93:19
**sitting** 18:9
34:25 35:11
44:20 46:9
50:12 51:6
54:16 58:5,24
72:17 73:1
77:25 78:7
95:14 96:4
97:24 112:5,24
115:5,15 116:23
125:10
**situated** 1:5
**situations** 24:15
29:1 30:6 93:16
**six** 6:1,3 37:7,12
40:4,10,16 41:1
**size** 71:6
**skintimate** 3:25
117:15 119:8,11
119:16 120:10
122:14,24 123:7
123:20 124:13
**sku** 66:23 67:18
68:1,5,6,8 69:17

69:25 71:13
72:8,12 78:24
**skus** 97:5
**slow** 19:4
**smaller** 56:10
**smoothies** 3:23
91:19
**smoothy** 93:7
97:1
**solutions** 4:12
4:14 136:22
**somebody**
102:20
**soon** 81:23
**sorry** 8:22 11:10
14:21 31:6 36:7
68:4 81:19 84:6
88:12 104:10
116:7 119:23
**sort** 30:14 54:2
54:7,8 56:17,24
57:3,6,9 63:3
65:15 67:9
68:16 78:13
95:5 110:22
111:5 122:7
127:14,18
**sorted** 54:6
**sorts** 48:11
**sound** 24:7
**sounded** 119:24
**sounds** 16:4
33:6 50:12
54:11 58:1
67:23

**south** 2:4 71:10
**southern** 1:1 4:9
**space** 8:17
**spanish** 6:24
**speak** 81:8
**speaking** 60:8
**specialities** 14:2
**specific** 18:7
19:6 26:11
33:23 34:1 43:2
44:14 46:16
47:15 49:14,18
51:3,13 74:22
77:5 78:6 79:24
81:9 83:9,18,24
93:2 121:7,17
122:4 125:2
127:6 128:10
129:7
**specifically**
19:22 26:9
27:20 31:25
33:14 37:17
38:2 44:15
52:12 55:22
89:4 102:4
106:1,25 111:5
119:6 123:2
**specifics** 77:23
78:5,7 121:22
**specifying** 130:4
**spell** 6:25
**spending** 59:17
112:1

**spent** 19:6,15
**spinning** 78:19
**spoke** 107:13
**spoken** 55:3
**spot** 26:20 73:6
125:11
**spreadsheet**
3:13,14 19:16
19:20,21 43:3
53:5,19 54:22
55:5,8,13,22
56:8,10,18,25
57:24 58:7
59:22,25 60:2,8
61:12 62:7,14
62:14,19 63:6
63:18,25 67:8
71:18 72:22
78:11 79:4,17
79:25 94:22
97:21 98:11
99:9 110:21,24
111:4 115:10,20
117:1,3 120:19
120:23 121:4,10
121:14,20 122:1
122:22 123:9,13
123:22 124:17
126:22 127:23
129:12
**stand** 133:3
**standalone**
20:25
**standpoint**
24:22 32:15,19

102:1,2
**start** 41:5 51:17
122:7
**started** 5:10
47:23 58:10
64:14
**starting** 39:23
41:4,23 42:11
43:11 47:17
49:25 50:14
58:18 89:22
**starts** 21:15
51:20 65:3
68:21
**state** 1:25 4:15
5:22 17:13,15
39:14 40:24
48:13 50:13
75:23 80:4 95:3
95:14 102:17
108:23 117:13
118:24 134:2,6
134:15
**stated** 17:10
29:5 38:5 40:24
60:25 95:9
111:12 122:22
137:20
**statement** 23:7
23:8 76:24
**statements**
119:7
**states** 1:1 4:8
22:11 60:3
61:18,23 78:25

87:6 99:20
104:3 111:7
113:14 116:14
116:17
**stating** 105:19
116:6
**statute** 136:17
**stenographic**
135:8
**stenographica...**
135:4
**step** 93:25
124:24
**steps** 72:16
83:18 93:23
94:6
**stick** 113:16
**sticker** 9:19
86:21 91:1,6
**stock** 71:10
89:18
**stopping** 73:6
81:20
**store** 25:8 26:11
26:15,18 31:20
58:11,19 61:13
61:16 62:4,17
62:23 63:4,17
65:6,7 71:4
73:25 74:3 75:2
75:9 77:2,11
80:5 83:25 89:4
91:12 100:5,9
102:9 104:5
105:13 114:8

116:8,15 117:14
117:16 123:6,7
**stores** 20:16
21:22 30:25
31:2,22 36:14
40:12 103:1
131:11
**straight** 120:3
**strategic** 29:23
**street** 2:4,14
71:11 118:13
136:2
**stuck** 127:23
**style** 110:4
111:8 117:2
127:16
**submission**
64:15
**submit** 17:5
**submitted** 18:25
**subsequent** 52:9
**sufficient** 45:16
**suggest** 106:10
**suggested**
136:16
**suitable** 13:19
**suite** 2:4,8
**summary** 118:5
118:7
**sunil** 1:16,22
3:1 4:5,25 5:3
5:24 133:6
134:7 135:5
136:8 137:2,23

**superior** 26:17
**supplement**
52:2
**supplemental**
8:5,25
**supports** 50:23
**suppose** 114:13
**sure** 9:15 12:4
17:11 18:6
20:14 26:5 37:5
41:17 54:5 56:3
59:17 73:8 81:8
90:17 98:8 99:7
104:10 114:6
116:6 125:22,24
**surface** 26:25
27:6 28:1,15
32:21
**surfaces** 52:17
**sworn** 5:5 134:8
**system** 27:2
103:2 105:7

**t**

**t** 3:9 7:1
**t1** 61:13
**tab** 53:22 65:15
**tablets** 87:7
**tabs** 19:21 66:20
121:17
**tag** 56:9 101:24
**tagless** 54:9
**take** 26:25 27:1
29:21 30:16
31:15 53:3,15
68:16 73:7,9,9

78:14 81:24
84:9 103:10
105:24 123:12
125:20
**taken** 1:17,19
4:6 13:7 86:15
89:3 102:12,13
136:8 137:2
**takes** 23:6 29:7
**talbott** 14:20,22
**talbott's** 14:23
**talk** 24:9
**talked** 14:12,15
**talking** 7:20
19:17 45:11
46:20 85:18
106:14 121:11
**target** 23:13,20
32:5,5,9 33:4,8
34:10 35:9
**task** 19:6
**tasked** 50:21
**taylor** 2:13 4:22
4:22 5:11 8:8,10
9:1,7 10:3,6
14:4,14 15:3,5
15:16,21,25
16:9,16,19
19:18 20:2,9,22
22:7,19 24:2,17
25:12 27:14,23
28:10 29:4,20
31:13 32:2,11
34:4,16 35:4,12
36:7,15,21

**[taylor - think]**                                                    Page 170

| | | | |
|---|---|---|---|
| 37:13 38:15,23 | 95:19 96:9,12 | 37:22 59:7,7 | **testimony**  5:14 |
| 39:5 40:2,14 | 96:19 97:3,9,23 | 62:3,11 68:14 | 6:12 12:19,20 |
| 41:14,25 42:13 | 98:14,20,25 | 68:17,22 69:10 | 37:8 38:3,8 39:3 |
| 42:20 43:6,12 | 99:12 100:19 | 70:7 71:21 | 48:3 67:1,17 |
| 43:24 44:5,8,10 | 101:14 102:10 | 75:19 76:19,19 | 97:17 103:21 |
| 44:11,23 45:3 | 103:18 104:20 | 77:25 88:25 | 104:21 105:1 |
| 45:13,22 46:5 | 105:2,16 106:17 | 97:4,5 100:14 | 106:22,23 |
| 46:13 47:9,18 | 107:7 109:3,25 | 112:1 123:15,17 | 107:12 114:1,12 |
| 48:7,22 49:12 | 110:5,11 111:14 | 124:15 | 116:12 123:24 |
| 50:3,16 51:9 | 111:24 112:23 | **telling**  16:4 33:6 | 133:6 136:11,16 |
| 52:8,23 54:15 | 113:25 114:11 | 43:21 | **texas**  1:9 8:16 |
| 54:24 55:9,16 | 115:18 116:10 | **temperature** | 8:19 |
| 55:24 56:20 | 116:21 117:6 | 25:22 | **thank**  5:7 30:19 |
| 57:18 58:14,21 | 119:2,19 120:1 | **ten**  18:10 19:25 | 66:22 132:24 |
| 59:5,10,23 | 120:14,21 121:6 | 33:22 35:10 | 133:1,19 |
| 60:15,22 62:8 | 121:15 122:25 | 41:10 46:23 | **theme**  30:16 |
| 62:20,25 63:19 | 123:14,23 | 47:16,16 48:20 | **thing**  7:18 77:21 |
| 64:16 66:25 | 124:11,18 125:8 | 48:24 49:3,10 | 80:17 |
| 67:20 68:12,22 | 126:25 129:5,13 | 49:24 50:14 | **things**  6:20 7:3 |
| 68:25 69:19 | 129:19 130:1,16 | 51:4,6 64:19 | 11:24 12:1,6 |
| 70:6 71:19 72:1 | 130:25 131:6,13 | 65:13 83:12 | 13:25 24:9 33:8 |
| 72:5,13,23 73:5 | 131:21 132:3,18 | **tennessee**  2:4 | 42:4,4 47:22 |
| 73:11 74:20 | 132:23 133:7,9 | **terminal**  61:4 | 94:12,14 |
| 75:15 76:6,18 | 133:13,15 136:1 | **terms**  28:21,22 | **think**  10:1,15,16 |
| 77:15 78:4 | **taylor's**  14:17 | 29:6 | 13:13 18:17 |
| 79:10,13,22 | 36:6 44:11,17 | **test**  12:25 | 19:25 21:10 |
| 80:13,23 81:6 | 120:18 | 115:12 125:14 | 22:7 24:4 27:9 |
| 81:20 82:1,17 | **teams**  102:25 | **tested**  46:21 | 30:13 33:16 |
| 83:5,17,21 84:1 | **technical**  69:11 | **testified**  5:5 | 44:7 48:2,15 |
| 84:11 85:9,15 | **technically**  60:8 | 101:2 | 52:15 67:23 |
| 85:16 86:19 | **technological** | **testifying**  84:24 | 76:16 77:18 |
| 87:15,24 88:5 | 103:3 | 119:25 | 78:16,19 80:14 |
| 88:11 89:9 92:8 | **telephone**  9:11 | **testimonial**  15:2 | 91:3 93:13,14 |
| 92:14,19 93:1 | **tell**  11:21 16:17 | **testimonies** | 94:9 95:1,8,20 |
| 93:10 94:3,25 | 18:10 21:1 | 106:8,20 | 96:2 97:17,18 |

99:15 100:14
101:11 107:17
114:22 116:1,13
119:3,4 120:1,7
122:3,11 125:9
127:8 130:3,7
131:2,15,16
**thinking**  82:19
**third**  26:23
28:13,19
**thorough**  55:7
129:10
**thousand**  18:11
18:12 33:19
**three**  8:8 9:1
40:5 117:10
**throws**  94:15
**time**  1:21 5:18
10:21 15:2 17:5
18:4,25 19:1,2,7
19:15,23 23:13
25:6,19,19
30:11 49:5
57:20 58:4,6
59:17 62:11
63:10 64:3
65:11 68:16
76:10 77:4,22
79:24 82:22
83:10 94:4 98:7
112:1 115:9
117:19 121:8
122:12 125:13
129:21 133:11

**times**  6:1,3,6
14:18 15:19
93:15 106:5
**title**  89:12
118:18
**today**  5:14 6:6
7:5,25 8:3,12
9:5 10:20,23
11:16 15:21
16:4 18:9 33:25
34:25 35:11
44:20 46:9 48:3
50:12 51:6
56:15 58:5
63:25 77:25
84:25 95:14
96:4 112:5
115:5,15 129:25
130:15,24
131:12
**today's**  133:6
**together**  7:25
47:23
**told**  8:23
**tonawanda**
100:6 102:9
108:12
**took**  72:17
74:16 108:11
117:10 118:20
118:23 123:20
128:9
**tools**  31:4
**top**  51:12 53:25
66:21 73:18

76:22 80:4
86:17 87:5 89:5
107:15 118:11
**tortilla**  3:24
42:25 100:3
103:16 106:15
109:16 110:16
113:22 114:8
126:17 128:13
**tortillas**  99:24
108:14 109:19
110:4 111:8
114:17 116:8
117:2 126:11
127:16
**total**  18:5,14
19:23 47:6,8
113:10,14,17
128:9,9,14,20
128:21,23,25
**touch**  14:9
**tough**  86:23
97:5
**towards**  17:13
107:17
**trading**  37:20
**transaction**
54:22 65:19
107:1,3,8 128:8
**transcript**  13:3
13:9 133:15
135:6,7 136:10
136:18
**transcripts**  11:2
11:4,6 13:12

51:25 136:14
**trent**  2:13 4:22
5:9 10:1 82:15
84:10 119:25
136:1
**tried**  15:19
107:25
**true**  29:17 135:7
137:21
**truth**  107:3
**try**  7:5,20,24
9:19,20,21 12:7
19:8 34:19
36:11 90:25
91:3 96:2 97:19
99:6 114:24
**trying**  11:12
12:24 18:6 70:8
70:14 82:21
86:20 115:11
120:2,7
**tums**  3:19,21,22
3:23 73:19,22
74:14,18 76:1,4
76:21,25 77:12
78:3,21,25 79:4
79:16 80:20
81:4,12,22 82:2
82:4,4 83:2
85:20,24 86:4
86:17 87:1,2,3,6
88:14 89:12,24
90:6,9,18,20
91:14,16 93:7
93:22,22 94:21

95:16 96:6 97:1
**turn** 64:24 66:4
99:18 117:9
**twice** 6:7
**twitter** 26:1
**two** 15:15 33:18
37:17 70:8
89:18 90:18
91:4 109:20,21
110:3,6,8,9,9,9
110:14,15,20
111:8,12 113:16
113:21 115:8,17
116:7,19 117:2
117:7 127:17
128:23
**type** 6:18,19
30:16 32:22
48:18 51:13
104:14 107:13
130:8
**types** 48:14
103:13
**typically** 25:21
**typo** 119:4

**u**

**u** 65:16
**u.s** 2:8
**uh** 12:7,7,7
**unable** 77:25
**uncommon** 26:8
**under** 6:13 32:6
51:19 54:8
60:12 61:13,23
66:7 67:14

69:13 70:24
74:13 84:23
99:19 111:7
118:18 136:17
137:20
**undercharged**
109:1
**underlying** 94:9
95:5,8,21 127:8
**understand** 7:8
10:16 34:20
41:17 57:16
84:25 94:11
110:12
**understanding**
14:6 16:6 44:3
54:13 56:3
63:13 83:22
84:7 104:21
106:8 121:2
**understood**
7:15 33:17
49:19 127:12
130:10
**undertook**
127:6
**unfortunately**
17:1
**unique** 83:25
**unit** 4:4 35:20
35:23 71:5
84:15,19 113:3
115:6 125:20
126:2,5 128:8
128:23 133:4

**united** 1:1 4:8
**units** 113:10,14
113:16 128:9,14
**universal** 83:20
**unnecessarily**
107:23
**unquote** 28:21
**upc** 69:25 82:8
82:10,19,24
83:3,20 85:23
86:3 87:13,23
88:4,9,11 90:9
90:10,17,20,23
91:23 92:7
94:24 97:2
**upcs** 95:4
**updates** 103:2
**upload** 91:6
**url** 87:5 91:24
**use** 25:7 66:20
86:16 107:14
**used** 54:20
105:4 136:19
**uses** 104:19
**using** 100:23
101:11 102:25
102:25 103:14
103:24

**v**

**v** 1:7 4:7 136:7
137:1
**variables**
114:23
**variety** 23:22
26:2,19 33:15

48:16 63:8 94:6
103:3,21,25
105:4
**vary** 46:17
**verbal** 12:2,5
**verification**
65:25 118:5,7
**verified** 61:3
**verify** 94:2
120:8 136:11
**veritext** 4:12,14
136:14,22
**veritext.com**
136:14
**versus** 107:5
**vicinity** 88:6
**video** 4:5 133:16
133:18
**videoconferen...**
1:17
**videographer**
2:20 4:2,12 10:7
10:10 35:19,22
84:14,18 108:3
108:6 125:16,18
125:19,23 126:1
126:4 132:5,8
132:11 133:3,19
**videotaped** 1:16
3:1
**view** 66:2
**violation** 57:15
119:22 122:16
122:17,19

**virginia** 2:15
  136:3
**volume** 39:21
  42:3

---

**w**

**w** 112:15
**w1** 61:18
**wait** 115:18
**waive** 133:8
**waived** 133:21
**walk** 31:18
  54:18 63:13
  64:19 94:7
**walked** 95:10
**walmart** 3:21
  86:15 88:15
  89:8 90:6 92:23
**walmart.com**
  87:6
**want** 5:8 19:2
  36:9 41:17
  49:15 54:5 63:9
  68:3 82:15
  84:23 90:16
  98:7 115:22
  126:8,13 127:18
  132:5
**wanted** 5:13
  97:16 104:10
**wants** 102:20
**waterhouse**
  23:12 25:5 28:7
  33:5,7 34:10
**way** 9:21 25:17
  25:18 26:11,14

26:15 27:2,12
27:20 29:19
32:18 35:10
37:16 50:5 91:1
97:7 98:23 99:6
103:8 105:7,9
105:23 115:5
121:25 125:11
128:4
**ways** 25:15
32:13,24
**we've** 10:17
53:18 56:18
61:12 62:7
65:25 90:19
92:22 93:6
111:4 120:20
121:10 125:19
**website** 3:18,23
70:24 86:15
89:4,23 90:24
91:12,24
**week** 13:8,12
**weir** 8:5,25
21:23 22:12
**went** 10:14 94:6
98:18 99:10
106:24 116:4
**wework** 8:13
**wheel's** 78:19
**whew** 54:12
**wilner** 13:4,5
**witness** 3:4 5:4
5:6 45:7 69:1
74:10 82:2

88:16 120:4
132:4 133:1
134:1,7,10
135:5 136:11,12
136:13,18
**witnesses** 13:25
14:1
**wolf** 1:4,4 3:13
3:14,16,19 4:7
53:4 56:13 65:9
71:18 117:17
121:12 122:2
136:7 137:1
**wondering** 13:8
59:21
**woods** 2:13
14:10,13,16
15:1 17:23
19:11 136:1
**words** 54:7
**work** 7:25 9:16
16:22 17:5
18:14 24:21
26:16 28:20
33:3 34:10 35:9
41:11 52:13
104:7 105:9
**worked** 14:25
15:15,21,24
16:3,16 37:11
41:21
**working** 15:3,4
17:20 19:7 28:4
28:25 33:2
64:14 88:2

130:12
**wrap** 132:1
**write** 21:17
  25:25 82:24
  88:9
**writings** 49:9
**written** 90:23
  116:2 125:15
**wrong** 100:14
  100:15 102:8
  118:25
**wrote** 51:23
  67:18 82:20
  85:23 86:1

---

**x**

**x** 3:2,9 112:16
**x1** 61:23

---

**y**

**yeah** 6:18 11:13
  15:14 18:21
  23:19 24:11
  25:14 27:19
  28:12 29:5 30:4
  32:13 40:16
  42:8,22 44:3
  45:16 47:10
  49:4,19 54:16
  55:18 58:23
  63:21 68:14
  70:13,13,15
  71:6 76:8 77:4
  77:21 80:24
  83:8 84:4 86:1
  86:24 88:6 95:1

**[yeah - zoom]**                                                    Page 174

96:15 97:12
98:9 100:21
103:20 104:12
105:19 110:1,24
114:3,6 116:22
118:12 119:4
122:3 124:21
125:9 127:2,13
127:20 129:7,7
129:23 130:7,10
131:15
**year**   16:16
**years**   23:4 24:11
  33:22 35:10
  37:9,12,15,17
**yep**   86:2 118:15
**yesterday**   8:9
  9:1
**york**   1:1,9 4:9
  4:23 20:16,20
  21:22 31:22
  32:1,4,10 33:4
  33:11,12,14,16
  34:1,11 35:2
  36:13,20 40:13
  44:9,15 45:21
  46:3,10 47:7
  48:5 58:11,19
  60:19 65:6
  66:11 71:11
  72:10,20 73:25
  75:3,10,12 77:3
  77:12 81:12
  83:3,16 85:24
  86:4 89:19 90:9

91:13 93:8
94:24 96:7 98:6
100:6 102:9,17
107:4,14 112:12
112:13 117:15
118:6,10,14,20
123:6 129:4,17
129:24 130:14
130:23

**z**

**z**   113:2,5,6,8,16
  115:16
**zoom**   9:11 66:21
  86:16,16

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.